**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | |
|---|---|
| REJI SAMUEL, ATHA MOHAMMAD ABDUL, KESAVARAO BUNDANKAYALA, RAJU DIVAKARAN, BIJU PERUMPILLY GEORGE, KRISHNA GONTHINA, NAYAPPULLI JAYACHANDRAN, GALLA VENKATA RAMA KRISHNA, SAMUEL JOSE KUMRUMTHODATHIL, LOHITHAKSHAN MADAMPET, JOHNY MANDY MATHAI, BELTHAZAR PETER, MOHANAN BALAKRISHNA PILLAI, SANTHOSH KUMAR RAJENDRAN PILLAI, ABY KARICKATHARA RAJU, SUMESH PORAMBATHUPARAMBIL SUBRAMANIAN, and CHANDRAN SHAJU THANISSERY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )  Civil No. |
| Plaintiffs, | ) ) |
| v. | ) ) |
| SIGNAL INTERNATIONAL L.L.C., SIGNAL INTERNATIONAL, INC., SIGNAL INTERNATIONAL TEXAS, G.P., SIGNAL INTERNATIONAL TEXAS, L.P., MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS), | ) ) ) ) ) ) ) ) |
| Defendants. | |

1

# COMPLAINT

# INTRODUCTION

1.     Plaintiffs (as defined below) and approximately 590 Indian men, were trafficked into the United States through the federal government's H-2B guest worker program to provide labor and services (the "Indian H-2B Workers") to Defendants Signal International L.L.C., Signal International, Inc., Signal International Texas, L.P., and Signal International Texas, G.P. (collectively "Signal").  Recruited to perform welding, pipefitting, and other marine fabrication work, Plaintiffs were subjected to forced labor and other serious abuses at Signal operations in Orange, Texas.

2.     Plaintiffs bring this action to recover damages inflicted by Signal and Signal's recruiters and agents operating in India, the United Arab Emirates, Saudi Arabia, and the United States.  Defendants, defined below, have exploited and defrauded Plaintiffs by fraudulently recruiting them to work in the United States and effectuating a broad scheme of psychological coercion, threats of serious harm and physical restraint, and threatened abuse of the legal process to maintain control over Plaintiffs.

3.     Lured by, and in reliance upon, Defendants' fraudulent promises of legal and permanent work-based immigration to the United States for themselves and their families, Plaintiffs plunged themselves and their families into debt to take advantage of these seemingly promising opportunities. Plaintiffs incurred significant debts to pay mandatory recruitment, immigration processing, and travel fees charged by Defendants totaling as much as $12,000 to

2

US2008 4422703 12

$20,000[1] per worker, equivalent to two to three years of an Indian welder's salary working in India.  Trusting the veracity of the immigration and work benefits promised by Defendants, Plaintiffs further relinquished stable employment opportunities in India and as guest workers in the Persian Gulf and Singapore.

4.      Defendants' main recruiting agents in India and the United Arab Emirates held Plaintiffs' passports and visas, and threatened, coerced, and defrauded Plaintiffs into paying extraordinary fees for recruitment, immigration processing, and travel.  Several Defendants further caused Plaintiffs to believe that if they did not work for Signal under the auspices of temporary, Signal-restricted, H-2B guest worker visas, they would suffer abuse or threatened abuse of the legal process, physical restraint, or other serious harm.

5.      The false promises, collection of exorbitant recruiting fees, and strong-arm tactics of Signal and its agents were, upon information and belief, authorized by Defendant Signal. Defendant Signal knew of the exorbitant fees charged and the Indian H-2B Workers' green card expectations by December 2006, before any of Plaintiffs arrived at Signal's facility.  (Order and Reasons Denying Class Certification, at 33, *Kurian David, et al. v. Signal International, LLC, et al.*, 2:08-cv-01220-SM-DEK, (E.D. La. Jan. 4, 2012), ECF No. 1117.)  Far from taking any corrective measures, Defendant Signal ratified and perpetuated the scheme by continuing to facilitate the transportation of additional waves of Indian H-2B workers, including Plaintiffs, from December 2006 through February 2007.

---

[1] Payments were made by Plaintiffs in both Indian Rupees and United States Dollars. For the purposes of this Complaint, all payments made in Indian Rupees discussed throughout the Complaint were converted to United States Dollars.  An exchange rate of 45 Indian Rupees to 1 United States Dollar was utilized as the approximate exchange rate for the relevant period.

3

6.     Upon Plaintiffs' arrival in the United States, Defendant Signal required that Plaintiffs live in a guarded, overcrowded, and isolated labor camp located in Orange, Texas (the "Texas Labor Camp").   Defendants further deceived Plaintiffs regarding their visa status, threatened Plaintiffs with arrest, loss of immigration status and deportation, and generally perpetrated a campaign of psychological abuse, coercion, and fraud designed to render Plaintiffs afraid, intimidated, and unable to leave Signal's employ.

7.     Defendant Signal subjected Plaintiffs to discriminatory and offensive mandatory room and board arrangements at the Texas Labor Camp to which non-Indian and United States citizen employees were not subjected.   Moreover, Defendant Signal imposed upon Plaintiffs discriminatory job-related requirements and adverse terms and conditions of employment on Plaintiffs to which non-Indian and United States citizen employees were not subjected. Defendant Signal subjected Plaintiffs to an objectively hostile and abusive work environment on account of Plaintiffs' race and alienage.

8.     Plaintiffs assert claims against Defendants arising from violations of their rights under the Victims of Trafficking and Violence Protection Act ("TVPA") (18 U.S.C. § 1581, et al.; the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Civil Rights Act of 1866 (42 U.S.C. § 1981); the Ku Klux Klan Act of 1871 (42 U.S.C. § 1985); the Declaratory Judgment Act (28 U.S.C. §2201); and claims for damages arising from fraud, negligent misrepresentation, and breach of contract.

4

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), 18 U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 1343 (civil rights).

10.      This Court has supplemental jurisdiction over the causes of action based on state law pursuant to 28 U.S.C. § 1367(a), as the state law claims arise out of the same nucleus of operative facts which support the federal claims.

11.      Venue is proper in the Eastern District of Texas under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 in that Defendants and/or agents of Defendants, resided or have been found in Orange, Texas during the relevant time periods and a substantial portion of the communications, transactions, events or omissions underlying Plaintiffs' claims occurred to secure labor for Signal's Orange, Texas operations in this judicial district.

12.      Declaratory relief is sought under 28 U.S.C. §§ 2201 *et seq.*

**PARTIES**

Plaintiffs

13.      Plaintiffs are of South Asian Indian descent, Indian nationals, and former H-2B guest workers who were recruited from India or the United Arab Emirates by Defendants at various times within calendar years 2006 and 2007.

14.      Plaintiffs are members of a racial minority, as contemplated by 42 U.S.C. §1981.

15.      At all relevant times, Plaintiffs were "persons" within the meaning of that term as defined by RICO, 18 U.S.C. § 1961(3).

16.      At all relevant times, Plaintiffs were employed by Defendant Signal.

5

17.     At all relevant times, Defendants were engaged in interstate commerce or in the production of goods for sale in interstate commerce.

18.     Plaintiffs were former putative class members in the Civil Action styled *Kurian David, et. al. v. Signal International, LLC, et.al*., 2:08-cv-01220-SM-DEK, currently pending in the United States District Court for the Eastern District of Louisiana.  On January 4, 2012, class certification was denied, thus paving the way for Plaintiffs to file individual actions.  Order and Reasons Denying Class Certification, at 33, *Kurian David, et al. v. Signal International, LLC, et al*., 2:08-cv-01220-SM-DEK, (E.D. La. January 4, 2012), ECF No. 1117.

19.     Plaintiff Reji Samuel ("Plaintiff Samuel") is a resident of Texas and a pipefitter and welder by trade.  Plaintiff Samuel was induced by Defendants to leave Mumbai, India on an airplane on or about December 12, 2006 to work for Defendant Signal in Orange, Texas.

20.     Plaintiff Atha Mohammad Abdul ("Plaintiff Abdul") is a resident of Texas and a pipefitter by trade.  Plaintiff Abdul was induced by Defendants to leave Mumbai, India on an airplane on or about December 11, 2006 to work for Defendant Signal in Orange, Texas.

21.     Plaintiff Kesavaro Budankayala ("Plaintiff Budankayala") is a resident of Texas and a pipefitter by trade.  Plaintiff Budankayala was induced by Defendants to leave Mumbai, India on an airplane on or about December 11, 2006 to work for Defendant Signal in Orange, Texas.

22.     Plaintiff Raju Divakaran ("Plaintiff Divakaran") is a resident of Georgia and a pipefitter by trade.  Plaintiff Divakaran was induced by Defendants to leave Mumbai, India on an airplane on or about December 9, 2006 to work for Defendant Signal in Orange, Texas.

US2008 4422703 12

23.     Plaintiff Biju Perumpilly George ("Plaintiff George") is a resident of California and a welder by trade.  Plaintiff George was induced by Defendants to leave Mumbai, India on an airplane on or about December 3, 2006 to work for Defendant Signal in Orange, Texas.

24.     Plaintiff Krishna Gonthina ("Plaintiff Gonthina") is a resident of Texas and a welder by trade.  Plaintiff Gonthina was induced by Defendants to leave Mumbai, India on an airplane on or about December 13, 2006 to work for Defendant Signal in Orange, Texas.

25.     Plaintiff Nayappulli Jayachandran ("Plaintiff Jayachandran") is a resident of Louisiana and a pipefitter by trade.  Plaintiff Jayachandran was induced by Defendants to leave Mumbai, India on an airplane on or about January 23, 2007 to work for Defendant Signal in Orange, Texas.

26.     Plaintiff Galla Venkaga Rama Krishna ("Plaintiff Krishna") is a resident of Texas and a pipefitter by trade.  Plaintiff Krishna was induced by Defendants to leave Mumbai, India on an airplane on or about December 12, 2006 to work for Defendant Signal in Orange, Texas.

27.     Plaintiff Samuel Jose Kurumthodathil ("Plaintiff Kurumthodathil") is a resident of California and a welder by trade.  Plaintiff Kurumthodathil was induced by Defendants to leave Mumbai, India on an airplane on or about December 13, 2006 to work for Defendant Signal in Orange, Texas.

28.     Plaintiff Lohithakashan Madampet ("Plaintiff Madampet") is a resident of Texas and a pipefitter by trade.  Plaintiff Madampet was induced by Defendants to leave Mumbai, India on an airplane on or about December 11, 2006 to work for Defendant Signal in Orange, Texas.

US2008 4422703 12

29.     Plaintiff Johny Mandy Mathai ("Plaintiff Mathai") is a resident of Texas and a pipefitter by trade.  Plaintiff Mathai was induced by Defendants to leave Mumbai, India on an airplane on or about February 15, 2007 to work for Defendant Signal in Orange, Texas.

30.     Plaintiff Belthazar Peter ("Plaintiff Peter") is a resident of Texas and a pipefitter by trade.  Plaintiff Peter was induced by Defendants to leave Mumbai, India on an airplane on or about December 18, 2006 to work for Defendant Signal in Orange, Texas.

31.     Plaintiff Mohanan Balakirshna Pillai ("Plaintiff B. Pillai") is a resident of Texas and a pipefitter by trade.  Plaintiff B. Pillai was induced by Defendants to leave Mumbai, India on an airplane on or about December 17, 2006 to work for Defendant Signal in Orange, Texas.

32.     Plaintiff Santhosh Kumar Rajendran Pillai ("Plaintiff R. Pillai") is a resident of Texas and a pipefitter and welder by trade.  Plaintiff R. Pillai was induced by Defendants to leave Mumbai, India on an airplane on or about January 23, 2007 to work for Defendant Signal in Orange, Texas.

33.     Plaintiff Aby Karickathara Raju ("Plaintiff Raju") is a resident of Georgia and a welder by trade.  Plaintiff Raju was induced by Defendants to leave Mumbai, India on an airplane on or about December 18, 2006 to work for Defendant Signal in Orange, Texas.

34.     Plaintiff Sumesh Porambathuparambil Subramanian ("Plaintiff Subramanian") is a resident of Louisiana and a welder by trade.  Plaintiff Subramanian was induced by Defendants to leave Mumbai, India on an airplane on or about December 10, 2006 to work for Defendant Signal in Orange, Texas.

35.     Plaintiff Chandran Shaju Thanissery ("Plaintiff Thanissery") is a resident of Texas and is a pipefitter by trade.  Plaintiff Thannissery was induced by Defendants to leave

8

Mumbai, India on an airplane on or about February 1, 2007 to work for Defendant Signal in Orange, Texas.

<u>Defendants</u>

*Defendant Signal*

36.     Upon information and belief, Defendant Signal International LLC is a corporation organized under the laws of Delaware and a provider of marine and fabrication services in the Gulf Coast region, with operations in Orange, Texas; Pascagoula, Mississippi; and Mobile, Alabama.

37.     Upon information and belief, Defendant Signal International Texas, G.P. is a general partnership organized under the laws of Texas and employed the labor for Signal International LLC and Signal International, Inc. at the Texas Labor Camp.

38.     Upon information and belief, Defendant Signal International Texas, L.P. is a limited partnership of Signal International, L.L.C. and Signal International Texas, G.P. and is organized under the laws of Texas.

39.     Upon information and belief, Defendant Signal International, Inc. is a corporation organized under the laws of Delaware and a provider of marine and fabrication services in the Gulf Coast region, with operations in Orange, Texas; Pascagoula, Mississippi; and Mobile, Alabama.

40.     Upon information and belief, all policies, money for payroll, corporate governance and legal advice for Defendant Signal International, G.P. was provided by Signal International, L.L.C..

41.     Upon information and belief, all policies, money for payroll, corporate governance and legal advice for Defendant Signal International, L.P. was provided by Signal International, L.L.C..

42.     Upon information and belief, Defendant Signal does distinguish the roles of the Signal entities including, but not limited to, which entity paid Plaintiffs.

43.     Upon information and belief, Defendant Signal International, L.L.C. executed contracts relevant to this Complaint in the name of Signal International, Inc.

44.     Upon information and belief, Signal did not document which entity employed Plaintiffs.

45.     Upon information and belief, Defendant Signal International, Inc. is the sole member of Defendant Signal International, L.L.C.

46.     Upon information and belief, Defendants Signal International, L.L.C. and Signal International, Inc. are and function as, the alter egos of Signal International Texas, G.P. and Signal International Texas, L.P.

47.     Defendants Signal International L.L.C., Signal International, Inc., Signal International Texas, G.P., and Signal International Texas, L.P. will be referred to collectively as "Signal".

48.     Upon information and belief, Defendant Signal paid the Indian H-2B Workers at the Texas Labor Camp through a Texas bank account and Texas payroll account.

*Recruiter Defendants*

49.     Defendant Global Resources, Inc. ("Global") is, or at all relevant times, was, a corporation organized under the laws of Mississippi and engaged in the business of recruiting

10

workers from India, including Plaintiffs, for employment in Texas.  Global entered into contracts with Defendant Signal, Burnett Defendants (defined below), Dewan Defendants (defined below), and Plaintiffs for labor to be provided in Signal's Texas Labor Camp.  Upon information and belief, Global recruited Plaintiffs for employment within Texas.  Upon information and belief, Global committed tortious conduct in Texas.

50.     Defendant Michael Pol ("Pol") is or was the President of Global, and resides in Mississippi.  Defendant Pol entered into contracts with Defendant Signal, Burnett Defendants, Dewan Defendants, and Plaintiffs for labor to be provided in Signal's Texas Labor Camp.  Upon information and belief, Pol recruited Plaintiffs for employment within Texas.  Upon information and belief, Pol committed tortious conduct in Texas.

51.     Defendant Dewan Consultants Pvt. Ltd. (a/k/a Medtech Consultants) ("Dewan Consultants") is a private limited liability company organized under the laws of India, which maintains offices in Mumbai (Bombay), India, and Dubai, United Arab Emirates.  Defendant Dewan Consultants entered into contracts with Defendant Signal, Burnett Defendants, Pol Defendants, and Plaintiffs for labor to be provided in Signal's Texas Labor Camp.  Dewan Consultants recruited Plaintiffs for employment within Texas.  Upon information and belief, Defendant Dewan Consultants committed tortious conduct in Texas.

52.     Defendant Sachin Dewan ("Dewan") is the Director of Dewan Consultants. Dewan resides in India.   Dewan entered into contracts with Defendant Signal, Burnett Defendants, Pol Defendants, and Plaintiffs for labor to be provided in Signal's Texas Labor Camp.  Dewan recruited Plaintiffs for employment within Texas.  Upon information and belief, Dewan committed tortious conduct in Texas.

11

53.     Upon information and belief, Defendants Dewan and Dewan Consultants ("Dewan Defendants") authorized and utilized Defendants Pol and Global, and Burnett Defendants to act as their United States-based operations and/or agents.

54.     Upon information and belief, Defendants Pol and Global, Burnett Defendants and Defendant Signal authorized and utilized Defendants Dewan and Dewan Consultants to act as their India and United Arab Emirates based operations and/or agents.

55.     Upon information and belief, Defendants Dewan, Dewan Consultants, Pol, and Global, and Burnett Defendants, acted as a joint venture with respect to the recruitment, contracting, and retention of Plaintiffs for the provision of labor or services.

56.     Defendants Pol and Global, and Burnett Defendants, utilized Defendants Dewan and Dewan Consultants to conduct and carry out their shared business interests and activities in India and the United Arab Emirates.  Among other things, Defendants Pol and Global shared offices with Defendants Dewan and Dewan Consultants in India and the United Arab Emirates.

57.     Upon information and belief, Defendants Dewan and Dewan Consultants utilized Defendants Pol and Global, and Burnett Defendants, to conduct and effectuate their shared business interests and activities in the United States.

58.     Throughout this Complaint, Plaintiffs refer to Defendants Dewan, Dewan Consultants, Pol, and Global collectively as "Recruiter Defendants."

*Burnett Defendants*

59.     Defendant Malvern C. Burnett ("Burnett") is an attorney who resides and maintains offices in New Orleans, Louisiana.

12

60.     Defendant Gulf Coast Immigration Law Center L.L.C. ("GCILC") is a limited liability corporation organized under the laws of Louisiana and located in New Orleans, Louisiana.  Upon information and belief, Defendant Burnett serves as GCILC's sole registered agent, member, and/or corporate officer.

61.     Defendant Law Offices of Malvern C. Burnett, A.P.C. ("Burnett Law Offices") is a professional law corporation organized under the laws of Louisiana and located in New Orleans, Louisiana.  Upon information and belief, Defendant Burnett serves as its sole registered agent, member, and/or corporate officer.

62.     Upon information and belief, Defendants Burnett, GCILC, and Burnett Law Offices are engaged in a joint venture or are alter egos in that all entities have the same corporate mailing address, intermingle business assets, do not operate at arms' length, and Defendant Burnett serves as the registered agent and sole member or corporate officer for GCILC and Burnett Law Offices.

63.     Upon information and belief, Defendant Burnett, GCILC, and the Burnett Law Offices have the same business objectives, and Defendant Burnett uses GCILC and the Burnett Law Offices to conduct and effectuate shared business objectives.

64.     Defendants Burnett, GCILC and the Burnett Law Offices entered into contracts with Recruiter Defendants and Plaintiffs for labor to be provided in Signal's Texas Labor Camp. Burnett Defendants recruited Plaintiffs for employment within Texas.  Upon information and belief, Burnett Defendants committed tortious conduct in Texas.

65.     Throughout this Complaint, Plaintiffs refer to Defendants Burnett, GCILC, and Burnett Law Offices collectively as "Burnett Defendants."

*All Defendants*

66.     At all relevant times, Defendants Dewan, Dewan Consultants, Pol, Global, Burnett, Burnett Law Offices and GCILC acted as agents of Defendant Signal for the purposes of recruiting, obtaining, contracting, transporting Plaintiffs to provide labor services in the state of Texas.

67.     Individually and through their agents, associates, attorneys, or employees, all Defendants have done or are doing business in Orange, Texas.

68.     At all relevant times, Defendants were "persons" as that term is defined in RICO, 18 U.S.C. § 1961(3).

69.     Upon information and belief, Defendants have been engaged in contacts with Plaintiffs, including recruiting, obtaining, labor contracting, providing immigration-related services to, transporting, harboring, providing /or employing Plaintiffs.

70.     At all relevant times, Defendants operated enterprises engaged in interstate commerce or in the production of goods for interstate commerce.

71.     At all relevant times, Defendant Signal employed Plaintiffs.

## STATEMENT OF FACTS

### The Recruitment Process

#### Recruitment of Plaintiffs

72.     Acting as Defendant Signal's recruiting agent for the purposes of facilitating the recruitment of Indian H-2B Workers for employment at Signal, Recruiter Defendants placed advertisements in newspapers throughout India and the United Arab Emirates in the spring, summer, and fall of 2006 offering opportunities for welders and pipefitters to immigrate

14

permanently to the United States under the auspices of Signal, "a leading marine and fabrication company in Mississippi and Texas."  Plaintiffs were targeted for recruitment on the basis of their race or alienage.

73.     Recruiter Defendants' advertisements and other recruiting efforts were undertaken on behalf of, at the direction of, or in coordination and consultation with Defendant Signal and Burnett Defendants.

74.     Recruiter Defendants' advertisements and other recruiting efforts promised "permanent residency" or "green cards."

75.     In response to the advertisements posted by Recruiter Defendants, Plaintiffs contacted Recruiter Defendants in the spring, summer and fall of 2006 via telephone and in-person meetings.

76.     Specific facts relevant to the experiences of Plaintiffs are set forth in the table attached as Exhibit 1 to this Complaint, which are incorporated herein by reference.

77.     Upon information and belief, Defendant Signal's direction and coordination of Recruiter Defendants' and Burnett Defendants' recruitment efforts were effectuated by the use of numerous telephone, fax, e-mail, or mail communications that occurred from the spring of 2006 through at least January 2007.

78.     Upon information and belief, in these communications Defendant Signal authorized Recruiter Defendants and Burnett Defendants to act as their agents for the purposes of recruiting and providing Indian welders and pipefitters to fill anticipated H-2B guest worker jobs at Signal's Orange, Texas operations.

US2008 4422703 12

79.     Upon information and belief, in these communications, Defendant Signal further authorized Recruiter Defendants and Burnett Defendants to represent that Signal would agree to sponsor *bona fide* green card applications for Plaintiffs and obtain at least two H-2B visa extensions on behalf of Plaintiffs to allow them to remain in the United States working for Signal while their green card applications were being processed.

80.     Defendant Signal authorized these representations even though it knew or had reason to know that such visa extensions and green card applications would not be *bona fide*, valid, or lawful under United States immigration law and even though Signal did not have the intention at that time to apply for visa extensions or green cards on behalf of all the Indian H-2B Workers, including Plaintiffs.

81.     At the latest, Defendant Signal knew that the H-2B Workers paid exorbitant recruitment fees to Signal's agents – Recruiter Defendants and Burnett Defendants – and made those payments on the basis of promises, namely that the workers would receive green cards, which Signal knew to be false.   Defendant Signal nonetheless continued to facilitate the transportation, to Signal worksites in Texas and Mississippi, of hundreds more Indian H-2B Workers, including Plaintiffs, because it was in Signal's financial interest to do so.

82.     In the spring, summer, and fall of 2006, Plaintiffs attended meetings at which Recruiter Defendants and Burnett Defendants, acting on Signal's behalf, informed Plaintiffs of the opportunity to work for Defendant Signal on H-2B visas which were represented to lead to permanent resident (green card) status.

83.     Upon information and belief, prior to attending these meetings and testing sessions (discussed in paragraphs 91 to 95 below), Defendant Signal, Recruiter Defendants, and

16

US2008 4422703 12

Burnett Defendants conferred in the spring, summer, and fall of 2006 by phone, mail, fax or e-mail to organize, plan, and coordinate the logistics and substantive content of these meetings.

84.     The United States-based Recruiter Defendants (Pol and Global), Burnett Defendants, and Defendant Signal traveled across state and international lines to attend meetings with Plaintiffs in India and the United Arab Emirates in the spring, summer, and fall of 2006.

85.     According to the statements made at these meetings and in communications effected by wire and mail during this time period, Defendant Signal represented that it would sponsor Plaintiffs' green card applications and extend their H-2B visas multiple times to enable Plaintiffs to work in the United States while their green card applications were pending. In exchange, each Plaintiff was required to pay fees totaling as much as 8 lakh rupees ($20,000), each in a series of approximately three installments.

86.     Plaintiffs were further informed by Recruiter Defendants and/or Burnett Defendants that Plaintiffs would be able to obtain legal permanent residence for their spouses and children.

87.     At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted through the use of mail and wire communications occurring during the spring, summer and fall of 2006, Recruiter Defendants and Burnett Defendants, personally or through their agents, representatives, or employees, represented to Plaintiffs that: Defendant Signal would provide lawful, stable, and ample employment opportunities; working under an H-2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal; and, Signal would obtain for Plaintiffs work-authorized green cards enabling Plaintiffs to permanently and legally reside in the United States with their families.

17

88.   In such communications with Plaintiffs, Recruiter Defendants and Burnett Defendants further promised to act diligently and to do everything necessary to ensure that Plaintiffs would obtain green cards within 24 months of initiating the green-card process.

89.   In reasonable reliance upon these and other contractually-binding promises made to them regarding green cards and work opportunities in the United States, Plaintiffs signed green card contracts at various points from mid-2006 to early 2007 with Recruiter Defendants and Burnett Defendants pursuant to which Plaintiffs promised to pay the fees charged by these Defendants.

90.   Contracts signed by Plaintiffs and other documents provided to Plaintiffs by Burnett Defendants and Recruiter Defendants through the use of mail or wire transmissions in and around mid-2006 through at least early 2007, further promised that Plaintiffs would promptly receive a refund of all or nearly all of their payments if these Defendants did not succeed in securing green cards for Plaintiffs, as promised.

91.   Burnett Defendants and Recruiter Defendants knew or should have known, however, that they would not refund Plaintiffs' money as promised in the contracts and other documents.

92.   Burnett Defendants and Recruiter Defendants induced Plaintiffs to enter the green card contracts even though such defendants did not intend to pursue diligently Plaintiffs' applications and without any basis whatsoever for representing, inter alia, that Defendant Signal had lawful long-term employment opportunities to provide Plaintiffs; that Signal could legally apply for numerous H-2B visa extensions to maintain Plaintiffs' presence in the United States; that working under an H-2B visa for Signal was not inconsistent with applying for permanent

18

immigration status sponsored by Signal; that green card applications sponsored by Signal would be valid and *bona fide* under U.S. immigration law; and that such applications were likely to be successfully completed and approved within the promised timelines.

93.     In reasonable reliance on Recruiter Defendants' and Burnett Defendants' explicit and repeated promises regarding the procurement of green cards and employment opportunities in the United States, Plaintiffs undertook considerable economic, personal and familial sacrifices, including the mortgaging or sale of personal property and other incurrence of debt, in order to amass the funds necessary to initiate the green card process with Defendant Signal.

94.     In reasonable reliance on the promises of Recruiter Defendants and Burnett Defendants, Plaintiffs signed contracts with these Defendants and made the payments required by these contracts.

95.     Plaintiffs would not have paid the fees charged by Recruiter Defendants and Burnett Defendants for green cards, visas, and employment opportunities had they known that these Defendants' promises and representations were false.

96.     Plaintiffs would not have paid the fees charged by Recruiter Defendants and Burnett Defendants for green cards, visas, and employment opportunities had they known that these Defendants had failed to disclose material facts concerning the nature and terms and conditions of the purported immigration and work opportunities offered.

<u>Departure for Signal Operations in the United States</u>

97.     At various times during the spring, summer, and fall of 2006, employees of Defendant Signal traveled to various locations in India and the United Arab Emirates and tested Plaintiffs' welding and pipefitting skills in anticipation of employing them in the United States.

19

US2008 4422703 12

98.     Plaintiffs paid costs necessary to travel to the cities where these tests were held.

99.     Plaintiffs paid admission fees in order to take these tests.

100.    Plaintiffs attended and passed these tests, which were overseen and graded by Defendant Signal's or Defendant Dewan's agents, employees, or representatives.

101.    Upon information and belief, prior to attending these meetings and testing sessions, Defendant Signal, Recruiter Defendants, and Burnett Defendants conferred in the spring, summer, and fall of 2006 by phone, mail, fax or e-mail to organize, plan, and coordinate the logistics and substantive content of these testing sessions.

102.    On or about July 20, 2006 and August 17, 2006, the United States Department of Labor approved Signal's labor certification applications for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

103.    In approving these labor certification applications, the United States Department of Labor relied on the accuracy of the applicants' stated 10-month period of labor need.

104.    On information and belief, the Department of Labor is prohibited by its internal guidelines from granting labor certification applications without relying on the applicants' statement of temporary labor need.

105.    In late August and early September 2006, the United States Citizenship and Immigration Service ("USCIS") approved Signal's H-2B visa petitions for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

106.    In approving these visa petitions, the USCIS relied on the purported accuracy of the applicants' stated 10-month period of labor need and the representation that Defendant Signal's need was based on a one time peak-load temporary demand.

20

US2008 4422703 12

107.    The USCIS must, according to regulation, rely on the stated period of the petitioner's labor need, see 8 C.F.R. 214.2(h)(6)(ii)(B) (2006).

108.    Defendant Signal, Burnett Defendants, and Recruiter Defendants knew that the stated period of need in Signal's applications for labor certifications and for H-2B visas were inconsistent with Signal's projected actual labor need, and therefore Defendants knew these statements to the United States Government were false.

109.    Recruiter Defendants and Burnett Defendants used the H-2B visas, obtained from the U.S. Government on the basis of false statements by Defendant Signal and Burnett Defendants, to elicit certain payments from Plaintiffs.

110.    Plaintiffs entered the United States on H-2B guest worker visas, issued by the United States Government on the basis of false statements made by Defendant Signal and Burnett Defendants, in late 2006 and early 2007 for the purposes of working for Defendant Signal at its Texas Labor Camp.

111.    Around the time of USCIS visa approval, Plaintiffs made necessary preparations to travel to the United States on H-2B visas to work for Signal, including: paying to obtain necessary travel and legal documents; making payments to the United States consulate, Recruiter Defendants and Burnett Defendants for mandatory H-2B visa and consular processing fees; attending H-2B visa interviews; and paying Recruiter Defendants for travel arrangements.

112.    In order to secure H-2B visas to work for Signal, Plaintiffs were interviewed by representatives of the United States Consular offices in Indian cities.

113.     These consular interviews necessitated that Plaintiffs pay the costs of travel from their homes or current places of employment to various large Indian cities including Chennai (Madras) and Mumbai (Bombay).

114.     Recruiter Defendants or Burnett Defendants, acting as Defendant Signal's agents, required that Plaintiffs meet with Recruiter Defendants or Burnett Defendants in these Indian cities prior to attending their consular interviews.

115.     Upon information and belief, prior to these meetings, Recruiter Defendants and Burnett Defendants discussed among themselves and with Defendant Signal by e-mail, telephone, or in-person communications the topics to be discussed and instructions to be given to Plaintiffs at these meetings.

116.     At these pre-interview meetings, Recruiter Defendants and Burnett Defendants ensured that Plaintiffs were up-to-date on paying the fee installments required by their green card contracts.

117.     Defendants further required that Plaintiffs pay an additional 35,000 to 45,000 rupees ($800 to $1,100) fee for H-2B visa processing.

118.     Recruiter Defendants or Burnett Defendants required Plaintiffs to sign documents permitting Defendant Dewan to receive their visa-stamped passports from the Consulate on Plaintiffs' behalf.

119.     Recruiter Defendants or Burnett Defendants also coached Plaintiffs on what to say during consular interviews.

120.     Recruiter Defendants or Burnett Defendants told Plaintiffs that if they did not follow these instructions regarding the interviews, Plaintiffs would not receive their visas and

22

would forfeit all of the money they had previously paid to Defendants, in addition to losing their opportunity to permanently immigrate to the United States.

121.    During Plaintiffs' consular interviews, the consular officials took Plaintiffs' passports from them.

122.    Once Plaintiffs' visas were approved, consular officials sent their passports, with H-2B visas affixed, directly to Defendant Dewan.

123.    After receiving word that Plaintiffs' visas were approved, Recruiter Defendants made travel arrangements for Plaintiffs' departures to the United States.

124.    Before Plaintiffs could leave for the United States, however, Plaintiffs were required to attend final meetings in Recruiter Defendants' office.

125.    Such meetings typically took place mere hours before Plaintiffs' scheduled departures to the United States, when Recruiter Defendants' office was teeming with anxious fellow Indian H-2B Workers awaiting departure to the United States.

126.    At these meetings, Recruiter Defendants collected final installment payments required by Plaintiffs' green card contracts.

127.    Recruiter Defendants also required that Plaintiffs, most of whom do not or did not at the time read or speak English proficiently, sign English language documents with little or no time for review, and did not allow Plaintiffs to keep a copy of the documents.

128.    Recruiter Defendants refused to return Plaintiffs' passports — which had been in Defendant Dewan's possession since Plaintiffs' H-2B visas were approved by consular officials — until after Plaintiffs had paid the final installments of their fees and signed mandatory paperwork.

23

129.    In forceful tones, Recruiter Defendants or their staff demanded that Plaintiffs quickly sign the mandatory documents, lest they miss the flights to the United States, which Recruiter Defendants had scheduled for them and forfeit the fees they had paid.

130.    Without possession of their passports and within this rushed and hostile atmosphere, Plaintiffs had no reasonable opportunity to review, negotiate, or make any changes to the documents presented them.

131.    On occasions when workers who appeared at the Mumbai office failed to present sufficient funds to pay the final installment required by the green card contracts, Defendant Dewan and his associates threatened to destroy or deface these workers' passports.

132.    Such threats were uttered in the presence of other workers, causing these workers to reasonably believe that they had no choice but to pay their final fee installments in full.

133.    Based on Recruiter Defendants' threatening and coercive behavior during these pre-departure meetings in Mumbai and the extraordinary and increasing levels of debt they had incurred to pay Recruiter Defendants and Burnett Defendants for green card and H-2B visa arrangements, Plaintiffs reasonably believed that they had no choice but to make the payments required by Recruiter Defendants and to travel to the United States to work for Defendant Signal. Not until Plaintiffs had fulfilled all of Defendants' requirements did Plaintiffs have their passports and visas returned to them.

134.    Plaintiffs and other Indian H-2B Workers traveled from Mumbai to Defendant Signal's operations in the U.S. at various times from late October 2006 to April 2007 on tickets arranged by Recruiter Defendants.

135.    Defendant Signal collected Plaintiffs at the Houston airport upon arrival and transported them immediately to the Texas Labor Camp.

136.    Pursuant to Defendant Signal's instructions and arrangements, approximately 300 workers were sent to Signal's Pascagoula, Mississippi facility (the "Mississippi Labor Camp" and collectively with the Texas Labor Camp, the "Labor Camps") and approximately 290 workers were sent to the Texas Labor Camp upon arrival in the United States.

137.    Plaintiffs had no choice but to use Recruiter Defendants and Burnett Defendants to secure employment at Defendant Signal's operations.

138.    Plaintiffs had no choice but to pay the fees charged by Recruiter Defendants and Burnett Defendants to secure employment at Defendant Signal's operations.

139.    Management personnel at Defendant Signal made the conscious and deliberate decision to prohibit Plaintiffs from securing employment at Signal's operations either through another recruiter or by bypassing recruiters altogether and applying directly with Signal.

<u>Conditions at the Texas Labor Camp</u>

140.    Upon arrival at Defendant Signal's Texas Labor Camp, Plaintiffs were shocked to discover that they were expected to live in an isolated, overcrowded labor camp comprised of trailer-like bunkhouses surrounded by barbed-wire fences, and accessible only by a single, guarded entrance.

141.    Defendant Signal's Texas Labor Camp was located in an isolated, industrial area miles removed from shopping areas, places of worship, public transportation or residential communities.

25

142.     Initially, there were no telephones and no internet access available for Plaintiffs to communicate outside of the Texas Labor Camp.

143.     Initially, there were no televisions available for Plaintiffs to keep apprised of events outside of the Texas Labor Camp.

144.     The Texas Labor Camp gates were constantly monitored by security guards retained by Defendant Signal.  Signal's security guards monitored Plaintiffs' comings and goings by requiring them to show their employee identification badges and recording when Plaintiffs entered and exited the Texas Labor Camp. Signal's security guards also searched Plaintiffs' packages and bags when they entered the Texas Labor Camp.

145.     Except on rare occasions, Plaintiffs were not permitted to receive visitors in the Texas Labor Camp.

146.     Up to twenty-four men were housed in each bunkhouse and made to sleep in two-tiered bunk beds.  The bunk beds were so tightly packed in the bunkhouses that it was difficult for workers to move about in the narrow passageways between bunks or sit up in bed.  These housing conditions violated OSHA regulations.

147.     The Texas Labor Camp bunkhouses had insufficient toilet and bathing facilities for twenty-four men, one or two toilets per bunkhouse, resulting in long lines for the bathrooms before and after work shifts and unsanitary conditions due to unresolved plumbing problems that rendered the toilets inoperable.

148.     Privacy was non-existent, and Plaintiffs often experienced extreme difficulty sleeping due to the constant noise resulting from the close quarters and the comings and goings of workers who worked on different shifts.

149.     Defendant Signal's personnel and security guards conducted surprise searches of the dormitory areas of the bunkhouses, including searches of workers' personal belongings.

150.     Plaintiffs took their meals in Defendant Signal's mess halls, which were only open during limited hours. Due to unhygienic kitchen conditions, Plaintiffs frequently became ill, sometimes requiring hospitalization.

151.     Upon information and belief, Defendant Signal did not obtain the required permit(s) to furnish board at the Texas Labor Camp, and the condition and sanitation of the board provided further violated federal, state, and/or local law including, inter alia, the U.S. Food and Drug Administration Food Code 2005[2], as adopted and modified by Texas Food Establishment Rules.  25 Tex. Admin. Code. §§229.161 – 229.171, 229.173-229.175.

152.     Defendant Signal deducted labor camp fees of approximately $35 per day ($245 per week, or approximately $1,050 per month) from Plaintiffs' paychecks for these substandard accommodations and meals.

153.     When Plaintiffs complained and asked to live outside the Texas Labor Camp, Defendant Signal initially refused and subsequently told workers that if they tried to live outside the Texas Labor Camp Defendant Signal would still deduct the labor camp fees from Plaintiffs' wages. As a result, Plaintiffs reasonably believed they had no choice but to continue living in Defendant Signal's Texas Labor Camp.

154.     Defendant Signal only housed Indian H-2B Workers such as Plaintiffs in its Labor Camps, which other employees and management at Signal referred to as the "reservation(s)". Upon information and belief, United States citizens and other workers of non-Indian descent and

---

[2] Available at http://www.fda.gov/downloads/food/guidanceregulation/ucm123926.pdf.

27

non-Indian race were neither required nor allowed to live in or pay for accommodations in Signal's Texas Labor Camp.

155.    Defendant Signal subjected Plaintiffs to skills testing and re-testing, on-the-job discipline, layoffs, periods without work, lack of safety precautions, unfavorable job assignments, evaluation processes, and other adverse employment actions to which non-Indian and United States citizen workers were not similarly subjected.

156.    In addition, Defendant Signal's Texas Labor Camp personnel and supervisors frequently used offensive language while speaking with or referring to Plaintiffs and other Indian H-2B Workers, and regularly insulted Plaintiffs on the basis of their race or alienage.

157.    During the first week of employing Plaintiffs in the United States, Defendant Signal did not reimburse Plaintiffs for any of the expenses that Plaintiffs were required to incur as a pre-condition of seeking employment with Signal.

158.    During the first two weeks of employing Plaintiffs, Defendant Signal deducted approximately $100 to $200 each week from Plaintiffs' checks for job-related tool kits which Signal required Plaintiffs to purchase from Signal.

159.    Defendant Signal personnel and management regularly threatened Plaintiffs and other Indian H-2B Workers that if they did not continue working for Defendant Signal, did not work according to Defendant Signal's specifications, or complained about the working or living conditions, Plaintiffs and other Indian H-2B Workers would be deported back to India.

160.    In the isolated and guarded atmosphere of the Texas Labor Camp and saddled with the crushing debts they had incurred to come to the United States in reliance upon the Defendants' representatives, Plaintiffs reasonably believed Signal's statements were threatening

28

and believed they had no choice but to continue working for Signal despite deplorable working and living conditions.

161.    At regular meetings and in one-on-one or small group conversations with Defendant Signal's Texas Labor Camp personnel and management, some workers voiced complaints regarding the discriminatory treatment to which Indian H-2B Workers were subjected, but to which non-Indian and U.S. citizen workers were not similarly subjected.

162.    When Defendant Signal took no action in response to workers' complaints, numerous Indian H-2B Workers living at the Texas Labor Camp, including Plaintiffs, began meeting to discuss how to persuade Defendant Signal to improve conditions in the Texas Labor Camp, and also began meeting with third parties to discuss how best to address their concerns.

163.    Upon information and belief, Defendant Signal became aware of these meetings between workers, including Plaintiffs, and third parties whom Signal believed to be attorneys.

164.    Upon information and belief, Defendant Signal, through its employees or agents, contacted Recruiter Defendants and Burnett Defendants to express its concerns about worker organizing efforts and the specific involvement of Plaintiffs.

165.    Upon information and belief, during these conversations Recruiter Defendants, Burnett Defendants, and Defendant Signal reached an agreement regarding steps to be taken to discourage further worker organizing efforts and to ensure that the Indian H-2B Workers continued to work at Signal without complaint, as well as to prevent the Indian H-2B Workers from exercising their legal rights.

166.    On March 9, 2007, Plaintiffs learned that Defendant Signal used private security guards to raid Signal's Mississippi Labor Camp.

29

167.    Plaintiffs and other Indian H-2B Workers became increasingly frightened and confused by these activities, particularly when word spread that Defendant Signal had locked up the Mississippi Labor Camp Indian H-2B Workers who complained about the working conditions.

168.    Plaintiffs learned of an Indian H-2B Worker at the Mississippi Labor Camp who attempted suicide, rather than be deported and face debts he had incurred in India to pay Recruiter Defendants and Burnett Defendants.

169.    Defendant Signal's actions on and after March 9, 2007 at the Mississippi Labor Camp significantly intensified the reasonable fears of Plaintiffs and other Indian H-2B Workers in the Texas Labor Camp that if they tried to leave Defendant Signal's employ or oppose unlawful and coercive employment conditions at Defendant Signal, including by consulting with counsel, they faced the threat of physical restraint, detention, forced deportation, or other serious harm or abuses of the legal process.  This reaction was, upon information and belief, exactly the reaction Signal wanted and expected from the Indian H-2B Workers.

170.    Throughout the spring and summer of 2007, Signal personnel in the Labor Camps held various meetings with Plaintiffs and other Indian H-2B Workers to discuss the status of Plaintiffs' and other Indian H-2B Workers' visas and green card applications.

171.    Defendant Signal officials held a meeting with the Indian H-2B Workers, including Plaintiffs.  Defendant Signal indicated that they had selected Plaintiffs to continue working, promising visa extensions in July 2007.

172.    In the summer of 2007, an Indian H-2B Worker was arrested by immigration police in a town near the Texas Labor Camp because his visa had expired.  Plaintiffs knew that

30

worker to be one whom Defendant Signal had promised to extend a visa.  Hearing of this arrest, Plaintiffs' fear of leaving the barbed-wire fence that surrounded Texas Labor Camp increased.

173.    Defendant Signal representatives then met with Indian H-2B Workers and told them not to leave the Texas Labor Camp because if anyone ended up in jail due to immigration issues, Defendant Signal would not pay the bond required to release them.

174.    In meetings and conversations in the spring and summer of 2007, Defendant Signal, through its agents and employees at the Texas Labor Camp, continued to promise that Defendant Signal would arrange for the H-2B visa extensions and green cards originally promised Plaintiffs when they were recruited in India and the United Arab Emirates.

175.    While Defendant Signal promised to arrange for H-2B visa extensions and green cards for Plaintiffs, Signal in fact was secretly evaluating all of the Indian H-2B Workers with no intention of applying for visa extensions for certain of the Indian H-2B Workers.

176.    Plaintiffs' continuing dependence on Defendant Signal for their present and future immigration status, their continuing high levels of indebtedness, as well as other factors reasonably led Plaintiffs, whose employment had not been terminated by Signal, to fear serious harm and abuse of the legal process if they left Signal's employ.

177.    Under such circumstances, Plaintiffs reasonably felt like they had no choice but to continue working for Signal.

178.    At various times relevant to Plaintiffs' claims, Defendant Signal refused to confirm whether valid H-2B visa extensions had in fact been obtained for Plaintiffs, coercing Plaintiffs to continue working for Signal in the hope that Signal would finally resolve their uncertain immigration status.

179.    Since first contracting with Defendants in India and the United Arab Emirates, Plaintiffs have yet to receive from Defendants the promised green cards or permanent residency. Despite clear contractual provisions requiring them to do so, Recruiter Defendants and Burnett Defendants have refused to refund any of the fees Plaintiffs paid to them for unsuccessful green card and visa processing.

## FIRST CLAIM FOR RELIEF

## THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2003

Forced Labor (18 U.S.C. § 1589) and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor)

*All Defendants*

180.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

181.    Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003 (TVPA), 18 U.S.C. § 1595.

182.    Defendants attempted to and did subject Plaintiffs to forced labor in violation of 18 U.S.C. § 1589.

183.    Defendants knowingly attempted to and did physically restrain and threaten Plaintiffs with serious harm in order to obtain the labor and services of Plaintiffs in violation of 18 U.S.C. § 1589(1).

184.    Defendants knowingly attempted to and did obtain the labor and services of Plaintiffs using a scheme, plan, or pattern which, in the totality of the circumstances, was

32

intended to coerce and did coerce Plaintiffs to believe that they would suffer serious harm if they were to leave the employ of the Defendant Signal, all in violation of 18 U.S.C. § 1589(2).

185.     Defendants' scheme to isolate Plaintiffs, to coerce them to live in conditions causing psychological harm, and to limit their outside contacts, including unlawful discrimination in violation of 42 U.S.C. § 1981, was designed to convince Plaintiffs that they would suffer serious harm if they were to leave the employ of Defendant Signal.

186.     Defendants retaliated against Plaintiffs for attempts to exercise their legal rights, and threatened Plaintiffs with deportation and deceived Plaintiffs about the terms of their immigration status in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(3).

187.     Defendants knowingly recruited, transported, harbored, provided, and/or obtained Plaintiffs so as to obtain their labor and services in violation of laws prohibiting peonage, slavery, involuntary servitude, and forced labor within the meaning of the provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1590 (TVPA).

188.     In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendants knowingly recruited, transported, harbored and/or obtained Plaintiffs for labor or services in furtherance of these Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

a.     enticing, persuading, or inducing Plaintiffs to go on board an airliner, train and passenger van, and to go to various locations throughout the United Arab Emirates, India, and the United States, with the intent that they may be made or held in modern-day slavery, violating 18 U.S.C. § 1583;

33

b.      knowingly and willfully holding Plaintiffs to involuntary servitude, as defined by the TVPA, 22 U.S.C. § 7102(5)(a) and (b), violating 18 U.S.C. § 1584;

c.      removing, confiscating, or possessing Plaintiffs' passports and other immigration documents in the course of, or with the intent to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1592(a); and

d.      attempting to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, and violating 18 U.S.C. § 1594(a).

189.    As a proximate result of the conduct of Defendants, Plaintiffs have suffered injuries to their persons, businesses, and property, and other damages.

190.    Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

## SECOND CLAIM FOR RELIEF

RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d)

*All Defendants*

191.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

192.    Plaintiffs' allegations contained in Exhibit 1, appended to this Complaint, are incorporated herein by reference.

193.    Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), are brought against all Defendants.

34

194.    Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

195.    Each of Defendants is a "RICO person" within the meaning of 18 U.S.C. § 1963(1).

196.    All Defendants and the United States Consular offices in India constitute an association-in-fact, and therefore an enterprise (the "RICO Enterprise I"), within the meaning of 18 U.S.C. § 1961(4).

197.    Recruiter Defendants, Burnett Defendants, and Defendant Signal are an association-in-fact, and therefore an enterprise (the "RICO Enterprise II"), within the meaning of 18 U.S.C. § 1961(4).

### The RICO Enterprises

### RICO Enterprise I

198.    At all relevant times, RICO Enterprise I was an ongoing business relationship among all Defendants, and the United States Consular officers in India, with the common purpose of recruiting, transporting, providing, processing, and obtaining foreign workers to work in shipyards in the United States, including in Signal's operations in Texas.

199.    At all relevant times, RICO Enterprise I was engaged in interstate commerce in that its activities and transactions relating to the international and interstate movement of workers affected interstate commerce and frequently require travel and communications across state and international lines.

200.    At all relevant times, the members of RICO Enterprise I functioned as a continuing unit.

35

201.    At all relevant times, Defendants conducted or participated in, and conspired to conduct or participate in, the affairs of RICO Enterprise I through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to recruit, obtain, transport, process, and provide workers through the use of fraudulent promises, exorbitant fees, forced labor, and trafficking.

202.    Specifically, Defendants conducted or participated in and agreed to conspire to conduct the affairs of RICO Enterprise I by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

      a.      Enticement into modern day slavery in violation of 18 U.S.C. § 1583;

      b.      Involuntary servitude in violation of 18 U.S.C. § 1584;

      c.      Forced labor in violation of 18 U.S.C. § 1589;

      d.      Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590; and

      e.      Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a).

203.    Specifically, all Defendants conducted or participated in and agreed to conspire to conduct the affairs of RICO Enterprise I by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

      a.      Mail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341;

      b.      Wire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343; and

36

      c.     Immigration document fraud in violation of 18 U.S.C. § 1546.

204.    Defendants' engagement in the above listed predicate acts in the conduct of affairs of RICO Enterprise I, resulted in the individual financial gain of each Defendant at the expense of business, property, and personal injury to Plaintiffs.

RICO Enterprise II

205.    At all relevant times, RICO Enterprise II was an ongoing business relationship among Defendants with the common purpose of selling United States green cards, visas, and work opportunities to Indian workers to convince such workers to pay fees and to travel to the United States to work for companies, including Defendant Signal.

206.    At all relevant times, the members of RICO Enterprise II operated as a continuing unit.

207.    At all relevant times, RICO Enterprise II was engaged in interstate commerce in that its activities and transactions relating to the sale of United States green cards, visas, and job opportunities affected interstate commerce.

208.    At all relevant times, Defendants conducted or participated in and conspired to conduct or participate in, the affairs of RICO Enterprise II through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to sell United States green cards and work opportunities to Indian workers for the purposes of furnishing such workers for employment at Signal's operations.

209.    Specifically, Defendants conducted or participated in the affairs of RICO Enterprise II by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

37

      a.        Enticement into modern day slavery in violation of 18 U.S.C. § 1583;

      b.        Involuntary servitude in violation of 18 U.S.C. § 1584;

      c.        Forced labor in violation of 18 U.S.C. § 1589;

      d.        Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590;

      e.        Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a);

      f.        Mail fraud in violation of 18 U.S.C. § 1341;

      g.        Wire fraud in violation of 18 U.S.C. § 1343; and

      h.        Immigration document fraud in violation of 18 U.S.C. § 1546.

210.    Defendants' engagement in the above listed predicate acts in the conduct of affairs of RICO Enterprise II, resulted in the individual financial gain of each Defendant at the expense of business, property, and personal injury to Plaintiffs.

**Predicate Acts**

**Enticement into Slavery: 18 U.S.C. § 1583**

211.    Defendants, through Enterprises I and II, enticed, persuaded, and induced Plaintiffs, to board a vessel, airplane, train, or passenger vehicle with the intent that Plaintiffs be compelled into forced labor or involuntary servitude.

212.    Defendants, through Enterprises I and II, willfully, knowingly, and intentionally committed and conspired to commit multiple predicate acts of enticement into modern-day slavery in violation of 18 U.S.C. § 1583, and as set forth in Plaintiffs' First Claim for Relief.

US2008 4422703 12

<u>Involuntary Servitude: 18 U.S.C. § 1584</u>

213.    Defendants, through RICO Enterprises I and II, willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of involuntary servitude in violation of 18 U.S.C. §1584, and as set forth in Plaintiffs' First Claim for Relief.

<u>Forced Labor: 18 U.S.C. § 1589</u>

214.    Defendants, through RICO Enterprises I and II, knowingly provided or obtained the labor or services of Plaintiffs by means of threats of serious harm or by means of threatened abuse of the legal process.

215.    Defendants, through RICO Enterprises I and II, benefitted financially from participation in a venture in which Defendants knowingly engaged in providing or obtaining the forced labor or services of Plaintiff.

216.    Defendants through RICO Enterprises I and II willfully, knowingly, and intentionally committed and conspired to commit multiple predicate acts of forced labor in violation of 18 U.S.C. § 1589, and as set forth in Plaintiffs' First Claim for Relief.

<u>Trafficking for the Purposes of Forced Labor and</u>

<u>Involuntary Servitude: 18 U.S.C. § 1590</u>

217.    Defendants, through RICO Enterprises I and II, knowingly recruited, harbored, transported, or provided Plaintiffs for labor or services in violation of the TVPA.

218.    As set forth in the preceding paragraphs, Defendants through RICO Enterprises I and II willfully, knowingly, and intentionally committed and conspired to commit multiple predicate acts of trafficking for the purposes of forced labor and/or involuntary servitude in violation of 18 U.S.C. § 1590, and as set forth in Plaintiffs' First Claim for Relief.

39

Document Servitude: 18 U.S.C. § 1592

219.    As set forth in the preceding paragraphs and Exhibit 1, Defendants through RICO

Enterprises I and II, knowingly and intentionally confiscated and possessed Plaintiffs' visa and

immigration documents in violation of the TVPA.

220.    Defendants, through Enterprises I and II willfully, knowingly, and intentionally

committed and conspired to commit multiple predicate acts of document servitude in violation of

18 U.S.C. § 1592, and as set forth in Plaintiffs' First Claim for Relief.

Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343

221.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through

RICO Enterprises I and II, intentionally made and conspired to make false promises regarding

green cards and other benefits in a scheme calculated to defraud Plaintiffs out of large sums of

money.

222.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through

RICO Enterprises I and II, made and conspired to make false statements related to applications

submitted to the U.S. Government for H-2B visas and false promises to Plaintiffs regarding

green cards and other benefits in a scheme calculated to defraud Plaintiffs out of large sums of

money.

223.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through

RICO Enterprises I and II, used the mails and wire communications, including communications

via telephone, fax, internet and e-mail, on numerous occasions to further these fraudulent

schemes.

40

224.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprises I and II, used the mails and wire communications, including communications via telephone, fax, internet and e-mail on numerous occasions to further this fraudulent scheme.

225.    As set forth in the preceding paragraphs and in Exhibit 1, Plaintiffs reasonably relied on these false statements made by Defendants, through RICO Enterprises I and II, and suffered injury as a result of such reliance and Defendants' ensuing conduct.

226.    These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

<u>Immigration Document Fraud: 18 U.S.C. § 1546(a)</u>

227.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprises I and II, fraudulently sold and conspired to sell H-2B visa extensions and green cards to Plaintiffs despite these Defendants' awareness that applications for these green cards and visa extensions were not *bona fide* or lawful under United States immigration law.

228.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprises I and II, obtained, accepted, and received H2-B visas despite knowing these visas to have been procured through false statements and/or fraud on the U.S. Government.

229.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprises I and II, fraudulently sold and conspired to sell H2-B visa extensions and green cards to Plaintiffs despite Defendants' awareness that applications for these green cards and visa extensions were not bona fide or lawful under United States immigration law.

230.    These willful, knowing, and intentional acts constitute immigration document fraud in violation of 18 U.S.C. § 1546(a).

41

## Pattern of Related Racketeering Acts

231.    Defendants engaged in the racketeering activity and commission of predicate acts as described in this Complaint repeatedly, beginning in 2003 and continuing at least through January 2009 with respect to approximately 590 Indian workers.

232.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants have committed at least two acts of racketeering activities in the past 10 years.

233.    Upon information and belief, Defendant Signal sought new Indian temporary workers for employment at Signal who were potentially subject to similar racketeering activities.

234.    Defendants, through RICO Enterprises I and II, implemented the racketeering acts described in this Complaint to conduct their regular business activities.

235.    Defendants' racketeering acts have or had similar purposes: to profit from the fraudulent recruitment and forced labor of Plaintiffs and other Indian workers, and to recruit, obtain, provide and maintain a consistent, submissive, isolated, and compliant Indian H-2B Worker labor force at Signal's operations.

236.    Defendants' acts yielded similar results and caused similar injuries to Plaintiffs, including payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and related legal fees.

237.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants' racketeering acts have or had similar participants: Recruiter Defendants, Burnett Defendants, and Defendant Signal.

238.    As set forth in the preceding paragraphs and in Exhibit 1, Defendants, though RICO Enterprises I and II, directed their racketeering activities at similar victims: Indian workers

42

who contacted Recruiter Defendants in search of green cards, economic opportunity, and stable employment in the United States.

239.    Defendants' acts have or had similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from Plaintiffs and other Indian workers, and the use of similar employment practices and policies with respect to Plaintiffs and other Indian workers.

**<u>Injury</u>**

240.    As a direct and proximate result of Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs have suffered injuries to their property and businesses including, but not limited to: exorbitant fees paid by Plaintiffs for green cards, visas and other immigration and recruitment-related services; interest on debts assumed by Plaintiffs to pay such fees; losses of personal and real property incurred in reliance on Defendants' fraudulent acts; lost and unpaid wages, lost employment opportunities, and other pecuniary and losses to real or personal property.

241.    Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

**<u>THIRD CLAIM FOR RELIEF</u>**

VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866 42 U.S.C. § 1981

*Defendant Signal (Signal International LLC, Signal International, Inc., Signal International Texas, G.P., and Signal International Texas, L.P.)*

242.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

243.    Plaintiffs assert this claim pursuant to 42 U.S.C. § 1981 for declaratory relief and damages against Defendant Signal.

244.    The actions of Defendant Signal, as set forth herein, violated Plaintiffs' rights to receive the full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including Plaintiffs' rights to enjoy and benefit from non-discriminatory employment relationships with Signal.

245.    Specifically, Defendant Signal subjected Plaintiffs to discriminatory and offensive mandatory room and board arrangements at the Texas Labor Camp.

246.    Defendant Signal did not subject its non-Indian and U.S. citizen employees to the same or similar room and board arrangements.

247.    As set forth in the preceding paragraphs, Defendant Signal also imposed discriminatory job-related requirements and adverse terms and conditions of employment to which non-Indian and United States citizen employees were not similarly subjected.

248.    As set forth in the preceding paragraphs, through the actions and statements of its personnel referring to and directed at Plaintiffs and other Indian H-2B workers, Defendant Signal maintained an objectively hostile and abusive work environment on account of Plaintiffs' race and alienage.

249.    As set forth in the preceding paragraphs, Defendant Signal's discriminatory and offensive treatment of Plaintiffs was sufficiently severe that it created a hostile work environment in violation of 42 U.S.C. § 1981.

250.    Plaintiffs reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of their race and alienage.

44

251.    Defendant Signal's hostile, abusive, and discriminatory treatment of Plaintiffs was unwelcome.

252.    Defendant Signal knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs of their rights on the basis of Plaintiffs' race and alienage.

253.    As a result of Defendant Signal's unlawful acts, Plaintiffs have suffered injury to their property and persons.

254.    Plaintiffs seek all appropriate relief, including declaratory relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF

VIOLATIONS OF THE KU KLUX KLAN ACT OF 1871
42 U.S.C. § 1985 and the Thirteenth Amendment

*All Defendants*

255.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

256.    Plaintiffs assert this claim pursuant to 42 U.S.C. § 1985(3) for declaratory relief, and damages against Defendants.

257.    As set forth in the preceding paragraphs and Plaintiffs' First Claim for Relief, Defendants conspired, agreed, planned and coordinated for the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes (inter alia, 18 U.S.C. §§ 1589, 1590) to be free from forced labor, involuntary servitude, and trafficking in persons.

45

258.     Defendants were motivated by racial, anti-Indian, and anti-immigrant animus when they conspired to deprive Plaintiffs of their rights and acted in furtherance of a conspiracy to deprive Plaintiffs of their rights.

259.     Defendants knowingly, willfully, maliciously, intentionally, and without justification planned and acted to deprive Plaintiffs of their rights.

260.     As a result of the unlawful acts of Defendants, Plaintiffs have suffered damages.

261.     Plaintiffs seek all appropriate relief, including declaratory relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF

### FRAUD AND NEGLIGENT MISREPRESENTATION

*All Defendants*

262.     Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs.

263.     As set forth in the preceding paragraphs and in Exhibit 1, Defendants, individually and through their agents, employees, and representatives, knowingly or negligently made materially false and untrue statements and representations to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

264.     As set forth in the preceding paragraphs and in Exhibit 1, Defendants knowingly or negligently failed to disclose material facts to Plaintiffs regarding the nature and terms and

46

conditions of applications and opportunities for immigration status and employment in the United States.

265.    Defendants intended that the false statements made by Defendants and their agents, employees, and representatives would induce Plaintiffs to pay the exorbitant fees demanded by Recruiter Defendants, and/or Burnett Defendants.

266.    Defendants intended that the false statements made by Defendants and their agents, employees, or representatives would induce Plaintiffs to leave their homes and jobs in India and the United Arab Emirates and travel to the United States to work for Defendant Signal.

267.    Plaintiffs were entitled to rely on Defendants' representations.

268.    In reliance on Defendants' false or negligent representations regarding green cards and employment opportunities, Plaintiffs paid large sums of money to Recruiter Defendants or Burnett Defendants.

269.    In reliance on Defendants' false or negligent representations regarding green cards and employment opportunities, Plaintiffs incurred substantial interest-bearing debts in order to pay recruitment, immigration-related, and travel fees charged by Defendants and their agents, employees or representatives.

270.    In reliance on Defendants' false or negligent representations regarding green cards and employment opportunities, Plaintiffs sold personal and real property and surrendered employment opportunities in India and the United Arab Emirates.

271.    In reliance on Defendants' false or negligent representations regarding green cards and employment opportunities, Plaintiffs left their homes and jobs and India and other countries and traveled to the United States to work for Defendant Signal.

47

272.    At all times, Plaintiffs' reliance was reasonable.

273.    As a direct and proximate result of Defendants' knowing, willing, intentional, and/or negligent actions, Plaintiffs have been injured.

274.    Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial.

## SIXTH CLAIM FOR RELIEF

### BREACH OF CONTRACT

*All Defendants*

275.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

276.    As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees and representatives, offered to obtain permanent residence and immigration status for Plaintiffs in the United States within 18 to 24 months as well as steady work opportunities in the United States with Defendant Signal in exchange for Plaintiffs' payment of exorbitant fees to Defendants and their employees, agents and/or representatives.

277.    Plaintiffs accepted Defendants' offers, paid the agreed upon fees, and performed the agreed-upon work.

278.    Defendants breached their contracts with Plaintiffs by failing to comply with their binding promises regarding permanent residence and immigration status.

279.    In reliance on these agreements, Plaintiffs paid large sums of money and entered into substantial debts, surrendered other employment opportunities, and incurred other financial losses.

48

280.    As a direct result of Defendants' breach, Plaintiffs have suffered damages.

281.    Plaintiffs are entitled to recover compensatory damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

### DECLARATORY JUDGMENT

*All Defendants*

282.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

283.    Defendants Signal International, L.L.C. and Signal International, Inc. are and function as, the alter egos of Signal International Texas, G.P. and Signal International Texas, L.P., thus piercing the corporate veil.

284.    Defendant Global Resources is and functions as the alter ego of Defendant Pol, thus piercing the corporate veil.

285.    Defendant Dewan Consultants is and functions as the alter ego of Defendant Dewan, thus piercing the corporate veil.

286.    Defendants Burnett Law Offices and GCILC are and function as the alter ego of Defendant Burnet, thus piercing the corporate veil.

287.    A real and actual controversy exists between Plaintiffs and Defendants; which is justiciable in character, concerning the trafficking of Plaintiffs, violations of Plaintiffs' civil rights, violation of the Klu Klux Klan Act, breach of contract, negligence and fraud.  Plaintiffs are entitled to a declaratory judgment under 28 U.S.C. §2201 declaring the alter egos referenced above.

288. A declaratory judgment is necessary to preserve the rights of the Plaintiffs who were victims of Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

a. Declaratory relief;

b. Compensatory damages;

c. Punitive damages;

d. Treble damages as authorized by RICO, 18 U.S.C. § 1964(c);

e. An award of prevailing party costs, including attorney fees;

f. A finding of alter ego between Signal International Texas, G.P. and Signal International Texas, L.P., thus piercing the corporate veil;

g. A finding of alter ego between Signal International Texas, L.P. and Signal International LLC, thus piercing the corporate veil;

h. A finding that Signal International, Inc. is the successor in interest to Signal International LLC, or in the alternative, a finding of alter ego between Signal International LLC and Signal International, Inc., thus piercing the corporate veil;

i. A finding of alter ego among Malvern C. Burnett, Gulf Coast Immigration Law Center, L.L.C., and Law Offices of Malvern C. Burnett, A.P.C., thus piercing the corporate veil;

j. A finding of alter ego between Global Resources, Inc. and Michael Pol, thus piercing the corporate veil;

k. A finding of alter ego between Sachin Dewan and Dewan Consultants Pvt., thus piercing the corporate veil; and

l. Such other relief as the court deems just and appropriate.

Respectfully submitted,


**KILPATRICK TOWNSEND & STOCKTON, LLP**


By:  /s/  William H. Boice
William H. Boice
Georgia Bar No. 065725
Brian G. Corgan (*pro hac vice* application to be filed)
Georgia Bar No. 187700
Susan W. Pangborn (*pro hac vice* application to be filed)
Georgia Bar No. 735027
Heather L. Heindel (*pro hac vice* application to be filed)
Georgia Bar No. 285204

1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Fax:  (404)-815-6555

US2008 4422703 12