## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

| | | |
|---|---|---|
| REJI SAMUEL, ATHA MOHAMMAD ABDUL, KESAVARAO BUNDANKAYALA, RAJU DIVAKARAN, BIJU PERUMPILLY GEORGE, KRISHNA GONTHINA, NAYAPPULLI JAYACHANDRAN, GALLA VENKATA RAMA KRISHNA, SAMUEL JOSE KUMRUMTHODATHIL, LOHITHAKSHAN MADAMPET, JOHNY MANDY MATHAI, BELTHAZAR PETER, MOHANAN BALAKRISHNA PILLAI, SANTHOSH KUMAR RAJENDRAN PILLAI, ABY KARICKATHARA RAJU, SUMESH PORAMBATHUPARAMBIL SUBRAMANIAN, and CHANDRAN SHAJU THANISSERY, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CIV. NO. 1:13-cv-00323 |
| SIGNAL INTERNATIONAL L.L.C., SIGNAL INTERNATIONAL, INC., SIGNAL INTERNATIONAL TEXAS, G.P., SIGNAL INTERNATIONAL TEXAS, L.P., MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS), | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

## APPENDIX A
## TO PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) OF MALVERN C. BURNETT, THE LAW OFFICES OF MALVERN C. BURNETT, A.P.C., AND GULF COAST IMMIGRATION CENTER, L.L.C.

US2008 4960034 1

| Tab | Description |
|---|---|
| 1. | *Allstate Ins. Co. v. Plambeck*, No. 3-08-CV-0388-M, 2009 WL 347423, *3, n. 2 (N.D. Tex. Feb. 11, 2009) |
| 2. | *David v. Signal Int'l*, No. 08-1220, 2012 U.S. Dist. LEXIS 114247 (E.D. La. Jan. 4, 2012) |
| 3. | *Gonzalez v. Bank of America Ins. Services, Inc.*, No. 11-20174, 2011 WL 6156856 (5th Cir. 2011) |
| 4. | *Hewlett-Packard Co. v. Byd:Sign, Inc.*, No. 6:05-CV-456, 2006 WL 2822151, at *9 (E.D. Tex. Sept. 28, 2006) |
| 5. | *Icon Health & Fitness, Inc. v. Horizon Fitness, Inc.*, No. 5:08CV26, 2009 WL 1025467, at *1 (E.D. Tex. Mar. 26, 2009) |
| 6. | *Oblio Telecom, Inc. v. Patel*, No. 3–08–CV–0279–L, 2008 WL 4936488 at *4 (N.D. Tex. Nov. 18, 2008) |
| 7. | *United Galvanizing Inc. v. Imperial Zinc Corp.*, No. H-08-0551, 2008 WL 4746334, 11 (S.D. Tex. Oct. 27, 2008). |

DATED:  September 27, 2013.

KILPATRICK TOWNSEND &
   STOCKTON, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Facsimile: (404)-815-6555
bboice@kilpatricktownsend.com
bcorgan@kilpatricktownsend.com
spangborn@kilpatrickstockton.com
hheindel@kilpatricktownsend.com

By:   s/ William H. Boice
William H. Boice
Georgia Bar No. 065725
Brian G. Corgan (*Admitted Pro Hac Vice*)
Georgia Bar No. 187700
Susan Pangborn (*Admitted Pro Hac Vice*)
Georgia Bar No. 735027
California Bar No. 282533
Heather L. Heindel (*Admitted Pro Hac Vice*)
Georgia Bar No. 285204

Attorneys for Plaintiffs

# TAB 1

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2009 WL 347423 (N.D.Tex.)
(Cite as: 2009 WL 347423 (N.D.Tex.))

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. Texas,
Dallas Division.
ALLSTATE INSURANCE COMPANY, et al.,
Plaintiffs,
v.
Michael Kent PLAMBECK, D.C., et al., Defendants.

No. 3–08–CV–0388–M.
Feb. 11, 2009.

David Kassabian, Bret Wayne Weatherford, Kassabian Doyle & Weatherford PC, Arlington, TX, for Plaintiffs.

Kenneth R. Stein, Matthews Stein Shiels Pearce Knott Eden & Davis, Dallas, TX, Robert H. Renneker, Law Office of Robert H Renneker, Kenton J. Hutcherson, The Hutcherson Law Firm, Robert Paul Kubicki, Law Office of Robert P Kubicki, Dallas, TX, Allen I Boudreaux, Jr., Law Office of Allen I Boudreaux Jr., Metairie, LA, John S. Flint, Law Office of John S Flint, Corpus Christi, TX, for Defendants.

Robert Ekin, McCordsville, IN. pro se.

Randall Toca, Kenner, LA, Roland G. Toca, II, Kenner, LA, pro se.

Angel Junio, New Orleans, LA, pro se.

Eugene Mercier, Corpus Christi, TX, pro se.

Thomas L Magelaner, Magelaner & Associates Ltd., Akron, OH, pro se.

Professional Management Group LLC, C/O Randall Toca, Kenner, LA, pro se.

Law Office Network LLC, C/O Randall Toca, Kenner, LA, pro se.

*ORDER ACCEPTING FINDINGS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

BARBARA M.G. LYNN, District Judge.

*1 After making an independent review of the pleadings, files and records in this case, and the Findings and Recommendation of the United States Magistrate Judge dated January 30, 2009, the Court finds that the Findings and Recommendation of the Magistrate Judge are correct and they are accepted as the Findings and Recommendation of the Court.

**IT IS, THEREFORE, ORDERED** that the Findings and Recommendation of the United States Magistrate Judge are accepted. The Rule 12(b)(2) and Rule 12(b)(3) motion to dismiss filed by Defendants Thomas Magelaner and Magelaner & Associates, Ltd. [Doc. # 56], and the Rule 12(b)(7) motions to dismiss filed by the Chiropractic Defendants and Defendant Rainbow Marketing Consultants, Inc. [Docs. # 51, 79] are denied.

**SO ORDERED.**

*FINDINGS AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

JEFF KAPLAN, United States Magistrate Judge.

In this civil RICO action, Defendants Thomas Magelaner and Magelaner & Associates, Ltd. ("the Magelaner Defendants") have filed a combined Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction and Rule 12(b)(3) motion to dismiss for improper venue. Defendant Rainbow Marketing Consultants, Inc. ("RMC") and a group of defendants consisting of chiropractors, chiropractic clinics, office staff, and some outside telemarketers ("the Chiropractic Defendants") have filed separate Rule 12(b)(7) motions to dismiss for failure to join indispensable parties. For the reasons stated herein, the motions should be denied.[FN1]

> FN1. RMC and the Chiropractic Defendants also sought dismissal of plaintiffs' original complaint under Rule 9(b) and Rule

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 347423 (N.D.Tex.)
**(Cite as: 2009 WL 347423 (N.D.Tex.))**

12(b)(6), while all defendants requested alternative relief under Rule 12(e) in the form of a more definite statement. Instead of addressing the pleading defects raised by these motions, the court ordered plaintiffs to file a RICO case statement and an amended complaint, and denied the motions without prejudice. (*See* Doc. # 97). Defendants did not renew their Rule 9(b), Rule 12(b)(6), or Rule 12(e) motions after plaintiffs amended their pleadings.

## I.

This is an action brought by Allstate Insurance Company and three of its affiliates to recover more than $2 million paid to chiropractors in Texas, Ohio, Indiana, and Alabama as a result of allegedly fraudulent billings for unreasonable and unnecessary chiropractic services. (*See* Plf. First Compl. at 6, ¶ 1; RICO Case Stmt. at 1, § 1(1)). The defendants can be grouped into three broad categories: (1) licensed chiropractors, chiropractic clinics, and their employees; (2) outside telemarketers and marketing firms; and (3) attorneys and law firms who represent accident victims treated by the chiropractors. In their most recent complaint, plaintiffs describe a scheme whereby telemarketers review police reports to obtain the names of persons involved in automobile accidents. Persons who are identified in the police reports as "not at fault" are then solicited by the telemarketers to visit a chiropractic clinic. (*See* Plf. First Am. Compl. at 6, ¶ 2 & 58, ¶ 256; RICO Case Stmt. at 2, § 1(1), 14, § 2(8), & 16–18, § 2(10)-(12)). According to plaintiffs, the accident victims are lured to the clinics with offers of free services. (*See* Plf. First Am. Compl. at 58–59, ¶¶ 260–61; RICO Case Stmt. at 2, § 1(1), 14, § 2(8), & 16–17, § 2(10)). During their initial visit, the accident victims submit to a "10–Point Examination" and, in some cases, x-rays. (*See* Plf. First Am. Compl. at 6, ¶ 3; RICO Case Stmt. at 2, § 1(1)). Plaintiffs allege that these examinations are cursory and sometimes performed by unlicensed chiropractic assistants, and that x-ray films either do not exist or are of such inferior qual-

ity as to be useless for diagnostic purposes. (*See* Plf. First Am. Compl. at 62–63, ¶¶ 279, 283). Regardless of the actual clinical findings, the accident victims are told that they have serious injuries that require immediate treatment. (*See id.* at 6, ¶ 3, 7, ¶ 5, & 63, ¶ 285; RICO Case Stmt. at 2, § 1(1)). The chiropractors "convert" the accident victims into treating patients by promising that they never will be personally liable for any treatment costs. (*See* Plf. First Am. Compl. at 63–64, ¶ 282, 286). Instead, the chiropractors agree to look only to insurance proceeds for payment. (*See id.* at 64, ¶ 286). Once the accident victims become patients, they are referred to lawyers associated with the clinics. (*See id.* at 66, ¶ 296). The lawyers send retention letters to automobile insurers—like plaintiffs—advising that they represent the patients. That effectively precludes the insurers from independently communicating with the patients to verify their condition. (*See id.* at 66, ¶ 299). At the clinics, the patients submit to a set course of treatment designed to maximize insurance billings. (*See id.* at 7, ¶ 6 & 65, ¶ 293; RICO Case Stmt. at 3, § 1(1)). The lawyers participate in the scheme by filing insurance claims on behalf of the patients, which include expenses for allegedly unnecessary chiropractic treatment. (*See* Plf. First Am. Compl. at 7, ¶ 7 & 68, ¶ 309; RICO Case Stmt. at 3, § 1(1)). When the claims are settled, the proceeds are deposited into trust accounts held in the name of one of the associated lawyers or law firms. (*See* Plf. First Am. Compl. at 69, ¶ 312).

**\*2** Plaintiffs allege that the ringleader of this insurance scam is Defendant Michael Kent Plambeck ("Plambeck"), a chiropractor in Arlington, Texas. (*See id.* at 9, ¶ 18 & 23, ¶ 81; RICO Case Stmt. at 5, § 2(1)). According to plaintiffs, Plambeck recruits newly licensed chiropractors to work in clinics managed and controlled by Chiropractic Strategies Group, Inc. ("CSG"), a Texas corporation. (*See* Plf. First Am. Compl. at 12, ¶ 34; RICO Case Stmt. at 5, § 2(1)). Seventeen of the CSG clinics are located in the Arlington area. (*See* Plf. First Am. Compl. at 13–17, ¶¶ 38–54). Plambeck al-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 347423 (N.D.Tex.)
**(Cite as: 2009 WL 347423 (N.D.Tex.))**

legedly trains CSG chiropractors in the processes of "conversion" and "retention" by providing scripts that emphasize the importance of convincing patients that they have spinal injuries that require immediate care regardless of any diagnostic findings. (*See* RICO Stmt. at 5, § 2(1)). Any chiropractor who fails to comply with these "conversion" and "retention" policies is terminated by CSG. (*See id.* at 6, § 2(1)). Plambeck and his CSG clinics also participate in the referral of patients to lawyers and law firms. (*See* Plf. First Am. Compl at 23, ¶ 84; RICO Stmt. at 6, § 2(1) & 13, § 2(7)).

On March 6, 2008, plaintiffs sued defendants in Dallas federal court for: (1) violations of the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. § 1961, *et seq.;* (2) violations of the Ohio and Indiana racketeering statutes; and (3) fraud, conspiracy, and unjust enrichment under Texas law. Three groups of defendants have filed preliminary Rule 12 motions. The Magelaner Defendants have filed a combined Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction and Rule 12(b)(3) motion to dismiss for improper venue. RMC and the Chiropractic Defendants have filed separate Rule 12(b)(7) motions to dismiss for failure to join as indispensable parties more than 700 patients who received chiropractic treatment. The motions have been fully briefed and are ripe for determination.

II.

The court first considers the issues of personal jurisdiction and venue. In their motion, the Magelaner Defendants maintain that the court lacks personal jurisdiction over Thomas Magelaner, an Ohio personal injury lawyer, and his law firm, Magelaner & Associates, Ltd., because neither defendant conducts business in the State of Texas. The Magelaner Defendants further contend that venue is not proper in the Northern District of Texas because plaintiffs have failed to show that a substantial part of the events or omissions giving rise to their claims occurred in this district.

A.

The exercise of personal jurisdiction over a defendant must always comport with the requirements of due process. When a federal court sitting in diversity attempts to exercise extraterritorial jurisdiction over a nonresident defendant, these requirements are met where the defendant has minimum contacts with the forum state. *See Busch v. Buchman, Buchman & O'Brien, Law Firm,* 11 F.3d 1255, 1258 (5th Cir.1994) (citing cases); *see also Quilling v. Stark,* No. 3–05–CV–1976–L, 2006 WL 1683442 at *2 (N.D.Tex. Jun.19, 2006). However, the due process analysis is different when personal jurisdiction is predicated on a federal statute that allows for nationwide service of process. In such cases, Congress has effectively provided for the national exercise of personal jurisdiction over a defendant based on his contacts with the United States. *Stark,* 2006 WL 1683442 at *2. Thus, "while the Due Process Clause must be satisfied if a forum is to acquire personal jurisdiction over a defendant, sovereignty defines the scope of the due process test." *Busch,* 11 F.3dat 1258.

*3 Where, as here, the court decides the issue of personal jurisdiction without conducting an evidentiary hearing, the plaintiff has the burden of establishing a prima facie case of jurisdiction over the nonresident defendant. *See Kevlin Services, Inc. v. Lexington State Bank,* 46 F.3d 13, 14 (5th Cir.1995). The court must accept as true all uncontroverted allegations in the complaint, and any factual conflicts must be resolved in favor of the plaintiff. *Bullion v. Gillespie,* 895 F.2d 213, 217 (5th Cir.1990). Similar standards govern motions to dismiss for improper venue. *See TransFirst Holdings, Inc. v. Phillips,* No. 3–06–CV–2303–P, 2007 WL 631276 at *3 (N.D.Tex. Mar.1, 2007).

B.

The federal RICO statute provides, in pertinent part:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has

Not Reported in F.Supp.2d, 2009 WL 347423 (N.D.Tex.)
(Cite as: 2009 WL 347423 (N.D.Tex.))

an agent, or transacts his affairs.

(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965. Most courts have interpreted section 1965(b) to confer nationwide jurisdiction in a RICO action over nonresident defendants if the plaintiff can establish personal jurisdiction over at least one defendant under section 1965(a).[FN2] *See Rolls–Royce Corp. v. Heros, Inc.,* 576 F.Supp.2d 765, 778–79 (N.D.Tex.2008) (citing cases); *Oblio Telecom, Inc. v. Patel,* No. 3–08–CV–0279–L, 2008 WL 4936488 at *4 (N.D.Tex. Nov.18, 2008) (citing cases). Stated differently, if a RICO plaintiff can show that at least one defendant "resides, is found, has an agent, or transacts his affairs" in the forum, then jurisdiction is proper as to all other defendants if "the ends of justice require." *Rolls–Royce,* 576 F.Supp.2d at 779; *Paolino v. Argyll Equities, L.L.C.,* 401 F.Supp.2d 712, 718 (W.D.Tex.2005). Due process in such cases is satisfied if the nonresident defendant has sufficient minimum contacts with the United States. *See Busch,* 11 F.3d at 1258; *Rolls–Royce,* 576 F.Supp.2d at 782

> FN2. A circuit split has developed on the issue of which subsection of the RICO statute grants nationwide jurisdiction. The Second, Seventh, Ninth, and Tenth Circuits have determined that subsection 1965(b) confers nationwide service of process in RICO cases. *See PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 71 (2d Cir.1998); *Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 671 (7th Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 700 (1988);

*Butcher's Union Local No. 498 v. SDC Investments, Inc.,* 788 F.2d 535, 539–39 (9th Cir.1986); *Cory v. Aztec Steel Building, Inc.,* 468 F.3d 1226, 1230 (10th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2134, 167 L.Ed.2d 864 (2007). The Fourth and Eleventh Circuits have held that section 1965(d) is the relevant subsection. *See ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617, 626–27 (4th Cir.1997), *cert. denied,* 523 U.S. 1048, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998); *Republic of Panama v. BCCI Holdings,* 119 F.3d 935, 942 (11th Cir.1997). Although the Fifth Circuit has not yet decided the issue, most federal courts in Texas, including two judges in this district, have followed the majority rule. *See Rolls–Royce Corp. v. Heros, Inc.,* 576 F.Supp.2d 765, 779 (N.D.Tex.2008); *Oblio Telecom, Inc. v. Patel,* No. 3–08–CV–0279–L, 2008 WL 4936488 at *4 (N.D.Tex. Nov.18, 2008); *Hawkins v. The Upjohn Co.,* 890 F.Supp. 601, 605–06 (E.D.Tex.1994).

C.

It is undisputed that Michael Kent Plambeck, the alleged mastermind of the RICO conspiracy, resides in the Northern District of Texas, and that 17 of his CSG clinics are located in this district. Nor is there any dispute that the Magelaner Defendants, who represent accident victims in Ohio and occasionally in Indiana, have minimum contacts with the United States. Therefore, the court may exercise personal jurisdiction over the Magelaner Defendants under section 1965(b) if "the ends of justice require."

"[T]he 'ends of justice' is a flexible concept uniquely tailored to the facts of each case." *Cory v. Aztec Steel Building, Inc.,* 468 F.3d 1226, 1232 (10th Cir.2006), *cert. denied,* —— U.S. ——, 127 S.Ct. 2134, 167 L.Ed.2d 864 (2007). In a RICO action, the "ends of justice" require nationwide service of process to further the Congressional intent

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 347423 (N.D.Tex.)
**(Cite as: 2009 WL 347423 (N.D.Tex.))**

of allowing "plaintiffs to bring all members of a na-
tionwide [ ] conspiracy before a court in a single
trial." *Butcher's Union Local No. 498 v. SDC In-
vestments, Inc.,* 788 F.2d 535, 539 (9th Cir.1986),
*citing Sanders v. United States,* 373 U.S. 1, 17, 83
S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963); *accord
Johnson      v.      Investacorp,      Inc.,*      No.
3–89–CV–2607–H, 1990 WL 25034 at *1
(N.D.Tex. Jan.31, 1990). Nationwide service of
process also promotes the "ends of justice" where,
as here, numerous defendants reside in different
states, and there likely is no alternative forum in
which jurisdiction would be proper as to all defend-
ants. *See Johnson,* 1990 WL 25034 at *2 (exercise
of nationwide jurisdiction under section 1965 was
appropriate where at least three defendants were
Texas residents and other defendants resided in
such diverse locales as Florida, California, Illinois,
Missouri, and Colorado); *see also Hewlett–Packard
Co. v. Byd:Sign, Inc.,* No. 6–05–CV–456, 2006 WL
2822151 at *10 (E.D.Tex. Sept.28, 2006).

*4 While recognizing that the RICO statute au-
thorizes nationwide service of process, the
Magelaner Defendants argue that the "ends of
justice" do not require that they be brought before
the court because plaintiffs have failed to "plead
with particularity overt acts within the forum taken
in furtherance of the conspiracy." (*See* Magel. Def.
Reply at 5). This argument misses the mark. There
is no requirement that a plaintiff plead or prove that
a nonresident defendant committed an overt act
within the forum in furtherance of a RICO conspir-
acy. All that is required is for the plaintiff to show
that at least one defendant "resides, is found, has an
agent, or transacts his affairs" in the district, that
the nonresident defendant has minimum contacts
with the United States, and that "the ends of
justice" require the exercise of personal jurisdiction
over the nonresident. Plaintiffs have easily met that
burden. To the extent the Magelaner Defendants at-
tempt to challenge the sufficiency of plaintiffs'
RICO allegations, a Rule 12(b)(2) motion is not a
proper vehicle for such an attack.

The Magelaner Defendants also suggest that
the exercise of personal jurisdiction does not com-
port with the constitutional requirement of due pro-
cess. (*See* Magel. Def. Reply at 5). "While the ex-
pansive minimum contacts test under a nationwide
service of process provision does not obviate due
process concerns, the Fifth Circuit has [ ] held that,
in the context of a nationwide service of process
provision, 'it does not offend traditional notions of
fair play and substantial justice to exercise personal
jurisdiction over a defendant residing within the
United States.' " *Rolls–Royce,* 576 F.Supp.2d at
782, *quoting Busch,* 11 F.3d at 1258.[FN3] This argu-
ment is foreclosed by Fifth Circuit precedent.

> FN3. Although another Fifth Circuit panel
> has criticized the *Busch* test for exercising
> personal jurisdiction over a nonresident de-
> fendant in a nationwide service of process
> case, *see Bellaire General Hospital v. Blue
> Cross Blue Shield of Michigan,* 97 F.3d
> 822, 826 (5th Cir.1996), *Busch* has never
> been overruled and has been consistently
> followed by district courts within the cir-
> cuit. *See Rolls–Royce,* 576 F.Supp.2d at
> 782.

In sum, the court determines that it has person-
al jurisdiction over the Magelaner Defendants be-
cause: (1) Michael Plambeck, the alleged ringleader
of the RICO conspiracy, resides in this district; (2)
the Magelaner Defendants have sufficient minimum
contacts with the United States; (3) allowing
plaintiffs to bring all members of the alleged con-
spiracy before the court in a single trial furthers the
"ends of justice;" and (4) there is no alternative for-
um in which jurisdiction would be proper as to all
defendants. The same analysis controls the resolu-
tion of the venue issue. Dismissal of the Magelaner
Defendants is not warranted under either Rule 12(b)
(2) or Rule 12(b)(3).

III.
The court next considers whether the failure to
join more than 700 patients who were treated by the
Chiropractic Defendants requires the dismissal of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 347423 (N.D.Tex.)
**(Cite as: 2009 WL 347423 (N.D.Tex.))**

this case. Under the federal rules, a court may dismiss a case for "failure to join a party under Rule 19 ." FED. R. CIV. P. 12(b)(7). Rule 19 provides, in pertinent part:

> A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if:

> **\*5** (A) in that person's absence, the court cannot accord complete relief among existing parties; or

> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:

> (i) as a practical matter impair or impede the person's ability to protect the interest; or

> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

FED. R. CIV. P. 19(a)(1). If a necessary party cannot be joined without destroying jurisdiction, the court must determine whether, "in equity and good conscience," the action should proceed among the existing parties or be dismissed. FED. R. CIV. P. 19(b). In making that determination, the court must consider:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;

> (2) the extent to which any prejudice could be lessened or avoided by:

> (A) protective provisions in the judgment;

> (B) shaping the relief; or

> (C) other measures;

> (3) whether a judgment rendered in the person's absence would be adequate; and

> (4) whether the plaintiff would have an adequate

remedy if the action were dismissed for nonjoinder.

*Id.; see also HS Resources, Inc. v. Wingate,* 327 F.3d 432, 439 (5th Cir.2003). The party seeking dismissal must prove that an absent party is both necessary under Rule 19(a) and indispensable under Rule 19(b). *See Payan v. Continental Tire North America, Inc.,* 232 F.R.D. 587, 589 (S.D.Tex.2005).

In their motions, RMC and the Chiropractic Defendants maintain that the clinic patients are necessary parties to this suit because: (1) the patients have an interest in whether their chiropractic treatments were fraudulent; (2) the patients should be given an opportunity to "speak for themselves" as to the reasonableness and necessity of their treatments; and (3) a judgment in favor of plaintiffs would entitle the patients to relief, thereby subjecting defendants to a risk of incurring multiple obligations. (*See* RMC Mot. at 17; Chiro. Def. Mot. at 30).[FN4] RMC further argues that the clinic patients should be joined as parties because they contracted with the chiropractors for a course of treatment. (*See* RMC Mot. at 16–17). Assuming these conclusory assertions are sufficient to satisfy the necessity element of the Rule 19 analysis, defendants have failed to show that the clinic patients could not be joined without destroying subject matter jurisdiction. "A prerequisite to a proper dismissal for failure to join an indispensable party is that the absent party, if added, would divest the court of subject-matter jurisdiction." *August v. Boyd Gaming Corp.,* 135 Fed. Appx., 731, 732, 2005 WL 1475640 at \*1 (5th Cir. Jun.22, 2005). *See also Power Equities, Inc. v. Atlas Telecom Services–USA, Inc.,* No. 3–06–CV–1892–G, 2007 WL 43843 at \*4 (N.D.Tex. Jan.5, 2007) (court cannot conduct Rule 19(b) analysis without evidence that the absent parties could not be joined in the suit). In this case, federal subject matter jurisdiction is predicated on the RICO statute. There is no argument, much less evidence, that joining any of the 700 clinic patients would divest the court of subject

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 347423 (N.D.Tex.)
**(Cite as: 2009 WL 347423 (N.D.Tex.))**

matter jurisdiction, Federal courts are reluctant to grant motions to dismiss based on nonjoinder, and the court should declines to do so here. *See Inclusive Communities Project, Inc. v. Texas Dept. of Housing and Community Affairs,* No. 3–08–CV–0546–D, 2008 WL 5191935 at *9 (N.D.Tex. Dec.11, 2008).

> FN4. In their reply, the Chiropractic Defendants offer an additional reason why the clinic patients should be joined as parties to this suit—they participated in the alleged fraudulent activity and should be required to share the risk of any adverse judgment. (*See* Chiro. Def. Reply at 4–6). Even if the court considers this untimely argument, Rule 19 does not require the joinder of co-conspirators, joint tortfeasors, or persons against whom a defendant may have a claim for contribution. *See Nottingham v. General American Communications Corp.,* 811 F.2d 873, 880 (5th Cir.), *cert. denied,* 484 U.S. 854, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987) ("[I]t is well-established that Rule 19 does not require the joinder of joint tortfeasors."); *Payan,* 232 F.R.D. at 589 ("Joint tortfeasors are not typically indispensable parties, and the general rule is that a plaintiff cannot be forced to sue a joint tortfeasor on the theory that an absent joint tortfeasor automatically subjects the other defendants to a risk of multiple or inconsistent obligations."); *Walker v. Inter–Americas Insurance Corp.,* No. 7–03–CV–222–R, 2004 WL 1620790 at *3 (N.D.Tex. Jul.19, 2004) (same).

### RECOMMENDATION

*6 The Rule 12(b)(2) and Rule 12(b)(3) motion to dismiss filed by the Magclaner Defendants [Doc. # 56], and the Rule 12(b)(7) motions to dismiss filed by the Chiropractic Defendants and RMC [Docs. # 51, 79] should be denied.

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party may file written objections to the recommendation within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b). The failure to file written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n,* 79 F.3d 1415, 1417 (5th Cir.1996).

N.D.Tex.,2009.
Allstate Ins. Co. v. Plambeck
Not Reported in F.Supp.2d, 2009 WL 347423 (N.D.Tex.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 2

Westlaw.

454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.)))**

**C**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Fifth Circuit Rules 28.7, 47.5.3, 47.5.4. (Find CTA5 Rule 28 and Find CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
Jorge **GONZALEZ**, Individually and on Behalf of All Other Similarly Situated, Plaintiff–Appellant
v.
**BANK** OF **AMERICA** INSURANCE SERVICES, INCORPORATED; BA Insurance Services, Incorporated; Intersections, Incorporated; Intersections Insurance Services, Incorporated; Loeb Holding, Corporation; Global Contact Services, L.L.C.; American International Group Incorporated; National Union Fire Insurance Company of Pittsburgh, Pennsylvania; **Bank** of **America**, N.A., Defendants–Appellees.

No. 11–20174.
Dec. 12, 2011.

**Background: Bank** customer filed putative class action against **bank**, its subsidiaries, telemarketer with whom **bank** had allegedly shared his information, and others, alleging breach of contract, breach of fiduciary duty, common law fraud, unjust enrichment, and violations of Racketeer Influenced and Corrupt Organizations Act (RICO). The United States District Court for the Southern District of Texas dismissed. Plaintiff appealed.

**Holdings:** The Court of Appeals held that:
(1) relaxed pleading standards for fraud did not apply;
(2) customer alleged injury sufficient to establish standing at pleading stage;

(3) parent company's 42% ownership of Texas subsidiary did not subject parent to personal jurisdiction in Texas;
(4) customer failed to plead fraud with sufficient particularity; and
(5) customer abandoned motion for leave to amend complaint.

Affirmed as modified.

West Headnotes

**[1] Federal Civil Procedure 170A ⟨key⟩1837.1**

170A Federal Civil Procedure
  170AXI Dismissal
    170AXI(B) Involuntary Dismissal
      170AXI(B)5 Proceedings
        170Ak1837 Effect
          170Ak1837.1 k. In general. Most Cited Cases
    If district court has not explicitly stated that a dismissal is with or without prejudice, the dismissal is made with prejudice. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A ⟨key⟩636**

170A Federal Civil Procedure
  170AVII Pleadings
    170AVII(A) Pleadings in General
      170Ak633 Certainty, Definiteness and Particularity
      170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases
    Relaxed pleading standards for fraud did not apply to allegations bank customer made for fraud against bank, its subsidiary, and telemarketer with whom bank had allegedly shared customer's information, under theory that facts were not within customer's knowledge, since the contents of allegedly fraudulent statements made to customer were known to him at all times. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.)))**

**[3] Banks and Banking 52 ⟨⟩221**

52 Banks and Banking
  52III Functions and Dealings
    52III(H) Actions
      52k220 Parties
        52k221 k. In general. Most Cited Cases

**Federal Civil Procedure 170A ⟨⟩182.5**

170A Federal Civil Procedure
  170AII Parties
    170AII(D) Class Actions
      170AII(D)3 Particular Classes Represented
        170Ak182.5 k. Consumers, purchasers, borrowers, and debtors. Most Cited Cases

**Racketeer Influenced and Corrupt Organizations 319H ⟨⟩66**

319H Racketeer Influenced and Corrupt Organizations
  319HI Federal Regulation
    319HI(B) Civil Remedies and Proceedings
      319Hk66 k. Parties. Most Cited Cases
  Bank customer alleged injury sufficient to establish standing, at pleading stage, to bring putative class action for breach of contract, breach of fiduciary duty, and violations of Racketeer Influenced and Corrupt Organizations Act (RICO) against bank, its subsidiary, and telemarketer with whom bank had allegedly shared customer's information, even though customer alleged only that he suffered a personal injury, caused by the defendants, which was redressable by the court. U.S.C.A. Const. Art. 3, § 2, cl. 1; 18 U.S.C.A. § 1962(c).

**[4] Federal Courts 170B ⟨⟩82**

170B Federal Courts
  170BII Venue
    170BII(A) In General
      170Bk77 Corporations, Actions by or Against
      170Bk82 k. Agent within district; par-

ent and subsidiary. Most Cited Cases
  Under Texas law, parent company's 42% ownership of Texas subsidiary did not subject parent to personal jurisdiction in Texas, based on alter ego theory, absent further evidence that foreign parent controlled actual operations of subsidiary or exercised greater influence over subsidiary than would be normal for a significant shareholder in company.

**[5] Federal Civil Procedure 170A ⟨⟩636**

170A Federal Civil Procedure
  170AVII Pleadings
    170AVII(A) Pleadings in General
      170Ak633 Certainty, Definiteness and Particularity
      170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases
  Bank customer failed to state a claim for fraud against bank, its subsidiary, or telemarketer with whom bank had allegedly shared customer's person information, with sufficient particularity, since complaint contained almost no allegations about events or actions affecting customer nor any claim that he was personally entitled to relief. Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[6] Federal Courts 170B ⟨⟩624**

170B Federal Courts
  170BVIII Courts of Appeals
    170BVIII(D) Presentation and Reservation in Lower Court of Grounds of Review
      170BVIII(D)2 Objections and Exceptions
      170Bk624 k. Pleading. Most Cited Cases
  Plaintiff abandoned motion for leave to amend complaint where he appealed dismissal of case before obtaining ruling on motion to amend, and twice filed "objections" stating that he no longer wanted a ruling from the district court. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⟨⟩849(3)**

170A Federal Civil Procedure

170AVII Pleadings
170AVII(E) Amendments
170Ak849 Motion and Proceedings for Allowance
170Ak849(3) k. Amendments by briefs or motion papers. Most Cited Cases
(Formerly 170Ak849)

A bare request to amend complaint in an opposition to a motion to dismiss, without any indication of the particular grounds on which the amendment is sought, does not constitute a motion for leave to amend complaint under federal rules. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

***296** Kenneth Reed Wynne, Esq., David E. Wynne, Esq., Wynne & Wynne, L.L.P., John Francis Sullivan, III, Esq., Attorney, Watt Beckworth Thompson & Henneman, L.L.P., Houston, TX, for Plaintiff–Appellant.

Thomas E. Gilbertsen, Esq., Venable, L.L.P., Washington, DC, Joseph Tillman Krause, Esq., Robert Thompson Mowrey, Locke, Lord, Bissell & Liddell, L.L.P., Dallas, TX, for Defendants–Appellees.

Appeal from the United States District Court for the Southern District of Texas, USDC No. 4:09–CV–2946.

Before BENAVIDES, PRADO, and GRAVES, Circuit Judges.

PER CURIAM: [FN*]

FN* Pursuant to FIFTH CIRCUIT RULE 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in FIFTH CIRCUIT RULE 47.5.4.

****1** In this putative class-action, Plaintiff–Appellant Jorge **Gonzalez** ("**Gonzalez**") appeals the district court's dismissal of the various state and federal claims that he brings against Defendants–Appellees **Bank** of **America** Insurance Services, Inc., BA Insurance Services, Inc., Intersections, Inc. ("Intersections"), Intersections Insurance Services, Inc. ("Intersections Insurance"), Loeb Holding, Corp. ("Loeb Holding" or "Loeb"), Global Contact Services, L.L.C. ("Global"), American International Group Inc. ("AIG"), National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"), and **Bank** of **America**, N.A. ("**Bank** of **America**"). We AFFIRM the judgment, except that we modify the dismissal to be without prejudice as to Defendant–Appellee Loeb Holding.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff–Appellant **Gonzalez** is a Mexican immigrant who opened an account at * **Bank** of **America**. He brings this putative class action alleging that Defendants–Appellees are engaged in a wide-reaching scheme to illegally sell inferior insurance products to **Bank** of **America** customers.

In his amended complaint, **Gonzalez** generally alleges that **Bank** of **America** identifies lower-income Spanish-speaking customers as potential targets, and that **Bank** of **America** then conveys information about these customers to Intersections or Intersections Insurance. **Gonzalez** claims that sharing this information violates the deposit agreement that customers sign with **Bank** of **America** when opening an account. Specifically, **Gonzalez** states that it violates **Bank** of **America's** customer Privacy Policy, which he alleges was incorporated into the deposit agreement by reference.

**Gonzalez** further alleges that once Intersections acquires customer information from **Bank** of **America**, it hires a telemarketing company, often Global, to contact these individuals to offer them death and disability insurance. **Gonzalez** states that these telemarketers sometimes use misleading sales techniques, such as misrepresenting the premium and coverage amounts, the availability of coverage, acting as though they were affiliated with **Bank** of

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.)))**

America, and enrolling individuals despite only receiving a request for more information. According to **Gonzalez**, the issued insurance policies are often underwritten by AIG or National Union. **Gonzalez** alleges that withdrawals for the payment of premiums are made electronically from the consumers' **bank** accounts with **Bank** of **America**, usually by a company called "Smart Step." **Gonzalez** also claims that the insurance policies are inferior and overpriced. As a result of these business practices, **Gonzalez** alleges that he and other potential class members have been damaged by the amount of money that was withdrawn from their **bank** accounts, or by the amount the premiums exceeded the actual value of the insurance.

Although providing a litany of allegations about the general business practices of the various Defendants, **Gonzalez** includes almost no allegations about his own interactions with the Defendant companies, or about actual actions taken against him. The only personal allegations made by **Gonzalez** are that he opened a **bank** account at **Bank** of **America** on an undisclosed date, that he was contacted by a telemarketer who persuaded him to purchase insurance, and that withdrawals for premiums were made from his account.

** In his amended complaint, **Gonzalez** brings claims for: (1) breach of contract against **Bank** of **America**; (2) breach of fiduciary duty against **Bank** of **America**; (3) common law fraud against all of the Defendants–Appellees; (4) unjust enrichment against all of the Defendants–Appellees; and (5) racketeering under Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c), against all of the Defendants–Appellees. As to the RICO claim, **Gonzalez** alleges that Defendants–Appellees committed various acts of fraud in violation of the mail and wire fraud statutes, 18 U.S.C. §§ 1341, 1343, the Telemarketers and Consumer Fraud and Abuse Prevention Act, 15 U.S.C. § 6101 et seq., and the Access Devices Act, 18 U.S.C. § 1029.[FN1]

FN1. **Gonzalez** brings these claims on behalf of a putative class composed of all individuals "who [ ] have opened or maintained deposit accounts at **Bank** of **America**, [ ] since June 9, 2006, [ ] with average monthly balances of less than $5,000 (or the amount targeted by **Bank** of **America** and/or Intersections), [ ] whose personal information **Bank** of **America** or one or more of its subsidiaries has provided to Intersections or any of its subsidiaries, [ ] who have been telephoned by an agent or contracted representative of Intersections or one of its subsidiaries, including [Global], to telemarket supposed accidental death or disability insurance coverage, [ ] from whose demand deposit accounts at **Bank** of **America** funds for supposed premiums for such supposed insurance benefits have been electronically withdrawn [ ] and who have been extended supposed accidental death and/or disability insurance type coverage by AIG or [National Union]."

*298 The district court granted Defendants–Appellees' motions to dismiss, finding: (1) that Gonzalez lacked standing to sue because he failed to allege any personal injury; (2) that Gonzalez failed to make a prima facie case of personal jurisdiction over Loeb Holding; and, on the merits, (3) that Gonzalez failed to state a claim because he did not make any individual allegations and because the conduct alleged to have been taken against him was not actionable.

[1] The district court entered judgment on February 22, 2011, dismissing the amended complaint with prejudice.[FN2] The following day, Gonzalez filed a motion for leave to file a second amended complaint. Prior to the district court ruling on that motion, Gonzalez filed a notice of appeal, appealing the dismissal of his amended complaint, as well as the district court's "implicit denial" of his motion for leave to amend. The next day, on March 11, the district court requested that Gonzalez provide addi-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.)))**

tional information about the date on which his motion to amend was served on Defendants–Appellees. Rather than supply this information, Gonzalez filed an objection to the order, indicating in his objection that he no longer wanted the district court to rule on his motion to amend. The district court then placed a notice on the docket, stating that it understood Gonzalez's objection to be a withdrawal of his motion. In response, Gonzalez filed another similar objection, stating that the district court no longer had jurisdiction over this suit. Because of Gonzalez's objections, no formal ruling was ever made on his motion to amend.

> FN2. The district court did not explicitly state if the dismissal was with or without prejudice. Accordingly, the dismissal was made *with* prejudice. *Memon v. Allied Domecq QSR,* 385 F.3d 871, 874 n. 6 (5th Cir.2004).

## II. STANDARD OF REVIEW

[2] This court reviews de novo a district court's grant of a motion to dismiss under Rule 12(b)(6). *Ballard v. Wall,* 413 F.3d 510, 514–15 (5th Cir.2005). We accept "all well-pleaded facts as true and view[ ] those facts in the light most favorable to the plaintiff." *Stokes v. Gann,* 498 F.3d 483, 484 (5th Cir.2007). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). While complaints generally need to contain only a short and plain statement of the cause of action, allegations of fraud must "state with particularity the circumstances constituting fraud...." Fed.R.Civ.P. 9(b). Under Rule 9(b), a plaintiff must include the "time, place and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." *U.S. ex rel. Russell v. Epic Healthcare Mgmt. Grp.,* 193 F.3d 304, 308 (5th Cir.1999) (quotation and internal citations omitted) (alteration in original).[FN3] We also *299 review a district court's decision to

dismiss for lack of standing or personal jurisdiction de novo. *Ordonez Orosco v. Napolitano,* 598 F.3d 222, 225 (5th Cir.2010); *Gardemal v. Westin Hotel Co.,* 186 F.3d 588, 592 (5th Cir.1999).

> FN3. Gonzalez requests that the Court relax the Rule 9(b) pleading standard. The fraud pleading requirements may be relaxed when the facts relating to the fraud are "peculiarly within the perpetrator's knowledge." *U.S. ex rel. Doe v. Dow Chem. Co.,* 343 F.3d 325, 330 (5th Cir.2003). Here, however, relaxing the standard is not appropriate because nearly all of the material facts that Gonzalez fails to allege in his amended complaint, such as the contents of the allegedly fraudulent statements made to him, were known to Gonzalez at all times.

**3 A district court's denial of a motion for leave to amend a pleading or a denial of a motion to amend a judgment is reviewed for abuse of discretion. *Rio Grande Royalty Co., Inc. v. Energy Transfer Partners,* 620 F.3d 465, 468 (5th Cir.2010); *Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 863 (5th Cir.2003).

## III. ANALYSIS

[3] As a preliminary matter, we first consider the district court's holding that Gonzalez failed to make a prima facie case of personal jurisdiction over Loeb Holding. *Guidry v. U.S. Tobacco Co.,* 188 F.3d 619, 623 n. 2 (5th Cir.1999) ("Personal jurisdiction is an essential element of the jurisdiction of a district court, without which it is powerless to proceed to an adjudication.").[FN4] A plaintiff bears the burden of proving the district court's personal jurisdiction, but relevant factual disputes should be resolved in the plaintiff's favor. *Revell v. Lidov,* 317 F.3d 467, 469 (5th Cir.2002). At this stage, a plaintiff need only plead a prima facie case of personal jurisdiction. *Felch v. Transportes Lar–Mex S.A. de C.V.,* 92 F.3d 320, 325 (5th Cir.1996). The only argument that Gonzalez makes to support personal jurisdiction over Loeb Holding

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.)))

is an alter ego theory, in which he claims that Loeb controls the operations of Intersections because Loeb is an investor in Intersections.[FN5]

FN4. We must also address the issue of standing before proceeding to the merits. *Rivera v. Wyeth–Ayerst Labs.,* 283 F.3d 315, 319 (5th Cir.2002). Although the issue of standing is a close question, given the liberal manner in which allegations should construed at the pleading stage, we find that Gonzalez narrowly meets the requirements for standing because he alleges that he suffered a personal injury, caused by Defendants–Appellees, which is redressable by the Court. *Little v. KPMG LLP,* 575 F.3d 533, 540 (5th Cir.2009); *Pub. Citizen, Inc. v. Bomer,* 274 F.3d 212, 218 (5th Cir.2001) (stating that general factual allegations of injury may suffice at the pleading stage). The deficiencies in Gonzalez's claims result from a failure to adequately allege facts constituting a cause of action, and dismissal is more appropriate on the merits. *See Cole v. General Motors Corp.,* 484 F.3d 717, 723 (5th Cir.2007).

FN5. Loeb Holding is an investment firm incorporated in Maryland with a principal place of business in New York. Loeb states that it owns no property, does no business, has no employees, and otherwise has no contacts with Texas.

Under the federal rules, except where a federal statute provides for more expansive personal jurisdiction, "the personal jurisdiction of a federal district court is coterminous with that of a court of general jurisdiction of the state in which the district court sits." *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.,* 249 F.3d 413, 418 (5th Cir.2001).[FN6] Here, the Texas *300 long-arm statute extends jurisdiction to the fullest extent allowed by the Due Process Clause of the Fourteenth Amendment. *Stroman Realty, Inc. v. Antt,* 528 F.3d

382, 385 (5th Cir.2008); *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir.1994). Thus, we only need determine whether exercising jurisdiction over Loeb Holding would offend due process. *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 214 (5th Cir.2000). Due process requirements are met when the defendant has certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Minimum contacts can be established through either specific or general jurisdiction. *Alpine,* 205 F.3d at 215.

FN6. We note that Plaintiff–Appellant Gonzalez brought a claim under RICO, which separately provides for service of process and personal jurisdiction. 18 U.S.C. § 1965; *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 70–73 (2d Cir.1998). Gonzalez, however, never raised this ground for personal jurisdiction—either in this Court or in the district court—and it is therefore waived. *See Dunbar v. Seger–Thomschitz,* 615 F.3d 574, 576 (5th Cir.2010) (arguments or theories not presented to district court are waived); *Martco Ltd. P'ship v. Wellons, Inc.,* 588 F.3d 864, 877 (5th Cir.2009) (same); *see also Touchcom, Inc. v. Bereskin & Parr,* 574 F.3d 1403, 1410–11 (4th Cir.2009) (stating that plaintiff can waive grounds for personal jurisdiction by failing to raise it in district court); *World Wide Minerals v. Republic of Kaz.,* 296 F.3d 1154, 1168 (D.C.Cir.2002) (plaintiff waived potential grounds for personal jurisdiction under RICO by not arguing them on appeal). Because this ground for personal jurisdiction was waived, we need not explore the contours of RICO's jurisdictional provisions. Instead, we only consider whether jurisdiction is permissible under the traditional contacts analysis. *See*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.)))**

*Cory v. Aztec Steel Building, Inc.,* 468 F.3d 1226, 1230–33 (10th Cir.2006) (analyzing traditional contacts analysis after finding RICO does not support jurisdiction); *World Wide Minerals,* 296 F.3d at 1168–69 (analyzing minimum contacts analysis after finding waiver of jurisdiction under RICO).

When determining if personal jurisdiction can be imputed through a parent-subsidiary relationship, we begin with a presumption that a subsidiary, even one that is wholly-owned, is independent of its parent for jurisdictional purposes. *Dickson Marine Inc. v. Panalpina, Inc.,* 179 F.3d 331, 338 (5th Cir.1999). This presumption can only be overcome by the plaintiff with clear evidence that is sufficient to demonstrate that the subsidiary is the alter ego of the parent. *Id.* In *Hargrave v. Fibreboard Corporation,* we set forth factors to be considered when deciding whether a parent company can be held amenable to personal jurisdiction because of the acts of a subsidiary. 710 F.2d 1154, 1159 (5th Cir.1983). These factors are: (1) the amount of stock owned by the parent of the subsidiary; (2) if the two corporations have separate headquarters; (3) if they have common officers and directors; (4) if they observe corporate formalities; (5) if they maintain separate accounting systems; (6) whether the parent exercise complete authority over the subsidiary's general policy; and (7) whether the subsidiary exercise complete authority over its daily operations. *Id.* at 1160; *Dickson Marine,* 179 F.3d at 339 (stating *Hargrave* test).

**4 [4] As noted by the district court, Gonzalez offers almost no support for his allegation that Loeb Holding controls the activities of Intersections. The only evidence offered by Gonzalez is a Form 10-K submitted by Intersections to the Securities and Exchange Commission in 2008. The form states that Loeb owns forty-two percent of Intersection's shares and notes that insiders "have substantial control over us and could delay or prevent a change in corporate control, which may harm the market price

of our common stock." Gonzalez offers no other evidence and makes no other allegations about the relationship between Loeb Holding and Intersections.

This showing is insufficient to make out a prima facie case of personal jurisdiction over Loeb Holding. In the past, we have held that demonstrating 100% ownership of stock and commonality of directors and officers is insufficient to show that the subsidiary is an alter ego of it parent. *Hargrave,* 710 F.2d at 1160–61; *see also Dalton v. R & W Marine, Inc.,* 897 F.2d 1359, 1363 (5th Cir.1990) (declining to find *301 an alter ego even though one entity owned 100% of its subsidiary, was responsible for corporate policy, funneled revenues into centralized accounts, and filed consolidated tax returns because those factors were "outweighed, albeit modestly" by observation of corporate formalities and subsidiary control over certain daily operations). The statement that insiders have substantial control over Intersections in the Form 10-K does not establish that Loeb Holding controls the actual operations of Intersections. It does not mention Loeb and there is no evidence or allegation that Loeb has any greater influence over Intersections than would be normal for a significant shareholder in a company. Given that we have required a plaintiff make a stronger showing before finding personal jurisdiction in this situation, we agree with the district court's dismissal of Loeb Holding for lack of personal jurisdiction. *See, e.g., Jackson v. Tanfoglio Giuseppe, S.R.L.,* 615 F.3d 579, 586–88 (5th Cir.2010) (finding much stronger and more detailed allegations insufficient to establish jurisdiction); *Turan v. Univ. Plan Invs. Ltd.,* 248 F.3d 1139, 1139 (5th Cir.2001) (per curiam) (same). Thus, we conclude that the claims against Loeb Holding were properly dismissed. We modify the judgment, however, to indicate that the dismissal of Loeb Holding for lack of personal jurisdiction is without prejudice. *Guidry,* 188 F.3d at 623 n. 2 (stating that dismissal for lack of personal jurisdiction should be made without prejudice).

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.)))**

[5] With regard to the merits of the claims that Gonzalez asserts against the remaining Defendants–Appellees, we also find no error in the district court's rulings. In its opinion dismissing the amended complaint, the district court found that Plaintiff–Appellant Gonzalez failed to state a claim because he did not make any individual allegations and because the conduct alleged to have been taken against him is not actionable. Having reviewed the record below and the briefing on appeal, we find no error in the district court's decision to dismiss Gonzalez's claims on the merits under Rules 9(b) and 12(b)(6). As noted by the district court, Gonzalez's amended complaint contains almost no allegations about events or actions affecting him. Although the amended complaint is replete with generalized allegations of wrongful conduct, Gonzalez fails to allege facts indicating that Defendants–Appellees acted in an actionable manner towards him personally. Because Gonzalez does not allege that he personally is entitled to any relief, we also agree with the district court's ruling that Gonzalez fails to adequately state a claim against the remaining Defendants–Appellees.

\*\*5 [6] Gonzalez also argues that the district court erred by not granting his motion for leave to file a second amended complaint. In making this argument, Gonzalez ignores the fact that he abandoned that motion in the district court. Gonzalez appealed before obtaining a ruling on his motion, and he twice filed "objections," stating that he no longer wanted a ruling from the district court. Given these filings, the district court properly deemed his motion to amend abandoned. *See* 56 Am.Jur.2d Motions, Rules, and Orders § 31 (2011) (a motion should be deemed abandoned where the movant "acts in a manner which is not consistent with the object of the motion," and such motion should be treated as though it were never filed).

[7] We have consistently held that we do not consider arguments on appeal that the district court was not given an opportunity to rule upon. *See Vogel v. Veneman,* 276 F.3d 729, 733 (5th Cir.2002)

(to be considered on appeal, "[a] party must have raised an argument to such a degree \*302 that the trial court may rule on it" (quotation omitted)). Indeed, a party may not "allude to an issue in the district court, abandon it at the crucial time when the district court might have been called to rule upon it, and then resurrect the issue on appeal." *Louque v. Allstate Ins. Co.,* 314 F.3d 776, 779 n. 1 (5th Cir.2002); *see also Hargrave,* 710 F.2d at 1163–64. Because Gonzalez abandoned his motion, he cannot claim on appeal that the district court abused its discretion by not granting it. *See Copar Pumice Co. v. Morris,* 639 F.3d 1025, 1030 (10th Cir.2011) (holding that a party waives all appellate review of a withdrawn motion). Although Gonzalez describes the district court's judgment as an "implicit" denial of his motion for leave to amend, this characterization is inaccurate because Gonzalez filed his motion to amend *after* the district court issued its judgment. *See Addington v. Farmer's Elevator Mut. Ins. Co.,* 650 F.2d 663, 666 (5th Cir.1981) (dismissal with prejudice is an implicit denial of a *pending* motion to amend).[FN7]

FN7. In support of this argument, Gonzalez also attempts to construe a footnote in his opposition to Defendants–Appellees' motions to dismiss as a motion to file a second amended complaint. This disclaimer, which indicates Gonzalez could provide additional facts should the motions to dismiss be granted, is not a valid motion to amend. *U.S. ex rel. Willard v. Humana Health Plan of Tex. Inc.,* 336 F.3d 375, 387 (5th Cir.2003) ("A bare request in an opposition to a motion to dismiss [,] without any indication of the particular grounds on which the amendment is sought[,] ... does not constitute a motion within the contemplation of Rule 15(a)." (quotation and internal punctuation omitted)).

Finally, even if the various filings are construed as a denial of the motion to amend, a denial

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 9

454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.)))**

would not be an abuse of discretion.[FN8] Denial of a motion to amend is warranted for "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of the amendment, and futility of the amendment." *Rosenblatt v. United Way of Greater Hous.,* 607 F.3d 413, 420 (5th Cir.2010) (internal quotation and punctuation omitted). "In cases where a party seeks to amend [his] complaint after entry of judgment, '[this Court has] consistently upheld the denial of leave to amend where the party seeking to amend has not clearly established that he could not reasonably have raised the new matter prior to the trial court's merits ruling.' " *Vielma,* 218 F.3d at 468 (quoting *Briddle v. Scott,* 63 F.3d 364, 380 (5th Cir.1995)); *Rosenblatt,* 607 F.3d at 420 (same). All of the facts that Gonzalez now seeks to include in his second amended complaint could have been alleged in the amended complaint. Gonzalez chose not to allege any of these facts for the approximately eighteen months that this action was pending prior to its dismissal, even noting in filings in the district court that he possessed these additional facts but chose not to include them. Thus, with the exception of the claims against Loeb Holding, we now hold that the district court did not abuse its discretion by dismissing the amended complaint with prejudice.

> FN8. Because Gonzalez did not file his motion for leave to amend until after judgment was entered, the motion must now be treated as a motion to amend the judgment under Rule 59(e), rather than a motion to amend under Rule 15(a). *Rosenzweig,* 332 F.3d at 864. Although the motion to amend is filed under Rule 59, it is analyzed using the same factors as would normally be considered when ruling on a motion to amend that is filed under Rule 15(a). *Id.; Vielma v. Eureka Co.,* 218 F.3d 458, 468 (5th Cir.2000).

### IV. CONCLUSION

**\*\*6** Accordingly, for the reasons stated by the district court, the dismissal with prejudice**\*303** is AFFIRMED, except that we modify the dismissal to be without prejudice as to Defendant–Appellee Loeb Holding.

C.A.5 (Tex.),2011.
Gonzalez v. Bank of America Ins. Services, Inc.
454 Fed.Appx. 295, 2011 WL 6156856 (C.A.5 (Tex.))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 3

Westlaw.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
**(Cite as: 2006 WL 2822151 (E.D.Tex.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas,
Tyler Division.
HEWLETT–PACKARD COMPANY, Plaintiff,
v.
BYD:SIGN, INC.; Byd:Sine, Co. Ltd., a/k/a
Byd:Sign, Co. Ltd., a/k/a Byd:Sign CompanyJapan,
Ltd, a/k/a Byd:Sign Worldwide; Eyefi Digital TV,
Inc.; Katsumi Electronics Corp.; J. Brian Dennison;
Karl Kamb, Jr.; Katsumi Iizuka; Marc McEachern;
David Thorson; Poojitha Preena, Defendants.

No. 6:05–CV–456.
Sept. 28, 2006.

Earl Glenn Thames, Jr, Michael Edwin Jones, Allen
Franklin Gardner, Diane Devasto, Potter Minton
PC, Tyler, TX, Kelly Dean Hine, Stephen Edward
Fox, Thomas M. Melsheimer, Fish & Richardson,
Dallas, TX, for Plaintiff.

Jennifer D. Jesinoski, Meredith A. Miles, William
D. Coston, Venable LLP, Washington, DC, John C.
Hardy, III, Hardy & Atherton, Tyler, TX, Bryce K.
Kunimoto, Elissa F. Cadish, J. Stephen Peek, Hale
Lane Peek Dennison & Howard, Las Vegas, NV,
William David Ellerman, Mark Tad Josephs, Jack-
son Walker, Dallas, TX, David T. Alexander, Mc-
Dermott Will & Emery, Palo Alto, CA, Sidney
Calvin Capshaw, III, Elizabeth L. Derieux, Brown
McCarroll, Longview, TX, John Alexander Irvine,
Porter & Hedges, Houston, TX, for Defendants.

***ORDER ON MOTIONS TO DISMISS FOR LACK
OF PERSONAL JURISDICTION AND MO-
TIONS TO TRANSFER VENUE***
MICHAEL H. SCHNEIDER, District Judge.

**\*1** Came on for consideration this day the fol-
lowing pre-answer motions:

(1) Defendants Poojitha Preena and Idapt Sys-

tems LLC's Motion to Dismiss and Brief in Sup-
port (Doc. No. 13);[FN1]

> FN1. Plaintiff HP has voluntarily dis-
> missed its claims against Defendant Idapt
> Systems LLC, and Idapt is no longer a
> party to this action.

(2) Defendants byd:sine, Co. Ltd., a/k/a byd:sign,
Co. Ltd., a/k/a byd:sign Company Japan, Ltd, a/
k/a byd: sign Worldwide; Eyefi Digital TV, Inc.;
and Katsumi Iizuka's Motion to Dismiss and Sup-
porting Brief (Doc. No. 21);

(3) Defendants byd:sine, Co. Ltd., a/k/a byd:sign,
Co. Ltd., a/k/a byd:sign Company Japan, Ltd, a/
k/a byd: sign Worldwide; Eyefi Digital TV, Inc.;
and Katsumi Iizuka's Motion to Transfer Venue
Pursuant to 28 U.S.C. § 1404(a) and Supporting
Brief (Doc. No. 22);

(4) Defendant Katsumi Electronics Corporation's
Motion to Dismiss for Lack of Jurisdiction (Doc.
No. 23);

(5) Defendant David Thorson's Motion to Trans-
fer Venue Pursuant to 28 U.S.C. § 1404(a) (Doc.
No. 31);

(6) Defendant David Thorson's Motion to Dis-
miss Pursuant to Rules 12(b)(2) and 12(b)(3) of
the Federal Rules of Civil Procedure (Doc. No.
32).

Having considered said motions, the Plaintiff's
consolidated Response, and the replies, as well as
having heard the argument of counsel at a hearing
held before a session of this Court on September
18, 2006, and in the interest of judicial economy,
the Court enters the following opinion and order
as to the above listed motions.

**I. BACKGROUND**

This case arises from certain allegations

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
**(Cite as: 2006 WL 2822151 (E.D.Tex.))**

brought by Plaintiff Hewlett–Packard Corporation ("HP") that natural and corporate citizens of Texas and individuals and entities throughout the United States and in East Asia conspired to usurp HP's corporate opportunities, to defraud HP, to misappropriate HP's trade secrets and proprietary information, to interfere tortiously with HP's contracts, to breach HP's contracts, to compete unfairly with HP, and to conspire and to establish an unlawful enterprise in violation of federal and state laws to HP's detriment. The Amended Complaint alleges that the Defendants utilized their positions of trust at HP to form and operate an enterprise that would compete directly with HP in the flat-panel television market.

HP alleges in its complaint that each of the individual Defendants—J. Brian Dennison ("Dennison"), Karl Kamb, Jr. ("Kamb"), Katsumi Iizuka ("Iizuka"), Marc McEachern ("McEachern"), David Thorson ("Thorson"), and Poojitha Preena ("Preena") (collectively, the "Individual Defendants")—were at one time either employees or contractors working for HP or for one of its predecessors, Compaq Computer Corporation. HP alleges that the Individual Defendants conspired to use their positions of trust and confidence at HP to obtain trade secrets and other proprietary information from HP and then illegally funneled those secrets and HP's corporate opportunities to an enterprise founded by several of the Individual Defendants. HP further alleges that the Defendant companies—byd:sign, Inc., a/k/a byd:sign, L.L.C. ("byd:sign USA"); byd:sine, Co. Ltd., a/k/a byd:sign, Co. Ltd., a/k/a byd:sign Company Japan, Ltd, a/k/a byd:sign Worldwide ("Byd:sign World Wide"); Eyefi Digital TV, Inc. ("Eyefi"); and Katsumi Electronics Corporation ("KEC")—were each formed and/or run by or with the assistance of the Individual Defendants in furtherance of that conspiracy. In this lawsuit, HP seeks an accounting, imposition of a constructive trust, and monetary damages to compensate HP for the loss that HP has suffered as a result of the Defendants' alleged wrongdoing.

*2 Defendants Dennison, McEachern, and byd:sign USA have answered HP's Complaint.[FN2] Defendants Iizuka, Thorson, Preena, byd:sign World Wide, Eyefi, and KEC have all filed motions challenging personal jurisdiction, venue, and/or the sufficiency of HP's pleading. The Court permitted HP to engage in jurisdictional discovery regarding the Defendants' contacts with Texas before considering the Defendants' pre-answer motions. *(See* Doc. Nos. 73, 81–86, 90.) The parties have completed that discovery, and Plaintiff HP has filed a Consolidated Response to Defendants' Pre-Answer Motions (Doc. No. 111), to which Plaintiff has attached several hundred pages of discovery which HP claims establishes that the moving Defendants have purposefully directed their activities towards this forum and have maintained continuous and systematic business and personal contacts with this State and that this Court's exercise of jurisdiction over the Defendants' persons is proper.

> FN2. Defendants Byd:sign World Wide, Eyefi, Iizuka, Kamb, and McEachern have also filed a motion to dismiss certain claims alleged against them pursuant to Rule 12(b)(6) and Rule 9(b) of the Federal Rules of Civil Procedure (Doc. No. 143). This motion is not yet ripe for decision.

The Moving Defendants have each replied to HP's Response and maintain that HP's evidence is insufficient to establish this court's jurisdiction over them.

## II. STANDARD OF REVIEW

When a court does not conduct an evidentiary hearing on a motion to dismiss for lack of personal jurisdiction, the plaintiff must present sufficient facts to make out a prima facie case for the exercise of jurisdiction over the nonresident defendant.[FN3] *Alpine View Co. v. Atlas Copco AB,* 205 F.3d 208, 215 (5th Cir.2000). A court must accept as true all non-conclusory, uncontroverted allegations in the plaintiff's complaint, and it must resolve all factual conflicts in favor of jurisdiction. *See id.; Central Freight Lines Inc. v. APA Transport Corp.,* 322

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
**(Cite as: 2006 WL 2822151 (E.D.Tex.))**

F.3d 376, 380 (5th Cir.2003).

> FN3. As noted previously, this Court held a hearing on the Defendants' motions to dismiss for lack of personal jurisdiction on September 18, 2006, but as this Court made clear at that hearing, the hearing was not an evidentiary hearing—the Court heard no sworn testimony and admitted no evidence. The hearing was for the purpose of hearing oral argument as to the pending motions.

### III. ANALYSIS

Whether the Court has personal jurisdiction over the Moving Defendants depends on whether personal jurisdiction lies under the Texas long-arm statute and the Due Process Clause of the U.S. Constitution. *Alpine View,* 205 F.3d at 214. The Texas long-arm statute has been determined to have the same scope as the Due Process Clause. *Id; Central Freight Lines,* 322 F.3d at 380. Therefore, the Court must consider whether exercising jurisdiction over the Moving Defendants is consistent with the Due Process Clause. *See Alpine View,* 205 F.3d at 214.

Exercising personal jurisdiction over a non-resident defendant is consistent with due process when "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing 'minimum contacts' with the forum state; and (2) the exercise of jurisdiction over that defendant does not offend 'traditional notions of fair play and substantial justice.' " *Central Freight Lines,* 322 F.3d at 380 (quoting *Mink v. AAAA Development LLC,* 190 F.3d 333, 336 (5th Cir.1999)). To find that a defendant has sufficient minimum contacts with the forum state, a plaintiff must establish that the defendant "purposefully avail[ed]" itself of the privilege of conducting activities in the forum, "thus invoking the benefits and protections of its laws." *Jones v. Petty–Ray Geophysical Geosource, Inc.,* 954 F.2d 1061, 1068 (5th Cir.1992) (citing *Hanson v. Denckla,* 357 U.S. 235, 253 (1958)). The defendant's activities in the

subject forum "must justify a conclusion that the defendant should reasonably anticipate being called into court there." *Id.* (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297 (1980)).

**\*3** A defendant's contacts with a forum may either be general or specific. *Central Freight Lines,* 322 F.3d at 381. Specific jurisdiction arises when a non-resident defendant has "purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985)). A court may assert general jurisdiction over a non-resident defendant when that defendant's contacts with the forum state are "substantial and 'continuous and systematic' but unrelated to the instant cause of action." *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8 (1984)).

Once a plaintiff meets its burden to establish minimum contacts between a defendant and the forum state, the burden shifts to the defendant challenging jurisdiction to make a "compelling case" that "the assertion of jurisdiction is unfair and unreasonable." *Id.* at 384. In determining whether the exercise of jurisdiction is fair and reasonable, the court must balance: (1) the burden on the nonresident defendant of having to defend itself in the forum; (2) the interests of the forum state in the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the shared interests of the states in furthering fundamental social policies. *Id.* (citing *Burger King,* 471 U.S. at 477; *Asahi Metal Indus. Co. Ltd. v. Superior Court of California,* 480 U.S. 102, 115 (1987)).

### A. Byd:sign World Wide
#### 1. General Jurisdiction

Byd:sign World Wide, an entity located in Japan, has sufficient contacts with Texas to support this court's jurisdiction over it. Jurisdiction over Byd: sign World Wide is appropriate under both the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
(Cite as: 2006 WL 2822151 (E.D.Tex.))

Page 4

general and specific theories of jurisdiction.

HP's evidence supports the exercise of general jurisdiction over Byd:sign World Wide because, from the founding of Byd:sign USA, a Texas corporation, in 2003 until Byd:sign World Wide transferred its North American operations to Eyefi in 2005, Byd:sign USA was the exclusive distributor and sales agent of Byd:sign World Wide products in North America. HP's evidence establishes that during this period, Byd:sign World Wide utilized Byd:sign USA's employees and resources to market Byd:sign World Wide products, which it designed, manufactured, and shipped to customers in Texas and the United States. Indeed, Byd:sign World Wide and its officers approached J. Brian Dennison, a Texas resident, about forming Byd:sign USA to operate as the Byd:sign World Wide sales apparatus in the United States. Moreover, the evidence shows that Byd:sign World Wide's officers and employees exercised some oversight of Byd:sign USA's operations and employees, made frequent visits to Byd:sign USA's corporate offices in Houston, Texas, directed numerous emails to Byd:sign USA's employees, and shipped products to Byd:sign USA's location in Houston. Furthermore, in February 2004, Byd:sign World Wide made an 8 million yen [FN4] loan to Byd: sign USA, and in 2004 Byd:sign World Wide's President, Iizuka, facilitated an approximately $9 million loan to Byd:sign World Wide and Byd:sign USA.

FN4. At an exchange rate of 105.55 Japanese yen per dollar, 8 million yen exchanged for $75793.46 on February 10, 2004, the date identified on the loan documents. *See* Federal Reserve Bank of New York, *Foreign Exchange Rates Historical Search,* http:// www.ny.frb.org/markets/fxrates/historical/ home.cfm.

*4 Byd:sign World Wide challenges HP's evidence regarding the extent of Byd:sign World Wide's contacts with Texas. In particular, Byd:sign World Wide states in its reply that "Bydesign Japan did

not make strategic decisions for Byd:sign USA." HP's evidence, however, does indicate that Byd:sign World Wide worked very closely with Byd:sign USA until Byd:sign World Wide ended its relationship with Byd: sign USA and began distributing its products through Eyefi in 2005. Because the precise extent of Byd:sign World Wide's control over Byd:sign USA is controverted, and because HP's evidence is sufficient to support the allegation that Byd:sign World Wide maintained some level of control over Byd:sign USA's operations, the Court resolves this conflict in favor of jurisdiction. *See Central Freight Lines,* 322 F.3d at 380.

Byd:sign World Wide also challenges that the evidence does not establish contacts "substantial enough" to justify subjecting Byd:sign World Wide to jurisdiction in Texas. Byd:sign World Wide cites *Central Freight Lines,* wherein the Fifth Circuit found that there was no general jurisdiction over a New Jersey defendant who routinely arranged for and received shipments to and from Texas and regularly sent sales people to Texas to develop business, negotiate contracts, and service national accounts. *Id.* at 381. The *Central Freight* court found that, though the New Jersey defendant's "contacts with the state of Texas have been, in some sense, 'continuous and systematic,' [the defendant's] activities, *in toto,* are clearly not substantial enough to justify subjecting [the defendant] to suit" in Texas. *Id.*

This case, however, is somewhat different than that in *Central Freight.* In *Central Freight,* the defendant was a New Jersey shipping company whose primary operations were located in New Jersey, and whose shipping business primarily operated in the northeastern United States, and whose contacts with Texas were therefore "not substantial enough" to justify subjecting the defendant to suit in Texas. *Id.* at 379, 381. In this case, however, Byd:sign USA was Byd:sign World Wide's exclusive distributor in North America, and therefore much, if not all of Byd:sign World Wide's business in the United States was in some way connected with Texas. In-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
**(Cite as: 2006 WL 2822151 (E.D.Tex.))**

deed, the evidence shows that, in many instances, Byd:sign World Wide and Byd:sign USA represented themselves collectively to others as "byd:sign." HP's evidence establishes at least a prima facie showing that Byd:sign World Wide's continuous and systematic contacts with Texas and Byd:sign USA were indeed substantial enough to justify subjecting Byd:sign World Wide to suit in Texas. Byd:sign World Wide's contacts are therefore sufficient to support the exercise of general jurisdiction over it.

### 2. Specific Jurisdiction

Byd:sign World Wide's contacts with Byd:sign USA are also sufficient to support a finding of specific jurisdiction. Specific jurisdiction arises when a non-resident defendant has "purposefully directed its activities at the forum state and the litigation results from alleged injuries that arise out of or relate to those activities." *Central Freight Lines,* 322 F.3d at 381. In this case, Byd: sign World Wide's contacts with Byd: sign USA form the basis of a significant portion of HP's causes of action, including claims for unfair competition, usurpation of corporate opportunity, tortious interference, and misappropriation of trade secrets. Byd: sign World Wide shipped products to Byd: sign USA and communicated with Byd:sign USA employees on numerous occasions, allegedly in furtherance of the conspiracy. Specific jurisdiction over Byd: sign World Wide is appropriate under these facts.

**\*5** Specific jurisdiction may also be found where a defendant delivers a product into the stream of commerce with the expectation that the product will be purchased by consumers in the forum state. *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 298 (1980). In the Fifth Circuit, "mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce." *Luv N' Care Ltd. v. Insta–Mix, Inc.,* 438 F.3d 465, 470 (5th Cir.2006); *Ruston Gas Turbines v. Donaldson Co.,* 9 F.3d 415, 419 (5th Cir.1993). Furthermore, when

assessing whether jurisdiction arises out of the stream of commerce, the underlying cause of action "must arise out of" the defendant's contacts with the forum state. *Luv N' Care,* 438 F.3d at 472.

In this case, HP brings causes of action for usurpation of business opportunities and interference with prospective business relationships, among others, and these claims relate directly to the sale of Byd:sign televisions in the United States and Texas. Moreover, Byd:sign World Wide has sold numerous televisions to Best Buy, a national retail electronics chain, which has in turn sold the same products in Texas, including the Eastern District of Texas. Byd:sign World Wide sells its televisions to Best Buy, who then resells the televisions under a house brand name. During discovery, HP subpoenaed business records from Best Buy that reveal that Best Buy has sold over 12,000 Byd:sign World Wide televisions in the state of Texas during the 2006 fiscal year. [FN5] The Court finds that it was foreseeable to Byd:sign World Wide that the televisions sold to Best Buy, a nation-wide retailer with numerous stores in Texas, including several in the Eastern District of Texas, would be sold in Texas. *See Jacobs Chuck Mfg. Co. v. Shandong Weida Machinery Co., Ltd.,* No. 2:05–CV–185, 2005 WL 3299718, at \*8 (E.D.Tex. Dec. 5, 2005) (finding that a foreign manufacturer selling to a large, well-known retailer with stores located throughout the United States reasonably expected or knew that its products would be purchased by consumers in Texas).

> FN5. Byd:sign World Wide objects that Exhibit 113, Best Buy's record of Byd:sign television sets sold in Texas, is an unauthenticated document and should not be considered. Under Rule 902(11) of the Federal Rules of Evidence, the original or a duplicate of a domestic business record qualifying under Rule 803(6) is self-authenticating "if accompanied by a written declaration of its custodian or other qualified person, in a manner complying

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
**(Cite as: 2006 WL 2822151 (E.D.Tex.))**

with any Act of Congress or rule pre- scribed by the Supreme Court pursuant to statutory authority, certifying that the re- cord—(A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a per- son with knowledge of those matters; (B) was kept in the course of the regularly con- ducted activity; and (C) was made by the regularly conducted activity as a regular practice." Exhibit 113 is accompanied by an affidavit of the Custodian of Records for Best Buy Enterprises Services, Inc. that confirms that this document satisfies the requirements of a self-authenticating docu- ment under Rules 902(11) and 803(6).

Accordingly, the Court finds that HP has made a prima facie showing that this court has personal jurisdiction over Byd:sign World Wide.

### 3. Traditional Notions of Fair Play and Substan- tial Justice

Byd:sign World Wide argues that because its principal place of business is in Tokyo, Japan, it is "extremely burdensome" to require it to defend this case in Texas. The Court finds, however, that the burden on Byd:sign World Wide of having to de- fend itself in Texas is no greater than the burden that would exist in any other forum in the United States. Furthermore, Byd:sign World Wide has not shown that any other State has any more significant connection with this lawsuit than does Texas, and Texas' interests in the outcome of this case are not significantly different than those of any other state. Accordingly, the Court finds that Byd:sign World Wide has failed to make a compelling case that the assertion of jurisdiction over Byd:sign World Wide is unfair or unreasonable. Accordingly, Byd:sign World Wide's motion to dismiss for lack of person- al jurisdiction should be denied.

### B. Katsumi Iizuka
### 1. Specific Jurisdiction

*6 HP alleges that Katsumi Iizuka is subject to specific personal jurisdiction in Texas because

Iizuka has purposefully directed activities at Texas and the subject litigation arises from these activit- ies. Specifically, HP alleges that Iizuka traveled to Texas numerous times to conduct Byd: sign busi- ness and to solicit business from Texas companies; that Iizuka routinely communicated with Byd:sign USA employees in furtherance of the alleged con- spiracy; that Iizuka personally managed the trans- mission of products to Texas to be sold by Byd:sign USA—products that were allegedly manufactured, designed, and marketed using misappropriated trade secrets, resources, and proprietary information; and that Iizuka individually recruited the Byd:sign USA founder, Brian Dennison, and others to work as agents for Byd:sign World Wide.

Iizuka argues, however, that HP's causes of ac- tion do not arise from Iizuka's contacts with Texas, and that as such the fiduciary shield doctrine should operate to protect Iizuka from specific personal jur- isdiction arising out of these contacts. The Court disagrees.

In Texas, the "fiduciary shield" doctrine provides that corporate officers are not subject to personal jurisdiction in a foreign forum when their actions are taken in a representative capacity. *See Brown v. General Brick Sales Co., Inc.,* 39 S.W.3d 291, 297–300 (Tex.App.-Fort Worth 2001, no pet.); *Wright v. Sage Engineering, Inc.,* 137 S.W.3d 238, 250 (Tex.App.-Houston [1st Dist.] 2004, pet. denied). Several courts have held, however, that the fiduciary shield doctrine only applies to prevent general jurisdiction, and does not protect an officer from the exercise of specific personal jurisdiction as to intentional torts or fraudulent acts for which the officer may be held individually liable. *Wright,* 137 S.W.3d at 250; *SITQ E. U., Inc. v. Reata Res- taurants, Inc.,* 111 S.W.3d 638 (Tex.App.-Fort Worth 2003, pet. denied). As Iizuka correctly notes in his reply, the instant cause of action should be related to the activities HP cites as contacts giving rise to jurisdiction. *See D.J. Investments, Inc. v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542, 548 (5th Cir.1985) (jurisdiction found

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
(Cite as: 2006 WL 2822151 (E.D.Tex.))

where cause of action was directly related to the tortious activities the plaintiff cited as contacts that gave rise to personal jurisdiction). Accordingly, Iizuka's personal contacts with Texas while doing business for Byd:sign World Wide may support specific jurisdiction over Iizuka only if those contacts are part of an intentional tort or fraudulent act that gives rise to or relates to the instant causes of action.

In this case, HP's evidence establishes that Iizuka did indeed participate closely in the founding and operation of Byd:sign USA, and that Iizuka traveled to Texas frequently to solicit business on behalf of Byd: sign World Wide and USA. HP further alleges that these activities were conducted in furtherance of the conspiracy to wrongfully obtain and misappropriate HP's trade secrets and other proprietary information. This allegation, which forms the substance of HP's claim against Iizuka, is sufficient to establish a prima facie case that these activities were indeed part of the tortious conduct that is related to the subject of the present litigation. As noted at the outset, the Court should resolve all contested issues of fact in favor of jurisdiction. *Central Freight Lines,* 322 F.3d at 380. Accordingly, specific jurisdiction over Iizuka is appropriate under the asserted facts.

*7 Because the Court finds that HP has made a prima facie case that specific jurisdiction is appropriate over Iizuka, the Court declines to consider whether this court has general jurisdiction over Iizuka.

## 2. Traditional Notions of Fair Play and Substantial Justice

Iizuka argues that it is unfair and unreasonable for him to have to defend HP's claims in Texas because he is a Japanese citizen and it would be "extremely difficult" to constantly have to commute to Texas from Japan to attend court proceedings and to participate in discovery. The evidence produced during jurisdictional discovery reveals, however, that Mr. Iizuka travels to the United States and to Texas quite frequently for both busi-

ness and pleasure. For this reason the Court finds that Iizuka has failed to make a compelling case that it is unfair and unreasonable for him to have to defend this lawsuit in Texas. Accordingly, Mr. Iizuka's motion to dismiss for lack of personal jurisdiction should be denied.

### C. Katsumi Electronics Corporation

HP alleges that KEC is subject to personal jurisdiction under the stream of commerce theory. The Court, however, disagrees and finds that the Court lacks personal jurisdiction over KEC. HP alleges that KEC "placed thousands of televisions into the stream of commerce with Best Buy, knowing, intending, and reasonably foreseeing that Best Buy would sell those products in Texas." HP's evidence, however, does not support this assertion. The only link between KEC and the sale of Byd: sign televisions through Best Buy is a Letter of Intent executed by Best Buy, but which was later superseded by a Vendor Agreement between Byd:sign World Wide and Best Buy. The Deposition of Peter Hong, KEC's president, attached to KEC's motion to dismiss, indicates that, though Hong personally signed the Vendor Agreement on behalf of Byd: sign World Wide, Hong did so under a power of attorney granted for that purpose and neither he nor KEC are parties to the agreement. Other than the stream of commerce allegations, HP asserts no other facts sufficient to establish personal jurisdiction over KEC. HP has failed to establish its prima facie case that KEC purposefully availed itself of the privilege of conducting activities in Texas or that KEC's activities in Texas justify a conclusion that KEC should reasonably anticipate being called into court in Texas. *Jones,* 954 F.2d at 1068. Accordingly, the Court finds that KEC's motion to dismiss for lack of personal jurisdiction should be granted.

### D. Eyefi
#### 1. Specific Jurisdiction

Eyefi is subject to specific personal jurisdiction in Texas. HP's evidence establishes that Eyefi is a wholly owned subsidiary of Byd:sign World Wide that was formed in 2005 to succeed Byd:sign USA

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
**(Cite as: 2006 WL 2822151 (E.D.Tex.))**

as Byd:sign World Wide's North American sales agent. Accordingly, Eyefi has had multiple contacts with Texas as it assumed many of Byd: sign USA's assets, inventory, and customer contacts. Eyefi directly assumed responsibility for Byd:sign USA's largest customer, ADI. Significantly, David Thorson, a former HP employee and Eyefi's president, was in contact with Byd:sign's employees in Texas concerning the details of the transition of ADI's account and with Marc Chilcoat, a Texas resident and employee or agent of Eyefi, concerning potential customers.

**\*8** These contacts with Texas were purposeful and are related to HP's causes of action for conspiracy and misappropriation of corporate opportunities and trade secrets. Furthermore, they establish that Eyefi could reasonably expect to be haled into a Texas court over matters relating to Eyefi's contact with Byd:sign USA or Eyefi's relationship with Mr. Chilcoat. Accordingly, HP has established a prima facie case that this court has specific personal jurisdiction over Eyefi.

### 2. Traditional Notions of Fair Play and Substantial Justice

Eyefi argues that many of the documents needed to defend itself are located in Japan and are in Japanese, and that it is unfair and unreasonable to have to transport these documents to Texas, and that it would be burdensome on a jury to have to translate the documents into English. As with Byd:sign World Wide, however, the Court finds that this burden is not greater for Texas than it would be in any other forum located in the United States, and would be lessened by Eyefi's location in Nevada compared to Japan. For this reason, as well as the reasons articulated in the discussion of Byd:sign World Wide, the Court finds that Eyefi has failed to provide a compelling reason why litigating in Texas would be unfair or unreasonable. Eyefi's motion to dismiss should therefore be denied.

### E. David Thorson
### 1. Specific Jurisdiction

David Thorson is likewise amenable to specific jurisdiction in Texas. HP alleges that Thorson began managing Eyefi while still employed by HP and began directing contacts with Texas as Eyefi assumed Byd:sign USA's role as Byd:sign World Wide's North American agent. These contacts with Texas were directly related to HP's cause of action, in that they were in furtherance of the alleged conspiracy and tortious conduct that gives rise to HP's claims. Thorson purposefully directed contacts to Byd:sign USA and Texas while he remained an employee of HP. As noted in relation to Iizuka, the fiduciary shield doctrine does not protect Thorson for his contacts with Texas on behalf of Eyefi because his contacts are part of the alleged individual tortious conduct. Accordingly, HP has made a prima facie showing that this court has specific jurisdiction over Thorson.

### 2. Traditional Notions of Fair Play and Substantial Justice

Thorson argues that to defend this lawsuit in Texas would be unduly burdensome, extremely difficult and time consuming, and would force Thorson to incur substantial costs and inconvenience. Given the contacts Thorson and Eyefi have already established with Texas, it is not unreasonable or unfair to have Thorson defend this suit in Texas. Furthermore, the interests of efficient relief, and the lack of a showing that any other forum has a more compelling interest in the outcome of the litigation than Texas, the Court finds that Thorson has failed to make a compelling case that jurisdiction in Texas is unfair or unreasonable.

### 3. RICO's Nationwide Service Provision
**\*9** HP further alleges that jurisdiction is conferred over Thorson by the RICO statute's nationwide service provisions. *See* 18 U.S.C. § 1965. As Thorson has admitted, nationwide service of process under RICO is appropriate if each of two elements are met. First, the RICO statute provides for nationwide service of process when the court has personal jurisdiction over one of the alleged RICO conspirators in a multi-district conspiracy.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
(Cite as: 2006 WL 2822151 (E.D.Tex.))

*Butcher's Union Local No. 498 v. SDC Investment, Inc.,* 788 F.2d 535, 539 (9th Cir.1986); *Hawkins v. Upjohn Co.,* 890 F.Supp. 601, 605–06 (E.D.Tex.1994). In this case, three of the alleged RICO conspirators—Kamb, Dennison, and McEachern—have consented to personal jurisdiction before this court. Moreover, Defendant Dennison is a Texas resident over whom personal jurisdiction is undoubtedly proper.

Second, RICO requires that the plaintiff show that "the ends of justice require that other parties residing in any other district be brought before the court." 18 U.S.C.1965(b). Though the Fifth Circuit has not commented on what set of facts would satisfy "the ends of justice" requirement, several other courts have opined as to what would satisfy "the ends of justice." Several courts, for instance, have held that "the ends of justice" require a showing that there be no other district court that would have personal jurisdiction over all of the alleged RICO conspirators. *See, e.g., Butcher's Union,* 788 F.2d at 539 (9th Cir.1986); *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 71–72 (2d Cir.1998). Other courts, however, have held that whether there is no other possible forum in which the action could be brought is but one factor to take into consideration, among others. *See Miller Brewing Co. v. Landau,* 616 F.Supp. 1285, 1290 (E.D.Wis.1985) (whether an alternative forum exists is at least one factor that should be considered as part of an ends of justice analysis); *Southmark Prime Plus, L.P. v. Falzone,* 768 F.Supp. 487, 491–92 (D.Del.1991) (whether other district courts would have proper venue and personal jurisdiction over all defendants was just one of three factors considered in assessing the ends of justice); *Soltex Polymer Corp. v. Fortex Indus., Inc.,* 590 F.Supp. 1453, 1459 (E.D .N.Y.1984); *Farmers Bank of Del. v. Bell Mortgage Corp.,* 452 F.Supp. 1278, 1282 n. 8 (D.Del.1978); *United Power Ass'n, Inc. v. L.K. Comstock & Co.,* No. 3–89 Civ. 766, 1992 WL 402906, at *3 (D.Minn. Oct. 27, 1992). HP argues that nationwide service of process is appropriate in this case because "it is unclear whether a Defendant such as

Dennison (a Texas resident) would be subject to personal jurisdiction in California, Nevada, or any other possible forum." (Pl.'s Resp. 33.) HP further argues that "the absence of an alternative venue is merely illustrative of the kind of circumstances that will support nationwide service, not an exclusive requirement of the statute." (Pl.'s Sur–Reply to D. Thorson's Reply 3.) The Court agrees.

**\*10** The *Butcher's Union* court said that "Congress intended the 'ends of justice' provision to enable plaintiffs to bring all members of a nationwide RICO conspiracy before a court in a single trial." 788 F.2d at 539. The *Butcher's* court cited *Farmers Bank of State of Del. v. Bell Mortg. Corp.* for this proposition. 577 F.Supp. 34, 35 (D.C.Del.1978). In *Farmer's Bank,* the court concluded that "[t]here are no facts in the record which would suggest that" the diverse defendants were all subject to venue in a single state. *Id.* The *Farmer's Bank* court went on to state, however, that "the interests of justice and judicial economy dictate that the whole action be tried in one Court," and that Section 1965(b) was instituted to aid these interests. *Id.* Accordingly, the *Farmer's Bank* court concluded that, "[g]iven the desirability of having the whole action litigated in one court," and considering that venue and jurisdiction over most of the other defendants was proper, "the ends of justice require[d] that the Court permit [the defendant] to be brought before it as a defendant pursuant to 18 U.S.C. § 1965(b)." *Id.*

Similarly, Judge Sanders in the Northern District of Texas found the exercise of jurisdiction over RICO defendants was appropriate under 18 U.S.C. § 1965(b) where it was "unlikely" that an alternative forum was available in which jurisdiction would be proper as to all defendants. *Johnson v. Investacorp, Inc.,* No. 3–89–2607–H, 1990 WL 25034, at *2 (N.D.Tex. Jan. 31, 1990).

In this case, where jurisdiction is proper over four of the RICO defendants—Kamb, Dennison, McEachern, and Iizuka—and where there is no evidence that a California court would have juris-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
**(Cite as: 2006 WL 2822151 (E.D.Tex.))**

diction over Defendant Dennison,[FN6] the ends of justice require a finding that personal jurisdiction exists over Thorson pursuant to 18 U.S.C. § 1965(b). Thorson's motion to dismiss for lack of personal jurisdiction should therefore be denied.

> FN6. Thorson challenges that Dennison's employment with HP, a California company, and his close working relationship with Defendant Preena, a California resident, make it "possible that the United States District Court for the Northern District of California would have personal jurisdiction over Dennison." (Thorson's Pers. Juris. Reply 10.) There are no facts on the record, however, that Dennison has the necessary minimum contacts with California to establish that personal jurisdiction or venue as to Dennison is proper in California. Furthermore, Dennison's employment with a California company, by itself, is not necessarily sufficient to establish personal jurisdiction over Dennison in California. *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 478 (1985) ("If the question is whether an individual's contract with an out-of-state party alone can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot.")

### F. Poojitha Preena

Having found that personal jurisdiction over the RICO conspirators is appropriate, the Court declines to consider Preena's minimum contacts with Texas and concludes that the exercise of personal jurisdiction over Poojitha Preena is proper under 18 U.S.C. § 1965(b). Consequently, Preena's motion to dismiss for lack of personal jurisdiction should be denied.

### IV. MOTIONS TO TRANSFER VENUE
### A. Motions to Transfer Venue Pursuant to 28 U.S.C. § 1406(a)

Having found that this court's the exercise of personal jurisdiction over Defendants Byd: sign

World Wide, Iizuka, Eyefi, Preena, and Thorson is appropriate, the Court next considers the various motions to transfer venue.

Defendants Preena and Thorson assert that venue in the Eastern District of Texas is improper and that this case should be transferred to the Northern District of California. If a plaintiff commences an action in the wrong district or division, a federal court must, upon timely motion, dismiss the action for improper venue, or if it be in the interest of justice, transfer the case to any district or division where it could have been brought. 28 U.S.C. § 1406(a). Though the cases seem to diverge on the question of which party bears the burden of showing that venue is either proper or improper, "the clear weight of authority, is that, when objection has been raised, the burden is on the plaintiff to establish that the district he chose is a proper venue." 15 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 3826 (2d. ed.1986). *See Youman v. Newfield Exploration Co.,* 977 F.Supp. 809, 810 (E.D.Tex.1997); *Langton v. Cheyond Communication, L .L.C.,* 282 F.Supp.2d 504, 508 (E.D.Tex.2003); *McCaskey v. Continental Airlines, Inc.,* 133 F.Supp.2d 514, 523 (S.D.Tex.2001).

**\*11** Where jurisdiction is based on a federal cause of action, venue is only proper in

> (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(b). Because the Defendants in this case reside in different states, 28 U.S.C. § 1391(b)(1) does not apply. Furthermore, HP does not argue that there is no district in which this action may otherwise be brought. *See* 28 U.S.C. §

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
**(Cite as: 2006 WL 2822151 (E.D.Tex.))**

1391(b)(3). Accordingly, the Court must decide whether the Eastern District of Texas is a district where a substantial part of the events or omissions giving rise to the claim occurred. 28 U.S.C. § 1391(b)(2).

HP argues that a substantial part of the events at issue as well as a substantial part of the property that is the subject of this action is located in this district because more than 3,200 Byd:signmade television sets have been sold at Best Buy stores located in this district.[FN7] HP argues that because these television sets are the result of wrongful sales, their sale in this district constitutes a substantial part of the events at issue, and the television sets themselves are a substantial part of the property that is the subject of this action. Accepting the undisputed facts and allegations as true, the Court finds that HP has met its burden as to venue in the Eastern District of Texas. *See McCaskey,* 133 F.Supp.2d at 523 (when assessing venue, the court should accept uncontroverted facts in the complaint as true and resolve conflicts in the evidence in the plaintiff's favor). Preena's and Thorson's motions challenging improper venue should be denied.

> FN7. HP relies on Exhibit 113, a print-out of byd: sign televisions sold by Best Buys stores in Texas. HP stated during oral argument that, to obtain the number of televisions sold in the Eastern District of Texas, it has obtained Best Buy store codes from http://www.bestbuy.com and has cross-referenced these store codes with Exhibit 113 to determine which televisions were sold at particular stores.

**B. Motions to Transfer Venue Pursuant to 28 U.S.C. § 1404(a)**

As an alternative to their motions to dismiss for lack of personal jurisdiction, Defendants Byd:sign World Wide, Eyefi, Iizuka, and Thorson move the Court to transfer this action to the Northern District of California for the convenience of the parties pursuant to 28 U.S.C. § 1404(a). "For the convenience of parties and witnesses, in the interest of justice, a

district court may transfer any civil action to any other district or division where [the case] might have been brought." 28 U.S.C. § 1404(a). It is within the sound discretion of the court to decide whether to transfer venue under § 1404. *See* 28 U.S.C. § 1404(b); *Jarvis Christian College v. Exxon Corp.,* 845 F.2d 523, 528 (5th Cir.1988).

Courts generally balance (a) the convenience of the litigants and (b) the public interests in the fair and efficient administration of justice when deciding whether transfer under § 1404 is appropriate. *Hanby v. Shell Oil Co.,* 144 F.Supp.2d 673, 676 (E.D.Tex.2001) (citing *Robertson v. Kiamichi RR Co., L.L.C.,* 42 F.Supp.2d 651, 655 (E.D.Tex.1999); *Singleton v. Volkswagen of America, Inc.,* No. 2:06–CV–222, 2006 WL 2634768, at *1 (E.D.Tex. Sept. 12, 2006). Convenience factors often include: (1) plaintiff's choice of forum; (2) convenience of parties and witnesses; (3) place of the alleged wrong; (4) location of counsel; (5) cost of obtaining the attendance of witnesses; (6) accessibility and location of sources of proof; and (7) possibility of delay and prejudice if transfer is granted. *See Hanby,* 14 F.Supp.2d at 676–77. Public interest factors often include: (1) administrative difficulties caused by court congestion; (2) local interest in adjudicating local disputes; (3) unfairness of burdening citizens in an unrelated forum with jury duty; and (4) avoidance of unnecessary problems in conflict of laws. *See id.* at 677.

***12** Convenience factors in this case either weigh in favor of or are neutral as to venue. First, HP has chosen this forum. Second, though transfer to California may ease the burden on several of the defendants located in the western portions of the United States and in Japan, other witnesses in Texas, Massachusetts, and Minnesota would bear potentially greater burdens. Transferring venue would only shift the inconvenience of forum from some parties and witnesses to other parties and witnesses. Commercial air service is available directly to Tyler via Dallas/Fort Worth International Airport, which offers direct flights from locations in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)
**(Cite as: 2006 WL 2822151 (E.D.Tex.))**

Page 12

the United States and around the world. Moreover, because the witnesses and parties in this case are so widely distributed both in the United States and across the globe, it is not clear that transferring this case to California would greatly increase the convenience of the parties and witnesses, if at all. Third, the alleged wrong to HP, though certainly located to some extent in the Northern District of California, is also alleged to be connected with Tyler because the Defendants' allegedly deprived HP of potential revenues by selling televisions in this district. Fourth, counsel for the parties are located in Washington, D.C., Las Vegas, Palo Alto, Dallas, and Houston, and transferring this action to the Northern District of California would have little or no positive impact on the burden on counsel. As to the fifth factor, the cost of obtaining the attendance of witnesses, no evidence has been produced to show that there is any greater cost associated with securing the attendance of witnesses at depositions and the like, especially given that witnesses are widely dispersed. As to the accessibility and location of sources of proof, again, the evidence is distributed across wide distances, and as has been shown during preliminary discovery on personal jurisdiction, the use and aid of modern technological conveniences greatly reduces, if not eliminates, many difficulties associated with gathering evidence. Finally, the possibility of delay and prejudice if a transfer is granted weighs in favor of maintaining venue in this forum, especially after the parties have spent considerable time and resources on the issue of personal jurisdiction in this court. As a whole, the above convenience factors weigh in favor of maintaining venue in this court.

As to the public interest factors, court congestion is not a substantial problem for this court, thanks in part to this district's broad discovery rules and other factors that are conducive to a relatively speedy docket. The second factor, the local interest in adjudicating this dispute, weighs somewhat against maintaining venue, largely because, when compared with the Northern District of California, relatively few individuals are employed by or have

a relationship with HP in this district. As to the third factor, the unfairness of burdening citizens in an unrelated forum with jury duty, there is no evidence, first, that this forum is "unrelated," and second, that jury duty would be any greater burden for jurors in this district than it would be for those in any other district. Finally, this court is capable of applying the relevant law. Accordingly, the public interest factors do not weigh heavily, if at all, in favor of transfer. For these reasons, the motions to transfer venue pursuant to 28 U.S.C. § 1404 should be denied.

## V. CONCLUSION

**\*13** For the above stated reasons, Defendant Katsumi Electronics Corporation's Motion to Dismiss for Lack of Jurisdiction (Doc. No. 23) is hereby **GRANTED** and all claims against Katsumi Electronics Corporation are **DISMISSED** without prejudice. It is further

ORDERED that the Defendant Preena's Motion to Dismiss (Doc. No. 13); Defendants Byd:sign World Wide, Eyefi, and Iizuka's Motion to Dismiss (Doc. No. 21); Defendants Byd:sign World Wide, Eyefi, and Iizuka's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (Doc. No. 22); Defendant Thorson's Motion to Transfer Venue Pursuant to 28 U.S.C. § 1404(a) (Doc. No. 31); and Defendant Thorson's Motion to Dismiss Pursuant to Rules 12(b)(2) and 12(b)(3) of the Federal Rules of Civil Procedure (Doc. No. 32) are hereby **DENIED.**

**It is so ORDERED.**

E.D.Tex.,2006.
Hewlett-Packard Co. v. Byd:Sign, Inc.
Not Reported in F.Supp.2d, 2006 WL 2822151 (E.D.Tex.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 4

Westlaw.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas,
Texarkana Division.
ICON HEALTH & FITNESS, INC., a Delaware
Corporation, Plaintiff
v.
HORIZON FITNESS, INC., et al., Defendants.

No. 5:08CV26.
April 16, 2009.

West KeySummary**Patents 291 ☞288(3)**

291 Patents
    291XII Infringement
        291XII(C) Suits in Equity
           291k288 Jurisdiction
               291k288(3) k. Residence and Place of
Infringement. Most Cited Cases
    A Taiwanese exercise equipment manufacturer
had minimum contacts with Texas under the stream
of commerce theory, as would support the exercise
of specific personal jurisdiction over the manufac-
turer in a patent infringement action. The manufac-
turer's allegedly infringing products were offered
for sale and sold by various national and regional
retailers. Each of those retailers had locations in
Texas. As a result of contracting to manufacture
products for sale in national retail stores, the manu-
facturer could have expected that it could be
brought into court in the states where those stores
were located.

C. J. Veverka, David R. Wright, Kirk R. Harris,
Larry R. Laycock, Mark W. Ford, Workman Nyde-
gger, Salt Lake City, UT, for Plaintiff.

J. Donald Best, John C. Scheller, Michelle L. Dama
, Wendy M. Ward, Michael Best & Friedrich LLP,
Madison, WI, Robert William Weber, Smith Weber
LLP, Texarkana, TX, Franklin Albright Poff, Jr.,
Boyd, Poff & Burgess, L.L.P., Texarkana, TX,

Jerry A. Riedinger, Ryan J. McBrayer, Tyler C.
Peterson, Perkins Coie LLP, Seattle, WA, John
Robert Mercy, Mercy Carter Tidwell, L.L.P., Tex-
arkana, TX, John Louis Tidwell, Mercy Carter Tid-
well, Texarkana, TX, Michael J. Hickey, Richard
B. Walsh, Jr., Lewis Rice & Fingersh, St. Louis,
MO, for Defendants.

### *MEMORANDUM ORDER*
DAVID FOLSOM, District Judge.
    **\*1** The above-entitled and numbered civil ac-
tion was heretofore referred to United States Magis-
trate Judge Caroline M. Craven pursuant to 28
U.S.C. § 636. The Report of the Magistrate Judge
which contains her proposed findings of fact and
recommendations for the disposition of such action
has been presented for consideration. No objections
to the Report and Recommendation were filed. The
Court is of the opinion that the findings and conclu-
sions of the Magistrate Judge are correct. There-
fore, the Court hereby adopts the Report of the
United States Magistrate Judge as the findings and
conclusions of this Court. Accordingly, it is

    **ORDERED** that Defendant Johnson Health
Tech Co. Ltd.'s Motion to Dismiss for Lack of Per-
sonal Jurisdiction (Dkt. No. 75) is **DENIED.**

### *REPORT AND RECOMMENDATION OF THE*
### *UNITED MAGISTRATE JUDGE*
CAROLINE M. CRAVEN, United States Magis-
trate Judge.
    The above-referenced case was referred to the
undersigned United States Magistrate Judge for
pre-trial purposes in accordance with 28 U.S.C. §
636. The following pending motion is before the
Court: Defendant Johnson Health Tech Co. Ltd.'s
Motion to Dismiss for Lack of Personal Jurisdiction
(Docket Entry # 75). The Court, having reviewed
the relevant briefing and hearing arguments of
counsel March 4, 2009, recommends the motion be
**DENIED.**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

## I. FACTUAL BACKGROUND

Plaintiff ICON Health and Fitness, Inc. ("Plaintiff" or "ICON") filed a complaint in this action on February 8, 2008 and a First Amended Complaint on March 20, 2008, both of which allege that Defendant Johnson Health Tech Co., Ltd. ("Defendant" or "JHT Taiwan") and several of its United States subsidiaries infringe three ICON patents. Plaintiff's amended complaint acknowledges that JHT Taiwan is a corporation organized under the laws of Taiwan R.O.C. with a principal place of business at No. 26, Ching Chuan Rd., Taya Hsiang, Taichung Hsien 428, Taiwan R.O.C. (Amended Complaint, Docket Entry # 19, ¶ 6).

Plaintiff's amended complaint includes two counts for patent infringement against JHT Taiwan; one count for infringement of United States Patent No. 5,104,120 ("the '120 patent"), and a second count for infringement of United States Patent Nos. 5,062,632 ("the '632 patent") and 5,512,025 ("the '025 patent"). Both counts allege that JHT Taiwan infringes the '120, '632 and ' 025 patents (collectively, "the patents-in-suit") under 35 U.S.C. § 271 by making, using, selling, offering for sale within the United States or importing into the United States, systems and/or methods that embody one or more claims of the patents-in-suit. (*Id.* at ¶¶ 27, 32).

## II. PROCEDURAL BACKGROUND

In its current motion, JHT Taiwan requests the Court dismiss Plaintiff's case against it for lack of personal jurisdiction. Plaintiff filed a response in opposition to JHT Taiwan's motion. JHT Taiwan filed a reply, and Plaintiff filed a surreply. On December 8, 2008, the Court granted Plaintiff's Motion for Jurisdictional Discovery and ordered that on or before February 13, 2009, Plaintiff should submit an additional brief regarding the issues raised in JHT Taiwan's motion to dismiss.

*2 After conducting limited jurisdictional discovery, Plaintiff filed an additional brief in opposition to JHT Taiwan's motion to dismiss, asserting JHT Taiwan has sufficient minimum contacts with

the state of Texas and imposing jurisdiction does not offend traditional notions of fair play and substantial justice. JHT Taiwan filed a response to Plaintiff's additional brief. Plaintiff filed a reply to JHT Taiwan's response. The Court conducted a hearing on JHT Taiwan's motion to dismiss on March 4, 2009.

## III. JHT TAIWAN'S MOTION

JHT Taiwan has submitted, among other things, the Declaration of Tony Huang in support of JHT Taiwan's motion to dismiss ("Huang Decl."). According to Huang's Declaration, JHT Taiwan does not "import[ ] into the United States exercise machines under brand names including Horizon, Vision, and Matrix." JHT Taiwan does not import *any* exercise machines into the United States. (Huang Decl. at ¶ 5). JHT Taiwan is the majority shareholder of Defendants Horizon Fitness, Inc. ("Horizon"), Epix, Inc. d/b/a Vision Fitness ("Vision"), and Matrix Fitness Systems Corp. ("Matrix") (collectively "subsidiaries" or "North American entities") (Huang Decl. at ¶ 3). JHT Taiwan conducts all of its manufacturing and other business operations in Taiwan. (Huang Decl. at ¶ 4). JHT Taiwan does not conduct business in Texas. Specifically, JHT Taiwan has not contracted with a Texas resident where the contract is to be performed at least in part in Texas; has not committed a tort in Texas; has not recruited a Texas resident, either directly or through an intermediary in Texas, for employment inside or outside Texas; has no office or place of business in Texas; does not hold a certificate to do business in Texas; has no employees or agents in Texas; has no bank accounts in Texas; does not pay taxes to any governmental entity in Texas; does not regularly conduct business in Texas; does not regularly contract with Texas residents; does not own, rent, lease or possess any real or personal property in Texas; and does not maintain a mailing address or telephone listing in Texas. (Huang Decl. at ¶ 6). JHT Taiwan also relies on an amended second declaration of Tony Huang ("Huang Second Decl."), asserting it is undisputed that JHT Taiwan does not exercise control over

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
(Cite as: 2009 WL 1025467 (E.D.Tex.))

Page 3

sales of allegedly infringing products by its brand subsidiaries, including where those products are sold. (Huang Second Decl., ¶ 5).

Relying on a stream of commerce theory, Plaintiff asserts JHT Taiwan, as the parent company of subsidiaries Horizon, Vision, and Matrix, caused allegedly infringing products to be sold in this forum. As for the direct shipping of products into the forum, Plaintiff relies on the subsidiaries' sales to retailer Sears and other retailers. According to Plaintiff, it is undisputed that Horizon, who sells allegedly infringing products to Sears, Sports Authority, and Dicks, had a sales office in Dallas, Texas. Plaintiff further asserts standard operating procedures implemented by JHT Taiwan provide that if the North American entities have insufficient inventory, JHT Taiwan can directly ship products to the customers in the United States. Plaintiff asserts JHT Taiwan knows its products are imported and sold in United States, including Texas, and JHT Taiwan is targeting those markets.

## IV. STANDARD OF REVIEW

*3 When a defendant challenges personal jurisdiction, the plaintiff bears the burden of proof on the issue. *D.J. Investments v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542, 545 (5th Cir.1985). The plaintiff need only establish a *prima facie* case for personal jurisdiction. The court can make this determination without an evidentiary hearing based on the complaint, affidavits, and information obtained during discovery. *Colwell Realty Investments, Inc. v. Triple T Inns of Arizona, Inc.,* 785 F.2d 1330, 1333 (5th Cir.1986). The court must accept the uncontroverted allegations in the plaintiff's complaint as true, and all factual disputes must be resolved in favor of the plaintiff. *D.J. Investments,* 754 F.2d at 545-46.

## V. PERSONAL JURISDICTION

"Federal Circuit law governs the issue of personal jurisdiction in this patent-related case." *Deprenyl Animal Health, Inc. v. The Univ. of Toronto Innovations Found.,* 297 F.3d 1343, 1348 (Fed.Cir.2002). The assumption of personal juris-

diction in a case "arising under" federal law involves a two-step inquiry. First, absent a controlling federal statute, the defendant must be amenable to service of process. Second, the exercise of jurisdiction must comport with due process. *Id.* at 1349; *Ham v. La Cienega Music Co.,* 4 F.3d 413, 415 (5th Cir.1993).

The first issue is the applicability of Texas' long-arm statute. "Federal courts apply the relevant statute when determining whether a federal court, sitting in a particular case, has personal jurisdiction over a defendant, even when the cause of action is purely federal." *Beverly Hills Fan,* 21 F.3d at 1569. "Under the Texas long-arm statute, a court has personal jurisdiction over a foreign defendant to the fullest extent allowed by the federal constitution." *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 213 (5th Cir.2000). In other words, the Texas long-arm statute and Federal Constitution are co-extensive in scope, and the analysis is reduced to a single inquiry: whether exercising jurisdiction over the nonresident defendant is consistent with due process. *Id.* (*citing Mink v. AAAA Dev. LLC,* 190 F.3d 333, 335 (5th Cir.1999)). Thus, it is undisputed that the sole inquiry is whether exercising personal jurisdiction comports with due process. *See Dainippon Screen Mfg. Co. v. CFMT, Inc.,* 142 F.3d 1266, 1270 (Fed.Cir.1998).

Determining whether the exercise of personal jurisdiction is consistent with the Due Process Clause of the United States Constitution involves a two-pronged test. First, the Court must conclude that the defendant has "minimum contacts" with the forum. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Second, the Court must conclude that requiring a defendant to litigate in the forum does not offend "traditional notions of fair play and substantial justice." *Id.*

When evaluating whether sufficient contacts exist between a defendant and the forum to support personal jurisdiction over the defendant, courts often consider specific jurisdiction and general juris-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

diction. *Vian Corp. v. Iowa Export-Import Trading Co.,* 84 F.3d 424, 427 (Fed.Cir.1996). "Specific jurisdiction exists when the nonresident defendant has 'purposefully directed' his activities at the residents of the forum, and the litigation results from alleged injuries that 'arise from or relate to' those activities." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). General jurisdiction exists when defendant's contacts are unrelated to the cause of action but are "continuous and systematic" and "substantial." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 9, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984).

*4 "In addition, there is a third, independent basis for personal jurisdiction known as the streamof-commerce theory." [FN1] *QR Spex, Inc. v. Motorola, Inc.,* 507 F.Supp.2d 650, 655 (E.D.Tex.2007) *(citing Viam,* 84 F.3d at 427). The distinction between specific and general jurisdiction is of little value in "stream-of-commerce" cases because the situation is one where "the defendant's contacts are the result of establishing a distribution network in the forum State for the sale of the defendant's products." *QR Spex,* 507 F.Supp.2d at 655 *(quoting Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558, 1566 (Fed.Cir.1994).

> FN1. Because the stream of commerce "theory of jurisdiction originates in the product liability context, which lends itself to the *specific* jurisdiction framework, it remains unclear whether contacts based solely on the 'stream of commerce' may suffice to establish *general* jurisdiction." *Avocent Huntsville Corp. v. Aten Intern. Co., Ltd.,* 552 F.3d 1324, 1331 (Fed.Cir. Dec.2008). The Fifth Circuit has held that such contacts will not support a finding of general jurisdiction. *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 375 (5th Cir.1987).

**VI. DISCUSSION**

**A. Minimum Contacts**

At the hearing, Plaintiff conceded general jurisdiction cannot support personal jurisdiction over JHT Taiwan. Plaintiff instead asserts jurisdiction over JHT Taiwan is proper because JHT Taiwan has sufficient minimum contacts with the forum under (1) specific jurisdiction based on the inference that JHT Taiwan has shipped infringing products directly to retailers in Texas; (2) specific jurisdiction based on the "stream of commerce" theory; and (3) specific jurisdiction based on JHT Taiwan's alter-ego relationship with its United States subsidiaries who distribute products in Texas. The Court discusses each theory below.

**1. Specific Jurisdiction Based on Shipment of Allegedly Infringing Products**

With respect to specific jurisdiction, the Court must examine three factors in analyzing due process: (1) did JHT Taiwan purposefully direct its activities at residents of Texas; (2) do Plaintiff's infringement claims arise out of, or relate to those activities; and (3) is the exercise of personal jurisdiction reasonable and fair. *Deprenyl Animal Health, Inc. v. The Univ. of Toronto Innovations Found.,* 297 F.3d 1343, 1351 (Fed.Cir.2002).

JHT Taiwan is the majority shareholder of Horizon, Vision, and Matrix. [FN2] (Huang Decl. at ¶ 3). According to Plaintiff, JHT Taiwan has purposefully directed activities towards Texas by manufacturing Horizon and Vision products which are sold in Texas. In addition, Plaintiff asserts JHT Taiwan manufactures products that are sold in Sears' stores throughout Texas. Plaintiff asserts under JHT Taiwan's own standard operating procedures, direct shipment from JHT Taiwan to retail warehouses in the United States is appropriate in certain circumstances. According to JHT Taiwan's standard operating procedures:

> FN2. Horizon, Vision, and Matrix are also defendants in this case.

(a) [When a] BMC [FN3] has received the purchase order from customer, but there is no invent-

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
(Cite as: 2009 WL 1025467 (E.D.Tex.))

ory on hand of this product, or inventory on hand is not enough to supply this purchase order.

> FN3. The term BMC refers to Horizon, Matrix, and Vision. (Huang Depo. at 87:21-24).

(b) Direct shipment order to BMC customers, not via ... BMC warehouse.
(Docket Entry # 122, Exhibit A).

Tony Huang, Director of the Research and Development Department of JHT Taiwan, confirmed that this standard operating procedure has been followed by JHT Taiwan. According to Mr. Huang, JHT Taiwan has directly shipped products to Sears in the United States:

*5 Q. Okay. And to your knowledge has JHT Taiwan or its Shanghai manufacturing entity ever shipped directly to Sears here in the United States in accordance with this SOP?

A. Yes, yes.

(Huang Depo. at 94:21-95:1).

Because Sears has distribution center warehouses in Dallas and Garland, Texas, Plaintiff asserts it is highly likely that direct shipments from JHT Taiwan to Sears' Texas warehouses have occurred. (Docket Entry # 122, Exhibit C). The only records available to determine whether JHT Taiwan has directly shipped products to Texas are JHT Taiwan's bills of lading.

Q. And that I take it the destination for the shipment would be listed in the bill of lading?

A. Yes.

Q. Would it be identified in anywhere in the sales order processing other than the bill of lading?

A. No, I don't think so.

* * *

Q. And the only place that the location of ship-

ments would appear would be in the bill of ladings; correct?

A. Yes.

(Huang Depo. at 83:25-84:20). Plaintiff asserts JHT Taiwan did not produce any bills of lading, and Mr. Huang admitted he did not review any bills of lading prior to his deposition.

Q. And I take it you didn't review the bill of ladings to Horizon Fitness over the last few years to determine whether or not shipments were actually made to the state of Texas; would that be fair to say?

A. Again.

INTERPRETER: Interprets.

A. I never have the chance to look at that. I don't know.

* * *

Q. Okay. You haven't reviewed the shipping logs of JHT Taiwan to determine the locations of any direct ships either on behalf of Horizon or Matrix; is that correct?

A. I review the PO box. In some case I do understood they would have some special case shipped to.

Q. To your understanding, did JHT Taiwan or its Shanghai manufacturing entity directly ship to Matrix products to warehouses in Texas?

A. No, I don't know.

Q. You don't know?

A. I don't know.

Q. Would you agree that at least according to this SOP that Mr. Jason Lo approved that it would be possible that Matrix and Horizon products would be directly shipped from JHT Taiwan to warehouses in Texas?

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

Page 6

A. It's not said but you can where it can be identi-fied.

Q. Anywhere including Texas?

A. You can say that, yes.

(Huang Depo. at 84:8-16, 97:13-98:12).

Without a review of JHT Taiwan's bills of lad-ing, Plaintiff asserts it cannot "conclusively estab-lish and JHT Taiwan cannot entirely deny that dir-ect shipments of infringing products by JHT Taiwan into Texas have occurred." (Docket Entry # 122 at pg. 6). Plaintiff asserts JHT Taiwan should not be allowed to rely upon or take advantage of its own failure to review and produce critical informa-tion that may establish personal jurisdiction. Rather, relying on *Elecs. For Imaging, Inc. v. Coyle,* 340 F.3d 1344 (Fed.Cir.2003), Plaintiff maintains it should be inferred that JHT Taiwan has in fact directly shipped infringing products into Texas.

**\*6** Although Plaintiff need only make a *prima facie* showing that JHT Taiwan is subject to person-al jurisdiction, Plaintiff must make said showing with evidence. Importantly, while Plaintiff asserts JHT Taiwan improperly decided not to examine or produce the "crucial information" allegedly con-tained in the bills of lading, Plaintiff did not file a motion to compel the information.

The case relied upon by Plaintiff, *Elecs. For Imaging,* stated that when deciding a motion to dis-miss for lack of personal jurisdiction, a district court should resolve "factual conflicts *in the affi-davits* in the plaintiff's favor." 340 F.3d at 349 (emphasis added). It does not support Plaintiff's proposition that because Sears has distribution cen-ter warehouses in Dallas and Garland, Texas, it is highly likely that direct shipments from JHT Taiwan to Sears' Texas warehouses have occurred and that the Court should assume they in fact did occur given JHT Taiwan's failure to produce the bills of lading. Just because two Sears' distribution

center warehouses exist in Texas does not mean, without more, that JHT Taiwan has shipped products to them. Without evidence of actual ship-ments and further considering evidence submitted by JHT Taiwan,[FN4] the Court will not infer, as urged by Plaintiff, that JHT Taiwan has in fact dir-ectly shipped infringing products into Texas to Sears.

> FN4. JHT Taiwan has presented evidence from a recent Rule 30(b)(6) deposition showing that the Horizon, Vision, and Matrix branded products are purchased on "an FOB basis from" Johnson Industrial Shanghai and JHT Taiwan. (Declaration of Clayton P. Kawski ("Kawski Decl.") at 41:24-42:3, 44:10-14). The Horizon, Vis-ion, and Matrix products are picked up by Johnson Health Tech North America at ports in Asia. (*Id.* at 44:18-20; 45:25-46:6; 50:23-51:11.) Additionally, the Rule 30(b)(6) deponent confirmed that JHT Taiwan has never shipped products dir-ectly to a customer of Vision, Horizon, or Matrix. (*Id.* at 48:9-20.) Finally, the North American companies-not JHT Taiwan-have always insured the products while they are in transit from Asia to the United States. (*Id.* at 51:20-52:7).

Even if the Court were to assume that some dir-ect shipments from JHT Taiwan to Sears' Texas warehouses have occurred, Plaintiff's evidence does not demonstrate, as it must, that any allegedly in-fringing products were actually shipped to Texas. Tony Huang's deposition testimony that JHT Taiwan or its Shanghai manufacturing entity has shipped directly to Sears in the United States in ac-cordance with one of JHT Taiwan's standard oper-ating procedure contains no specificity regarding the state of Texas or the accused products. (Huang Depo. at 94:21-95:1).

Plaintiff also asserts the Eastern District of Texas recently found specific jurisdiction over a foreign defendant under factual circumstances very

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

similar to this action. There, the foreign defendant claimed to be "merely a holding company ... that neither manufactures, sells, offers to sell, imports, ships or distributes products or services to the United States, including Texas." *International Printer Corp. v. Brother Int'l Corp.,* 2008 WL 4280345, at *1 (E.D.Tex. Sept.9, 2008). District Judge T. John Ward held that personal jurisdiction over the foreign defendant was proper. The plaintiff had produced evidence that the foreign defendant held "itself out as having over 24,000 employees world wide," in addition to being "active in approximately 80 countries and maintain[ing] research and manufacturing centres throughout Europe and the US." *Id.* The plaintiff also presented evidence that the foreign defendant "centrally manage[d] its worldwide affiliates." *Id.* at *2. Finally, to support specific jurisdiction, the plaintiff presented evidence that the foreign defendant's website allowed "users to download allegedly infringing software in Texas" and that the foreign defendant actually offered allegedly infringing products for sale at a trade show in Texas. *Id.* Based on this evidence, the plaintiff had met its *prima facie* burden of establishing personal jurisdiction over the foreign defendant. *Id.*

*7 Here, Plaintiff presents evidence that JHT Taiwan has "[o]ver 5,000 employees worldwide," and these worldwide operations consist of eighteen sales offices, three research and development centers and four manufacturing facilities, as well as distributors in sixty countries. In addition, Plaintiff states JHT Taiwan touts its "Global Network" on its website as follows:

JOHNSON's [JHT Taiwan] global network consists of manufacturing facilities in Shanghai and Taiwan, and Research & Development centers in North America, Shanghai and Taiwan. JOHNSON's own brands (Matrix, Johnson, Vision and Horizon) and 18 marketing subsidiaries form a premium global enterprise which offers an extensive high quality product line utilizing the most advanced technologies.

(Docket Entry # 76, Exhibit I). JHT Taiwan states "[o]ur brands Matrix, Johnson, Vision, and Horizon have been sold across 60 countries ... [p]roviding the public with choice and high quality products." (Docket Entry # 76, Exhibit B). Plaintiff presents evidence that JHT Taiwan has centrally managed its worldwide affiliates, as evidenced by the September 4, 2008 press release titled "Johnson Health Tech, Co. Ltd. merges its four U.S. subsidiaries into one fitness equipment powerhouse." (Docket Entry # 76, Exhibit J).[FN5] Finally, Plaintiff asserts JHT Taiwan's website allows Texas residents to obtain allegedly infringing products manufactured by JHT Taiwan by linking to the Horizon and Vision websites which provide online shopping. (Docket Entry # 76, Exhibit K). Relying on this evidence, Plaintiff asserts JHT Taiwan has purposefully directed activities towards the forum state of Texas and this action arises out of and relates to those activities, thereby establishing minimum contacts based upon specific jurisdiction.

> FN5. JHT Taiwan announced it had merged its four U.S. subsidiaries, Horizon, Matrix, Vision, and Johnson Health Tech Research & Development into a new entity named Johnson Health Tech North America Corp.

The *International Printer Corp.* case relied upon by Plaintiff is distinguishable from the facts here. There the foreign defendant had offered infringing products for sale at a trade show in Texas and also had a website that allowed users to download allegedly infringing software in Texas. *Id.* at *2. In contrast, customers in the United States cannot purchase any products from JHT Taiwan's website. (Second Huang Decl. at ¶ 4).

Plaintiff also relies on a website link from JHT Taiwan's website to those of its subsidiaries. However, a passive website created for informational purposes, like that of JHT Taiwan, cannot establish personal jurisdiction over a defendant. *See Agar Corp. v. Multi-Fluid Inc.,* 1997 WL 829340, 45 U.S.P.Q.2d 1444, 1447-48 (S.D.Tex.1997)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

(describing the difference between "passive, interactive, and integral" websites, and holding that the defendant's website did not confer personal jurisdiction because it was "largely passive," "entirely informational," and that products could not be purchased from it). As previously noted, JHT Taiwan does not sell products to residents of the United States (let alone residents of Texas) from its website. (Second Huang Decl. at ¶ 4).

*8 The totality of the contacts alleged herein between JHT Taiwan and Texas does not demonstrate that JHT Taiwan has purposefully directed its activities toward Texas, that it has purposefully availed itself of the benefits and protections of Texas law, or that it could reasonably foresee being haled into court in Texas. Similarly, here there is no evidence indicating JHT Taiwan expressly targeted any residents of Texas. Plaintiff has failed to establish a *prima facie* case that JHT Taiwan has minimum contacts with Texas sufficient to confer specific jurisdiction. The Court now considers whether Plaintiff has established a *prima facie* case under an "independent basis for personal jurisdiction known as the stream-of-commerce theory." *QR Spex,* 507 F.Supp.2d at 655.

**2. Stream of Commerce Theory**
In *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286 (1980), the Supreme Court recognized the stream of commerce theory as a proper basis for establishing minimum contacts. *Id.* at 297-98. "The forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Id.* Under the stream of commerce theory, "if the sale of a product of a manufacturer ... is not simply an isolated occurrence, but arises from the efforts of the [defendant] to serve, directly or indirectly, the market for its product ..., [then] it is not unreasonable to subject [the defendant] to suit." *Id.* at 297.

In *Asahi Metal Indus. Co. v.Super. Ct.,* 480

U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987), a divided Supreme Court presented two different views on the proper application of the stream of commerce theory. Writing on behalf of four justices, Justice O'Connor stated that minimum contacts requires "placement of a product into the stream of commerce" and some "additional conduct" of the defendant "purposefully directed toward the forum State." *Id.* at 112. More specifically, Justice O'Connor stated:

[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State.

*Id.*

Justice Brennan, writing on behalf of three justices, stated that "additional conduct" was unnecessary, as minimum contacts are satisfied by merely placing a product in the stream of commerce, which Justice Brennan defined as "the regular and anticipated flow of products from manufacture to distribution to retail sale." *Id* . at 117. Mere placement in the stream of commerce is sufficient because "[a]s long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." *Id.*

*9 The Federal Circuit Court of Appeals has not expressly decided whether Justice Brennan's view is sufficient to establish minimum contacts because it has "yet to be presented with facts that do not meet the more rigorous standard adopted by Justice O'Connor." *Commissariat A L'Energie Atomique,* 395 F.3d 1315, 1322 n. 7 (Fed.Cir.2005). The Federal Circuit applied the stream of commerce theory in *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558 (Fed.Cir.1994), by as-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

serting personal jurisdiction over a foreign manufacturer and its domestic importer because "[they] placed the accused [products] in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Id.* at 1566.

Plaintiff asserts JHT Taiwan, like the defendants in *Beverly Hills Fan,* has manufactured infringing products and placed them into the stream of commerce, through their domestic subsidiaries, who import and sell those products in the United States. JHT Taiwan manufactures treadmills and other fitness equipment which is imported and sold in the United States by its domestic subsidiary, Horizon. JHT Taiwan also designs and manufactures fitness equipment for its Vision and Matrix subsidiaries.

In its original response in opposition to JHT Taiwan's motion, Plaintiff relied upon an alleged agreement between JHT Taiwan and Sears, asserting it is unreasonable for JHT Taiwan to claim complete ignorance of sales of its products in Texas. According to Plaintiff, on July 27, 2006, JHT Taiwan entered into a $30 million dollar agreement "to supply 870 SEARS Department stores with its home fitness products." (Docket Entry # 76, Exhibit E). As a result of the Sears agreement, Plaintiff asserts products manufactured by JHT Taiwan bearing the Horizon brand name can be purchased online by Texas residents or at Sears locations across Texas. (Docket Entry # 76, Exhibit F). Therefore, through the Sears agreement, Plaintiff asserts JHT Taiwan has benefitted from the laws of Texas that regulate and facilitate commercial activity in that forum.

JHT Taiwan takes issue with this assertion, as it contends it was based on an internet "news" article that reports the distribution agreement with Sears. Aside from arguing the article is inadmissible, JHT Taiwan states the article misrepresents the facts. JHT Taiwan was not a party to the agree-

ment (Second Huang Decl. ¶ 3), and even if it were, Plaintiff would still have failed to establish that any JHT Taiwan products that were subject to the agreement were distributed by Sears *in Texas*. JHT Taiwan also claims that even if a subsidiary, presumably Horizon, had an agreement with Sears, the agreement could not be indirectly attributable to JHT Taiwan because JHT Taiwan does not exercise control over its subsidiaries with respect to product sales.

In addition to the disputed agreement with Sears, Plaintiff relies on the following evidence in its additional response brief, asserting JHT Taiwan knows the likely destination of the products it manufactured for Horizon, Matrix, and Vision would be the United States. Specifically, Tony Huang stated that JHT Taiwan is aware that it manufactures products to be sold in the United States.

**\*10** Q. And JHT Taiwan is aware that [Johnson Health Tech North America, including the Horizon, Matrix and Vision brands, are] in the United States trying to sell products that are made by JHT Taiwan; correct?

A. Yes.

(Huang Depo. at 69:17-21). Likewise JHT Taiwan admitted that it "is or was aware that Domestic Distributors import into the United States products made by JHT Taiwan." (Exh. D, JHT Taiwan's Response to Jurisdictional Discovery Requests for Admission # 2).

JHT Taiwan's 2007 Annual Report boasts that JHT Taiwan is "the fifth largest leading company in the fitness equipment market" and it is "ranked 230th in the 1000 manufacturers." (Docket Entry # 122, Exhibit E, Attached as Exhibit B to Declaration of Eric Cheng, Translation of JHT Taiwan 2007 Annual Report at JHTAIWAN000969). According to JHT Taiwan's 2007 Annual Report, in 2006 sales in the United States of products manufactured by JHT Taiwan accounted for roughly $219 million or 63% of JHT Taiwan's total revenue.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

(Exh. E, Translation at JHTAIWAN0001009). Similarly, in 2007 sales in the United States of products manufactured by JHT Taiwan accounted for roughly $195 million or 54% of JHT Taiwan's total revenue. (Exh. E, Translation at JH-TAIWAN0001009).

Plaintiff further asserts JHT Taiwan not only anticipates large sales of its products to occur in the United States, but it also targets the United States market. JHT Taiwan's 2007 Annual Report describes the target markets as follows:

Europe and *America*, big chain fitness centers and chain hotels in the commercial market to increase market share in the home use and commercial markets.

(Exh. E, Translation at JHTAIWAN001009; *see also* Exh. E, Translation at JHTAIWAN00972) (emphasis added). JHT Taiwan's allegedly infringing products are offered for sale and sold by various national and regional retailers, such as Academy Sports + Outdoors, Dick's Sporting Goods, Play It Again Sports, Sears, and The Sports Authority.[FN6] Each of these retailers has locations in Texas. (Black Decl. attached to Docket Entry # 84). Accordingly, Plaintiff asserts JHT Taiwan knowingly places products into the stream of commerce.

FN6. JHT Taiwan's 2007 Annual Report shows that JHT Taiwan is aware that Horizon products are developed specifically for sale at Sears and Dick's Sporting Goods. (Docket Entry # 122, Exh. E, Translation at JHTAIWAN001007).

It is undisputed JHT Taiwan receives substantial revenues from sales of products in the United States. However, Plaintiff's above evidence does not show the flow of JHT Taiwan products into Texas.

Arguing specifically that JHT Taiwan is aware its products are marketed in Texas and that JHT Taiwan has established distribution channels, designed products, and advertised in Texas, Plaintiff relies on the following evidence. Horizon has a "Dallas Sales Office" located in Rockwall, Texas. (Docket Entry # 122, Exhibit F). According to Plaintiff, unlike the situation in *QR Spex,* wherein indirect sales of the accused product were avoided through the defendant's insistence that non-affiliated retailers of its products avoid selling or offering the accused product for sale in Texas, 507 F.Supp.2d at 658, here there is no evidence that JHT Taiwan precludes Vision, Horizon, or Matrix from selling JHT Taiwan's products in any particular state. To the contrary, Plaintiff asserts JHT Taiwan has directed substantial additional conduct towards Texas in the form of establishing distribution channels, designing products, and advertising.

*11 According to Plaintiff, JHT Taiwan and its brand subsidiaries intend to sell products throughout Texas as well as the rest of the United States. Plaintiff contends such an intention can be inferred from the fact that JHT Taiwan established Horizon, Matrix and Vision to target various segments of the United States fitness equipment market:

Q. Horizon as I understand it was the mass retailer product; is that correct?

A. Yes.

Q. And so those would be mostly products that are sold via mass retailer to consumers; correct?

A. Yes.

Q. And Matrix was intended to be the commercial line of products; correct?

A. Yes.

Q. And Vision as I understand it was the like commercial line of products?

A. We sold they call, as I they call it high end home retailer.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
(Cite as: 2009 WL 1025467 (E.D.Tex.))

Page 11

Q. So the specialty fitness stores?

A. Yes.

Q. And who established the brands, the brand strategies for Matrix, Horizon, and Vision?

* * *

A. I don't know exactly who but when we know they all do their own category but of course some time they will touch each other.

Q. But with respect to developing the Matrix brand, the Vision brand, and the Horizon brand, who established the strategy for creating those brands to compete in the markets that we have talked about?

A. At the beginning stage, Peter Lo is the person to set up the company those kinds of companies.

Q. Peter Lo is the chairman of the board of JHT Taiwan?

A. Yes.

(Huang Depo. at 62:15-63:24) (Exh. E, Translation at JHTAIWAN000974).

Plaintiff also relies on the websites for both Horizon and Vision, asserting they show that several retailers of Horizon and Vision products are located within the Eastern District of Texas. According to Plaintiff, further evidence that JHT Taiwan has designed products for Texas can be found in JHT Taiwan's internal standard operating procedures, which require that products developed by the Johnson Group conform to "the regulations of North America" in the form of the UL certification from the Underwriter's Laboratory, a United States product safety and certification organization. (Docket Entry # 122, Exhibit G). Based on the above evidence, Plaintiff asserts JHT Taiwan has placed infringing products into the stream of commerce and offered them for sale in Texas through its manufacturing relationship with Horizon, Matrix, and Vision.

In *Beverly Hills Fan Co. v. Royal Sovereign Corp.,* 21 F.3d 1558 (Fed.Cir.1994), the Federal Circuit Court of Appeals asserted personal jurisdiction over a foreign manufacturer and its domestic importer because "[they] placed the accused [products] in the stream of commerce, they knew the likely destination of the products, and their conduct and connections with the forum state were such that they should reasonably have anticipated being brought into court there." *Id.* at 1566. The Federal Circuit stated that "the defendants' shipments into [the forum state] were purposeful or knowing" as evidenced by the defendants' "commercial relationship with [a forum state retailer that] was ongoing, and obviously intentional." *Id.* at 1564. More specifically, the fact that allegedly infringing products were present at retail locations in the forum state reflected "an ongoing relationship with the [forum state] retailer and customers." *Id.* From such facts, the Federal Circuit "presumed that the distribution channel formed by defendants and [the forum state retailer] was intentionally established, and that defendants knew, or reasonably could have foreseen, that a termination point of the channel was [the forum state]." *Id.* The court noted that the presence of an established distribution channel was a significant factor in the cases cited by the parties involving the stream of commerce theory. *Id.* at 1566, n. 15.

**\*12** As further noted by the Federal Circuit, the Supreme Court in *World-Wide Volkswagen* specifically commented on a defendant's purposeful shipment of a product through an established distribution channel: "[I]f the sale of a product of a manufacturer or distributor ... is not simply an isolated occurrence, but arises from the efforts of the [defendants] to serve, directly or indirectly, the market for its product ..., it is not unreasonable to subject it to suit." *Beverly Hills Fan,* 21 F.3d at 1565-66 (*quoting World-Wide Volkswagen,* 444 U.S. at 297). And "[t]he forum State does not exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

with the expectation that they will be purchased by consumers in the forum State." *Beverly Hills Fan,* 21 F.3d at 1566 (*quoting World-Wide Volswagen,* 444 U.S. at 297-98).

The Court finds unpersuasive JHT Taiwan's reliance on the several Federal Circuit decisions that are declaratory judgment cases. In *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.,* 148 F.3d 1355 (Fed.Cir.1998), the Federal Circuit declined to find personal jurisdiction over a patentee under a stream of commerce theory based on sales by the patentee's licensees in the forum state. *Id.* at 1359-62. The court noted that "doing business with a company that does business in Minnesota is not the same as doing business in Minnesota" and that finding jurisdiction based on a flawed theory premised on third-party contact with the forum state would "subject a defendant to nationwide personal jurisdiction if it decides to do business with a company that does business nationwide." *Id.* at 1361.

Recently, in the context of another action for declaratory judgment of non-infringement and invalidity against a patentee, the Federal Circuit considered whether defendant Aten International's contacts with Alabama through the stream of commerce rose to the level of activity sufficient to confer specific jurisdiction. *Avocent Huntsville Corp. v. Aten International Co., Ltd.,* 552 F.3d 1324, 1338 (Fed.Cir. Dec.2008). The Federal Circuit affirmed the district court's dismissal of the action against Aten International, asserting plaintiff Avocent failed to allege "sufficient activities related to the claim of patent non-infringement and invalidity" as to support the assertion of specific personal jurisdiction. *Id.* at 1338 (*quoting Silent Drive, Inc. v. Strong Indus., Inc.,* 326 F.3d 1194, 1201 (Fed.Cir.2003). The Federal Circuit held that mere sales of a defendant's products, whether covered by the patents-in-suit or not, was insufficient to establish specific personal jurisdiction in a declaratory judgment suit. *Avocent,* 552 F.3d at 1338.

These cases are distinguishable because they were decided in the context of declaratory judgment

actions which involve analysis of the patent holder's contacts in the face of allegations of non-infringement and invalidity. In the ordinary patent infringement suit, like this one, "the claim asserted by the patentee plaintiff is that some act of making, using, offering to sell, selling, or importing products or services by the defendant constitutes an infringement of the presumptively valid patent named in suit." *Avocent,* 552 F.3d at 1332. "Thus, for purposes of specific jurisdiction, the jurisdictional inquiry is relatively easily discerned from the nature and extent of the commercialization of the accused products or services by the defendant in the forum." *Id.* In the context of an action for declaratory judgment of non-infringement, invalidity, and/ or unenforceability, however, "the patentee is the defendant, and the claim asserted by the plaintiff relates to the 'wrongful restraint [by the patentee] on the free exploitation of non-infringing goods ... [such as] the threat of an infringement suit.' " *Id.* ( *quoting Red Wing Shoe,* 148 F.3d at 1360). The relevant inquiry for specific personal jurisdiction purposes in a declaratory judgment action is to what extent has the defendant patentee purposefully directed enforcement activities at the residents of the forum and the extent to which the declaratory judgment claim "arises out of or relates to those activities." *Avocent,* 552 F.3d at 1332 (*quoting Breckenridge Pharmaceutical, Inc. v. Metabolite Laboratories, Inc.,* 444 F.3d 1356, 1363 (Fed.Cir.2006).

**\*13** Considering the *Beverly Hills Fan* case, the Court is not convinced, as urged by JHT Taiwan, that asserting personal jurisdiction over JHT Taiwan under a stream of commerce theory is improper. Rather, the Court finds Plaintiff has made the required jurisdictional showing. There is evidence that JHT Taiwan manufactured allegedly accused products and placed them in the stream of commerce, knowing the likely destination of the products, and its conduct and connections with Texas were such that JHT Taiwan should reasonably have anticipated being brought into court here. *See Beverly Hills Fan,* 21 F.3d 1566.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

JHT Taiwan's argument that it is not aware whether its products are sold in a particular state cannot stand. JHT Taiwan does not argue that its products are not sold in the United States, only that it is does not direct its products to Texas. As discussed above, there is evidence that JHT Taiwan has established a distribution channel into Texas. Horizon has a "Dallas Sales Office" located in Rockwall, Texas. (Docket Entry # 122, Exhibit F). Horizon and Vision's websites show that several retailers of Horizon and Vision products are located within the Eastern District of Texas. Tony Huang testified that JHT Taiwan is aware that Johnson Health Tech North America, including the Horizon, Matrix and Vision brands, are in the United States trying to sell products that are manufactured by JHT Taiwan. (Huang Depo. at 69:17-21).

Courts have held that a "corporation cannot sell its products to national retailers ... and then claim that it is surprised to be haled into court in a particular State because, it was not specifically aware that its products were actually sold or used in that State." *Kernius v. Int'l Elecs., Inc.,* 433 F.Supp.2d 621, 627 (D.Md.2006); *Estes v. Midwest Products, Inc.,* 24 F.Supp.2d 621, 630 (S.D.W.Va.1998) ("The defendant's intent and purpose are completely revealed in its decision to sell through national retail chains.... [I]t is the direct purpose and intent of the defendant that its products be sold in Kmart and Wal-Mart stores in [the forum State].").

Here, JHT Taiwan's allegedly infringing products are offered for sale and sold by various national and regional retailers, such as Academy Sports + Outdoors, Dick's Sporting Goods, Play It Again Sports, Sears, and The Sports Authority. Each of these retailers has locations in Texas. (Black Decl. attached to Docket Entry # 84). As a result of contracting to manufacture products for sale in Sears and other national retail stores, JHT Taiwan could have expected that it could be brought into court in the states where Sears and other stores are located. JHT Taiwan's conduct with Texas was such that it should reasonably have anticipated being brought into court here.

Another case relied upon by Plaintiff supports personal jurisdiction over JHT Taiwan under a stream of commerce theory. In *LG Electronics, Inc. v. Asustek Computers,* 126 F.Supp.2d 414 (E.D.Va.2000), the court found personal jurisdiction over a Taiwanese manufacturer that was accused of patent infringement for products sold in the United States. *Id.* at 421. There, the defendants were a Taiwanese manufacturer of computer products (Asustek) and its wholly-owned subsidiary (Asus). The subsidiary was organized in the United States under the laws of California. *Id.* at 416. Asustek distributed computers containing the allegedly infringing motherboards to Asus. *Id.* at 420.

*14 Asustek argued that because it delivered its products to Asus in Taiwan, it did not have any contacts with Virginia or even the United States. *Id.* The court rejected Asustek's argument, stating that regardless of whether Asustek delivered the products in Taiwan or directly to Virginia, "Asustek place[d] the products into the stream of commerce with the expectation that Asus [would] further assemble the products, and distribute them throughout the United States." *Id.* Noting further that the distribution's destination included retailers in Virginia, the court presumed "that Asustek knew Virginia was a termination point of the distribution channel because Asus intentionally established a connection with Virginia retailers." *Id.*

Similarly, in this case, JHT Taiwan is a Taiwanese manufacturer and Horizon, Vision, and Matrix are its domestic subsidiaries organized in Wisconsin who distribute products manufactured by JHT Taiwan. JHT Taiwan admits that the North American companies ship and insure the JHT Taiwan-manufactured products from Asia into the United States. (Docket Entry # 133 at pg. 6). JHT Taiwan argues that such an importation arrangement (where subsidiaries pick up products in Taiwan) should not form the basis for personal jurisdiction.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

As in *Asustek,* the Court rejects JHT Taiwan's argument. JHT Taiwan places products into the stream of commerce with the expectation that the North American companies will distribute them throughout the United States. Such distribution's destination includes retailers in Texas. Therefore, as in *Asustek,* this Court presumes that JHT Taiwan knew Texas was a termination point of the distribution channel because the North American companies established a connection with Texas retailers. JHT Taiwan "purposefully directed its activities at [Texas] because it continued to supply goods to [the North American companies] with the presumed knowledge that they would arrive in [Texas]." *Id.*

In sum, the Court finds JHT Taiwan has minimum contacts with Texas under the stream of commerce theory and specific personal jurisdiction is proper,[FN7] provided traditional notions of fair play and substantial justice are not offended. The Court now considers whether subjecting JHT Taiwan to personal jurisdiction in Texas is fair and reasonable.

> FN7. Given the Court's determination that personal jurisdiction is proper under the stream of commerce theory, the Court declines to address whether personal jurisdiction would also be proper under an alter ego theory.

**B. Fair Play and Substantial Justice**
Notwithstanding the existence of purposeful minimal contacts with Texas, a due process determination requires an additional step. Minimum requirements inherent in the concept of "fair play and substantial justice" may defeat the reasonableness of jurisdiction even if the defendant has purposefully engaged in forum activities. *Asahi,* 480 U.S. at 121-22 (Stevens, J., concurring in part and concurring in the judgment). "In other words, even if the requisite minimum contacts have been found through an application of the stream of commerce theory or otherwise, if it would be unreasonable for the forum to assert jurisdiction under all the facts and circumstances, then due process requires that

jurisdiction be denied." *Beverly Hills Fan,* 21 F.3d at 1568.

*15 Relevant factors include: (1) the burden on the defendant; (2) the forum State's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several States in furthering fundamental substantive social policies. *Avocent,* 552 F.3d at 1331. Generally, "these cases are limited to the rare situations in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." *Beverly Hills Fan,* 21 F.3d at 1568.

This case is not one of the rare cases. Plaintiff has sued multiple defendants, and this forum will allow for a single resolution of all legal and factual questions at issue. Texas has an interest in discouraging injuries that occur within the state. The burden on JHT Taiwan does not appear sufficiently significant to outweigh the plaintiff's interest and the state's interest in adjudicating this dispute. The Federal Circuit has recognized that " 'progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.' " *Beverly Hills Fan,* 21 F.3d at 1569 ( *quoting World-Wide Volkswagen,* 444 U.S. at 294). The Court is of the opinion that the exercise of personal jurisdiction over JHT Taiwan would not offend fair play and substantial justice.

**VII. RECOMMENDATION**
Based on the foregoing analysis, it is hereby

**RECOMMENDED** that Defendant Johnson Health Tech Co. Ltd.'s Motion to Dismiss for Lack of Personal Jurisdiction (Docket Entry # 75) be **DENIED.**

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)                                    Page 15
**(Cite as: 2009 WL 1025467 (E.D.Tex.))**

written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir.1988).

**SIGNED this 26th day of March, 2009.**

E.D.Tex.,2009.
Icon Health & Fitness, Inc. v. Horizon Fitness, Inc.
Not Reported in F.Supp.2d, 2009 WL 1025467 (E.D.Tex.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 5

LEXSEE

**Ⓐ**
Analysis
As of: Jul 30, 2013

## KURIAN DAVID, ET AL. versus SIGNAL INTERNATIONAL, LLC, ET AL.

### CIVIL ACTION NO: 08-1220 SECTION: "A" (3)

### UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA

### 2012 U.S. Dist. LEXIS 114247

January 3, 2012, Decided
January 4, 2012, Filed

**SUBSEQUENT HISTORY:** Motion granted by David v. Signal Int'l, L.L.C., 2012 U.S. Dist. LEXIS 135254 (E.D. La., Sept. 21, 2012)

**PRIOR HISTORY:** David v. Signal Int'l, L.L.C., 2010 U.S. Dist. LEXIS 128614 (E.D. La., Nov. 23, 2010)

**CORE TERMS:** green cards, visa, certification, forced labor, trafficking, coercion, involuntary servitude, temporary, immigration, causation, predicate acts, foreign workers, fraudulent, recruit, certify, compensatory, recruited, arrived, predominate, recruiting, class certification, class-wide, conspiracy, slavery, class members, individualized, recruitment, mail, class action, misrepresentation

**COUNSEL:** [*1] For Kurian David, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, PRO HAC VICE, Kristi L. Graunke, PRO HAC VICE, Mary C. Bauer, PRO HAC VICE, Morris S. Dees, PRO HAC VICE, Naomi Tsu, PRO HAC VICE, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, PRO HAC VICE, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, PRO HAC VICE, Shirley Lin, PRO HAC VICE, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Sony Vasudevan Sulekha, Palanyandi Thangamani, Hemant Khuttan, Andrews Issac Padaveettiyl, Dhananjaya Kechuru, on behalf of other similarly situated individuals, Sabulal Vijayan, Krishan Kumar, Kuldeep Singh, Plaintiffs: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, Kristi L. Graunke, Mary [*2] C. Bauer, Morris S. Dees, Naomi Tsu, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, Shirley Lin, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Maruganantham Kandhasamy, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, Kristi L. Graunke, Mary C. Bauer, Morris S. Dees, Naomi Tsu, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY;

2012 U.S. Dist. LEXIS 114247, *

Ivy O. Suriyopas, Shirley Lin, PRO HAC VICE, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY;  [*3] Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Jacob Joseph Kaddakkarappally, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Shirley Lin, LEAD ATTORNEY, PRO HAC VICE, Ivy O. Suriyopas, Asian American Legal Defense and Educational Fund, New York, NY; Ashleigh Ferris, Daniel Werner, Kristi L. Graunke, Mary C. Bauer, Morris S. Dees, Naomi Tsu, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Thanasekar Chellappan, individually, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, PRO HAC VICE, Kristi L. Graunke, PRO HAC VICE, Mary C. Bauer, PRO HAC VICE, Morris S. Dees, PRO HAC VICE, Naomi Tsu, PRO HAC VICE, Southern Poverty Law Center, Immigrant Justice Project, Atlanta,  [*4] GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, PRO HAC VICE, Shirley Lin, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Signal International LLC, Defendant, Third Party Plaintiff, Cross Claimant: Erin Casey Hangartner, LEAD ATTORNEY, Alan Dean Weinberger, Dominic Joseph Gianna, Elham Rabbani, Hal D. Ungar, Paul John Mirabile, Middleberg, Riddle & Gianna (New Orleans), New Orleans, LA; Elliot Ross Buckley, Jr., Jefferson Parish Attorney's Office (Elmwood), Harahan, LA; Patricia Anne F. Bollman, Patricia A. Bollman, APLC, Metairie, LA.

Malvern C. Burnett, Defendant, Pro se, New Orleans, LA.

For Malvern C. Burnett, Gulf Coast Immigration Law Center, L.L.C., Law Offices of Malvern C. Burnett, A.P.C., Defendants, Cross Defendants: Ralph R. Alexis, III, LEAD ATTORNEY, Denia Sylve Aiyegbusi, Glenn B. Adams, Porteous, Hainkel & Johnson (New Orleans), New Orleans, LA; Michael  [*5] J. Madere, The Law Offices of Robert D. Ford, Kenner, LA.

Gulf Coast Immigration Law Center, L.L.C., Defendant, Pro se, New Orleans, LA.

Law Offices of Malvern C. Burnett, A.P.C., Defendant, Pro se, New Orleans, LA.

Indo-Ameri Soft L.L.C., Defendant, Pro se, New Orleans, LA.

Kurella Rao, Defendant, Pro se, Metairie, LA.

For J & M Associates, Inc. of Mississippi, Billy R Wilks, J&M Marine & Industrial, LLC, Defendants: James G. Curenton, Jr., LEAD ATTORNEY, PRO HAC VICE, James G. Curenton, Jr., Attorney at Law, Fairhope, AL; Ralph R. Alexis, III, Porteous, Hainkel & Johnson (New Orleans), New Orleans, LA.

Global Resources, Inc., Defendant, Pro se, c/o Michael Pol, Beaumont, MS.

Michael Pol, Defendant, Pro se, Beaumont, MS.

For Sachin Dewan, Defendant: Ralph R. Alexis, III, Porteous, Hainkel & Johnson (New Orleans), New Orleans, LA.

For Dewan Consultants Pvt. Ltd., also known as Medtech Consultants, Defendant: Stephen H. Shapiro, LEAD ATTORNEY, Stephen H. Shapiro, Attorney at Law, New Orleans, LA.

For J&M Associates, Inc. of Mississippi, Cross Claimant, Cross Defendant: James G. Curenton, Jr., LEAD ATTORNEY, PRO HAC VICE, James G. Curenton, Jr., Attorney at Law, Fairhope, AL.

Malvern C. Burnett,  [*6] Cross Defendant, Pro se, New Orleans, LA.

Gulf Coast Immigration Law Center, L.L.C., Cross Defendant, Pro se, New Orleans, LA.

Law Offices of Malvern C. Burnett, A.P.C., Cross Defendant, Pro se, New Orleans, LA.

Kurella Rao, Cross Defendant, Pro se, Metairie, LA.

2012 U.S. Dist. LEXIS 114247, *

Global Resources, Inc., Cross Defendant, Pro se, c/o Michael Pol, Beaumont, MS.

Michael Pol, Cross Defendant, Pro se, Beaumont, MS.

For Sachin Dewan, Dewan Consultants Pvt. Ltd., Cross Defendants: Stephen H. Shapiro, LEAD ATTORNEY, Stephen H. Shapiro, Attorney at Law, New Orleans, LA.

Global Resources, Inc., Cross Claimant, Pro se, c/o Michael Pol, Beaumont, MS.

Michael Pol, Cross Claimant, Pro se, Beaumont, MS.

**JUDGES:** JAY C. ZAINEY, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JAY C. ZAINEY

**OPINION**

<u>**ORDER AND REASONS**</u>

The following motions are before the Court: **Motion to Certify Class (Rec. Doc. 165)** and **Supplemental Motion to Certify Class (Rec. Doc. 994)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012)** filed by defendant Signal International, LLC; [1] **Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence [*7] Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1082)** filed by defendant Signal International, LLC.

> 1   Defendants Malvern C. Burnett, Gulf Coast Immigration Law Center, LLC, and the Law Offices of Malvern C. Burnett, A.P.C., Sachin Dewan, and Dewan Consultants, Pvt. Ltd. have formally moved to join in the Motion to Strike-1012. (Rec. Docs. 1039 & 1053).

All motions are opposed. [2]

> 2   Defendants J & M Associates Inc. of Mississippi, J & M Marine & Industrial, LLC, and Billy Wilks adopt Signal's and the Burnett Defendants' arguments in opposition to class certification. (Rec. Doc. 992). Defendant Kurella Rao has indicated that he will be a "passive" defendant. (Rec. Doc. 897).

The Motion to Strike-1012 was taken under submission on March 16, 2011, and the Motion for Leave was taken under submission on March 23, 2011, but the Court elected to take up those motions in conjunction with the issue of class certification. The motion(s) for class certification were taken under submission on April 29, 2011 (Rec. Doc. 1076), upon receipt of the parties' rebuttal submissions. [3] The Motion to Strike-1082 was taken under submission on June 22, 2011.

> 3   In this case, all parties consented to waive [*8] a live evidentiary hearing and to submit the issue of certification to the Court on the briefs. (Rec. Docs. 907 & 926). <u>Rule 23</u> does not itself require an evidentiary hearing on the question of class certification. <u>Merrill v. So. Methodist Univ., 806 F.2d 600, 608 (5th Cir. 1986)</u>. However, any factual uncertainties trigger the necessity for a hearing. <u>Id. at 609</u>.

Signal has requested oral argument on its Motion to Strike-1012 and Plaintiffs have requested oral argument on their Motion for Leave to File a Third Amended Complaint. The Court finds that the parties' memoranda more than adequately expound upon the issues presented and that oral argument would not be helpful to the Court.

For the reasons that follow, the Motions to Certify are DENIED, the Motion to Strike-1012 is DENIED, the Motion for Leave to File a Third Amended Complaint is DENIED AS MOOT, and the Motion to Strike-1082 is DENIED.

**I. INTRODUCTION**

Plaintiffs are seven (7) citizens of India who secured H-2B guest-worker visas to work in the United States for defendant Signal International, LLC. These seven plaintiffs, Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, Hemant Khuttan, Padaveettiyil [*9] Issac Andrews, and Kechuru Dhananjaya, seek to represent a putative class of approximately 500 ship and rig workers to pursue federal class claims against the defendants under the Trafficking Victims Protection Reauthorization Act of 2003, <u>18 U.S.C. § 1589</u> (forced labor) & <u>§ 1590</u> (trafficking); the Racketeer Influenced and Corrupt Organizations Act, <u>18 U.S.C. §§ 1962(c)-(d)</u>; the Civil Rights Act of 1866, <u>42 U.S.C. § 1981</u>; and the Ku Klux Klan Act of 1871, <u>42 U.S.C. § 1985</u>. [4]

> 4   Plaintiffs also assert claims for fraud, negligent misrepresentation, and breach of contract. Plaintiffs are not seeking certification to pursue these claims as a class so those claims are not before the Court at this time.

Defendants are immigration attorney Malvern C. Burnett and his business Gulf Coast Immigration Law

2012 U.S. Dist. LEXIS 114247, *

Center, LLC and Law Offices of Malvern C. Burnett, A.P.C. (collectively "Burnett"); labor recruiter/broker Michael Pol and his company Global Resources, Inc. (collectively "Pol"); labor broker Billy Wilks and the two companies through which he operated, J & M Associates Inc. of Mississippi and J & M Marine & Industrial, LLC; Kurella Rao and his company Indo-Ameri Soft, LLC ("IAS"); Indian labor [*10] recruiter Sachin Dewan and his company Dewan Consultants Pvt., Ltd. (collectively "Dewan"); and American employer Signal International, LLC. [5]

> 5   Defendants Pol and Rao and their associated companies are not represented by counsel at this time.

Plaintiffs' claims are numerous and at times complex but the gist of their claims is that Defendants engaged in a fraudulent scheme built around the fictitious promise of employment-based green cards to obtain permanent residence in the United States. [6] Plaintiffs assert that they relied on this core false promise, as well as other misrepresentations by Defendants, when deciding to pay exorbitant labor recruiting fees to travel to the United States to work at Signal's marine fabrication facilities in Mississippi and Texas. Once there, Plaintiffs allege that they were subjected to segregated housing, severe discrimination, and adverse working and living conditions--that given their debts--reasonable persons in their position would have felt compelled to endure. Plaintiffs contend that the scheme yielded Dewan, Pol, and Burnett millions of dollars in fees, and procured for Signal a compliant and expendable labor pool that saved the company millions [*11] of dollars in wages that it would otherwise have had to pay to contract laborers and American direct hires.

> 6   The term "green card" is used colloquially for an alien registration receipt card, which denotes legal permanent resident status in the United States. See Ascencio-Guzman v. Chertoff, No. B-94-215, 2009 U.S. Dist. LEXIS 32203, 2009 WL 1064962, at *4 (S.D. Tex. Apr. 15, 2009).

Plaintiffs seek to have a class certified pursuant to Federal Rule of Civil Procedure 23(b)(3) consisting of

> All Indian guest-workers who were recruited by one or more Defendants and who traveled and/or were transported to the United States at any time through September 30, 2007, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(b) ("H-2B") visas assigned to Defendant Signal International.

Plaintiffs contend that the core facts of the case as well as Defendants' main defenses are equally applicable to the claims of all class members, and that the "pernicious scheme" underlying this case had no individualized dimensions. According to Plaintiffs, they satisfy Rule 23's legal requirements for certification and equity militates in favor of Defendants having to answer for their conduct in the same fashion that they treated Plaintiffs in their prior [*12] dealings with them: As a nameless and faceless class of fungible migrant workers who could be misled and exploited without regard to individual rights or interests.

## II. BACKGROUND

The factual background for this case separates well into two phases. The Phase 1 events began in 2004 and did not involve defendant Signal or the H-2B visa process. But the Phase 1 events, and the pre-existing relationships between the various other defendants, laid the ground work for much of the Phase 2 events. The Phase 2 events began in 2006 when Signal's domestic labor pool was adversely affected by Hurricanes Katrina and Rita. It was in the aftermath of the hurricanes that Signal sought to supplement its labor pool with foreign workers via the H-2B visa process. Thus, many of the plaintiffs in this case were originally recruited for employers other than Signal, although all of the plaintiffs eventually came to the United States to work for Signal under the auspices of the H-2B guest-worker program. [7]

> 7   At least 38 putative class members were denied employment at Signal even though they paid the recruiting fees and came to the United States. (Rec. Doc. 994-1, at 4). Plaintiffs' claim under 42 U.S.C. § 1981 [*13] for discriminatory conditions at Signal does not apply to these 38 plaintiffs. Plaintiffs suggest that a sub-class as to these plaintiffs might be appropriate.

### A. Factual Background--Phase 1

At all material times, defendant Global was a Mississippi corporation engaged in the business of recruiting foreign workers for employment in the United States. Defendant Michael Pol was Global's president. Pol had an existing business relationship with defendant Billy R. Wilks, defendant J & M's corporate principal. (Pla. Exhs. 520(Pol); 521(Pol)). J & M is in the business of recruiting laborers to then subcontract them out to other companies for a profit. Together Pol and Wilks were supplying labor to a shipyard client in California.

Pol also had a prior business relationship with defendant Sachin Dewan. Dewan is a businessman and he

Page 4

2012 U.S. Dist. LEXIS 114247, *

resides in India. As far back as 1996, Pol and Dewan had worked together, along with defendant Malvern Burnett, to bring Indian H-2B welders and pipe fitters into the United States for Avondale Shipyards. (Signal Exh. C).

According to Pol, Dewan contacted him in early 2004 to see if Pol was interested in placing foreign workers with his customers. [8] Pol then presented [*14] Billy Wilks with a plan to recruit foreign workers through the green card program that he and Dewan had discussed. Global and J & M executed a contract whereby Global would find qualified foreign workers to be acquired for employment with J & M under the I-140 "permanent resident" process. (Pla. Exh. 522(Pol)). Under the agreement Global was to provide the services of an immigration attorney to facilitate bringing workers into the country legally--that attorney was Malvern Burnett. Wilks sent Pol a demand letter for 300 workers. (Pla. Exh. 520(Pol)).

   8   Dewan asserts that it was Pol who contacted him.

To facilitate the J & M/Global deal, in March 2004, Global, Sachin Dewan (for Dewan Consultants), and Malvern C. Burnett (for Gulf Coast Immigration Law Center, Inc.) executed a contract, the Multi-Lateral Business Agreement, pursuant to which Dewan would recruit suitable foreign workers, Burnett would handle the immigration legal work, and Global would provide suitable employment in the United States. (Pla. Exh. 455). Each applicant-employee was to be charged a fee of roughly $10,000-$12,000 USD. The Multilateral Agreement states that the workers would be coming to the United States under [*15] the "'permanent residence' process for migration." Id.

In early 2004 defendant Kurella Rao (for IAS) also entered the picture. Rao and his company IAS had been in the business of recruiting foreign information technology personnel since 1997 and Rao wanted to branch out into shipyard workers. Rao and Dewan executed a contract, the Bilateral Business Agreement, to memorialize their business arrangement. [9] (Pla. Exh. 756). Dewan was to recruit the foreign workers and Rao (via his company IAS) was to sponsor them for employment in the United States.

   9   Plaintiffs' Exhibit 746 is an unsigned copy of the agreement.

Burnett acted as immigration counsel for the J & M and IAS recruits. But the workers recruited by IAS had no direct contact with Burnett. Rather, Rao retained Burnett for legal services in connection with IAS's recruitment of workers and IAS made payments to Burnett for legal services provided.

Thus, as of 2004 Dewan was recruiting foreign workers on behalf of Global, for the ultimate benefit of J & M and its clients, and for IAS. Dewan recruited 232 workers for the benefit of J & M. Dewan recruited around 130 workers for the benefit of IAS. According to Dewan, he used the same recruitment [*16] process for the Global/J & M and IAS contracts. (Dewan depo at 216). Dewan was the lead recruiter but Pol, Burnett, and Rao each participated in some recruiting seminars overseas in order to assist Dewan with the process. It is undisputed that all of the recruitment and placement was done with permanent residence in the United States as part of the program and the workers were told that this would take about two years. At this stage, H-2B visas were not part of the arrangement. [10]

   10   At this point it bears noting that an H-2B guest-worker visa is fundamentally different than an employment-based green card. H-2B visas are *temporary, non-immigrant* visas. Under the H-2B program, a worker may come to the United States *temporarily* to work for an employer who has petitioned for the right to employ H-2B guest-workers and whose petition has been approved by the Department of Labor. Castellanos-Contreras v. Decatur Hotels, LLC, 622 F.3d 393, 405 n.2 (5th Cir. 2010) (en banc) (Dennis, J., dissenting) (quoting 8 C.F.R. § 214.2(h)(1)(i)). Once admitted, the guest-worker's legal status is tied to performing labor for the specific employer who petitioned for the visa. Id. (citing § 214.2). If at any [*17] point the H-2B visa expires or the worker is dismissed from his job, then he is required to immediately leave the country. Id. (citing § 214.2(h)(6)(vi)(E), (h)(17)(iii)(C)). Under no circumstances can the worker remain in the country longer than three years. Id. (citing § 214.2(h)(15)(ii)(C)).

   An employment-based green card, on the other hand, is given to someone who has obtained an immigrant visa to enter the United States on a permanent basis and to reside here indefinitely. Green card holders are permanent resident aliens and they have nearly all of the rights of a citizen. Generally speaking, a permanent resident alien can live and work in the United States without restriction.

   Thus, as a practical matter, H-2B employees cannot simultaneously be sponsored for an H-2B visa and a green card, given the fundamental difference in the temporal aspects of the two types of visas.

As of February 2006 none of the green card promises to the J & M and IAS recruits had come to fruition. [11]

Page 5

2012 U.S. Dist. LEXIS 114247, *

The workers had paid significant fees up front and were naturally becoming frustrated with the process and irate with the lack of progress toward their legal, permanent immigration to the United States. By [*18] this point some of the workers had been waiting for over two years to come to the United States with green cards. Some workers even demanded refunds, which none of the recruiter/broker defendants were interested in providing. [12]

> 11 According to Burnett, in 2003-2004 the process of obtaining labor certifications was extremely long--in some cases in excess of three years. (Burnett memo at 6). It was anticipated that the Department of Labor was going to institute a streamlined process for granting labor certifications or PERMs. Burnett contends that he delayed the filing of any PERMs to take advantage of the new system, which itself was delayed for nearly a year.
>
> The employment based green card process is a three step process. The first step requires that an ETA 9089 ("PERM") be filed with the Department of Labor and certified. The second step requires the filing of an I-140 with the United States Citizenship and Immigration Services.
>
> The third step depends on a "window of opportunity" opening and this can take a matter of months or even years depending on the allocation of immigrant visas by the State Department. The third step differs depending on whether the beneficiary of the PERM and [*19] the I-140 is in the United States or a foreign country when a green card becomes available for him in the quota. If the beneficiary is in a foreign country then he processes through the consulate and receives his green card. If the beneficiary is already lawfully in the United States then he files an I-485 for adjustment of status. Once the I-485 is approved then the applicant receives permanent resident status in the United States. (Signal memo at 3 n.8; Burnett memo at 9).
>
> 12 As of the end of 2006 IAS was no longer a functional company and Burnett had filed no I-140 petitions on behalf of the IAS recruits. The filing of an I-140 petition with the United States Citizenship and Immigration Services is the second step of three for obtaining a green card. Rao knew by January 2006 that IAS was no longer financially viable and that no green cards would be processed for his recruits. (Signal Exhs. K, L). He nonetheless continued to accept installment payments from the recruits. (Id.).

Those Plaintiffs who were originally recruited during the Phase 1 events are referred to as "Group I Plaintiffs." Second Amended Complaint ("SAC") (Rec. Doc. 944). Named plaintiffs Issac Andrews Padaveettiyil [*20] and Kechuru Dhananjaya are in this group. (Id. at 5).

**1. Issac Andrews Padaveettiyil**

Padaveettiyil was working in Dubai in 2004 when he was recruited for employment with J & M. According to Padaveettiyil, Dewan advertised in the paper in Dubai for jobs in America and permanent residence in this country. Padaveettiyil recalls attending an information seminar in Dubai with Dewan, Burnett, and Pol present. Padaveettiyil sold his land to finance his way in the program and he asserts that he was promised a permanent job and permanent residency in the United States. Padaveettiyil claims that in 2006, still with no green card, Dewan told him that he would be going to the United States on an H-2B visa to work for Signal, to forget about the current green card processing, and that Signal would file for a green card on his behalf. According to Padaveettiyil, he had no choice but to go because he had already paid his money. After arriving in the United States in 2007 Padaveettiyil worked at Signal's Pascagoula, Mississippi facility.

**2. Kechuru Dhananjaya**

Dhananjaya was recruited as part of the IAS employment program. In December 2003, Dhananjaya was working in Dubai when he saw one of Dewan's advertisements [*21] in the newspaper. Dhananjaya went to the office listed in the advertisement and spoke to Dewan about the recruiting program. Dewan told Dhananjaya about an upcoming meeting where Dhananjaya could learn more about the program and pay his first installment for green card processing if he was interested. Defendants Rao, Burnett, and Dewan were present at the meeting. Dhananjaya borrowed money from his brother and some of his friends to finance his way in the program. Dhananjaya and IAS executed an Agreement for U.S. Permanent Residency/Green Card on January 18, 2004. (Pla. Exh. 578). In the following two years Rao sent Dhananjaya encouraging correspondence about the status of his green card. (Signal Exhs. I, J). Dhananjaya had worked at Avondale Shipyards in 1997 under the H-2B guest-worker program. (Signal Exh. D). When Dhananjaya entered the IAS program he had never heard of a company called Signal. After arriving in the United States in 2007 Dhananjaya worked at Signal's Orange, Texas facility.

Plaintiffs do not suggest that Signal was involved in recruiting the foreign workers during the 2004 time frame. But by 2006 when the Indian recruits were becoming disgruntled with the green [*22] card program that Pol, Dewan, Burnett, and Rao had concocted, Signal

was experiencing its own labor problems in the aftermath of Hurricanes Katrina and Rita. Signal had a legitimate and immediate need for laborers like those that Pol, Dewan, Burnett, and Rao had recruited beginning in 2004 and who were now clamoring for results on the promised green cards. Thus, Signal's labor shortage in 2006 and its willingness to employ foreign workers, which it viewed as a cheap source of labor, created a seemingly perfect opportunity for Pol, Dewan, Burnett, and Rao to temporarily mollify the original J & M/IAS green card recruits by offloading them to Signal. According to Dewan, some of the workers jumped at the opportunity to go to the United States sooner rather than later, even if that meant traveling on an H-2B visa to the detriment of the green card process. (Signal Exh. AA). But Plaintiffs contend that Dewan persuaded them to go to the United States on the H-2B visas and that they were told that Signal would take care of getting them their green cards once they arrived in the United States.

### B. Factual Background--Phase 2--Enter Signal

Signal is a marine and fabrication company with its home [*23] office in Pascagoula, Mississippi and an additional shipyard in Orange, Texas. Signal is in the business of providing offshore drilling rig overhaul, repair, upgrade, and conversion. Signal also offers services to the general marine and heavy fabrication markets. In 2006-2007 Signal had a substantial amount of work after hurricanes Katrina and Rita because of damages to rigs in the Gulf of Mexico. Hurricane-related housing shortages around Signal's shipyards had depleted its work force.

Sometime in the first quarter of 2006, Pol called Ron Schnoor (Sr. VP & General Mgr.) with Signal to talk to him about the possibility of Global providing Signal with foreign workers under the "permanent resident process." Schnoor called contacts with Avondale Shipyards to inquire about how the H-2B program had worked at that company. (Signal Exh. W). Bill Bingle (VP of Production) with Signal called Pol to set up a meeting. Bingle and Pol discussed bringing workers to the United States under the H-2B program for employment with Signal and Bingle eventually accompanied Pol to India on a recruiting trip. According to Pol, the plan was to get permanent residence visas for welders and fabricators to work [*24] at Signal's Pascagoula, Mississippi and Orange, Texas facilities. Using H-2B visas was an "afterthought" because Signal wanted the workers to arrive quickly, certainly more quickly than what green card processing could provide. Signal would not be required to pay any of the workers' fees and travel expenses--everything was to be paid by the workers themselves so Signal considered this to be a good deal. [13] Pol told Signal that the workers would be paying about $2,000

each to participate in the program, which was of course not accurate. Signal was adamant that it incur none of the costs of the program.

> 13    Indian workers in particular were considered to be a cheap source of labor. (Pla. Exh. 517). Signal intended to use the Indian workers to displace subcontracted labor that was costing the company $100,000 to $200,000 per day.

On April 18, 2006, Global and Signal executed a Skilled Worker Recruitment Agreement (Pla. Exh. 423) to establish the framework for their arrangement to bring foreign workers into the United States under the H-2B temporary program and/or the I-140 "permanent residence" process. (Id. at 1). The agreement clearly delineates the temporary nature of an H-2B visa versus [*25] the long-term nature of an I-140 permanent residence visa. The agreement also expressly notes that H-2B visas are not always issued in a timely manner but that "[i]n any case, the permanent resident (I-140) process will continue as agreed upon." (Id. at 3). With the Multi-Lateral Business Agreement between Pol, Burnett, and Dewan already in place, Pol contacted Dewan and Burnett about the Signal deal.

Signal executed a document appointing Dewan as its representative in India to facilitate the recruitment of skilled workers to the United States for employment under "the temporary and permanent resident program." (Pla. Exhs. 463 & 665). In that same document Signal granted Dewan a limited power of attorney to sign any legal document or letter which may be required to obtain permission from the government/immigration agencies in India for advertising, conducting seminars, and trade tests to further "our efforts." Id. On June 19, 2006, Signal sent Dewan a demand letter for 600 skilled workers for a 10-24 month period. (Pla. Exh. 461). Accommodations, transportation, and food were all to be paid via salary deduction and travel expenses to Pascagoula, Mississippi were to be paid by the individual [*26] worker. Id. The workers were to be skills tested in India prior to any employment offer and the salary range would be $14 to $18 USD per hour depending on experience and skill level. Id.

On August 3, 2006, Signal executed yet another power of attorney in favor of Dewan making him the company's agent and giving him full authority to act on behalf of Signal, whether filing documents with the U.S. immigration authorities or executing contracts, in the process of bringing migrant workers to the United States for employment at Signal. (Pla. Exh. 512). Signal retained Burnett and his law firm to represent the company in legally bringing the workers into the United States. (Pla. Exhs. 563 & 574). The terms of the agreement between Signal and Burnett dictated that all of the legal

fees were to be paid by the workers, with Signal owing Burnett nothing for legal fees.

Dewan went to work recruiting workers for Signal. Dewan placed advertisements in newspapers throughout India and the United Arab Emirates in 2006 offering opportunities for welders and pipe fitters to immigrate to the United States under the auspices of Signal's guest-worker program. (Pla. Exh. 460). Dewan and Pol held six recruitment [*27] seminars using a PowerPoint presentation that Pol had prepared. (Pla. Exh. 684). Green cards were expressly touted as part of the program but a second set of advertisements only mentioned H-2B visas. Nonetheless, Dewan asserts that he believed that Signal was going to request green cards for these workers too. The average fee that each worker paid was about $10,000 [14] (split between Dewan, Pol, and Burnett) which in some cases might exceed the worker's annual salary in his home country. [15] Plaintiffs contend that Dewan, Pol, and Burnett used the Signal contract as a way to extract more money from the existing and eager J & M and IAS recruits and to generate fees from a whole new group of Signal recruits. To be sure, maximizing profits from importing foreign workers into the United States was of the utmost importance to Dewan, Pol, and Burnett. (Signal Exhs. Z, CC, FF).

14   Plaintiffs contend that Rao, J & M, Pol, Dewan, and Burnett eventually charged the recruits anywhere from $17,600 to $20,000 for an "expedited option" when the H-2B program with Signal came along. Plaintiffs were charged more for H-2B visa processing after the first set of H-2B visas were approved by the consulate.

15   The [*28] workers executed separate contracts with Global, Burnett, and Dewan, agreeing to pay each of them separately for their services in three installment payments. Global was to be paid $3750, (Pla. Exhs. 327, 345, 354, 500), Burnett was to be paid $3750, (Pla. Exhs. 342, 350)and Dewan was to be paid Rs.33,500 (Pla. Exhs. 344, 351, 502, 505). Plaintiffs' Exhibit 59 indicates that Global and Burnett were to be paid $5373 USD each. Burnett was particularly adamant about receiving his fee. (Pla. Exhs. 468 ("Mafiaso: Tell them to pay up . . .", 572, 834 ("Please see if you can't get Ramesh to 'persuade' him to pay me . . . . If he does not pay, I will see to it that his visa gets mysteriously revoked.")). Plaintiffs estimate that Dewan, Pol, and Burnett collected about $7 million dollars from all of the putative class members. (Pla. Exhs. 865, 866, 867, 868 (repeated recitation of "Cha Ching")).

In late May and early June 2006, Signal filed paperwork with the United States Department of Homeland Security-Citizenship and Immigration Services and the Department of Labor seeking permission to import and hire 590 foreign guest-workers pursuant to the government's H-2B guest-worker program. Bingle, [*29] on behalf of Signal's Mississippi operation, and Thomas Rigolo (Sr. VP & General Mgr., Texas Operations), on behalf of Signal's Texas operation, executed the paperwork. In the filings Bingle explained that Hurricanes Katrina and Rita had caused a tremendous but temporary shortage of labor in the Gulf region and that Signal sought to hire temporary H-2B workers until the labor force would return to normal. (Pla. Exh. 516). Bingle explained that the need for current workers reflected a peak load and would be a one-time occurrence. Bingle also stated that the peak load temporary workers would not become part of Signal's permanent workforce--they would work for the length of time prescribed and then return to their home countries at the end of the employment period. (Pla. Exh. 516). In Signal's Application(s) for Alien Employment Certification to the Department of Labor, Bingle and Rigolo declared under penalty of perjury that the exact dates that the workers would be employed were 10/01/06 to 07/31/07. (Pla. Exhs. 515, 595, 863, 864).

According to Bingle, Signal had always intended to file for green cards for the foreign workers, or at least those workers who proved to meet Signal's expectations. [*30] When questioned at his deposition about the certifications of temporary employment made to the government, Bingle explained that he did have concerns about signing those documents and making those representations but that Malvern Burnett had told him that this was just the way the H-2B visa process worked. Rigolo testified that Signal actually needed workers for about a two-year time frame but that he had no reservations about submitting forms to the government that cited the ten month time frame dictated by the H-2B program. Burnett's explanation was that the workers coming over on temporary visas were not going to be part of Signal's permanent workforce, at least in the beginning, and that it might be a year or two before they might return to Signal as permanent workers. (Burnett depo at 457-48).

Signal sent employees to India to personally test the workers' skills. Therefore, everyone who was given an offer of employment with Signal had passed a test to the satisfaction of Signal's employees and no one with Signal told the workers that there would be further testing when they arrived at Signal and that their hourly pay would be subject to reduction or their employment subject to [*31] termination if they failed to pass. Signal's form letter offer of employment simply offers congratulations for passing the skills test in India and the worker is told that "[a]s agreed, [his] salary will be $18.00 per hour." (Pla. Exh. 381). Nothing in the offer of employment

2012 U.S. Dist. LEXIS 114247, *

from Signal alluded to a second round of testing once the worker arrived in the United States. The Signal employment agreement itself, however, specifically states that the worker would be subject to skills testing upon arrival at Signal and that his hourly rate might be reduced based on skill level. (Pla. Exhs. 64, 179, 201, 294, 300, 348, 808, 854). [16] But the Signal employment agreement was presented to the workers after they had already traveled to the United States from India and arrived at Signal. (Signal Exhs. SSS, SSS-A).

> 16   The Memorandum of Understanding that each worker executed with Dewan also references the second round of testing. (Pla. Exhs. 344, 351, 502, 505, at ¶¶ 5 & 9).

In addition to the workers that Dewan, Pol, and Burnett actively recruited anew for Signal, Pol agreed to use Rao's IAS recruits to fill some of the employment slots at Signal, (Pla. Exh. 808 [Dhananjaya/Signal agreement]), even [*32] though Pol would receive significantly less of a fee for each of these recruits who had already paid their fees over to Rao, Dewan, and Burnett. Global's agreement with Signal also provided a U.S. employer onto which Dewan, Pol, and Burnett could offload the J & M green card recruits. Nearly half of the Indian workers whom Burnett, Dewan, and Pol provided to Signal had been recruited for other companies.

Dewan, Pol, and Burnett were well aware that U.S. immigration officials would not approve an H-2B visa for any worker who communicated to the consulate officials that he was participating in the Signal program with the intent of receiving a green card. (Pla. Exhs. 519, 550). The recruits were therefore escorted to their consulate interviews by a Dewan Consultants employee to ensure that all went well. The recruits were warned about not disclosing anything about green cards to the consulate officials. Dewan also warned them not to mention the amount of money that they had paid to participate in the Signal program. Several plaintiffs also contend that after their visas were issued Dewan (and perhaps on one occasion Burnett) [17] withheld their passports pending the final installment payment [*33] for the program. Plaintiffs contend that with their passports being held they feared that they must either pay the rest of the money to Dewan to go to Signal or forfeit all of the money that they had already paid. Plaintiffs claim that they were assured by Dewan that participation in the H-2B program would allow them to stay in the United States while their green card applications were being processed.

> 17   Sony Sulekha testified that Burnett took custody of his passport after his H-2B visa was approved. (Sulekha depo at 182).

Those Plaintiffs who were recruited specifically for Signal during the Phase 2 events are referred to as "Group II Plaintiffs." SAC at 6. Named plaintiffs Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, and Hemant Khuttan are in this group. Id.

### 1. Kurian David

David was working in Abu Dhabi as a high-level senior foreman when he saw one of Dewan's advertisements in a newspaper. David attended an information seminar in Dubai where employment opportunities at Signal were discussed. He asserts that the attendees were told that they would receive green cards within 24 months but that the company needed workers immediately so they would [*34] be going on H-2B visas. David says that Burnett explained that David would first go on an H-2B temporary visa which would eventually be extended two times. During the 24 month waiting period and with the two extensions of the original H-2B visa, David would get the green card. David says that he was assured that Signal was a good company with good accommodations and that the workers would be treated well.

David asserts that he came to Signal only because he expected a green card and that he would not have left his otherwise lucrative position at home to come to the United S tates solely for temporary employment. David borrowed money from his brother-in-law to finance his participation in the program. David stayed with Signal through March 2008. (Signal Exh. FFF). After arriving in the United States in 2007 David worked at Signal's Orange, Texas facility.

### 2. Sony Vasudevan Sulekha

Sulekha decided to participate in the program because of an ad that he saw in a Malayalam newspaper. Sulekha attended a seminar at the Hilton Hotel in Cochin in May 2006. Dewan, Pol, and Salimon (another Dewan employee) were present. Sulekha was told that Signal needed workers, the company would give permanent [*35] residence, that Signal was a good company, and that this would be a very good opportunity for him. Dewan and Pol explained that at first the workers would be sent on an H-2B temporary visa, which would be extended, and a green card would follow within 24 months. Sulekha pawned his ornaments and wife's jewelry and borrowed money from a distant relative in order to finance his participation in the program. Sulekha contends that he was promised a green card and that he would be able to bring his family to the United States but those promises never materialized. After arriving in the United States in 2006 Sulekha worked at Signal's Orange, Texas facility.

Page 9

2012 U.S. Dist. LEXIS 114247, *

### 3. Palanyandi Thangamani

Thangamani testified that he went to Signal expecting a green card. Thangamani pledged his sister's ornaments and jewelry in order to finance his participation in the program. After arriving in the United States in 2006 Thangamani worked at Signal's Orange, Texas facility.

### 4. Muruganantham Kandhasamy

Kandhasamy saw an advertisement in a paper called Dhinethandi that advised that workers were needed to work in the United States and would receive green cards. Kandhasamy attended an interview with Pol, Dewan, Burnett, [*36] and representatives from Signal--everyone present spoke. Kandhasamy was told that he would get a green card. Kandhasamy contends that just a few days before he was to leave for the United States he was told by Dewan that he would be going on an H-2B visa instead of a green card. Kandhasamy contends that Dewan told him, in the presence of Pol, Burnett, and a Signal representative, that once he arrived in the United States his H-2B visa would become a green card. After arriving in the United States in 2007 Kandhasamy worked at Signal's Orange, Texas facility.

### 5. Hemant Khuttan

Khuttan responded to an advertisement in the Hindustan Time newspaper in Delhi. The advertisement did not mention Signal by name. Khuttan attended an information meeting in Delhi where he first met Dewan. Khuttan traveled from Delhi to Mumbai to speak with Dewan Consultants about the program and this is when he first heard about Signal. Khuttan paid Dewan about $20,000 USD up front to participate in the employment program with Signal and he borrowed the money from a friend. Khuttan contends that he really didn't know which kind of visa he was supposed to get but that Dewan later informed him that he would be going  [*37] to Signal on an H-2B visa and that once he arrived in the United States Signal would take care of him and get him a green card. After arriving in the United States in 2007 Khuttan worked at Signal's Pascagoula, Mississippi facility.

All of the named plaintiffs, whether recruited for J & M, IAS, or Signal contend that they were promised green cards and that this is what their contracts with Defendants guaranteed to them. Plaintiffs contend that it was in reasonable reliance on Defendants' assertions that they undertook such considerable personal, financial, and familial sacrifices in order to participate in the recruiting program, and they assert that they would not have made such sacrifices had they known that Defendants' assertions regarding permanent residence in the United States were false.

### C. Factual Background--Phase 2--Employment/Life at Signal

From the beginning, it was understood that housing and meals would be provided by Signal with the cost of these "accommodations" to be paid by the workers out of their paychecks. [18] Originally, Global was going to provide the accommodations with Signal then reimbursing Global out of the workers' paychecks. (Pla. Exh. 517). But Signal opted  [*38] to construct man camp housing facilities onsite in Texas and Mississippi to house the workers. The decision was prompted in large part by housing shortages after hurricanes Katrina and Rita. Meals would also be prepared and served onsite. These preparations did require capital and expense outlays by Signal but it was always Signal's intention to recoup these expenditures by deducting fees from the workers' pay. Signal invested millions of dollars building the camps and decided to charge the workers $35 dollars per day (7 days a week) for room and board so that the company could recoup its investment over a five year period. [19] At the $35/day rate Signal anticipated realizing a profit from the man camps. [20] (Pla. Exh. 871). For this reason it would eventually become important to Signal to ensure that the man camps were filled to maximum capacity. (Pla. Exhs. 528, 449, 850). Signal implemented a policy that required each foreign worker to pay the $35/day accommodations charge even if the worker elected to live offsite and even if the worker earned no pay for a given day. Only the Indian H-2B workers were allowed to live at the man camps. And only the Indian H-2B workers were charged  [*39] the $35 per day accommodations fee regardless of whether they chose to live in the man camp or elsewhere.

> 18   Plaintiff Thangamani testified that someone told him that room and board would be free. (Thangamani depo at 56).
> 19   Signal also envisioned charging the workers for enlarging its welder testing and training facilities. (Pla. Exh. 846).
> 20   One member of Signal's management proposed charging the workers $53.50 per day for accommodations, reasoning that the workers had only been making about $10 per day in India and that even after the deduction they would still be making about 11 times more per day than what they were making at home. (Pla. Exh. 671). Signal did not recoup its expenditures for the man camps and in the end Signal spent about $6.5 million dollars more than it recovered. (Cunningham depo at 136).

By August 2006 Signal was eager to have the workers arrive given its increased workload and manpower

shortage in that year and given the soaring costs that the company was incurring for subcontracted labor. (Pla. Exh. 550). The first workers began arriving at Signal in November 2006. Each H-2B worker was given a second skills test--some workers had their wages reduced from the $18 [*40] per hour rate by as much as 30 percent to an amount commensurate with their skills and some were terminated. Each worker also executed a Man Camp Housing Rules Agreement (Pla. Exhs. 48, 76, 811, 858, 859), [21] an H2B Resident Housing Agreement (Pla. Exhs. 63, 181, 779, 860, [22] and an Authorization Agreement for Payroll Deduction (Pla. Exhs. 75, 812, 845, 861, 862). [23] Once arrived the workers were presented with new employment contracts terminable at will. (Signal Exhs. SSS, SSS-A).

> 21   The Rules prohibited alcohol, smoking, visitors/guests, and horse-playing in the man camp. Also, all employees were required to enter the facility through security.
>
> 22   The Housing Agreement expounds upon some of the rules contained in the Man Camp Rules, imposes the $35/day charge for room and board, and imposes stiff fines for violations of camp rules.
>
> 23   Via this document each worker authorized Signal to deduct the $35/day "accommodations" or room/board charge from his paycheck.

Perhaps Signal understood even before the first workers arrived that they expected to receive green cards at some point. [24] (Pla. Exhs. 550, 817). But without question Signal knew of the workers' green card expectations once they arrived [*41] on site because the workers questioned Bill Bingle about green cards on their first day at the camp. According to Bingle, it was only later in the process that Signal learned that the H-2B process would not support the filing of green cards for the workers. Signal maintains that it had believed early on that there was an avenue available to convert the temporary visas to green cards and that it intended to apply for green cards for those workers who proved to be good employees. (Pla. Exh. 817). But green cards would only be considered once the allowable H-2B extensions were exhausted and only for valued workers. Prior to the expiration of the first H-2B visas in July 2007, Signal began using a "yes/no" evaluation protocol for identifying potential candidates for long term employment.

> 24   Less clear, however, and perhaps ultimately more important, is whether Signal understood the significance of the references to green cards in the various emails and correspondence that were exchanged before the workers arrived at Signal. See Rigolo depo at 72 ("[V]ery early in the process [] there was probably some misunderstand-

ing and [the terms] visa and green card were used synonymously.").

Signal concedes [*42] that its intention was never to seek green cards for all H-2B workers without considering factors like skill level, work ethic, attitude, etc. Signal maintains that it never agreed to seek green cards on behalf of every worker without considering job performance and that it never felt obligated to do that. According to Signal, if such broad promises pertaining to green cards were made to the workers then they were not authorized by Signal and were not true. After all, green cards are issued by the government and with the government involved no employer could guarantee any worker a green card.

Plaintiffs contend that Defendants' green card scheme was grounded in part upon false representations about the living conditions at Signal. Upon arriving at Signal, Plaintiffs were sorely disappointed in the man camp accommodations, including the food. According to Plaintiffs, their $35 per day bought them life in overcrowded and cramped labor camps, [25] with insufficient bathroom and shower facilities for the number of men housed in each bunkhouse. Plaintiffs assert that the facilities lacked privacy and were not conducive to regular sleep. Signal believes that the facilities conformed to all [*43] applicable city codes but not necessarily to OSHA requirements. (Pla. Exh. 940). Plaintiffs contend that the squalid conditions in the man camp were conducive to the spread of disease and illness. At one of the camps water would leak and stagnate due to shoddy plumbing. (Pla. Exh. 621). One kitchen facility was described by Signal's own staff as "disgusting." (Pla. Exh. 828 ("I pray that the TX Health Dept doesn't show up. They will shut this place down immediately.").

> 25   Plaintiffs submitted numerous photographs and a video of the man camp living areas while they were occupied. (Pla. Exhs. 838, 839). Plaintiffs' assertions about overcrowded conditions are not exaggerated.

Plaintiffs also resented the man camp housing rules. In practice, Plaintiffs did not appreciate having to pass through security to enter to the camps, and the attendant searches of their parcels and requisite presentation of identification. Alcohol and visitors were strictly prohibited in the camps, and Plaintiffs contend that they often felt like prisoners while living in the camps, and isolated or marginalized from the rest of the workforce and the community. Of course, no worker could be forced to live at the man [*44] camp so long as he was willing to pay room and board elsewhere on top of the $35 per day (approximately $1050 per month) accommodations fee that Signal would continue to charge him in light of his H-2B status. Thus, some of the workers felt financially com-

2012 U.S. Dist. LEXIS 114247, *

pelled to live in the man camps despite how miserable any particular worker might have felt about that prospect.

Plaintiffs characterize the man camp as a "racialized ghetto," (Pla. memo at 20), and they point to the man camp as strong evidence of the discriminatory treatment that they claim to have received at Signal. Plaintiffs point out that they were the only members of Signal's work-force who were allowed or required to live in the man camp, with its attendant security rules and hefty daily rates, and that they were required to pack their lunches from the food available at the man camp cafeteria, which often spoiled in the heat before they could eat it. Plain-tiffs point out that only the migrant workers at Signal were subjected to these conditions. [26] Plaintiffs also com-plain that they were given the most undesirable and dan-gerous work that Signal's non-foreign workers did not want to perform. Plaintiffs contend that they were [*45] left with no choice but to endure the unpleasant and abysmal conditions at Signal or go back to India finan-cially bankrupt and socially scarred. Plaintiffs contend that Signal exploited their precarious financial situation and their vulnerable immigration status.

> [26]    Plaintiffs have also submitted various emails from Signal personnel which they contend exemplifies the company's discriminatory attitude toward the Indian H-2B workers. (Pla. memo at 23 n.25).

John Sanders was Signal's point man for the Glob-al/Signal contract and he took what appears to be a gen-uine interest in the day to day concerns and welfare of the H-2B workers. [27] In November 2006 Sanders learned from the workers about the onerous fees charged by De-wan, Pol, and Burnett. Several workers told Sanders personal stories about pawning private possessions in order to raise the fees required to participate in the H-2B program, and of the significant debts that they had in-curred in the process. The workers also complained about the $35 per day accommodations fee, pointing out that after this fee was deducted from their pay, and in light of the debts already incurred, it was not economi-cally advantageous to be at Signal. Sanders [*46] re-layed this information to upper management and noted how these issues were affecting morale amongst the workers. (Pla. Exh. 618).

> [27]    Sanders kept a personal diary in which he recorded his dealings with the Indian workers and Signal management and his personal impressions of many of the events at issue in this case.

On November 20, 2006, a meeting took place to discuss the clear contradiction in the workers' assertions about the fees that they were claiming that they had paid to participate in the H-2B/green card program and Pol's

statements to Signal that the workers had paid $2000 to participate. (Pla. Exh. 521(Bingle)). Pol, Ron Schnoor, and John Sanders were present. Signal maintains that it was during this meeting that it learned with certainty about the exorbitant fees that the workers had paid to Global, Burnett, and Dewan. Ron Schnoor followed up with a letter to Pol demanding an accounting of the workers' payments and demanding that Pol refund 50 percent of the fees paid by the workers and reimburse them for airfare. (Pla. Exh. 520(Bingle)). Schnoor copied Dewan and Burnett on the letter. Pol replied via letter defending the fees charged and explaining why he could not refund [*47] any of the money. (Pla. Exh. 559). Signal was convinced that Pol had misrepresented to Signal the amount of money that each worker would be paying to participate. Signal terminated its relationship with Pol and requested that Dewan and Burnett do the same. (Pla. Exh. 669).

Thus, as of November 2006, Signal knew about the significant fees that the workers had paid and about the workers' green card expectations. Around this time Sig-nal also became concerned that perhaps Dewan was not being honest with the testing in India because the actual skill level of the workers who were arriving at Signal was not commensurate with the tests that they were passing in India. Signal noticed that the workers coming over were not the best and that perhaps the ability to pay hefty recruiting fees was being given more weight than actual skill. Plaintiffs assert that November 2006 pre-sents a watershed moment in the case because from this point onward Signal clearly knew what was going on but nevertheless continued for months thereafter to accept hundreds more workers into the program--workers who were relying on false promises. And while Signal termi-nated its dealings with Pol, it nonetheless continued to [*48] work with Dewan and Burnett. (Pla. Exh. 522(Bingle)). Plaintiffs contend that Signal took no cor-rective action because it needed the workers to continue to save on labor costs and to continue to pay for the man camp. Plaintiffs contend that Signal's decision to contin-ue to bring in workers via Dewan and Burnett, all the while knowing the truth, makes the company liable in the scheme.

On March 9, 2007, Signal decided to terminate eight of the workers--six who were allegedly unproductive and two, Jacob Joseph Kaddakkarappally and Sabulal Vi-jayan, who might be characterized as "rabblerousers." (Pla. Exh. 646). Jacob and Sabulal had a reputation in Mississippi for creating unrest among the foreign work-ers even though they were otherwise skilled workers. By this time Signal also knew that some of the workers had contacted a lawyer about their rights, and that two of the workers in particular had been wheedling other workers to also speak to the lawyer. (Pla. Exh. 443). Signal un-

2012 U.S. Dist. LEXIS 114247, *

dertook to terminate Jacob and Sabular on the morning of March 9, 2007, in the presence of the other foreign workers, which Plaintiffs contend was a calculated decision in order to make an example of Jacob and Sabular [*49] so that everyone would understand what happens to troublemakers. Signal called in Swetman security guards in advance of the terminations in the event that things got out of hand--which they did as the situation deteriorated into mayhem. The security guards allegedly detained the terminated workers unlawfully in one of the bunkhouses, and Plaintiffs contend that this was done at Signal's direction. Sabular attempted suicide and the Pascagoula Police Department arrived on the scene after someone called to report a kidnaping. (Pla. Exh. 444). The Mississippi Immigrant Relief Association was present outside the camp and so was the media. (Pla. Exh. 646). The Mississippi debacle of March 9, 2007, became known as "Black Friday." Plaintiffs contend that word of the Black Friday events in Mississippi quickly spread to the workers in the Texas camp.

Dewan flew from India to Mississippi on March 9, 2007, to help settle some of the unrest amongst the foreign workers but he was not present for the Black Friday events. Dewan believed that he might be able to calm the workers in light of the troublemakers who were trying to create problems for everyone. (Pla. Exh. 446). Dewan suggested that the workers [*50] who had initiated the problems should be deported first. Burnett later traveled to the Texas facility to similarly calm the workers.

On March 12, 2007, Schnoor and Burnett addressed the workers in Mississippi to reassure them that they were part of Signal's long term solution for supplementing its labor force. Schnoor advised the workers to think very carefully about suing Signal because Signal would vigorously fight any such efforts and that a bunch of frivolous lawsuits would mean no visa extensions for the foreign workers so that they would all have to return to India when the first H-2B visas expired on July 31, 2007. Plaintiffs contend that the events and aftermath of Black Friday emphasized to the Indian workers the importance of being compliant while at Signal because even good workers would be terminated and deported if they complained. Plaintiffs assert that Signal made false assurances about the status of their green cards thereby continuing the deception. Plaintiffs characterize the working and living conditions at Signal as psychologically coercive.

By April 25, 2007, Dewan, Burnett, and Pol were at odds when Pol and Burnett came to suspect that Dewan had lied to them about [*51] giving a refund to a candidate while he in fact took the candidate's money. (Pla. Exh. 469). Signal's first H-2B authorization was scheduled to expire on July 31, 2007, but on the advice of Burnett Signal requested the first extension for all of the

workers because it was just easier that way. By March 2008 when this lawsuit was filed more than three quarters of the putative class had left Signal. At present, none of the putative plaintiff class members remain at Signal.

**D. Procedural Background**

Plaintiffs filed this proposed class action on March 7, 2008, and amended their complaint twice. Plaintiffs originally moved for class certification on October 1, 2008. (Rec. Doc. 165). Plaintiffs filed their Second Amended Complaint (Rec. Doc. 944) on November 23, 2010. The Court allowed discovery on class issues and that discovery proceeded for over two years.

Plaintiffs successfully defeated numerous dispositive motions but on November 10, 2010, the Court granted Signal's motion to dismiss Plaintiffs' claim for certification of a Rule 23(b)(2) class for injunctive relief. [28] (Rec. Doc. 926).

> 28   When dismissing the (b)(2) claims the Court specifically noted that the ruling did not constitute a [*52] final adjudication of the class certification issue so as to trigger any party's right to seek an interlocutory appeal pursuant to Rule 23(f). (Rec. Doc. 926). In order to avoid the inefficiency of a piecemeal appeal process, all parties expressly agreed on the record to waive any subsequent argument that Plaintiffs' failure to seek immediate review in the Fifth Circuit would constitute a waiver of their rights under Rule 23(f). Accordingly, the Court will incorporate its ruling on the (b)(2) claims as part of this Order and Reasons so that the parties can seek review of all certification claims at one time.

Plaintiffs filed their Supplemental Motion to Certify (Rec. Doc. 994) on February 1, 2011, and Defendants filed their submissions in opposition to certification (Rec. Docs. 997, 998, 992, & 1000). Signal then filed its Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012) and Motion for Partial Stay of Class Certification Proceedings (Rec. Doc. 1013), in response to Plaintiffs' argument that certification of RICO claims predicated on 18 U.S.C. § 1546, insofar as Plaintiffs were urging that Signal defrauded the United States government, were [*53] never pled with the required specificity. Plaintiffs then filed their Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031). The Court granted Signal's Motion for Partial Stay such that Defendants would not be required to address the merits of the § 1546 claims in their rebuttal memoranda. (Rec. Doc. 1043). The Court advised that it would issue an order inviting Defendants to respond to the § 1546 claims on the merits if the Court were inclined to deny the Motion to Strike-1012 and/or to grant

2012 U.S. Dist. LEXIS 114247, *

the Motion for Leave, and if the § 1546 claims were otherwise certifiable. (Rec. Doc. 1043).

The parties filed their rebuttal memoranda (Rec. Docs. 1073, 1070, 1074, $ 1071) on April 29, 2011, at which time the issue of class certification was taken under submission, along with the Motion to Strike-1012 and Motion for Leave to File, the latter two relating solely to the issue of RICO claims predicated on § 1546 insofar as Plaintiffs argue third-party reliance by the United States government.

After the rebuttal memoranda were filed, Signal filed its second motion to strike, Motion to Strike-1082, which was taken under submission on June 22, 2011. This motion to strike, as with the [*54] first motion to strike, pertains solely to the RICO claims.

## III. CLASS CERTIFICATION PURSUANT TO RULE 23(b)(3)

Plaintiffs move to have a class certified pursuant to Federal Rules of Civil Procedure 23(b)(2) [29] and (b)(3) consisting of

> All Indian guest-workers who were recruited by one or more Defendants and who traveled and/or were transported to the United States at any time through September 30, 2007, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(b) ("H-2B") visas assigned to Defendant Signal International.

29   The Court has already rejected the (b)(2) injunctive relief class claims. See note 28, supra. The Court will therefore limit the substance of its analysis to the Rule 23(b)(3) class claims.

Plaintiffs seek certification with respect to their claims for violations of 1) the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1589 (forced labor) & § 1590 (trafficking); 2) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)-(d); 3) the Civil Rights Act of 1866, 42 U.S.C. § 1981; and 4) the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3).

Federal Rule of Civil Procedure 23 governs class actions. The rule provides in relevant part:

> (a) Prerequisites.  [*55] One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

> (b) Types of Class Actions. A class action may be maintained if Rule 23(a) is satisfied and if:

> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of

Page 14

2012 U.S. Dist. LEXIS 114247, *

separate actions;

**(B)** the extent [*56] and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

Fed. R. Civ. Pro. 23(a), (b)(2)-(3). To obtain certification a party must satisfy Rule 23(a)'s four threshold requirements (numerosity, commonality, typicality, and adequacy of representation), as well as the requirements of Rule 23(b)(1), (2), or (3). Gene & Gene, LLC v. Biopay, LLC, 541 F.3d 318, 325 (5th Cir. 2008) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)). District courts have discretion as to whether a class will be certified. Stirman v. Exxon Corp., 280 F.3d 554, 561 (5th Cir. 2002) (citing Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996)). However, that discretion must be exercised within the framework of Rule 23. Id. The district court must "conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class." Gene & Gene, 541 F.3d at 325 (quoting O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 737-38 (5th Cir. 2003)). The party seeking certification bears the [*57] burden of demonstrating

that the Rule 23 requirements have been met. [30] Id. (citing Berger v. Compaq Comp. Corp., 257 F.3d 475, 479 (5th Cir. 2001)).

> 30   Plaintiffs suggest that courts in the Fifth Circuit are urged to err on the side of certifying class actions because the order is always subject to modification in light of later developments. (Rec. Doc. 994-1, at 35). The Court has reviewed numerous class action decisions from this circuit and the Court does not glean such an urging. To the contrary, the Fifth Circuit has specifically noted how certification can dramatically affect the litigation stakes for defendants by magnifying and strengthening the number of unmeritorious claims, Castano, 84 F.3d at 746 (citing In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 165-66 (2d Cir. 1987)), and that certification cannot follow from mere instinct and a "fig-ure-it-out-as-we-go-along approach," Madison v. Chalmette Refining, LLC, 637 F.3d 551, 557 (5th Cir. 2011). The "rigorous" Rule 23 analysis required by this circuit's precedent does not comport well with a policy of erring on the side of certifying class actions when there is any uncertainty as to whether Rule 23's standards are [*58] met.

Rule 23(b)(3) is "[f]ramed for situations in which 'class-action treatment is not as clearly called for' as it is in Rule 23(b)(1) and (b)(2) situations. Amchem Prods., 521 U.S. at 615 (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697). A party seeking certification of a Rule 23(b)(3) class must demonstrate *inter alia* that the questions of law or fact common to class members predominate over any questions affecting only individual members. Gene & Gene, 541 F.3d at 325 (quoting Fed. R. Civ. Pro. 23(b)(3)). Considering whether "questions of law or fact common to class members predominate" begins with the elements of the underlying cause of action. Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011).

The predominance inquiry requires a court to consider "how a trial on the merits would be conducted if a class were certified." Gene & Gene, 541 F.3d at 325 (quoting Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 302 (5th Cir. 2003)). This in turn means that the court must identify the substantive issues that will control the outcome, assessing which issues will predominate, and then determine whether the issues are common to the class--a process that ultimately prevents [*59] the class from degenerating into a series of individual trials. Id. The court must go beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination

of the certification issues. Castano, 84 F.3d at 744 (citing Manual for Complex Litigation § 30.11 (3d ed. 1995)). The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. Id. (quoting Amchem Prods., 521 U.S. at 623-24). The predominance of individual issues necessary to decide an affirmative defense may preclude class certification. Gene & Gene, 541 F.3d at 327 (quoting In re Monumental Life Ins. Co., 365 F.3d 408, 420 (5th Cir. 2004)).

Generally, the strength of the plaintiff's claim on the merits should not affect the certification decision. See Castano, 84 F.3d at 744. Nonetheless, the determination of class action questions is often intimately involved with the merits of the underlying claims. Id. at 744 n. 17 (quoting Cooper & Lybrand v. Livesay, 437 U.S. 463, 469 n.12, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978)). Frequently the "rigorous analysis" required for Rule 23 certification will entail some overlap with [*60] the merits of the plaintiff's underlying claim. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52, 180 L. Ed. 2d 374 (2011). "The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Id. (quoting Gen. Tel. Co. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). This is particularly true with the more complex determinations required for certification under Rule 23(b)(3). Castano, 84 F.3d at 744 n.17. "[I]n some cases there will be overlap between the demands of 23(a) and (b) and the question of whether plaintiff can succeed on the merits." Huff v. N.D. Cass Co., 485 F.2d 710, 714 (5th Cir. 1973) (en banc).

In this case all aspects of the Rule 23 certification inquiry are contested except the numerosity requirement [31] and the adequacy of Plaintiffs' counsel. (Rec. Doc. 994-1, at 40 n.42). All of the Rule 23(a) requirements are important and must be satisfied but the (b)(3) requirements usually present a far more challenging obstacle for certification than the Rule 23(a) requirements. Therefore, for the various causes of action, the Court can appropriately begin its Rule 23 analysis by assuming arguendo that the Rule 23(a) [*61] requirements are satisfied and turning its attention to the more "exacting demands" of Rule 23(b)(3), in particular the predominance requirement. Gene, 541 F.3d at 325. If the predominance requirement is satisfied then the Court will necessarily address Rule 23(b)(3)'s superiority requirement, and if necessary, Rule 23(a)'s requirements. Id. at 326.

[31] The proposed class numbers about 500 members.

**1. Trafficking Victims Protection Act**

The first set of claims that Plaintiffs seek to certify for class-wide treatment are their forced labor and trafficking claims brought under the auspices of the Trafficking Victims Protection Reauthorization Act of 2003. These claims derive from alleged violations of two criminal statutes, 18 U.S.C. § 1589 (forced labor) and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor). 18 U.S.C. § 1595 allows Plaintiffs to seek civil recovery for violations of the forced labor and trafficking criminal statutes, §§ 1589 and 1590. [32] Plaintiffs' forced labor and trafficking claims are brought against defendants Signal, Pol, and Dewan.

[32] "An individual who is a victim of a violation of section 1589, 1590, or 1591 of [*62] this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorney's fees." 18 U.S.C.A. § 1595(a) (West 2000 & Supp. 2004). The civil remedies provision was enacted as part of the Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875 (2003). In 2008 Congress broadened the scope of the civil remedy statute but that amendment, which came subsequent to the events giving rise to this lawsuit, is not at issue in this case.

Defendants contend that Plaintiffs' § 1589 claims cannot be tried on a representative basis and are therefore not amenable to certification because the claims are fundamentally about individual consent. According to Defendants, the legislative history of § 1589, and the Supreme Court's decision in United States v. Kozminski, which actually predates the enactment of § 1589, demonstrate that Plaintiffs' forced labor claims cannot be certified as a matter of law under the facts of this case. In other words, the very nature of a forced labor claim precludes Plaintiffs from meeting their burden of demonstrating that the predominance requirement [*63] of Rule 23(b)(3) is satisfied.

Plaintiffs argue that the Trafficking Victims Protection Act ("TVPA") does not require a showing of individualized consent because the TVPA focuses on the actions of the defendant, not the plaintiff. Therefore, liability under the TVPA can be proven regardless of the number of plaintiffs bringing a claim. Plaintiffs point out that the TVPA introduced the concept of "serious harm" into the forced labor realm and that "serious harm" is assessed objectively on a reasonable person standard. Therefore, according to Plaintiffs, no one plaintiff's perspective, subjective position, or consent is legally relevant. The only question that need be answered is whether a reasonable person in Plaintiffs' shoes would feel com-

pelled to provide his labor against his will--a question that can be answered on a class-wide basis.

The question of whether to certify a class for a TVPA claim is a question of first impression in the Fifth Circuit. To determine whether issues of fact common to the class predominate over individual issues the Court turns its attention to the elements of the forced labor cause of action and the substantive issues that will control the outcome of the [*64] claims.

**A. Forced Labor, _18 U.S.C. § 1589_**

Section 1589 of Title 18, pertaining to **Forced Labor**, provides:

> Whoever knowingly provides or obtains the labor or services of a person--
>
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
>
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
>
> (3) by means of the abuse or threatened abuse of law or the legal process,
>
> shall be [subject to criminal penalties].

18 U.S.C.A. § 1589 (West 2000 & Supp. 2001). [33] The coercive means described in subsections (1)-(3) supra are taken nearly verbatim from the definition of "coercion" found at 22 U.S.C. § 7102(2), which is part of the civil provisions of the Trafficking Victims Protection Act.

33 Congress amended § 1589 in 2008 to make it even broader. That amendment was signed into law on December 23, 2008, and is not applicable to Plaintiffs' claims.

Section 1589 became law on October 28, 2000, when President Clinton signed into law the Victims of Trafficking and Violence Protection Act of 2000. The [*65] purposes of the Act were "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." 22 U.S.C.A. § 7101 (West 2004).

It is widely recognized that Congress crafted § 1589 pertaining to forced labor to fill a significant gap in the

scheme of involuntary servitude criminal laws that the Supreme Court had identified in United States v. Kozminski, 487 U.S. 931, 108 S. Ct. 2751, 101 L. Ed 2d 788 (1988). In Kozminski, the government prosecuted the defendants for criminal violations of 18 U.S.C. § 1584, which criminalized involuntary servitude. The victims were two mentally retarded men who had been found laboring on the defendants' farm in poor health, in squalid conditions, and in relative isolation from society. During the criminal prosecutions the government offered some evidence of physical abuse but also relied on various other methods of coercion--denial of pay, subjection to substandard living conditions, isolation--to establish that the victims believed that they had no alternative but to work on the farm. Kozminski, 487 U.S. at 936. The government had argued that the [*66] two men were "psychological hostages" whom the defendants had "brainwashed into serving them." Id. The district court's jury charge specifically allowed the jury to consider various types of non-physical, psychological coercion when determining whether the two men had been held to involuntary servitude. Id. at 939. The jury voted to convict. The appellate court en banc reversed the convictions.

The Supreme Court granted the government's writ to consider the scope of conduct pertinent to the meaning of "involuntary servitude" for purposes of a criminal prosecution under § 1584. In light of the state of the law when Congress first enacted § 1584 in 1948, the Court concluded that "involuntary servitude" was limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion-- psychological coercion would not suffice. Kozminski, 487 U.S. at 948. The government had urged the Court to adopt a broad construction of "involuntary servitude" so as to prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power [*67] of choice. Id. at 949. But the Court refused to give such an amorphous interpretation to a criminal statute. Such an interpretation would give no notice to ordinary people who are required to conform their conduct to the law and the question of whether any specific acts would constitute a crime would depend solely on the specific victim's state of mind. Id. at 949-50. Further, the rule of lenity, which serves to promote fair notice to those subject to the criminal laws, requires that any uncertainty concerning the ambit of criminal statutes leads to a narrower interpretation, not a broader one. Id. at 951-52.

In summing up, the Supreme Court stated that _absent change by Congress_, for purposes of a criminal prosecution under § 1584, the term "involuntary servitude" necessarily means a condition of servitude in which the victim is forced to work for the defendant by

2012 U.S. Dist. LEXIS 114247, *

the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process. Kozminski, 487 U.S. at 952. The Court clarified, however, that its holding did not imply that evidence of other means of coercion, or of the victim's special vulnerabilities would be irrelevant.   [*68] To the contrary, the vulnerabilities of the victim would be relevant in determining inter alia whether the physical or legal coercion or threats thereof "could plausibly have compelled the victim to serve," as well as the "causal effect" of any physical or legal coercion. Id. The Supreme Court affirmed, thereby vacating the convictions and remanding for a new trial.

Congress enacted § 1589 in the wake of Kozminski to provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in Kozminski. H.R. Rep. 106-939. Section 1589 is intended to address the increasingly subtle methods of traffickers who often use means other than overt violence. Id. With § 1589, prosecutors would no longer be required to demonstrate physical harm or threats of force against victims because the "serious harm" standard employed by the statute encompasses a broad array of harms, both physical and non-physical. Id.

The Kozminski Court did not directly confront the question of whether a forced labor charge requires proof that the victim's rendering of labor was involuntary or non-consensual, which of course is the point of   [*69] law that the parties dispute in this case. But it is beyond dispute that the Court's discussion of the law throughout the opinion confirms that the concept of involuntary servitude or forced labor turns on whether the victim rendered labor because of the verboten physical force or legal coercion. In other words, the issue is whether the victim was coerced by physical force or legal coercion into providing labor *involuntarily*. Nothing about Kozminski even remotely suggests that a finding of involuntary servitude or forced labor could be premised solely on the defendant's conduct and the fact that the victim did in fact work for the defendant, while ignoring the issue of causation. Kozminski clearly suggests that a determination of involuntary servitude or forced labor requires a causal connection between what the defendant did, what the victim did, *and why the victim did it.* See Kozminski, 487 U.S. at 952 ("[T]he vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve."). In other words, the forced labor analysis cannot be confined solely to the defendant's conduct but necessarily   [*70] must take into account the particular victim's vulnerabilities. [34]

34   Justice Brennan's concurring opinion in particular contains numerous points of discussion that confirm that the victim's perspective is crucial to a forced labor determination. See, e.g., Kozminski, 487 U.S. at 956-57 (Brennan, J., concurring) ("Without considering these techniques (and their particular effect on a mentally disabled person), one would hardly have a complete picture of whether the coercion inflicted on the victims was sufficient to make their service involuntary.").

The question then is whether the TVPA so changed the forced labor inquiry so as to focus solely on the defendant's conduct to the exclusion of the victim's perspective. The TVPA included the new § 1589 statute on forced labor, that Plaintiffs rely upon herein, to counter Kozminski but the problem with Kozminski was not that the Supreme Court considered the individual victim's vulnerabilities to be relevant to the issue of compulsion but rather that the coercive means punishable for a forced labor violation were too narrow under Kozminski, particularly with respect to psychological coercion. Section 1589 clearly recognizes that there are numerous   [*71] types of harm beyond physical abuse or legal coercion that can be used to force an individual to work involuntarily. So because of the TVPA the more subtle forms of coercion that escaped criminal punishment in Kozminski are now clearly unlawful.

But the Court does not read either the TVPA or § 1589 in particular as shifting the focus of the crime of forced labor solely to the defendant's conduct without concern for whether the defendant's conduct was sufficient to make *the specific alleged victim* render labor involuntarily. The TVPA did not render the issue of consent irrelevant to a forced labor determination. Congress could have expressly rendered victim consent irrelevant to the determination, as is the case with the United Nations Protocol applicable to human trafficking, but Congress declined to do so. See Jennifer M. Chacon, Misery & Myopia: Understanding the Failures of U.S. Efforts to Stop Human Trafficking, 74 Fordham L. Rev. 2977, 2982 (2006). [35] And the House Report on the TVPA contains a discussion that talks about "the individual circumstances of the victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to   [*72] maintain or obtain a victim's labor or services, including the age and background of the victims." H.R. Rep. 106-939. Other courts continue to recognize implicitly that even in the aftermath of the TVPA the question of forced labor turns on whether the defendant's conduct or tactics reasonably coerced or forced the victim to provide labor. See, e.g., United States v. Bradley, 390 F.3d 145 (1st Cir. 2004), rev'd on other grounds, Bradley v. United States, 545

2012 U.S. Dist. LEXIS 114247, *

U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005); United States v. Peterson, 627 F. Supp. 2d 1359 (M.D. Ga. 2008). And one cannot determine whether the defendant's actions coerced or forced the victim to provide labor without looking to the specific victim involved.

35    In fact, this author has opined that the TVPA, contrary to earlier law, actually gives "central importance" to the question of victim consent. Chacon, supra, at 2999.

Moreover, the need to consider the specific alleged victim becomes even more crucial when the subtler forms of psychological coercion are involved, which the new § 1589 allows and which Plaintiffs rely upon in this case. Most human beings would likely choose to provide labor in lieu of receiving severe beatings or being tortured so with   [*73] egregious forms of physical abuse the specific victim's vulnerabilities may become less important. But with more subtle types of coercion, particularly psychological coercion, the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce in providing forced labor. This is exactly what § 1589 now recognizes. But because § 1589 is a criminal statute that potentially reaches a broad range of coercive conduct that standing alone might not be unlawful, two things are clear. First, the defendant's conduct must be the driving force behind the victim's "choice" to render the labor. [36] And second, the victim's response to the defendant's actions must pass the reasonable person test. The reasonable person test injects an objective standard into the forced labor determination which is important given the criminal nature of the statute. After all, as Justice Brennan noted in Kozminski, criminal sanctions cannot depend on a completely subjective standard that criminalizes otherwise innocent behavior simply because a particularly sensitive victim reacts to it. 487 U.S. at 960-61 [*74] (Brennan, J., concurring). Therefore, even though the "serious harm" that § 1589 encompasses is extremely broad it must at least pass a threshold objective standard such that it would cause a reasonable person in the victim's shoes to render forced labor--the criminal law of which § 1589 is a part requires no less. Thus, it is not enough that the defendant's conduct was subjectively coercive so as to cause the victim to render involuntary labor. The defendant's conduct must also be objectively coercive enough to do so. [37] But contrary to Plaintiffs' assertion, the injection of the objective reasonable person standard into the forced labor equation does not serve to eliminate the subjective aspects of the crime--the jury must still determine whether the victim was coerced subjectively to provide labor based on the defendant's threats. This is the very essence of the crime of forced labor and Plaintiffs' interpretation of their burden of proof on the forced labor claims is contrary to the statute.

36    Justice Brennan sagaciously explained in Kozminski how at some level the laborer always has a "choice" no matter what the threat because he can choose to work or take a beating. But with less   [*75] egregious forms of coercion it is particularly difficult to determine when a person's actions are "involuntary." Kozminski, 487 U.S. 931, 959, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (Brennan, J., concurring).
37    The reasonable person standard for serious harm was codified in the 2008 amendments to the TVPA when Congress added a definition for "serious harm" to § 1589: "The term 'serious harm' means any harm, whether physical or nonphysical including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform and to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C.A. § 1589(c)(2) (West Supp. 2011). The court in Bradley had used a very similar definition of "serious harm" in its pre-2008 charges to the jury. 390 F.3d at 150.

Of course, Plaintiffs are not prosecutors, they are civil litigants seeking to recover money damages under § 1595 for a violation of a criminal statute, § 1589. But § 1595 is a damages statute, not a statutory penalty provision that imposes a monetary sanction once the plaintiff establishes that the defendant has engaged in   [*76] certain conduct. The plaintiff must prove the damages that he sustains as a result of the defendant's violation of § 1589, and proving that compulsion at the hands of the defendant caused the plaintiff to render his services involuntarily is simply part of the causation analysis for the civil claim. It would be inimical to the concept of damage recovery in civil litigation to simply ignore the question of whether the individual plaintiff was in fact injured by the defendant's conduct. And with a forced labor claim, the injury question is inextricably intertwined with the question of whether it was in fact the defendant's conduct that coerced labor from the plaintiff.

That said, Plaintiffs do not suggest that they are completely irrelevant to whether a violation of § 1589 has occurred, only that individual characteristics that might make one individual less susceptible to coercion than his co-worker are irrelevant. Plaintiffs' contention is that certain broader characteristics shared by the class as a whole, e.g., immigration status, payment of exorbitant fees to recruiters, poor living conditions at Signal, would have compelled any reasonable person to stay at Signal

2012 U.S. Dist. LEXIS 114247, *

and provide labor [*77] and therefore the focus should be on Defendants' conduct. Clearly, the members of the class do share some common characteristics. And broadly speaking, it may very well be a logical conclusion that a welder of Indian origin, who incurred significant debt and now finds himself in the United States on a temporary visa, might choose to stay in an unpleasant employment situation. But while all of these considerations surely factor into the decision to stay with the employment, it does not mean that these characteristics that apply class-wide can substitute for the subjective aspects of why any given Plaintiff chose to stay at Signal. The question in a forced labor case is not whether any reasonable person who finds himself in the victim's situation would have felt trapped by his circumstances and therefore stayed on the job with Signal. The question is whether Defendants' coercive conduct was such that it could overcome the will of the victim so as to make him render his labor *involuntary*. The Court is persuaded that this question cannot be answered via generalized class-wide proof but rather must be answered individually based upon individualized proof.

The Court does not agree, however, [*78] with Signal's contention that a § 1589 claim can never be suitable for class certification. Certainly, based on the type of coercion used, there may be cases where consent becomes irrelevant. In other words, some "choices" might be so illegitimate that any decision to work is "involuntary." See Kozminski, 487 U.S. at 959 (Brennan, J., concurring). But this case does not present one of those situations. To the contrary, this case involves plaintiff workers who in fact could leave their jobs at any time, albeit under penalty of returning to their home countries but that restriction was dictated by U.S. immigration law. The workers were for the most part paid well, free to come and go as they pleased, and some even took vacations and bought cars. The pressure to work for Signal arguably came at least in part from a set of circumstances that each plaintiff individually brought upon himself when he elected to pay what is now characterized as "exorbitant" fees to participate in the green card program. Part of the "serious harm" that Plaintiffs claim that they faced was financial and reputational harm which are uniquely individual in nature. And the "threats" that Plaintiffs allege were made to [*79] compel them to work were often made to individuals, not to the class as a whole.

Based on the foregoing this Court is persuaded that individual issues with respect to coercion and consent will predominate Plaintiffs' § 1589 forced labor claims. This is true whether the question is viewed as one of coercion as an element of Plaintiffs' claims, see Channer v. Hall, 112 F.3d 214 (5th Cir. 1997), or as consent as an element of Defendants' defense. Plaintiffs cannot avoid

the burden of proof that each individual plaintiff faces, i.e., that it was conduct on the part of either Signal, Pol, or Dewan that was coercive so as to overcome his will and render his labor involuntary, by relying on the characteristics that apply broadly to the class as a whole. Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3) even though common issues are present in their forced labor claims. The motion to certify is therefore DENIED as to the § 1589 forced labor claims.

### B. Trafficking, 18 U.S.C. § 1590

Section 1590 of Title 18, pertaining to **Trafficking** With Respect to Peonage, Slavery, Involuntary, Servitude, or Forced Labor, provides:

> Whoever knowingly recruits, harbors, transports, provides, [*80] or obtains by any means, any person for labor or services *in violation of this chapter* shall be [subject to criminal penalties].

18 U.S.C.A. § 1590 (West 2000 & Supp. 2001) (emphasis added). [38] The specific violations of Chapter 77 that Plaintiffs allege underlie their § 1590 trafficking claims, in addition to the violations of § 1589 regarding forced labor, are § 1583 (Enticement into slavery), § 1584 (Sale into involuntary servitude), § 1592(a) (Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and § 1594(a) (Attempted violations of §§ 1583, 1584, 1589, & 1590).

> 38   Congress amended § 1590 in 2008. That amendment is not applicable to Plaintiffs' claims.

For the reasons explained in the § 1589 forced labor section above, the Court is persuaded that a human trafficking claim premised on a violation of the forced labor statute cannot be tried on a class-wide basis. Although a trafficking claim will focus to a great extent on the conduct of the defendant, it remains that a trafficking claim under § 1590 must be premised on a violation of one of the involuntary servitude statutes, even if indirectly so as is [*81] the case with § 1592(a), pertaining to the claim that Dewan confiscated passports while Plaintiffs were still in India. Under the facts of this case, individual issues will play a significant part in any claim premised on a violation of the statutes prohibiting forced labor, slavery, and involuntary servitude. Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3) even though common issues are present in their trafficking claims. Therefore, Plaintiffs' trafficking claims under § 1590 are not amenable to class certification and the motion is DENIED as to these claims.

Page 20

## 2. Racketeer Influenced and Corrupt Organizations Act (RICO)

The second set of claims that Plaintiffs seek to certify for class-wide treatment pursuant to Rule 23(b)(3) are their claims under the Racketeer Influenced and Corrupt Organizations Act or RICO, 18 U.S.C. §§ 1962(c) and 1962(d). Plaintiffs' RICO claims are brought against all defendants.

The RICO statutory scheme is aimed at combating organized crime--RICO is located in Title 18 of the criminal code--and the Act imposes criminal and civil liability upon those who engage in certain "prohibited activities" which are listed in 18 U.S.C. § 1962 (a) through (c). [*82] [39] Section 1962(c), which is Plaintiffs first RICO claim, prohibits "any person employed by or associated with any enterprise" from participating in or conducting the affairs of that enterprise through a "pattern of racketeering activity." [40] St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 445 (5th Cir. 2000); 18 U.S.C. § 1962(c). Section 1962(d), which is Plaintiffs' second RICO claim, prohibits a conspiracy to violate the provisions of § 1962(c). Regardless of the subsection, RICO claims under § 1962 have three common elements: 1) a person who engages in, 2) a pattern of racketeering activity, 3) connected to the acquisition, establishment, conduct, or control of an enterprise. Abraham v. Singh, 480 F.3d 351, 355 (5th Cir. 2007) (quoting Word of Faith v. Sawyer, 90 F.3d 118, 122 (5th Cir. 1996)). Private individuals who are injured by criminal RICO activity can recover damages in a civil action. [41] 18 U.S.C. § 1964 (c).

39   The prohibited activities are:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a [*83] principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C.A. § 1962 (a) - (c) (West 2000).

40   "Racketeering activity" means, in [*84] relevant part, any act which is indictable under any of the following provisions of Title 18 of the United States Code: section 1341 (mail fraud), section 1343 (wire fraud), section 1546 (fraud and misuse of visas, permits, and other documents), and sections 1581-1592 (peonage, slavery, and trafficking in persons). 18 U.S.C.A. § 1961(1)(B) (West 2000 & Supp. 2011). The foregoing predicate acts are only those relevant to this lawsuit. The RICO statute contains a lengthy and exhaustive list of criminal acts that can serve as predicate acts. A "pattern of racketeering activity" requires at least two acts of racketeering activity. Id. § 1961(5).

41   RICO's civil enforcement provision provides in relevant part:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

2012 U.S. Dist. LEXIS 114247, *

18 U.S.C.A. § 1964 (c) (West 2000).

Plaintiffs allege three association-in-fact RICO enterprises in support of their RICO claims. "RICO Enterprise I" is defined as "[a]ll Defendants and the United [*85] States Consular officers in India." (SAC ¶ 290). Plaintiffs allege that the common purpose of this enterprise is recruiting, transporting, providing, processing, and obtaining foreign workers to work on shipyards in the United States, including Signal's operations in Texas and Mississippi. (Id. ¶ 293).

"RICO Enterprise II" is defined as the "Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal." (SAC ¶ 291). Plaintiffs allege that the common purpose of this enterprise is selling United States green cards, visas, and work opportunities to Indian workers to convince such workers to pay fees and travel to the United States to work for companies, including Signal. (Id. ¶ 299).

"RICO Enterprise III" is defined as the "Recruiter Defendants, Defendant Signal, Legal Facilitator Defendants, Swetman Security, and M & M Bank." [42] (SAC ¶ 292). Plaintiffs allege that the common purpose of this enterprise is providing and maintaining a consistent and acquiescent labor force at Signal's operations. (Id. ¶ 304).

42   Swetman Security and M & M Bank are not parties to this litigation. Plaintiffs contend that Swetman Security assisted Signal in effectuating forced labor and trafficking [*86] at Signal by participating in the forced detention and attempted deportation of several plaintiffs and perhaps by conducting other security activities at Signal's Pascagoula facility. (RICO Case Stmt. ¶ 3B).

Plaintiffs contend that M & M Bank, at the direction of Signal, opened accounts for Plaintiffs and agreed to have their wages directly deposited into these accounts. Plaintiffs contend that when some workers departed Signal the bank denied them access to their bank accounts at Signal's behest. (Id. ¶ 3J).

Plaintiffs rely upon the following predicate acts of racketeering activity for their RICO violations under 18 U.S.C. §§ 1962(c)-(d): a) enticement into slavery in violation of 18 U.S.C. § 1583; b) involuntary servitude in violation of 18 U.S.C. § 1584; c) forced labor in violation of 18 U.S.C. § 1589; d) trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590; e) unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a); f) mail fraud in violation of 18 U.S.C. § 1341; g) wire fraud in violation

of 18 U.S.C. § 1343; and h) immigration document fraud in violation of  [*87] 18 U.S.C. § 1546.

Plaintiffs allege that as a result of Defendants' RICO violations they have sustained similar injuries such as payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and additional legal fees. (SAC ¶¶ 327, 331). Plaintiffs seek treble damages, attorneys' fees, and costs. (Id. ¶ 332).

Plaintiffs argue that their RICO claims are amenable to certification because the answer to the core question of whether Signal and each of the other defendants conducted or participated in RICO enterprises through a pattern of racketeering activity will be the same for all putative class members. Plaintiffs contend that the trafficking and forced labor-based RICO claims are certifiable for the same reasons that the TVPA claims are certifiable. Regarding the mail/wire/visa fraud claims, Plaintiffs contend that Signal and Burnett filed attestations with the Department of Labor and United States Citizenship and Immigration Services of a 10-month labor need in order to obtain H-2B visas for the plaintiff class all the while knowing that Signal's labor need was really two to three years and perhaps  [*88] permanent; that Dewan, Pol, Burnett and Signal fraudulently promised United States green cards, visa extensions, and jobs; that all Defendants designed and carried out the fraudulent recruitment scheme by use of the phones, e-mail, and the mails.

Plaintiffs stress that they are not seeking to certify fraud claims that require proof of individualized reliance. In that vein, the first theory that Plaintiffs rely upon in support of certifying their fraud claims is that in issuing the H-2B visas the U.S. government relied on the false attestations of a 10 month labor need at Signal. Plaintiffs argue that they suffered injury as a direct result of this fraud directed at the U.S. government because but for the government having issued the H-2B visas, Plaintiffs would have never made the final installment payment to defendant Dewan, Pol, and Burnett. Plaintiffs argue that because there is a direct relationship between their injury and Defendants' mail and wire fraud upon the U.S. government, they need not show individualized, first party reliance in order to support their RICO fraud claims. This theory of third-party reliance is referred to throughout the parties' briefing as the Bridge [43] [*89] claim.

43   Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008).

Plaintiffs' second theory of RICO fraud is a "market approach"  [*90] theory. Plaintiffs contend that a jury

2012 U.S. Dist. LEXIS 114247, *

could validly infer from the identical contracts that they signed and the exorbitant fees that they paid that the plaintiff class relied on Defendants' fraudulent representations regarding green cards. Without the promise of a green card no plaintiff would have paid the exorbitant fees that they paid to participate in the program and work at Signal. Plaintiffs contend that the evidence adduced thus far demonstrates that the prices that Defendants charged were commensurate with what would be charged for green cards, not temporary work visas. Plaintiffs advise that they will introduce expert testimony showing that in the Indian market for foreign visas no applicant would have paid the money that Plaintiffs paid without the expectation of a green card. Thus, Plaintiffs argue that they can prove reliance for their fraud claims on a class-wide basis without the need for individualized proof. According to Plaintiffs, there is no need to ask each of them individually if he relied on the contents of the contract that he signed.

Defendants argue that Plaintiffs' RICO claims cannot be certified for class treatment because RICO claims simply defy certification  [*91] in any form and RICO's legal requirements preclude certification of the trafficking and fraud-based claims. Defendants argue that RICO claims premised on the trafficking and involuntary servitude predicate acts cannot be certified for the same reasons that the TVPA claims are not subject to certification, i.e., that trafficking and other coercion claims are implicitly based upon reliance on threats--something that can only be proven on an individual basis. Defendants also argue that RICO causation cannot be proven on a class-wide basis because a RICO plaintiff must establish that his injury is caused by conduct that is wrongful under RICO--again, something that can only be proven on an individual basis. Signal argues that Plaintiffs' fraud-based RICO claims are founded on allegations of first-party individual reliance and under the law in this circuit such claims cannot be certified under Rule 23(b)(3) because individual issues will predominate.

## A. Section 1962(c)--Substantive RICO Violation

### Trafficking Predicate Acts

Plaintiffs' RICO claims premised on the predicate acts of enticement into slavery in violation of 18 U.S.C. § 1583, involuntary servitude in violation of 18 U.S.C. § 1584,  [*92] forced labor in violation of 18 U.S.C. § 1589, trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590, and unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a) cannot be certified for the same reasons that the claims cannot be certified when sued upon directly under the TVPA. Plaintiffs will be required to

prove that the defendant committed the predicate acts upon which they rely for the pattern of racketeering activity. As previously explained in the section addressing certification of the TVPA claims, proof of these predicate acts, which are all premised on coercion, cannot be made without resort to individualized proof in light of the facts of this case. Common issues will not predominate and certification under Rule 23(b)(3) is therefore not appropriate.

### Fraud-Based Predicate Acts

Plaintiffs also rely upon the following fraud-based predicate acts in support of their § 1962(c) RICO claims: mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and immigration document fraud in violation of 18 U.S.C. § 1546. As explained above,  [*93] Plaintiffs urge two arguments in support of their contention that common issues will predominate under Rule 23(b)(3) with these fraud-based claims: 1) that a fraud-on-the-government Bridge claim requires no individualized proof of reliance, and 2) that first-party reliance can be proven via common evidence under Plaintiffs' market approach theory.

### 1) Bridge claim

#### a. Motion to Strike-1012 and Motion to File Third Amended Complaint

In response to Plaintiffs' Bridge claim of third party reliance, Signal has filed a Motion to Strike-1012 arguing that Plaintiffs did not adequately plead a third party reliance claim for the predicate acts of visa document fraud under 18 U.S.C. § 1546(a). According to Signal, Plaintiffs only pled first-party reliance and those claims are not subject to certification. Even so, Signal argues that the § 1546 Bridge claim cannot be certified because RICO proximate cause will not be satisfied.

The Motion to Strike-1012 is DENIED and the Motion to File Third Amended Complaint is DENIED AS MOOT. The Court is persuaded that Plaintiffs adequately pled their RICO claims and that there is no need to amend their complaint. Signal and the other defendants will suffer no prejudice  [*94] at this juncture because the Court has determined that the RICO claims premised on predicate acts under 18 U.S.C. § 1546 are not amenable to certification anyway. As the case moves into the merits phase, notice as to the scope of Plaintiffs' § 1546 claims will not be an issue because Defendants are now all well aware of Plaintiffs' various fraud theories, and Defendants will be free to conduct whatever discovery they believe to be necessary to defend the RICO claims premised on violation of § 1546.

2012 U.S. Dist. LEXIS 114247, *

The Court is not moved by Signal's contention that evidence elicited at their representatives' depositions should be stricken. Signal's representatives were testifying as to facts about which they had first-hand knowledge and the questions that Plaintiffs' counsel asked were fair game.

**b. Analysis**

Causation is a crucial element of every civil RICO claim. In Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992), the Supreme Court held that factual or "but for" causation alone is insufficient to prove causation for a civil RICO claim. Proximate cause is also required. Id. Proximate cause requires a direct relation between the injury asserted and the injurious conduct alleged. [*95] Id. When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged RICO violation led directly to the plaintiff's injuries. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006). With RICO claims, the compensable injury at issue is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Sedima v. IMREX Co., 473 U.S. 479, 497, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985). Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the predicate acts. Id.

When the predicate acts are fraud-based, proof of reliance on the fraud is often a necessary prerequisite to establishing the causation required by § 1964(c). Anza, 547 U.S. at 478 (Thomas, J., concurring in part and dissenting in part). Prior to the Supreme Court's decision in Bridge, the law in this circuit required a RICO plaintiff to prove individual, first-party reliance on alleged fraud as part of the element of causation. See Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205 (5th Cir. 2003). In Sandwich Chef the Fifth [*96] Circuit explained that RICO fraud actions require a showing of detrimental reliance *by the plaintiff* on the alleged fraud in order to satisfy proximate cause. Id. at 219 (quoting Summit Props., Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 560 (5th Cir. 2000)). Fraud actions that require proof of individual reliance cannot be certified for class treatment under Rule 23(b)(3) because individual rather than common issues will predominate. Id. at 211, 219; Castano, 84 F.3d at 745. Essentially, Sandwich Chef all but foreclosed the possibility of Rule 23(b)(3) certification of fraud-based RICO actions in this circuit. [44]

44   Sandwich Chef expressly held open the possibility that proof of fraud upon a third party

could constitute proof of reliance by the plaintiff under circumstances not present in that case. 319 F.3d at 223 n.13.

In 2008 the Supreme Court decided Bridge, which held that first-party reliance is not an element of a civil RICO claim premised on mail fraud. 553 U.S. at 641. The plaintiffs in Bridge were participants in a local tax sale. They claimed that the defendants' acts of mail fraud against the county gave the defendants an unfair advantage at tax sale auctions. The district [*97] court dismissed the plaintiffs' RICO claims because the plaintiffs were not the direct recipients of the allegedly fraudulent statements and therefore could not have relied upon them.

The Seventh Circuit reversed and the Supreme Court granted certiorari to address whether first-party reliance is an element of a civil RICO claim predicated on mail fraud. Bridge, 553 U.S. at 646. The Supreme Court held that first-party reliance is not an element of a civil RICO claim predicated on mail fraud. Id. at 649. The Court reasoned that neither the mail fraud statute nor the RICO statute imposed a requirement of first-party reliance. Id. A person can be injured by reason of a pattern of mail fraud even if he has not relied on any misrepresentations. Id. at 649.

The Court also rejected the contention that proof of first-party reliance is necessary to establish proximate causation. Bridge, 553 U.S. at 654-55. But a RICO plaintiff will have to establish that *someone* relied upon the defendant's misrepresentation because without such reliance even "but for" causation will probably be lacking. [45] Id. at 658-59.

45   The Fifth Circuit made a very similar observation in Sandwich Chef, noting that for a misrepresentation [*98] to cause injury there must be reliance somewhere. 319 F.3d at 218-19, After all, knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the "but for" cause of the damages. Id. (citing Summit, 214 F.3d at 560 n.19).

Thus, while Bridge overruled cases like Sandwich Chef to the extent that they conflicted with the decision by requiring first-party reliance as part of a RICO fraud claim, see St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir. 2009), Bridge did not eliminate the need for reliance *by someone* when proof of the element of proximate cause necessitates it. Bridge likewise does not foreclose that in some situations proof of first-party reliance might very well be necessary to establish causation. And where proof of first-party reliance breaks down into individual determinations of reliance then Sandwich Chef's admonitions about why certification under Rule

Page 24

2012 U.S. Dist. LEXIS 114247, *

23(b)(3) is not likely still survive. Further, causation can be more challenging to prove when the plaintiff relies upon fraud perpetrated on a third party. See, e.g., Hemi Group, LLC v. City of New York, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010); Anza, 547 U.S. at 457.

Turning now to the Bridge claim herein, the contention [*99] is that defendants Signal and Burnett lied on forms submitted to the U.S. government in order to obtain approval to bring temporary H-2B workers into the United States to work for Signal. The "lies" at issue are the assertions that Signal's labor needs were temporary and limited to a 10 month period. According to Plaintiffs, the government clearly relied on these misrepresentations because otherwise Signal would not have received approval to hire H-2B foreign workers. Plaintiffs contend that this third-party reliance by the government on Signal's and Burnett's fraudulent statements does not implicate individual proof the way that first-party reliance does and therefore does not create an impediment to certification under Rule 23(b)(3). The Bridge claim implicates fraud under 18 U.S.C. § 1546 [46] most strongly but §1341 and § 1343 are also implicated because the mails and wires were surely used to transmit the H-2B documents to the government.

46  Section 1546, entitled Fraud and misuse of visas, permits, and other documents, provides in relevant part:

Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien [*100] registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained; or

. . . .

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact--

Shall be fined under this [*101] title or imprisoned not more than 25 years . . . .

18 U.S.C.A. § 1546(a) (West 2000 & Supp. 2011).

Plaintiffs are of course correct in their contention that proving that the government relied on misrepresentations in approving H-2B status for Signal, and ultimately in issuing the hundreds of H-2B visas when the individual plaintiffs applied for them, does not trigger the individual questions that can often derail certification of fraud-based RICO actions. It does not necessarily follow, however, that Plaintiffs can nevertheless prove causation for their RICO injuries without resort to individual proof of reliance. In fact, the Court is persuaded that they cannot.

In order to understand why individual proof of reliance is necessary to the element of causation in this case notwithstanding Plaintiffs' fraud on the government theory, one must consider the nature of the RICO violations alleged in this case and the specific injuries that Plaintiffs' attribute to those RICO violations. Plaintiffs' claim in a nutshell is that the defendants engaged in a scheme to defraud them by making false promises regarding green cards. (RICO Case Stmt.¶ 5D). Fraud on the government aside, it has always been [*102] and remains Plaintiffs' contention that without the fraudulent promise of a green card they would not have paid the significant recruitment fees, would not have burdened themselves with massive amounts of debt, and would not have come to the United States to work for Signal. (Id. ¶ 9). Plaintiffs claim to have endured great financial, personal, and familial sacrifices in reliance on Defendants' misrepresentations. The most significant of the specific injuries

Page 25

2012 U.S. Dist. LEXIS 114247, *

that Plaintiffs attribute to Defendants' fraudulent scheme are the exorbitant fees that they paid to Dewan, Pol, Rao, and Burnett, and the interest on the loans that Plaintiffs incurred to finance their way into the program. (Id. ¶¶ 4, 17). But these injuries were not the consequence of the alleged fraud that Signal and Burnett directed at the U.S. government when applying for H-2B status. In fact, for many of the plaintiffs the green card scheme began before Signal even entered the picture and applied for H-2B status. As to every plaintiff in this case, his RICO injuries arose directly out of the allegedly false and fraudulent green card promises that Dewan, Pol, Rao, and Burnett made to him. And the only way that any individual [*103] plaintiff could sustain an injury from that fraud was to rely upon it in ignorance of the truth.

Plaintiffs do not attempt to argue that the entirety of their injuries are attributable to Signal's and Burnett's alleged fraud on the government. Instead, Plaintiffs point out that the third installment payment that they paid to the recruiters is attributable to the government having approved Signal's H-2B status, the government having done so in reliance on misrepresentations as to Signal's labor needs. Moreover, Plaintiffs have made the allegation that once they arrived in the United States Signal continued to use the false promise of a green card in order to placate them, and therefore they continued to sustain injury from the fraudulent green card scheme after arriving at Signal via the H-2B program.

The fact that Signal received approval to bring H-2B workers into this country is surely a but for cause of some portion of each plaintiff's alleged injuries--for those plaintiffs who were recruited specifically for Signal after it had obtained approval to bring H-2B workers into the United States, the fraud on the government is probably one but for cause of every aspect of those plaintiffs' [*104] injuries; for those plaintiffs who were recruited and began incurring payments and debt before Signal entered the picture, the fraud on the government is perhaps one but for cause of a latter portion of their injuries. But for every plaintiff in this case, the totality of the injuries alleged, or at the very least the most significant of the injuries alleged, were not proximately caused by fraudulent representations made to the government--they were proximately caused by Defendants' false representations to the plaintiff of receiving a green card. It was the fraudulent conduct directed specifically at the plaintiffs that injured them.

In a fraudulent scheme like the one alleged in this case that spans several years and the globe, and involves numerous players to effect its purpose, the instances of fraud that occur might very well be legion. But the fact that Plaintiffs can identify one narrow aspect of fraud and prove that someone relied upon it, does not strip the question of RICO causation in this case of its individual nature. It is important at this juncture to recognize exactly what Bridge teaches about reliance in a RICO fraud case--reliance is not an element of the case. Reliance [*105] is important only insofar as it is necessary to prove causation. And while causation fails at the outset if no one relies on a fraudulent misrepresentation, it does not follow that causation between a RICO violation and the injury alleged is satisfied simply because the plaintiff can identify one aspect of fraudulent conduct that occurred in furtherance of the scheme to defraud and show that someone relied on it. RICO injuries must arise out of the unlawful conduct that constitutes the predicate acts. The injuries asserted in this case are not proximately caused by any predicate act premised on fraud on the government. That's not to say that the alleged fraud on the government is not relevant to some aspect of Plaintiffs' RICO claims, including the element of causation. But the Court is persuaded that in light of the specific scheme to defraud that Plaintiffs allege in this case, they will still have to prove first-party reliance on the alleged fraud that was directed at them--the fraud that most proximately caused their injuries.

Furthermore, in Bridge, the entirety of the fraudulent conduct alleged was directed at third parties whose reliance on it directly injured the plaintiff. In [*106] this case, the majority of the injurious fraudulent conduct was directed specifically and directly to Plaintiffs. The fraud on the government that Plaintiffs allude to herein is not the fraud that directly injured Plaintiffs.

To be sure, there will be significant overlap in the evidence if each Plaintiff is required to present his RICO claim to a jury. And surely there will be numerous common issues amongst the cases. But in light of the issue of individual reliance, those common issues will not predominate even if they happen to outnumber the individual issues. The question of individual reliance will be paramount to resolving whether Plaintiffs' injuries were caused by a RICO violation. Therefore, Plaintiffs' reliance on Bridge in support of certification under Rule 23(b)(3) is misplaced.

## 2) Market Approach Theory

### a. Motion to Strike-1082

Signal has filed a second Motion to Strike-1082 arguing in essence that Plaintiffs' contention that they can prove reliance via written contracts is new. Plaintiffs' market approach theory is simply one way that they hope to show causation with respect to their RICO claims. As explained above, reliance is not an element of the claims, and therefore [*107] neither is the method that Plaintiffs intend to rely upon to show it. The motion is DENIED.

2012 U.S. Dist. LEXIS 114247, *

**b. Analysis**

Regarding Plaintiffs' "market approach" theory of reliance, Defendants argue that Plaintiffs cannot obtain certification in this manner because they are essentially arguing for a presumption of reliance based on circumstantial evidence. Defendants contend that certification on this theory would likely run afoul of Defendants' Seventh Amendment right to a jury trial.

In contrast to certification under Bridge, Plaintiffs' market approach theory is grounded on first-party reliance-Plaintiffs' own reliance on Defendants' fraudulent promises regarding green cards. However, Plaintiffs contend that first-party reliance can be proven via circumstantial, class-wide evidence that eliminates the need for individualized proof. Plaintiffs point to the decision in Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004), as an example of how common evidence can be used to establish first-party reliance.

Certainly evidence such as the contracts that Plaintiffs signed, the slide show presentations that were made at recruitment seminars, and even the quantum of the fees that Plaintiffs paid will be relevant [*108] to establishing individual reliance on the green card promise. But the Court is not persuaded that this case presents a situation like Klay where first-party reliance can be established based solely on this type of evidence. Plaintiffs' contention in this case is that they were defrauded by a false promise of a green card into joining Dewan's recruitment program, traveling to the United States to work for Signal under conditions so deplorable that they were violative of the criminal laws of this country, and then duped once again into staying on at Signal based on Signal's own false representations regarding green cards and permanent employment. Plaintiffs allege injuries arising out of each leg of the fraudulent scheme. But while the circumstantial evidence that Plaintiffs point to for proving first-party reliance might be sufficient to permit a jury to infer that a plaintiff signed up for the program and paid the first installment in reliance on the promise of a green card, it is not necessarily sufficient to carry the entire claim to its conclusion at Signal.

Each plaintiff who came to the United States had to apply for an H-2B temporary visa in order to enter the country. Some plaintiffs [*109] like Dhananjaya had previously worked in the United States under the temporary H-2B guest-worker program and therefore must have understood the temporary nature of the visa. Plaintiffs understood that they could not divulge to consular staff that they were expecting to get green cards or to stay in the United States permanently. Arguably, Plaintiffs had to be willing to misrepresent the truth during those interviews and some presumably did just that. Plaintiffs arrived at Signal in waves and the first group to arrive began protesting immediately about the lack of green cards yet others continued to go to Signal voluntarily on H-2B visas, presumably based on representations made by Signal personal to other class members. Although Plaintiffs maintain that Dewan lied to them about the ramifications of going to Signal on temporary visas, Dewan testified that some of the class members were so adamant about coming to the United States that they were willing to do so even though it might mean not getting a green card. Once arrived at Signal some of the plaintiff class was in Texas and some was in Mississippi, and perhaps subject to differing representations by Signal personnel.

All of these [*110] facts, and many others, must be weighed in light of the fact that the plaintiff class as a whole did not labor under any specific vulnerabilities when they decided to join the green card program. That's not to say that they were not the victims of fraud but Plaintiffs are not a class of children or mentally challenged persons. Plaintiffs were adult men, some of whom had worked overseas before and some of whom were well-educated and savvy. All of the Plaintiffs knew that green cards were difficult to get and could only be obtained from the United States government. Plaintiffs were clearly eager to come to the United States--some individuals tried to obtain employment with Signal even without going through the recruiting scheme. A jury could find, for any given individual plaintiff, that given the nature of green cards, the significant money that Defendants were demanding, and a plaintiff's own complicity in doing whatever was necessary to enter this country, that the injuries alleged were not proximately caused by Defendants' conduct. On the other hand, a jury could find, for any given individual plaintiff, that Defendants' conduct did cause the plaintiff's injuries. The Court is persuaded [*111] that Defendants have the right to test each plaintiff's claim of reliance to the jury.

None of the foregoing necessarily means that any given plaintiff did not rely on Defendants' allegedly fraudulent representations when choosing to join the program, travel to the United States, and work for Signal. And the Court is not disputing Plaintiffs' contention that many members of the class faced a Hobson's choice of either coming to the United States on a temporary H-2B visa or losing all of their money. But it is clear that in order to get from point A, which is joining the recruitment program, to point C, which is staying on as part of Signal's compliant workforce, far more fraud must have been involved than the class-wide evidence that Plaintiffs point to in this case. In fact, Plaintiffs claim exactly that. Plaintiffs contend that they were lied to about the temporary nature of an H-2B visa and lied to about whether green card processing would continue once they arrived at Signal. But these alleged misrepresentations, which

2012 U.S. Dist. LEXIS 114247, *

would have been crucial to understanding why Plaintiffs came to Signal, were made individually. And in contrast to the Klay case, which seemingly involved no direct [*112] communication of misrepresentations by the defendants to the plaintiffs, the plaintiffs in this case had direct contact with the recruiters and the Signal personnel who allegedly lied to them about green cards and permanent residency. Those lies form a crucial part of each plaintiff's reliance on the fraud at issue in this case.

For the foregoing reasons the Court is persuaded that Plaintiffs cannot prove their § 1962(c) substantive RICO claims without resort to individualized proof in light of the facts of this case. Common issues will not predominate and certification under Rule 23(b)(3) is therefore not appropriate. [47] The motion to certify is therefore DENIED as to Plaintiffs' RICO claims under 18 U.S.C. § 1962(c).

> 47 The Court also notes that some of the injuries/damages that Plaintiffs allege in conjunction with the RICO violations are highly individualized in nature and not subject to formulaic calculation: Assumption of significant interest bearing debt, interest on loans, lost work and professional opportunities, and lost and unpaid wages.

## B. Section 1962(d)--RICO Conspiracy

RICO criminalizes conspiracy to violate any of its substantive provisions. United States v. Delgado, 401 F.3d 290, 296 (2005) [*113] (citing 18 U.S.C. § 1962(d)). In the criminal setting, the government must establish that two or more people agreed to commit a substantive RICO offense, and that the defendant knew of and agreed to the overall objective of the RICO offense. Id. (quoting United States v. Posada-Rios, 158 F.3d 832, 855 (5th Cir. 1998)). The conspirator need not have committed or agreed to commit two predicate acts. Id. (citing Salinas v. United States, 522 U.S. 52, 61-66, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997)).

The core of a RICO civil conspiracy is an agreement to commit predicate acts. Abraham, 480 F.3d 351, 357 (5th Cir. 2007). A plaintiff can use § 1962(d) to sue a defendant or co-conspirator who might not have violated one of the substantive provisions of § 1962. Beck v. Prupis, 529 U.S. 494, 506-07, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000). But while § 1962(d) criminalizes an illegal agreement, § 1964(c) imposes civil liability and therefore asks whether an admittedly illegal agreement gives rise to damages. Beck, 529 U.S. at 507 (Stevens, J., dissenting). In Beck, the Supreme Court held that a civil RICO conspiracy plaintiff cannot establish injury for purposes of § 1962(d) by relying on an overt act that is not unlawful under the RICO statute. Beck, 529 U.S. at 505-06. [*114] The injury recoverable for a RICO

conspiracy violation must result from either an act of racketeering or conduct otherwise unlawful under the statute. Id. at 507. An agreement alone will not give rise to civil liability under §§ 1962(d) and 1964(c). Id. at 508 n.1 (Stevens, J., dissenting).

The implication of the foregoing discussion is clear. Proving the mere existence of a RICO conspiracy might be sufficient to trigger criminal sanctions but it is not sufficient to recover damages in a civil suit. Plaintiffs will have to prove that their injuries were caused by the predicate acts that they have alleged. But as the Court explained in the section discussing RICO liability under § 1962(c), the predicate acts are not amenable to certification under Rule 23(b)(3) because common issues will not predominate. The motion to certify is therefore DENIED as to Plaintiffs' RICO claims under 18 U.S.C. § 1962(d).

## 3. Civil Rights Claims (42 U.S.C. § 1981)

The third set of claims that Plaintiffs seek to certify for class-wide treatment are their disparate treatment claims under 42 U.S.C. § 1981 for discriminatory employment practices. Plaintiffs' § 1981 claims are brought against defendant Signal. In [*115] support of their § 1981 claims, Plaintiffs allege that Signal discriminated against them with respect to the mandatory room and board arrangements at the Signal labor camps, which the non-Indian and/or U.S. citizen employees were not subject to. (SAC ¶ 336, 337). Plaintiffs also allege that Signal discriminated against them with respect to job assignments and other conditions of employment. (Id. at ¶ 378). Plaintiffs allege that Signal maintained an objectively hostile and abusive work environment based on their race, national origin, and/or alienage. (Id. at ¶¶ 339-342). Plaintiffs seek damages, including compensatory and punitive damages, attorney's fees, and costs. [48] (Id. at ¶ 345).

> 48 Again, this claim does not include all members of the plaintiff class because it only involves those plaintiffs who actually worked at Signal. See note 7, supra.

Section 1981, Equal Rights Under the Law, provides:

> (a) Statement of equal rights
>
> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons [*116] and property as is

2012 U.S. Dist. LEXIS 114247, *

enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

42 U.S.C.A. § 1981 (West 2003).

Section 1981 provides a federal remedy for workplace discrimination in private employment on the basis of race or ethnicity. See Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975); St. Francis College v. Al-Khazraji, 481 U.S. 604, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987). To establish a prima facie case under § 1981, a plaintiff must show: 1) that he is a racial minority, 2) that the defendant intended to discriminate against him on the basis of race, and 3) that the discrimination concerns one or more of the activities enumerated in the statute. Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745, 660 F.3d 211, 2011 WL 4579133, at *2 (5th Cir. Oct. 5, 2011) [*117] (citing Felton v. Polles, 315 F.3d 470, 483 (5th Cir. 2002), abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). Proof of intentional discrimination is essential for relief under § 1981. Id. (citing Gen. Bldg. Contractors Ass'n v. Penn., 458 U.S. 375, 389, 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982)).

Plaintiffs argue that their § 1981 claims are amenable to certification because they are grounded on Signal's uniform corporate policies toward the putative class. Plaintiffs contend that they will prove their § 1981 claims with generalized proof applicable to the class as a whole--Signal's executives' testimony, Signal's emails, employee writings, etc. According to Plaintiffs, common issues not only predominate the § 1981 claims, they constitute the only issues.

Plaintiffs point out that Signal's basis for resisting certification of their § 1981 claims is that individualized proof will be necessary to prove subjective harm and

mental distress injury. But Plaintiffs contend that this will not be an issue because they will not seek emotional distress injury as part of their claim for compensatory damages. Further, the compensatory damages that they do seek are "refund-type" recovery [*118] of the recruitment fees and man camp fees, which are subject to a formulaic calculation. Therefore, according to Plaintiffs, issues pertaining to individual damage awards do not foreclose certification.

In Allison v. Citgo Petoleum Corp., the Fifth Circuit addressed the issue of whether claims of disparate treatment race discrimination were subject to class certification under either Rule 23(b)(2) or (b)(3). 151 F.3d 402 (5th Cir. 1998). The Fifth Circuit explained that compensatory damages *for intangible injuries* are not presumed merely because the plaintiff proves that a statutory violation has occurred. Id. at 416-17. Specific individualized proof is necessary and compensatory damages may be awarded only if the plaintiff submits proof of actual injury. Id. at 417 (citing Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 938-40(5th Cir. 1996); Brady v. Fort Bend County, 145 F.3d 691, 717-20 (5th Cir. 1998)). The very nature of compensatory damages for intangible injuries necessarily implicates the subjective differences of each plaintiff's circumstances so that they constitute an individual, not a class-wide remedy. Allison, 151 F.3d at 417. Allison explains why a plaintiff class [*119] seeking compensatory damages for a discrimination claim faces great difficulty in obtaining certification under Rule 23(b)(3) because individual issues will typically predominate.

While Plaintiffs are likely correct in their assertion that intentional discrimination by Signal can be proven via class-wide, non-individualized evidence, Plaintiffs' attempt to circumvent the predominance problem surrounding damages is unconvincing for several reasons. Aside from punitive damages, all of the relief that Plaintiffs seek for the § 1981 claims are compensatory in nature. In other words, there are no back pay issues or front pay issues or other remedies that would normally pertain to an ongoing employment relationship. [49] But compensatory damages arising out of workplace discrimination are not presumed to be owed simply because the plaintiff establishes that the employer maintained a discriminatory work environment. In order to obtain compensatory damages the plaintiff must prove actual injury to himself and that injury must be attributable to (caused by) the defendant's disparate treatment. Thus, while Plaintiffs have attempted to define their compensatory damage claims in formulaic "refund" [*120] terms, it is clear that the significant recruitment fees that they are trying to recoup as compensatory damages--fees that were paid to third parties before the plaintiffs even arrived at Signal--are not an element of damages attributable to dis-

2012 U.S. Dist. LEXIS 114247, *

crimination at Signal's facilities. Plaintiffs cannot change the nature of § 1981 recovery by defining their own damages scheme based on what they believe would be a just result under the bigger picture of facts. Plaintiffs are only entitled to recover for those damages that they can prove were caused by Signal's alleged race discrimination.

> 49  None of the members of the plaintiff class remain employed at Signal.

Further, the Court finds Plaintiffs' suggestion that they will forego any type of emotional distress recovery perplexing. The class representatives willingness to forego a claim that would preclude certification is not per se invalid but the Court is persuaded that it does create serious concerns for the rights of the plaintiff class. See Colindres v. Quietflex Manuf., 235 F.R.D. 347, 375 (S.D. Tex. 2006). Based on Plaintiffs' own assertions about employment at Signal, the Court would assume that emotional injury would not be an insignificant [*121] part of Plaintiffs' claims. Plaintiffs have argued repeatedly about how Signal created a psychologically coercive work environment that basically turned them into modern day slaves. Their entire cause of action under the TVPA was based on conduct supposedly so psychologically coercive as to cause them to render labor involuntarily. Plaintiffs have characterized life at Signal as a "racialized ghetto" where they experienced feelings of isolation and segregation, as "prisoners" in the man camps, subject to abuse, threats, and exploitation. Plaintiffs allege that some class members became physically ill and required hospitalization while living in the man camps. Plaintiffs have pointed to the Black Friday suicide incident as evidence of how emotionally abysmal and untenable the situation at Signal had become for them. Plaintiffs allege that they were subjected to offensive language and threats (SAC ¶ 210) and that they were frightened and confused while at Signal (SAC ¶ 233-35). The Court finds it questionable that this case, which again is a case grounded on claims of psychological coercion and manipulation, can be certified for class treatment based on the assertion that the class representatives [*122] are not making claims for psychological injury--an assertion that would eventually bind the entire plaintiff class if the § 1981 were certified. And to the extent that the class representatives are willing to waive emotional damages in this case, this militates against a finding of adequacy under Rule 23(a)(4) for these representatives.

Moreover, Plaintiffs have pled a claim for punitive damages in addition to the compensatory damages that they seek. (SAC ¶ 345). Punitive damages cannot be assessed merely upon a finding that the defendant discriminated against the class and the award is based only in part upon the defendant's conduct. Allison, 151 F.3d at 417. A punitive damage award turns on the recovery of compensatory damages and must be reasonably related to the plaintiff's compensatory damage award. Id. at 417-18 (citing Patterson, 90 F.3d at 943-44). Punitive damages are not capable of computation by reference to objective standards. Id. at 418.

Plaintiffs have not suggested that the issues of liability and damages can be severed and tried separately in order to facilitate certification. Of course, bifurcation carries with it the danger of Seventh Amendment problems if a second [*123] jury is called upon to reexamine facts and issues addressed by the first jury. Castano, 84 F.3d at 750; Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 628 (5th Cir. 1999). The Court is persuaded that at the very least the claim for punitive damages would carry the risk of Seventh Amendment problems in a bifurcated scenario. Punitive damages are necessarily based in part upon the evidence used to establish liability because punitive damages are a measure of the reprehensibility of the defendant's discriminatory conduct. But punitive damages are not appropriate until the plaintiff proves actual harm and compensatory damages and therefore cannot be awarded in the liability phase of a trial.

Finally, even aside from the predominance problem that the damages aspect of the § 1981 claims creates, the most compelling rationale for finding superiority in a class action is not present in this case. Plaintiffs' § 1981 claims do not present a negative value suit situation in which the paltry award that each plaintiff might recover precludes prosecution of individual claims. See Castano, 84 F.3d at 748. And the potential for recovery of attorney's fees and punitive damages makes the case even [*124] less compelling for finding class action treatment superior to individual trials. See id.

In sum, the Court is persuaded that neither the predominance nor superiority requirements of Rule 23(b)(3) are satisfied for Plaintiffs' § 1981 claims. The motion to certify is therefore DENIED as to the § 1981 discrimination claims

### 4. The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985, and the Thirteenth Amendment

The last set of claims that Plaintiffs seek to certify for class-wide treatment are their claims under 42 U.S.C. § 1985(3). Plaintiffs' § 1985 claims are brought against defendants Signal, Pol, and Dewan. The gist of Plaintiffs' § 1985 claim is that Defendants conspired to subject Plaintiffs to involuntary servitude based on their race, ethnicity and alienage. (Rec. Doc. 994-1, at 67-68). In support of the § 1985 claim, Plaintiffs allege that Signal, Pol, and Dewan conspired with other non-defendant par-

2012 U.S. Dist. LEXIS 114247, *

ties, including Swetman Security and M & M Bank, for the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment and its implementing and enforcing statutes, 18 U.S.C. §§ 1589 and 1590, to be free from forced labor, involuntary servitude, and trafficking [*125] in persons. (SAC ¶ 348). Plaintiffs allege that Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive Plaintiffs of their rights. (Id. ¶ 349). Plaintiffs allege that they have suffered damages as a result and they seek compensatory damages, punitive damages, and attorney's fees and costs. (Id. ¶¶ 351-52).

Section 1985(3), Conspiracy to Interfere With Civil Rights, provides in relevant part:

> If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C.A. § 1985(3) (West 2003).

In [*126] order to prove a conspiracy under § 1985(3), a plaintiff must show inter alia 1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action, and 2) that the conspiracy aimed at interfering with rights that are protected against "private as well as official, encroachment." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267-68, 113 S. Ct. 753, 122 L. Ed. 2d 34 (1993) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971); Carpenters v. Scott, 463 U.S. 825, 833, 103 S. Ct. 3352, 77 L. Ed. 2d 1049 (1983)). Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates. Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 372, 99 S. Ct. 2345, 60 L. Ed. 2d 957 (1979).

Conspiracies among private actors (as opposed to state actors) are within the scope of § 1985(3) so long as

the right at issue is one guaranteed against private (as opposed to state) infringement. Id. (citing Carpenters, 463 U.S. at 833). There are few such rights but the Supreme Court has expressly acknowledged that the right to involuntary servitude, as guaranteed by the Thirteenth Amendment, is one such right. [50] Id. (citing Kozminski, 487 U.S. at 942).

> [50] The contours of a § 1985(3) claim [*127] are often nebulous in light of the varied jurisprudence addressing the cause of action. This Court is convinced that the "right" to be free from involuntary servitude for purposes of a § 1985(3) claim derives not from §§ 1589 & 1590, as Plaintiffs suggest, but from the Thirteenth Amendment itself otherwise every criminal statute that involves a victim could potentially give rise to a "right." This would be contrary to the admonition that the Supreme Court has long held since Griffin v. Breckenridge, 403 U.S. 88, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971), that § 1985(3) cannot be interpreted in such a way so as to render it "a general federal tort law." Bray, 506 U.S. at 268 (quoting Griffin, 403 U.S. at 102).

The Thirteenth Amendment states that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." U.S. Const. amend. XIII, § 1. The primary purpose of the amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, although the amendment has not been limited to that application. Kozminski, 487 U.S. at 942. [*128] Rather, the Thirteenth Amendment extends to cover "those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results." Id. (quoting Butler v. Perry, 240 U.S. 328, 332, 36 S. Ct. 258, 60 L. Ed. 672 (1916)).

The Court is persuaded that Plaintiffs' § 1985(3) claim cannot be certified for class treatment. In Kozminski, the Supreme Court discussed the types of coercion that must be shown under the Thirteenth Amendment. Those types of coercion are physical coercion and legal coercion in which the victim is compelled to work by law. Neither type of coercion is at issue in this case. The TVPA, which sought to criminalize involuntary servitude based other forms of coercion, did not change the scope of the Thirteenth Amendment. And even if this Court errs as a matter of law in concluding that Plaintiffs have no "rights" under §§ 1589 and 1590 to vindicate via § 1985(3), see note 50, supra, a claim premised on a violation of §§ 1589 and 1590 is not subject to certification for the same reasons that none of the

Page 31

2012 U.S. Dist. LEXIS 114247, *

TVPA claims are certifiable, as explained above. The motion to certify is therefore DENIED as to the § 1985(3) conspiracy claims.

### IV. CLASS CERTIFICATION [*129] PURSUANT TO RULE 23(b)(2)

For the reasons given on the record in open court on November 10, 2010, the Motions to Certify are DENIED insofar as Plaintiffs seek certification of a class under Rule 23(b)(2).

Accordingly, and for the foregoing reasons;

IT IS ORDERED that the **Motion to Certify Class (Rec. Doc. 165)** and **Supplemental Motion to Certify Class (Rec. Doc. 994)** filed by plaintiffs Kurian David, et al. is **DENIED**;

IT IS FURTHERED ORDERED that the **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012)** filed by defendant Signal International, LLC is **DENIED**;

IT IS FURTHERED ORDERED that the **Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031)** filed by plaintiffs Kurian David, et al. is **DENIED AS MOOT**;

IT IS FURTHERED ORDERED that the **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1082)** filed by defendant Signal International, LLC. is **DENIED.**

January 3, 2012

/s/ Jay C. Zainey

JAY C. ZAINEY

UNITED STATES DISTRICT JUDGE

# TAB 6

Westlaw.

711 F.Supp.2d 668
**(Cite as: 711 F.Supp.2d 668)**

**H**

United States District Court,
N.D. Texas,
Dallas Division.
OBLIO TELECOM, INC., Plaintiff,
v.
Zuber PATEL, et al., Defendants.

Civil Action No. 3:08–CV–0279–L.
Nov. 18, 2008.

**Background:** Telephone card provider brought action against employee and customers, asserting claim under the Racketeer Influenced and Corrupt Organizations Act (RICO) as well as state law claims of fraud and conspiracy to commit tortious interference arising from alleged scheme involving employee's unauthorized discount sales of cards to customers and disruption of provider's network. Employee and customers moved to dismiss.

**Holdings:** The District Court, Sam A. Lindsay, J., held that:
(1) RICO authorized nationwide service of process on nonresident defendants;
(2) customer which was resident of New Jersey had minimum contacts with United States required for exercise of personal jurisdiction;
(3) pendent personal jurisdiction existed over New Jersey customer for state fraud and conspiracy claims;
(4) alleged association-in-fact enterprise did not exist separate and apart from pattern of racketeering;
(5) provider failed to plead predicate acts of mail and wire fraud with requisite particularity for RICO claim; and
(6) court would grant leave to amend to allow provider to replead its claims.

Motions denied.

West Headnotes

**[1] Federal Courts 170B ☞96**

170B Federal Courts
 170BII Venue
  170BII(A) In General
   170Bk96 k. Affidavits and other evidence.
Most Cited Cases
 On court's determination of motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the plaintiff may establish personal jurisdiction over nonresident defendant by presenting a prima facie case that personal jurisdiction is proper; proof by a preponderance of the evidence is not required. Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

**[2] Federal Courts 170B ☞96**

170B Federal Courts
 170BII Venue
  170BII(A) In General
   170Bk96 k. Affidavits and other evidence.
Most Cited Cases
 Court may determine motion to dismiss for lack of personal jurisdiction without an evidentiary hearing by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery. Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

**[3] Federal Courts 170B ☞96**

170B Federal Courts
 170BII Venue
  170BII(A) In General
   170Bk96 k. Affidavits and other evidence.
Most Cited Cases
 On motion to dismiss for lack of personal jurisdiction, after a plaintiff makes his prima facie case of jurisdiction over nonresident defendant, the burden then shifts to defendant to present a compelling case that the presence of some other consideration would render jurisdiction unreasonable. Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

**[4] Constitutional Law 92 ☞3964**

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

711 F.Supp.2d 668
(Cite as: 711 F.Supp.2d 668)

92 Constitutional Law
   92XXVII Due Process
      92XXVII(E) Civil Actions and Proceedings
         92k3961 Jurisdiction and Venue
            92k3964 k. Non-residents in general.
Most Cited Cases

Because the Texas long-arm statute extends to the limits of federal due process, district court ruling on motion to dismiss for lack of personal jurisdiction must determine (1) whether the defendants have established minimum contacts with the forum state, and (2) whether the exercise of personal jurisdiction over the defendants would offend traditional notions of fair play and substantial justice. U.S.C.A. Const.Amend. 14; Fed.Rules Civ.Proc.Rule 12(b)(2), 28 U.S.C.A.

**[5] Federal Civil Procedure 170A ⟪⟫1832**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
               170Ak1832 k. Matters considered in general. Most Cited Cases

In ruling on motion to dismiss for failure to state a claim upon which relief can be granted, the court cannot look beyond the pleadings; such pleadings include the complaint and any documents attached to it, as well as documents that the defendant attaches to its motion if they are referred to in the plaintiff's complaint and are central to the plaintiff's claims. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[6] Federal Civil Procedure 170A ⟪⟫1772**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)3 Pleading, Defects In, in General
            170Ak1772 k. Insufficiency in general. Most Cited Cases

**Federal Civil Procedure 170A ⟪⟫1829**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)5 Proceedings
            170Ak1827 Determination
               170Ak1829 k. Construction of pleadings. Most Cited Cases

The ultimate question on a motion to dismiss for failure to state a claim upon which relief can be granted is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[7] Federal Civil Procedure 170A ⟪⟫1771**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)3 Pleading, Defects In, in General
            170Ak1771 k. In general. Most Cited Cases

**Federal Civil Procedure 170A ⟪⟫1772**

170A Federal Civil Procedure
   170AXI Dismissal
      170AXI(B) Involuntary Dismissal
         170AXI(B)3 Pleading, Defects In, in General
            170Ak1772 k. Insufficiency in general. Most Cited Cases

In ruling on a motion to dismiss for failure to state a claim upon which relief can be granted, the court does not evaluate the plaintiff's likelihood of success; instead, the court only determines whether the plaintiff has a legally cognizable claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

**[8] Federal Courts 170B ⟪⟫76.35**

170B Federal Courts
   170BII Venue
      170BII(A) In General

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 668
(Cite as: 711 F.Supp.2d 668)

170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
170Bk76.35 k. Other particular types of cases. Most Cited Cases

**Racketeer Influenced and Corrupt Organizations 319H ☞67**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk67 k. Process. Most Cited Cases
Racketeer Influenced and Corrupt Organizations Act (RICO) authorized nationwide service of process on nonresident defendants in civil RICO suit brought in Texas district court, where court had personal jurisdiction over at least one participant in alleged conspiracy and there was no other district that had personal jurisdiction over all the alleged coconspirators. 18 U.S.C.A. § 1965(b).

**[9] Federal Courts 170B ☞76.35**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk76 Actions Against Non-Residents; "Long-Arm" Jurisdiction in General
170Bk76.35 k. Other particular types of cases. Most Cited Cases

**Racketeer Influenced and Corrupt Organizations 319H ☞67**

319H Racketeer Influenced and Corrupt Organizations
319HI Federal Regulation
319HI(B) Civil Remedies and Proceedings
319Hk67 k. Process. Most Cited Cases
Court may exercise personal jurisdiction over nonresident defendants in civil Racketeer Influenced and Corrupt Organizations Act (RICO) suit if defendants have minimum contacts with the United States and RICO's requirements for nationwide service of process are met. 18 U.S.C.A. § 1965.

**[10] Federal Courts 170B ☞79**

170B Federal Courts
170BII Venue
170BII(A) In General
170Bk77 Corporations, Actions by or Against
170Bk79 k. Corporate activities and contacts within district; doing business in general. Most Cited Cases
Alleged conspirator, which was resident of New Jersey, had minimum contacts with United States as required for exercise of personal jurisdiction in civil action brought under Racketeer Influenced and Corrupt Organizations Act (RICO) in Texas district court. 18 U.S.C.A. § 1965.

**[11] Federal Courts 170B ☞15**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk14 Jurisdiction of Entire Controversy; Pendent Jurisdiction
170Bk15 k. Federal question cases in general, claims pendent to. Most Cited Cases
Court may exercise pendent personal jurisdiction over state claims against alleged conspirator in civil action brought under Racketeer Influenced and Corrupt Organizations Act (RICO) if state claims arise from same nucleus of operative facts as RICO claim.

**[12] Federal Courts 170B ☞15**

170B Federal Courts
170BI Jurisdiction and Powers in General
170BI(A) In General
170Bk14 Jurisdiction of Entire Controversy; Pendent Jurisdiction
170Bk15 k. Federal question cases in general, claims pendent to. Most Cited Cases
State fraud and conspiracy to commit tortious interference claims arose out of same nucleus of operative facts as civil claim brought under Racketeer Influenced and Corrupt Organizations Act

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 668
**(Cite as: 711 F.Supp.2d 668)**

(RICO) against alleged conspirator, and thus pendent personal jurisdiction existed over conspirator for state claims; state claims alleging that conspirator engaged in illegal plan with telephone card provider's employee to defraud provider of millions of dollars of telephone cards and to interfere with provider's contractual obligations were similar to RICO claim which alleged that employee and conspirator engaged in conspiracy to defraud provider. 18 U.S.C.A. § 1965.

**[13] Racketeer Influenced and Corrupt Organizations 319H ☞3**

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk3 k. Elements of violation in general. Most Cited Cases
    Elements required for any civil Racketeer Influenced and Corrupt Organizations Act (RICO) claim for treble damages necessitates (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct, or control of an enterprise. 18 U.S.C.A. §§ 1962, 1964.

**[14] Racketeer Influenced and Corrupt Organizations 319H ☞36**

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk33 Enterprise
                319Hk36 k. Informal entities; associations-in-fact. Most Cited Cases
    To establish an association-in-fact enterprise as required for civil treble damages claim alleging violation of Racketeer Influenced and Corrupt Organizations Act (RICO), plaintiff must show evidence of an ongoing organization, formal or informal, and evidence that various associates function as a continuing unit; an association-in-fact enterprise must have continuity. 18 U.S.C.A. §§ 1961(4), 1962,

1964.

**[15] Racketeer Influenced and Corrupt Organizations 319H ☞36**

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk33 Enterprise
                319Hk36 k. Informal entities; associations-in-fact. Most Cited Cases

**Racketeer Influenced and Corrupt Organizations 319H ☞38**

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk33 Enterprise
                319Hk38 k. Separateness from predicate acts, pattern, or persons. Most Cited Cases
    An "association-in-fact enterprise" as would serve as basis for civil claim for violation of Racketeer Influenced and Corrupt Organizations Act (RICO) (1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization, and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure. 18 U.S.C.A. § 1961(4).

**[16] Racketeer Influenced and Corrupt Organizations 319H ☞38**

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk33 Enterprise
                319Hk38 k. Separateness from predicate acts, pattern, or persons. Most Cited Cases
    Since an "association-in-fact enterprise" must have an existence separate and apart from the pattern of racketeering alleged in civil claim for viola-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 668
**(Cite as: 711 F.Supp.2d 668)**

tion of Racketeer Influenced and Corrupt Organizations Act (RICO), proof of a pattern of racketeering activity does not necessarily establish a RICO enterprise. 18 U.S.C.A. §§ 1961(4), 1962, 1964.

**[17] Racketeer Influenced and Corrupt Organizations 319H ☞39**

319H Racketeer Influenced and Corrupt Organizations
    319HI Federal Regulation
        319HI(A) In General
            319Hk33 Enterprise
                319Hk39 k. Particular enterprises.
Most Cited Cases
    Alleged association-in-fact enterprise comprised of telephone card provider's employee and provider's customers did not exist separate and apart from pattern of racketeering alleged by provider as required to support provider's civil claim under Racketeer Influenced and Corrupt Organizations Act (RICO); aside from the commission of alleged predicate racketeering acts, there was nothing that bound the purported association together. 18 U.S.C.A. §§ 1961(4), 1962, 1964.

**[18] Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
    170AVII Pleadings
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases
    Telephone card provider failed to plead predicate acts of mail and wire fraud with requisite particularity required for civil claim under Racketeer Influenced and Corrupt Organizations Act (RICO) against provider's employee and customers; while provider generally alleged that employee and customers conspired unlawfully in a variety of ways, provider did not specifically allege that any misrepresentation was made through interstate mails or wires. 18 U.S.C.A. § 1962; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[19] Federal Civil Procedure 170A ☞636**

170A Federal Civil Procedure
    170AVII Pleadings
        170AVII(A) Pleadings in General
            170Ak633 Certainty, Definiteness and Particularity
                170Ak636 k. Fraud, mistake and condition of mind. Most Cited Cases
    Particularity pleading requirement applies to the pleading of predicate acts on civil claim alleging violation of Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1962; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

**[20] Federal Civil Procedure 170A ☞1838**

170A Federal Civil Procedure
    170AXI Dismissal
        170AXI(B) Involuntary Dismissal
            170AXI(B)5 Proceedings
                170Ak1837 Effect
                    170Ak1838 k. Pleading over. Most Cited Cases
    Defects in complaint alleging civil claim for violation of Racketeer Influenced and Corrupt Organizations Act (RICO) were not incurable and court would therefore grant leave to amend to allow plaintiff to replead its claims. 18 U.S.C.A. §§ 1961(3), 1962(a–d).

**\*671** C. John Scheef, III, Kelly M. Massad, Scheef & Stone, Frisco, TX, Eric C. Wood, Scheef & Stone LLP, Dallas, TX, for Plaintiff.

Walter S. Cowger, Law Office of Walter S. Cowger, Aamer Ravji, The Ravji Law Firm, Kenneth E. Gardner, Terrell W. Oxford, Susman Godfrey LLP, Alan J. Harlan, Wright Ginsberg & Brusilow PC, J. Michael Weston, Bennett Weston & Lajone, Daniel L. Wyde, Wyde Clements & Westmoreland, Dallas, TX, John E. Andrews, Maxwell M. Blecher, Blecher & Collins PC, Marc M. Seltzer, Steve Morrissey, Susman Godfrey LLP, Los Angeles, CA, Nizam Arain, Lakeshore Law Group LLP, Chicago, IL, for Defendants.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

711 F.Supp.2d 668
**(Cite as: 711 F.Supp.2d 668)**

Diamond Phone Card Inc., Elmhurst, NY, pro se.

### *MEMORANDUM OPINION AND ORDER*
SAM A. LINDSAY, District Judge.

Before the court are: (1) Defendant Asia Telecom's Motion and Notice of Motion to Dismiss for Lack of Personal Jurisdiction, filed March 24, 2008; (2) Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim Upon Which Relief May Be Granted by Defendants Hawaii Global Exchange, Inc. and Transpac Telecom, Inc., filed March 26, 2008; (3) Defendant Zuber Patel's Motion to Dismiss, filed April 1, 2008; and (4) Defendant Touch Tell, Inc.'s Rule 12(b)(6) Motion to Dismiss Plaintiff's Original Complaint for Failure to State a Claim Upon Which Relief Can Be Granted, filed April 8, 2008. After carefully considering the motions, briefs, record, and applicable law, the court **denies** Defendant Asia Telecom's Motion and Notice of Motion to Dismiss for Lack of Personal Jurisdiction; **denies without prejudice** Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim Upon Which Relief May Be Granted by Defendants Hawaii Global Exchange, Inc. and Transpac Telecom, Inc.; **denies without prejudice** Defendant Zuber Patel's Motion to Dismiss; and **denies without prejudice** Defendant Touch Tell, Inc.'s Rule 12(b)(6) Motion to Dismiss Plaintiff's Original Complaint for Failure to State a Claim Upon Which Relief Can Be Granted.

### I. Factual and Procedural Background

Plaintiff Oblio Telecom, Inc. ("Plaintiff" or "Oblio") filed its Original Complaint on February 15, 2008, against Defendants Zuber Patel ("Patel"), Touch Tell, Inc. ("Touch Tell"), Hawaii Global Exchange, Inc. d/b/a Transpac Telecom and Pacific Telecard ("HGE"), Diamond Phone Card, Inc., Detroit Phone Card, Inc., Raza Telecom, Inc. d/b/a Raza Communication, Asia Telecom Corporation ("Asia Telecom"), and Transpac Telecom, Inc. ("TTI") (collectively, "Defendants"). Oblio asserts a claim pursuant to the Racketeer Influenced**\*672** and Corrupt Organizations Act ("RICO"), 18

U.S.C. § 1961, *et seq.,* as well as state law claims of fraud and conspiracy to commit tortious interference.

Plaintiff alleges that Defendants comprise a RICO enterprise pursuant to 18 U.S.C. § 1961(3) and 1962(a) through (d) that "ma[de] a run on a phone card provider." Compl. ¶¶ 16, 19. Oblio asserts that it employed Patel, who controlled its network and provided telephone cards to the other Defendants. Plaintiff contends that Patel sold cards to the other Defendants but added value greater than the face value of the cards, applied unauthorized discounts to Defendants' invoices, began a scheme to disrupt the network to create an excuse to pay less than the amount it invoiced, and sold activated cards to Defendants but told them they did not need to pay Oblio. *Id.* ¶ 19. Oblio asserts that it lost millions of dollars in revenue as a result of Defendants' actions. *Id.* ¶ 26.

### II. Legal Standards

#### A. Motion to Dismiss for Lack of Personal Jurisdiction

[1][2][3] On a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing a prima facie case for the court's jurisdiction over a nonresident defendant. *See Ham v. La Cienega Music Co.,* 4 F.3d 413, 415 (5th Cir.1993); *Stuart v. Spademan,* 772 F.2d 1185, 1192 (5th Cir.1985). When the court rules on the motion without an evidentiary hearing, the plaintiff may establish personal jurisdiction by presenting a prima facie case that personal jurisdiction is proper, *id.;* proof by a preponderance of the evidence is not required. *International Truck and Engine Corp. v. Quintana,* 259 F.Supp.2d 553, 556 (N.D.Tex.2003) (citing *WNS, Inc. v. Farrow,* 884 F.2d 200, 203 (5th Cir.1989)). The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery. *Stuart,* 772 F.2d at 1192. Uncontroverted allegations in a plaintiff's complaint must be taken as true, and con-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 7

711 F.Supp.2d 668
**(Cite as: 711 F.Supp.2d 668)**

flicts between the facts contained in the parties' affidavits must be resolved in favor of the plaintiff. *Bullion v. Gillespie,* 895 F.2d 213, 217 (5th Cir.1990). After a plaintiff makes his prima facie case, the burden then shifts to the defendant to present "a compelling case that the presence of some other consideration would render jurisdiction unreasonable." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

[4] A federal court has jurisdiction over a nonresident defendant if the state long-arm statute confers personal jurisdiction over that defendant, and if the exercise of jurisdiction is consistent with due process under the United States Constitution. *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 418 (5th Cir.1993). Because the Texas long-arm statute extends to the limits of federal due process, *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990), the court must determine whether (1) the defendants have established "minimum contacts" with the forum state; and, (2) whether the exercise of personal jurisdiction over the defendants would offend "traditional notions of fair play and substantial justice." *Ruston Gas,* 9 F.3d at 418 (*citing International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

The "minimum contacts" prong is satisfied when a defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174. The nonresident defendant's availment must be such that the defendant *673 "should reasonably anticipate being haled into court" in the forum state. *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). This test "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.' " *Burger King,* 471 U.S. at 475, 105 S.Ct. 2174 (citations omitted). The "minimum contacts"

prong of the inquiry may be subdivided into contacts that give rise to "specific" personal jurisdiction and those that give rise to "general" personal jurisdiction. *Marathon Oil Co. v. A.G. Ruhrgas,* 182 F.3d 291, 295 (5th Cir.1999). Specific jurisdiction is only appropriate when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The exercise of general personal jurisdiction is proper when the nonresident defendant's contacts with the forum state, even if unrelated to the cause of action, are continuous, systematic, and substantial. *Id.* at 414 n. 9, 104 S.Ct. 1868.

In evaluating the second prong of the due process test, the court must examine a number of factors in order to determine fairness and reasonableness, including: (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering social policies. *Asahi Metal Indus. Co. v. Superior Court,* 480 U.S. 102, 112, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). As noted above, "once minimum contacts are established, a defendant must present 'a compelling case that the presence of some consideration would render jurisdiction unreasonable.' " *Enviro Petroleum, Inc. v. Kondur Petroleum,* 79 F.Supp.2d 720, 725 (S.D.Tex.1999) ( *quoting Burger King,* 471 U.S. at 477, 105 S.Ct. 2174). In fact, "[o]nly in rare cases ... will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Id.* (quoting *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 231 (Tex.1991)).

**B. Motion to Dismiss for Failure to State a Claim**
To defeat a motion to dismiss pursuant to Fed.R.Civ.P. 12(b) (6), a plaintiff must plead "enough facts to state a claim to relief that is plaus-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 668
(Cite as: 711 F.Supp.2d 668)

ible on its face." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). While a complaint need not contain detailed factual allegations, it must set forth "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1965 (citation omitted). The "[f]actual allegations [of a complaint] must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (quotation marks, citations, and footnote omitted).

[5] In reviewing a Rule 12(b)(6) motion, the court must accept all well-pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff. *Sonnier v. State Farm Mutual Auto. Ins. Co.,* 509 F.3d 673, 675 (5th Cir.2007); *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir.2004); *Baker v. Putnal,* 75 F.3d 190, 196 (5th Cir.1996). In ruling on such a motion, the court cannot look beyond the pleadings. *Id.; *674Spivey v. Robertson,* 197 F.3d 772, 774 (5th Cir.1999), *cert. denied,* 530 U.S. 1229, 120 S.Ct. 2659, 147 L.Ed.2d 274 (2000). The pleadings include the complaint and any documents attached to it. *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir.2000). Likewise, " '[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to [the plaintiff's] claims.' " *Id.* (quoting *Venture Assocs. Corp. v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (7th Cir.1993)).

[6][7] The ultimate question in a Rule 12(b)(6) motion is whether the complaint states a valid claim when it is viewed in the light most favorable to the plaintiff. *Great Plains Trust Co. v. Morgan Stanley Dean Witter,* 313 F.3d 305, 312 (5th Cir.2002). A court, however, is not to strain to find inferences favorable to the plaintiff and is not to accept conclusory allegations, unwarranted deductions, or legal conclusions. *R2 Invs. LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir.2005) (citations omitted). The

court does not evaluate the plaintiff's likelihood of success; instead, it only determines whether the plaintiff has a legally cognizable claim. *United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 376 (5th Cir.2004).

**III. Analysis**

**A. Asia Telecom's Motion to Dismiss for Lack of Personal Jurisdiction**

[8] Defendant Asia Telecom moves to dismiss Plaintiff's claims against it for lack of personal jurisdiction. It argues that the RICO statute, which authorizes nationwide process, does not authorize personal jurisdiction over Asia Telecom and that this court does not have either general or specific jurisdiction over it. Plaintiff responds that the RICO statute is a basis for finding personal jurisdiction over Asia Telecom, and even if it is not, that Defendant's contacts with Texas establish specific jurisdiction. Defendant did not file a reply. The parties do not appear to dispute that Asia Telecom is a resident of New Jersey.

The court turns first to the parties' dispute with respect to the RICO statute. Section 1965(b) of the RICO statute provides:

> In any action under section 1964 [civil remedies] of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

18 U.S.C. § 1965(b). Both parties cite to *Butcher's Union Local No. 498 v. SDC Investment, Inc.,* 788 F.2d 535 (9th Cir.1986). Defendant argues that pursuant to *Butcher's Union,* before nationwide service is permitted, a plaintiff must show that the court has personal jurisdiction over at least one participant in the alleged conspiracy and that there is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 668
**(Cite as: 711 F.Supp.2d 668)**

no other district that will have personal jurisdiction over all the alleged coconspirators.

Plaintiff argues that this test is met and that although the Fifth Circuit has not specifically held that section 1965(b) grants nationwide service of process, at least four other circuits and other district courts in this circuit have reached this conclusion. It points out that it has alleged that Defendants Patel and TTI are residents of Dallas County, Texas. The court notes that both Patel and TTI have filed motions to dismiss, but neither has moved pursuant to Rule 12(b)(2) for lack of personal jurisdiction. Plaintiff also argues that the other defendants are residents of Hawaii, New *675 York, Michigan, Illinois, and California, and therefore there is no district that would have jurisdiction over all of the Defendants alleged to be part of the RICO conspiracy.

Reviewing the provisions of section 1965, as well as the opinions by circuit and district courts, the court concludes that the statute does provide for nationwide service of process. *Cory v. Aztec Steel Building, Inc.,* 468 F.3d 1226, 1230 (10th Cir.2006), *cert. denied,* 550 U.S. 918, 127 S.Ct. 2134, 167 L.Ed.2d 864 (2007); *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65, 71 (2d Cir.1998); *Butcher's Union,* 788 F.2d at 538–39; *Lisak v. Mercantile Bancorp, Inc.,* 834 F.2d 668, 671 (7th Cir.1987), *cert. denied,* 485 U.S. 1007, 108 S.Ct. 1472, 99 L.Ed.2d 700 (1988); *Rolls–Royce Corp. v. Heros, Inc.,* 576 F.Supp.2d 765, 778–80 (N.D.Tex.2008) (Fitzwater, J); *Hawkins v. Upjohn Co.,* 890 F.Supp. 601, 605–06 (E.D.Tex.1994).[FN*] The court also determines that the requirements for nationwide service of process have been met in this case; the court has personal jurisdiction over Defendants Patel and TTI, and no single district would have personal jurisdiction over all of the Defendants alleged to be coconspirators.

FN* These cases reflect the majority view that nationwide service of process is authorized pursuant to section 1965(b). Other circuits have concluded that nationwide service of process is authorized, but that it is created through section 1965(d), which provides: "All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." *See ESAB Group, Inc. v. Centricut, Inc.,* 126 F.3d 617, 626–27 (4th Cir.1997), *cert. denied,* 523 U.S. 1048, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998); *Republic of Panama v. BCCI Holdings,* 119 F.3d 935, 942 (11th Cir.1997).

[9][10] Next, the court must determine whether it has personal jurisdiction over nonresident Defendants pursuant to the nationwide service of process provision. Plaintiff points out that although the Fifth Circuit has not addressed this issue, district courts in this circuit have followed *Butcher's Union* and other circuits in holding that in a civil RICO suit, personal jurisdiction over nonresident defendants is warranted once the nationwide service of process provision is satisfied. 788 F.2d at 539; *see also PT United,* 138 F.3d at 71–72; *Lisak,* 834 F.2d at 671–72; *Rolls–Royce,* 576 F.Supp.2d at 782. In the context of a securities fraud case, the Fifth Circuit held: "[W]hen a federal court is attempting to exercise personal jurisdiction over a defendant in a suit based upon a federal statute providing for nationwide service of process, the relevant inquiry is whether the defendant has minimum contacts with the United States." *Busch v. Buchman, Buchman & O'Brien, Law Firm,* 11 F.3d 1255, 1258 (5th Cir.1994) (citations omitted). Accordingly, the court concludes that once the nationwide service of process requirement has been met, as it has in this case, then a court may exercise personal jurisdiction over nonresident defendants if they have minimum contacts with the United States. Defendant Asia Telecom, a resident of New Jersey, meets this test. Therefore, the court concludes that it can exercise personal jurisdiction over Defendant Asia Telecom pursuant to 18 U.S.C. § 1965.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 668
**(Cite as: 711 F.Supp.2d 668)**

[11] Plaintiff argues that finding that there is personal jurisdiction over Asia Telecom for the RICO claim also justifies the exercise of personal jurisdiction over this Defendant for the state law claims pursuant to pendent personal jurisdiction. Again, this is an issue that the Fifth Circuit has not specifically considered, but in *Rolls–Royce,* this court noted that every circuit that had considered the issue had **\*676** approved pendent personal jurisdiction and then held that "if [plaintiff's] remaining claims arise out of the same nucleus of operative facts as its RICO claims, it is within the court's discretion to exercise pendent personal jurisdiction over them." 576 F.Supp.2d at 784 (citing cases from the 2d, 3d, 4th, 7th, 9th, 10th, D.C. and Federal circuits). The court agrees that if Oblio's other claims arise from the "same nucleus of operative facts," it has personal jurisdiction over the additional state claims of fraud and conspiracy to commit tortious interference.

[12] Plaintiff's fraud claim alleges that Patel abused his position of trust and confidence with Oblio and defrauded it; Oblio also contends that Defendants engaged in an illegal plan to defraud it of millions of dollars of telephone cards. Compl. ¶¶ 26–27. The conspiracy to commit tortious interference claim also alleges that there was a civil conspiracy to interfere with Oblio's contractual obligations and goodwill, reputation, and standing. *Id.* ¶ 29. These claims are similar to Plaintiff's RICO claim, which alleges that Patel and the other Defendants together engaged in a conspiracy to defraud Oblio. Accordingly, the court concludes that the state law claims arise out of the same nucleus of operative facts as Plaintiff's RICO claim and therefore the court may exercise personal jurisdiction over Asia Telecom for these claims.

Asia Telecom has not moved to dismiss the RICO claim brought against it, and if the court were to dismiss this claim against it, then the court would not have personal jurisdiction over Asia Telecom pursuant to 18 U.S.C. § 1965. *See Rolls–Royce,* 576 F.Supp.2d at 773 ("If dismissal of

[plaintiff's] RICO claims ... is proper, then [plaintiff] cannot establish personal jurisdiction over defendants under 18 U.S.C. § 1965."). Asia Telecom, however, has not moved to dismiss the RICO claims. If it does, and the court determines that Plaintiff has failed to state a RICO claim against Asia Telecom pursuant to the RICO statute, then Defendant may reurge its additional arguments regarding specific jurisdiction. At this juncture, the court will not address the parties' additional arguments regarding general and specific jurisdiction. Accordingly, the court **denies** Defendant Asia Telecom's Motion and Notice of Motion to Dismiss for Lack of Personal Jurisdiction.

**B. HGE, TTI, Patel, and Touch Tell's Motions to Dismiss for Failure to State a Claim**

Defendants HGE and TTI jointly moved to dismiss Plaintiff's claims against them for lack of personal jurisdiction and failure to state a claim upon which relief can be granted. HGE and TTI, in their reply, withdrew their motion with respect to the argument that the court lacks personal jurisdiction over them. Defendant Patel moved separately to dismiss Plaintiff's claims against him for failure to state a claim, but he joins Defendants HGE and TTI's motion insofar as they argue that Plaintiff has failed to state a claim upon which relief can be granted. Finally, Defendant Touch Tell also filed a separate motion to dismiss Plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because Defendants' arguments are overlapping, the court considers these three motions together.

### 1. RICO Claim
#### a. Legal Standards

[13] RICO provides a civil cause of action to recover treble damages for "[a]ny person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964. Oblio contends that Defendants violated subsections (a) **\*677** through (d) of section 1962. Reduced to their simplest terms, these subsections mean:

(a) a person who has received income from a pat-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 668
(Cite as: 711 F.Supp.2d 668)

tern of racketeering activity cannot invest that income in an enterprise;

(b) a person cannot acquire or maintain an interest in an enterprise through a pattern of racketeering activity;

(c) a person who is employed by or associated with an enterprise cannot conduct the affairs of the enterprise through a pattern of racketeering activity; and

(d) a person cannot conspire to violate subsections (a), (b), or (c).

*Crowe v. Henry,* 43 F.3d 198, 203 (5th Cir.1995). "Common elements are present in all four of these subsections. These common elements teach that any RICO claim necessitates 1) a *person* who engages in 2) a *pattern of racketeering activity,* 3) connected to the acquisition, establishment, conduct, or control of an *enterprise." Id.* at 204 (original emphasis) (internal citations and quotations omitted).

Defendants HGE, TTI, and Patel argue that Plaintiff has failed to show the elements required for a RICO claim, that Plaintiff has failed to show causation as required by the statute, and that the Complaint is not specific enough to meet the standards of Rule 9(b) of the Federal Rules of Civil Procedure. Touch Tell argues that Plaintiff has failed to establish a RICO enterprise, a pattern of racketeering activity, any predicate act, and that the Complaint lacks the specificity required by Rule 9(b).

**b. RICO Enterprise**

The court first addresses Defendants' contentions that Plaintiff has failed to adequately plead the existence of a RICO enterprise. The statute simply defines the term "enterprise" as including "any individual partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Plaintiff does not allege that Defendants share any legal relationship,

but rather that they are an association-in-fact. Compl. ¶ 16.

[14][15][16] To establish an association-in-fact enterprise, Oblio must show "evidence of an ongoing organization, formal or informal, and ... evidence that various associates function as a continuing unit." *Crowe,* 43 F.3d at 205 (internal citation and quotation omitted). An association-in-fact enterprise must have continuity. *Calcasieu Marine Nat'l Bank v. Grant,* 943 F.2d 1453, 1461 (5th Cir.1991); *see also Crowe,* 43 F.3d at 205; *Delta Truck & Tractor, Inc. v. J.I. Case Co.,* 855 F.2d 241, 243 (5th Cir.1988), *cert. denied,* 489 U.S. 1079, 109 S.Ct. 1531, 103 L.Ed.2d 836(1989). An association-in-fact enterprise "(1) must have an existence separate and apart from the pattern of racketeering, (2) must be an ongoing organization[,] and (3) its members must function as a continuing unit as shown by a hierarchical or consensual decision making structure." *Crowe,* 43 F.3d at 205; *Calcasieu,* 943 F.2d at 1461; *Delta Truck,* 855 F.2d at 243. "Since an association-in-fact enterprise must have an existence separate and apart from the pattern of racketeering, proof of a pattern of racketeering activity does not necessarily establish a RICO enterprise." *Calcasieu,* 943 F.2d at 1461 (internal citation omitted). Oblio must therefore plead specific facts that establish that the association exists for purposes other than simply to commit the predicate acts. *Elliott v. Foufas,* 867 F.2d 877, 881 (5th Cir.1989); *Montesano v. Seafirst Commercial Corp.,* 818 F.2d 423, 427 (5th Cir.1987).

**\*678** [17] The enterprise alleged in this case is an association-in-fact comprised of Patel, an employee of Oblio, and the other Defendants, who distribute and sell prepaid phone cards. Plaintiff alleges that Defendants "conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity and worked together to orchestrate and receive the benefits of the predicate acts ...." Compl. ¶ 17. Plaintiff, however, has not alleged the existence of an ascertainable structure separate and apart from the alleged pattern of rack-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

711 F.Supp.2d 668
**(Cite as: 711 F.Supp.2d 668)**

etering. In other words, there is no allegation that the association of Defendants existed separate and apart from the alleged pattern of racketeering. Aside from the commission of the alleged predicate acts, there appears to be nothing that binds the association together. Accordingly, the court determines that Plaintiff has failed to adequately plead a RICO enterprise. As a RICO enterprise is an element required for any RICO claim, the court determines that Plaintiff has failed to state a claim pursuant to 18 U.S.C. § 1962.

### c. Predicate Acts

[18] Defendants also argue that Plaintiff has failed to plead with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure and that it has not sufficiently pleaded predicate acts. Plaintiff alleges that Defendants engaged in predicate acts of mail and wire fraud and a scheme or artifice to defraud. Compl. ¶¶ 19(j), 21–22.

[19] Rule 9(b)'s particularity requirement applies to the pleading of RICO predicate acts. *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.,* 975 F.2d 1134, 1138 (5th Cir.1992). Rule 9(b) requires "a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Herrmann Holdings Ltd. v. Lucent Techs. Inc.,* 302 F.3d 552, 564–65 (5th Cir.2002) (quotations omitted).

While Plaintiff's complaint generally alleges that Defendants conspired unlawfully in a variety of ways, Oblio fails to allege with specificity any misrepresentation or a misrepresentation that was made through the interstate mails or wires. Plaintiff alleges generally that Patel took certain actions, but it fails to provide the specific details required under Rule 9(b). Accordingly, the court determines that Plaintiff has also failed to allege the predicate acts that are required to bring a civil RICO claim.

### 2. Leave to Amend

[20] Plaintiff asks for leave to amend its com-

plaint if the court determines that it has failed to state a RICO claim. The court determines that the defects in Plaintiff's complaint are not necessarily incurable and Plaintiff has not amended its complaint; accordingly, leave should be granted to allow Plaintiff to replead its claims. *See Hart v. Bayer Corp.,* 199 F.3d 239, 248 n. 6 (5th Cir.2000). The court therefore **denies without prejudice** the pending motions to dismiss and **orders** Plaintiff to file an amended complaint to address the pleading deficiencies by **December 3, 2008.**

### IV. Conclusion

For the reasons stated herein, the court **denies** Defendant Asia Telecom's Motion and Notice of Motion to Dismiss for Lack of Personal Jurisdiction; **denies without prejudice** Motion to Dismiss for Lack of Personal Jurisdiction and for Failure to State a Claim Upon Which Relief May Be Granted by Defendants Hawaii Global Exchange, Inc. and Transpac Telecom, Inc.; **denies without prejudice** Defendant Zuber*679 Patel's Motion to Dismiss; and **denies without prejudice** Defendant Touch Tell, Inc.'s Rule 12(b)(6) Motion to Dismiss Plaintiff's Original Complaint for Failure to State a Claim Upon Which Relief Can Be Granted. Plaintiff is **granted leave** to replead its complaint, and its amended complaint must be filed no later than **December 3, 2008.**

N.D.Tex.,2008.
Oblio Telecom, Inc. v. Patel
711 F.Supp.2d 668

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 7

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
UNITED GALVANIZING INC., Plaintiff,
v.
IMPERIAL ZINC CORP., et al., Defendants.

Civil Action No. H-08-0551.
Oct. 27, 2008.

Jason David Kraus, Michael Robert Bouman, Bouman Kraus, PC, The Woodlands, TX, for Plaintiff.

Melissa Anne Dorman, Hartline Dacus, Et. Al., Dallas, TX, Steven N. Malitz, Armstein & Lehr, LLP, Chicago, IL, James D. Petruzzi, Mason & Petruzzi, Houston, TX, Jonathan G. Gabriel, Atty. at Law, Encino, CA, for Defendants.

**MEMORANDUM AND OPINION**
LEE H. ROSENTHAL, District Judge.
*1 This diversity suit arises from a contract to purchase a load of remelt zinc. The plaintiff, United Galvanizing, Inc., a Texas corporation, was the purchaser; defendant Richker Metals, Inc., a California corporation, was the seller; and defendant Imperial Zinc Corp., an Illinois corporation, was the manufacturer. United Galvanizing alleges that the zinc was not of the high-grade quality it had specified. United Galvanizing asserts state-law claims that include breach of contract, breach of warranty, and violations of the Texas Deceptive Trade Practices Act.

Imperial Zinc has filed a motion to dismiss for lack of personal jurisdiction. (Docket Entry No. 13). United Galvanizing has responded, (Docket Entry No. 15), and Imperial Zinc has replied, (Docket Entry No. 25). United Galvanizing moved for jurisdictional discovery and an extension of time to respond to Imperial Zinc's reply, (Docket Entry No. 27), which Imperial Zinc opposes, (Docket Entry No. 29).

Based on a careful review of the motions, responses, and reply; the parties' submissions; and the applicable law; this court denies United Galvanizing's motion for jurisdictional discovery and extension of time to respond and grants Imperial Zinc's motion to dismiss for lack of personal jurisdiction. The reasons for these rulings are explained below.

**I. Background**
Imperial Zinc is an Illinois corporation with its principal place of business in Chicago, Illinois. (Docket Entry No. 14, Ex. A-1). Imperial Zinc has been in business for 14 years, producing zinc alloys and zinc anodes. Imperial Zinc's only contact with Texas occurred in 2007, when it entered into three contracts to sell zinc materials it produced in Illinois to an Ohio corporation with a Texas division. (Docket Entry No. 14, Ex. A, Affidavit of David Kozin, Imperial Zinc's president, at ¶ 4). An Imperial Zinc vice-president made two trips, 11 months apart, from Illinois to the purchaser's Texas plant. (*Id.*). Imperial Zinc's revenue from these contracts was less than one percent of its 2007 revenue. (*Id.*).

United Galvanizing, based in Houston, Texas, uses zinc in its galvanizing process. On June 25, 2007, United Galvanizing's purchasing manager, Kerry Henrichsen, sent Richker's Albert Vasquez, Vice President of Sales, an e-mail asking that Richker "ship United a load of zinc metal we discussed at lunch the other day." (Docket Entry No. 11, Ex. A). United Galvanizing asserts that the zinc discussed was "prime western" grade. Vasquez responded that his supplier was gone for the day, but that he would "call am tomorrow and get a ship date for [Henrichsen]." (*Id.*).

On June 26, 2007, Richker entered into a contract with Imperial Zinc to purchase one truck load (44,761 pounds) of remelt high-grade zinc sows at

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

$1.4860/pound. (Docket Entry No. 14, Ex. A-2). The contract stated that any disputes between Imperial and Richker would be litigated in Chicago, Illinois. (*Id.*). On June 27, 2007, Imperial Zinc produced the remelt zinc for Richker in Illinois and invoiced Richker on the same date. (*Id.*). Richker had the goods shipped by a carrier of its choosing to California. (*Id.*, Ex. A-3).

**\*2** The zinc arrived at Richker's place of business in California. Richker shipped the zinc to Houston, Texas where it arrived at United Galvanizing's place of business on June 29, 2007. According to United Galvanizing, soon after delivery it became apparent that the zinc was not "prime western" grade. United Galvanizing asserts that subsequent testing of part of the load confirmed the deficient quality. On June 30, 2007, United Galvanizing informed Richker that it was rejecting the zinc. Richker arranged to pick up the remaining zinc on July 19, 2007.

United Galvanizing alleges that after it rejected the zinc, Richker agreed that no payment was due. Richker denies this allegation and asserts that it repeatedly requested payment. In October 2007, United Galvanizing sent a Richker a letter demanding payment for the costs and consequential damages caused by the nonconforming zinc. (Docket Entry No. 11, Ex. B). On October 19, 2007, Richker sued United Galvanizing in California state court. The California court granted United Galvanizing's motion to dismiss for lack of personal jurisdiction. United Galvanizing filed this suit on February 19, 2008, alleging breach of contract, violations of the Texas Deceptive Trade Practices Act, and seeking damages and attorneys' fees. (Docket Entry No. 1).

On April 21, 2008, Imperial Zinc moved to dismiss for lack of personal jurisdiction and for failure to state a claim. (Docket Entry No. 6). On April 23, 2008, United Galvanizing filed its first amended complaint to "clarify and add additional causes of action under F.R.C.P. 15(a)." (Docket Entry No. 11). The amended complaint asserts claims for

breach of contract, attorneys' fees, negligence, negligent misrepresentation, deceptive trade practices, and breach of implied warranty of merchantability against Richker and breach of warranty of merchantability against Imperial Zinc. (*Id.*). Richker filed an answer to the first amended complaint and a counterclaim against United Galvanizing on May 13, 2008. (Docket Entry No. 17).

Imperial Zinc filed its second motion to dismiss for lack of personal jurisdiction on May 8, 2008, arguing that it lacks the necessary contacts with Texas. (Docket Entry No. 13). The issues are whether, based on the present record, Imperial Zinc should be dismissed for lack of specific personal jurisdiction and whether to allow United Galvanizing jurisdictional discovery against Imperial Zinc and an extension of time to respond to Imperial Zinc's reply.

**II. The Legal Standard for Personal Jurisdiction**
    A federal court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if the long-arm statute of the forum state confers personal jurisdiction over that defendant and exercise of such jurisdiction by the forum state is consistent with due process under the United States Constitution. *Delgado v. Reef Resort, Ltd.,* 364 F.3d 642, 644 (5th Cir.2004). The Texas long-arm statute confers jurisdiction to the limits of due process. *Stroman Realty, Inc. v. Antt,* 528 F.3d 382, 385 (5th Cir.2008); *see* TEX. CIV. PRAC. AND REM.CODE ANN. § 17.041-.045; *see also Religious Tech. Ctr. v. Liebreich,* 339 F.3d 369, 373 (5th Cir.2003). Due process permits the exercise of personal jurisdiction over a nonresident defendant when the defendant has "minimum contacts" with the forum state and the exercise of jurisdiction over the defendant does not offend "traditional notions of fair play and substantial justice." *Johnston v. Multidata Systems Intern. Corp.,* 523 F.3d 602, 609 (5th Cir.2008) (quoting *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir.1994)).

**\*3** A plaintiff bears the burden of demonstrating facts sufficient to support personal jurisdiction

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

Page 3

over a nonresident defendant. That burden is met by a *prima facie* showing; proof by a preponderance of the evidence is not necessary. *Revell v. Lidov,* 317 F.3d 467, 469 (5th Cir.2002); *Alpine View Co. Ltd. v. Atlas Copco AB,* 205 F.3d 208, 215 (5th Cir.2000). "The court may determine the jurisdictional issue by receiving affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery." *Id.* "[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *Johnston,* 523 F.3d at 609 (quoting *D.J. Invs. v. Metzeler Motorcycle Tire Agent Gregg, Inc.,* 754 F.2d 542, 546 (5th Cir.1985)).

The "minimum contacts" aspect of the analysis can be established through "contacts that give rise to 'specific' personal jurisdiction and those that give rise to 'general' personal jurisdiction." *Wilson v. Belin,* 20 F.3d 644, 647 (5th Cir.1994). A court's exercise of specific jurisdiction is appropriate only when the nonresident defendant's contacts with the forum state arise from, or are directly related to, the cause of action. *Gundle Lining Const. Corp. v. Adams County Asphalt, Inc.,* 85 F.3d 201, 205 (5th Cir.1996) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 446 U.S. 408, 414 n. 8 (1984); *Religious Tech. Ctr.,* 339 F.3d at 375; *Quick Techs., Inc. v. Sage Group PLC,* 313 F.3d 338, 344 (5th Cir.2002)). To determine whether specific jurisdiction exists, a court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice." *Gundle Lining Const.,* 85 F.3d at 205; *Helicopteros Nacionales,* 466 U.S. at 414 n. 8. Even a single contact can support specific jurisdiction if the defendant "purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528

(1985). A court may exercise specific jurisdiction when: (1) the nonresident defendant purposely availed itself of the privileges of conducting activities in the forum state; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state. *Freudensprung v. Offshore Tech. Serv.,* 379 F.3d 327 (5th Cir.2004) (citations omitted). "The non-resident's 'purposeful availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state." *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 419 (5th Cir.1993) (citing *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). Specific jurisdiction requires a sufficient nexus between the nonresident defendant's contacts with the forum and the cause of action. *Rittenhouse v. Mabry,* 832 F.2d 1380, 1390 (5th Cir.1987).

*4 When the cause of action does not arise from or relate to the foreign defendant's purposeful conduct within the forum state, due process requires that the foreign defendant have engaged in continuous and systematic contacts with the forum state before a court may exercise general personal jurisdiction. *Helicopteros Nacionales,* 466 U.S. at 414-15; *Bearry v. Beech Aircraft Corp.,* 818 F.2d 370, 374 (5th Cir.1987). The plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the defendant than those needed to support specific jurisdiction. *Dalton v. R & W Marine,* 897 F.2d 1359, 1362 (5th Cir.1990). "To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction.' " *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 777 (5th Cir.1986) (quoting *Stuart v. Spademan,* 772 F.2d 1185, 1191 (5th Cir.1985) (additional citations omitted)).

In this case, United Galvanizing "concedes that Imperial Zinc's actions do not subject it to general jurisdiction." (Docket Entry No. 15). The issue is whether specific personal jurisdiction is present.

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

### III. Analysis

#### A. The First Amended Complaint

Imperial Zinc first argues that United Galvanizing's first amended complaint is not properly before this court because it was filed without leave of court after Imperial Zinc had moved to dismiss. Imperial Zinc asks this court to strike the amended complaint and consider its motion to dismiss as directed against United Galvanizing's initial complaint.

Rule 15 permits a party to "amend its pleading once as a matter of course before being served with a responsive pleading." FED. R. CIV. P. 15(a)(1). Imperial Zinc asserts that its motion to dismiss was a responsive pleading, and that United Galvanizing was required to seek leave of court to file an amended complaint. *See* FED. R. CIV. P. 15(a)(2). Fifth Circuit "precedent is clear that a motion to dismiss is not considered a 'responsive pleading' that would cut off the right to amend a pleading as a matter of course." *Crawford v. United States Dep't of Homeland Security*, 245 Fed. Appx. 369, 381 (5th Cir.2007) (citing *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 315 (5th Cir.2002)). Because neither defendant served an answer to the complaint before April 23, 2008, United Galvanizing was entitled to amend its complaint on that date without seeking the court's leave.[FN1]

> FN1. A proposed amendment to Rule 15(a)(1) will address this situation. The proposed amended rule states that "[a] party may amend its pleading once as a matter of course within 21 days after serving it, or if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." As amended, the rule eliminates the distinction between a responsive pleading and a motion to dismiss for purposes of Rule 15. The right to amend once as a mat-

ter of course is no longer terminated by service of a responsive pleading, but a party has 21 days in which to amend after service of the responsive pleading. The right to amend a pleading once as a matter of course terminates 21 days after service of a motion under Rule 12(b), (e), or (f). The amendment will become effective December 1, 2009 if approved by the Supreme Court and not disapproved by Congress.

In its first amended complaint, United Galvanizing alleges:

> Defendant Imperial Zinc Corp manufactured the zinc at issue herein which was sold to Plaintiff through Defendant Imperial Zinc Corp's broker and/or distributor, Defendant Richker Metals, who served as Defendant Imperial Zinc's sales agent in the forum State.

(Docket Entry No. 11, at ¶ 42). This is the only jurisdictional allegation about Imperial Zinc in the amended complaint. United Galvanizing attached to the amended complaint the e-mail between Henrichsen and Vasquez by which United Galvanizing contracted to purchase the remelt zinc from Richker and the demand letter from United Galvanizing to Richker. (Docket Entry No. 11, Exs. A, B). Neither document mentions Imperial Zinc.

#### B. The Motion to Dismiss

**\*5** United Galvanizing asserts that its first amended complaint and attached exhibits make a *prima facie* showing of specific personal jurisdiction. United Galvanizing asserts that it has made a *prima facie* showing that Richker was acting as Imperial Zinc's agent so that Richker's contacts are imputed to Imperial Zinc. United Galvanzing also argues that personal jurisdiction against Imperial Zinc is proper under the stream-of-commerce theory of minimum contacts. In response to Imperial Zinc's second motion to dismiss, United Galvanizing asserts that "Imperial not only could have foreseen that its zinc would be delivered and used in

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

Texas but knew that they were going to be used in Texas as a positive fact." (Docket Entry No. 15, at 1). United Galvanizing claims that "[i]t is undisputed that" Imperial "consented" to shipment to Texas; Imperial "knew as a fact that the products were going to be delivered to a specific user in Houston, Texas-the Plaintiff," and that "Imperial Zinc knowingly and intentionally marketed its zinc (through its brokers) with the knowledge that they were serving a national and even global market." (*Id.,* at 2, 7, 8).

Imperial Zinc argues that the amended complaint does not allege that Imperial Zinc knew or could have reasonably foreseen that the zinc was intended for sale to a Texas company or would be sold to a Texas company. Imperial Zinc argues that the record shows no basis for specific personal jurisdiction and instead defeats the arguments that Richker is Imperial Zinc's agent and that a stream-of-commerce basis for jurisdiction is present.

In support of its motion to dismiss, Imperial Zinc has submitted an affidavit by its president, David Kozin. (Docket Entry No. 14, Ex. A). Kozin states:

At the time Imperial contracted to sell and manufacture zinc goods for Richker Metals, I did not know who Richker was selling the goods to. Until this dispute, I had never heard of United Galvanizing, Inc. Richker Metals, Inc. has never been Imperial's sales agent, broker, or distributor in Texas or in any other state. Imperial has no agents for sales or other purposes in the State of Texas.

(*Id.*). Imperial Zinc also submits the contracts for the sale of the zinc at issue.

The record shows that there were two separate sales contracts for the zinc. The first is the sales contract between Richker and Imperial Zinc. (Docket Entry No. 14, Ex. A-2). The second contract is an e-mail from United Galvanizing's purchasing manager, Kerry Henrichsen, to Richker's

Albert Vasquez, vice-president of sales, asking that Richker "ship United a load of zinc metal we discussed at lunch the other day," (Docket Entry No. 11, Ex. A), followed by an e-mail frm Vasquez stating that his supplier was gone for the day, but that he would "call am tomorrow and get a ship date for [Henrichsen]." (*Id.*).

The sales contract between Richker and Imperial Zinc does not mention a subsequent sale by Richker, either to United Galvanizing or any other company. (Docket Entry No. 14, Ex. A-2). Neither the invoice Imperial Zinc sent to Richker nor the bill of lading for the shipment from Illinois to California mention United Galvanizing or Texas. (Docket Entry No. 14, Ex. A-3). There is no indication of any agency or broker relationship between Richker and Imperial Zinc. There is no evidence that Imperial Zinc was aware that Richker had a contract to ship the zinc to Texas. There is no evidence that Imperial Zinc knew or could reasonably foresee that Richker would resell the zinc to a Texas company. United Galvanizing responded to the second motion to dismiss with conclusory assertions that "Imperial Zinc must have accepted and ratified Richker Metals' efforts"; Imperial "ostensibly consented to Richker Metals' brokering of the sale"; and that Imperial Zinc knew the zinc would be shipped to Texas. (Docket Entry No. 15, at 7, 9). United Galvanizing has not identified or submitted evidence to support these assertions or the bare and conclusory jurisdictional allegation contained in the first amended complaint.

**\*6** The "plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson Ceco-Corp.,* 84 F.3d 560, 567 (2d Cir.1996); *see also Hartford Fire Ins. Co. v. Hutchinson,* 2006 WL 903715, at \*2 (S.D.Tex. Apr.6, 2006) ("A plaintiff may present a prima facie case by producing admissible evidence which, if believed, would suffice to establish the existence

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

Page 6

of personal jurisdiction."). United Galvanizing has not presented or identified such evidence. Its conclusory allegations are insufficient. *See Panda Brandywine Corp. v. Potomac Elec. Power,* 253 F.3d 865, 868 (5th Cir.2001). In *Panda Brandywine,* the Fifth Circuit upheld a district court's decision to exclude uncontroverted assertions offered to show personal jurisdiction over a nonresident defendant because those assertions were conclusory. 253 F.3d at 868-69. The only evidence offered to establish personal jurisdiction was a state-court petition alleging "on information and belief" that the defendant knew that the plaintiffs were Texas residents and knew that the defendant's actions would harm the plaintiffs in Texas. *Id.* at 869. The district court found the allegations too conclusory to consider in the jurisdictional analysis. *See also Southern Bleacher Co., Inc. v. Husco, Inc.,* 2001 WL 497772, at *6 (N.D.Tex. May 7, 2001) (concluding that plaintiff's bald assertions and conclusory allegations in its pleadings were insufficient to establish a *prima facie* case of jurisdiction). Although United Galvanizing need only make a *prima facie* showing of jurisdiction over Imperial Zinc, its conclusory assertions are insufficient for a *prima facie* showing of either an agency/broker relationship between Imperial Zinc and Richker or of jurisdiction based on stream of commerce. The record does not present a factual dispute that would be resolved in United Galvanizing's favor.

The evidence in the record does not show any agency or broker relationship between Richker and Imperial Zinc. There is a single contract between Richker and Imperial Zinc. The president of Imperial Zinc testified in his affidavit that "Richker Metals, Inc. has never been Imperial's sales agent, broker, or distributor in Texas or in any other state." Imperial has no agents for sales or other purposes in the State of Texas." (Docket Entry No. 14, Ex. A at ¶ 25).

The stream-of-commerce theory, United Galvanizing's second proffered basis for personal jurisdiction over Imperial Zinc, does not support a

*prima facie* showing because the record shows that Imperial Zinc neither knew nor could have reasonably foreseen that Richker would ship the zinc from California to Texas. United Galvanizing argues that under *World-Wide Volkswagen Corporation v. Woodson,* 444 U.S. 286 (1980), Imperial Zinc has minimum contacts with Texas. United Galvanizing argues that "Imperial Zinc intentionally placed its product into the stream of commerce by delivering them to a shipper destined for delivery in Texas." (Docket Entry No. 15, at 11).

*7 In *World-Wide Volkswagen,* a product liability case, the Supreme Court addressed whether the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma constituted "minimum contacts" with Oklahoma for personal jurisdiction over the automobile wholesaler and retailer with no activities in that State. 444 U.S. at 286. The Court held that specific personal jurisdiction in Oklahoma was not present because although foreseeability is a critical factor in the stream-of-commerce analysis, it was "not the mere likelihood that a product will find its way into the forum state." *World-Wide Volkswagen,* 444 U.S. at 297. The Court reasoned:

> If foreseeability were the criterion, a local California tire retailer could be forced to defend in Pennsylvania when a blowout occurs there; a Wisconsin seller of a defective automobile jack could be haled before a distant court for damages caused in New Jersey; or a Florida soft-drink concessionaire could be summoned to Alaska to account for injuries happening there. Every seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel.

*Id.* at 296. Rather, the touchstone is that the "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id.*

The Supreme Court revisited the stream-of-commerce theory in *Asahi Metal Indus. Co., Ltd.*

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

*v. Superior Court of California,* 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). A plurality advocated an "awareness plus" test under which "a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State." *Id.* at 112. In the Fifth Circuit, the *Asahi* plurality opinion is not binding, leaving circuit case law law interpreting *World-Wide Volkswagen* unchanged. *See Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.,* 9 F.3d 415, 419-21 (5th Cir.1993). Because a defendant who "knowingly benefits from the availability of a particular state's market for its products" should be amenable to suit in that state, the Fifth Circuit "declined to follow the suggestion of the plurality in *Asahi* ... that some additional action on the part of the defendant, beyond foreseeability, is necessary to 'convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.' " *Luv n' Care, Ltd. v. Insta-Mix, Inc.,* 438 F.3d 465, 469 (5th Cir.2006) (quoting *Asahi,* 480 U.S. at 112).

United Galvanizing relies on *Bean Dredging Corp. v. Dredge Technology Corp.,* 744 F.2d 1081 (5th Cir.1984), to support its argument that the stream-of-commerce theory applies to support specific personal jurisdiction over Imperial Zinc. In *Bean,* a Washington manufacturer introduced thousands of steel castings into the stream of commerce. Some of the castings were sold to a California corporation, which used them to manufacture cylinders. *Id.* at 1082. A Louisiana corporation ultimately used the cylinders in constructing a dredge. In a products suit alleging negligence and strict liability for defective dredge components, the Fifth Circuit found the Washington manufacturer subject to personal jurisdiction in Louisiana. *Id.* United Galvanizing also relies on *Ruston Gas Turbines,* 9 F.3d at 420, in which the Fifth Circuit stated that " 'mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum

state while still in the stream of commerce.' " *Id.* at 419 (quoting *Asahi,* 480 U.S. at 111). United Galvanizing asserts that Imperial Zinc is subject to jurisdiction in Texas by selling to a California company because that sale placed the zinc in the stream of commerce and the zinc could end up anywhere, including Texas.

**\*8** *World-Wide Volkswagen, Bean,* and *Ruston Gas Turbines* do not support stream-of-commerce specific personal jurisdiction in this case. As explained in *World-Wide Volkswagen,* the touchstone of the stream-of-commerce analysis is that the "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." 444 U.S. at 297. The Fifth Circuit has interpreted the stream-of-commerce test to require "foreseeability or awareness" that the product will enter the forum state while in the stream of commerce. *Luv n' Care,* 438 F.3d at 470.

In *World-Wide Volkswagen,* the sale of the vehicle in New York to New Yorkers did not support personal jurisdiction over the defendants in Oklahoma, where the accident occurred, because the defendants had conducted no activity in the forum state and could not reasonably anticipate being haled into court there. In *Bean,* the castings manufacturer had sufficient contacts with the foreign state because there was no "attempt to limit the states in which its castings would be sold and used," and because the manufacturer "had every reason to believe that its product would be sold to a nation-wide market, that is, in any or all states." *Id .* In *Ruston Gas Turbines,* the court held that a Texas court could exercise personal jurisdiction over a Minnesota manufacturer based on evidence that the manufacturer knew its "products were going to be delivered to a specific user in Houston, Texas." 9 F.3d at 420. That evidence consisted of affidavits showing that: (1) the defendant was aware the goods it manufactured would be shipped to the plaintiff in Texas; (2) the purchase order issued to the defendant showed that the goods were to be

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

sold to the plaintiff in Texas; (3) the defendant delivered the goods to a common carrier for direct shipment to Texas; (4) on 211 separate occasions over a 15-year period, the defendant shipped goods directly from Minnesota to locations in Texas; (5) those 211 shipments were to 44 different entities and locations in Texas; (6) on several occasions the defendant's employees met with customers in Texas; and (7) the defendant's practice of shipping goods directly to the plaintiff in Texas continued after the transaction at issue in the lawsuit. *Id* . at 417-18.

The Fifth Circuit's approach to the stream-of-commerce analysis is aptly illustrated by *Luv n' Care, Ltd.,* 438 F.3d at 469. In that case, a baby-bottle manufacturer attempted to avoid personal jurisdiction in Louisiana. The court reasoned that the manufacturer benefitted from Louisiana's market, as evidenced by the fact that it contracted to fill approximately 65 purchase orders for items bound for Louisiana, sent invoices to a third party confirming those orders, and derived substantial revenue from the sale of its products to Louisiana. *Id.* at 470-71. Because the manufacturer knowingly benefitted from Louisiana's market for its products, it was "only fitting that the defendant be amenable to suit in [Louisiana]." *Id.*

**\*9** The relevant inquiry is whether Imperial Zinc's conduct and connections with Texas are such that it could reasonably anticipate being haled into court in Texas or, as the Fifth Circuit stated, whether there was "foreseeability or awareness" that the zinc would enter the forum state while in the stream of commerce. *Luv n' Care,* 438 F.3d at 470. Unlike the defendant in *Bean,* there is no evidence that Imperial Zinc intended to avail itself of as wide a market as possible, such that it could reasonably anticipate its product being sold in all states and being haled into court in any state, including Texas. And unlike the defendants in *Ruston Gas Turbines* and *Luv n' Care,* there is no evidence that Imperial Zinc knew or was aware that its customer would sell this load of zinc to a Texas client and ship the zinc to Texas.

A defendant should reasonably anticipate being haled into court in a state when the defendant "purposefully avails itself of the privilege of conducting activities within the forum State." *World-Wide Volkswagen,* 444 U.S. at 297. The Texas Supreme Court has emphasized several essential aspects of a nonresident's "purposeful availment" of the privileges of conducting activities in the forum state necessary for personal jurisdiction in that state. "First, it is only the defendant's contacts with the forum that count," not the " 'unilateral activity of another party or a third person.' " *Michiana Easy Livin ' Country, Inc. v. Holten,* 168 S.W.3d 777, 785 (Tex.2005) (internal quotations omitted). "Second, the acts relied on must be 'purposeful' rather than fortuitous. Sellers who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to the jurisdiction of the latter in suits based on their activities. By contrast, a defendant will not be haled into a jurisdiction solely based on contacts that are 'random, isolated, or fortuitous.' " *Id.* (citations omitted).

Imperial Zinc did not purposefully avail itself of the privilege of conducting activities in Texas in connection with this load of zinc. The pleadings and the parties' submissions show that any contact Imperial Zinc had with Texas arising from the sale of zinc to Richker is fortuitous and isolated, and dependent on the unilateral activities of Richker, rather than the result of its purposeful conduct. Imperial Zinc sold the zinc to Richker, a California corporation, and shipped it by common carrier to Richker in California. The unilateral activity of Richker in selling the zinc to United Galvanizing and shipping it to Texas cannot serve as the basis for exercising personal jurisdiction over Imperial Zinc.

Nor is there evidence that Imperial Zinc knowingly benefitted from the sale of the zinc in Texas, as was the case in *Luv n' Care* . The dispute over the load of zinc does not arise from any of Imperial

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

Zinc's activities in Texas. Other than the three unrelated contracts Imperial Zinc entered into with an Ohio corporation that had a Texas division, Imperial Zinc has had no contacts with Texas. Kozin's affidavit states that: Imperial Zinc is not licensed to do business in Texas; has no registered agent in Texas; has no office in Texas; has no telephone or fax number in Texas; maintains no business records in Texas; has no Texas employees or agents; has never performed administrative functions in Texas; has not held a board of directors or shareholders meeting in Texas; has no shareholders, officers, and directors who are Texas residents; has never had any accounting work done in Texas; has never applied for a loan or acted as a guarantor or cosigner on a loan in Texas; has no bank account in Texas; and has never owned, leased, or rented any real or personal property in Texas. (Docket Entry No. 14, Ex. A, Kozin Affidavit David Kozin, President of Imperial, at ¶¶ 5-17).

*10 The record does not show that Imperial Zinc has "minimum contacts" with Texas sufficient for this court to exercise personal jurisdiction. *See Southern Copper, Inc. v. Specialloy, Inc.,* 245 F.3d 791, 2000 WL 1910176 (5th Cir.2000) (affirming dismissal based on lack of personal jurisdiction over an Illinois manufacturer that conferred by phone and fax with a Texas buyer, maintained a website that advertised in Texas, and placed its products in the stream of commerce knowing that three shipments of its good were destined for Texas; the defendant had no office, employees or agents in Texas, did not reach out to plaintiff to sell goods, and hired an independent carrier to pick up the goods in Illinois and ship them to Texas); *Freudensprung,* 379 F.3d at 344 ("[T]his Court has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient to establish the minimum contacts necessary to support the exercise of specific personal jurisdiction over the nonresident de-

fendant"); *Holt Oil & Gas,* 801 F.2d at 778 (finding no specific jurisdiction over nonresident defendant when that defendant entered into a contract with a Texas resident, sent an agreement and checks to Texas, and engaged in extensive telephonic and written communication with the plaintiff in Texas).

Because Imperial Zinc lacks minimum contacts with Texas, this court need not determine whether the exercise of jurisdiction would offend traditional notions of fair play and substantial justice. *Southern Copper, Inc.,* 2000 WL 1910176, at *4 (citing *Felch v. Transportes Lar-Mex SA DE CV,* 92 F.3d 320, 329 n. 20 (5th Cir.1996) ("Because we find that the first due process condition of minimum contacts was not satisfied, we need not address whether the exercise of personal jurisdiction in this case would offend traditional notions of fair play and substantial justice"); *Baldwin v. Household, Int'l, Inc.,* 36 S.W.3d 273, 277 (Tex.App.-Houston [14th Dist.] 2001, no pet.) (the court would "not reach the 'fair play and substantial justice' analysis" because plaintiff failed to establish defendant's minimum contacts with Texas).

## C. United Galvanizing's Motion for Jurisdictional Discovery

After Imperial Zinc filed a reply in support of its second motion to dismiss, United Galvanizing moved for jurisdictional discovery and an extension of time to respond. Imperial Zinc argues that United Galvanizing waived jurisdictional discovery, that the motion to dismiss should be decided on the pleadings, and that discovery would serve no purpose.

United Galvanizing seeks to depose Kozin and a Rule 30(b)(6) representative. United Galvanizing also "seeks to serve up to 25 requests for production of documents and things related to jurisdiction in this action." (Docket Entry No. 28). United Galvanizing asserts that "[t]he requested discovery will allow Plaintiff to obtain the information necessary to support its jurisdictional allegations and to refute the facts alleged in the Kozin declaration." (*Id.*). In support, United Galvanizing quotes *Williamson v.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

*Tucker,* 645 F.2d 404 (5th Cir.1981), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981). In that case, the court stated that "[i]nsofar as the defendant's motion to dismiss raises factual issues, the plaintiff should have an opportunity to develop and argue the facts in a manner that is adequate in the context of the disputed issues and evidence." *Id.* at 414. United Galvanizing also cites *Kelly v. Syria Shelly Petroleum Dev. B.V.,* 213 F.3d 841, 856 (5th Cir.2000), *Grafon Corp. v. Hausermann,* 602 F.2d 781, 783 (7th Cir.1979), and *Andersen v. Sportmart,* 179 F.R.D. 236, 245 (N.D.Ind.1998), in support of the argument that United Galvanizing should be permitted to take depositions and obtain documents from Imperial Zinc to attempt to refute the statements in Kozin's affidavit.

**\*11** United Galvanizing's reliance on *Williamson, Grafon,* and *Andersen* is misplaced. The court in *Williamson* did not address a motion for jurisdictional discovery into contacts with a forum state for the purpose of personal jurisdiction, but stated that as a general matter plaintiffs are entitled to discovery concerning subject-matter jurisdiction. 645 F.2d at 414. Notably, the parties in *Williamson* timely sought and conducted discovery on the jurisdictional issue before filing their briefs. United Galvanizing did not seek jurisdictional discovery until after it had filed an amended complaint, Imperial Zinc had filed its second motion to dismiss, United Galvanizing had responded and Imperial Zinc had filed a reply. In *Grafon,* the court did not discuss whether a plaintiff may obtain discovery to oppose a motion to dismiss, but rather found personal jurisdiction appropriate based on the plaintiff's affidavits that were filed in response to the motion to dismiss. 602 F.2d at 784. In *Andersen,* the third-party plaintiff filed a motion seeking to conduct jurisdictional discovery before the third-party defendant filed a motion to dismiss. The plaintiff also submitted specific interrogatories, production requests, and deposition notices that it wanted leave to propound. 179 F.R.D. at 243-44. The court recognized that "a plaintiff does not en-

joy an automatic right to discovery pertaining to personal jurisdiction in every case," but must make "a prima facie showing with some competent evidence demonstrating that personal jurisdiction might exist over a defendant in order to be entitled to jurisdictional discovery." *Id.* at 241. And in *Kelly,* 213 F.3d at 849-50, the Fifth Circuit affirmed the district court's denial of jurisdictional discovery because the plaintiffs had waited six months before seeking it, despite opportunity to take the discovery earlier, did not make a formal request for discovery until after the motion to dismiss was fully briefed, and did not show what they hoped to obtain from discovery. The court stated that it would not permit a "fishing expedition" or countenance the plaintiff's lack of diligence. 213 F.3d at 849-50.

These cases do not support the jurisdictional discovery United Galvanizing seeks. Nearly two months passed between the filing of Imperial Zinc's first motion to dismiss, which included an affidavit from Kozin, and United Galvanizing's motion for jurisdictional discovery. United Galvanizing did not seek jurisdictional discovery in the Joint Discovery/ Case Management Plan or in response to Imperial Zinc's first or second motion to dismiss. As in *Kelly,* and unlike *Williamson,* the discovery in this case was not sought until after the motion to dismiss was fully briefed.

United Galvanizing states that discovery should be allowed because "Imperial Zinc has entered into three contracts with businesses residing within the state of Texas." (Docket Entry No. 28). Those contracts are only relevant as to general jurisdiction, which United Galvanizing has conceded is lacking. "When the lack of personal jurisdiction is clear, discovery would serve no purpose and should not be permitted." *Wyatt v. Kaplan,* 686 F.2d 276, 284 (5th Cir.1982). A district court has discretion to allow a plaintiff to conduct jurisdictional discovery, but the plaintiff must first make a "preliminary showing of jurisdiction." *Fielding v. Hubert Burda Media, Inc.,* 415 F.3d 419, 429 (5th Cir.2005). Because United Galvanizing has failed to make such a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)
**(Cite as: 2008 WL 4746334 (S.D.Tex.))**

showing, it is not entitled to jurisdictional discovery. *See id.* (affirming district court's denial of jurisdictional discovery because plaintiff had failed to make a preliminary showing of jurisdiction).

**IV. Conclusion**

*12 Imperial Zinc lacks minimum contacts with Texas to justify the assertion of personal jurisdiction by this court. United Galvanizing's motion for jurisdictional discovery and extension of time to respond is denied. Imperial Zinc's motion to dismiss for lack of personal jurisdiction is granted.

S.D.Tex.,2008.
United Galvanizing Inc. v. Imperial Zinc Corp.
Not Reported in F.Supp.2d, 2008 WL 4746334 (S.D.Tex.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2013, I electronically filed the foregoing **APPENDIX A TO PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(2) OF MALVERN C. BURNETT, THE LAW OFFICES OF MALVERN C. BURNETT, A.P.C., AND GULF COAST IMMIGRATION CENTER, L.L.C.** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to all CM/ECF participants.

I further certify that on September 27, 2013, I served a true and correct copy of the foregoing document upon the below-named Defendants by depositing a copy of same in the U.S. Mail, with sufficient postage thereon to insure delivery, and properly addressed as follows:

> Michael Pol
> 1566 Redwood Court
> Biloxi, MS  39532
>
> Global Resources, Inc.
> c/o Michael Pol
> 13 Herring Road
> Beaumont, MS 39423-2055

I further certify that on September 27, 2013, I served a true and correct copy of the foregoing document upon the below named Defendants by forwarding a copy to them via International Mail, with sufficient postage thereon to insure delivery, and properly addressed as follows:

US2008 4959556 1

Sachin Dewan
Dewan Consultants
Dewan Consultants Pvt. Ltd.
708, Sagar Tech Plaza
Andheri Kurla Road
Sakinaka Junction, Andheri (E)
Mumbai 400 072, India

KILPATRICK TOWNSEND &
STOCKTON, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404)-815-6555
bboice@kilpatricktownsend.com

By:   s/ William H. Boice
William H. Boice
Georgia Bar No. 065725

Attorney for Plaintiffs

2

US2008 4959556 1