IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| REJI SAMUEL, ATHA MOHAMMAD ABDUL, KESAVARAO BUNDANKAYALA, RAJU DIVAKARAN, BIJU PERUMPILLY GEORGE, KRISHNA GONTHINA, NAYAPPULLI JAYACHANDRAN, GALLA VENKATA RAMA KRISHNA, SAMUEL JOSE KUMRUMTHODATHIL, LOHITHAKSHAN MADAMPET, JOHNY MANDY MATHAI, BELTHAZAR PETER, MOHANAN BALAKRISHNA PILLAI, SANTHOSH KUMAR RAJENDRAN PILLAI, ABY KARICKATHARA RAJU, SUMESH PORAMBATHUPARAMBIL SUBRAMANIAN, and CHANDRAN SHAJU THANISSERY, <br><br> Plaintiffs, <br><br> v. <br><br> SIGNAL INTERNATIONAL L.L.C., SIGNAL INTERNATIONAL, INC., SIGNAL INTERNATIONAL TEXAS, G.P., SIGNAL INTERNATIONAL TEXAS, L.P., MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS), <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CIV. NO. 1:13-cv-00323 ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

APPENDIX A
TO PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO DISMISS
PURSUANT TO FED. R. CIV. P. 12(b)(6) OF MALVERN C. BURNETT, THE LAW
OFFICES OF MALVERN C. BURNETT, A.P.C., AND GULF COAST IMMIGRATION
CENTER, L.L.C

| Tab | Description |
|-----|-------------|
| 1.  | *Beavers v. Metropolitan Life Ins. Co.*, 2007 WL 3342540, at *6 (S.D. Tex. Nov. 8, 2007) |
| 2.  | *Gordon v. JPMorgan Chase Bank, N.A.*, 505 Fed. Appx. 361, 362, 2013 WL 49587 (5th Cir. 2013) |
| 3.  | *Hall v. Variable Annuity Life Ins. Co.*, 2013 WL 4233103, at *2 (5th Cir. Aug. 15, 2013) |
| 4.  | *Kurian David, et al. v. Signal International, LLC, et al.*, 2:08-cv-01220-SM-DEK, (E.D. La. January 4, 2012), ECF No. 1117 |
| 5.  | *Newby v. Enron Corp.*, Civil Action No. H-01-3624 (S.D. Tex. Nov. 29, 2006) |

DATED:  September 27, 2013.

KILPATRICK TOWNSEND &
   STOCKTON, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404)-815-6555
bboice@kilpatricktownsend.com
bcorgan@kilpatricktownsend.com
spangborn@kilpatrickstockton.com
hheindel@kilpatricktownsend.com

By:     s/ William H. Boice
William H. Boice
Georgia Bar No. 065725
Brian G. Corgan (*Admitted Pro Hac Vice*)
Georgia Bar No. 187700
Susan Pangborn (*Admitted Pro Hac Vice*)
Georgia Bar No. 735027
California Bar No. 282533
Heather L. Heindel (*Admitted Pro Hac Vice*)
Georgia Bar No. 285204

Attorneys for Plaintiffs

# TAB 1



Not Reported in F.Supp.2d, 2007 WL 3342540 (S.D.Tex.)
**(Cite as: 2007 WL 3342540 (S.D.Tex.))**

**H**
Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Galveston Division.
Paul BEAVERS, et al., Plaintiffs,
v.
METROPOLITAN LIFE INSURANCE COM-
PANY, Defendant.

Civil Action No. G-07-00260.
Nov. 8, 2007.

Jared B. Stamell, John C. Crow, Stamell and Schar-
ger LLP, New York, NY, Christopher K. Johns,
The Buzbee Law Firm, Galveston, TX, for
Plaintiffs.

Charles W. Schwartz, Skadden Arps et al., Hous-
ton, TX, for Defendant.

### MEMORANDUM OPINION & ORDER
GRAY H. MILLER, United States District Judge.
### I. INTRODUCTION
*1 In this putative class action, the named
Texas plaintiffs (collectively, "plaintiffs") are hold-
ers of pre-1982 insurance policies with Metropolit-
an Life Insurance Company ("defendant" or
"MetLife"). They claim that MetLife breached the
insurance contracts by distributing dividends lower
than that to which they were entitled. Plaintiffs al-
lege that surplus from the policies which should
have been returned to them was reallocated to other
lines of business, precipitating their losses.
Moreover, plaintiffs only claim that they received
lower dividends through April 4, 2000, more than
seven years before this action was filed on May 7,
2007.

To that end, MetLife moved to dismiss the pu-
tative class action complaint for failure to state a
claim upon which relief may be granted. MetLife
claims that Texas's four-year statute of limitations

for a breach of contract claim bars plaintiffs' claim
for relief and that no grounds for tolling are applic-
able. After considering the complaint, the argu-
ments of counsel, and the applicable law, the de-
fendant's motion to dismiss will be GRANTED.
Moreover, because the court is granting the motion
to dismiss, it need not address defendant's pending
motion for a transfer of venue. Accordingly, de-
fendant's pending motion to transfer venue will be
DENIED AS MOOT.

### II. FACTUAL AND PROCEDURAL BACK-
GROUND
Before examining the limitations issues, the
court will briefly recount the facts of the case in the
light most favorable to the plaintiffs, as the court
must on defendant's motion to dismiss. *See McKin-
ney v. Irving Independent Sch. Dist.,* 309 F.3d 308,
310 (5th Cir.2002) (citing *Nolen v. Nucentrix
Broadband Networks Inc.,* 293 F.3d 926, 928 (5th
Cir.2002)). This suit was brought as a putative class
action by plaintiffs on behalf of themselves and all
persons who, before January 1, 1982, purchased
one or more participating MetLife individual life or
other participating policy in force any time during
the period January 1, 1985 through April 4, 2000.
[FN1] During this time period, MetLife was organ-
ized into four income-producing departments
which, as of the early 1990s, consisted of Personal
Insurance, Pensions, Group Insurance, and Employ-
er Financial Services.[FN2]

FN1. Dkt. 1, Class Action Compl. ¶ 15.

FN2. *Id.* ¶ 23.

The Personal Insurance line of business at issue
included participating life insurance policyholders
who were entitled to receive dividends from the
surplus accruing on their policies. Personal Insur-
ance managed individual insurance policies which
were divided into two blocks of business: pre-1982
policies, and 1982 and later policies. The putative
class members are those insureds holding pre-1982

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3342540 (S.D.Tex.)
**(Cite as: 2007 WL 3342540 (S.D.Tex.))**

policies.[FN3]

> FN3. *Id.* ¶ 24.

Plaintiffs contend that, beginning in 1983, Met-Life and a partner acquired the First Interstate Bank building ("First Interstate") in Houston, Texas. In 1985, MetLife bought out its partner and became the sole owner of First Interstate. MetLife allocated income from its equity interest to the Personal Insurance line of business and the income from its mortgage interest primarily to other lines of business. According to the plaintiffs, this allocation, as well as 80 similar transactions, had the purpose and result of transferring surplus profits from Personal Insurance to other business areas.[FN4]

> FN4. *Id.* ¶¶ 29-34.

**\*2** Plaintiffs assert that these improper allocations breached the insurance contracts and caused damages in the form of dividends paid to the plaintiffs throughout the 1990s lower than that to which they were entitled. Specifically, from 1991 to 1998, MetLife repeatedly reduced dividends to participating policyholders. In internal documents, MetLife allegedly conceded that investment earnings were inadequate because the earnings allocated to Personal Insurance were reduced by imposing on pre-1982 policyholders high-interest borrowing from other lines of business. MetLife also allegedly admitted that the lower earnings were the result of the real estate income allocations from the 1980s alone.[FN5] Notably, all of MetLife's conduct which the plaintiffs allege constituted a breach of contract occurred during the 1980s alone. Thus, for limitations purposes, plaintiffs' claim accrued no later than December 31, 1989, unless the plaintiffs can demonstrate the existence of a tolling exception to defer accrual of their claim.

> FN5. *Id.* ¶ 43.

This action was filed more than seventeen years later, on May 7, 2007, and the defendant has moved to dismiss on the basis of limitations.

## III. STANDARD OF REVIEW

Rule 12(b)(6) provides for dismissal of an action for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). In considering a motion to dismiss under Rule 12(b)(6), the complaint must be liberally construed in favor of the plaintiff, and all facts pleaded in the complaint must be taken as true. *Manguno v. Prudential Prop. & Cas. Ins. Co.,* 276 F.3d 720, 725 (5th Cir.2002). However, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* --- U.S. ----, ---- - ----, 127 S.Ct. 1955, 1964-65, 167 L.Ed.2d 929 (2007). "[M]ore than labels and conclusions" are required, "and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65.

In the class action context, if the defendant demonstrates that the named plaintiffs' cause of action should be dismissed for failure to state a claim, the entire putative class action complaint should be dismissed. *See Pharo v. Smith,* 621 F.2d 656, 664 (5th Cir.), *modified on reh'g on other grounds,* 625 F.2d 1226 (5th Cir.1980). Further, the affirmative defense of limitations may justify dismissal under Rule 12(b)(6) if it is evident from the pleadings that the action is barred and the plaintiffs cannot demonstrate grounds for tolling or some other basis to avoid the bar. *Jones v. Alcoa, Inc.,* 339 F.3d 359, 366 (5th Cir.2003); *Taylor v. Books A Million, Inc.,* 296 F.3d 376, 378-79 (5th Cir.2002); *see Kansa Reinsurance v. Cong. Mortgage Corp. of Tex.,* 20 F.3d 1362, 1366 (5th Cir.1994); *Clark v. Amoco Prod. Co.,* 794 F.2d 967, 970 (5th Cir.1986) ("[A] claim may also be dismissed if a successful affirmative defense appears clearly on the face of the pleadings.").

## IV. ANALYSIS

**\*3** The complaint and the plaintiffs' response to the defendant's motion confirm that the allegedly improper allocations underlying plaintiffs' breach of contract claim all occurred during the 1980s. In Texas, breach of contract actions are subject to a

Not Reported in F.Supp.2d, 2007 WL 3342540 (S.D.Tex.)
**(Cite as: 2007 WL 3342540 (S.D.Tex.))**

four-year statute of limitations, *see* TEX. CIV. PRAC. & REM.CODE ANN. § 16.051 (Vernon 2002), and limitations generally begins to run from the time of the breach. *See Enterprise-Laredo Assocs. v. Hachar's, Inc.,* 839 S.W.2d 822, 837 (Tex.App.-San Antonio), *writ denied per curiam,* 843 S.W.2d 476 (Tex.1992). Therefore, since this action was filed in 2007, the complaint must be dismissed unless plaintiffs can avail themselves of an applicable tolling exception to avoid the limitations bar. *See Jones,* 339 F.3d at 366. Plaintiffs assert two possible exceptions: (1) the discovery rule; and (2) *American Pipe* tolling.[FN6] The court will consider each of these possible exceptions in turn.

> FN6. The latter exception derives its name and origin from the case of *American Pipe & Constr. Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), in which the Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *See id.* at 554.

**A. THE DISCOVERY RULE**

Generally speaking, a cause of action accrues when a wrongful act causes some legal injury. *See Via Net v. TIG Ins. Co.,* 211 S.W.3d 310, 313 (Tex.2006). However, accrual may be deferred under the discovery rule when "the nature of the injury incurred is inherently undiscoverable and the evidence of injury is objectively verifiable." *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 456 (Tex.1996). The Texas Legislature has adopted the discovery rule in some cases. *See, e.g.,* TEX. BUS. & COM.CODE ANN. § 17.565 (Vernon 2002) (deceptive trade practices); TEX. CIV. PRAC. & REM.CODE ANN. § 16.010(a) (Vernon 2002) (misappropriation of trade secrets). When the legislature is silent on the applicability of the discovery rule to a certain type of claim, that issue is appropriately left to the courts. *See Via Net,*

211 S.W.3d at 313. But to avoid defeating the purpose behind the limitations statutes, Texas courts have restricted the discovery rule to exceptional cases. *See id.; S.V. v. R.V.,* 933 S.W.2d 1, 25 (Tex.1996) (explaining that applications of the discovery rule "should be few and narrowly drawn").

**1. Inherently Undiscoverable**

The Texas Supreme Court has cogently summarized the requisite showing for the first element of the discovery rule:

> To be "inherently undiscoverable", an injury need not be absolutely impossible to discover, else suit would never be filed and the question whether to apply the discovery rule would never arise. Nor does "inherently undiscoverable" mean merely that a particular plaintiff did not discover his injury within the prescribed period of limitations; discovery of a particular injury is dependent not solely on the nature of the injury but on the circumstances in which it occurred and plaintiff's diligence as well. An injury is inherently undiscoverable if it is by nature unlikely to be discovered within the prescribed limitations period despite due diligence.[FN7]

> FN7. The courts have excused the due diligence requirement and applied the discovery rule when the parties share a fiduciary relationship. *See Andretta v. West,* 415 S.W.2d 638, 642 (Tex.1967) (holding in the oil and gas law context that an executive rightholder owes a fiduciary duty to nonparticipating royalty owners, and thus limitations on the latter's claim for wrongful amendment of a lease would be tolled because they have no reason to know of such wrongful conduct); *see also Willis v. Maverick,* 760 S.W.2d 642, 645 (Tex.1988) (applying the discovery rule to a legal malpractice claim because of the special *fiduciary* relationship shared between attorney and client). In this case, the plaintiffs have argued that insurer and

Not Reported in F.Supp.2d, 2007 WL 3342540 (S.D.Tex.)
**(Cite as: 2007 WL 3342540 (S.D.Tex.))**

insured share a "special relationship." *See* Dkt. 17 at 7. However, they have not made any showing that MetLife owed any fiduciary duty to plaintiffs, and this court will not presume one. Accordingly, the court cannot excuse any due diligence requirement for an application of the discovery rule to the breach of contract claim in this case.

**\*4** *S.V.,* 933 S.W.2d at 7. This legal question is decided on a categorical rather than case-specific basis; the focus is on whether a *type* of injury rather than a *particular* injury was discoverable. *Via Net,* 211 S.W.3d at 313-14 (citing *Apex Towing Co. v. Tolin,* 41 S.W.3d 118, 122 (Tex.2001)).

The plaintiffs argue that "it was impossible for policyholders to learn of MetLife's internal reallocations of surplus and earnings." Dkt. 17 at 8. Met-Life responds that plaintiffs could have discovered the allegedly unlawful conduct through the exercise of due diligence, and indeed one plaintiff in a similar class action against MetLife in New York, Joyce Rabouin, did so as late as 1998. The court agrees with the defendant.

As a federal court sitting in diversity, the court first notes that in Texas "[i]t is well-settled law that a breach of contract claim accrues when the contract is breached." *See Stine v. Stewart,* 80 S.W.3d 586, 592 (Tex.2002). Indeed, the Texas Supreme Court has recently reaffirmed this basic tenet and rejected the discovery rule three times for ordinary contract disputes. *See Via Net,* 211 S.W.3d at 314-15; *Wagner & Brown Ltd. v. Horwood,* 58 S.W.3d 732, 737 (Tex.2001); *HECI Exploration Co. v. Neel,* 982 S.W.2d 881, 888 (Tex.1999). Still, the Texas Supreme Court did acknowledge that some contract claims may present a need for the discovery rule, but "those cases should be rare, as diligent contracting parties should discover any breach during the relatively long four-year limitations period provided for such claims." *Via Net,* 211 S.W.3d at 314-15.

This language provides a narrow opening in the tolling door for contract claims; however, the alleged breaches present in this case simply do not cross the threshold. Due diligence requires that each contracting party protect its own interests. *Barfield v. Howard Smith Co. of Amarillo,* 426 S.W.2d 834, 840 (Tex.1968). This diligence requirement may include requesting information from the contracting partner regarding performance of the contractual obligations. In fact, failing to ask for such information is not due diligence. *See Wagner & Brown,* 58 S.W.3d at 736.

In *Wagner & Brown,* the defendant leased and operated the mineral estates in the Conger Field in which the plaintiffs Lonnie Harwood and David Lawrence owned royalty interests. *Id.* at 733. The leases provided that the plaintiffs were entitled to a one-eighth royalty on the amount realized from the sale of gas at the wells. *Id.* After the lessor entered into a gas purchase agreement with a third party, its general partner contracted with the gas purchasers to gather and compress the gas and deliver it to a central facility. *Id.* The lessor deducted the gathering and compression charges from the amount realized on the sale of gas, thus reducing the royalty payments made to the plaintiffs in the early 1980s. *Id.* at 733-34. Despite this questionable reduction in payments, the plaintiffs did not bring suit against the lessor until 1996, arguing that the discovery rule was applicable because the lessor maintained all of the information and records related to the reduction of royalties. *Id.* at 734-36. The Texas Supreme Court disagreed, holding that "a royalty owner should exercise due diligence to determine whether charges made against royalty payments are proper and reasonable." *Id.* at 736. Thus, the court found that the lessees' injuries were not inherently undiscoverable, and the breach of contract action accrued at the time of the breach rather than the delayed discovery thereof. *Id.* at 737.

**\*5** The case at bar is materially indistinguishable from *Wagner & Brown.* Just like the lessees who did not diligently investigate the lessor's con-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3342540 (S.D.Tex.)
**(Cite as: 2007 WL 3342540 (S.D.Tex.))**

duct or the reasons for the lower royalty payments, the plaintiffs in this case have not shown this court that they made appropriate efforts, or, indeed, any efforts to inquire with MetLife about any allocations of surplus profits throughout the 1980s to determine whether defendant was properly performing its contractual obligations. In rebuttal, plaintiffs contend that it would have been impossible to discover defendant's actions during this time period, but this is not so. Dkt. 17 at 8. The simple fact that plaintiffs did not themselves discover MetLife's alleged conduct is not probative of whether the type of injury was inherently undiscoverable by an affected party. *Via Net,* 211 S.W.3d at 314-15. Indeed, Joyce Rabouin, the named plaintiff in a similar class action in New York state court, did discover the allegedly unlawful conduct and brought suit against MetLife in 1998. Thus, the injuries in this case were not inherently undiscoverable, and the discovery rule exception is inapplicable to defer accrual of plaintiffs' claim.

**2. Objectively Verifiable**

Because of the court's conclusion that plaintiffs' type of injury is not inherently undiscoverable, it need not determine whether plaintiffs' evidence of injuries are objectively verifiable. *See Wagner & Brown,* 58 S.W.3d at 737. Nonetheless, for the sake of completeness, the court will consider this element as well.

For evidence of an injury to be objectively verifiable, "the presence of the injury and the producing wrongful act cannot be disputed." *See Howard v. Fiesta Tex. Show Park, Inc.,* 980 S.W.2d 716, 720 (Tex.App.-San Antonio 1998, pet. denied). The Texas Supreme Court has held that this element of the discovery rule requires that "the evidence must rise to a higher level of certainty" than the preponderance of the evidence standard for liability. *S.V.,* 933 S.W.2d at 19. Here, after carefully reviewing plaintiffs' proffer of evidence, the court finds that their submission does not meet the high bar of "objectively verifiable" evidence of injury.

The exhibits plaintiffs attached to their re-

sponse do indeed show that MetLife transferred earnings between lines of business during the challenged period in the 1980s. However, as in the *Rabouin* litigation, there will undoubtedly be a "battle of the experts" on the issue of whether these allocations actually damaged the plaintiffs in the form of reduced dividend payments. *Cf. Rabouin v. Metro. Life Ins. Co.,* No. 111355/98, 2005 WL 3536441, at *8 (N.Y.Sup.Ct. Nov.23, 2005) ("[W]hile MetLife's expert opines that [plaintiffs] were not damaged, their actuarial expert opines that the transfer of earnings distorted plaintiffs' contribution to surplus reducing the dividends refunded to them."). While this contradictory testimony may create a triable issue of fact, it cannot meet the "higher level of certainty" required of documentary evidence in this situation to conclusively establish the "presence of the injury." *See S.V.,* 933 S.W.2d at 19; *Howard,* 980 S.W.2d at 720. Thus, plaintiffs have not adduced indisputable, "objectively verifiable" evidence of the wrongful act *and* resultant injury to satisfy this element.

**3. Conclusion**

*6 Because plaintiffs have not shown that their injuries were either inherently undiscoverable or that the documentary proof made the injuries objectively verifiable, the discovery rule does not toll the accrual of plaintiffs' claim against MetLife for the allegedly improper allocations of profits.[FN8]

> FN8. Alternatively, even if the court held that the discovery rule was applicable to this type of injury, the court would still find that this claim is time-barred. At the latest, reasonably diligent plaintiffs should have inquired the reasons for the lower dividend payments beginning in 1991. As this later date is far more than four years before commencement of this suit, plaintiffs' cause of action would have long since expired in any case.

**B. *AMERICAN PIPE* TOLLING**

Plaintiffs alternatively assert that their claim is saved by *American Pipe* tolling. One Texas appel-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3342540 (S.D.Tex.)
**(Cite as: 2007 WL 3342540 (S.D.Tex.))**

late court has summarized the *American Pipe* doctrine as follows:

[E]ven though the statute of limitations on a class member's individual cause of action would expire during the pendency of a class action, the filing of the class action suspends the applicable statute of limitations as [to] all purported members of the class. Thus, the right to pursue an *individual* cause of action is not foreclosed by decertification of the class. Any time remaining on the statute of limitations of the unnamed property owners' *individual* cause of action on the date of the filing of the lawsuit was restored and began to run again on the date the class was decertified.

*Grant v. Austin Bridge Constr. Co.,* 725 S.W.2d 366, 370 (Tex.App.-Houston [14th Dist.] 1987, no writ) (emphases added). Plaintiffs claim that during the pendency of the *Rabouin* class action filed in 1998, the limitations period on their claim was tolled, and after decertification in January 2006, the clock restarted anew. According to plaintiffs, because they filed this action within four years of decertification, their breach of contract claim is still viable. MetLife vehemently disagrees, arguing that any tolling could only begin on June 22, 1998 (when Joyce Rabouin filed her complaint), and tolling was unavailable at this late date because by then limitations had already run. Further, even if the plaintiffs could avail themselves of the benefit of *American Pipe,* MetLife posits that they cannot do so through the vehicle of a successive class action. The court agrees with MetLife on both grounds.

Under Texas law, the *American Pipe* rule does not restart the limitations period after decertification of a class action; it merely suspends the running of any time left during the pendency of a certified class. *See Grant,* 725 S.W.2d at 370. Here, plaintiffs' claim accrued no later than 1989, and thus limitations must have run by the end of 1993. Because the *Rabouin* case was not instituted until 1998, *American Pipe* is inapplicable to suspend a limitations period that had already expired.

In the alternative, even if the limitations period on plaintiffs' claim could be stayed during the pendency of the *Rabouin* class certification, *American Pipe* does not toll limitations on a claim for reassertion in a subsequent *class* action. *See Salazar-Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1351 (5th Cir.1985) ("Plaintiffs have no authority for their contention that putative class members may piggyback one class action onto another and thus toll the statute of limitations indefinitely, nor have we found any."); *see also Basch v. Ground Round, Inc.,* 139 F.3d 6, 11 (1st Cir.1998) ("Plaintiffs may not stack one class action on top of another and continue to toll the statute of limitations indefinitely. Permitting such tactics would allow lawyers to file successive putative class actions with the hope of attracting more potential plaintiffs and perpetually tolling the statute of limitations as to all such potential litigants, regardless of how many times a court declines to certify the class. This simply cannot be what the *American Pipe* rule was intended to allow, and we decline to embrace such an extension of that rule."). Rather, the Texas courts applying the *American Pipe* doctrine have only suspended the limitations period for a subsequent *individual* action. *See Grant,* 725 S.W.2d at 370 ("Any time remaining on the statute of limitations of the unnamed property owners' *individual* cause of action on the date of the filing of the lawsuit was restored and began to run again on the date the class was decertified." (emphasis added)). Therefore, in any case, *American Pipe* tolling is inapplicable to plaintiffs' instant claim asserted through the vehicle of a subsequent class action complaint.

**V. CONCLUSION**

**\*7** For the foregoing reasons, neither the discovery rule nor the *American Pipe* doctrine can defer the accrual of plaintiffs' breach of contract claim beyond some time in the 1980s, when MetLife engaged in the challenged transactions. Plaintiffs' claim was only viable for four subsequent years under the applicable Texas statute of limitations, and the claim expired at the very latest on December

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 3342540 (S.D.Tex.)
**(Cite as: 2007 WL 3342540 (S.D.Tex.))**

31, 1993. The filing of the putative class action complaint on May 7, 2007 was therefore untimely. Defendant's motion to dismiss (Dkt.10-11) is GRANTED, and the plaintiffs' putative class action complaint (Dkt.1) is DISMISSED WITH PREJU-DICE. MetLife's pending motion to transfer this action to the United States District Court for the Southern District of New York (Dkt.15-16) is DENIED AS MOOT.

S.D.Tex.,2007.
Beavers v. Metropolitan Life Ins. Co.
Not Reported in F.Supp.2d, 2007 WL 3342540 (S.D.Tex.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 2

Westlaw.

505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.)))**

**H**
This case was not selected for publication in the
Federal Reporter.

Not for Publication in West's Federal Reporter. See
Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or
after Jan. 1, 2007. See also Fifth Circuit Rules
28.7, 47.5.3, 47.5.4. (Find CTA5 Rule 28 and Find
CTA5 Rule 47)

United States Court of Appeals,
Fifth Circuit.
Rochelle Gaspard GORDON, Plaintiff–Appellant
v.
JPMORGAN CHASE BANK, N.A. and Chase
Home Finance, LLC, Defendants–Appellees.

No. 12–20323
Summary Calendar.
Jan. 3, 2013.

**Background:** Mortgagor brought action against
mortgagee, alleging claims for breach of contract
and promissory estoppel, arising from mortgagor's
unsuccessful efforts to obtain a permanent modific-
ation of her mortgage loan. The United States Dis-
trict Court for the Southern District of Texas,
Nancy F. Atlas, J., 2012 WL 1552050, dismissed
the action. Mortgagor appealed.

**Holding:** The Court of Appeals held that purported
oral agreement to permanently modify terms of
mortgage loan was not enforceable.
Affirmed.

West Headnotes

**Frauds, Statute Of 185 ⟪⟫131(1)**

185 Frauds, Statute Of
    185IX Operation and Effect of Statute
        185k131 Modification of Contract
            185k131(1) k. In general. Most Cited Cases

Purported oral agreement to permanently modi-
fy terms of mortgage loan to provide for lower loan
payments was not enforceable, under Texas law, as
it did not comply with Texas statute of frauds, re-
quiring such agreements to be in writing. V.T.C.A.,
Bus. & C. § 26.02(b).

**\*361** Omotayo Jamin Lawal, Wakil Oyeleru Oye-
demi, Houston, TX, for Plaintiff–Appellant.

Marcie Lynn Schout, Esq., William Lance Lewis,
Esq., Quilling, Selander, Lownds, Winslett &
Moser, P.C., Dallas, TX, for Defendants–Appellees.

Appeal from the United States District Court for the
Southern District of Texas, No. 4:12–cv–00528.

Before SMITH, PRADO, and HIGGINSON, Cir-
cuit Judges.

PER CURIAM: FN*

> FN* Pursuant to 5TH CIR. R. 47.5, the
> court has determined that this opinion
> should not be published and is not preced-
> ent except under the limited circumstances
> set forth in 5TH CIR. R. 47.5.4.

**\*\*1** This case arises from the plaintiff's unsuc-
cessful efforts to obtain a permanent modification
of her mortgage. The district court granted the de-
fendants' motion to dismiss for failure to state a
claim. Because we find that the agreements
between the parties are subject to the statute of
frauds, and because the plaintiff has not alleged that
the defendants signed—or promised to sign—any
written modification to those agreements, we AF-
FIRM the district court's order.

**\*362 FACTS AND PROCEEDINGS**
Plaintiff Rochelle Gaspard Gordon entered into
a home mortgage loan for $190,000 with Defend-
ants JPMorgan Chase Bank, N.A. and Chase Home

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.))
(Not Selected for publication in the Federal Reporter)
(Cite as: 505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.)))

Finance, LLC ("Chase") in 2006. Gordon agreed to pay Chase in monthly installments of $1,370.29.

Three years later, Gordon suffered an injury that left her unable to work, and she fell behind on her payments. As a result, the parties entered into a Forbearance Agreement (the "Agreement") in February 2010. Gordon acknowledged in the Agreement that she had defaulted on the loan and that she owed Chase a total past-due debt of $20,017.69. The Agreement specified that Gordon would pay a reduced monthly amount of $936.66 in February, March, and April of 2010, and "the regular monthly payment thereafter until final maturity as stated in the Loan Documents." Chase, in turn, agreed to "forbear from exercising its rights under the Loan Documents" pursuant to the Agreement's terms, but if Gordon defaulted under the Agreement, Chase would proceed with foreclosure.

The terms of the Agreement do not reference a permanent modification of the loan. The Agreement released Chase from "any claims, actions or causes of action, defenses, counterclaims or setoffs of any kind" that Gordon "now or hereafter may assert against [Chase] in connection with the making, closing, administration, collections or the enforcement by [Chase] of the loan documents." Finally, the Agreement provides that it may not be "supplemented, changed, waived, discharged, eliminated, modified, or omitted except by written document between" the parties, and "neither parole evidence nor any prior or other agreement shall be permitted to contradict or vary its terms. There are no promises, conditions, or obligations other than those contained in the Agreement."

Chase participates in the federal Home Affordable Modification Program (HAMP), which allows homeowners to receive income-based mortgage modifications. A Supplemental Directive to HAMP, submitted by Chase as an appendix to its brief on appeal, allows for loan servicers to offer borrowers a temporary "trial period plan," with the provision that if the borrower complies with the terms of such a plan, a permanent loan modification will become effective. Gordon alleges that Chase representatives told her the Agreement constituted the "beginning" of such a trial plan. She was "made to believe" that after fulfilling the terms of the Agreement, her loan would "go into automatic modification and nothing else needed to be done."

**2 After making three reduced payments under the terms of the Agreement from February through April 2010, Gordon continued to make payments on the reduced payment schedule until September 2010. Gordon describes her payments as complying with the terms of the Agreement, while Chase contends that the Agreement required Gordon to make regular rather than reduced payments from May onwards. In September 2010, Chase returned Gordon's monthly payment, claiming that it was late, and threatened to foreclose on Gordon's home.

Over the next several months, Chase representatives told Gordon to "be hopeful and she [would] get her loan modified." Gordon applied for a loan modification from Chase. Chase representatives assured her that her application paperwork was "fine" and that she would "receive all the needed documents confirming the beginning of the modification soon." Subsequently, however, Gordon received inconsistent information from Chase regarding *363 the status of her application. One Chase representative told Gordon that Chase would send final papers for her to sign "any day from now," but Gordon was unable to get in touch with the representative following that conversation. Gordon alleges that she was alternately told that her home would be foreclosed on, but also that she would be considered for a loan modification.

Gordon filed suit against Chase in the United States District Court for the Southern District of Texas in February 2011, asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of implied contract, and promissory estoppel. Chase moved to dismiss all of Gordon's claims under Federal Rule of Civil Procedure 12(b)(6), arguing that the waiver provi-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.)))**

sion in the Agreement barred Gordon's claims and that Gordon failed to allege facts upon which relief could be granted. In the alternative, Chase moved for a more definite statement of Gordon's pleadings under Rule 12(e).

The district court granted Gordon's motion to dismiss. The court found that Chase was entitled to dismissal because of the Agreement's release provision, and that because the Agreement "contains a clear release of all claims, amendment of the complaint in this case would be futile." The district court also found that Gordon had failed to allege facts sufficient to state a claim for relief under the theories put forth in the complaint.

### STANDARD OF REVIEW

We review a district court's grant of a motion to dismiss under Rule 12(b)(6) de novo, construing the complaint liberally in favor of the plaintiff, and accepting all well-pleaded facts in the complaint as true. *Harrington v. State Farm Fire & Cas. Co.,* 563 F.3d 141, 147 (5th Cir.2009). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555, 127 S.Ct. 1955.

### DISCUSSION

**\*\*3** The district court found that the Agreement's waiver provision released Chase from all claims asserted by Gordon in this suit. However, neither party addresses this finding on appeal. As Chase has not argued that the waiver provision controls on appeal, we will not rely on it. Instead, Chase argues the district court correctly ruled that Gordon's complaint failed to state a claim for breach of contract and for promissory estoppel.[FN1] The parties agree that Texas law controls.

FN1. Gordon lists breach of implied con-

tract and breach of the implied covenant of good faith and fair dealing in the Statement of Issues of her brief on appeal, but she does not argue those claims. She has therefore waived those arguments. *Procter & Gamble Co. v. Amway Corp.,* 376 F.3d 496, 499 n. 1 (5th Cir.2004) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument.").

Gordon first argues that Chase breached a contract to permanently modify her loan. "[T]he existence of a valid contract" is an "essential element[ ] in a breach of contract claim" under Texas law. *Bridgmon v. Array Sys. Corp.,* 325 F.3d 572, 577 (5th Cir.2003) (quoting *Frost Nat'l Bank v. Burge,* 29 S.W.3d 580, 593 (Tex.App.-Houston 2000, no pet.)). To show the existence of a contract, a plaintiff must establish, *inter alia,* an offer, "an acceptance in strict **\*364** compliance with the terms of the offer," and a meeting of the minds. *Southern v. Goetting,* 353 S.W.3d 295, 299 (Tex.App.-El Paso 2011, reh'g denied). The district court found that Gordon only alleged that she engaged in negotiations with Chase, not that Chase made an offer to permanently modify her loan.

Gordon argues that communications between herself and Chase "ripened into a valid contract" when Chase offered to modify her loan provided that she supply certain documents, and she accepted Chase's offer by providing those documents. Chase responds that the loan agreements between the parties are subject to the statute of frauds, and that Gordon has pointed to no written agreement that would modify the terms of the contract.

We agree that both the original mortgage documents and the Forbearance Agreement are governed by the statute of frauds. Under Texas law, a "loan agreement in which the amount involved in the loan agreement exceeds $50,000 in value is not enforceable unless the agreement is in writing and signed by the party to be bound or by that party's authorized representative." Tex. Bus. Com.Code § 26.02(b). The term "loan agreement" includes any

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
(Cite as: 505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.)))

agreement or promise where a financial institution "loans or delays repayment of or agrees to loan or delay repayment of money, goods, or another thing of value or to otherwise extend credit or make a financial accommodation." *Id.* § 26.02(a)(2).

Gordon argues that the HAMP Supplemental Directive trumps the statute of frauds by allowing for "oral loan modification," but points only to a provision of HAMP allowing servicers to use "verbal financial information" to prepare and offer a trial period plan. Nothing in the Supplemental Directive indicates that a binding agreement would exist between servicer and borrower to permanently modify a loan without a trial period plan containing a written provision to that effect. Gordon relies on a Chase representative's statement that her payment under the Agreement was the "beginning" of a trial period plan, but the Agreement itself does not state that compliance with its terms would lead to a permanent loan modification.[FN2]

> FN2. *Wigod v. Wells Fargo Bank, N.A.,* cited by Gordon, is not to the contrary. In that case, the parties signed a written trial period plan which explicitly provided that if the borrower complied with its terms, then "the Lender will provide [the borrower] with a [permanent] Loan Modification Agreement." 673 F.3d 547, 558 (7th Cir.2012). The statute of frauds was therefore not at issue in *Wigod.*

**\*\*4** When a written agreement is governed by the statute of frauds, it cannot be materially modified by a subsequent oral agreement. *Dracopoulas v. Rachal,* 411 S.W.2d 719, 721 (Tex.1967). Chase points to only one written provision: the application form she submitted to Chase, which provides that Chase would "determine whether [she is] eligible for a mortgage modification" and, if so, would send her "a Trial Period Plan Notice that explains the plan and next steps." Although Gordon alleges that she was verbally assured that she would receive a loan modification, she does not point to a written offer to do anything more than determine her eli-

gibility for such a modification. [FN3] She has therefore **\*365** not alleged facts that would allege a modification of her loan terms under the statute of frauds.

> FN3. Gordon also alleges that Chase reneged on its promise to send her loan modification documents. She did not make that claim in her complaint. Gordon points to a Chase representative's oral statement that Chase would send her loan modification papers "any day from now." But that statement does not constitute an oral contract under Texas law. *See Goetting,* 353 S.W.3d at 299–300 ("The terms of an oral contract must be definite, certain, and clear as to all essential terms and, if they are not, the oral contract fails for indefiniteness.").

Gordon also argues that Chase is liable under the equitable theory of promissory estoppel. Under Texas law, although promissory estoppel is primarily a defensive theory, it is also available as a cause of action for a "promisee who has acted to his detriment in reasonable reliance on an otherwise unenforceable promise." *Ford v. City State Bank of Palacios,* 44 S.W.3d 121, 140 (Tex.App.–Corpus Christi 2001, no pet.).

Where, as here, an oral promise is barred by the statute of frauds, to show promissory estoppel the promisor must have "promised to sign a written document that would satisfy the statute of frauds." *Id.* (citing *Nagle v. Nagle,* 633 S.W.2d 796, 799–800 (Tex.1982)). "[C]ourts will enforce an oral promise to sign an instrument complying with the Statute of Frauds if: (1) the promisor should have expected that his promise would lead the promisee to some definite and substantial injury; (2) such an injury occurred[;] and (3) the court must enforce the promise to avoid injustice." *Nagle,* 633 S.W.2d at 800.

Texas courts require that for promissory estoppel to apply, the agreement that is the subject of the promise "must be in writing at the time of the oral

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.)))**

promise to sign it." *Sullivan v. Leor Energy, LLC,* 600 F.3d 542, 549 (5th Cir.2010) (quoting *Exxon Corp. v. Breezevale Ltd.,* 82 S.W.3d 429, 438 (Tex.App.-Dallas 2002)). Gordon has not alleged that any written permanent loan modification agreement existed, nor that Chase promised to sign such an agreement. Instead, Gordon alleged that a Chase representative told her that Chase would send final modification papers for her to sign "any day from now." Gordon has not alleged facts that would show that any modification agreement "was ever prepared," nor that Chase represented that it had " *already* been prepared." *Breezevale,* 82 S.W.3d at 438–39 (declining to find promissory estoppel in a case subject to the statute of frauds where the defendant's representative informed the plaintiff that he planned to "memorialize" a working agreement into a written agreement.); *see also Morris v. LTV Corp.,* 725 F.2d 1024, 1029 (5th Cir.1984). *Cf. Wigod,* 673 F.3d at 558 (finding breach of contract where a bank executed an agreement expressly providing that if the borrower complied with certain terms, the bank would "provide [the borrower] with a [permanent] Loan Modification Agreement."). [FN4]

> FN4. Gordon argues that regardless of whether promissory estoppel applies in this case, "equity and fairness" dictate that Chase should be held to its promise to modify the loan. But Gordon does not assert any equitable theory of relief other than promissory estoppel under which Chase's oral representations would be enforceable.

**\*\*5** Gordon requests, in the alternative, that she be allowed to replead any insufficiently alleged claims before the district court. Chase argued in its motion to dismiss that the Agreement's waiver provision released it from all of Gordon's claims in this case. Gordon did not address the waiver provision in her response to Chase's motion. The district court found that the waiver provision barred all of Gordon's claims and, therefore, that amendment of the complaint would have been "futile."

We review a district court's denial of leave to amend a complaint for abuse of discretion. *Dussouy v. Gulf Coast Inv. Corp.,* 660 F.2d 594, 597 (5th Cir.1981). The parties do not discuss the Agreement's waiver provision on appeal, and we **\*366** therefore do not rely on it. However, we do not find that the district court abused its discretion in denying leave to amend based on the application of a waiver provision, when Gordon did not challenge the validity or effect of the provision.

Because the loan agreement and forbearance agreement between the parties are governed by the statute of frauds, and because Gordon has not alleged that Chase signed or promised to sign a subsequent agreement, we agree with the district court that Gordon has not made out a claim of breach of contract or promissory estoppel under Texas law.

**CONCLUSION**
For the foregoing reasons, we AFFIRM the district court's grant of the Defendant's motion to dismiss Gordon's claims.

C.A.5 (Tex.),2013.
Gordon v. JPMorgan Chase Bank, N.A.
505 Fed.Appx. 361, 2013 WL 49587 (C.A.5 (Tex.))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 3

Westlaw.

--- F.3d ----, 2013 WL 4233103 (C.A.5 (Tex.))
**(Cite as: 2013 WL 4233103 (C.A.5 (Tex.)))**

Only the Westlaw citation is currently available.

United States Court of Appeals,
Fifth Circuit.
John HALL and Brenda Hall, on behalf of themselves and all others similarly situated,
Plaintiffs–Appellants
v.
VARIABLE ANNUITY LIFE INSURANCE COMPANY; Variable Annuity Marketing Company; Variable Annuity Life Insurance CompanySeparate Account A; Valic Financial Advisors Incorporated; John A. Graf; Robert A. Devlin; Kent E. Barrett; Bruce R. Abrams; M. Kathleen Adamson; Mary L. Cavanaugh; Carl J. Santillo; Robert P. Condon; Rebecca G. Campbell; Unknown Parties, named as Does 1–100 inclusive, Defendants–Appellees.

No. 12–20440.
Aug. 15, 2013.

**Background:** Members of certified class of securities fraud plaintiffs whose certification order was vacated subsequently filed similar action against life insurer. The United States District Court for the Southern District of Texas dismissed action as barred by the statute of repose. Plaintiffs appealed.

**Holding:** The Court of Appeals, W. Eugene Davis, Circuit Judge, held that *American Pipe* tolling, which freezes the clock for putative class members once class action suit is filed, ceased when certification order was vacated.

Affirmed.

West Headnotes

**[1] Limitation of Actions 241 ☞126.5**

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(H) Commencement of Proceeding; Relation Back

241k126.5 k. Class Actions, Matters Peculiar To. Most Cited Cases
*American Pipe* tolling of running of statute of repose, which freezes the clock for putative class members once class action suit is filed, ceased for securities fraud class action suite when certification order was vacated, and statute of repose resumed running. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[2] Limitation of Actions 241 ☞1**

241 Limitation of Actions
    241I Statutes of Limitation
        241I(A) Nature, Validity, and Construction in General

241k1 k. Nature of Statutory Limitation. Most Cited Cases

**Limitation of Actions 241 ☞165**

241 Limitation of Actions
    241IV Operation and Effect of Bar by Limitation

241k165 k. Operation as to Rights or Remedies in General. Most Cited Cases
Statutes of limitations speak to matters of remedy, whereas statutes of repose eliminate the underlying rights when they lapse.

**[3] Federal Civil Procedure 170A ☞175**

170A Federal Civil Procedure
    170AII Parties
        170AII(D) Class Actions
            170AII(D)2 Proceedings
                170Ak175 k. Time for Proceeding and Determination. Most Cited Cases
Class action lawsuits, like any other lawsuit, are subject to statutes of limitation and repose that limit the time within which a suit must be brought. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[4] Limitation of Actions 241 ☞126.5**

241 Limitation of Actions

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

--- F.3d ----, 2013 WL 4233103 (C.A.5 (Tex.))
**(Cite as: 2013 WL 4233103 (C.A.5 (Tex.)))**

241II Computation of Period of Limitation
241II(H) Commencement of Proceeding; Relation Back
241k126.5 k. Class Actions, Matters Peculiar To. Most Cited Cases
The filing of a class action tolls the running of a statute of limitations for all asserted members of the class. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[5] Limitation of Actions 241 ☜126.5**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(H) Commencement of Proceeding; Relation Back
241k126.5 k. Class Actions, Matters Peculiar To. Most Cited Cases
The statute of limitations for putative class members resumes running when class certification is denied or when a certified class is decertified; accordingly, the unsuccessful appeal of either a decertification or a denial of certification does not extend the tolling period. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

**[6] Limitation of Actions 241 ☜126.5**

241 Limitation of Actions
241II Computation of Period of Limitation
241II(H) Commencement of Proceeding; Relation Back
241k126.5 k. Class Actions, Matters Peculiar To. Most Cited Cases
If a denial of certification is reversed on appeal, the putative class members can claim the benefit of uninterrupted tolling from the original class action filing date. Fed.Rules Civ.Proc.Rule 23, 28 U.S.C.A.

Robert B. Carey, Esq., Attorney, Leonard Wayne Aragon, Esq., Attorney, Hagens Berman Sobol Shapiro, L.L.P., Phoenix, AZ, Austin P. Tighe, Jr., Feazell & Tighe, L.L.P. Austin, TX, for Plaintiffs–Appellants.

Daniel McNeel Lane, Jr., Esq., Akin Gump Strauss

Hauer & Feld, L.L.P., San Antonio, TX, Ashley Brooke Vinson, Akin Gump Strauss Hauer & Feld, L.L.P., San Francisco, CA, for Defendants–Appellees.

Appeal from the United States District Court for the Southern District of Texas.

Before STEWART, Chief Judge, and DAVIS and WIENER, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:
*1 Plaintiffs–Appellants John and Brenda Hall ("the Halls") were members of a certified class of securities fraud plaintiffs whose certification order was vacated in 2004. When the Halls attempted to re-file their class action in 2009, the district court dismissed it as barred by the statute of repose. Because the statute of repose ceased to be tolled when the class certification order was vacated, we AFFIRM.

I.

The facts relevant to the instant case begin with an identical lawsuit brought against the Variable Annuity Life Insurance Company ("VALIC") by another set of plaintiffs. In April 2001, James Drnek and Maureen Tiernan filed a class action complaint ("the *Drnek* action") against VALIC alleging that VALIC had committed securities fraud by misrepresenting the prospective tax benefits of its annuities. In January 2004, the *Drnek* court certified a nationwide class of purchasers of VALIC deferred annuities. The plaintiffs in the instant case, the Halls, had purchased a VALIC deferred variable annuity in 2000 and were members of the *Drnek* class.

Following class certification, class counsel allowed the district court's expert and fact witness disclosure deadline to expire without identifying any expert witnesses or producing any expert reports. When class counsel finally filed an expert and fact witness list nearly six months after the disclosure deadline, VALIC immediately moved to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 4233103 (C.A.5 (Tex.))
**(Cite as: 2013 WL 4233103 (C.A.5 (Tex.)))**

strike the plaintiffs' witness list and exclude the witnesses' testimony. The district court agreed that class counsel's lapse was inexcusable and granted the motion on August 17, 2004. Without any expert or witness testimony, the court reasoned, the *Drnek* plaintiffs would not be able to prove a class-wide measure of damages, so the district court vacated its prior order granting class certification.[FN1] The *Drnek* class representatives appealed the district court's decision to exclude their witnesses, which the Ninth Circuit affirmed.[FN2]

On December 21, 2009, the Halls filed the instant class action against VALIC in the Southern District of Texas reciting the same claims previously outlined in the *Drnek* action.[FN3] VALIC promptly moved to dismiss the Hall complaint, arguing that the five-year statute of repose applicable to securities fraud actions had expired before the Halls filed their complaint. Although the parties agreed that the filing of the *Drnek* class action "tolled," or temporarily suspended, the running of the statute of repose against putative class members, they disagreed about whether the *Drnek* court's vacatur of class certification caused the tolling to cease. Agreeing with VALIC, the district court found that the statute of repose resumed running against putative members of the *Drnek* class when the *Drnek* court vacated its certification order. Because the Halls filed their class action more than five years after the *Drnek* court vacated its certification order, the district court concluded that the Halls' claim had been extinguished. The district court then entered an order dismissing the action, and the Halls now appeal.

II.

**\*2** "We review a district court's grant of a motion to dismiss de novo." *Bowlby v. City of Aberdeen, Miss.,* 681 F.3d 215, 219 (5th Cir.2012).

III.

[1] On appeal, the Halls first contend that the district court erred in its conclusion that their claim has been extinguished by the applicable statute of repose.[FN4] Specifically, the Halls contend that the

*Drnek* court's order vacating class certification did not cause the tolling of the statute of repose to cease. Arguing that the statute of repose on their claim remained tolled following the vacatur of class certification, the Halls maintain that their claim never expired.[FN5]

[2][3][4] Class action lawsuits, like any other lawsuit, are subject to statutes of limitation and repose that limit the time within which a suit must be brought.[FN6] However, the class action mechanism would not succeed in its goal of reducing repetitious and unnecessary filings if members of a putative class were required to file individual suits to prevent their claims from expiring if certification of the class is denied. As a result, the Supreme Court in *American Pipe & Construction Co. v. Utah* created a special rule to "freeze the clock" for putative class members once a class action lawsuit was filed. 414 U.S. 538, 550–52, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). Now called " *American Pipe* tolling," later decisions of the Supreme Court have distilled a brightline rule: The filing of a class action tolls the running of a statute of limitations for " 'all asserted members of the class.' " *See Crown, Cork & Seal Co., Inc. v. Parker,* 462 U.S. 345, 350, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983) (quoting *American Pipe,* 414 U.S. at 554, 94 S.Ct. 756).

[5][6] However, this tolling does not continue indefinitely. Under *American Pipe,* the statute of limitations for the putative class members resumes running when class certification is denied or when a certified class is decertified. *See id.* at 354, 103 S.Ct. 2392.[FN7] Once the district court denies certification or decertifies a class, "the putative class members ha[ve] no reason to assume that their rights [a]re being protected." *Taylor v. United Parcel Serv., Inc.,* 554 F.3d 510, 520 (5th Cir.2008). Although the denial of class certification or the decertification of the class might potentially be reversed on appeal, such a ruling nonetheless serves as notice to the once-putative class members that they are "no longer parties to the suit and ... [a]re obliged to file individual suits or intervene." *See id.*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 4233103 (C.A.5 (Tex.))
**(Cite as: 2013 WL 4233103 (C.A.5 (Tex.)))**

FN8   Accordingly, the unsuccessful appeal of either a decertification or a denial of certification does not extend the tolling period. *See id.* at 519.

In the instant case, the district court found that the *Drnek* court's vacatur of certification was the functional equivalent of a denial of certification. As the district court pointed out, "While the *Drnek* court used the label 'vacated,' the court also made it clear that the case would not proceed as a class action." Because the *Drnek* court's vacatur order "un-certified" the class and left no room for the action to proceed as a class, it had effectively denied certification.

**\*3** The Halls assert that the district court erred by determining that a vacatur of certification is equivalent to a denial of certification. As the Halls emphasize, the requirements for certifying a class action are set forth in Federal Rule of Civil Procedure 23(a-b). But in this case, the Halls argue, the *Drnek* court vacated certification not because the class failed to meet the Rule 23 requirements, but to prevent the class members from being handicapped by the witness exclusion caused by class counsel. Because the court vacated certification without finding that the class should not be certified, the Halls contend that the court never addressed certification. As a result, the Halls argue, the *Drnek* class's original motion for certification was effectively reinstated and remained pending, entitling the putative class members to *American Pipe* tolling.

While the Halls' argument does have some theoretical appeal, it is ultimately unpersuasive for several reasons. First, although the Halls are correct that the vacatur of a certification order has the effect of nullifying that order, it is not necessarily true that a vacatur completely reinstates the parties' pre-existing procedural and temporal statuses. As many of our own supervisory instructions recognize, the vacatur of a judgment and the reinstatement of a pre-existing judgment are conceptually distinct actions. FN9   Moreover, the instant case illustrates the unfairness of finding that a vacatur of class certification implicitly reactivates a pending

motion for certification. Here, the *Drnek* plaintiffs' years-old motion for certification would silently perpetuate tolling for putative class members, leaving VALIC indefinitely exposed to the stale claim of an uncertified class.

Second, the Halls have offered us no real reason to distinguish between a decertification order and a vacatur of certification. Although the Halls insist that the vacatur of certification is different from *de* certification because vacatur does not involve a consideration of Rule 23's requirements, the Halls ignore the fact that the basis of the *Drnek* court's vacatur was fundamentally a Rule 23 class certification issue. The record verifies that the *Drnek* court vacated its class certification order because the plaintiffs could not "prove a class-wide measure of damages," a classic issue of common question predominance under Rule 23(b)(3). FN10 Though a district court normally *decertifies* a class—and re-initiates the running of the statute of limitations or repose—when it determines common questions do not predominate, the Halls ask that we give different treatment to a *vacatur of certification* on the same grounds. Because the vacatur of certification in this context is the functional equivalent of a decertification, the actions should have equivalent tolling consequences under *American Pipe.* FN11

Recognizing that a vacatur of class certification causes tolling to cease is also most consistent with our reasoning in similar cases. In *Taylor v. UPS*, we considered how long the statute of limitations remained tolled for an employment discrimination plaintiff who had been a member of a certified class of similarly situated plaintiffs. 554 F.3d at 513. Although the class's claims were dismissed on the merits in 2000, the dismissal was not affirmed on appeal until 2004. *Id.* After delving into *American Pipe*, its Supreme Court progeny, and finally its Fifth Circuit progeny, we found that "it is clear from the[ ] cases that if the district court denies class certification under Rule 23, tolling of the statute of limitations ends." *Id.* at 519. We reasoned,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

--- F.3d ----, 2013 WL 4233103 (C.A.5 (Tex.))
**(Cite as: 2013 WL 4233103 (C.A.5 (Tex.)))**

*4 In those cases, the district court's refusal to certify the class was tantamount to a declaration that only the named plaintiffs were parties to the suit. Thus, those cases logically concluded that after the district court's denial of certification, the putative class members had no reason to assume that their rights were being protected. Stated differently, they were notified that they were no longer parties to the suit and they should have realized that they were obliged to file individual suits or intervene in the class action.

*Id.* at 520.

When a class is certified, however...., unless the district court later decertifies the class for failure to satisfy the Rule 23 factors, members of the certified class may continue to rely on the class representative to protect their interests throughout the entire prosecution of the suit, including appeal. A contrary rule would require certified class members to immediately intervene or file individual suits in the event of a merits dismissal of the class action in the district court. Such a rule would not work to prevent "needless multiplicity of actions," and would ignore the intended benefit of certification—efficient representation of a class of claimants.

*Id.* at 520–21 (quoting *Crown, Cork & Seal,* 462 U.S. at 351, 103 S.Ct. 2392). Because the *Taylor* plaintiff was still a member of a certified class even after a merits dismissal, we determined that he retained the right to rely on the class representatives to protect his interest—and *American Pipe* tolling—until 2004 when the dismissal was finally affirmed. *Id.* at 521. Such a conclusion honors both Rule 23's purpose as a vehicle of efficient group representation and limitation statutes' role in providing timely notice of adverse claims and preventing harmful delay. *See id.; Crown, Cork & Seal,* 462 U.S. at 352, 103 S.Ct. 2392.

The principles enunciated in *Taylor* weigh in favor of finding that *American Pipe* tolling ceases when a certification order is vacated. In the words of the *Taylor* court, the *Drnek* court's decision to vacate certification was "tantamount to a declaration that only the named plaintiffs were parties to the suit." 554 F.3d at 520. Through this lens, a vacatur of certification is no different than a decertification or a denial of certification. Plaintiffs whose class certification has been vacated simply have no reason to think that the ex-class representative will continue to protect their interests. While a putative class representative might later succeed in overturning the vacatur of certification, we have consistently deemed reliance upon the possibility of reversal as irrelevant for purposes of tolling.[FN12]

As evidenced by the instant case, a contrary rule would allow non-class members to sit on their rights indefinitely while awaiting full appellate review of a decision that does not legally apply to them. In contrast, the resumption of a statute of repose after a vacatur of certification puts the onus of filing individual claims only on those putative class members who have officially *lost their status as a class.* Accordingly, we hold that the *Drnek* court's vacatur of certification caused *American Pipe* tolling to cease and the statute of repose to resume running. Because the Halls brought this action after the statute of repose expired, their claim has been extinguished.[FN13]

IV.

*5 For the reasons stated above, the judgment of the district court is AFFIRMED.

> FN1. *See Drnek* District Court's August 17, 2004 Order granting summary judgment in part and vacating order granting class certification.

> FN2. *Drnek v. Variable Annuity Life Ins. Co.,* 261 Fed.Appx. 50 (9th Cir.2007) (affirming district court's exclusion of class plaintiffs' proposed witnesses).

> FN3. To be clear, the Halls actually filed their suit in the District of Arizona, but VALIC transferred venue to the Southern District of Texas.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 6

--- F.3d ----, 2013 WL 4233103 (C.A.5 (Tex.))
**(Cite as: 2013 WL 4233103 (C.A.5 (Tex.)))**

FN4. Because the Halls have asserted securities fraud claims under Sections 10(b) and 20(a) of the Securities Exchange Act and Securities and Exchange Commission Rule 10b–5, the applicable limitations and repose statute is 28 U.S.C. § 1658(b): "[A] private right of action that involves a claim of fraud ... may be brought not later than the earlier of—(1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation."

FN5. While § 1658(b)'s 2–year deadline is a statute of limitation, its 5–year deadline is a statute of *repose* that completely "eliminate[s] the underlying right[ ] when [it] lapse[s]." *See Margolies v. Deason,* 464 F.3d 547, 551 (5th Cir.2006). As a result, there is some debate about whether § 1658(b)'s statute of repose can be extended by tolling. *Compare Joseph v. Wiles,* 223 F.3d 1155, 1167–68 (10th Cir.2000) (finding Securities Exchange Act statute of repose subject to legal tolling in class action context), *with Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.,* 721 F.3d 95,—— (2d Cir.2013) (finding Securities Exchange Act statute of repose not subject to tolling). Because the parties have not briefed this issue, we decide the case on other grounds.

FN6. "Statutes of limitations speak to matters of remedy, whereas statutes of repose eliminate the underlying rights when they lapse." *Margolies,* 464 F.3d at 551.

FN7. Decertification under Rule 23(c)(1)(C) is ordinarily accomplished by an order modifying the original grant of certification and changing it to a denial of certification, and denials of certification cause *American Pipe* tolling to cease. *See Crown, Cork, & Seal,* 462 U.S. at 354, 103 S.Ct. 2392; *see also Birmingham Steel Corp. v. Tenn. Valley Auth.,* 353 F.3d

1331, 1343 n. 12 (11th Cir.2003) ("[T]he statute of limitations, tolled during the class action, has begun running upon the decertification of the class."); *Culver v. City of Milwaukee,* 277 F.3d 908, 914–15 (7th Cir.2002) (reaching same conclusion).

FN8. If a denial of certification is *reversed* on appeal, the putative class members can claim the benefit of uninterrupted tolling from the original class action filing date. *See Deposit Guar. Nat'l Bank, Jackson, Miss. v. Roper,* 445 U.S. 326, 330 n. 3, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980) ("Reversal of the District Court's denial of certification by the Court of Appeals may relate back to the time of the original motion for certification for the purposes of tolling the statute of limitations on the claims of the class members."); *see also Calderon v. Presidio Valley Farmers Ass'n,* 863 F.2d 384, 390 (5th Cir.1989).

FN9. *See, e.g., United States v. Ross,* 557 F.3d 237, 243 (5th Cir.2009) (vacating district court's judgment modifying sentence and remanding with instructions to reinstate the original sentence); *United States v. Kirkpatrick,* 184 Fed.Appx. 421, 424 (5th Cir.2006) (finding that in reversing a district court's second judgment where its first judgment was also defective, the court should "VACATE it, not 'reinstate' it, and REMAND.").

FN10. *See, e.g., In re Wilborn,* 609 F.3d 748, 755 (5th Cir.2010).

FN11. The Halls have also asserted that the *Drnek* court's action in vacating certification involved a consideration of a merits issue (weighing of evidence relevant to damages) and was therefore a dismissal on the merits. If this were the case, *American Pipe* tolling would have continued until the dismissal was affirmed on appeal. *See*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

--- F.3d ----, 2013 WL 4233103 (C.A.5 (Tex.))

**(Cite as: 2013 WL 4233103 (C.A.5 (Tex.)))**

*Taylor,* 554 F.3d at 519–20. However, the Supreme Court squarely foreclosed this argument in *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, 131 S.Ct. 2541, 2551–52, 180 L.Ed.2d 374 (2011), where the Court reiterated that the district court's "rigorous analysis" under Rule 23 inevitably "will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped."

FN12. *See Taylor,* 554 F.3d at 519 ("[T]he denial of certification ends the tolling period without regard to any appeal from that decision.").

FN13. Because the Halls' claim is extinguished, we need not decide whether putative class members can rely upon *American Pipe* tolling to toll the statute of limitations during a first class action so as to make a successive class action possible.

C.A.5 (Tex.),2013.
Hall v. Variable Annuity Life Ins. Co.
--- F.3d ----, 2013 WL 4233103 (C.A.5 (Tex.))

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

KURIAN DAVID, ET AL.                    CIVIL ACTION


VERSUS                                  NO: 08-1220


SIGNAL INTERNATIONAL, LLC,              SECTION: "A" (3)
ET AL.


## ORDER AND REASONS

The following motions are before the Court: **Motion to Certify Class (Rec. Doc. 165)** and **Supplemental Motion to Certify Class (Rec. Doc. 994)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012)** filed by defendant Signal International, LLC;[1] **Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1082)** filed by defendant Signal International, LLC.

All motions are opposed.[2]

_____

[1] Defendants Malvern C. Burnett, Gulf Coast Immigration Law Center, LLC, and the Law Offices of Malvern C. Burnett, A.P.C., Sachin Dewan, and Dewan Consultants, Pvt. Ltd. have formally moved to join in the Motion to Strike-1012. (Rec. Docs. 1039 & 1053).

[2] Defendants J & M Associates Inc. of Mississippi, J & M Marine & Industrial, LLC, and Billy Wilks adopt Signal's and the Burnett Defendants' arguments in opposition to class

1

The Motion to Strike-1012 was taken under submission on March 16, 2011, and the Motion for Leave was taken under submission on March 23, 2011, but the Court elected to take up those motions in conjunction with the issue of class certification. The motion(s) for class certification were taken under submission on April 29, 2011 (Rec. Doc. 1076), upon receipt of the parties' rebuttal submissions.[3] The Motion to Strike-1082 was taken under submission on June 22, 2011.

For the reasons that follow, the Motions to Certify are DENIED, the Motion to Strike-1012 is DENIED, the Motion for Leave to File a Third Amended Complaint is DENIED AS MOOT, and the Motion to Strike-1082 is DENIED.

## I.   **INTRODUCTION**

Plaintiffs are seven (7) citizens of India who secured H-2B guest-worker visas to work in the United States for defendant

_____

certification. (Rec. Doc. 992). Defendant Kurella Rao has indicated that he will be a "passive" defendant. (Rec. Doc. 897).

[3] In this case, all parties consented to waive a live evidentiary hearing and to submit the issue of certification to the Court on the briefs. (Rec. Docs. 907 & 926). Rule 23 does not itself require an evidentiary hearing on the question of class certification. Merrill v. So. Methodist Univ., 806 F.2d 600, 608 (5th Cir. 1986). However, any factual uncertainties trigger the necessity for a hearing. Id. at 609.

Signal has requested oral argument on its Motion to Strike-1012 and Plaintiffs have requested oral argument on their Motion for Leave to File a Third Amended Complaint. The Court finds that the parties' memoranda more than adequately expound upon the issues presented and that oral argument would not be helpful to the Court.

Signal International, LLC.  These seven plaintiffs, Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, Hemant Khuttan, Padaveettiyil Issac Andrews, and Kechuru Dhananjaya, seek to represent a putative class of approximately 500 ship and rig workers to pursue federal class claims against the defendants under the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1589 (forced labor) & § 1590 (trafficking); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)-(d); the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985.[4]

Defendants are immigration attorney Malvern C. Burnett and his business Gulf Coast Immigration Law Center, LLC and Law Offices of Malvern C. Burnett, A.P.C. (collectively "Burnett"); labor recruiter/broker Michael Pol and his company Global Resources, Inc. (collectively "Pol"); labor broker Billy Wilks and the two companies through which he operated, J & M Associates Inc. of Mississippi and J & M Marine & Industrial, LLC; Kurella Rao and his company Indo-Ameri Soft, LLC ("IAS"); Indian labor recruiter Sachin Dewan and his company Dewan Consultants Pvt., Ltd. (collectively "Dewan"); and American employer Signal

---

[4] Plaintiffs also assert claims for fraud, negligent misrepresentation, and breach of contract.  Plaintiffs are not seeking certification to pursue these claims as a class so those claims are not before the Court at this time.

International, LLC.[5]

Plaintiffs' claims are numerous and at times complex but the gist of their claims is that Defendants engaged in a fraudulent scheme built around the fictitious promise of employment-based green cards to obtain permanent residence in the United States.[6] Plaintiffs assert that they relied on this core false promise, as well as other misrepresentations by Defendants, when deciding to pay exorbitant labor recruiting fees to travel to the United States to work at Signal's marine fabrication facilities in Mississippi and Texas.  Once there, Plaintiffs allege that they were subjected to segregated housing, severe discrimination, and adverse working and living conditions--that given their debts--reasonable persons in their position would have felt compelled to endure.  Plaintiffs contend that the scheme yielded Dewan, Pol, and Burnett millions of dollars in fees, and procured for Signal a compliant and expendable labor pool that saved the company millions of dollars in wages that it would otherwise have had to pay to contract laborers and American direct hires.

Plaintiffs seek to have a class certified pursuant to Federal Rule of Civil Procedure 23(b)(3) consisting of

_____

[5] Defendants Pol and Rao and their associated companies are not represented by counsel at this time.

[6] The term "green card" is used colloquially for an alien registration receipt card, which denotes legal permanent resident status in the United States.  See Ascencio-Guzman v. Chertoff, No. B-94-215, 2009 WL 1064962, at *4 (S.D. Tex. Apr. 15, 2009).

> All Indian guest-workers who were recruited by one or more Defendants and who traveled and/or were transported to the United States at any time through September 30, 2007, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(B) ("H-2B") visas assigned to Defendant Signal International.

Plaintiffs contend that the core facts of the case as well as Defendants' main defenses are equally applicable to the claims of all class members, and that the "pernicious scheme" underlying this case had no individualized dimensions. According to Plaintiffs, they satisfy Rule 23's legal requirements for certification and equity militates in favor of Defendants having to answer for their conduct in the same fashion that they treated Plaintiffs in their prior dealings with them: As a nameless and faceless class of fungible migrant workers who could be misled and exploited without regard to individual rights or interests.

## II. <u>BACKGROUND</u>

The factual background for this case separates well into two phases. The Phase 1 events began in 2004 and did not involve defendant Signal or the H-2B visa process. But the Phase 1 events, and the pre-existing relationships between the various other defendants, laid the ground work for much of the Phase 2 events. The Phase 2 events began in 2006 when Signal's domestic labor pool was adversely affected by Hurricanes Katrina and Rita. It was in the aftermath of the hurricanes that Signal sought to supplement its labor pool with foreign workers via the H-2B visa process. Thus, many of the plaintiffs in this case were

5

originally recruited for employers other than Signal, although all of the plaintiffs eventually came to the United States to work for Signal under the auspices of the H-2B guest-worker program.[7]

### A.   Factual Background--Phase 1

At all material times, defendant Global was a Mississippi corporation engaged in the business of recruiting foreign workers for employment in the United States.  Defendant Michael Pol was Global's president.  Pol had an existing business relationship with defendant Billy R. Wilks, defendant J & M's corporate principal.  (Pla. Exhs. 520(Pol); 521(Pol)).  J & M is in the business of recruiting laborers to then subcontract them out to other companies for a profit.  Together Pol and Wilks were supplying labor to a shipyard client in California.

Pol also had a prior business relationship with defendant Sachin Dewan.  Dewan is a businessman and he resides in India.  As far back as 1996, Pol and Dewan had worked together, along with defendant Malvern Burnett, to bring Indian H-2B welders and pipe fitters into the United States for Avondale Shipyards.  (Signal Exh. C).

_____

[7] At least 38 putative class members were denied employment at Signal even though they paid the recruiting fees and came to the United States.  (Rec. Doc. 994-1, at 4).  Plaintiffs' claim under 42 U.S.C. § 1981 for discriminatory conditions at Signal does not apply to these 38 plaintiffs.  Plaintiffs suggest that a sub-class as to these plaintiffs might be appropriate.

According to Pol, Dewan contacted him in early 2004 to see if Pol was interested in placing foreign workers with his customers.[8] Pol then presented Billy Wilks with a plan to recruit foreign workers through the green card program that he and Dewan had discussed. Global and J & M executed a contract whereby Global would find qualified foreign workers to be acquired for employment with J & M under the I-140 "permanent resident" process. (Pla. Exh. 522(Pol)). Under the agreement Global was to provide the services of an immigration attorney to facilitate bringing workers into the country legally--that attorney was Malvern Burnett. Wilks sent Pol a demand letter for 300 workers. (Pla. Exh. 520(Pol)).

To facilitate the J & M/Global deal, in March 2004, Global, Sachin Dewan (for Dewan Consultants), and Malvern C. Burnett (for Gulf Coast Immigration Law Center, Inc.) executed a contract, the Multi-Lateral Business Agreement, pursuant to which Dewan would recruit suitable foreign workers, Burnett would handle the immigration legal work, and Global would provide suitable employment in the United States. (Pla. Exh. 455). Each applicant-employee was to be charged a fee of roughly $10,000-$12,000 USD. The Multilateral Agreement states that the workers would be coming to the United States under the "'permanent residence' process for migration." Id.

---

[8] Dewan asserts that it was Pol who contacted him.

In early 2004 defendant Kurella Rao (for IAS) also entered the picture.  Rao and his company IAS had been in the business of recruiting foreign information technology personnel since 1997 and Rao wanted to branch out into shipyard workers.  Rao and Dewan executed a contract, the Bilateral Business Agreement, to memorialize their business arrangement.[9]  (Pla. Exh. 756).  Dewan was to recruit the foreign workers and Rao (via his company IAS) was to sponsor them for employment in the United States.

Burnett acted as immigration counsel for the J & M and IAS recruits.  But the workers recruited by IAS had no direct contact with Burnett.  Rather, Rao retained Burnett for legal services in connection with IAS's recruitment of workers and IAS made payments to Burnett for legal services provided.

Thus, as of 2004 Dewan was recruiting foreign workers on behalf of Global, for the ultimate benefit of J & M and its clients, and for IAS.  Dewan recruited 232 workers for the benefit of J & M.  Dewan recruited around 130 workers for the benefit of IAS.  According to Dewan, he used the same recruitment process for the Global/J & M and IAS contracts.  (Dewan depo at 216).  Dewan was the lead recruiter but Pol, Burnett, and Rao each participated in some recruiting seminars overseas in order to assist Dewan with the process.  It is undisputed that all of

---

[9] Plaintiffs' Exhibit 746 is an unsigned copy of the agreement.

8

the recruitment and placement was done with permanent residence in the United States as part of the program and the workers were told that this would take about two years.  At this stage, H-2B visas were not part of the arrangement.[10]

As of February 2006 none of the green card promises to the J & M and IAS recruits had come to fruition.[11]  The workers had paid

_____

[10] At this point it bears noting that an H-2B guest-worker visa is fundamentally different than an employment-based green card.  H-2B visas are *temporary, non-immigrant* visas.  Under the H-2B program, a worker may come to the United States *temporarily* to work for an employer who has petitioned for the right to employ H-2B guest-workers and whose petition has been approved by the Department of Labor.  Castellanos-Contreras v. Decatur Hotels, LLC, 622 F.3d 393, 405 n.2 (5th Cir. 2010) (en banc) (Dennis, J., dissenting) (quoting 8 C.F.R. § 214.2(h)(1)(i)).  Once admitted, the guest-worker's legal status is tied to performing labor for the specific employer who petitioned for the visa.  Id. (citing § 214.2).  If at any point the H-2B visa expires or the worker is dismissed from his job, then he is required to immediately leave the country.  Id. (citing § 214.2(h)(6)(vi)(E), (h)(17)(iii)(C)). Under no circumstances can the worker remain in the country longer than three years.  Id. (citing § 214.2(h)(15)(ii)(C)).
An employment-based green card, on the other hand, is given to someone who has obtained an immigrant visa to enter the United States on a permanent basis and to reside here indefinitely. Green card holders are permanent resident aliens and they have nearly all of the rights of a citizen.  Generally speaking, a permanent resident alien can live and work in the United States without restriction.
Thus, as a practical matter, H-2B employees cannot simultaneously be sponsored for an H-2B visa and a green card, given the fundamental difference in the temporal aspects of the two types of visas.

[11] According to Burnett, in 2003-2004 the process of obtaining labor certifications was extremely long--in some cases in excess of three years.  (Burnett memo at 6).  It was anticipated that the Department of Labor was going to institute a streamlined process for granting labor certifications or PERMs. Burnett contends that he delayed the filing of any PERMs to take

9

significant fees up front and were naturally becoming frustrated with the process and irate with the lack of progress toward their legal, permanent immigration to the United States.  By this point some of the workers had been waiting for over two years to come to the United States with green cards.  Some workers even demanded refunds, which none of the recruiter/broker defendants were interested in providing.[12]

Those Plaintiffs who were originally recruited during the

--------

advantage of the new system, which itself was delayed for nearly a year.

The employment based green card process is a three step process.  The first step requires that an ETA 9089 ("PERM") be filed with the Department of Labor and certified. The second step requires the filing of an I-140 with the United States Citizenship and Immigration Services.

The third step depends on a "window of opportunity" opening and this can take a matter of months or even years depending on the allocation of immigrant visas by the State Department.  The third step differs depending on whether the beneficiary of the PERM and the I-140 is in the United States or a foreign country when a green card becomes available for him in the quota.  If the beneficiary is in a foreign country then he processes through the consulate and receives his green card.  If the beneficiary is already lawfully in the United States then he files an I-485 for adjustment of status.  Once the I-485 is approved then the applicant receives permanent resident status in the United States.  (Signal memo at 3 n.8; Burnett memo at 9).

[12] As of the end of 2006 IAS was no longer a functional company and Burnett had filed no I-140 petitions on behalf of the IAS recruits.  The filing of an I-140 petition with the United States Citizenship and Immigration Services is the second step of three for obtaining a green card.  Rao knew by January 2006 that IAS was no longer financially viable and that no green cards would be processed for his recruits.  (Signal Exhs. K, L).  He nonetheless continued to accept installment payments from the recruits.  (Id.).

Phase 1 events are referred to as "Group I Plaintiffs."  Second
Amended Complaint ("SAC") (Rec. Doc. 944).  Named plaintiffs
Issac Andrews Padaveettiyil and Kechuru Dhananjaya are in this
group.  (Id. at 5).

### 1. Issac Andrews Padaveettiyil

Padaveettiyil was working in Dubai in 2004 when he was
recruited for employment with J & M.  According to Padaveettiyil,
Dewan advertised in the paper in Dubai for jobs in America and
permanent residence in this country.  Padaveettiyil recalls
attending an information seminar in Dubai with Dewan, Burnett,
and Pol present.  Padaveettiyil sold his land to finance his way
in the program and he asserts that he was promised a permanent
job and permanent residency in the United States.  Padaveettiyil
claims that in 2006, still with no green card, Dewan told him
that he would be going to the United States on an H-2B visa to
work for Signal, to forget about the current green card
processing, and that Signal would file for a green card on his
behalf.  According to Padaveettiyil, he had no choice but to go
because he had already paid his money.  After arriving in the
United States in 2007 Padaveettiyil worked at Signal's
Pascagoula, Mississippi facility.

### 2. Kechuru Dhananjaya

Dhananjaya was recruited as part of the IAS employment
program.  In December 2003, Dhananjaya was working in Dubai when

he saw one of Dewan's advertisements in the newspaper. Dhananjaya went to the office listed in the advertisement and spoke to Dewan about the recruiting program.  Dewan told Dhananjaya about an upcoming meeting where Dhananjaya could learn more about the program and pay his first installment for green card processing if he was interested.  Defendants Rao, Burnett, and Dewan were present at the meeting.  Dhananjaya borrowed money from his brother and some of his friends to finance his way in the program.  Dhananjaya and IAS executed an Agreement for U.S. Permanent Residency/Green Card on January 18, 2004.  (Pla. Exh. 578).  In the following two years Rao sent Dhananjaya encouraging correspondence about the status of his green card.  (Signal Exhs. I, J).  Dhananjaya  had worked at Avondale Shipyards in 1997 under the H-2B guest-worker program.  (Signal Exh. D).  When Dhananjaya entered the IAS program he had never heard of a company called Signal.  After arriving in the United States in 2007 Dhananjaya worked at Signal's Orange, Texas facility.

Plaintiffs do not suggest that Signal was involved in recruiting the foreign workers during the 2004 time frame.  But by 2006 when the Indian recruits were becoming disgruntled with the green card program that Pol, Dewan, Burnett, and Rao had concocted, Signal was experiencing its own labor problems in the aftermath of Hurricanes Katrina and Rita.  Signal had a legitimate and immediate need for laborers like those that Pol,

Dewan, Burnett, and Rao had recruited beginning in 2004 and who were now clamoring for results on the promised green cards. Thus, Signal's labor shortage in 2006 and its willingness to employ foreign workers, which it viewed as a cheap source of labor, created a seemingly perfect opportunity for Pol, Dewan, Burnett, and Rao to temporarily mollify the original J & M/IAS green card recruits by offloading them to Signal. According to Dewan, some of the workers jumped at the opportunity to go to the United States sooner rather than later, even if that meant traveling on an H-2B visa to the detriment of the green card process. (Signal Exh. AA). But Plaintiffs contend that Dewan persuaded them to go to the United States on the H-2B visas and that they were told that Signal would take care of getting them their green cards once they arrived in the United States.

**B.    Factual Background--Phase 2--Enter Signal**

Signal is a marine and fabrication company with its home office in Pascagoula, Mississippi and an additional shipyard in Orange, Texas.   Signal is in the business of providing offshore drilling rig overhaul, repair, upgrade, and conversion.   Signal also offers services to the general marine and heavy fabrication markets.   In 2006-2007 Signal had a substantial amount of work after hurricanes Katrina and Rita because of damages to rigs in the Gulf of Mexico.   Hurricane-related housing shortages around Signal's shipyards had depleted its work force.

Sometime in the first quarter of 2006, Pol called Ron Schnoor (Sr. VP & General Mgr.) with Signal to talk to him about the possibility of Global providing Signal with foreign workers under the "permanent resident process." Schnoor called contacts with Avondale Shipyards to inquire about how the H-2B program had worked at that company. (Signal Exh. W). Bill Bingle (VP of Production) with Signal called Pol to set up a meeting. Bingle and Pol discussed bringing workers to the United States under the H-2B program for employment with Signal and Bingle eventually accompanied Pol to India on a recruiting trip. According to Pol, the plan was to get permanent residence visas for welders and fabricators to work at Signal's Pascagoula, Mississippi and Orange, Texas facilities. Using H-2B visas was an "afterthought" because Signal wanted the workers to arrive quickly, certainly more quickly than what green card processing could provide. Signal would not be required to pay any of the workers' fees and travel expenses--everything was to be paid by the workers themselves so Signal considered this to be a good deal.[13] Pol told Signal that the workers would be paying about $2,000 each to participate in the program, which was of course not accurate. Signal was adamant that it incur none of the costs of the

---

[13] Indian workers in particular were considered to be a cheap source of labor. (Pla. Exh. 517). Signal intended to use the Indian workers to displace subcontracted labor that was costing the company $100,000 to $200,000 per day.

program.

On April 18, 2006, Global and Signal executed a Skilled Worker Recruitment Agreement (Pla. Exh. 423) to establish the framework for their arrangement to bring foreign workers into the United States under the H-2B temporary program and/or the I-140 "permanent residence" process. (Id. at 1). The agreement clearly delineates the temporary nature of an H-2B visa versus the long-term nature of an I-140 permanent residence visa. The agreement also expressly notes that H-2B visas are not always issued in a timely manner but that "[i]n any case, the permanent resident (I-140) process will continue as agreed upon." (Id. at 3). With the Multi-Lateral Business Agreement between Pol, Burnett, and Dewan already in place, Pol contacted Dewan and Burnett about the Signal deal.

Signal executed a document appointing Dewan as its representative in India to facilitate the recruitment of skilled workers to the United States for employment under "the temporary and permanent resident program." (Pla. Exhs. 463 & 665). In that same document Signal granted Dewan a limited power of attorney to sign any legal document or letter which may be required to obtain permission from the government/immigration agencies in India for advertising, conducting seminars, and trade tests to further "our efforts." Id. On June 19, 2006, Signal sent Dewan a demand letter for 600 skilled workers for a 10-24

month period.  (Pla. Exh. 461).  Accommodations, transportation, and food were all to be paid via salary deduction and travel expenses to Pascagoula, Mississippi were to be paid by the individual worker.  Id.  The workers were to be skills tested in India prior to any employment offer and the salary range would be $14 to $18 USD per hour depending on experience and skill level. Id.

On August 3, 2006, Signal executed yet another power of attorney in favor of Dewan making him the company's agent and giving him full authority to act on behalf of Signal, whether filing documents with the U.S. immigration authorities or executing contracts, in the process of bringing migrant workers to the United States for employment at Signal.  (Pla. Exh. 512). Signal retained Burnett and his law firm to represent the company in legally bringing the workers into the United States.  (Pla. Exhs. 563 & 574).  The terms of the agreement between Signal and Burnett dictated that all of the legal fees were to be paid by the workers, with Signal owing Burnett nothing for legal fees.

Dewan went to work recruiting workers for Signal.  Dewan placed advertisements in newspapers throughout India and the United Arab Emirates in 2006 offering opportunities for welders and pipe fitters to immigrate to the United States under the auspices of Signal's guest-worker program.  (Pla. Exh. 460). Dewan and Pol held six recruitment seminars using a PowerPoint

presentation that Pol had prepared.  (Pla. Exh. 684).  Green cards were expressly touted as part of the program but a second set of advertisements only mentioned H-2B visas.  Nonetheless, Dewan asserts that he believed that Signal was going to request green cards for these workers too.  The average fee that each worker paid was about $10,000[14] (split between Dewan, Pol, and Burnett) which in some cases might exceed the worker's annual salary in his home country.[15]  Plaintiffs contend that Dewan, Pol, and Burnett used the Signal contract as a way to extract more money from the existing and eager J & M and IAS recruits and to generate fees from a whole new group of Signal recruits.  To be sure, maximizing profits from importing foreign workers into the

---

[14] Plaintiffs contend that Rao, J & M, Pol, Dewan, and Burnett eventually charged the recruits anywhere from $17,600 to $20,000 for an "expedited option" when the H-2B program with Signal came along.  Plaintiffs were charged more for H-2B visa processing after the first set of H-2B visas were approved by the consulate.

[15] The workers executed separate contracts with Global, Burnett, and Dewan, agreeing to pay each of them separately for their services in three installment payments.  Global was to be paid $3750, (Pla. Exhs. 327, 345, 354, 500), Burnett was to be paid $3750, (Pla. Exhs. 342, 350)and Dewan was to be paid Rs.33,500 (Pla. Exhs. 344, 351, 502, 505).  Plaintiffs' Exhibit 59 indicates that Global and Burnett were to be paid $5373 USD each.  Burnett was particularly adamant about receiving his fee. (Pla. Exhs. 468 ("Mafiaso:  Tell them to pay up . . .", 572, 834 ("Please see if you can't get Ramesh to 'persuade' him to pay me . . . . If he does not pay, I will see to it that his visa gets mysteriously revoked.")).  Plaintiffs estimate that Dewan, Pol, and Burnett collected about $7 million dollars from all of the putative class members.  (Pla. Exhs. 865, 866, 867, 868 (repeated recitation of "Cha Ching")).

United States was of the utmost importance to Dewan, Pol, and Burnett.  (Signal Exhs. Z, CC, FF).

In late May and early June 2006, Signal filed paperwork with the United States Department of Homeland Security-Citizenship and Immigration Services and the Department of Labor seeking permission to import and hire 590 foreign guest-workers pursuant to the government's H-2B guest-worker program.  Bingle, on behalf of Signal's Mississippi operation, and Thomas Rigolo (Sr. VP  & General Mgr., Texas Operations), on behalf of Signal's Texas operation, executed the paperwork.  In the filings Bingle explained that Hurricanes Katrina and Rita had caused a tremendous but temporary shortage of labor in the Gulf region and that Signal sought to hire temporary H-2B workers until the labor force would return to normal.  (Pla. Exh. 516).  Bingle explained that the need for current workers reflected a peak load and would be a one-time occurrence.  Bingle also stated that the peak load temporary workers would not become part of Signal's permanent workforce--they would work for the length of time prescribed and then return to their home countries at the end of the employment period.  (Pla. Exh. 516).  In Signal's Application(s) for Alien Employment Certification to the Department of Labor, Bingle and Rigolo declared under penalty of perjury that the exact dates that the workers would be employed were 10/01/06 to 07/31/07.  (Pla. Exhs. 515, 595, 863, 864).

According to Bingle, Signal had always intended to file for green cards for the foreign workers, or at least those workers who proved to meet Signal's expectations.  When questioned at his deposition about the certifications of temporary employment made to the government, Bingle explained that he did have concerns about signing those documents and making those representations but that Malvern Burnett had told him that this was just the way the H-2B visa process worked.  Rigolo testified that Signal actually needed workers for about a two-year time frame but that he had no reservations about submitting forms to the government that cited the ten month time frame dictated by the H-2B program.  Burnett's explanation was that the workers coming over on temporary visas were not going to be part of Signal's permanent workforce, at least in the beginning, and that it might be a year or two before they might return to Signal as permanent workers. (Burnett depo at 457-48).

Signal sent employees to India to personally test the workers' skills.  Therefore, everyone who was given an offer of employment with Signal had passed a test to the satisfaction of Signal's employees and no one with Signal told the workers that there would be further testing when they arrived at Signal and that their hourly pay would be subject to reduction or their employment subject to termination if they failed to pass. Signal's form letter offer of employment simply offers

congratulations for passing the skills test in India and the worker is told that "[a]s agreed, [his] salary will be $18.00 per hour." (Pla. Exh. 381). Nothing in the offer of employment from Signal alluded to a second round of testing once the worker arrived in the United States. The Signal employment agreement itself, however, specifically states that the worker would be subject to skills testing upon arrival at Signal and that his hourly rate might be reduced based on skill level. (Pla. Exhs. 64, 179, 201, 294, 300, 348, 808, 854).[16] But the Signal employment agreement was presented to the workers after they had already traveled to the United States from India and arrived at Signal. (Signal Exhs. SSS, SSS-A).

In addition to the workers that Dewan, Pol, and Burnett actively recruited anew for Signal, Pol agreed to use Rao's IAS recruits to fill some of the employment slots at Signal, (Pla. Exh. 808 [Dhananjaya/Signal agreement]), even though Pol would receive significantly less of a fee for each of these recruits who had already paid their fees over to Rao, Dewan, and Burnett. Global's agreement with Signal also provided a U.S. employer onto which Dewan, Pol, and Burnett could offload the J & M green card recruits. Nearly half of the Indian workers whom Burnett, Dewan, and Pol provided to Signal had been recruited for other

---

[16] The Memorandum of Understanding that each worker executed with Dewan also references the second round of testing. (Pla. Exhs. 344, 351, 502, 505, at ¶¶ 5 & 9).

companies.

Dewan, Pol, and Burnett were well aware that U.S. immigration officials would not approve an H-2B visa for any worker who communicated to the consulate officials that he was participating in the Signal program with the intent of receiving a green card. (Pla. Exhs. 519, 550). The recruits were therefore escorted to their consulate interviews by a Dewan Consultants employee to ensure that all went well. The recruits were warned about not disclosing anything about green cards to the consulate officials. Dewan also warned them not to mention the amount of money that they had paid to participate in the Signal program. Several plaintiffs also contend that after their visas were issued Dewan (and perhaps on one occasion Burnett)[17] withheld their passports pending the final installment payment for the program. Plaintiffs contend that with their passports being held they feared that they must either pay the rest of the money to Dewan to go to Signal or forfeit all of the money that they had already paid. Plaintiffs claim that they were assured by Dewan that participation in the H-2B program would allow them to stay in the United States while their green card applications were being processed.

Those Plaintiffs who were recruited specifically for Signal

---

[17] Sony Sulekha testified that Burnett took custody of his passport after his H-2B visa was approved. (Sulekha depo at 182).

during the Phase 2 events are referred to as "Group II Plaintiffs." SAC at 6. Named plaintiffs Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, and Hemant Khuttan are in this group. Id.

### 1. Kurian David

David was working in Abu Dhabi as a high-level senior foreman when he saw one of Dewan's advertisements in a newspaper. David attended an information seminar in Dubai where employment opportunities at Signal were discussed. He asserts that the attendees were told that they would receive green cards within 24 months but that the company needed workers immediately so they would be going on H-2B visas. David says that Burnett explained that David would first go on an H-2B temporary visa which would eventually be extended two times. During the 24 month waiting period and with the two extensions of the original H-2B visa, David would get the green card. David says that he was assured that Signal was a good company with good accommodations and that the workers would be treated well.

David asserts that he came to Signal only because he expected a green card and that he would not have left his otherwise lucrative position at home to come to the United S tates solely for temporary employment. David borrowed money from his brother-in-law to finance his participation in the program. David stayed with Signal through March 2008. (Signal Exh. FFF).

After arriving in the United States in 2007 David worked at Signal's Orange, Texas facility.

### 2.  Sony Vasudevan Sulekha

Sulekha decided to participate in the program because of an ad that he saw in a Malayalam newspaper.  Sulekha attended a seminar at the Hilton Hotel in Cochin in May 2006. Dewan, Pol, and Salimon (another Dewan employee) were present. Sulekha was told that Signal needed workers, the company would give permanent residence, that Signal was a good company, and that this would be a very good opportunity for him.  Dewan and Pol explained that at first the workers would be sent on an H-2B temporary visa, which would be extended, and a green card would follow within 24 months.  Sulekha pawned his ornaments and wife's jewelry and borrowed money from a distant relative in order to finance his participation in the program.  Sulekha contends that he was promised a green card and that he would be able to bring his family to the United States but those promises never materialized.  After arriving in the United States in 2006 Sulekha worked at Signal's Orange, Texas facility.

### 3.  Palanyandi Thangamani

Thangamani testified that he went to Signal expecting a green card.  Thangamani pledged his sister's ornaments and jewelry in order to finance his participation in the program. After arriving in the United States in 2006 Thangamani worked at

Signal's Orange, Texas facility.

### 4.   Muruganantham Kandhasamy

Kandhasamy saw an advertisement in a paper called Dhinethandi that advised that workers were needed to work in the United States and would receive green cards.  Kandhasamy attended an interview with Pol, Dewan, Burnett, and representatives from Signal—everyone present spoke.  Kandhasamy was told that he would get a green card.  Kandhasamy contends that just a few days before he was to leave for the United States he was told by Dewan that he would be going on an H-2B visa instead of a green card. Kandhasamy contends that Dewan told him, in the presence of Pol, Burnett, and a Signal representative, that once he arrived in the United States his H-2B visa would become a green card.  After arriving in the United States in 2007 Kandhasamy worked at Signal's Orange, Texas facility.

### 5.   Hemant Khuttan

Khuttan responded to an advertisement in the Hindustan Time newspaper in Delhi.  The advertisement did not mention Signal by name.  Khuttan attended an information meeting in Delhi where he first met Dewan.  Khuttan traveled from Delhi to Mumbai to speak with Dewan Consultants about the program and this is when he first heard about Signal.  Khuttan paid Dewan about $20,000 USD up front to participate in the employment program with Signal and he borrowed the money from a friend.  Khuttan contends that he

really didn't know which kind of visa he was supposed to get but that Dewan later informed him that he would be going to Signal on an H-2B visa and that once he arrived in the United States Signal would take care of him and get him a green card.  After arriving in the United States in 2007 Khuttan worked at Signal's Pascagoula, Mississippi facility.

All of the named plaintiffs, whether recruited for J & M, IAS, or Signal contend that they were promised green cards and that this is what their contracts with Defendants guaranteed to them.  Plaintiffs contend that it was in reasonable reliance on Defendants' assertions that they undertook such considerable personal, financial, and familial sacrifices in order to participate in the recruiting program, and they assert that they would not have made such sacrifices had they known that Defendants' assertions regarding permanent residence in the United States were false.

C.   **Factual Background--Phase 2--Employment/Life at Signal**

From the beginning, it was understood that housing and meals would be provided by Signal with the cost of these "accommodations" to be paid by the workers out of their paychecks.[18]  Originally, Global was going to provide the accommodations with Signal then reimbursing Global out of the

_____

[18] Plaintiff Thangamani testified that someone told him that room and board would be free.  (Thangamani depo at 56).

workers' paychecks.  (Pla. Exh. 517).  But Signal opted to construct man camp housing facilities onsite in Texas and Mississippi to house the workers.  The decision was prompted in large part by housing shortages after hurricanes Katrina and Rita.  Meals would also be prepared and served onsite.  These preparations did require capital and expense outlays by Signal but it was always Signal's intention to recoup these expenditures by deducting fees from the workers' pay.  Signal invested millions of dollars building the camps and decided to charge the workers $35 dollars per day (7 days a week) for room and board so that the company could recoup its investment over a five year period.[19]  At the $35/day rate Signal anticipated realizing a profit from the man camps.[20]  (Pla. Exh. 871).  For this reason it would eventually become important to Signal to ensure that the man camps were filled to maximum capacity.  (Pla. Exhs. 528, 449, 850).  Signal implemented a policy that required each foreign worker to pay the $35/day accommodations charge even if the worker elected to live offsite and even if the worker earned no

---

[19] Signal also envisioned charging the workers for enlarging its welder testing and training facilities.  (Pla. Exh. 846).

[20] One member of Signal's management proposed charging the workers $53.50 per day for accommodations, reasoning that the workers had only been making about $10 per day in India and that even after the deduction they would still be making about 11 times more per day than what they were making at home.  (Pla. Exh. 671).  Signal did not recoup its expenditures for the man camps and in the end Signal spent about $6.5 million dollars more than it recovered.  (Cunningham depo at 136).

pay for a given day.  Only the Indian H-2B workers were allowed to live at the man camps.  And only the Indian H-2B workers were charged the $35 per day accommodations fee regardless of whether they chose to live in the man camp or elsewhere.

By August 2006 Signal was eager to have the workers arrive given its increased workload and manpower shortage in that year and given the soaring costs that the company was incurring for subcontracted labor.  (Pla. Exh. 550).  The first workers began arriving at Signal in November 2006.  Each H-2B worker was given a second skills test--some workers had their wages reduced from the $18 per hour rate by as much as 30 percent to an amount commensurate with their skills and some were terminated.  Each worker also executed a Man Camp Housing Rules Agreement (Pla. Exhs. 48, 76, 811, 858, 859),[21] an H2B Resident Housing Agreement (Pla. Exhs. 63, 181, 779, 860,[22] and an Authorization Agreement for Payroll Deduction (Pla. Exhs. 75, 812, 845, 861, 862).[23]  Once arrived the workers were presented with new employment contracts

---

[21] The Rules prohibited alcohol, smoking, visitors/guests, and horse-playing in the man camp.  Also, all employees were required to enter the facility through security.

[22] The Housing Agreement expounds upon some of the rules contained in the Man Camp Rules, imposes the $35/day charge for room and board, and imposes stiff fines for violations of camp rules.

[23] Via this document each worker authorized Signal to deduct the $35/day "accommodations" or room/board charge from his paycheck.

27

terminable at will.   (Signal Exhs. SSS, SSS-A).

Perhaps Signal understood even before the first workers arrived that they expected to receive green cards at some point.[24] (Pla. Exhs. 550, 817).  But without question Signal knew of the workers' green card expectations once they arrived on site because the workers questioned Bill Bingle about green cards on their first day at the camp.  According to Bingle, it was only later in the process that Signal learned that the H-2B process would not support the filing of green cards for the workers. Signal maintains that it had believed early on that there was an avenue available to convert the temporary visas to green cards and that it intended to apply for green cards for those workers who proved to be good employees.  (Pla. Exh. 817).  But green cards would only be considered once the allowable H-2B extensions were exhausted and only for valued workers.  Prior to the expiration of the first H-2B visas in July 2007, Signal began using a "yes/no" evaluation protocol for identifying potential candidates for long term employment.

Signal concedes that its intention was never to seek green cards for all H-2B workers without considering factors like skill

---

[24] Less clear, however, and perhaps ultimately more important, is whether Signal understood the significance of the references to green cards in the various emails and correspondence that were exchanged before the workers arrived at Signal.  See Rigolo depo at 72 ("[V]ery early in the process [] there was probably some misunderstanding and [the terms] visa and green card were used synonymously.").

level, work ethic, attitude, etc.  Signal maintains that it never agreed to seek green cards on behalf of every worker without considering job performance and that it never felt obligated to do that.  According to Signal, if such broad promises pertaining to green cards were made to the workers then they were not authorized by Signal and were not true.  After all, green cards are issued by the government and with the government involved no employer could guarantee any worker a green card.

Plaintiffs contend that Defendants' green card scheme was grounded in part upon false representations about the living conditions at Signal.  Upon arriving at Signal, Plaintiffs were sorely disappointed in the man camp accommodations, including the food.  According to Plaintiffs, their $35 per day bought them life in overcrowded and cramped labor camps,[25] with insufficient bathroom and shower facilities for the number of men housed in each bunkhouse.  Plaintiffs assert that the facilities lacked privacy and were not conducive to regular sleep.  Signal believes that the facilities conformed to all applicable city codes but not necessarily to OSHA requirements.  (Pla. Exh. 940). Plaintiffs contend that the squalid conditions in the man camp were conducive to the spread of disease and illness.  At one of

---

[25] Plaintiffs submitted numerous photographs and a video of the man camp living areas while they were occupied.  (Pla. Exhs. 838, 839).  Plaintiffs' assertions about overcrowded conditions are not exaggerated.

the camps water would leak and stagnate due to shoddy plumbing. (Pla. Exh. 621). One kitchen facility was described by Signal's own staff as "disgusting." (Pla. Exh. 828 ("I pray that the TX Health Dept doesn't show up. They will shut this place down immediately.").

Plaintiffs also resented the man camp housing rules. In practice, Plaintiffs did not appreciate having to pass through security to enter to the camps, and the attendant searches of their parcels and requisite presentation of identification. Alcohol and visitors were strictly prohibited in the camps, and Plaintiffs contend that they often felt like prisoners while living in the camps, and isolated or marginalized from the rest of the workforce and the community. Of course, no worker could be forced to live at the man camp so long as he was willing to pay room and board elsewhere on top of the $35 per day (approximately $1050 per month) accommodations fee that Signal would continue to charge him in light of his H-2B status. Thus, some of the workers felt financially compelled to live in the man camps despite how miserable any particular worker might have felt about that prospect.

Plaintiffs characterize the man camp as a "racialized ghetto," (Pla. memo at 20), and they point to the man camp as strong evidence of the discriminatory treatment that they claim to have received at Signal. Plaintiffs point out that they were

the only members of Signal's workforce who were allowed or required to live in the man camp, with its attendant security rules and hefty daily rates, and that they were required to pack their lunches from the food available at the man camp cafeteria, which often spoiled in the heat before they could eat it. Plaintiffs point out that only the migrant workers at Signal were subjected to these conditions.[26]  Plaintiffs also complain that they were given the most undesirable and dangerous work that Signal's non-foreign workers did not want to perform.  Plaintiffs contend that they were left with no choice but to endure the unpleasant and abysmal conditions at Signal or go back to India financially bankrupt and socially scarred.  Plaintiffs contend that Signal exploited their precarious financial situation and their vulnerable immigration status.

John Sanders was Signal's point man for the Global/Signal contract and he took what appears to be a genuine interest in the day to day concerns and welfare of the H-2B workers.[27]  In November 2006 Sanders learned from the workers about the onerous fees charged by Dewan, Pol, and Burnett.  Several workers told

---

[26] Plaintiffs have also submitted various emails from Signal personnel which they contend exemplifies the company's discriminatory attitude toward the Indian H-2B workers.  (Pla. memo at 23 n.25).

[27] Sanders kept a personal diary in which he recorded his dealings with the Indian workers and Signal management and his personal impressions of many of the events at issue in this case.

Sanders personal stories about pawning private possessions in order to raise the fees required to participate in the H-2B program, and of the significant debts that they had incurred in the process.  The workers also complained about the $35 per day accommodations fee, pointing out that after this fee was deducted from their pay, and in light of the debts already incurred, it was not economically advantageous to be at Signal.  Sanders relayed this information to upper management and noted how these issues were affecting morale amongst the workers.  (Pla. Exh. 618).

On November 20, 2006, a meeting took place to discuss the clear contradiction in the workers' assertions about the fees that they were claiming that they had paid to participate in the H-2B/green card program and Pol's statements to Signal that the workers had paid $2000 to participate.  (Pla. Exh. 521(Bingle)). Pol, Ron Schnoor, and John Sanders were present.  Signal maintains that it was during this meeting that it learned with certainty about the exorbitant fees that the workers had paid to Global, Burnett, and Dewan.  Ron Schnoor followed up with a letter to Pol demanding an accounting of the workers' payments and demanding that Pol refund 50 percent of the fees paid by the workers and reimburse them for airfare.  (Pla. Exh. 520(Bingle)). Schnoor copied Dewan and Burnett on the letter.  Pol replied via letter defending the fees charged and explaining why he could not

refund any of the money.  (Pla. Exh. 559).  Signal was convinced that Pol had misrepresented to Signal the amount of money that each worker would be paying to participate.  Signal terminated its relationship with Pol and requested that Dewan and Burnett do the same.  (Pla. Exh. 669).

Thus, as of November 2006, Signal knew about the significant fees that the workers had paid and about the workers' green card expectations.  Around this time Signal also became concerned that perhaps Dewan was not being honest with the testing in India because the actual skill level of the workers who were arriving at Signal was not commensurate with the tests that they were passing in India.  Signal noticed that the workers coming over were not the best and that perhaps the ability to pay hefty recruiting fees was being given more weight than actual skill. Plaintiffs assert that November 2006 presents a watershed moment in the case because from this point onward Signal clearly knew what was going on but nevertheless continued for months thereafter to accept hundreds more workers into the program-- workers who were relying on false promises.  And while Signal terminated its dealings with Pol, it nonetheless continued to work with Dewan and Burnett.  (Pla. Exh. 522(Bingle)). Plaintiffs contend that Signal took no corrective action because it needed the workers to continue to save on labor costs and to continue to pay for the man camp.  Plaintiffs contend that

Signal's decision to continue to bring in workers via Dewan and Burnett, all the while knowing the truth, makes the company liable in the scheme.

On March 9, 2007, Signal decided to terminate eight of the workers--six who were allegedly unproductive and two, Jacob Joseph Kaddakkarappally and Sabulal Vijayan, who might be characterized as "rabblerousers." (Pla. Exh. 646). Jacob and Sabulal had a reputation in Mississippi for creating unrest among the foreign workers even though they were otherwise skilled workers. By this time Signal also knew that some of the workers had contacted a lawyer about their rights, and that two of the workers in particular had been wheedling other workers to also speak to the lawyer. (Pla. Exh. 443). Signal undertook to terminate Jacob and Sabulal on the morning of March 9, 2007, in the presence of the other foreign workers, which Plaintiffs contend was a calculated decision in order to make an example of Jacob and Sabulal so that everyone would understand what happens to troublemakers. Signal called in Swetman security guards in advance of the terminations in the event that things got out of hand--which they did as the situation deteriorated into mayhem. The security guards allegedly detained the terminated workers unlawfully in one of the bunkhouses, and Plaintiffs contend that this was done at Signal's direction. Sabulal attempted suicide and the Pascagoula Police Department arrived on the scene after

someone called to report a kidnaping.  (Pla. Exh. 444).  The Mississippi Immigrant Relief Association was present outside the camp and so was the media.  (Pla. Exh. 646).  The Mississippi debacle of March 9, 2007, became known as "Black Friday." Plaintiffs contend that word of the Black Friday events in Mississippi quickly spread to the workers in the Texas camp.

Dewan flew from India to Mississippi on March 9, 2007, to help settle some of the unrest amongst the foreign workers but he was not present for the Black Friday events.  Dewan believed that he might be able to calm the workers in light of the troublemakers who were trying to create problems for everyone. (Pla. Exh. 446).  Dewan suggested that the workers who had initiated the problems should be deported first.  Burnett later traveled to the Texas facility to similarly calm the workers.

On March 12, 2007, Schnoor and Burnett addressed the workers in Mississippi to reassure them that they were part of Signal's long term solution for supplementing its labor force.  Schnoor advised the workers to think very carefully about suing Signal because Signal would vigorously fight any such efforts and that a bunch of frivolous lawsuits would mean no visa extensions for the foreign workers so that they would all have to return to India when the first H-2B visas expired on July 31, 2007.  Plaintiffs contend that the events and aftermath of Black Friday emphasized to the Indian workers the importance of being compliant while at

Signal because even good workers would be terminated and deported if they complained.  Plaintiffs assert that Signal made false assurances about the status of their green cards thereby continuing the deception.  Plaintiffs characterize the working and living conditions at Signal as psychologically coercive.

By April 25, 2007, Dewan, Burnett, and Pol were at odds when Pol and Burnett came to suspect that Dewan had lied to them about giving a refund to a candidate while he in fact took the candidate's money.  (Pla. Exh. 469).  Signal's first H-2B authorization was scheduled to expire on July 31, 2007, but on the advice of Burnett Signal requested the first extension for all of the workers because it was just easier that way.  By March 2008 when this lawsuit was filed more than three quarters of the putative class had left Signal.  At present, none of the putative plaintiff class members remain at Signal.

### D.   Procedural Background

Plaintiffs filed this proposed class action on March 7, 2008, and amended their complaint twice.  Plaintiffs originally moved for class certification on October 1, 2008.  (Rec. Doc. 165).  Plaintiffs filed their Second Amended Complaint (Rec. Doc. 944) on November 23, 2010.  The Court allowed discovery on class issues and that discovery proceeded for over two years.

Plaintiffs successfully defeated numerous dispositive motions but on November 10, 2010, the Court granted Signal's

motion to dismiss Plaintiffs' claim for certification of a Rule 23(b)(2) class for injunctive relief.[28]  (Rec. Doc. 926).

Plaintiffs filed their Supplemental Motion to Certify (Rec. Doc. 994) on February 1, 2011, and Defendants filed their submissions in opposition to certification (Rec. Docs. 997, 998, 992, & 1000).  Signal then filed its Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012) and Motion for Partial Stay of Class Certification Proceedings (Rec. Doc. 1013), in response to Plaintiffs' argument that certification of RICO claims predicated on 18 U.S.C. § 1546, insofar as Plaintiffs were urging that Signal defrauded the United States government, were never pled with the required specificity.  Plaintiffs then filed their Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031).  The Court granted Signal's Motion for Partial Stay such that Defendants would not be required to address the merits of the § 1546 claims in their rebuttal memoranda.  (Rec. Doc. 1043).  The Court

---

[28] When dismissing the (b)(2) claims the Court specifically noted that the ruling did not constitute a final adjudication of the class certification issue so as to trigger any party's right to seek an interlocutory appeal pursuant to Rule 23(f).  (Rec. Doc. 926).  In order to avoid the inefficiency of a piecemeal appeal process, all parties expressly agreed on the record to waive any subsequent argument that Plaintiffs' failure to seek immediate review in the Fifth Circuit would constitute a waiver of their rights under Rule 23(f).  Accordingly, the Court will incorporate its ruling on the (b)(2) claims as part of this Order and Reasons so that the parties can seek review of all certification claims at one time.

advised that it would issue an order inviting Defendants to respond to the § 1546 claims on the merits if the Court were inclined to deny the Motion to Strike-1012 and/or to grant the Motion for Leave, and if the § 1546 claims were otherwise certifiable.  (Rec. Doc. 1043).

The parties filed their rebuttal memoranda (Rec. Docs. 1073, 1070, 1074, $ 1071) on April 29, 2011, at which time the issue of class certification was taken under submission, along with the Motion to Strike-1012 and Motion for Leave to File, the latter two relating solely to the issue of RICO claims predicated on § 1546 insofar as Plaintiffs argue third-party reliance by the United States government.

After the rebuttal memoranda were filed, Signal filed its second motion to strike, Motion to Strike-1082, which was taken under submission on June 22, 2011.  This motion to strike, as with the first motion to strike, pertains solely to the RICO claims.

III. **CLASS CERTIFICATION PURSUANT TO RULE 23(b)(3)**

Plaintiffs move to have a class certified pursuant to Federal Rules of Civil Procedure 23(b)(2)[29] and (b)(3) consisting of

---

[29] The Court has already rejected the (b)(2) injunctive relief class claims.  See note 28, supra.  The Court will therefore limit the substance of its analysis to the Rule 23(b)(3) class claims.

All Indian guest-workers who were recruited by one or more Defendants and who traveled and/or were transported to the United States at any time through September 30, 2007, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(B) ("H-2B") visas assigned to Defendant Signal International.

Plaintiffs seek certification with respect to their claims for violations of 1) the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1589 (forced labor) & § 1590 (trafficking); 2) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)-(d); 3) the Civil Rights Act of 1866, 42 U.S.C. § 1981; and 4) the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3).

Federal Rule of Civil Procedure 23 governs class actions. The rule provides in relevant part:

> **(a) Prerequisites.** One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
>> **(1)** the class is so numerous that joinder of all members is impracticable;
>>
>> **(2)** there are questions of law or fact common to the class;
>>
>> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>>
>> **(4)** the representative parties will fairly and adequately protect the interests of the class.
>
> **(b) Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. Pro. 23(a), (b)(2)-(3). To obtain certification a party must satisfy Rule 23(a)'s four threshold requirements (numerosity, commonality, typicality, and adequacy of representation), as well as the requirements of Rule 23(b)(1), (2), or (3). <u>Gene & Gene, LLC v. Biopay, LLC</u>, 541 F.3d 318, 325

(5th Cir. 2008) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997)).  District courts have discretion as to whether a class will be certified.  Stirman v. Exxon Corp., 280 F.3d 554, 561 (5th Cir. 2002) (citing Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996)).  However, that discretion must be exercised within the framework of Rule 23.  Id.  The district court must "conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class."  Gene & Gene, 541 F.3d at 325 (quoting O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 737-38 (5th Cir. 2003)).  The party seeking certification bears the burden of demonstrating that the Rule 23 requirements have been met.[30]  Id. (citing Berger v. Compaq Comp. Corp., 257 F.3d 475, 479 (5th Cir. 2001)).

Rule 23(b)(3) is "[f]ramed for situations in which 'class-action treatment is not as clearly called for' as it is in Rule

---

[30] Plaintiffs suggest that courts in the Fifth Circuit are urged to err on the side of certifying class actions because the order is always subject to modification in light of later developments.  (Rec. Doc. 994-1, at 35).  The Court has reviewed numerous class action decisions from this circuit and the Court does not glean such an urging.  To the contrary, the Fifth Circuit has specifically noted how certification can dramatically affect the litigation stakes for defendants by magnifying and strengthening the number of unmeritorious claims, Castano, 84 F.3d at 746 (citing In re Agent Orange Prods. Liab. Litig., 818 F.2d 145, 165-66 (2d Cir. 1987)), and that certification cannot follow from mere instinct and a "figure-it-out-as-we-go-along approach," Madison v. Chalmette Refining, LLC, 637 F.3d 551, 557 (5th Cir. 2011).  The "rigorous" Rule 23 analysis required by this circuit's precedent does not comport well with a policy of erring on the side of certifying class actions when there is any uncertainty as to whether Rule 23's standards are met.

23(b)(1) and (b)(2) situations.  Amchem Prods., 521 U.S. at 615 (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697).  A party seeking certification of a Rule 23(b)(3) class must demonstrate *inter alia* that the questions of law or fact common to class members predominate over any questions affecting only individual members.  Gene & Gene, 541 F.3d at 325 (quoting Fed. R. Civ. Pro. 23(b)(3)).  Considering whether "questions of law or fact common to class members predominate" begins with the elements of the underlying cause of action.  Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2184 (2011).

The predominance inquiry requires a court to consider "how a trial on the merits would be conducted if a class were certified."  Gene & Gene, 541 F.3d at 325 (quoting Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 302 (5th Cir. 2003)).  This in turn means that the court must identify the substantive issues that will control the outcome, assessing which issues will predominate, and then determine whether the issues are common to the class--a process that ultimately prevents the class from degenerating into a series of individual trials.  Id.  The court must go beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues.  Castano, 84 F.3d at 744 (citing Manual for Complex Litigation § 30.11 (3d ed. 1995)).  The predominance requirement tests whether proposed

42

classes are sufficiently cohesive to warrant adjudication by representation.  <u>Id.</u> (quoting <u>Amchem Prods.</u>, 521 U.S. at 623-24). The predominance of individual issues necessary to decide an affirmative defense may preclude class certification.  <u>Gene & Gene</u>, 541 F.3d at 327 (quoting <u>In re Monumental Life Ins. Co.</u>, 365 F.3d 408, 420 (5th Cir. 2004)).

Generally, the strength of the plaintiff's claim on the merits should not affect the certification decision.  <u>See Castano</u>, 84 F.3d at 744.  Nonetheless, the determination of class action questions is often intimately involved with the merits of the underlying claims.  <u>Id.</u> at 744 n. 17 (quoting <u>Cooper & Lybrand v. Livesay</u>, 437 U.S. 463, 469 n.12 (1978)).  Frequently the "rigorous analysis" required for Rule 23 certification will entail some overlap with the merits of the plaintiff's underlying claim.  <u>Wal-Mart Stores, Inc. v. Dukes</u>, 131 S. Ct. 2541, 2551-52 (2011).  "The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."  <u>Id.</u> (quoting <u>Gen. Tele. Co. v. Falcon</u>, 457 U.S. 147, 160 (1982)).  This is particularly true with the more complex determinations required for certification under Rule 23(b)(3).  <u>Castano</u>, 84 F.3d at 744 n.17.  "[I]n some cases there will be overlap between the demands of 23(a) and (b) and the question of whether plaintiff can succeed on the merits."  <u>Huff v. N.D. Cass Co.</u>, 485 F.2d 710, 714

(5th Cir. 1973) (en banc).

In this case all aspects of the Rule 23 certification inquiry are contested except the numerosity requirement[31] and the adequacy of Plaintiffs' counsel. (Rec. Doc. 994-1, at 40 n.42). All of the Rule 23(a) requirements are important and must be satisfied but the (b)(3) requirements usually present a far more challenging obstacle for certification than the Rule 23(a) requirements. Therefore, for the various causes of action, the Court can appropriately begin its Rule 23 analysis by assuming arguendo that the Rule 23(a) requirements are satisfied and turning its attention to the more "exacting demands" of Rule 23(b)(3), in particular the predominance requirement. Gene, 541 F.3d at 325. If the predominance requirement is satisfied then the Court will necessarily address Rule 23(b)(3)'s superiority requirement, and if necessary, Rule 23(a)'s requirements. Id. at 326.

### 1. Trafficking Victims Protection Act

The first set of claims that Plaintiffs seek to certify for class-wide treatment are their forced labor and trafficking claims brought under the auspices of the Trafficking Victims Protection Reauthorization Act of 2003. These claims derive from alleged violations of two criminal statutes, 18 U.S.C. § 1589

---

[31] The proposed class numbers about 500 members.

44

(forced labor) and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor). 18 U.S.C. § 1595 allows Plaintiffs to seek civil recovery for violations of the forced labor and trafficking criminal statutes, §§ 1589 and 1590.[32]  Plaintiffs' forced labor and trafficking claims are brought against defendants Signal, Pol, and Dewan.

Defendants contend that Plaintiffs' § 1589 claims cannot be tried on a representative basis and are therefore not amenable to certification because the claims are fundamentally about individual consent. According to Defendants, the legislative history of § 1589, and the Supreme Court's decision in United States v. Kozminski, which actually predates the enactment of § 1589, demonstrate that Plaintiffs' forced labor claims cannot be certified as a matter of law under the facts of this case. In other words, the very nature of a forced labor claim precludes Plaintiffs from meeting their burden of demonstrating that the predominance requirement of Rule 23(b)(3) is satisfied.

---

[32] "An individual who is a victim of a violation of section 1589, 1590, or 1591 of this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorney's fees." 18 U.S.C.A. § 1595(a) (West 2000 & Supp. 2004). The civil remedies provision was enacted as part of the Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875 (2003). In 2008 Congress broadened the scope of the civil remedy statute but that amendment, which came subsequent to the events giving rise to this lawsuit, is not at issue in this case.

Plaintiffs argue that the Trafficking Victims Protection Act ("TVPA") does not require a showing of individualized consent because the TVPA focuses on the actions of the defendant, not the plaintiff.  Therefore, liability under the TVPA can be proven regardless of the number of plaintiffs bringing a claim.  Plaintiffs point out that the TVPA introduced the concept of "serious harm" into the forced labor realm and that "serious harm" is assessed objectively on a reasonable person standard.  Therefore, according to Plaintiffs, no one plaintiff's perspective, subjective position, or consent is legally relevant.  The only question that need be answered is whether a reasonable person in Plaintiffs' shoes would feel compelled to provide his labor against his will--a question that can be answered on a class-wide basis.

The question of whether to certify a class for a TVPA claim is a question of first impression in the Fifth Circuit.  To determine whether issues of fact common to the class predominate over individual issues the Court turns its attention to the elements of the forced labor cause of action and the substantive issues that will control the outcome of the claims.

### A.   *Forced Labor, 18 U.S.C. § 1589*

Section 1589 of Title 18, pertaining to **Forced Labor,** provides:

Whoever knowingly provides or obtains the labor or services of a person--

(1)  by threats of serious harm to, or physical restraint against, that person or another person;

(2)  by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or

(3)  by means of the abuse or threatened abuse of law or the legal process,

shall be [subject to criminal penalties].

18 U.S.C.A. § 1589 (West 2000 & Supp. 2001).[33]  The coercive means described in subsections (1)-(3) supra are taken nearly verbatim from the definition of "coercion" found at 22 U.S.C. § 7102(2), which is part of the civil provisions of the Trafficking Victims Protection Act.

Section 1589 became law on October 28, 2000, when President Clinton signed into law the Victims of Trafficking and Violence Protection Act of 2000.  The purposes of the Act were "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect

---

[33] Congress amended § 1589 in 2008 to make it even broader. That amendment was signed into law on December 23, 2008, and is not applicable to Plaintiffs' claims.

47

their victims." 22 U.S.C.A. § 7101 (West 2004).

It is widely recognized that Congress crafted § 1589 pertaining to forced labor to fill a significant gap in the scheme of involuntary servitude criminal laws that the Supreme Court had identified in United States v. Kozminski, 487 U.S. 931 (1988). In Kozminski, the government prosecuted the defendants for criminal violations of 18 U.S.C. § 1584, which criminalized involuntary servitude. The victims were two mentally retarded men who had been found laboring on the defendants' farm in poor health, in squalid conditions, and in relative isolation from society. During the criminal prosecutions the government offered some evidence of physical abuse but also relied on various other methods of coercion—denial of pay, subjection to substandard living conditions, isolation—to establish that the victims believed that they had no alternative but to work on the farm. Kozminski, 487 U.S. at 936. The government had argued that the two men were "psychological hostages" whom the defendants had "brainwashed into serving them." Id. The district court's jury charge specifically allowed the jury to consider various types of non-physical, psychological coercion when determining whether the two men had been held to involuntary servitude. Id. at 939. The jury voted to convict. The appellate court en banc reversed the convictions.

The Supreme Court granted the government's writ to consider

the scope of conduct pertinent to the meaning of "involuntary servitude" for purposes of a criminal prosecution under § 1584. In light of the state of the law when Congress first enacted § 1584 in 1948, the Court concluded that "involuntary servitude" was limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion-- psychological coercion would not suffice. <u>Kozminski</u>, 487 U.S. at 948. The government had urged the Court to adopt a broad construction of "involuntary servitude" so as to prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power of choice. <u>Id.</u> at 949. But the Court refused to give such an amorphous interpretation to a criminal statute. Such an interpretation would give no notice to ordinary people who are required to conform their conduct to the law and the question of whether any specific acts would constitute a crime would depend solely on the specific victim's state of mind. <u>Id.</u> at 949-50. Further, the rule of lenity, which serves to promote fair notice to those subject to the criminal laws, requires that any uncertainty concerning the ambit of criminal statutes leads to a narrower interpretation, not a broader one. <u>Id.</u> at 951-52.

In summing up, the Supreme Court stated that *absent change by Congress*, for purposes of a criminal prosecution under § 1584,

49

the term "involuntary servitude" necessarily means a condition of servitude in which the victim is forced to work for the defendant by the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process. Kozminski, 487 U.S. at 952. The Court clarified, however, that its holding did not imply that evidence of other means of coercion, or of the victim's special vulnerabilities would be irrelevant. To the contrary, the vulnerabilities of the victim would be relevant in determining inter alia whether the physical or legal coercion or threats thereof "could plausibly have compelled the victim to serve," as well as the "causal effect" of any physical or legal coercion. Id. The Supreme Court affirmed, thereby vacating the convictions and remanding for a new trial.

Congress enacted § 1589 in the wake of Kozminski to provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in Kozminski. H.R. Rep. 106-939. Section 1589 is intended to address the increasingly subtle methods of traffickers who often use means other than overt violence. Id. With § 1589, prosecutors would no longer be required to demonstrate physical harm or threats of force against victims because the "serious harm" standard employed by the statute encompasses a broad array of harms, both physical and non-

physical.  Id.

    The Kozminski Court did not directly confront the question
of whether a forced labor charge requires proof that the victim's
rendering of labor was involuntary or non-consensual, which of
course is the point of law that the parties dispute in this case.
But it is beyond dispute that the Court's discussion of the law
throughout the opinion confirms that the concept of involuntary
servitude or forced labor turns on whether the victim rendered
labor because of the verboten physical force or legal coercion.
In other words, the issue is whether the victim was coerced by
physical force or legal coercion into providing labor
involuntarily.  Nothing about Kozminski even remotely suggests
that a finding of involuntary servitude or forced labor could be
premised solely on the defendant's conduct and the fact that the
victim did in fact work for the defendant, while ignoring the
issue of causation.  Kozminski clearly suggests that a
determination of involuntary servitude or forced labor requires a
causal connection between what the defendant did, what the victim
did, and why the victim did it.  See Kozminski, 487 U.S. at 952
("[T]he vulnerabilities of the victim are relevant in determining
whether the physical or legal coercion or threats thereof could
plausibly have compelled the victim to serve.").  In other words,
the forced labor analysis cannot be confined solely to the
defendant's conduct but necessarily must take into account the

particular victim's vulnerabilities.[34]

The question then is whether the TVPA so changed the forced labor inquiry so as to focus solely on the defendant's conduct to the exclusion of the victim's perspective.  The TVPA included the new § 1589 statute on forced labor, that Plaintiffs rely upon herein, to counter Kozminski but the problem with Kozminski was not that the Supreme Court considered the individual victim's vulnerabilities to be relevant to the issue of compulsion but rather that the coercive means punishable for a forced labor violation were too narrow under Kozminski, particularly with respect to psychological coercion.  Section 1589 clearly recognizes that there are numerous types of harm beyond physical abuse or legal coercion that can be used to force an individual to work involuntarily.  So because of the TVPA the more subtle forms of coercion that escaped criminal punishment in Kozminski are now clearly unlawful.

But the Court does not read either the TVPA or § 1589 in particular as shifting the focus of the crime of forced labor

---

[34] Justice Brennan's concurring opinion in particular contains numerous points of discussion that confirm that the victim's perspective is crucial to a forced labor determination.  See, e.g., Kozminski, 487 U.S. at 956-57 (Brennan, J., concurring) ("Without considering these techniques (and their particular effect on a mentally disabled person), one would hardly have a complete picture of whether the coercion inflicted on the victims was sufficient to make their service involuntary.").

solely to the defendant's conduct without concern for whether the defendant's conduct was sufficient to make *the specific alleged victim* render labor involuntarily.   The TVPA did not render the issue of consent irrelevant to a forced labor determination. Congress could have expressly rendered victim consent irrelevant to the determination, as is the case with the United Nations Protocol applicable to human trafficking, but Congress declined to do so.   See Jennifer M. Chacon, <u>Misery & Myopia: Understanding the Failures of U.S. Efforts to Stop Human Trafficking</u>, 74 Fordham L. Rev. 2977, 2982 (2006).[35]   And the House Report on the TVPA contains a discussion that talks about "the individual circumstances of the victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to maintain or obtain a victim's labor or services, including the age and background of the victims." H.R. Rep. 106-939.   Other courts continue to recognize implicitly that even in the aftermath of the TVPA the question of forced labor turns on whether the defendant's conduct or tactics reasonably coerced or forced the victim to provide labor.   See, e.g., <u>United States v. Bradley</u>, 390 F.3d 145 (1st Cir. 2004), <u>rev'd on other grounds</u>, <u>Bradley v. United States</u>, 545 U.S. 1101 (2005); <u>United States v. Peterson</u>, 627 F. Supp. 2d 1359 (M.D. Ga.

---

[35] In fact, this author has opined that the TVPA, contrary to earlier law, actually gives "central importance" to the question of victim consent.   Chacon, <u>supra</u>, at 2999.

2008).  And one cannot determine whether the defendant's actions coerced or forced the victim to provide labor without looking to the specific victim involved.

Moreover, the need to consider the specific alleged victim becomes even more crucial when the subtler forms of psychological coercion are involved, which the new § 1589 allows and which Plaintiffs rely upon in this case.  Most human beings would likely choose to provide labor in lieu of receiving severe beatings or being tortured so with egregious forms of physical abuse the specific victim's vulnerabilities may become less important.  But with more subtle types of coercion, particularly psychological coercion, the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce in providing forced labor.  This is exactly what § 1589 now recognizes.  But because § 1589 is a criminal statute that potentially reaches a broad range of coercive conduct that standing alone might not be unlawful, two things are clear.  First, the defendant's conduct must be the driving force behind the victim's "choice" to render the labor.[36]

---

[36] Justice Brennan sagaciously explained in <u>Kozminski</u> how at some level the laborer always has a "choice" no matter what the threat because he can choose to work or take a beating.  But with less egregious forms of coercion it is particularly difficult to determine when a person's actions are "involuntary."  <u>Kozminski</u>, 487 U.S. 959 (Brennan, J., concurring).

And second, the victim's response to the defendant's actions must pass the reasonable person test. The reasonable person test injects an objective standard into the forced labor determination which is important given the criminal nature of the statute. After all, as Justice Brennan noted in Kozminski, criminal sanctions cannot depend on a completely subjective standard that criminalizes otherwise innocent behavior simply because a particularly sensitive victim reacts to it. 487 U.S. at 960-61 (Brennan, J., concurring). Therefore, even though the "serious harm" that § 1589 encompasses is extremely broad it must at least pass a threshold objective standard such that it would cause a reasonable person in the victim's shoes to render forced labor-- the criminal law of which § 1589 is a part requires no less. Thus, it is not enough that the defendant's conduct was subjectively coercive so as to cause the victim to render involuntary labor. The defendant's conduct must also be objectively coercive enough to do so.[37] But contrary to

---

[37] The reasonable person standard for serious harm was codified in the 2008 amendments to the TVPA when Congress added a definition for "serious harm" to § 1589: "The term 'serious harm' means any harm, whether physical or nonphysical including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform and to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C.A. § 1589(c)(2) (West Supp. 2011). The court in Bradley had used a very similar definition of "serious harm" in its pre-2008 charges to the jury. 390 F.3d at 150.

Plaintiffs' assertion, the injection of the objective reasonable person standard into the forced labor equation does not serve to eliminate the subjective aspects of the crime--the jury must still determine whether the victim was coerced subjectively to provide labor based on the defendant's threats.  This is the very essence of the crime of forced labor and Plaintiffs' interpretation of their burden of proof on the forced labor claims is contrary to the statute.

Of course, Plaintiffs are not prosecutors, they are civil litigants seeking to recover money damages under § 1595 for a violation of a criminal statute, § 1589.  But § 1595 is a damages statute, not a statutory penalty provision that imposes a monetary sanction once the plaintiff establishes that the defendant has engaged in certain conduct.  The plaintiff must prove the damages that he sustains as a result of the defendant's violation of § 1589, and proving that compulsion at the hands of the defendant caused the plaintiff to render his services involuntarily is simply part of the causation analysis for the civil claim.  It would be inimical to the concept of damage recovery in civil litigation to simply ignore the question of whether the individual plaintiff was in fact injured by the defendant's conduct.  And with a forced labor claim, the injury question is inextricably intertwined with the question of whether it was in fact the defendant's conduct that coerced labor from

the plaintiff.

That said, Plaintiffs do not suggest that they are completely irrelevant to whether a violation of § 1589 has occurred, only that individual characteristics that might make one individual less susceptible to coercion than his co-worker are irrelevant.  Plaintiffs' contention is that certain broader characteristics shared by the class as a whole, e.g., immigration status, payment of exorbitant fees to recruiters, poor living conditions at Signal, would have compelled any reasonable person to stay at Signal and provide labor and therefore the focus should be on Defendants' conduct.  Clearly, the members of the class do share some common characteristics.  And broadly speaking, it may very well be a logical conclusion that a welder of Indian origin, who incurred significant debt and now finds himself in the United States on a temporary visa, might choose to stay in an unpleasant employment situation.  But while all of these considerations surely factor into the decision to stay with the employment, it does not mean that these characteristics that apply class-wide can substitute for the subjective aspects of why any given Plaintiff chose to stay at Signal.  The question in a forced labor case is not whether any reasonable person who finds himself in the victim's situation would have felt trapped by his circumstances and therefore stayed on the job with Signal.  The question is whether Defendants' coercive conduct was such that it

could overcome the will of the victim so as to make him render his labor *involuntary*.  The Court is persuaded that this question cannot be answered via generalized class-wide proof but rather must be answered individually based upon individualized proof.

The Court does not agree, however, with Signal's contention that a § 1589 claim can never be suitable for class certification.  Certainly, based on the type of coercion used, there may be cases where consent becomes irrelevant.  In other words, some "choices" might be so illegitimate that any decision to work is "involuntary."  See Kozminski, 487 U.S. at 959 (Brennan, J., concurring).  But this case does not present one of those situations.  To the contrary, this case involves paid workers who in fact could leave their jobs at any time, albeit under penalty of returning to their home countries but that restriction was dictated by U.S. immigration law.  The workers were for the most part paid well, free to come and go as they pleased, and some even took vacations and bought cars.  The pressure to work for Signal arguably came at least in part from a set of circumstances that each plaintiff individually brought upon himself when he elected to pay what is now characterized as "exorbitant" fees to participate in the green card program.  Part of the "serious harm" that Plaintiffs claim that they faced was financial and reputational harm which are uniquely individual in nature.  And the "threats" that Plaintiffs allege were made to

compel them to work were often made to individuals, not to the class as a whole.

Based on the foregoing this Court is persuaded that individual issues with respect to coercion and consent will predominate Plaintiffs' § 1589 forced labor claims.  This is true whether the question is viewed as one of coercion as an element of Plaintiffs' claims, see Channer v. Hall, 112 F.3d 214 (5th Cir. 1997), or as consent as an element of Defendants' defense. Plaintiffs cannot avoid the burden of proof that each individual plaintiff faces, i.e., that it was conduct on the part of either Signal, Pol, or Dewan that was coercive so as to overcome his will and render his labor involuntary, by relying on the characteristics that apply broadly to the class as a whole. Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3) even though common issues are present in their forced labor claims.  The motion to certify is therefore DENIED as to the § 1589 forced labor claims.

## B.    *Trafficking, 18 U.S.C. § 1590*

Section 1590 of Title 18, pertaining to **Trafficking** With Respect to Peonage, Slavery, Involuntary, Servitude, or Forced Labor, provides:

> Whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services *in violation of this chapter* shall be [subject to criminal penalties].

18 U.S.C.A. § 1590 (West 2000 & Supp. 2001) (emphasis added).[38] The specific violations of Chapter 77 that Plaintiffs allege underlie their § 1590 trafficking claims, in addition to the violations of § 1589 regarding forced labor, are § 1583 (Enticement into slavery), § 1584 (Sale into involuntary servitude), § 1592(a) (Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and § 1594(a) (Attempted violations of §§ 1583, 1584, 1589, & 1590).

For the reasons explained in the § 1589 forced labor section above, the Court is persuaded that a human trafficking claim premised on a violation of the forced labor statute cannot be tried on a class-wide basis. Although a trafficking claim will focus to a great extent on the conduct of the defendant, it remains that a trafficking claim under § 1590 must be premised on a violation of one of the involuntary servitude statutes, even if indirectly so as is the case with § 1592(a), pertaining to the claim that Dewan confiscated passports while Plaintiffs were still in India. Under the facts of this case, individual issues will play a significant part in any claim premised on a violation of the statutes prohibiting forced labor, slavery, and involuntary servitude. Plaintiffs cannot satisfy the

---

[38] Congress amended § 1590 in 2008. That amendment is not applicable to Plaintiffs' claims.

predominance requirement of Rule 23(b)(3) even though common issues are present in their trafficking claims.  Therefore, Plaintiffs' trafficking claims under § 1590 are not amenable to class certification and the motion is DENIED as to these claims.

### 2. Racketeer Influenced and Corrupt Organizations Act (RICO)

The second set of claims that Plaintiffs seek to certify for class-wide treatment pursuant to Rule 23(b)(3) are their claims under the Racketeer Influenced and Corrupt Organizations Act or RICO, 18 U.S.C. §§ 1962(c) and 1962(d).  Plaintiffs' RICO claims are brought against all defendants.

The RICO statutory scheme is aimed at combating organized crime--RICO is located in Title 18 of the criminal code--and the Act imposes criminal and civil liability upon those who engage in certain "prohibited activities" which are listed in 18 U.S.C. § 1962 (a) through (c).[39]  Section 1962(c), which is Plaintiffs

---

[39] The prohibited activities are:

**(a)** It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . . .

**(b)** It shall be unlawful for any person through a pattern

61

first RICO claim, prohibits "any person employed by or associated with any enterprise" from participating in or conducting the affairs of that enterprise through a "pattern of racketeering activity."[40] <u>St. Paul Mercury Ins. Co. v. Williamson</u>, 224 F.3d 425, 445 (5th Cir. 2000); 18 U.S.C. § 1962(c).  Section 1962(d), which is Plaintiffs' second RICO claim, prohibits a conspiracy to

---

of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

**(c)** It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

**(d)** It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C.A. § 1962 (a) – (c) (West 2000).

[40] "Racketeering activity" means, in relevant part, any act which is indictable under any of the following provisions of Title 18 of the United States Code: section 1341 (mail fraud), section 1343 (wire fraud), section 1546 (fraud and misuse of visas, permits, and other documents), and sections 1581-1592 (peonage, slavery, and trafficking in persons).  18 U.S.C.A. § 1961(1)(B) (West 2000 & Supp. 2011).  The foregoing predicate acts are only those relevant to this lawsuit.  The RICO statute contains a lengthy and exhaustive list of criminal acts that can serve as predicate acts.  A "pattern of racketeering activity" requires at least two acts of racketeering activity.  <u>Id.</u> § 1961(5).

violate the provisions of § 1962(c).  Regardless of the
subsection, RICO claims under § 1962 have three common elements:
1) a person who engages in, 2) a pattern of racketeering activity,
3) connected to the acquisition, establishment, conduct, or
control of an enterprise.  Abraham v. Singh, 480 F.3d 351, 355 (5th
Cir. 2007) (quoting Word of Faith v. Sawyer, 90 F.3d 118, 122 (5th
Cir. 1996)).  Private individuals who are injured by criminal RICO
activity can recover damages in a civil action.[41]  18 U.S.C. § 1964
(c).

Plaintiffs allege three association-in-fact RICO enterprises
in support of their RICO claims.  "RICO Enterprise I" is defined
as "[a]ll Defendants and the United States Consular officers in
India."  (SAC ¶ 290).  Plaintiffs allege that the common purpose
of this enterprise is recruiting, transporting, providing,
processing, and obtaining foreign workers to work on shipyards in
the United States, including Signal's operations in Texas and

---

[41] RICO's civil enforcement provision provides in relevant
part:

> Any person injured in his business or property by reason
> of a violation of section 1962 of this chapter may sue
> therefor in any appropriate United States district court
> and shall recover threefold the damages he sustains and
> the cost of the suit, including a reasonable attorney's
> fee . . . .

18 U.S.C.A. § 1964 (c) (West 2000).

Mississippi.  (Id. ¶ 293).

"RICO Enterprise II" is defined as the "Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal." (SAC ¶ 291).  Plaintiffs allege that the common purpose of this enterprise is selling United States green cards, visas, and work opportunities to Indian workers to convince such workers to pay fees and travel to the United States to work for companies, including Signal.  (Id. ¶ 299).

"RICO Enterprise III" is defined as the "Recruiter Defendants, Defendant Signal, Legal Facilitator Defendants, Swetman Security, and M & M Bank."[42]  (SAC ¶ 292).  Plaintiffs allege that the common purpose of this enterprise is providing and maintaining a consistent and acquiescent labor force at Signal's operations.  (Id. ¶ 304).

Plaintiffs rely upon the following predicate acts of racketeering activity for their RICO violations under 18 U.S.C. §§ 1962(c)-(d):  a) enticement into slavery in violation of 18

---

[42] Swetman Security and M & M Bank are not parties to this litigation.  Plaintiffs contend that Swetman Security assisted Signal in effectuating forced labor and trafficking at Signal by participating in the forced detention and attempted deportation of several plaintiffs and perhaps by conducting other security activities at Signal's Pascagoula facility.  (RICO Case Stmt. ¶ 3B).

Plaintiffs contend that M & M Bank, at the direction of Signal, opened accounts for Plaintiffs and agreed to have their wages directly deposited into these accounts.  Plaintiffs contend that when some workers departed Signal the bank denied them access to their bank accounts at Signal's behest.  (Id. ¶ 3J).

U.S.C. § 1583; b) involuntary servitude in violation of 18 U.S.C. § 1584; c) forced labor in violation of 18 U.S.C. § 1589; d) trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590; e) unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a); f) mail fraud in violation of 18 U.S.C. § 1341; g) wire fraud in violation of 18 U.S.C. § 1343; and h) immigration document fraud in violation of 18 U.S.C. § 1546.

Plaintiffs allege that as a result of Defendants' RICO violations they have sustained similar injuries such as payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and additional legal fees. (SAC ¶¶ 327, 331). Plaintiffs seek treble damages, attorneys' fees, and costs. (Id. ¶ 332).

Plaintiffs argue that their RICO claims are amenable to certification because the answer to the core question of whether Signal and each of the other defendants conducted or participated in RICO enterprises through a pattern of racketeering activity will be the same for all putative class members. Plaintiffs contend that the trafficking and forced labor-based RICO claims are certifiable for the same reasons that the TVPA claims are certifiable. Regarding the mail/wire/visa fraud claims,

Plaintiffs contend that Signal and Burnett filed attestations with the Department of Labor and United States Citizenship and Immigration Services of a 10-month labor need in order to obtain H-2B visas for the plaintiff class all the while knowing that Signal's labor need was really two to three years and perhaps permanent; that Dewan, Pol, Burnett and Signal fraudulently promised United States green cards, visa extensions, and jobs; that all Defendants designed and carried out the fraudulent recruitment scheme by use of the phones, e-mail, and the mails.

Plaintiffs stress that they are not seeking to certify fraud claims that require proof of individualized reliance. In that vein, the first theory that Plaintiffs rely upon in support of certifying their fraud claims is that in issuing the H-2B visas the U.S. government relied on the false attestations of a 10 month labor need at Signal. Plaintiffs argue that they suffered injury as a direct result of this fraud directed at the U.S. government because but for the government having issued the H-2B visas, Plaintiffs would have never made the final installment payment to defendant Dewan, Pol, and Burnett. Plaintiffs argue that because there is a direct relationship between their injury and Defendants' mail and wire fraud upon the U.S. government, they need not show individualized, first party reliance in order to support their RICO fraud claims. This theory of third-party reliance is referred to throughout the parties' briefing as the

<u>Bridge</u>[43] claim.

Plaintiffs' second theory of RICO fraud is a "market approach" theory.  Plaintiffs contend that a jury could validly infer from the identical contracts that they signed and the exorbitant fees that they paid that the plaintiff class relied on Defendants' fraudulent representations regarding green cards. Without the promise of a green card no plaintiff would have paid the exorbitant fees that they paid to participate in the program and work at Signal.  Plaintiffs contend that the evidence adduced thus far demonstrates that the prices that Defendants charged were commensurate with what would be charged for green cards, not temporary work visas.  Plaintiffs advise that they will introduce expert testimony showing that in the Indian market for foreign visas no applicant would have paid the money that Plaintiffs paid without the expectation of a green card.  Thus, Plaintiffs argue that they can prove reliance for their fraud claims on a class-wide basis without the need for individualized proof.  According to Plaintiffs, there is no need to ask each of them individually if he relied on the contents of the contract that he signed.

Defendants argue that Plaintiffs' RICO claims cannot be certified for class treatment because RICO claims simply defy certification in any form and RICO's legal requirements preclude

---

[43] <u>Bridge v. Phoenix Bond & Indem. Co.</u>, 553 U.S. 639 (2008).

certification of the trafficking and fraud-based claims.
Defendants argue that RICO claims premised on the trafficking and
involuntary servitude predicate acts cannot be certified for the
same reasons that the TVPA claims are not subject to
certification, _i.e._, that trafficking and other coercion claims
are implicitly based upon reliance on threats--something that can
only be proven on an individual basis.  Defendants also argue
that RICO causation cannot be proven on a class-wide basis
because a RICO plaintiff must establish that his injury is caused
by conduct that is wrongful under RICO--again, something that can
only be proven on an individual basis.  Signal argues that
Plaintiffs' fraud-based RICO claims are founded on allegations of
first-party individual reliance and under the law in this circuit
such claims cannot be certified under Rule 23(b)(3) because
individual issues will predominate.

   **A.    Section 1962(c)--Substantive RICO Violation**

                   *Trafficking Predicate Acts*

     Plaintiffs' RICO claims premised on the predicate acts of
enticement into slavery in violation of 18 U.S.C. § 1583,
involuntary servitude in violation of 18 U.S.C. § 1584, forced
labor in violation of 18 U.S.C. § 1589, trafficking persons with
respect to modern day slavery, involuntary servitude, and forced
labor in violation of 18 U.S.C. § 1590, and unlawful document-

related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a) cannot be certified for the same reasons that the claims cannot be certified when sued upon directly under the TVPA.  Plaintiffs will be required to prove that the defendant committed the predicate acts upon which they rely for the pattern of racketeering activity.  As previously explained in the section addressing certification of the TVPA claims, proof of these predicate acts, which are all premised on coercion, cannot be made without resort to individualized proof in light of the facts of this case.  Common issues will not predominate and certification under Rule 23(b)(3) is therefore not appropriate.

### *Fraud-Based Predicate Acts*

Plaintiffs also rely upon the following fraud-based predicate acts in support of their § 1962(c) RICO claims:  mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and immigration document fraud in violation of 18 U.S.C. § 1546.  As explained above, Plaintiffs urge two arguments in support of their contention that common issues will predominate under Rule 23(b)(3) with these fraud-based claims: 1) that a fraud-on-the-government Bridge claim requires no individualized proof of reliance, and 2) that first-party reliance can be proven via common evidence under Plaintiffs' market approach theory.

1)   **Bridge** claim

a.   **Motion to Strike-1012 and Motion to File Third Amended Complaint**

In response to Plaintiffs' Bridge claim of third party reliance, Signal has filed a Motion to Strike-1012 arguing that Plaintiffs did not adequately plead a third party reliance claim for the predicate acts of visa document fraud under 18 U.S.C. § 1546(a).  According to Signal, Plaintiffs only pled first-party reliance and those claims are not subject to certification.  Even so, Signal argues that the § 1546 Bridge claim cannot be certified because RICO proximate cause will not be satisfied.

The Motion to Strike-1012 is DENIED and the Motion to File Third Amended Complaint is DENIED AS MOOT.  The Court is persuaded that Plaintiffs adequately pled their RICO claims and that there is no need to amend their complaint.  Signal and the other defendants will suffer no prejudice at this juncture because the Court has determined that the RICO claims premised on predicate acts under 18 U.S.C. § 1546 are not amenable to certification anyway.  As the case moves into the merits phase, notice as to the scope of Plaintiffs' § 1546 claims will not be an issue because Defendants are now all well aware of Plaintiffs' various fraud theories, and Defendants will be free to conduct whatever discovery they believe to be necessary to defend the

RICO claims premised on violation of § 1546.

The Court is not moved by Signal's contention that evidence elicited at their representatives' depositions should be stricken.  Signal's representatives were testifying as to facts about which they had first-hand knowledge and the questions that Plaintiffs' counsel asked were fair game.

### b.   Analysis

Causation is a crucial element of every civil RICO claim. In Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268 (1992), the Supreme Court held that factual or "but for" causation alone is insufficient to prove causation for a civil RICO claim.  Proximate cause is also required.  Id.  Proximate cause requires a direct relation between the injury asserted and the injurious conduct alleged.  Id.  When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged RICO violation led directly to the plaintiff's injuries.  Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461 (2006).  With RICO claims, the compensable injury at issue is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise.  Sedima v. IMREX Co., 473 U.S. 479, 497 (1985). Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the predicate acts.  Id.

71

When the predicate acts are fraud-based, proof of reliance on the fraud is often a necessary prerequisite to establishing the causation required by § 1964(c).  Anza, 547 U.S. at 478 (Thomas, J., concurring in part and dissenting in part).  Prior to the Supreme Court's decision in Bridge, the law in this circuit required a RICO plaintiff to prove individual, first-party reliance on alleged fraud as part of the element of causation.  See Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205 (5th Cir. 2003).  In Sandwich Chef the Fifth Circuit explained that RICO fraud actions require a showing of detrimental reliance *by the plaintiff* on the alleged fraud in order to satisfy proximate cause.  Id. at 219 (quoting Summit Props., Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 560 (5th Cir. 2000)).  Fraud actions that require proof of individual reliance cannot be certified for class treatment under Rule 23(b)(3) because individual rather than common issues will predominate.  Id. at 211, 219; Castano, 84 F.3d at 745. Essentially, Sandwich Chef all but foreclosed the possibility of Rule 23(b)(3) certification of fraud-based RICO actions in this circuit.[44]

In 2008 the Supreme Court decided Bridge, which held that

---

[44] Sandwich Chef expressly held open the possibility that proof of fraud upon a third party could constitute proof of reliance by the plaintiff under circumstances not present in that case.  319 F.3d at 223 n.13.

first-party reliance is not an element of a civil RICO claim premised on mail fraud.  553 U.S. at 641.  The plaintiffs in Bridge were participants in a local tax sale.  They claimed that the defendants' acts of mail fraud against the county gave the defendants an unfair advantage at tax sale auctions.  The district court dismissed the plaintiffs' RICO claims because the plaintiffs were not the direct recipients of the allegedly fraudulent statements and therefore could not have relied upon them.

The Seventh Circuit reversed and the Supreme Court granted certiorari to address whether first-party reliance is an element of a civil RICO claim predicated on mail fraud.  Bridge, 553 U.S. at 646.  The Supreme Court held that first-party reliance is not an element of a civil RICO claim predicated on mail fraud.  Id. at 649.  The Court reasoned that neither the mail fraud statute nor the RICO statute imposed a requirement of first-party reliance.  Id.  A person can be injured by reason of a pattern of mail fraud even if he has not relied on any misrepresentations.  Id. at 649.

The Court also rejected the contention that proof of first-party reliance is necessary to establish proximate causation.  Bridge, 553 U.S. at 654-55.  But a RICO plaintiff will have to establish that *someone* relied upon the defendant's misrepresentation because without such reliance even "but for"

causation will probably be lacking.[45]   Id. at 658-59.

Thus, while Bridge overruled cases like Sandwich Chef to the extent that they conflicted with the decision by requiring first-party reliance as part of a RICO fraud claim, see St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir. 2009), Bridge did not eliminate the need for reliance *by someone* when proof of the element of proximate cause necessitates it.  Bridge likewise does not foreclose that in some situations proof of first-party reliance might very well be necessary to establish causation. And where proof of first-party reliance breaks down into individual determinations of reliance then Sandwich Chef's admonitions about why certification under Rule 23(b)(3) is not likely still survive.  Further, causation can be more challenging to prove when the plaintiff relies upon fraud perpetrated on a third party.  See, e.g., Hemi Group, LLC v. City of New York, 130 S. Ct. 983 (2010); Anza, 547 U.S. at 457.

Turning now to the Bridge claim herein, the contention is that defendants Signal and Burnett lied on forms submitted to the U.S. government in order to obtain approval to bring temporary H-2B workers into the United States to work for Signal.  The "lies"

---

[45] The Fifth Circuit made a very similar observation in Sandwich Chef, noting that for a misrepresentation to cause injury there must be reliance somewhere.  319 F.3d at 218-19, After all, knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the "but for" cause of the damages.  Id. (citing Summit, 214 F.3d at 560 n.19).

Case 1:13-cv-00323-MAC-ZJH   Document 43-3   Filed 09/27/13   Page 100 of 148 PageID #:
1020
Case 2:08-cv-01220-SM-DEK   Document 1117   Filed 01/04/12   Page 75 of 100

at issue are the assertions that Signal's labor needs were
temporary and limited to a 10 month period.  According to
Plaintiffs, the government clearly relied on these
misrepresentations because otherwise Signal would not have
received approval to hire H-2B foreign workers.  Plaintiffs
contend that this third-party reliance by the government on
Signal's and Burnett's fraudulent statements does not implicate
individual proof the way that first-party reliance does and
therefore does not create an impediment to certification under
Rule 23(b)(3).  The <u>Bridge</u> claim implicates fraud under 18 U.S.C.
§ 1546[46] most strongly but §1341 and § 1343 are also implicated

_____

[46] Section 1546, entitled Fraud and misuse of visas,
permits, and other documents, provides in relevant part:

> Whoever knowingly forges, counterfeits, alters, or falsely
> makes any immigrant or nonimmigrant visa, permit, border
> crossing card, alien registration receipt card, or other
> document prescribed by statute or regulation for entry
> into or as evidence of authorized stay or employment in
> the United States, or utters, uses, attempts to use,
> possesses, obtains, accepts, or receives any such visa,
> permit, border crossing card, alien registration receipt
> card, or other document prescribed by statute or
> regulation for entry into or as evidence of authorized
> stay or employment in the United States, knowing it to be
> forged, counterfeited, altered, or falsely made, or to
> have been procured by means of any false claim or
> statement, or to have been otherwise procured by fraud or
> unlawfully obtained; or

> . . . .

> Whoever knowingly makes under oath, or as permitted under
> penalty of perjury under section 1746 of title 28, United
> States Code, knowingly subscribes as true, any false
> statement with respect to a material fact in any

because the mails and wires were surely used to transmit the H-2B documents to the government.

Plaintiffs are of course correct in their contention that proving that the government relied on misrepresentations in approving H-2B status for Signal, and ultimately in issuing the hundreds of H-2B visas when the individual plaintiffs applied for them, does not trigger the individual questions that can often derail certification of fraud-based RICO actions. It does not necessarily follow, however, that Plaintiffs can nevertheless prove causation for their RICO injuries without resort to individual proof of reliance. In fact, the Court is persuaded that they cannot.

In order to understand why individual proof of reliance is necessary to the element of causation in this case notwithstanding Plaintiffs' fraud on the government theory, one must consider the nature of the RICO violations alleged in this case and the specific injuries that Plaintiffs' attribute to

---

application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact--

Shall be fined under this title or imprisoned not more than 25 years . . . .

18 U.S.C.A. § 1546(a) (West 2000 & Supp. 2011).

those RICO violations.  Plaintiffs' claim in a nutshell is that
the defendants engaged in a scheme to defraud them by making
false promises regarding green cards.  (RICO Case Stmt.¶ 5D).
Fraud on the government aside, it has always been and remains
Plaintiffs' contention that without the fraudulent promise of a
green card they would not have paid the significant recruitment
fees, would not have burdened themselves with massive amounts of
debt, and would not have come to the United States to work for
Signal.  (Id. ¶ 9).  Plaintiffs claim to have endured great
financial, personal, and familial sacrifices in reliance on
Defendants' misrepresentations.  The most significant of the
specific injuries that Plaintiffs attribute to Defendants'
fraudulent scheme are the exorbitant fees that they paid to
Dewan, Pol, Rao, and Burnett, and the interest on the loans that
Plaintiffs incurred to finance their way into the program.  (Id.
¶¶ 4, 17).  But these injuries were not the consequence of the
alleged fraud that Signal and Burnett directed at the U.S.
government when applying for H-2B status.  In fact, for many of
the plaintiffs the green card scheme began before Signal even
entered the picture and applied for H-2B status.  As to every
plaintiff in this case, his RICO injuries arose directly out of
the allegedly false and fraudulent green card promises that
Dewan, Pol, Rao, and Burnett made to him.  And the only way that
any individual plaintiff could sustain an injury from that fraud

was to rely upon it in ignorance of the truth.

Plaintiffs do not attempt to argue that the entirety of their injuries are attributable to Signal's and Burnett's alleged fraud on the government. Instead, Plaintiffs point out that the third installment payment that they paid to the recruiters is attributable to the government having approved Signal's H-2B status, the government having done so in reliance on misrepresentations as to Signal's labor needs. Moreover, Plaintiffs have made the allegation that once they arrived in the United States Signal continued to use the false promise of a green card in order to placate them, and therefore they continued to sustain injury from the fraudulent green card scheme after arriving at Signal via the H-2B program.

The fact that Signal received approval to bring H-2B workers into this country is surely a but for cause of some portion of each plaintiff's alleged injuries--for those plaintiffs who were recruited specifically for Signal after it had obtained approval to bring H-2B workers into the United States, the fraud on the government is probably *one* but for cause of every aspect of those plaintiffs' injuries; for those plaintiffs who were recruited and began incurring payments and debt *before* Signal entered the picture, the fraud on the government is perhaps one but for cause of a latter portion of their injuries. But for every plaintiff in this case, the totality of the injuries alleged, or at the

78

very least the most significant of the injuries alleged, were not proximately caused by fraudulent representations made to the government--they were proximately caused by Defendants' false representations to the plaintiff of receiving a green card.  It was the fraudulent conduct directed specifically at the plaintiffs that injured them.

In a fraudulent scheme like the one alleged in this case that spans several years and the globe, and involves numerous players to effect its purpose, the instances of fraud that occur might very well be legion.  But the fact that Plaintiffs can identify one narrow aspect of fraud and prove that someone relied upon it, does not strip the question of RICO causation in this case of its individual nature.  It is important at this juncture to recognize exactly what Bridge teaches about reliance in a RICO fraud case--reliance is *not* an element of the case.  Reliance is important only insofar as it is necessary to prove causation. And while causation fails at the outset if no one relies on a fraudulent misrepresentation, it does not follow that causation between a RICO violation and the injury alleged is satisfied simply because the plaintiff can identify one aspect of fraudulent conduct that occurred in furtherance of the scheme to defraud and show that someone relied on it.  RICO injuries must arise out of the unlawful conduct that constitutes the predicate acts.  The injuries asserted in this case are not proximately

caused by any predicate act premised on fraud on the government.
That's not to say that the alleged fraud on the government is not
relevant to some aspect of Plaintiffs' RICO claims, including the
element of causation.  But the Court is persuaded that in light
of the specific scheme to defraud that Plaintiffs allege in this
case, they will still have to prove first-party reliance on the
alleged fraud that was directed at them--the fraud that most
proximately caused their injuries.

Furthermore, in Bridge, the entirety of the fraudulent
conduct alleged was directed at third parties whose reliance on
it *directly* injured the plaintiff.  In this case, the majority of
the injurious fraudulent conduct was directed specifically and
directly to Plaintiffs.  The fraud on the government that
Plaintiffs allude to herein is not the fraud that directly
injured Plaintiffs.

To be sure, there will be significant overlap in the
evidence if each Plaintiff is required to present his RICO claim
to a jury.  And surely there will be numerous common issues
amongst the cases.  But in light of the issue of individual
reliance, those common issues will not predominate even if they
happen to outnumber the individual issues.  The question of
individual reliance will be paramount to resolving whether
Plaintiffs' injuries were caused by a RICO violation.  Therefore,
Plaintiffs' reliance on Bridge in support of certification under

Rule 23(b)(3) is misplaced.

### 2)   Market Approach Theory

### a.   Motion to Strike-1082

Signal has filed a second Motion to Strike-1082 arguing in essence that Plaintiffs' contention that they can prove reliance via written contracts is new.  Plaintiffs' market approach theory is simply one way that they hope to show causation with respect to their RICO claims.  As explained above, reliance is not an element of the claims, and therefore neither is the method that Plaintiffs intend to rely upon to show it.  The motion is DENIED.

### b.   Analysis

Regarding Plaintiffs' "market approach" theory of reliance, Defendants argue that Plaintiffs cannot obtain certification in this manner because they are essentially arguing for a presumption of reliance based on circumstantial evidence. Defendants contend that certification on this theory would likely run afoul of Defendants' Seventh Amendment right to a jury trial.

In contrast to certification under Bridge, Plaintiffs' market approach theory is grounded on first-party reliance--Plaintiffs' own reliance on Defendants' fraudulent promises regarding green cards.  However, Plaintiffs contend that first-party reliance can be proven via circumstantial, class-wide evidence that eliminates the need for individualized proof.

81

Plaintiffs point to the decision in <u>Klay v. Humana, Inc.</u>, 382 F.3d 1241 (11th Cir. 2004), as an example of how common evidence can be used to establish first-party reliance.

Certainly evidence such as the contracts that Plaintiffs signed, the slide show presentations that were made at recruitment seminars, and even the quantum of the fees that Plaintiffs paid will be relevant to establishing individual reliance on the green card promise. But the Court is not persuaded that this case presents a situation like <u>Klay</u> where first-party reliance can be established based solely on this type of evidence. Plaintiffs' contention in this case is that they were defrauded by a false promise of a green card into joining Dewan's recruitment program, traveling to the United States to work for Signal under conditions so deplorable that they were violative of the criminal laws of this country, and then duped once again into staying on at Signal based on Signal's own false representations regarding green cards and permanent employment. Plaintiffs allege injuries arising out of each leg of the fraudulent scheme. But while the circumstantial evidence that Plaintiffs point to for proving first-party reliance might be sufficient to permit a jury to infer that a plaintiff signed up for the program and paid the first installment in reliance on the promise of a green card, it is not necessarily sufficient to carry the entire claim to its conclusion at Signal.

Each plaintiff who came to the United States had to apply for an H-2B temporary visa in order to enter the country. Some plaintiffs like Dhananjaya had previously worked in the United States under the temporary H-2B guest-worker program and therefore must have understood the temporary nature of the visa. Plaintiffs understood that they could not divulge to consular staff that they were expecting to get green cards or to stay in the United States permanently. Arguably, Plaintiffs had to be willing to misrepresent the truth during those interviews and some presumably did just that. Plaintiffs arrived at Signal in waves and the first group to arrive began protesting immediately about the lack of green cards yet others continued to go to Signal voluntarily on H-2B visas, presumably based on representations made by Signal personal to other class members. Although Plaintiffs maintain that Dewan lied to them about the ramifications of going to Signal on temporary visas, Dewan testified that some of the class members were so adamant about coming to the United States that they were willing to do so even though it might mean not getting a green card. Once arrived at Signal some of the plaintiff class was in Texas and some was in Mississippi, and perhaps subject to differing representations by Signal personnel.

All of these facts, and many others, must be weighed in light of the fact that the plaintiff class as a whole did not

labor under any specific vulnerabilities when they decided to join the green card program.  That's not to say that they were not the victims of fraud but Plaintiffs are not a class of children or mentally challenged persons.  Plaintiffs were adult men, some of whom had worked overseas before and some of whom were well-educated and savvy.  All of the Plaintiffs knew that green cards were difficult to get and could only be obtained from the United States government.  Plaintiffs were clearly eager to come to the United States--some individuals tried to obtain employment with Signal even without going through the recruiting scheme.  A jury could find, for any given individual plaintiff, that given the nature of green cards, the significant money that Defendants were demanding, and a plaintiff's own complicity in doing whatever was necessary to enter this country, that the injuries alleged were not proximately caused by Defendants' conduct.  On the other hand, a jury could find, for any given individual plaintiff, that Defendants' conduct did cause the plaintiff's injuries.  The Court is persuaded that Defendants have the right to test each plaintiff's claim of reliance to the jury.

None of the foregoing necessarily means that any given plaintiff did not rely on Defendants' allegedly fraudulent representations when choosing to join the program, travel to the United States, and work for Signal.  And the Court is not

disputing Plaintiffs' contention that many members of the class faced a Hobson's choice of either coming to the United States on a temporary H-2B visa or losing all of their money.  But it is clear that in order to get from point A, which is joining the recruitment program, to point C, which is staying on as part of Signal's compliant workforce, far more fraud must have been involved than the class-wide evidence that Plaintiffs point to in this case.  In fact, Plaintiffs claim exactly that.  Plaintiffs contend that they were lied to about the temporary nature of an H-2B visa and lied to about whether green card processing would continue once they arrived at Signal.  But these alleged misrepresentations, which would have been crucial to understanding why Plaintiffs came to Signal, were made individually.  And in contrast to the <u>Klay</u> case, which seemingly involved no direct communication of misrepresentations by the defendants to the plaintiffs, the plaintiffs in this case had direct contact with the recruiters and the Signal personnel who allegedly lied to them about green cards and permanent residency. Those lies form a crucial part of each plaintiff's reliance on the fraud at issue in this case.

For the foregoing reasons the Court is persuaded that Plaintiffs cannot prove their § 1962(c) substantive RICO claims without resort to individualized proof in light of the facts of this case.  Common issues will not predominate and certification

under Rule 23(b)(3) is therefore not appropriate.[47]   The motion to certify is therefore DENIED as to Plaintiffs' RICO claims under 18 U.S.C. § 1962(c).

**B.   Section 1962(d)--RICO Conspiracy**

RICO criminalizes conspiracy to violate any of its substantive provisions. United States v. Delgado, 401 F.3d 290, 296 (2005) (citing 18 U.S.C. § 1962(d)).  In the criminal setting, the government must establish that two or more people agreed to commit a substantive RICO offense, and that the defendant knew of and agreed to the overall objective of the RICO offense.  Id. (quoting United States v. Posada-Rios, 158 F.3d 832, 855 (5th Cir. 1998)).  The conspirator need not have committed or agreed to commit two predicate acts.  Id. (citing Salinas v. United States, 522 U.S. 52, 61-66 (1997)).

The core of a RICO civil conspiracy is an agreement to commit predicate acts. Abraham, 480 F.3d 351, 357 (5th Cir. 2007).  A plaintiff can use § 1962(d) to sue a defendant or co-conspirator who might not have violated one of the substantive provisions of § 1962. Beck v. Prupis, 529 U.S. 494, 506-07 (2000).  But while § 1962(d) criminalizes an illegal agreement, §

---

[47] The Court also notes that some of the injuries/damages that Plaintiffs allege in conjunction with the RICO violations are highly individualized in nature and not subject to formulaic calculation:  Assumption of significant interest bearing debt, interest on loans, lost work and professional opportunities, and lost and unpaid wages.

1964(c) imposes civil liability and therefore asks whether an admittedly illegal agreement gives rise to damages. <u>Beck</u>, 529 U.S. at 507 (Stevens, J., dissenting). In <u>Beck</u>, the Supreme Court held that a civil RICO conspiracy plaintiff cannot establish injury for purposes of § 1962(d) by relying on an overt act that is not unlawful under the RICO statute. <u>Beck</u>, 529 U.S. at 505-06. The injury recoverable for a RICO conspiracy violation must result from either an act of racketeering or conduct otherwise unlawful under the statute. <u>Id.</u> at 507. An agreement alone will not give rise to civil liability under §§ 1962(d) and 1964(c). <u>Id.</u> at 508 n.1 (Stevens, J., dissenting).

The implication of the foregoing discussion is clear. Proving the mere existence of a RICO conspiracy might be sufficient to trigger criminal sanctions but it is not sufficient to recover damages in a civil suit. Plaintiffs will have to prove that their injuries were caused by the predicate acts that they have alleged. But as the Court explained in the section discussing RICO liability under § 1962(c), the predicate acts are not amenable to certification under Rule 23(b)(3) because common issues will not predominate. The motion to certify is therefore DENIED as to Plaintiffs' RICO claims under 18 U.S.C. § 1962(d).

**3.   Civil Rights Claims (42 U.S.C. § 1981)**

The third set of claims that Plaintiffs seek to certify for class-wide treatment are their disparate treatment claims under

42 U.S.C. § 1981 for discriminatory employment practices. Plaintiffs' § 1981 claims are brought against defendant Signal. In support of their § 1981 claims, Plaintiffs allege that Signal discriminated against them with respect to the mandatory room and board arrangements at the Signal labor camps, which the non-Indian and/or U.S. citizen employees were not subject to. (SAC ¶ 336, 337). Plaintiffs also allege that Signal discriminated against them with respect to job assignments and other conditions of employment. (Id. at ¶ 378). Plaintiffs allege that Signal maintained an objectively hostile and abusive work environment based on their race, national origin, and/or alienage. (Id. at ¶¶ 339-342). Plaintiffs seek damages, including compensatory and punitive damages, attorney's fees, and costs.[48] (Id. at ¶ 345).

Section 1981, Equal Rights Under the Law, provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

---

[48] Again, this claim does not include all members of the plaintiff class because it only involves those plaintiffs who actually worked at Signal. See note 7, supra.

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C.A. § 1981 (West 2003).

Section 1981 provides a federal remedy for workplace discrimination in private employment on the basis of race or ethnicity. See Johnson v. Railway Express Agency, Inc., 421 U.S. 454 (1975); St. Francis College v. Al-Khazraji, 481 U.S. 604 (1987). To establish a prima facie case under § 1981, a plaintiff must show: 1) that he is a racial minority, 2) that the defendant intended to discriminate against him on the basis of race, and 3) that the discrimination concerns one or more of the activities enumerated in the statute. Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745, -- F.3d --, 2011 WL 4579133, at *2 (5th Cir. Oct. 5, 2011) (citing Felton v. Polles, 315 F.3d 470, 483 (5th Cir. 2002), abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67 (2006)). Proof of intentional discrimination is essential for relief under § 1981. Id. (citing Gen. Bldg. Contractors Ass'n v. Penn., 458 U.S. 375,

389 (1982)).

Plaintiffs argue that their § 1981 claims are amenable to certification because they are grounded on Signal's uniform corporate policies toward the putative class.  Plaintiffs contend that they will prove their § 1981 claims with generalized proof applicable to the class as a whole--Signal's executives' testimony, Signal's emails, employee writings, etc.  According to Plaintiffs, common issues not only predominate the § 1981 claims, they constitute the only issues.

Plaintiffs point out that Signal's basis for resisting certification of their § 1981 claims is that individualized proof will be necessary to prove subjective harm and mental distress injury.  But Plaintiffs contend that this will not be an issue because they will not seek emotional distress injury as part of their claim for compensatory damages.  Further, the compensatory damages that they do seek are "refund-type" recovery  of the recruitment fees and man camp fees, which are subject to a formulaic calculation.  Therefore, according to Plaintiffs, issues pertaining to individual damage awards do not foreclose certification.

In Allison v. Citgo Petoleum Corp., the Fifth Circuit addressed the issue of whether claims of disparate treatment race discrimination were subject to class certification under either Rule 23(b)(2) or (b)(3).  151 F.3d 402 (5th Cir. 1998).  The Fifth

Circuit explained that compensatory damages *for intangible injuries* are not presumed merely because the plaintiff proves that a statutory violation has occurred.  Id. at 416-17. Specific individualized proof is necessary and compensatory damages may be awarded only if the plaintiff submits proof of actual injury.  Id. at 417 (citing Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 938-40(5th Cir. 1996); Brady v. Fort Bend County, 145 F.3d 691, 717-20 (5th Cir. 1998)).  The very nature of compensatory damages for intangible injuries necessarily implicates the subjective differences of each plaintiff's circumstances so that they constitute an individual, not a class-wide remedy.  Allison, 151 F.3d at 417.  Allison explains why a plaintiff class seeking compensatory damages for a discrimination claim faces great difficulty in obtaining certification under Rule 23(b)(3) because individual issues will typically predominate.

While Plaintiffs are likely correct in their assertion that intentional discrimination by Signal can be proven via class-wide, non-individualized evidence, Plaintiffs' attempt to circumvent the predominance problem surrounding damages is unconvincing for several reasons.  Aside from punitive damages, all of the relief that Plaintiffs seek for the § 1981 claims are compensatory in nature.  In other words, there are no back pay issues or front pay issues or other remedies that would normally

pertain to an ongoing employment relationship.[49]  But compensatory

damages arising out of workplace discrimination are not presumed

to be owed simply because the plaintiff establishes that the

employer maintained a discriminatory work environment.  In order

to obtain compensatory damages the plaintiff must prove actual

injury to himself and that injury must be attributable to (caused

by) the defendant's disparate treatment.  Thus, while Plaintiffs

have attempted to define their compensatory damage claims in

formulaic "refund" terms, it is clear that the significant

recruitment fees that they are trying to recoup as compensatory

damages--fees that were paid to third parties before the

plaintiffs even arrived at Signal--are not an element of damages

attributable to discrimination at Signal's facilities.

Plaintiffs cannot change the nature of § 1981 recovery by

defining their own damages scheme based on what they believe

would be a just result under the bigger picture of facts.

Plaintiffs are only entitled to recover for those damages that

they can prove were caused by Signal's alleged race

discrimination.

    Further, the Court finds Plaintiffs' suggestion that they

will forego any type of emotional distress recovery perplexing.

The class representatives willingness to forego a claim that

---

    [49] None of the members of the plaintiff class remain
employed at Signal.

would preclude certification is not per se invalid but the Court is persuaded that it does create serious concerns for the rights of the plaintiff class. See Colindres v. Quietflex Manuf., 235 F.R.D. 347, 375 (S.D. Tex. 2006). Based on Plaintiffs' own assertions about employment at Signal, the Court would assume that emotional injury would not be an insignificant part of Plaintiffs' claims. Plaintiffs have argued repeatedly about how Signal created a psychologically coercive work environment that basically turned them into modern day slaves. Their entire cause of action under the TVPA was based on conduct supposedly so psychologically coercive as to cause them to render labor involuntarily. Plaintiffs have characterized life at Signal as a "racialized ghetto" where they experienced feelings of isolation and segregation, as "prisoners" in the man camps, subject to abuse, threats, and exploitation. Plaintiffs allege that some class members became physically ill and required hospitalization while living in the man camps. Plaintiffs have pointed to the Black Friday suicide incident as evidence of how emotionally abysmal and untenable the situation at Signal had become for them. Plaintiffs allege that they were subjected to offensive language and threats (SAC ¶ 210) and that they were frightened and confused while at Signal (SAC ¶ 233-35). The Court finds it questionable that this case, which again is a case grounded on claims of psychological coercion and manipulation, can be

certified for class treatment based on the assertion that the class representatives are not making claims for psychological injury--an assertion that would eventually bind the entire plaintiff class if the § 1981 were certified.  And to the extent that the class representatives are willing to waive emotional damages in this case, this militates against a finding of adequacy under Rule 23(a)(4) for these representatives.

Moreover, Plaintiffs have pled a claim for punitive damages in addition to the compensatory damages that they seek.  (SAC ¶ 345).  Punitive damages cannot be assessed merely upon a finding that the defendant discriminated against the class and the award is based only in part upon the defendant's conduct.  <u>Allison</u>, 151 F.3d at 417.  A punitive damage award turns on the recovery of compensatory damages and must be reasonably related to the plaintiff's compensatory damage award.  <u>Id.</u> at 417-18 (<u>citing</u> <u>Patterson</u>, 90 F.3d at 943-44).  Punitive damages are not capable of computation by reference to objective standards.  <u>Id.</u> at 418.

Plaintiffs have not suggested that the issues of liability and damages can be severed and tried separately in order to facilitate certification.  Of course, bifurcation carries with it the danger of Seventh Amendment problems if a second jury is called upon to reexamine facts and issues addressed by the first jury.  <u>Castano</u>, 84 F.3d at 750; <u>Mullen v. Treasure Chest Casino, LLC</u>, 186 F.3d 620, 628 (5th Cir. 1999).  The Court is persuaded

that at the very least the claim for punitive damages would carry the risk of Seventh Amendment problems in a bifurcated scenario. Punitive damages are necessarily based in part upon the evidence used to establish liability because punitive damages are a measure of the reprehensibility of the defendant's discriminatory conduct. But punitive damages are not appropriate until the plaintiff proves actual harm and compensatory damages and therefore cannot be awarded in the liability phase of a trial.

Finally, even aside from the predominance problem that the damages aspect of the § 1981 claims creates, the most compelling rationale for finding superiority in a class action is not present in this case. Plaintiffs' § 1981 claims do not present a negative value suit situation in which the paltry award that each plaintiff might recover precludes prosecution of individual claims. See Castano, 84 F.3d at 748. And the potential for recovery of attorney's fees and punitive damages makes the case even less compelling for finding class action treatment superior to individual trials. See id.

In sum, the Court is persuaded that neither the predominance nor superiority requirements of Rule 23(b)(3) are satisfied for Plaintiffs' § 1981 claims. The motion to certify is therefore DENIED as to the § 1981 discrimination claims

**4.    The Ku Klux Klan Act of 1871, 42 U.S.C. § 1985, and the**

**Thirteenth Amendment**

The last set of claims that Plaintiffs seek to certify for class-wide treatment are their claims under 42 U.S.C. § 1985(3). Plaintiffs' § 1985 claims are brought against defendants Signal, Pol, and Dewan. The gist of Plaintiffs' § 1985 claim is that Defendants conspired to subject Plaintiffs to involuntary servitude based on their race, ethnicity and alienage. (Rec. Doc. 994-1, at 67-68). In support of the § 1985 claim, Plaintiffs allege that Signal, Pol, and Dewan conspired with other non-defendant parties, including Swetman Security and M & M Bank, for the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment and its implementing and enforcing statutes, 18 U.S.C. §§ 1589 and 1590, to be free from forced labor, involuntary servitude, and trafficking in persons. (SAC ¶ 348). Plaintiffs allege that Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive Plaintiffs of their rights. (Id. ¶ 349). Plaintiffs allege that they have suffered damages as a result and they seek compensatory damages, punitive damages, and attorney's fees and costs. (Id. ¶¶ 351-52).

Section 1985(3), Conspiracy to Interfere With Civil Rights, provides in relevant part:

If two or more persons in any State or Territory conspire

96

. . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; . . . in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C.A. § 1985(3) (West 2003).

In order to prove a conspiracy under § 1985(3), a plaintiff must show inter alia 1) that some racial, or perhaps otherwise class-based, invidiously discriminatory animus lay behind the conspirators' action, and 2) that the conspiracy aimed at interfering with rights that are protected against "private as well as official, encroachment." Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 267-68 (1993) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971); Carpenters v. Scott, 463 U.S. 825, 833 (1983)). Section 1985(3) provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates. Great Am. Fed. Sav. & Loan Ass'n v. Novotny, 442 U.S. 366, 372 (1979).

Conspiracies among private actors (as opposed to state actors) are within the scope of § 1985(3) so long as the right at issue is one guaranteed against private (as opposed to state)

97

infringement.  Id. (citing Carpenters, 463 U.S. at 833).  There are few such rights but the Supreme Court has expressly acknowledged that the right to involuntary servitude, as guaranteed by the Thirteenth Amendment, is one such right.[50]  Id. (citing Kozminski, 487 U.S. at 942).

The Thirteenth Amendment states that "[n]either slavery nor involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction."  U.S. Const. amend. XIII, § 1.  The primary purpose of the amendment was to abolish the institution of African slavery as it had existed in the United States at the time of the Civil War, although the amendment has not been limited to that application. Kozminski, 487 U.S. at 942.  Rather, the Thirteenth Amendment extends to cover "those forms of compulsory labor akin to African slavery which in practical operation would tend to produce like undesirable results."  Id. (quoting Butler v. Perry, 240 U.S.

---

[50] The contours of a § 1985(3) claim are often nebulous in light of the varied jurisprudence addressing the cause of action. This Court is convinced that the "right" to be free from involuntary servitude for purposes of a § 1985(3) claim derives not from §§ 1589 & 1590, as Plaintiffs suggest, but from the Thirteenth Amendment itself otherwise every criminal statute that involves a victim could potentially give rise to a "right."  This would be contrary to the admonition that the Supreme Court has long held since Griffin v. Breckenridge, 403 U.S. 88 (1971), that § 1985(3) cannot be interpreted in such a way so as to render it "a general federal tort law."  Bray, 506 U.S. at 268 (quoting Griffin, 403 U.S. at 102).

328, 332 (1916)).

The Court is persuaded that Plaintiffs' § 1985(3) claim cannot be certified for class treatment.   In <u>Kozminski</u>, the Supreme Court discussed the types of coercion that must be shown under the Thirteenth Amendment.   Those types of coercion are physical coercion and legal coercion in which the victim is compelled to work by law.   Neither type of coercion is at issue in this case.   The TVPA, which sought to criminalize involuntary servitude based other forms of coercion, did not change the scope of the Thirteenth Amendment.   And even if this Court errs as a matter of law in concluding that Plaintiffs have no "rights" under §§ 1589 and 1590 to vindicate via § 1985(3), <u>see</u> note 50, <u>supra</u>, a claim premised on a violation of §§ 1589 and 1590 is not subject to certification for the same reasons that none of the TVPA claims are certifiable, as explained above.   The motion to certify is therefore DENIED as to the § 1985(3) conspiracy claims.

**IV.   <u>CLASS CERTIFICATION PURSUANT TO RULE 23(b)(2)</u>**

For the reasons given on the record in open court on November 10, 2010, the Motions to Certify are DENIED insofar as Plaintiffs seek certification of a class under Rule 23(b)(2).

Accordingly, and for the foregoing reasons;

**IT IS ORDERED** that the **Motion to Certify Class (Rec. Doc.**

99

165) and **Supplemental Motion to Certify Class (Rec. Doc. 994)** filed by plaintiffs Kurian David, et al. is **DENIED;**

IT IS FURTHERED ORDERED that the **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012)** filed by defendant Signal International, LLC is **DENIED;**

IT IS FURTHERED ORDERED that the **Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031)** filed by plaintiffs Kurian David, et al. is **DENIED AS MOOT;**

IT IS FURTHERED ORDERED that the **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1082)** filed by defendant Signal International, LLC. is **DENIED.**

January 3, 2012

_____
JAY C. ZAINEY
UNITED STATES DISTRICT JUDGE

100

# TAB 5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In Re Enron Corporation Securities, Derivative & "ERISA" Litigation | § § § § | MDL-1446 |
| MARK NEWBY, ET AL., | § § | |
| Plaintiffs | § § | |
| VS. | § § | CIVIL ACTION NO. H-01-3624 CONSOLIDATED CASES |
| ENRON CORPORATION, ET AL., | § § | |
| Defendants. | § § | |

## OPINION AND ORDER

Pending before the Court in the above referenced cause is Fleming & Associates, L.L.P.'s motion for leave to file [thirty-four new] Enron-related actions in state court (instrument #4034) "to avoid the statute of limitations from running on any causes of action that may be available."[1] The motion was filed on

---

[1] On February 15, 2002 this Court issued a memorandum and order (#296), pursuant to motions for injunctive relief from Kenneth Lay and Jeffrey Skilling, joined by Andrew Fastow and David Duncan. The Court found that Fleming & Associates' "harassing actions" in filing Enron-related state-court suits with the same facts giving rise to the same claims against most of the same defendants and seeking emergency injunctive relief, but avoiding the reach of the Securities Litigation Uniform Standards Act ("SLUSA"), 15 U.S.C. § 77p, by joining fewer than fifty plaintiffs in each, "necessitated the waste of substantial defense resources addressing their duplicative and uncalled for TRO's." #296 at 7-8. Finding that Fleming & Associates' actions clearly indicated that it would persist in filing new state court actions and in seeking emergency injunctive relief that would disrupt the orderly resolution of the consolidated *Newby* actions (which at that time had not yet been designated MDL litigation), this Court, based on the All Writs Act, 28 U.S.C. § 1651, the exceptions to the Anti-Injunction Statute, 28 U.S.C. § 2283, and the Court's inherent authority, *inter alia* enjoined Fleming & Associates from filing any new Enron-related actions in state court without leave from this Court. *Id.* at 8. The Fifth Circuit affirmed the decision. *Newby v. Enron Corp.*, 302 F.3d 295 (5th Cir. 2002).

October 14, 2005.  The proposed state-court petitions, which are virtually identical as to facts alleged and causes of action asserted against generally the same defendants, but with different plaintiffs numbering fewer than fifty in each case, apparently to avoid SLUSA preemption, are attached as exhibits A through HH to the motion.

Opposition to the motion has been filed by the following *Newby* and putative Defendants to the proposed actions:  Financial Institutions (#4120)[2]; Ken Harrison (#4122); Bank of America

_____

Since then, the Court did grant one Fleming & Associate's motion for leave to file two Enron-related actions in state court (#1772, 2209), entered on June 16, 2004, but both cases were subsequently removed to federal court.  *See* H-04-3331, *Cynthia Adams, et al., v. Arthur Andersen, L.L.P., et al.*, and H-04-3330, *Don L. Guy for the Guy Family Living Trust, et al., v. Arthur Andersen, L.L.P.*  Opponents of Fleming & Associates' instant motion for leave to file point out that Fleming & Associates stated in #1772 that it was filed because "the statute of limitations continues to run in these matters." Yet  Fleming & Associates did not request leave to file any other Enron-related state court actions until the pending one, filed on October 14, 2005.

[2]  JPMorgan Chase & Co., J.P. Morgan Securities, Inc., JP Morgan Chase Bank, Citigroup, Inc., Citicorp, Citibank, N.A., Citicorp North America, Inc., Citigroup Global Markets, Inc. f/k/a Salomon Smith Barney, Inc., Citicorp Global Markets Ltd. f/k/a Salomon Brothers International Limited, Credit Suisse First Boston (USA), Inc., Credit Suisse First Boston LLC f/k/a Credit Suisse First Boston Corp., Pershing LLC f/k/a Donaldson, Lufkin & Jenrette Securities Corporation, Canadian Imperial Bank of Commerce, CIBC Inc., CIBC World Markets Corp., Bank of America Corp., Bank of America, N.A., Banc of America Securities LLC, Barclays PLC, Barclays Bank PLC, Merrill Lynch, Pierce Fenner & Smith Incorporated a/k/a Merrill Lynch & Co., The Royal Bank of Scotland Group plc, National Westminster Bank plc, Greenwich NatWest Ltd., Greenwich NatWest Structured Finance, Inc., Campsie, Ltd., Royal Bank of Canada, Royal Bank Holding Inc., Royal Bank DS Holding Inc., RBC Dominion Securities Ltd., RBC Dominion Securities Inc., RBC Holdings (USA), Inc., RBC Dominion Securities Corp., Lehman Brothers, Inc., and Lehman Brothers Holdings, Inc. (Collectively, the "Financial Institutions").

Corporation, Bank of America N.A., and Banc of America Securities LLC (#4123, 4125); Joseph Hirko (#4124); Andrew Fastow (#4129); Kristina Mordaunt (#4034); the Outside Directors[3] (#4141); Rebecca Mark-Jusbasche (#4144); and Paulo V. Ferraz Pereira (#4161). Fleming & Associates has filed an omnibus reply (#4375), to which the Outside Directors have filed a surreply (#4411).  The Court has reviewed all the briefing, and rather than summarizing each argument, it presents its conclusion that the motion should be denied and the reasons for that decision.

By analogy, Defendants suggest that the principles for amending a complaint under Federal Rule of Civil Procedure 15(a) offer the Court guidance here.  It is well established that for a motion to amend to add new claims under Federal Rule of Civil Procedure 15(a), leave "shall be freely given when justice so requires" except *inter alia* when the filing would be futile because the proposed claims are time-barred.  *Pan-Islamic Trade Corp. V. Exxon Corp.*, 632 F.2d 539, 546 (5th Cir. 1980), *cert. denied*, 454 U.S. 927 (1981), *abrogated on other grounds, Todorov v. DCH Healthcare Auth.*, 925 F.2d 1438 (11th Cir. 1991); *FDIC v. Conner*, 20 F.3d 1376, 1385 (5th Cir. 1994); *Duzich v. Advantage Finance Corp.*, 395 F.3d 527, 531 (5th Cir. 2004).  As argued by a number of parties without disagreement from Fleming & Associates, that principle should appropriately apply here.

_____

[3] Robert A. Belfer, Norman P. Blake, Jr., Ronnie C. Chan, John H. Duncan, Joe H. Foy, Wendy L. Gramm, Robert K. Jaedicke, Charles A. LeMaistre, John Mendelsohn, Jerome J. Meyer, Frank Savage, John A. Urquhart, and Charles E. Walker (collectively, "Outside Directors").

Each of the thirty-four putative petitions asserts the following same causes of action under Texas law.

Count I is a claim for common law fraud and fraud-on-the-market against all Defendants. The statute of limitations for common-law fraud, Tex. Civ. Prac. & Rem. Code Ann. § 16.004(a)(5), provides that a plaintiff must commence a fraud claim "not later than four years after the day the cause of action accrues." Furthermore the cause of action accrues only when a plaintiff has discovered the wrongful act and resulting injury, i.e., "'Discovery' . . . occurs when a plaintiff ha[s] knowledge of such facts as would cause a reasonable prudent person to make an inquiry that would lead to discovery of the cause of action." *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1140 (5th Cir. 1997)(*quoting Hoover v. Gregory*, 835 S.W.2d 668, 671 (Tex. Ct. App.--Dallas 1992, writ denied)), *cert. denied*, 522 U.S. 817 (1997).

The parties raising the time-bar in opposition to Fleming and Associates' motion argue that plaintiffs were on notice of the fraud claim by October 17, 2001, as evidenced by their own allegations. *See, e.g.,* Ex. A at ¶ 139, 141-42. On October 17, 2001 Enron publicly announced that it was taking non-recurring charges of $1.01 billion after-tax in the third quarter of 2001 (period ending September 30, 2001). That same day the *Wall Street Journal* published an article, the first of a week-long series revealing that Enron and the LJM entities had "engaged in billions of dollars of complex hedging transactions . . .

- 4 -

involving company assets and Enron stock,"[4] stating that these charges were the result of Enron's use of limited partnerships managed by its Chief Financial Officer, Andrew Fastow. The price of Enron's common stock plunged. Thus, insist Defendants, the four-year statute of limitations for common-law fraud expired on October 17, 2005. They point to the same facts to argue notice for discovery rule purposes to trigger the limitations period for the other causes of action to which Texas applies the discovery rule.[5]

Defendants further argue that although Fleming & Associates had years to request leave of court to file new state court actions and was fully aware that the statute of limitations was running,[6] Fleming & Associates waited until October 14, 2005 to file its motion for leave, and thus the motion would not be ripe for ruling until November 3, 2005 (Local Rule 7.3), after all limitations periods had expired. Indeed, Fleming & Associates' omnibus reply to all opposition (#4375), which first raised the

_____

[4] Ex. A to #4034 at ¶¶ 140-43.

[5] In addition Certain Defendants argue that Plaintiffs had notice of specific claims against them by the filing of lawsuits asserting the same claims. The original *Newby* complaint was filed on November 11, 2001. Claims arising from Bank of America's purported investment in LJM2 or alleged control-person claims, governed by the three-year statute of limitations in Article 581-33H(2), were asserted in the Newby Consolidated Amended Complaint, filed on April 8, 2002; thus the limitations period expired on April 8, 2005.

[6] As noted, Fleming & Associates' October 9, 2003 motion for leave to file Enron-related actions in state court (#1772 at ¶ 5), noted that "the statute of limitations continues to run in these matters."

- 5 -

firm's tolling argument, was filed on January 3, 2006 and the Outside Directors filed a surreply on January 18, 2006 (#4411). Therefore the state court petitions could not have been filed within any of the limitations periods. Under Texas Rule of Civil Procedure 22, a "civil suit in the district or county court shall be commenced by a petition filed in the office of the clerk." Fleming & Associates' filing of their motion for leave in federal court does not constitute filing a petition in state court. This Court agrees that if the statutes of limitations were not tolled, Fleming & Associates slept on its and/or its clients' rights and its proposed actions are time-barred.

Count II alleges negligence against the Arthur Andersen Defendants. Governed by Tex. Civ. Prac. & Rem. Code Ann. § 16.003, a personal injury suit in Texas must be filed "not later than two years after the date the cause of action accrues." Putative Defendants argue that the two-year limitations period, even with the application of the discovery rule, thus expired by October 17, 2003.

Count III asserts statutory fraud under Tex. Bus. & Com. Code § 27.01 against all Defendants. As with common-law fraud, statutory fraud is subject to a four-year limitations period from the date of discovery. *Pooley v. Seal*, 802 S.W.2d 390, 393 (Tex. App.--Corpus Christi 1990, writ denied). Defendants maintain that Plaintiffs had notice of their claims at the latest on October 17, 2001, so limitations ran on October 17, 2005.

Count IV alleges control person/aiding and abetting liability under the Texas Securities Act, Art. 581-33, § 33A(2) of the Tex. Rev. Civ. Stats. and is subject to a three-year limitations period "after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence." Defendants maintain the statute started running at the latest from October 17, 2001, by which time Enron's financial distress had been widely publicized. Even if one focuses on Enron's bankruptcy filing in December 2001, the statute would have expired by 2004.

Count V charges all Defendants with civil conspiracy. Civil conspiracy in Texas is subject to a two-year statute of limitations and the discovery rule applies. *Thomas v. Barton Lodge II, Ltd.*, 174 F.3d 636, 645 (5th Cir. 1999); *Mellon Serv. Co. V. Touche, Ross & Co.*, 17 S.W.3d 432, 435 (Tex. App.--Houston [1st Dist.] 2000). Defendants argue that the civil conspiracy claim accrued no later that October 17, 2001 and expired two years later.

Count VI alleges that Defendants are liable under common law aiding and abetting, though without reference to the asserted causes of action. Even if applied to the fraud claims, which have the longest statute of limitations, Defendants reiterate that Plaintiffs had inquiry notice of these claims by October 17, 2001, and that the statute expired four years later.

Count VII asserts claims for negligent misrepresentation against Enron Officer and Director Defendants. Tex. Civ. Prac.

& Rem. Code § 16003 establishes a two-year statute of limitations. *Kansa Reinsurance Co., Ltd. V. Congressional Mortgage Corp. Of Texas*, 20 F.3d 1362, 1372 (5th Cir. 1994); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 221 n.9 (Tex. 2003). With the discovery rule applicable, Defendants contend that at the latest limitations expired on October 17, 2003.

Fleming & Associates' omnibus reply does not address the length of the relevant statutes of limitations, but for the first time argues that its proposed Plaintiffs' claims are preserved by the class tolling doctrine under *American Pipe & Construction Co. V. Utah*, 414 U.S. 538 (1974), which has been adopted by Texas courts. The firm contends that the filing of the *Newby* action tolled the statutes of limitations as to all putative class members, including the Plaintiffs in the thirty-four proposed actions, until the *Newby* class was certified and they were given notice of their opportunity to opt out.

In *American Pipe & Construction Co. V. Utah*, 414 U.S. 538, 554 (1974)("the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action"), the Supreme Court held that the filing of a class action under Federal Rule of Civil Procedure 23 tolls statute of limitations, from the time the class action is filed to the time class certification is denied, as to all

purported class members who waited to file suit, not just those who earlier filed motions to intervene.[7]  It explained,

> A contrary rule allowing participation only to those potential members of the class who had earlier filed motions to intervene in the suit would deprive Rule 23 class actions of the efficiency and economy of litigation which is the principal purpose of the procedure.  Potential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable.

*Id.* at 553.

The *American Pipe* tolling doctrine was extended by *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 350-52 (1983), beyond members of the putative class and intervenors to include those timely seeking to bring individual actions after class certification is denied and to those who choose to opt out of the class, once certified, to file individual claims.[8]  *In accord Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 863 F.2d 384, 390 (5th Cir. 1989), *cert. denied*, 493 U.S. 821 (1989).[9]  The rationale was that "[o]therwise, class members would be led to file individual actions prior to denial of class certification,

---

[7]  In *American Pipe*, the court tolled the statute of limitations specifically for persons who moved to intervene after class certification had been denied.

[8]  If the class is certified, the plaintiffs are members; if class certification is denied, the putative class members may choose to file their own suits or to intervene as named plaintiffs in the pending action.  *Crown*, 462 U.S. at 354 (the *American Pipe* doctrine applies to all potential class members, not just intervenors or named plaintiffs).

[9]  The *Newby* class was certified on July 5, 2006.  H-01-3624, #4836

in order to preserve their rights.  The result would be a needless multiplicity of actions-precisely the situation that Federal Rule of Civil Procedure 23 and the tolling rule of *American Pipe* were designed to avoid." *Crown*, 462 U.S. at 345.[10]

Courts addressing the issue are divided over whether plaintiffs who bring an independent action while a related class action is pending are entitled to the benefits of a class action, including tolling under the *American Pipe* doctrine.  Among the majority of courts concluding that a plaintiff who files an independent action before a decision regarding class certification in the related class action forfeits tolling under *American Pipe* are the following: *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 568, 569 (6th Cir. 2005)(concluding that "a plaintiff who chooses to file an independent action without waiting for a determination on the class certification issue may not rely on the *American Pipe* tolling doctrine"; "The purposes of *American Pipe* tolling are not furthered when plaintiffs file independent actions

_____

[10] In *American Pipe*, the Supreme Court pointed out that a contrary rule would

> frustrate the principal function of a class suit because then the sole means by which members of the class could assure their participation in the judgment if notice of the class did not reach them until after the running of the limitation period would be to file earlier individual motions to join or intervene as parties-precisely the multiplicity of activity which Rule 23 was designed to avoid . . . .

414 U.S. at 551.

before the decision on the issue of class certification, but are when plaintiffs delay until the certification issue has been decided."); *Glater v. Eli Lilly & Co.*, 712 F.2d 735, 739 (1st Cir. 1983) ("The policies behind Rule 23 and *American Pipe* would not be served, in fact would be disserved, by guaranteeing a separate suit at the same time that a class action is ongoing."); *In re Heritage Bond Litigation*, 289 F. Supp. 2d 1132, 1150 (C.D. Cal. 2003) (holding that the *American Pipe* tolling doctrine does not apply because plaintiffs "voluntarily filed their own action prior to a class certification decision" in the related class action, "clearly indicating a lack of intent to be a party" to that class action, and thus plaintiffs "should not be permitted to benefit from tolling while at the same time pursuing their own action."); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 451 (S.D.N.Y. 2003) (Although Second Circuit has not address the question whether the *American Pipe* tolling doctrine applies to plaintiffs who file individual actions before district court determines class certification, a number of district courts in the Second Circuit as well as district courts in other Circuits have concluded they are not entitled to the benefits of the tolling rule because it "would create the very inefficiency that *American Pipe* sought to prevent.") (and cases cited therein),[11]

---

[11] Judge Cote in *WorldCom*, 294 F. Supp. 2d at 453, reasons,

Limiting the *American Pipe* tolling doctrine to plaintiffs who wait until after a decision on class certification to commence their actions is consistent with the purpose and holdings of

*reconsideration denied*, 308 F. Supp. 2d 214 (S.D.N.Y. 2004), and 2004 WL 473307 (S.D.N.Y. Mar. 12, 2004); *Rahr v. Grant Thornton, LLP*, 142 F. Supp. 2d 793, 799-800 (N.D. Tex. 2000)("The class action tolling doctrine, however, was never intended to apply to plaintiffs like Rahr who file separate suits *prior to* a decision being reached on the class certification issue" because such a rule would not serve "the judicial efficiency purposes of the doctrine"; "[T]he class action tolling doctrine is intended to avoid the injustice and judicial inefficiency of requiring putative class member to file individual suits or to lose their claims. It is not intended to be a tool to manipulate limitations periods for parties who, intending all along to pursue individual claims, assert reliance on the proposed class action just long enough to validate their otherwise time barred claims."); *Stutz v. Minnesota Mining Manufacturing Co.*, 947 F. Supp. 399, 403 (S.D. Ind. 1996); *In re Brand Name Prescription Drugs Antitrust Litig.*,

---

both *American Pipe* and *Crown, Cork*. Those decisions were driven by concerns regarding the fate of class members in cases that were not allow to proceed as class actions. The tolling rule provides that when the class certification decision is made, those who relied knowingly or not on the class action to pursue their claims will not be penalized for their forbearance. The same logic does not warrant extending the tolling period to individual actions file *before* a determination on class certification. Plaintiffs who choose, as is their right, to pursue separate litigation may not enjoy the benefits of that separate litigation without bearing its burdens. One of the burdens plaintiffs bear is an obligation to commence their actions within the applicable statute of limitations.

No. 94-C 897, MDL 997, 1998 WL 474146, *8 (N.D. Ill. Aug. 6, 1998)("[I]t would be inequitable to now allow the Individual Plaintiffs to reap the benefits of a doctrine which is designed for a group--the Class and its putative members--which they have disavowed being a part of from the beginning."). *But see Lehman v. United Parcel Service, Inc.*, 443 F. Supp. 2d 1146, 1151 (W.D. Mo. 2006)(Nothing in the language of *Crown* suggests the statute of limitations is only tolled for those plaintiffs who waited to file suit until there is a ruling on class certification."; "[T]here can be no surprise if an individual plaintiff files her own claim before certification is decided."  The defendant would be on notice and would have had every incentive to preserve evidence.  The defendant might now be required to defend itself in multiple cases in different fora but there is no guarantee against such contingencies even if the individual plaintiffs waited until after certification were decided."); *Schimmer v. State Farm Mutual Automobile Ins. Co.*, Civ. A. No. 05-cv-02523-MSK, 2006 WL 2361810, *6 (D. Colo. Aug. 15, 2006)(class action tolling doctrine is inapplicable because either it would penalize the plaintiff for knowing about the class litigation and electing to proceed separately or for not being aware of the class action and commencing suit to protect his rights; the Supreme Court in *American Pipe* stated that "a putative class member's knowledge or reliance upon the class action's existence does not impact whether class action tolling applies.").  Because this Court agrees with the reasoning of the majority of courts addressing the issue, it,

too, concludes that the *American Pipe* tolling doctrine applies only to opt-out plaintiffs **after** the district court makes the class certification determination.

The tolling doctrine in *American Pipe* and in *Crown* applied to federal court class actions brought under federal statutes involving federal statutes of limitations; thus the doctrine is persuasive, but not binding, on issues of state law. Among the factors to be considered by a court addressing the issue of tolling by the filing of a federal or state class action of an individual state court suit are whether a class action rule modeled on the Federal Rule of Civil Procedure 21 has been adopted by the state, whether the state allows class action tolling in its jurisdiction, whether the state permits cross-jurisdictional tolling for individual cases, whether the state applies common-law tolling, and the state's policies. *See generally* Gerald D. Jowers, Jr., *The Class Stops the Clock*, 41-NOV Trial 18 (Nov. 2005).[12] *See, e.g., Wade v. Danek Medical, Inc.,* 182 F. 3d 281, 287 (4th Cir. 1999)(concluding that because Virginia had not adopted class action tolling, did not have a state class action rule analogous to Fed. R. Civ. P 23, and did not favor common law

_____

[12] *See, e.g., In re Linerboard Antitrust Litigation*, 223 F.R.D. 335, 345 (E.D. Pa. 2004)(antitrust action)(faced with issue of cross-jurisdictional class action tolling, court examined "(1) the federal interest in tolling the state statutes of limitations; (2) whether the highest court of the state has or would adopt cross-jurisdictional class action tolling for antitrust class actions filed in federal courts; (3) whether plaintiffs state law claims are sufficiently similar to plaintiffs federal claims to toll the state statutes of limitations; and (4) the prejudice suffered by defendants if the Court tolls the statutes of limitations."

equitable tolling, Virginia would not apply cross-jurisdictional tolling and the plaintiff's claims were time-barred); *In re: Vitamins Antitrust Litigation*, 183 Fed. Appx. 1, 2 (D.C. Cir. 2006)(Affirming district court ruling denying *American Pipe* tolling of limitations in a price-fixing action where a related class action was pending because Florida law specifies exclusive list of conditions that can toll running of statute of limitations and makes clear that "*[n]o disability or other reason* shall toll the running of any statute of limitations").

The doctrine of *American Pipe* and progeny has been adopted by Texas courts.  In the wake of *American Pipe* and *Crown, Cork and Seal,* in Texas, in *Grant v. Austin Bridge Construction Co.*, 725 S.W.2d 366 (Tex. Ct. App.-Houston [14th Dist.] 1987, no writ), a Houston court of appeals decided that Texas Rule of Civil Procedure 42 was patterned on Federal Rule of Civil Procedure 23 and by analogy held that a state class action seeking property damages tolled limitations for all potential class members' individual claims, pending a decision on class certification. *Id.* at 370 ("We hold that even though the statute of limitations on a class member's individual cause of action would expire during the pendency of a class action, the filing of the class action suspends the applicable statute of limitations for all purported members of the class.").

In *Bell v. Showa Denko K.K.*, 899 S.W.2d 749, 757-58 (Tex. App.-Amarillo 1995, writ denied), relying on *Grant* but refusing to extend it in the context of a mass personal injury

suit filed in federal court in another state, a panel of the Amarillo court of appeals recognized an *American Pipe*-type tolling rule for state statutes of limitations for a state class action lawsuit addressing property damage claims. It opined, "The basic premise of the *American Pipe* ruling is that a statute of limitations can be tolled while class allegations are pending, provided the defendant has notice of the type and potential number of claims against it." *Id.* at 758.

Emphasizing that defendants must have received fair notice of the existence of a claim by the filing of the class suit, the *Bell* appellate court distinguished *Grant,* which involved "plaintiffs who were readily discernible group of people claiming injury to certain property rather than personal injury," from the case before it, a "mass personal injury suit, in federal court, in another state, with the variety of claims necessarily involved in such a case," which it found "would be an extension of *American Pipe* not warranted by the *Grant* decisions . . . ." *Id.* at 758.

Furthermore, the panel proclaimed, "We do not agree that *American Pipe* operates to toll our state statute of limitations. That case involved an interpretation of Rule 23 of the Federal Rules of Civil Procedure and concerned the question of whether a federal statute of limitations was tolled for the purpose of filing a federal claim. Under the doctrine of the hoary case of *Erie Railroad v. Tomkins*, 304 U.S. 64 . . . (1938) and its progeny, where a claim is derived from state law, as is

- 16 -

appellant's suit, state law governs the tolling of the statute of limitations."  899 S.W.2d at 757.[13]

In *Vaught v. Showa Denko K.K.*, 107 F.3d 1137 (5th Cir. 1997), *cert. denied*, 522 U.S. 817 (1997), the Fifth Circuit affirmed the district court's summary judgment in a products liability action where the district court concluded that the plaintiff's state-court cause of action under Texas law for her individual personal injury against a pharmaceutical manufacturer accrued under the Texas discovery rule when the plaintiff read an article linking a nutritional supplement, which she had taken, to her own symptoms of eosinophilia myalgia syndrome (EMS).[14]  More relevant here, the panel also held that the fact that the plaintiff was potentially a member of the putative classes in two, nation-wide, federal, mass tort personal injury class actions did not toll the operation of the Texas two-year statute of limitations (Tex. Civ. Prac. & Rem. Code § 16.002(a)). Highlighting that *American Pipe* "involved the tolling effect of putative federal class actions on *federal* statutes of limitations," the Fifth Circuit panel rejected the argument of a

---

[13] In *Boone v. Citigroup, Inc.*, 416 F.3d 382, 393 (5th Cir. 2005), the Fifth Circuit did not impose the federal rule of *American Pipe*, but refused to apply class action tolling, noting that "Mississippi does not have class actions."

[14] The Texas Supreme Court later disagreed with this part of *Vaught*'s holding and found that where a plaintiff consulted several doctors about his symptoms but the doctors rejected his suspicions about the cause of his symptoms, a fact question, on which reasonable minds could differ, was for the jury relating to the discovery rule's application to the statute of limitations. *Childs v. Haussecker*, 974 S.W.3d 31, 45 n.11 (Tex. 1998).

plaintiff that a federal class action filed in New Mexico tolled her limitations on her claims in her Texas state-law products liability action and wrote,

> [T]he *Bell* court concluded first that the *American Pipe* line of cases did not directly control, because they involved the tolling effect of putative *federal* class actions on *federal* statutes of limitations. . . . Whether a *state* statute of limitations would be tolled by a *federal* class action, the court explained, was a question of state law. The *Bell* court construed *Grant* to apply only to the tolling effect of a *state* class action on *state* claims. . . . In addition, the *Bell* court concluded, the *American Pipe* tolling rule was meant to apply only where a class action gives a defendant notice of the "type and potential number of the claims against it--for example where "a discernible group of people claim[] injury to certain property."

107 F.3d at 1144. It summarized,

> In light of *Bell*, we understand Texas' tolling rule to operate as follows: A state (Texas) class action that raises property damage-type claims tolls a Texas statute of limitations pending a certification ruling. And, consistent with our understanding of this Texas tolling rule, it is unclear, whether under this rule a federal class action filed in Texas or in any other State would ever toll a Texas statute of limitations, regardless of the type of claims raised."

107 F.3d at 1147. In a footnote, the panel observed, "Pre-*Bell*, our court noted that Texas' tolling rule was the same as the federal rule under *American Pipe* and *Crown* . . . . *See National Ass'n of Gov't Employees v. City Pub. Serv. Bd. Of San Antonio, Tex.*, 40 F.3d 698, 715 n. 25 (5th Cir. 1994)(citing *Grant*). Post-*Bell*, that observation retains little vitality." *Id.* at 1147 n.2. The panel concluded, "In any event the Texas rule clearly

- 18 -

conflicts with the well-established federal practice on class action tolling. . . . [A] tolling rule is an 'integral part' of a statute of limitations. . . . Therefore Texas' interest in its tolling rule has quite considerable depth.  This is because its rule is a means of enforcing its statute of limitations, a matter of considerable importance to Texas, one reflecting a deliberate policy choice by its legislature." *Id.* at 1147.[15]

Thus under the Fifth Circuit's holding in *Vaught*, this Court concludes that the filing of the complex federal *Newby* class action, grounded in federal securities law and involving a not easily discernible class of plaintiffs, did not toll the state-law

---

[15] This Court is aware that a couple of federal district courts in Texas have modified the Texas class action tolling rule and varied from the Fifth's Circuit's interpretation of it, but this Court is not persuaded that the Fifth Circuit would agree with these decisions.  *See Prieto v. John Hancock Mutual Life Ins. Co.*, 132 F. Supp. 2d 506, 518-19 (N.D. Tex. 2001)(reading *Bell* as stating that *American Pipe* held that a statute of limitations may be tolled while class allegations are pending if the defendant has notice of the type and potential number of claims against it, but not if the federal class action was a mass personal injury suit filed in another state; "The court . . . believes that . . . Texas courts would interpret the class action tolling rule of *Grant* and *Bell* as extending to all property damage claims (where, as here, the type and potential number of claims can easily be determined or estimated [and where the defendants were parties to the class action]) regardless of the forum in which the class action was filed"), *aff'd on other grounds*, 35 Fed. Appx. 390 (5th Cir. 2002); *In re Norplant Contraceptive Products Liability Litig.*, 173 F.R.D. 185, 189-90 (E.D. Tex. 1997)(relying on *Bell's* emphasis on the class complaint's providing defendants with notice of the type and potential number of claims against them, Chief Judge Schell concluded that a federal class action did toll state-law limitations because all plaintiffs' claims shared two elements (inadequate warnings and the alleged deficiency as the legal cause of Plaintiffs' injuries) and because the potential Norplant claimants "are readily quantifiable through Defendants' own sales data.").

claims asserted in the thirty-four proposed petitions and that these state-law claims are time-barred. Therefore granting the motion for leave to file these suits in state court would be futile.

Moreover, Fleming & Associates' motion for leave to filed new Enron-related actions ins state court was filed on October 14, 2005, long before this Court certified a class in *Newby* on July 5, 2006. Therefore, because the policy reasons underling the *American Pipe* tolling doctrine have been undermined by the request, the doctrine does not apply.

Accordingly, the these reasons, the Court

ORDERS that Fleming & Associates, L.L.P.'s motion for leave to file [thirty-four new] Enron-related actions in state court (instrument #4034) is DENIED.

**SIGNED** at Houston, Texas, this 29th day of November, 2006.

MELINDA HARMON
UNITED STATES DISTRICT JUDGE

- 20 -

## CERTIFICATE OF SERVICE

I hereby certify that on September 27, 2013, I electronically filed the foregoing

**APPENDIX A TO PLAINTIFFS' RESPONSE IN OPPOSITION TO MOTION TO**

**DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) OF MALVERN C. BURNETT, THE**

**LAW OFFICES OF MALVERN C. BURNETT, A.P.C., AND GULF COAST**

**IMMIGRATION CENTER, L.L.C.** with the Clerk of the Court using the CM/ECF system

which will send notification of such filing to all CM/ECF participants.

I further certify that on September 27, 2013, I served a true and correct copy of the

foregoing document upon the below-named Defendants by depositing a copy of same in the U.S.

Mail, with sufficient postage thereon to insure delivery, and properly addressed as follows:

> Michael Pol
> 1566 Redwood Court
> Biloxi, MS  39532
>
> Global Resources, Inc.
> c/o Michael Pol
> 13 Herring Road
> Beaumont, MS 39423-2055

I further certify that on September 27, 2013, I served a true and correct copy of the

foregoing document upon the below named Defendants by forwarding a copy to them via

International Mail, with sufficient postage thereon to insure delivery, and properly addressed as

follows:

US2008 4959591 1

Sachin Dewan
Dewan Consultants
Dewan Consultants Pvt. Ltd.
708, Sagar Tech Plaza
Andheri Kurla Road
Sakinaka Junction, Andheri (E)
Mumbai 400 072, India


KILPATRICK TOWNSEND &
    STOCKTON, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404)-815-6555
bboice@kilpatricktownsend.com

By:  ___s/ William H. Boice_____
William H. Boice
Georgia Bar No. 065725



Attorney for Plaintiffs

2