**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **REJI SAMUEL, et al.** | § | |
| | § | |
| v. | § | 1:13-CV-323 |
| | § | |
| **SIGNAL INTERNATIONAL L.L.C.,** | § | |
| et al. | § | |

### REPORT AND RECOMMENDATION DENYING THE BURNETT DEFENDANTS' MOTION TO DISMISS (DOC. NO. 37)

This case is assigned to the Honorable Marcia A. Crone, United States District Judge, and is referred to the undersigned United States Magistrate Judge for all pretrial matters pursuant to a Referral Order. (Doc. No. 5.) Before the undersigned is a "Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" filed by Malvern C. Burnett, the Law Offices of Malvern C. Burnett, A.P.C., and Gulf Coast Immigration Law Center, L.L.C (hereinafter referred to interchangeably as "Burnett" and "the Burnett Defendants"). (Doc. No. 37.) The undersigned has considered the pending motion and the corresponding response (Doc. No. 43). The Burnett Defendants' motion should be denied because the Plaintiffs have sufficiently stated a claim upon which relief can be granted, and a motion for summary judgment is the proper vehicle to prove the Plaintiffs state law claims are barred by the statute of limitations.

### I. Background

*A. Procedural Background*

On March 7, 2008, twelve individuals who were allegedly trafficked into the United States filed a putative class action against the Defendants in the Eastern District of Louisiana. See David v. Signal Int'l, LLC, Civ. A. No. 08-1220 (E.D. La.). That Court denied class

certification;[1] and, as a result of this ruling, the Plaintiffs in the instant action filed suit in this District, where they were allegedly subjected to deplorable working conditions at a Signal facility in Orange, Texas. (Doc. No. 1.) On May 21, 2013, the Plaintiffs filed a complaint in this court against the following Defendants: the Burnett Defendants, Signal International L.L.C., Signal International, Inc., Signal International Texas, G.P., Signal International Texas, L.P. (collectively referred to as "Signal"), Michael Pol, Global Resources, Inc., Sachin Dewan, and Dewan Consultants PVT. LTD. (a/k/a Medtech Consultants). (Id.) On September 10, 2013, the Burnett Defendants filed the instant motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. No. 37.)

B. *Factual Background*

In the aftermath of Hurricane Katrina, approximately 590 men, including the Plaintiffs, were allegedly trafficked into the United States through the federal government's H-2B guest worker program to provide labor and services to the Signal Defendants. (Doc. No. 1, p. 1.) The Plaintiffs claim they were lured to work for Signal through the fraudulent promise of legal and permanent work-based immigration to the United States for themselves and their families. (Id., p. 2.) Subsequently, after coming to the United States, the Plaintiffs were allegedly subjected to forced labor and other serious abuses at Signal's facility in Orange, Texas. (Id., p. 4.)

The Burnett Defendants consist of Malvern C. Burnett and his two corporations: Gulf Coast Immigration Law Center, L.L.C. and the Law Offices of Malvern C. Burnett, A.P.C. The Plaintiffs accuse Burnett of conspiring with Signal and other Defendants to recruit Indian welders and pipefitters to fill anticipated H-2B guest worker jobs at Signal's operations with false promises of permanent residency in the United States for the workers and their families. (Id.)

---

1. David v. Signal Int'l, LLC, Civ. A. No. 08-1220, 2012 U.S. Dist. LEXIS 114247, at *129 (E.D. La. Jan. 3, 2012).

## II. Jurisdiction

The Plaintiffs seek recovery pursuant to several federal statutes. For actions brought under these statutory provisions, the court has subject-matter jurisdiction predicated upon federal question jurisdiction. See 28 U.S.C. § 1331; 29 U.S.C. § 216(b). For the state law causes of action, the court has subject-matter jurisdiction predicated upon supplemental jurisdiction. See 28 U.S.C. § 1367(a). Venue is proper because the events giving rise to the above claims occurred within the confines of this District. See 28 U.S.C. § 1391.

## III. Rule 12(b)(6) Standard

Rule 12(b)(6) of the Federal Rules of Civil Procedure authorizes dismissal of a complaint that fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion to dismiss "is viewed with disfavor and is rarely granted." Harrington v. State Farm Fire & Cas. Co., 563 F.3d 141, 147 (5th Cir. 2009). When a court analyzes a Rule 12(b)(6) motion, it "accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" In re Katrina Beaches Litig., 495 F.3d 191, 205 (5th Cir. 2007) (quoting Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit, 369 F.3d 464, 467 (5th Cir. 2004)). A court should grant such a motion only when the complaint fails to contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id.

## IV. Analysis

The Plaintiffs allege Burnett violated the Trafficking Victims Protection Reauthorization Act ("TVPA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the Ku Klux Klan Act of 1871 ("KKA"). (Doc. No. 1.) The Plaintiffs have also asserted state law claims of fraud, negligent misrepresentation, and breach of contract against Burnett. (Id.) First, Burnett argues the Plaintiffs have failed to provide sufficient facts to state any claim. (Doc. No. 37.) Second, Burnett asserts the Plaintiffs' state law claims are barred by the statute of limitations. (Id.)

A. *Failure to State a Claim under Rule 12(b)(6)*

**1. Insufficient Facts**

Burnett generally argues the Plaintiffs failed to state more than mere conclusions and recitals of statutory language without any basis in fact in their complaint. In particular, Burnett argues that the Plaintiffs did not provide any facts showing Burnett engaged in illegal activity. In addition, Burnett argues that each of the Plaintiffs' federal claims "has as its linchpin" the false concept "that threats of deportation satisfy the definition of involuntary servitude." (Doc. No. 37, p. 2.)

First, the undersigned finds, contrary to Burnett's assertion, that the Plaintiffs have sufficiently alleged facts that allow the court to draw the reasonable inference that Burnett is liable for the alleged misconduct. In their complaint the Plaintiffs stated the following:

> The Plaintiffs were trafficked into the United States through the federal government's H-2B guest worker program to provide labor and services to Signal. Recruited to perform welding, pipefitting, and other marine fabrication work, the Plaintiffs were subjected to forced labor and other serious abuses at Signal's operations in Orange, Texas. All of the Defendants, including Burnett, have exploited and defrauded the Plaintiffs by fraudulently recruiting them to work in the United States and effectuating a broad

scheme of psychological coercion, threats of serious harm and physical restraint, and threatened abuse of the legal process to maintain control over the Plaintiffs.

At all relevant times, the Burnett Defendants acted as agents of Signal for the purposes of recruiting, obtaining, contracting, and transporting the Plaintiffs to provide labor services in the state of Texas. Signal's direction and coordination of the Recruiter Defendants' and the Burnett Defendants' recruitment efforts were effectuated by the use of numerous telephone, fax, e-mail, or mail communications that occurred from the spring of 2006 through at least January 2007. In these communications Signal authorized the Recruiter Defendants and the Burnett Defendants to act as their agents for the purposes of recruiting Indian welders and pipefitters to fill anticipated H-2B guest worker jobs at Signal's Orange, Texas operations. Signal further authorized the Recruiter Defendants and the Burnett Defendants to represent that Signal would agree to sponsor *bona fide* green card applications for the Plaintiffs and obtain at least two H-2B visa extensions on behalf of Plaintiffs to allow them to remain in the United States working for Signal while their green card applications were being processed. In exchange, each Plaintiff was required to pay fees totaling as much as 8 lakh rupees ($20,000), each in a series of approximately three installments.

At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted through the use of mail and wire communications occurring during the spring, summer and fall of 2006, the Recruiter Defendants and the Burnett Defendants, personally or through their agents, representatives, or employees, represented to the Plaintiffs that Signal would provide lawful, stable, and ample employment opportunities; working under an H-2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal; and, Signal would obtain for the Plaintiffs work-authorized green cards enabling them to permanently and legally reside in the United States with their families. Burnett further promised to act diligently and to do everything necessary to ensure that Plaintiffs would obtain green cards within 24 months of initiating the green-card process. Finally, Burnett and the Recruiter Defendants promised that the Plaintiffs would promptly receive a refund of all or nearly all of their payments if these Defendants did not succeed in securing green cards for Plaintiffs, as promised.

The Burnett Defendants and Recruiter Defendants induced the Plaintiffs to enter the green card contracts even though they did not intend to pursue diligently the Plaintiffs' applications and without any basis whatsoever for representing that: 1) Signal had

lawful long-term employment opportunities to provide the Plaintiffs; 2) Signal could legally apply for numerous H-2B visa extensions to maintain the Plaintiffs' presence in the United States; 3) working under an H-2B visa for Signal was not inconsistent with applying for permanent immigration status sponsored by Signal; 4) green card applications sponsored by Signal would be valid and *bona fide* under U.S. immigration law; and 5) such applications were likely to be successfully completed and approved within the promised timelines. Furthermore, the Burnett Defendants and Recruiter Defendants knew or should have known that they would not refund Plaintiffs' money as promised in the contracts and other documents.

In late August and early September 2006, the United States Citizenship and Immigration Service ("USCIS") approved Signal's H-2B visa petitions for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007. In approving these visa petitions, the USCIS relied on the purported accuracy of the applicants' stated 10-month period of labor need and the representation that Signal's need was based on a one time peak-load temporary demand. Signal, the Burnett Defendants, and the Recruiter Defendants knew that the stated period of need in Signal's applications for labor certifications and for H-2B visas were inconsistent with Signal's projected actual labor need; and, therefore the Defendants knew these statements to the United States Government were false.

Lured by, and in reliance upon, the Defendants' fraudulent promises of legal and permanent work-based immigration to the United States for themselves and their families, the Plaintiffs plunged themselves and their families into debt to take advantage of these seemingly promising opportunities. The Plaintiffs incurred significant debts to pay mandatory recruitment, immigration processing, and travel fees charged by Defendants. Upon the Plaintiffs' arrival in the United States, Signal required that the Plaintiffs live in a guarded, overcrowded, and isolated labor camp located in Orange, Texas (the "Texas Labor Camp"). The Plaintiffs had no choice but to use Recruiter Defendants and Burnett Defendants to secure employment at Signal's operations. Management personnel at Signal made the conscious and deliberate decision to prohibit Plaintiffs from securing employment at Signal's operations either through another recruiter or by bypassing recruiters altogether and applying directly with Signal.

Signal, through its employees or agents, contacted the Recruiter Defendants and the Burnett Defendants to express its concerns about worker organizing efforts and the specific involvement of the Plaintiffs. During these conversations the Recruiter Defendants, the Burnett Defendants and Signal reached an agreement regarding steps to be taken to discourage further worker

>organizing efforts and to ensure that the Indian H-2B Workers continued to work at Signal without complaint, as well as to prevent the Indian H-2B Workers from exercising their legal rights.
>Since first contracting with Defendants in India and the United Arab Emirates, the Plaintiffs have yet to receive from the Defendants the promised green cards or permanent residency. Despite clear contractual provisions requiring them to do so, the Recruiter Defendants and the Burnett Defendants have refused to refund any of the fees Plaintiffs paid to them for unsuccessful green card and visa processing.

The Plaintiffs have clearly alleged the Burnett Defendants were an "integral member of a labor trafficking scheme designed to recruit the Plaintiffs for work at Signal based on false promises of permanent residency." (Doc. No. 43, p. 5.) In their motion to dismiss, the Burnett Defendants argue that these facts are merely "occurrences and actions that are consistent with any attorney representing his or her clients." (Doc. No. 37, p. 3.) However, the Plaintiffs have provided facts describing Burnett's acts that are entirely inconsistent with a "normal" attorney-client relationship. As stated above, Burnett allegedly made false promises to the Plaintiffs to lure them into working for Signal. Burnett also required the Plaintiffs to pay him exorbitant fees for his services, and then refused to refund the Plaintiffs' money when he failed to perform as promised.

Furthermore, the Plaintiffs have provided sufficient facts to support their argument that Burnett is liable for fraud and negligent misrepresentation. Under Federal Rule of Civil Procedure 9(b), "a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." As detailed above, Burnett made several promises to the Plaintiffs that he allegedly knew to be untrue: 1) Signal had lawful long-term employment opportunities to provide Plaintiffs; 2) Signal could legally apply for numerous H-2B visa extensions to maintain Plaintiffs' presence in the United States; 3) working under an H-2B visa for Signal was not inconsistent with applying

for permanent immigration status sponsored by Signal; 4) green card applications sponsored by Signal would be valid and *bona fide* under U.S. immigration law; 5) such applications were likely to be successfully completed and approved within the promised timelines; and 6) Burnett would refund the Plaintiffs' money if he failed to perform. In reliance on Burnett's promises, the Plaintiffs "plunged themselves and their families into debt," and traveled to the United States to work at Signal's Orange, Texas facility. (Doc. No. 1, p. 2.)

The Plaintiffs have also provided sufficient facts alleging that Burnett conspired with Signal. More than once, in their complaint and the RICO chart attached to the complaint as Exhibit 1, the Plaintiffs allege that the Burnett Defendants worked with the Recruiter Defendants and Signal to carry out this scheme. The Plaintiffs allege there are letters and phone conversations showing the Defendants conspired to: 1) recruit the Plaintiffs with false promises of permanent residency for themselves and their families; and 2) keep the Plaintiffs from protesting their mistreatment and leaving Signal's employ.

Finally, Burnett generally states the Plaintiffs failed to allege facts to support their breach of contract claim. (Doc. No. 37, p. 5.) However, the Plaintiffs allege they entered into contracts with Burnett under which they would pay fees to Burnett in exchange for his promise to provide them with lawful employment and work-authorized green cards enabling them to permanently and legally reside in the United States with their families. (Doc. No. 1, p. 17.) Burnett allegedly breached this contract by not fulfilling those promises and refusing to refund the fees the Plaintiffs paid him. (Id.)

### 2. Involuntary Servitude

The Burnett Defendants also argue that "each of the federal causes of action has as its linchpin the concept that threats of deportation satisfies the definition of involuntary servitude,"

and "as a matter of law, the threat of deportation does not satisfy a determination of involuntary servitude." (Doc. No. 37, p. 2.) The Burnett Defendants do not elaborate on how each of the Plaintiffs' claims is based on the premise that threats of deportation satisfy the definition of involuntary servitude.

Nonetheless, the case cited by Burnett in support of his assertion is easily distinguished from the instant case. In *Zavala v. Wal Mart Stores*, the plaintiffs were "seeking compensation for unpaid overtime and certification of a collective action under the Fair Labor Standards Act (FLSA), civil damages under RICO, and damages for false imprisonment." Zavala v. Wal Mart Stores Inc., 691 F.3d 527, 530 (3d Cir. 2012). The plaintiffs supported their RICO and false imprisonment claims on the theory that the defendants forced them into working by threatening to report their immigration status to the authorities. Id. at 533. The Court stated that "absent some special circumstances, threats of deportation are insufficient to constitute involuntary servitude." Id. at 541. However, unlike the instant case, in *Zavala*, Wal-Mart did not contract directly with the plaintiffs; the plaintiffs did not work exclusively for Wal-Mart and "often switched jobs, freely moving to different employers in different cities;" and the plaintiffs were not housed in labor camps. Id. In fact, the *Zavala* court asserted that "[m]odern day examples of involuntary servitude have been limited to labor camps, isolated religious sects, or forced confinement." Id. at 540. In the instant case, the Plaintiffs allege they were housed in a guarded, overcrowded and isolated "labor camp, which other employees and management at Signal referred to as the reservation." (Doc. No. 1, p. 4, 27.) The "labor camp" was allegedly surrounded by barbed-wire fences and was located in an isolated industrial area miles removed from shopping, places of worship, public transportation or residential communities. (Doc. No. 1, p. 25.)

Furthermore, the Supreme Court held in *United States v. Kozminski* that "the

vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve" involuntarily. United States v. Kozminski, 487 U.S. 931, 952 (1988). The Court further held that "a trial court could properly find that evidence of . . . extremely poor working conditions is relevant to corroborate disputed evidence regarding the use or threatened use of physical or legal coercion . . . ." Id. Therefore, a court must consider all of the relevant circumstances when determining whether the Plaintiffs were forced to serve involuntarily. In their complaint, the Plaintiffs allege the following:

> The Texas Labor Camp gates were constantly monitored by security guards retained by Signal. Signal's security guards monitored the Plaintiffs' comings and goings by requiring them to show their employee identification badges and recording when the Plaintiffs entered and exited the camp. Signal's security guards also searched the Plaintiffs' packages and bags when they entered the camp. Except on rare occasions, the Plaintiffs were not permitted to receive visitors in the camp.
> Up to twenty-four men were housed in each bunkhouse and made to sleep in two tiered bunk beds. The bunk beds were so tightly packed in the bunkhouses that it was difficult for workers to move about in the narrow passageways between bunks or sit up in bed. These housing conditions violated OSHA regulations. The Texas Labor Camp bunkhouses had insufficient toilet and bathing facilities for twenty-four men, one or two toilets per bunkhouse, resulting in long lines for the bathrooms before and after work shifts and unsanitary conditions due to unresolved plumbing problems that rendered the toilets inoperable. Signal's personnel and security guards conducted surprise searches of the dormitory areas of the bunkhouses, including searches of workers' personal belongings. Upon information and belief, Signal did not obtain the required permit(s) to furnish board at the Texas Labor Camp, and the condition and sanitation of the board provided further violated federal, state, and/or local law. When the Plaintiffs complained and asked to live outside the Texas Labor Camp, Signal initially refused and subsequently told workers that if they tried to live outside the Texas Labor Camp, Signal would still deduct the labor camp fees from the Plaintiffs' wages. As a result, the Plaintiffs reasonably believed they had no choice but to continue living in Signal's Texas Labor Camp.
> Signal only housed Indian H-2B Workers such as the Plaintiffs in its Labor Camps, which other employees and

> management at Signal referred to as the "reservation(s)." Upon information and belief, United States citizens and other workers of non-Indian descent and non-Indian race were neither required nor allowed to live in or pay for accommodations in Signal's Texas Labor Camp. Signal subjected the Plaintiffs to skills testing and re-testing, on-the-job discipline, layoffs, periods without work, lack of safety precautions, unfavorable job assignments, evaluation processes, and other adverse employment actions to which non-Indian and United States citizen workers were not similarly subjected.
> 
> In the isolated and guarded atmosphere of the Texas Labor Camp and saddled with the crushing debts they had incurred to come to the United States in reliance upon the Defendants' representatives, the Plaintiffs reasonably believed Signal's statements were threatening and believed they had no choice but to continue working for Signal despite deplorable working and living conditions.
> 
> The Plaintiffs and other Indian H-2B Workers became increasingly frightened and confused, particularly when word spread that Signal had locked up the Mississippi Labor Camp Indian H-2B Workers who complained about the working conditions. Signal's actions at the Mississippi Labor Camp significantly intensified the reasonable fears of the Plaintiffs and other Indian H-2B Workers in the Texas Labor Camp that if they tried to leave Signal's employ or oppose unlawful and coercive employment conditions at Signal, including by consulting with counsel, they faced the threat of physical restraint, detention, forced deportation, or other serious harm or abuses of the legal process.

In light of these allegations, the undersigned finds the Plaintiffs have stated a plausible claim of involuntary servitude. Accordingly, the undersigned recommends that the court deny the Burnet Defendants' motion to dismiss on the basis that the Plaintiffs failed to state a plausible claim.

   B.  *Statute of Limitations*

The Burnett Defendants also assert that the Plaintiffs' pendent state law claims are time barred by the statute of limitations. Burnett argues the statute of limitations on the state law claims began to run, at the latest, when the *David* case was filed on March 7, 2008. Burnett submits that because the plaintiffs were putative class members in *David*, they were "necessarily

aware of all the facts" that would trigger the running of the statute of limitations. Although Burnett does not catalogue the statute of limitations for each pendent state law claim under Texas law, he claims they would expire, at the latest, in four years—2012. The complaint in the instant case was filed in 2013. Burnett also argues the federal class action filed in the *David* court, which was not certified, did not toll the running of the statute of limitations on the state law claims. In response, the Plaintiffs argue the *David* Court explicitly tolled the statute of limitations on all of the Plaintiffs' state law claims. (Doc. No. 43, p. 15.) In the alternative, they argue Texas law supports the tolling of the statute of limitations as to all purported members of a class upon the filing of the class action. (Id.)

The *David* complaint was filed on March 7, 2008. (Doc. No. 37, Exh. 2.) United States District Judge Zainey, *upon the consent of Signal and the Burnett Defendants*, entered an order tolling the statute of limitations for the absent class members' (who are the Plaintiffs in this case) state law claims for 120 days until after the court's final ruling on class certification. Order, Kurian David et al. v. Signal International, L.L.C., et al., No. 2:08-cv-1220 (E.D. La. Jan. 20, 2011) (Doc. No. 982). Judge Zainey entered an order denying class certification on January 4, 2012, making the expiration of the tolling period May 3, 2012. Order and Reasons, *David*, No. 2:08-cv-1220 (Doc. No. 1117). The case was subsequently transferred to United States District Judge Susie Morgan. Order Reassigning Case, David, No. 2:08-cv-1220 (Doc. No. 1157). Over Signal's objection, Judge Morgan further tolled the statute of limitations for the Plaintiffs' claims until August 28, 2013. Order and Reasons, David, No. 2:08-cv-1220 (Doc. No. 1379). However, pursuant to Burnett's request, Judge Morgan clarified that prior order by stating it only tolled the limitations period for the *federal* law claims, not any state law claims. Order and Reasons, David, No. 2:08-cv-1220 (Doc. No. 1417).

For a Rule 12(b)(6) motion, a court is typically not to look beyond the complaint. However, a court may consider attachments to briefing regarding a motion to dismiss if the documents are referenced in the complaint, central to the complaint, referenced by the parties, and their authenticity is not in dispute. See Walch v. Adjutant Gen. Dep't, 533 F.3d 289, 293–94 (5th Cir. 2008) (citing In re Katrina Canal Breaches Litig., 495 F.3d 191, 205 (5th Cir. 2007)); Causey v. Sewell Cadillac-Chevrolet, Inc., 394 F.3d 285, 288 (5th Cir. 2004). Those are the only documents the undersigned should consider in deciding the motion to dismiss as it concerns the limitations issue—not the various court orders entered by the New Orleans district courts tolling state statutes of limitations for the pendent state law claims.[2]

Nevertheless, even if the undersigned were to consider and apply Judge Zainey's tolling order from the date the *David* complaint was filed until its expiration, the undersigned would still need to go outside the pleadings to intelligently determine the appropriate accrual date for the various state law claims and what effect the tolling period from Judge Zainey's order has on the timeliness of the pendent state law claims filed in the instant complaint.[3] Pursuant to Federal Rule of Civil Procedure 12(d), "if on a motion under Rule 12(b)(6) matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56, and all parties must be given a reasonable opportunity to present material that is pertinent to the motion." Accordingly, to the extent the Burnett Defendants believe the Plaintiffs' state law claims are still barred by the statute of limitations in light of Judge Zainey's

---

2. Burnett did not address the tolling orders entered by the *David* court, and the Plaintiffs only mentioned Judge Morgan's initial order tolling the statute of limitations for the state law claims, not the order clarifying that the previous order only applied to the federal law claims. It should be noted that the briefing on the instant motion occurred before Judge Morgan's order clarifying the previous order was entered.

3. Burnett cites Bell v. Showa Denko K.K., 899 S.W.2d 749 (Tex. App. 1995) in support of their argument that Texas courts hold the filing of a proposed federal class action does not toll the limitations period on pendent state law claims. See also Newby v. Enron Corp., 542 F.3d 463 (5th Cir. 2008). In those cases, it does not appear the Defendants consented to the tolling of the statute of limitations, as the Burnett Defendants did here, at least for the period of time reflected in Judge Zainey's order. As such, those cases appear to be inapposite.

tolling order, that is a matter best addressed in a motion for summary judgment, after the parties have had an opportunity for full discovery and the court can consider evidence outside the pleadings.

## V. Recommendation

For the reasons stated above, the Burnett Defendants' "Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(6)" (Doc. No. 37) should be denied, subject to reconsideration in a motion for summary judgment that the state law claims are barred by the statute of limitations.

## VI. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c) (Supp. IV 2011), each party to this action has the right to file objections to this report and recommendation. Objections to this report must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, and (3) be served and filed within fourteen (14) days after being served with a copy of this report. See 28 U.S.C. § 636(b)(1)(c); Fed R. Civ. P. 72(b)(2). A party who objects to this report is entitled to a *de novo* determination by the United States District Judge of those proposed findings and recommendations to which a specific objection is timely made. See 28 U.S.C. § 636(b)(1)(c); Fed R. Civ. P. 72(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this report, within fourteen (14) days of being served with a copy of this report, bars that party from: (1) entitlement to *de novo* review by the United States District Judge of the findings of fact and conclusions of law, see Rodriguez v. Bowen, 857 F.2d 275, 276–77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error, of any such findings

of fact and conclusions of law accepted by the United States District Judge, see <u>Douglass v. United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

SIGNED this 29th day of July, 2014.

_____
Zack Hawthorn
United States Magistrate Judge