**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

REJI SAMUEL, ATHA MOHAMMAD ABDUL,  )
KESAVARAO BUNDANKAYALA, RAJU  )
DIVAKARAN, BIJU PERUMPILLY GEORGE,  )
KRISHNA GONTHINA, NAYAPPULLI  )
JAYACHANDRAN, GALLA VENKATA RAMA  )
KRISHNA, SAMUEL JOSE  )
KUMRUMTHODATHIL, LOHITHAKSHAN  )
MADAMPET, JOHNY MANDY MATHAI,  )
BELTHAZAR PETER, MOHANAN BALAKRISHNA  )
PILLAI, SANTHOSH KUMAR RAJENDRAN  )
PILLAI, ABY KARICKATHARA RAJU, SUMESH  )
PORAMBATHUPARAMBIL SUBRAMANIAN, and  )
CHANDRAN SHAJU THANISSERY,  )
                                                          )
                 Plaintiffs,  )
                                                          )   CIV. NO. 1:13-cv-00323
                                                          )
v.  )
                                                          )
SIGNAL INTERNATIONAL L.L.C., SIGNAL  )
INTERNATIONAL, INC., SIGNAL  )
INTERNATIONAL TEXAS, G.P., SIGNAL  )
INTERNATIONAL TEXAS, L.P., MALVERN C.  )
BURNETT, GULF COAST IMMIGRATION LAW  )
CENTER, L.L.C., LAW OFFICES OF MALVERN C.  )
BURNETT, A.P.C., GLOBAL RESOURCES, INC.,  )
MICHAEL POL, SACHIN DEWAN, and DEWAN  )
CONSULTANTS PVT. LTD. (a/k/a MEDTECH  )
CONSULTANTS),  )
                                                          )
                 Defendants.  )

**APPENDIX A
TO PLAINTIFFS' RESPONSE IN OPPOSITION TO APPEAL OF MAGISTRATE
JUDGE'S ORDER OR ALTERNATIVELY OBJECTION TO MAGISTRATE'S
REPORT AND RECOMMENDATION TO DENY MOTIONS OF BURNETT TO
TRANSFER VENUE**

| Tab | Document Description |
|-----|---------------------|
| 1. | *Buckalew v. Celanese, Ltd.*, No. G-05-315, 2005 WL 2266619 (S.D. Tex. Sept. 16, 2005). |

| Tab | Document Description |
|-----|---------------------|
| 2. | *David, et al. v. Signal International, LLC, et al.*, 2:08-cv-01220-SM-DEK, 2012 U.S. Deist. LEXIS 114247 (E.D. La. Jan. 4, 2012) |
| 3. | *Epicrealm Licensing, LLC v. Autoflex Leasing, Inc.*, Cases No. 2:05-CV-163-DF-CMC, 2:05-CV-356-DF-CMC, 2007 WL 2580969 (E.D. Tex. Aug. 27, 2007). |
| 4. | *Gardner v. GC Servs., LP*, No. 10-CV-997-IEG, 2010 WL 2721271 (S.D. Cal. July 6, 2010) |
| 5. | *Ichl, LLC v. NEC Corp. of America*, No. 5:08-CV-65, 2009 WL 1748573 (E.D. Tex. June 19, 2009) |
| 6. | *Jones v. Xerox Commercial Solutions, LLC,* No. H-13-0650, 2013 WL 3245957 (S.D. Tex. June 26, 2013) |
| 7. | *Murrell v. Casterline*, No. 1:10-CV-974, 2011 WL 2600600 (E.D. Tex. June 29, 2011) |
| 8. | *Reddy v. Superior Global Solutions, Inc.*, No. 4:11-CV-845, 2013 WL 1949948 (E.D. Tex. May 9, 2013) |

DATED:  July 31, 2014.

KILPATRICK TOWNSEND &
   STOCKTON, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404)-815-6555
bboice@kilpatricktownsend.com
bcorgan@kilpatricktownsend.com
spangborn@kilpatrickstockton.com
hheindel@kilpatricktownsend.com

By:   s/ William H. Boice
William H. Boice
Georgia Bar No. 065725
Brian G. Corgan (*Admitted Pro Hac Vice*)
Georgia Bar No. 187700
Susan Pangborn (*Admitted Pro Hac Vice*)
Georgia Bar No. 735027
California Bar No. 282533
Heather L. Heindel (*Admitted Pro Hac Vice*)
Georgia Bar No. 285204
Attorneys for Plaintiffs

TAB 1



Not Reported in F.Supp.2d, 2005 WL 2266619 (S.D.Tex.)
**(Cite as: 2005 WL 2266619 (S.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas, Galveston Division.
David C. BUCKALEW, et al., Plaintiffs,
v.
CELANESE, LTD., et al., Defendants.

No. Civ.A. G-05-315.
Sept. 16, 2005.

Bobby D. Brown, Attorney at Law, Victoria, TX, for Plaintiffs.

Jerry L. Mitchell, Jr., Kasowitz Benson et. al., Houston, TX, for Defendants.

*ORDER DENYING DEFENDANTS' MOTION TO TRANSFER VENUE*

KENT, J.

**\*1** Plaintiffs sued Defendants Celanese, Ltd. and Celanese International Corporation (collectively, "Defendants") for violations of the Fair Labor Standards Act ("FLSA") and various state laws. Now before the Court comes Defendants' Motion to Transfer Venue to the Victoria Division of this District pursuant to the first-to-file rule. Defendants' Motion is respectfully DENIED.

I. Background

Plaintiffs were employed at Defendant Celanese Ltd.'s facility in Bay City, Texas. Plaintiffs allege that Defendants failed to pay proper wages when they worked at the Bay City facility in violation of the FLSA. They also claim damages for breach of contract and fraud under Texas state law. They claim that Defendants failed to pay overtime wages and their posted hourly wage rate as part of an overarching scheme to deny compensation.

On May 15, 2003, prior to filing this lawsuit, attorney for Plaintiffs, Bobby D. Brown, filed a similar suit against Defendants on behalf of similarly situated plaintiffs in the Victoria Division of this District, in a case entitled *Conner, et al. v. Hoechst Celanese Chemical, Inc., et al.,* No. 6:03-cv-00054 ( *"Conner* litigation"). The plaintiffs' claims in the *Conner* litigation arose from their employment at Defendants' Bay City facility. Defendants claim that many of the allegations in the *Conner* litigation are nearly identical to the ones made in this case. That is, the alleged unlawful conduct arises from the same policies and procedures that were employed at the same Bay City plant.

Defendants argue that this lawsuit should be transferred to the Victoria Division pursuant to the first-to-file rule, which provides that "the court in which an action is first filed is the appropriate court to determine whether subsequently filed cases involving substantially similar issues should proceed." *Save Power Ltd. v. Syntek Finance Corp.,* 121 F.3d 947, 950 (5th Cir.1997) (citing *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 728 (5th Cir.1985); *Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403, 408 (5th Cir.1971)). Defendants admit that, but for the first-to-file rule, there is "no serious question as to the appropriateness of the Galveston Division as a venue for this lawsuit." [FN1]

> FN1. Defendants also allege that counsel for Plaintiffs failed to inform this Court of the pending related litigation in the Victoria Division, and suggest that had this been done, this case would have automatically been assigned to the Victoria Division. Defendants provide no authority for this point other than Local Rule 5.3, which provides that "parties must advise the Court of current or recent litigation and of directly affected non-parties." S.D. TX. CIV. R. 5.3. This argument is without merit. This case was filed in the Galveston Division and as such was properly assigned to the Galveston Division.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 1:13-cv-00323-MAC-ZJH   Document 123-1   Filed 07/31/14   Page 5 of 77 PageID #: 2613

Not Reported in F.Supp.2d, 2005 WL 2266619 (S.D.Tex.)
**(Cite as: 2005 WL 2266619 (S.D.Tex.))**

II. Legal Standard

The federal venue transfer statute provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The movant bears the burden of demonstrating to the Court that it should transfer the case. See *Peteet v. Dow Chem. Co.,* 868 F.2d 1428, 1436 (5th Cir.1989) (requiring the movant to make a showing that the forum sought is more convenient); *Time, Inc. v. Manning,* 366 F.2d 690, 698 (5th Cir.1966) ("At the very least, the plaintiff's privilege of choosing venue places the burden on the defendant to demonstrate why the forum should be changed."). The decision to transfer a case lies within the sound discretion of the Court, and such determinations are reviewed under an abuse of discretion standard. See *Peteet,* 868 F.2d at 1436.

**\*2** The first-to-file provides that "when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599, 603 (5th Cir.1999). See *Save Power Ltd.,* 121 F.3d at 950. The first-to-file rule is "grounded in principles of comity and sound judicial administration," which requires "courts of co-ordinate jurisdiction and equal rank [ ] to exercise care to avoid interference with each other's affairs." *Id.* (quoting *West Gulf,* 751 F.2d at 728). The crucial inquiry under the first-to-file rule is whether there is substantial overlap between the two cases. See *Save Power Ltd.,* 121 F.3d at 950-51. If the overlap between the two cases is less than complete, then the court making the determination whether to transfer the case should consider whether the cases would be consolidated, the extent of the overlap, the likelihood of conflict, and the comparative advantage and interest of each forum in resolving the dispute. *Id.* (citing *TPM Holdings, Inc. v. Intra-Gold Indus., Inc.,* 91 F.3d 1, 4 (1st Cir.1996)). The three primary concerns of the rule are: (1) to "avoid the waste of duplication;" (2) to

"avoid rulings which may trench upon the authority of sister courts;" and (3) to "avoid piecemeal resolution of issues that call for a uniform result." See *Save Power Ltd.,* 121 F.3d at 950.

Other than the aforementioned factors, the Fifth Circuit has not clearly articulated what constitutes "substantial overlap." Complete identity of the parties and issues is not required, but the facts of *Save Power Ltd.* clearly indicate that the cases should be more than merely related to support a motion for transfer when venue is otherwise appropriate. To hold otherwise would frustrate the well-established rule that the plaintiff's choice of forum is generally entitled to great deference. See *Speed v. Omega Protein, Inc.,* 246 F.Supp.2d 668, 672 (S.D.Tex.2003).

In *Save Power Ltd.,* both the original lawsuit and the subsequently filed declaratory judgment action centered on the interpretation of a provision in the same subordination agreement. *Save Power Ltd.,* 121 F.3d at 948-49. In that case, one of the parties from the original lawsuit, while applications for temporary restraining orders and preliminary injunctions were pending in the original court, filed a separate declaratory judgment action in the same division, which was randomly assigned to a different judge within that division. *Id.* The moving party sought a declaratory judgment that it had a perfected security interest in the assets of the debtor that were superior to that of any third party, that it was entitled to foreclose on that security interest, and that an additional third party did not possess any standing or rights under the subordination agreement. *Id.* Those issues were also before the judge in the original court, and the judge in the subsequent court refused to transfer the declaratory judgment action back to the judge in the original court. The two judges reached contrary results on the same issue. The Fifth Circuit held that the denial of the motion to transfer the declaratory judgment action to the judge in the original action was an abuse of discretion. *Id.* at 949-50.

**\*3** The first-to-file rule applies whether the re-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2005 WL 2266619 (S.D.Tex.)
**(Cite as: 2005 WL 2266619 (S.D.Tex.))**

lated cases are pending before different judges in different divisions within a single district, or in two different districts. Once the subsequent court determines that the issues substantially overlap, it should transfer the case to the first-filed court for that court to determine the outcome of the second suit. *Cadle Co.,* 174 F.3d at 606.

III. Analysis

*A. Extent of the Overlap*

In this case, the overlap between the *Conner* litigation and this case is less than complete. First, the parties are not identical. Although the defendants are the same, the plaintiffs in this litigation are not parties to the *Conner* litigation. The first-to-file rule does not require identical parties, but the fact that the parties are different cuts against an argument for substantial overlap. Second, the claims in the two cases are not identical. The *Conner* litigation includes claims of retaliation, intentional infliction of emotional distress, and harassment, which this lawsuit does not. Third, the *Conner* lawsuit was filed in 2003, and involves different periods of recovery than the lawsuit before this Court.

Finally, in *Save Power Ltd.* the subsequently filed cause of action arose out of the original cause of action. One of the creditors sought, in essence, to get a second opinion when it came to the priority determinations. That is not the case here. Plaintiffs in this case bear no relation (other than working at the same facility) to the plaintiffs in the *Conner* litigation, and they have their own independent causes of action.

*B. Likelihood of Conflict*

Defendants have demonstrated that similar issues may arise in both this case and the *Conner* litigation. However, they have failed to show any substantial likelihood of conflicting rulings, as existed in *Save Power Ltd.* Furthermore, Defendants failed to show that if inconsistent rulings are issued, that problems and conflicts will arise. There is no evidence that a ruling in one of the causes of action

will have any effect on the rulings of or outcome in the other cause of action. On the other hand, in *Save Power Ltd.* the nature of the two causes of action allowed for inconsistent creditor priority determinations by the judges that created a direct irreconcilable conflict. *See Save Power Ltd.,* 121 F.3d at 951. The two rulings created an impasse-there were two judges within the same division that issued contradictory rulings on an identical question. *Id.* The legal questions were of primary import in *Save Power Ltd.* Here, the law is relatively straightforward and most of the questions will be fact questions that will be left to a jury to determine.

*C. Comparative Advantage and Interest of Each Forum in Resolving the Dispute*

The events giving rise to this lawsuit occurred within the Galveston Division. Defendants reside within the Galveston Division. All relevant records are located within the Galveston Division. As such, the citizens of Matagorda County have a local interest in adjudicating this dispute. In addition, this Court has an interest in resolving disputes brought before it in a timely and efficient manner, especially when those suits involve local citizens. Other that the *Conner* litigation, this lawsuit has no connection to the Victoria Division or to the docket of the presiding judge of the Victoria Division, the Honorable John Rainey. Therefore, this Court has the superior comparative interest in resolving this dispute, which weighs against transfer.

**\*4** Judge Rainey may at this time have greater conceptual familiarity with the issues presented in this case as a result of the *Conner* litigation. However, the facts and issues presented in this case are not of such a nature that getting up to speed will be difficult or burdensome. Nor have Defendants shown any great advantage to the parties if this case were transferred to the Victoria Division. Defendants have not shown that the greater familiarity Judge Rainey may hold with respect to the facts and issues in his case warrants transfer. Indeed, the only significant question remaining is why *Conner* was filed in Victoria at all.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Not Reported in F.Supp.2d, 2005 WL 2266619 (S.D.Tex.)
**(Cite as: 2005 WL 2266619 (S.D.Tex.))**

*D. Promotion of the Interests of Justice and Judicial Economy*

Defendants offer little evidence that there are likely to be rulings issued by this Court that would "trench upon the authority" of its sister court in Victoria, or that transferring the lawsuit would "avoid piecemeal resolution of issues that call for a uniform result." *See Save Power Ltd.,* 121 F.3d at 950. If this Court were to transfer this case to the Victoria Division, it would be too late to consolidate the case with the *Conner* lawsuit, and as a result, no efficiencies would be made to promote judicial economy or avoid the waste of duplication. By waiting until the eve of trial in the *Conner* litigation to file a motion to transfer in this lawsuit, Defendants prevented any steps that might have been taken to maximize or gain efficiency. Moreover, given the substantive distinctions between the two, Defendants argue an astonishing premise: that if they are sued in one kind of case in a particular forum, they must be sued there always, ever after. For instance, had they been sued in Victoria by one plaintiff in a personal injury case, all injured plaintiffs thereafter would be *required* to file in Victoria. This is a wholly unpersuasive argument.

IV. Conclusion

For the above-stated reasons, Defendants' Motion to Transfer Venue is hereby DENIED. Each Party is to bear its own taxable costs, attorneys' fees, and expenses incurred herein to date. Rather, if Defendants want the suggested relief, they should more properly petition the Victoria Court to transfer its case here.

IT IS SO ORDERED.

S.D.Tex.,2005.
Buckalew v. Celanese, Ltd.
Not Reported in F.Supp.2d, 2005 WL 2266619 (S.D.Tex.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB 2

LEXSEE



Analysis
As of: Jul 30, 2013

**KURIAN DAVID, ET AL. versus SIGNAL INTERNATIONAL, LLC, ET AL.**

**CIVIL ACTION NO: 08-1220 SECTION: "A" (3)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

**2012 U.S. Dist. LEXIS 114247**

**January 3, 2012, Decided
January 4, 2012, Filed**

**SUBSEQUENT HISTORY:** Motion granted by David v. Signal Int'l, L.L.C., 2012 U.S. Dist. LEXIS 135254 (E.D. La., Sept. 21, 2012)

**PRIOR HISTORY:** David v. Signal Int'l, L.L.C., 2010 U.S. Dist. LEXIS 128614 (E.D. La., Nov. 23, 2010)

**CORE TERMS:** green cards, visa, certification, forced labor, trafficking, coercion, involuntary servitude, temporary, immigration, causation, predicate acts, foreign workers, fraudulent, recruit, certify, compensatory, recruited, arrived, predominate, recruiting, class certification, class-wide, conspiracy, slavery, class members, individualized, recruitment, mail, class action, misrepresentation

**COUNSEL:** [*1] For Kurian David, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, PRO HAC VICE, Kristi L. Graunke, PRO HAC VICE, Mary C. Bauer, PRO HAC VICE, Morris S. Dees, PRO HAC VICE, Naomi Tsu, PRO HAC VICE, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, PRO HAC VICE, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, PRO HAC VICE, Shirley Lin, PRO HAC VICE, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY;

Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Sony Vasudevan Sulekha, Palanyandi Thangamani, Hemant Khuttan, Andrews Issac Padaveettiyl, Dhananjaya Kechuru, on behalf of other similarly situated individuals, Sabulal Vijayan, Krishan Kumar, Kuldeep Singh, Plaintiffs: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, Kristi L. Graunke, Mary [*2] C. Bauer, Morris S. Dees, Naomi Tsu, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, Shirley Lin, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Maruganantham Kandhasamy, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, Kristi L. Graunke, Mary C. Bauer, Morris S. Dees, Naomi Tsu, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY;

Ivy O. Suriyopas, Shirley Lin, PRO HAC VICE, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY;  [*3] Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Jacob Joseph Kaddakkarappally, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Shirley Lin, LEAD ATTORNEY, PRO HAC VICE, Ivy O. Suriyopas, Asian American Legal Defense and Educational Fund, New York, NY; Ashleigh Ferris, Daniel Werner, Kristi L. Graunke, Mary C. Bauer, Morris S. Dees, Naomi Tsu, Southern Poverty Law Center, Immigrant Justice Project, Atlanta, GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Thanasekar Chellappan, individually, Plaintiff: Alan Bruce Howard, LEAD ATTORNEY, PRO HAC VICE, Crowell & Moring, LLP (New York), New York, NY; Ashleigh Ferris, Daniel Werner, PRO HAC VICE, Kristi L. Graunke, PRO HAC VICE, Mary C. Bauer, PRO HAC VICE, Morris S. Dees, PRO HAC VICE, Naomi Tsu, PRO HAC VICE, Southern Poverty Law Center, Immigrant Justice Project, Atlanta,  [*4] GA; Chandra S. Bhatnagar, PRO HAC VICE, American Civil Liberties Union Foundation (New York/Broad), New York, NY; Hugh Daniel Sandler, Joseph Bjarnson, Dewey & LeBoeuf LLP (New York), New York, NY; Ivy O. Suriyopas, PRO HAC VICE, Shirley Lin, Asian American Legal Defense and Educational Fund, New York, NY; Jennifer Stewart, Winston & Strawn, LLP (New York), New York, NY; Tracie L. Washington, The Louisiana Justice Institute, New Orleans, LA.

For Signal International LLC, Defendant, Third Party Plaintiff, Cross Claimant: Erin Casey Hangartner, LEAD ATTORNEY, Alan Dean Weinberger, Dominic Joseph Gianna, Elham Rabbani, Hal D. Ungar, Paul John Mirabile, Middleberg, Riddle & Gianna (New Orleans), New Orleans, LA; Elliot Ross Buckley, Jr., Jefferson Parish Attorney's Office (Elmwood), Harahan, LA; Patricia Anne F. Bollman, Patricia A. Bollman, APLC, Metairie, LA.

Malvern C. Burnett, Defendant, Pro se, New Orleans, LA.

For Malvern C. Burnett, Gulf Coast Immigration Law Center, L.L.C., Law Offices of Malvern C. Burnett, A.P.C., Defendants, Cross Defendants: Ralph R. Alexis, III, LEAD ATTORNEY, Denia Sylve Aiyegbusi, Glenn B. Adams, Porteous, Hainkel & Johnson (New Orleans), New Orleans, LA; Michael  [*5] J. Madere, The Law Offices of Robert D. Ford, Kenner, LA.

Gulf Coast Immigration Law Center, L.L.C., Defendant, Pro se, New Orleans, LA.

Law Offices of Malvern C. Burnett, A.P.C., Defendant, Pro se, New Orleans, LA.

Indo-Ameri Soft L.L.C., Defendant, Pro se, New Orleans, LA.

Kurella Rao, Defendant, Pro se, Metairie, LA.

For J & M Associates, Inc. of Mississippi, Billy R Wilks, J&M Marine & Industrial, LLC, Defendants: James G. Curenton, Jr., LEAD ATTORNEY, PRO HAC VICE, James G. Curenton, Jr., Attorney at Law, Fairhope, AL; Ralph R. Alexis, III, Porteous, Hainkel & Johnson (New Orleans), New Orleans, LA.

Global Resources, Inc., Defendant, Pro se, c/o Michael Pol, Beaumont, MS.

Michael Pol, Defendant, Pro se, Beaumont, MS.

For Sachin Dewan, Defendant: Ralph R. Alexis, III, Porteous, Hainkel & Johnson (New Orleans), New Orleans, LA.

For Dewan Consultants Pvt. Ltd., also known as Medtech Consultants, Defendant: Stephen H. Shapiro, LEAD ATTORNEY, Stephen H. Shapiro, Attorney at Law, New Orleans, LA.

For J&M Associates, Inc. of Mississippi, Cross Claimant, Cross Defendant: James G. Curenton, Jr., LEAD ATTORNEY, PRO HAC VICE, James G. Curenton, Jr., Attorney at Law, Fairhope, AL.

Malvern C. Burnett,  [*6] Cross Defendant, Pro se, New Orleans, LA.

Gulf Coast Immigration Law Center, L.L.C., Cross Defendant, Pro se, New Orleans, LA.

Law Offices of Malvern C. Burnett, A.P.C., Cross Defendant, Pro se, New Orleans, LA.

Kurella Rao, Cross Defendant, Pro se, Metairie, LA.

Global Resources, Inc., Cross Defendant, Pro se, c/o Michael Pol, Beaumont, MS.

Michael Pol, Cross Defendant, Pro se, Beaumont, MS.

For Sachin Dewan, Dewan Consultants Pvt. Ltd., Cross Defendants: Stephen H. Shapiro, LEAD ATTORNEY, Stephen H. Shapiro, Attorney at Law, New Orleans, LA.

Global Resources, Inc., Cross Claimant, Pro se, c/o Michael Pol, Beaumont, MS.

Michael Pol, Cross Claimant, Pro se, Beaumont, MS.

**JUDGES:** JAY C. ZAINEY, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** JAY C. ZAINEY

**OPINION**

**ORDER AND REASONS**

The following motions are before the Court: **Motion to Certify Class (Rec. Doc. 165)** and **Supplemental Motion to Certify Class (Rec. Doc. 994)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012)** filed by defendant Signal International, LLC; [1] **Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031)** filed by plaintiffs Kurian David, et al.; **Motion to Strike Evidence** [*7] **Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1082)** filed by defendant Signal International, LLC.

> 1   Defendants Malvern C. Burnett, Gulf Coast Immigration Law Center, LLC, and the Law Offices of Malvern C. Burnett, A.P.C., Sachin Dewan, and Dewan Consultants, Pvt. Ltd. have formally moved to join in the Motion to Strike-1012. (Rec. Docs. 1039 & 1053).

All motions are opposed. [2]

> 2   Defendants J & M Associates Inc. of Mississippi, J & M Marine & Industrial, LLC, and Billy Wilks adopt Signal's and the Burnett Defendants' arguments in opposition to class certification. (Rec. Doc. 992). Defendant Kurella Rao has indicated that he will be a "passive" defendant. (Rec. Doc. 897).

The Motion to Strike-1012 was taken under submission on March 16, 2011, and the Motion for Leave was taken under submission on March 23, 2011, but the Court elected to take up those motions in conjunction with the issue of class certification. The motion(s) for class certification were taken under submission on April 29, 2011 (Rec. Doc. 1076), upon receipt of the parties' rebuttal submissions. [3] The Motion to Strike-1082 was taken under submission on June 22, 2011.

> 3   In this case, all parties consented to waive [*8] a live evidentiary hearing and to submit the issue of certification to the Court on the briefs. (Rec. Docs. 907 & 926). Rule 23 does not itself require an evidentiary hearing on the question of class certification. Merrill v. So. Methodist Univ., 806 F.2d 600, 608 (5th Cir. 1986). However, any factual uncertainties trigger the necessity for a hearing. Id. at 609.

> Signal has requested oral argument on its Motion to Strike-1012 and Plaintiffs have requested oral argument on their Motion for Leave to File a Third Amended Complaint. The Court finds that the parties' memoranda more than adequately expound upon the issues presented and that oral argument would not be helpful to the Court.

For the reasons that follow, the Motions to Certify are DENIED, the Motion to Strike-1012 is DENIED, the Motion for Leave to File a Third Amended Complaint is DENIED AS MOOT, and the Motion to Strike-1082 is DENIED.

**I. INTRODUCTION**

Plaintiffs are seven (7) citizens of India who secured H-2B guest-worker visas to work in the United States for defendant Signal International, LLC. These seven plaintiffs, Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, Hemant Khuttan, Padaveettiyil [*9] Issac Andrews, and Kechuru Dhananjaya, seek to represent a putative class of approximately 500 ship and rig workers to pursue federal class claims against the defendants under the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1589 (forced labor) & § 1590 (trafficking); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)-(d); the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985. [4]

> 4   Plaintiffs also assert claims for fraud, negligent misrepresentation, and breach of contract. Plaintiffs are not seeking certification to pursue these claims as a class so those claims are not before the Court at this time.

Defendants are immigration attorney Malvern C. Burnett and his business Gulf Coast Immigration Law

Center, LLC and Law Offices of Malvern C. Burnett, A.P.C. (collectively "Burnett"); labor recruiter/broker Michael Pol and his company Global Resources, Inc. (collectively "Pol"); labor broker Billy Wilks and the two companies through which he operated, J & M Associates Inc. of Mississippi and J & M Marine & Industrial, LLC; Kurella Rao and his company Indo-Ameri Soft, LLC ("IAS"); Indian labor  [*10] recruiter Sachin Dewan and his company Dewan Consultants Pvt., Ltd. (collectively "Dewan"); and American employer Signal International, LLC. [5]

> 5   Defendants Pol and Rao and their associated companies are not represented by counsel at this time.

Plaintiffs' claims are numerous and at times complex but the gist of their claims is that Defendants engaged in a fraudulent scheme built around the fictitious promise of employment-based green cards to obtain permanent residence in the United States. [6] Plaintiffs assert that they relied on this core false promise, as well as other misrepresentations by Defendants, when deciding to pay exorbitant labor recruiting fees to travel to the United States to work at Signal's marine fabrication facilities in Mississippi and Texas. Once there, Plaintiffs allege that they were subjected to segregated housing, severe discrimination, and adverse working and living conditions--that given their debts--reasonable persons in their position would have felt compelled to endure. Plaintiffs contend that the scheme yielded Dewan, Pol, and Burnett millions of dollars in fees, and procured for Signal a compliant and expendable labor pool that saved the company millions  [*11] of dollars in wages that it would otherwise have had to pay to contract laborers and American direct hires.

> 6   The term "green card" is used colloquially for an alien registration receipt card, which denotes legal permanent resident status in the United States. See Ascencio-Guzman v. Chertoff, No. B-94-215, 2009 U.S. Dist. LEXIS 32203, 2009 WL 1064962, at *4 (S.D. Tex. Apr. 15, 2009).

Plaintiffs seek to have a class certified pursuant to Federal Rule of Civil Procedure 23(b)(3) consisting of

> All Indian guest-workers who were recruited by one or more Defendants and who traveled and/or were transported to the United States at any time through September 30, 2007, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(b) ("H-2B") visas assigned to Defendant Signal International.

Plaintiffs contend that the core facts of the case as well as Defendants' main defenses are equally applicable to the claims of all class members, and that the "pernicious scheme" underlying this case had no individualized dimensions. According to Plaintiffs, they satisfy Rule 23's legal requirements for certification and equity militates in favor of Defendants having to answer for their conduct in the same fashion that they treated Plaintiffs in their prior  [*12] dealings with them: As a nameless and faceless class of fungible migrant workers who could be misled and exploited without regard to individual rights or interests.

## II. BACKGROUND

The factual background for this case separates well into two phases. The Phase 1 events began in 2004 and did not involve defendant Signal or the H-2B visa process. But the Phase 1 events, and the pre-existing relationships between the various other defendants, laid the ground work for much of the Phase 2 events. The Phase 2 events began in 2006 when Signal's domestic labor pool was adversely affected by Hurricanes Katrina and Rita. It was in the aftermath of the hurricanes that Signal sought to supplement its labor pool with foreign workers via the H-2B visa process. Thus, many of the plaintiffs in this case were originally recruited for employers other than Signal, although all of the plaintiffs eventually came to the United States to work for Signal under the auspices of the H-2B guest-worker program. [7]

> 7   At least 38 putative class members were denied employment at Signal even though they paid the recruiting fees and came to the United States. (Rec. Doc. 994-1, at 4). Plaintiffs' claim under 42 U.S.C. § 1981  [*13] for discriminatory conditions at Signal does not apply to these 38 plaintiffs. Plaintiffs suggest that a sub-class as to these plaintiffs might be appropriate.

### A. Factual Background--Phase 1

At all material times, defendant Global was a Mississippi corporation engaged in the business of recruiting foreign workers for employment in the United States. Defendant Michael Pol was Global's president. Pol had an existing business relationship with defendant Billy R. Wilks, defendant J & M's corporate principal. (Pla. Exhs. 520(Pol); 521(Pol)). J & M is in the business of recruiting laborers to then subcontract them out to other companies for a profit. Together Pol and Wilks were supplying labor to a shipyard client in California.

Pol also had a prior business relationship with defendant Sachin Dewan. Dewan is a businessman and he

resides in India. As far back as 1996, Pol and Dewan had worked together, along with defendant Malvern Burnett, to bring Indian H-2B welders and pipe fitters into the United States for Avondale Shipyards. (Signal Exh. C).

According to Pol, Dewan contacted him in early 2004 to see if Pol was interested in placing foreign workers with his customers. [8] Pol then presented [*14] Billy Wilks with a plan to recruit foreign workers through the green card program that he and Dewan had discussed. Global and J & M executed a contract whereby Global would find qualified foreign workers to be acquired for employment with J & M under the I-140 "permanent resident" process. (Pla. Exh. 522(Pol)). Under the agreement Global was to provide the services of an immigration attorney to facilitate bringing workers into the country legally--that attorney was Malvern Burnett. Wilks sent Pol a demand letter for 300 workers. (Pla. Exh. 520(Pol)).

> 8   Dewan asserts that it was Pol who contacted him.

To facilitate the J & M/Global deal, in March 2004, Global, Sachin Dewan (for Dewan Consultants), and Malvern C. Burnett (for Gulf Coast Immigration Law Center, Inc.) executed a contract, the Multi-Lateral Business Agreement, pursuant to which Dewan would recruit suitable foreign workers, Burnett would handle the immigration legal work, and Global would provide suitable employment in the United States. (Pla. Exh. 455). Each applicant-employee was to be charged a fee of roughly $10,000-$12,000 USD. The Multilateral Agreement states that the workers would be coming to the United States under [*15] the "'permanent residence' process for migration." Id.

In early 2004 defendant Kurella Rao (for IAS) also entered the picture. Rao and his company IAS had been in the business of recruiting foreign information technology personnel since 1997 and Rao wanted to branch out into shipyard workers. Rao and Dewan executed a contract, the Bilateral Business Agreement, to memorialize their business arrangement. [9] (Pla. Exh. 756). Dewan was to recruit the foreign workers and Rao (via his company IAS) was to sponsor them for employment in the United States.

> 9   Plaintiffs' Exhibit 746 is an unsigned copy of the agreement.

Burnett acted as immigration counsel for the J & M and IAS recruits. But the workers recruited by IAS had no direct contact with Burnett. Rather, Rao retained Burnett for legal services in connection with IAS's recruitment of workers and IAS made payments to Burnett for legal services provided.

Thus, as of 2004 Dewan was recruiting foreign workers on behalf of Global, for the ultimate benefit of J & M and its clients, and for IAS. Dewan recruited 232 workers for the benefit of J & M. Dewan recruited around 130 workers for the benefit of IAS. According to Dewan, he used the same recruitment [*16] process for the Global/J & M and IAS contracts. (Dewan depo at 216). Dewan was the lead recruiter but Pol, Burnett, and Rao each participated in some recruiting seminars overseas in order to assist Dewan with the process. It is undisputed that all of the recruitment and placement was done with permanent residence in the United States as part of the program and the workers were told that this would take about two years. At this stage, H-2B visas were not part of the arrangement. [10]

> 10   At this point it bears noting that an H-2B guest-worker visa is fundamentally different than an employment-based green card. H-2B visas are *temporary, non-immigrant* visas. Under the H-2B program, a worker may come to the United States *temporarily* to work for an employer who has petitioned for the right to employ H-2B guest-workers and whose petition has been approved by the Department of Labor. Castellanos-Contreras v. Decatur Hotels, LLC, 622 F.3d 393, 405 n.2 (5th Cir. 2010) (en banc) (Dennis, J., dissenting) (quoting 8 C.F.R. § 214.2(h)(1)(i)). Once admitted, the guest-worker's legal status is tied to performing labor for the specific employer who petitioned for the visa. Id. (citing § 214.2). If at any [*17] point the H-2B visa expires or the worker is dismissed from his job, then he is required to immediately leave the country. Id. (citing § 214.2(h)(6)(vi)(E), (h)(17)(iii)(C)). Under no circumstances can the worker remain in the country longer than three years. Id. (citing § 214.2(h)(15)(ii)(C)).
>
> An employment-based green card, on the other hand, is given to someone who has obtained an immigrant visa to enter the United States on a permanent basis and to reside here indefinitely. Green card holders are permanent resident aliens and they have nearly all of the rights of a citizen. Generally speaking, a permanent resident alien can live and work in the United States without restriction.
>
> Thus, as a practical matter, H-2B employees cannot simultaneously be sponsored for an H-2B visa and a green card, given the fundamental difference in the temporal aspects of the two types of visas.

As of February 2006 none of the green card promises to the J & M and IAS recruits had come to fruition. [11]

The workers had paid significant fees up front and were naturally becoming frustrated with the process and irate with the lack of progress toward their legal, permanent immigration to the United States. By [*18] this point some of the workers had been waiting for over two years to come to the United States with green cards. Some workers even demanded refunds, which none of the recruiter/broker defendants were interested in providing. [12]

> 11   According to Burnett, in 2003-2004 the process of obtaining labor certifications was extremely long--in some cases in excess of three years. (Burnett memo at 6). It was anticipated that the Department of Labor was going to institute a streamlined process for granting labor certifications or PERMs. Burnett contends that he delayed the filing of any PERMs to take advantage of the new system, which itself was delayed for nearly a year.
>
> The employment based green card process is a three step process. The first step requires that an ETA 9089 ("PERM") be filed with the Department of Labor and certified. The second step requires the filing of an I-140 with the United States Citizenship and Immigration Services.
>
> The third step depends on a "window of opportunity" opening and this can take a matter of months or even years depending on the allocation of immigrant visas by the State Department. The third step differs depending on whether the beneficiary of the PERM and [*19] the I-140 is in the United States or a foreign country when a green card becomes available for him in the quota. If the beneficiary is in a foreign country then he processes through the consulate and receives his green card. If the beneficiary is already lawfully in the United States then he files an I-485 for adjustment of status. Once the I-485 is approved then the applicant receives permanent resident status in the United States. (Signal memo at 3 n.8; Burnett memo at 9).
>
> 12   As of the end of 2006 IAS was no longer a functional company and Burnett had filed no I-140 petitions on behalf of the IAS recruits. The filing of an I-140 petition with the United States Citizenship and Immigration Services is the second step of three for obtaining a green card. Rao knew by January 2006 that IAS was no longer financially viable and that no green cards would be processed for his recruits. (Signal Exhs. K, L). He nonetheless continued to accept installment payments from the recruits. (Id.).

Those Plaintiffs who were originally recruited during the Phase 1 events are referred to as "Group I Plain-

tiffs." Second Amended Complaint ("SAC") (Rec. Doc. 944). Named plaintiffs Issac Andrews Padaveettiyil [*20] and Kechuru Dhananjaya are in this group. (Id. at 5).

## 1. Issac Andrews Padaveettiyil

Padaveettiyil was working in Dubai in 2004 when he was recruited for employment with J & M. According to Padaveettiyil, Dewan advertised in the paper in Dubai for jobs in America and permanent residence in this country. Padaveettiyil recalls attending an information seminar in Dubai with Dewan, Burnett, and Pol present. Padaveettiyil sold his land to finance his way in the program and he asserts that he was promised a permanent job and permanent residency in the United States. Padaveettiyil claims that in 2006, still with no green card, Dewan told him that he would be going to the United States on an H-2B visa to work for Signal, to forget about the current green card processing, and that Signal would file for a green card on his behalf. According to Padaveettiyil, he had no choice but to go because he had already paid his money. After arriving in the United States in 2007 Padaveettiyil worked at Signal's Pascagoula, Mississippi facility.

## 2. Kechuru Dhananjaya

Dhananjaya was recruited as part of the IAS employment program. In December 2003, Dhananjaya was working in Dubai when he saw one of Dewan's advertisements [*21] in the newspaper. Dhananjaya went to the office listed in the advertisement and spoke to Dewan about the recruiting program. Dewan told Dhananjaya about an upcoming meeting where Dhananjaya could learn more about the program and pay his first installment for green card processing if he was interested. Defendants Rao, Burnett, and Dewan were present at the meeting. Dhananjaya borrowed money from his brother and some of his friends to finance his way in the program. Dhananjaya and IAS executed an Agreement for U.S. Permanent Residency/Green Card on January 18, 2004. (Pla. Exh. 578). In the following two years Rao sent Dhananjaya encouraging correspondence about the status of his green card. (Signal Exhs. I, J). Dhananjaya had worked at Avondale Shipyards in 1997 under the H-2B guest-worker program. (Signal Exh. D). When Dhananjaya entered the IAS program he had never heard of a company called Signal. After arriving in the United States in 2007 Dhananjaya worked at Signal's Orange, Texas facility.

Plaintiffs do not suggest that Signal was involved in recruiting the foreign workers during the 2004 time frame. But by 2006 when the Indian recruits were becoming disgruntled with the green [*22] card program that Pol, Dewan, Burnett, and Rao had concocted, Signal

was experiencing its own labor problems in the aftermath of Hurricanes Katrina and Rita. Signal had a legitimate and immediate need for laborers like those that Pol, Dewan, Burnett, and Rao had recruited beginning in 2004 and who were now clamoring for results on the promised green cards. Thus, Signal's labor shortage in 2006 and its willingness to employ foreign workers, which it viewed as a cheap source of labor, created a seemingly perfect opportunity for Pol, Dewan, Burnett, and Rao to temporarily mollify the original J & M/IAS green card recruits by offloading them to Signal. According to Dewan, some of the workers jumped at the opportunity to go to the United States sooner rather than later, even if that meant traveling on an H-2B visa to the detriment of the green card process. (Signal Exh. AA). But Plaintiffs contend that Dewan persuaded them to go to the United States on the H-2B visas and that they were told that Signal would take care of getting them their green cards once they arrived in the United States.

**B. Factual Background--Phase 2--Enter Signal**

Signal is a marine and fabrication company with its home [*23] office in Pascagoula, Mississippi and an additional shipyard in Orange, Texas. Signal is in the business of providing offshore drilling rig overhaul, repair, upgrade, and conversion. Signal also offers services to the general marine and heavy fabrication markets. In 2006-2007 Signal had a substantial amount of work after hurricanes Katrina and Rita because of damages to rigs in the Gulf of Mexico. Hurricane-related housing shortages around Signal's shipyards had depleted its work force.

Sometime in the first quarter of 2006, Pol called Ron Schnoor (Sr. VP & General Mgr.) with Signal to talk to him about the possibility of Global providing Signal with foreign workers under the "permanent resident process." Schnoor called contacts with Avondale Shipyards to inquire about how the H-2B program had worked at that company. (Signal Exh. W). Bill Bingle (VP of Production) with Signal called Pol to set up a meeting. Bingle and Pol discussed bringing workers to the United States under the H-2B program for employment with Signal and Bingle eventually accompanied Pol to India on a recruiting trip. According to Pol, the plan was to get permanent residence visas for welders and fabricators to work [*24] at Signal's Pascagoula, Mississippi and Orange, Texas facilities. Using H-2B visas was an "afterthought" because Signal wanted the workers to arrive quickly, certainly more quickly than what green card processing could provide. Signal would not be required to pay any of the workers' fees and travel expenses--everything was to be paid by the workers themselves so Signal considered this to be a good deal. [13] Pol told Signal that the workers would be paying about $2,000

each to participate in the program, which was of course not accurate. Signal was adamant that it incur none of the costs of the program.

> 13    Indian workers in particular were considered to be a cheap source of labor. (Pla. Exh. 517). Signal intended to use the Indian workers to displace subcontracted labor that was costing the company $100,000 to $200,000 per day.

On April 18, 2006, Global and Signal executed a Skilled Worker Recruitment Agreement (Pla. Exh. 423) to establish the framework for their arrangement to bring foreign workers into the United States under the H-2B temporary program and/or the I-140 "permanent residence" process. (Id. at 1). The agreement clearly delineates the temporary nature of an H-2B visa versus [*25] the long-term nature of an I-140 permanent residence visa. The agreement also expressly notes that H-2B visas are not always issued in a timely manner but that "[i]n any case, the permanent resident (I-140) process will continue as agreed upon." (Id. at 3). With the Multi-Lateral Business Agreement between Pol, Burnett, and Dewan already in place, Pol contacted Dewan and Burnett about the Signal deal.

Signal executed a document appointing Dewan as its representative in India to facilitate the recruitment of skilled workers to the United States for employment under "the temporary and permanent resident program." (Pla. Exhs. 463 & 665). In that same document Signal granted Dewan a limited power of attorney to sign any legal document or letter which may be required to obtain permission from the government/immigration agencies in India for advertising, conducting seminars, and trade tests to further "our efforts." Id. On June 19, 2006, Signal sent Dewan a demand letter for 600 skilled workers for a 10-24 month period. (Pla. Exh. 461). Accommodations, transportation, and food were all to be paid via salary deduction and travel expenses to Pascagoula, Mississippi were to be paid by the individual [*26] worker. Id. The workers were to be skills tested in India prior to any employment offer and the salary range would be $14 to $18 USD per hour depending on experience and skill level. Id.

On August 3, 2006, Signal executed yet another power of attorney in favor of Dewan making him the company's agent and giving him full authority to act on behalf of Signal, whether filing documents with the U.S. immigration authorities or executing contracts, in the process of bringing migrant workers to the United States for employment at Signal. (Pla. Exh. 512). Signal retained Burnett and his law firm to represent the company in legally bringing the workers into the United States. (Pla. Exhs. 563 & 574). The terms of the agreement between Signal and Burnett dictated that all of the legal

fees were to be paid by the workers, with Signal owing Burnett nothing for legal fees.

Dewan went to work recruiting workers for Signal. Dewan placed advertisements in newspapers throughout India and the United Arab Emirates in 2006 offering opportunities for welders and pipe fitters to immigrate to the United States under the auspices of Signal's guest-worker program. (Pla. Exh. 460). Dewan and Pol held six recruitment [*27] seminars using a PowerPoint presentation that Pol had prepared. (Pla. Exh. 684). Green cards were expressly touted as part of the program but a second set of advertisements only mentioned H-2B visas. Nonetheless, Dewan asserts that he believed that Signal was going to request green cards for these workers too. The average fee that each worker paid was about $10,000 [14] (split between Dewan, Pol, and Burnett) which in some cases might exceed the worker's annual salary in his home country. [15] Plaintiffs contend that Dewan, Pol, and Burnett used the Signal contract as a way to extract more money from the existing and eager J & M and IAS recruits and to generate fees from a whole new group of Signal recruits. To be sure, maximizing profits from importing foreign workers into the United States was of the utmost importance to Dewan, Pol, and Burnett. (Signal Exhs. Z, CC, FF).

14   Plaintiffs contend that Rao, J & M, Pol, Dewan, and Burnett eventually charged the recruits anywhere from $17,600 to $20,000 for an "expedited option" when the H-2B program with Signal came along. Plaintiffs were charged more for H-2B visa processing after the first set of H-2B visas were approved by the consulate.

15   The [*28] workers executed separate contracts with Global, Burnett, and Dewan, agreeing to pay each of them separately for their services in three installment payments. Global was to be paid $3750, (Pla. Exhs. 327, 345, 354, 500), Burnett was to be paid $3750, (Pla. Exhs. 342, 350)and Dewan was to be paid Rs.33,500 (Pla. Exhs. 344, 351, 502, 505). Plaintiffs' Exhibit 59 indicates that Global and Burnett were to be paid $5373 USD each. Burnett was particularly adamant about receiving his fee. (Pla. Exhs. 468 ("Mafiaso: Tell them to pay up . . .", 572, 834 ("Please see if you can't get Ramesh to 'persuade' him to pay me . . . . If he does not pay, I will see to it that his visa gets mysteriously revoked.")). Plaintiffs estimate that Dewan, Pol, and Burnett collected about $7 million dollars from all of the putative class members. (Pla. Exhs. 865, 866, 867, 868 (repeated recitation of "Cha Ching")).

In late May and early June 2006, Signal filed paperwork with the United States Department of Homeland Security-Citizenship and Immigration Services and the Department of Labor seeking permission to import and hire 590 foreign guest-workers pursuant to the government's H-2B guest-worker program. Bingle, [*29] on behalf of Signal's Mississippi operation, and Thomas Rigolo (Sr. VP & General Mgr., Texas Operations), on behalf of Signal's Texas operation, executed the paperwork. In the filings Bingle explained that Hurricanes Katrina and Rita had caused a tremendous but temporary shortage of labor in the Gulf region and that Signal sought to hire temporary H-2B workers until the labor force would return to normal. (Pla. Exh. 516). Bingle explained that the need for current workers reflected a peak load and would be a one-time occurrence. Bingle also stated that the peak load temporary workers would not become part of Signal's permanent workforce--they would work for the length of time prescribed and then return to their home countries at the end of the employment period. (Pla. Exh. 516). In Signal's Application(s) for Alien Employment Certification to the Department of Labor, Bingle and Rigolo declared under penalty of perjury that the exact dates that the workers would be employed were 10/01/06 to 07/31/07. (Pla. Exhs. 515, 595, 863, 864).

According to Bingle, Signal had always intended to file for green cards for the foreign workers, or at least those workers who proved to meet Signal's expectations. [*30] When questioned at his deposition about the certifications of temporary employment made to the government, Bingle explained that he did have concerns about signing those documents and making those representations but that Malvern Burnett had told him that this was just the way the H-2B visa process worked. Rigolo testified that Signal actually needed workers for about a two-year time frame but that he had no reservations about submitting forms to the government that cited the ten month time frame dictated by the H-2B program. Burnett's explanation was that the workers coming over on temporary visas were not going to be part of Signal's permanent workforce, at least in the beginning, and that it might be a year or two before they might return to Signal as permanent workers. (Burnett depo at 457-48).

Signal sent employees to India to personally test the workers' skills. Therefore, everyone who was given an offer of employment with Signal had passed a test to the satisfaction of Signal's employees and no one with Signal told the workers that there would be further testing when they arrived at Signal and that their hourly pay would be subject to reduction or their employment subject to [*31] termination if they failed to pass. Signal's form letter offer of employment simply offers congratulations for passing the skills test in India and the worker is told that "[a]s agreed, [his] salary will be $18.00 per hour." (Pla. Exh. 381). Nothing in the offer of employment

from Signal alluded to a second round of testing once the worker arrived in the United States. The Signal employment agreement itself, however, specifically states that the worker would be subject to skills testing upon arrival at Signal and that his hourly rate might be reduced based on skill level. (Pla. Exhs. 64, 179, 201, 294, 300, 348, 808, 854). [16] But the Signal employment agreement was presented to the workers after they had already traveled to the United States from India and arrived at Signal. (Signal Exhs. SSS, SSS-A).

> 16    The Memorandum of Understanding that each worker executed with Dewan also references the second round of testing. (Pla. Exhs. 344, 351, 502, 505, at ¶¶ 5 & 9).

In addition to the workers that Dewan, Pol, and Burnett actively recruited anew for Signal, Pol agreed to use Rao's IAS recruits to fill some of the employment slots at Signal, (Pla. Exh. 808 [Dhananjaya/Signal agreement]), even [*32] though Pol would receive significantly less of a fee for each of these recruits who had already paid their fees over to Rao, Dewan, and Burnett. Global's agreement with Signal also provided a U.S. employer onto which Dewan, Pol, and Burnett could offload the J & M green card recruits. Nearly half of the Indian workers whom Burnett, Dewan, and Pol provided to Signal had been recruited for other companies.

Dewan, Pol, and Burnett were well aware that U.S. immigration officials would not approve an H-2B visa for any worker who communicated to the consulate officials that he was participating in the Signal program with the intent of receiving a green card. (Pla. Exhs. 519, 550). The recruits were therefore escorted to their consulate interviews by a Dewan Consultants employee to ensure that all went well. The recruits were warned about not disclosing anything about green cards to the consulate officials. Dewan also warned them not to mention the amount of money that they had paid to participate in the Signal program. Several plaintiffs also contend that after their visas were issued Dewan (and perhaps on one occasion Burnett) [17] withheld their passports pending the final installment payment [*33] for the program. Plaintiffs contend that with their passports being held they feared that they must either pay the rest of the money to Dewan to go to Signal or forfeit all of the money that they had already paid. Plaintiffs claim that they were assured by Dewan that participation in the H-2B program would allow them to stay in the United States while their green card applications were being processed.

> 17    Sony Sulekha testified that Burnett took custody of his passport after his H-2B visa was approved. (Sulekha depo at 182).

Those Plaintiffs who were recruited specifically for Signal during the Phase 2 events are referred to as "Group II Plaintiffs." SAC at 6. Named plaintiffs Kurian David, Sony Vasudevan Sulekha, Palanyandi Thangamani, Muruganantham Kandhasamy, and Hemant Khuttan are in this group. Id.

## 1. Kurian David

David was working in Abu Dhabi as a high-level senior foreman when he saw one of Dewan's advertisements in a newspaper. David attended an information seminar in Dubai where employment opportunities at Signal were discussed. He asserts that the attendees were told that they would receive green cards within 24 months but that the company needed workers immediately so they would [*34] be going on H-2B visas. David says that Burnett explained that David would first go on an H-2B temporary visa which would eventually be extended two times. During the 24 month waiting period and with the two extensions of the original H-2B visa, David would get the green card. David says that he was assured that Signal was a good company with good accommodations and that the workers would be treated well.

David asserts that he came to Signal only because he expected a green card and that he would not have left his otherwise lucrative position at home to come to the United S tates solely for temporary employment. David borrowed money from his brother-in-law to finance his participation in the program. David stayed with Signal through March 2008. (Signal Exh. FFF). After arriving in the United States in 2007 David worked at Signal's Orange, Texas facility.

## 2. Sony Vasudevan Sulekha

Sulekha decided to participate in the program because of an ad that he saw in a Malayalam newspaper. Sulekha attended a seminar at the Hilton Hotel in Cochin in May 2006. Dewan, Pol, and Salimon (another Dewan employee) were present. Sulekha was told that Signal needed workers, the company would give permanent [*35] residence, that Signal was a good company, and that this would be a very good opportunity for him. Dewan and Pol explained that at first the workers would be sent on an H-2B temporary visa, which would be extended, and a green card would follow within 24 months. Sulekha pawned his ornaments and wife's jewelry and borrowed money from a distant relative in order to finance his participation in the program. Sulekha contends that he was promised a green card and that he would be able to bring his family to the United States but those promises never materialized. After arriving in the United States in 2006 Sulekha worked at Signal's Orange, Texas facility.

### 3. Palanyandi Thangamani

Thangamani testified that he went to Signal expecting a green card. Thangamani pledged his sister's ornaments and jewelry in order to finance his participation in the program. After arriving in the United States in 2006 Thangamani worked at Signal's Orange, Texas facility.

### 4. Muruganantham Kandhasamy

Kandhasamy saw an advertisement in a paper called Dhinethandi that advised that workers were needed to work in the United States and would receive green cards. Kandhasamy attended an interview with Pol, Dewan, Burnett, [*36] and representatives from Signal--everyone present spoke. Kandhasamy was told that he would get a green card. Kandhasamy contends that just a few days before he was to leave for the United States he was told by Dewan that he would be going on an H-2B visa instead of a green card. Kandhasamy contends that Dewan told him, in the presence of Pol, Burnett, and a Signal representative, that once he arrived in the United States his H-2B visa would become a green card. After arriving in the United States in 2007 Kandhasamy worked at Signal's Orange, Texas facility.

### 5. Hemant Khuttan

Khuttan responded to an advertisement in the Hindustan Time newspaper in Delhi. The advertisement did not mention Signal by name. Khuttan attended an information meeting in Delhi where he first met Dewan. Khuttan traveled from Delhi to Mumbai to speak with Dewan Consultants about the program and this is when he first heard about Signal. Khuttan paid Dewan about $20,000 USD up front to participate in the employment program with Signal and he borrowed the money from a friend. Khuttan contends that he really didn't know which kind of visa he was supposed to get but that Dewan later informed him that he would be going [*37] to Signal on an H-2B visa and that once he arrived in the United States Signal would take care of him and get him a green card. After arriving in the United States in 2007 Khuttan worked at Signal's Pascagoula, Mississippi facility.

All of the named plaintiffs, whether recruited for J & M, IAS, or Signal contend that they were promised green cards and that this is what their contracts with Defendants guaranteed to them. Plaintiffs contend that it was in reasonable reliance on Defendants' assertions that they undertook such considerable personal, financial, and familial sacrifices in order to participate in the recruiting program, and they assert that they would not have made such sacrifices had they known that Defendants' assertions regarding permanent residence in the United States were false.

## C. Factual Background--Phase 2--Employment/Life at Signal

From the beginning, it was understood that housing and meals would be provided by Signal with the cost of these "accommodations" to be paid by the workers out of their paychecks. [18] Originally, Global was going to provide the accommodations with Signal then reimbursing Global out of the workers' paychecks. (Pla. Exh. 517). But Signal opted [*38] to construct man camp housing facilities onsite in Texas and Mississippi to house the workers. The decision was prompted in large part by housing shortages after hurricanes Katrina and Rita. Meals would also be prepared and served onsite. These preparations did require capital and expense outlays by Signal but it was always Signal's intention to recoup these expenditures by deducting fees from the workers' pay. Signal invested millions of dollars building the camps and decided to charge the workers $35 dollars per day (7 days a week) for room and board so that the company could recoup its investment over a five year period. [19] At the $35/day rate Signal anticipated realizing a profit from the man camps. [20] (Pla. Exh. 871). For this reason it would eventually become important to Signal to ensure that the man camps were filled to maximum capacity. (Pla. Exhs. 528, 449, 850). Signal implemented a policy that required each foreign worker to pay the $35/day accommodations charge even if the worker elected to live offsite and even if the worker earned no pay for a given day. Only the Indian H-2B workers were allowed to live at the man camps. And only the Indian H-2B workers were charged [*39] the $35 per day accommodations fee regardless of whether they chose to live in the man camp or elsewhere.

18   Plaintiff Thangamani testified that someone told him that room and board would be free. (Thangamani depo at 56).

19   Signal also envisioned charging the workers for enlarging its welder testing and training facilities. (Pla. Exh. 846).

20   One member of Signal's management proposed charging the workers $53.50 per day for accommodations, reasoning that the workers had only been making about $10 per day in India and that even after the deduction they would still be making about 11 times more per day than what they were making at home. (Pla. Exh. 671). Signal did not recoup its expenditures for the man camps and in the end Signal spent about $6.5 million dollars more than it recovered. (Cunningham depo at 136).

By August 2006 Signal was eager to have the workers arrive given its increased workload and manpower

shortage in that year and given the soaring costs that the company was incurring for subcontracted labor. (Pla. Exh. 550). The first workers began arriving at Signal in November 2006. Each H-2B worker was given a second skills test--some workers had their wages reduced from the $18 [*40] per hour rate by as much as 30 percent to an amount commensurate with their skills and some were terminated. Each worker also executed a Man Camp Housing Rules Agreement (Pla. Exhs. 48, 76, 811, 858, 859), [21] an H2B Resident Housing Agreement (Pla. Exhs. 63, 181, 779, 860, [22] and an Authorization Agreement for Payroll Deduction (Pla. Exhs. 75, 812, 845, 861, 862). [23] Once arrived the workers were presented with new employment contracts terminable at will. (Signal Exhs. SSS, SSS-A).

> 21    The Rules prohibited alcohol, smoking, visitors/guests, and horse-playing in the man camp. Also, all employees were required to enter the facility through security.
> 22    The Housing Agreement expounds upon some of the rules contained in the Man Camp Rules, imposes the $35/day charge for room and board, and imposes stiff fines for violations of camp rules.
> 23    Via this document each worker authorized Signal to deduct the $35/day "accommodations" or room/board charge from his paycheck.

Perhaps Signal understood even before the first workers arrived that they expected to receive green cards at some point. [24] (Pla. Exhs. 550, 817). But without question Signal knew of the workers' green card expectations once they arrived [*41] on site because the workers questioned Bill Bingle about green cards on their first day at the camp. According to Bingle, it was only later in the process that Signal learned that the H-2B process would not support the filing of green cards for the workers. Signal maintains that it had believed early on that there was an avenue available to convert the temporary visas to green cards and that it intended to apply for green cards for those workers who proved to be good employees. (Pla. Exh. 817). But green cards would only be considered once the allowable H-2B extensions were exhausted and only for valued workers. Prior to the expiration of the first H-2B visas in July 2007, Signal began using a "yes/no" evaluation protocol for identifying potential candidates for long term employment.

> 24    Less clear, however, and perhaps ultimately more important, is whether Signal understood the significance of the references to green cards in the various emails and correspondence that were exchanged before the workers arrived at Signal. See Rigolo depo at 72 ("[V]ery early in the process [] there was probably some misunderstanding and [the terms] visa and green card were used synonymously.").

Signal concedes [*42] that its intention was never to seek green cards for all H-2B workers without considering factors like skill level, work ethic, attitude, etc. Signal maintains that it never agreed to seek green cards on behalf of every worker without considering job performance and that it never felt obligated to do that. According to Signal, if such broad promises pertaining to green cards were made to the workers then they were not authorized by Signal and were not true. After all, green cards are issued by the government and with the government involved no employer could guarantee any worker a green card.

Plaintiffs contend that Defendants' green card scheme was grounded in part upon false representations about the living conditions at Signal. Upon arriving at Signal, Plaintiffs were sorely disappointed in the man camp accommodations, including the food. According to Plaintiffs, their $35 per day bought them life in overcrowded and cramped labor camps, [25] with insufficient bathroom and shower facilities for the number of men housed in each bunkhouse. Plaintiffs assert that the facilities lacked privacy and were not conducive to regular sleep. Signal believes that the facilities conformed to all [*43] applicable city codes but not necessarily to OSHA requirements. (Pla. Exh. 940). Plaintiffs contend that the squalid conditions in the man camp were conducive to the spread of disease and illness. At one of the camps water would leak and stagnate due to shoddy plumbing. (Pla. Exh. 621). One kitchen facility was described by Signal's own staff as "disgusting." (Pla. Exh. 828 ("I pray that the TX Health Dept doesn't show up. They will shut this place down immediately.").

> 25    Plaintiffs submitted numerous photographs and a video of the man camp living areas while they were occupied. (Pla. Exhs. 838, 839). Plaintiffs' assertions about overcrowded conditions are not exaggerated.

Plaintiffs also resented the man camp housing rules. In practice, Plaintiffs did not appreciate having to pass through security to enter to the camps, and the attendant searches of their parcels and requisite presentation of identification. Alcohol and visitors were strictly prohibited in the camps, and Plaintiffs contend that they often felt like prisoners while living in the camps, and isolated or marginalized from the rest of the workforce and the community. Of course, no worker could be forced to live at the man [*44] camp so long as he was willing to pay room and board elsewhere on top of the $35 per day (approximately $1050 per month) accommodations fee that Signal would continue to charge him in light of his H-2B status. Thus, some of the workers felt financially com-

pelled to live in the man camps despite how miserable any particular worker might have felt about that prospect.

Plaintiffs characterize the man camp as a "racialized ghetto," (Pla. memo at 20), and they point to the man camp as strong evidence of the discriminatory treatment that they claim to have received at Signal. Plaintiffs point out that they were the only members of Signal's workforce who were allowed or required to live in the man camp, with its attendant security rules and hefty daily rates, and that they were required to pack their lunches from the food available at the man camp cafeteria, which often spoiled in the heat before they could eat it. Plaintiffs point out that only the migrant workers at Signal were subjected to these conditions. [26] Plaintiffs also complain that they were given the most undesirable and dangerous work that Signal's non-foreign workers did not want to perform. Plaintiffs contend that they were [*45] left with no choice but to endure the unpleasant and abysmal conditions at Signal or go back to India financially bankrupt and socially scarred. Plaintiffs contend that Signal exploited their precarious financial situation and their vulnerable immigration status.

> [26]   Plaintiffs have also submitted various emails from Signal personnel which they contend exemplifies the company's discriminatory attitude toward the Indian H-2B workers. (Pla. memo at 23 n.25).

John Sanders was Signal's point man for the Global/Signal contract and he took what appears to be a genuine interest in the day to day concerns and welfare of the H-2B workers. [27] In November 2006 Sanders learned from the workers about the onerous fees charged by Dewan, Pol, and Burnett. Several workers told Sanders personal stories about pawning private possessions in order to raise the fees required to participate in the H-2B program, and of the significant debts that they had incurred in the process. The workers also complained about the $35 per day accommodations fee, pointing out that after this fee was deducted from their pay, and in light of the debts already incurred, it was not economically advantageous to be at Signal. Sanders [*46] relayed this information to upper management and noted how these issues were affecting morale amongst the workers. (Pla. Exh. 618).

> [27]   Sanders kept a personal diary in which he recorded his dealings with the Indian workers and Signal management and his personal impressions of many of the events at issue in this case.

On November 20, 2006, a meeting took place to discuss the clear contradiction in the workers' assertions about the fees that they were claiming that they had paid to participate in the H-2B/green card program and Pol's statements to Signal that the workers had paid $2000 to participate. (Pla. Exh. 521(Bingle)). Pol, Ron Schnoor, and John Sanders were present. Signal maintains that it was during this meeting that it learned with certainty about the exorbitant fees that the workers had paid to Global, Burnett, and Dewan. Ron Schnoor followed up with a letter to Pol demanding an accounting of the workers' payments and demanding that Pol refund 50 percent of the fees paid by the workers and reimburse them for airfare. (Pla. Exh. 520(Bingle)). Schnoor copied Dewan and Burnett on the letter. Pol replied via letter defending the fees charged and explaining why he could not refund [*47] any of the money. (Pla. Exh. 559). Signal was convinced that Pol had misrepresented to Signal the amount of money that each worker would be paying to participate. Signal terminated its relationship with Pol and requested that Dewan and Burnett do the same. (Pla. Exh. 669).

Thus, as of November 2006, Signal knew about the significant fees that the workers had paid and about the workers' green card expectations. Around this time Signal also became concerned that perhaps Dewan was not being honest with the testing in India because the actual skill level of the workers who were arriving at Signal was not commensurate with the tests that they were passing in India. Signal noticed that the workers coming over were not the best and that perhaps the ability to pay hefty recruiting fees was being given more weight than actual skill. Plaintiffs assert that November 2006 presents a watershed moment in the case because from this point onward Signal clearly knew what was going on but nevertheless continued for months thereafter to accept hundreds more workers into the program--workers who were relying on false promises. And while Signal terminated its dealings with Pol, it nonetheless continued to [*48] work with Dewan and Burnett. (Pla. Exh. 522(Bingle)). Plaintiffs contend that Signal took no corrective action because it needed the workers to continue to save on labor costs and to continue to pay for the man camp. Plaintiffs contend that Signal's decision to continue to bring in workers via Dewan and Burnett, all the while knowing the truth, makes the company liable in the scheme.

On March 9, 2007, Signal decided to terminate eight of the workers--six who were allegedly unproductive and two, Jacob Joseph Kaddakkarappally and Sabulal Vijayan, who might be characterized as "rabblerousers." (Pla. Exh. 646). Jacob and Sabulal had a reputation in Mississippi for creating unrest among the foreign workers even though they were otherwise skilled workers. By this time Signal also knew that some of the workers had contacted a lawyer about their rights, and that two of the workers in particular had been wheedling other workers to also speak to the lawyer. (Pla. Exh. 443). Signal un-

dertook to terminate Jacob and Sabulal on the morning of March 9, 2007, in the presence of the other foreign workers, which Plaintiffs contend was a calculated decision in order to make an example of Jacob and Sabulal [*49] so that everyone would understand what happens to troublemakers. Signal called in Swetman security guards in advance of the terminations in the event that things got out of hand--which they did as the situation deteriorated into mayhem. The security guards allegedly detained the terminated workers unlawfully in one of the bunkhouses, and Plaintiffs contend that this was done at Signal's direction. Sabulal attempted suicide and the Pascagoula Police Department arrived on the scene after someone called to report a kidnaping. (Pla. Exh. 444). The Mississippi Immigrant Relief Association was present outside the camp and so was the media. (Pla. Exh. 646). The Mississippi debacle of March 9, 2007, became known as "Black Friday." Plaintiffs contend that word of the Black Friday events in Mississippi quickly spread to the workers in the Texas camp.

Dewan flew from India to Mississippi on March 9, 2007, to help settle some of the unrest amongst the foreign workers but he was not present for the Black Friday events. Dewan believed that he might be able to calm the workers in light of the troublemakers who were trying to create problems for everyone. (Pla. Exh. 446). Dewan suggested that the workers [*50] who had initiated the problems should be deported first. Burnett later traveled to the Texas facility to similarly calm the workers.

On March 12, 2007, Schnoor and Burnett addressed the workers in Mississippi to reassure them that they were part of Signal's long term solution for supplementing its labor force. Schnoor advised the workers to think very carefully about suing Signal because Signal would vigorously fight any such efforts and that a bunch of frivolous lawsuits would mean no visa extensions for the foreign workers so that they would all have to return to India when the first H-2B visas expired on July 31, 2007. Plaintiffs contend that the events and aftermath of Black Friday emphasized to the Indian workers the importance of being compliant while at Signal because even good workers would be terminated and deported if they complained. Plaintiffs assert that Signal made false assurances about the status of their green cards thereby continuing the deception. Plaintiffs characterize the working and living conditions at Signal as psychologically coercive.

By April 25, 2007, Dewan, Burnett, and Pol were at odds when Pol and Burnett came to suspect that Dewan had lied to them about [*51] giving a refund to a candidate while he in fact took the candidate's money. (Pla. Exh. 469). Signal's first H-2B authorization was scheduled to expire on July 31, 2007, but on the advice of Burnett Signal requested the first extension for all of the

workers because it was just easier that way. By March 2008 when this lawsuit was filed more than three quarters of the putative class had left Signal. At present, none of the putative plaintiff class members remain at Signal.

**D. Procedural Background**

Plaintiffs filed this proposed class action on March 7, 2008, and amended their complaint twice. Plaintiffs originally moved for class certification on October 1, 2008. (Rec. Doc. 165). Plaintiffs filed their Second Amended Complaint (Rec. Doc. 944) on November 23, 2010. The Court allowed discovery on class issues and that discovery proceeded for over two years.

Plaintiffs successfully defeated numerous dispositive motions but on November 10, 2010, the Court granted Signal's motion to dismiss Plaintiffs' claim for certification of a Rule 23(b)(2) class for injunctive relief. [28] (Rec. Doc. 926).

> 28   When dismissing the (b)(2) claims the Court specifically noted that the ruling did not constitute a [*52] final adjudication of the class certification issue so as to trigger any party's right to seek an interlocutory appeal pursuant to Rule 23(f). (Rec. Doc. 926). In order to avoid the inefficiency of a piecemeal appeal process, all parties expressly agreed on the record to waive any subsequent argument that Plaintiffs' failure to seek immediate review in the Fifth Circuit would constitute a waiver of their rights under Rule 23(f). Accordingly, the Court will incorporate its ruling on the (b)(2) claims as part of this Order and Reasons so that the parties can seek review of all certification claims at one time.

Plaintiffs filed their Supplemental Motion to Certify (Rec. Doc. 994) on February 1, 2011, and Defendants filed their submissions in opposition to certification (Rec. Docs. 997, 998, 992, & 1000). Signal then filed its Motion to Strike Evidence Not Within Issues Raised in Plaintiffs' Pleadings (Rec. Doc. 1012) and Motion for Partial Stay of Class Certification Proceedings (Rec. Doc. 1013), in response to Plaintiffs' argument that certification of RICO claims predicated on 18 U.S.C. § 1546, insofar as Plaintiffs were urging that Signal defrauded the United States government, were [*53] never pled with the required specificity. Plaintiffs then filed their Motion for Leave to File a Third Amended Complaint (Rec. Doc. 1031). The Court granted Signal's Motion for Partial Stay such that Defendants would not be required to address the merits of the § 1546 claims in their rebuttal memoranda. (Rec. Doc. 1043). The Court advised that it would issue an order inviting Defendants to respond to the § 1546 claims on the merits if the Court were inclined to deny the Motion to Strike-1012 and/or to grant

the Motion for Leave, and if the § 1546 claims were otherwise certifiable. (Rec. Doc. 1043).

The parties filed their rebuttal memoranda (Rec. Docs. 1073, 1070, 1074, $ 1071) on April 29, 2011, at which time the issue of class certification was taken under submission, along with the Motion to Strike-1012 and Motion for Leave to File, the latter two relating solely to the issue of RICO claims predicated on § 1546 insofar as Plaintiffs argue third-party reliance by the United States government.

After the rebuttal memoranda were filed, Signal filed its second motion to strike, Motion to Strike-1082, which was taken under submission on June 22, 2011. This motion to strike, as with the [*54] first motion to strike, pertains solely to the RICO claims.

## III. CLASS CERTIFICATION PURSUANT TO RULE 23(b)(3)

Plaintiffs move to have a class certified pursuant to Federal Rules of Civil Procedure 23(b)(2) [29] and (b)(3) consisting of

> All Indian guest-workers who were recruited by one or more Defendants and who traveled and/or were transported to the United States at any time through September 30, 2007, pursuant to 8 U.S.C. § 1101(a)(15)(H)(ii)(b) ("H-2B") visas assigned to Defendant Signal International.

29    The Court has already rejected the (b)(2) injunctive relief class claims. See note 28, supra. The Court will therefore limit the substance of its analysis to the Rule 23(b)(3) class claims.

Plaintiffs seek certification with respect to their claims for violations of 1) the Trafficking Victims Protection Reauthorization Act of 2003, 18 U.S.C. § 1589 (forced labor) & § 1590 (trafficking); 2) the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c)-(d); 3) the Civil Rights Act of 1866, 42 U.S.C. § 1981; and 4) the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3).

Federal Rule of Civil Procedure 23 governs class actions. The rule provides in relevant part:

> (a) **Prerequisites.** [*55] One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

> (b) **Types of Class Actions.** A class action may be maintained if Rule 23(a) is satisfied and if:

> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

> (3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

> (A) the class members' interests in individually controlling the prosecution or defense of

separate actions;

**(B)** the extent [*56] and nature of any litigation concerning the controversy already begun by or against class members;

**(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

**(D)** the likely difficulties in managing a class action.

Fed. R. Civ. Pro. 23(a), (b)(2)-(3). To obtain certification a party must satisfy Rule 23(a)'s four threshold requirements (numerosity, commonality, typicality, and adequacy of representation), as well as the requirements of Rule 23(b)(1), (2), or (3). Gene & Gene, LLC v. Biopay, LLC, 541 F.3d 318, 325 (5th Cir. 2008) (citing Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 117 S. Ct. 2231, 138 L. Ed. 2d 689 (1997)). District courts have discretion as to whether a class will be certified. Stirman v. Exxon Corp., 280 F.3d 554, 561 (5th Cir. 2002) (citing Castano v. Am. Tobacco Co., 84 F.3d 734, 740 (5th Cir. 1996)). However, that discretion must be exercised within the framework of Rule 23. Id. The district court must "conduct a rigorous analysis of the Rule 23 prerequisites before certifying a class." Gene & Gene, 541 F.3d at 325 (quoting O'Sullivan v. Countrywide Home Loans, Inc., 319 F.3d 732, 737-38 (5th Cir. 2003)). The party seeking certification bears the [*57] burden of demonstrating

that the Rule 23 requirements have been met. [30] Id. (citing Berger v. Compaq Comp. Corp., 257 F.3d 475, 479 (5th Cir. 2001)).

> 30   Plaintiffs suggest that courts in the Fifth Circuit are urged to err on the side of certifying class actions because the order is always subject to modification in light of later developments. (Rec. Doc. 994-1, at 35). The Court has reviewed numerous class action decisions from this circuit and the Court does not glean such an urging. To the contrary, the Fifth Circuit has specifically noted how certification can dramatically affect the litigation stakes for defendants by magnifying and strengthening the number of unmeritorious claims, Castano, 84 F.3d at 746 (citing In re Agent Orange Prod. Liab. Litig., 818 F.2d 145, 165-66 (2d Cir. 1987)), and that certification cannot follow from mere instinct and a "figure-it-out-as-we-go-along approach," Madison v. Chalmette Refining, LLC, 637 F.3d 551, 557 (5th Cir. 2011). The "rigorous" Rule 23 analysis required by this circuit's precedent does not comport well with a policy of erring on the side of certifying class actions when there is any uncertainty as to whether Rule 23's standards are [*58] met.

Rule 23(b)(3) is "[f]ramed for situations in which 'class-action treatment is not as clearly called for' as it is in Rule 23(b)(1) and (b)(2) situations. Amchem Prods., 521 U.S. at 615 (quoting Adv. Comm. Notes, 28 U.S.C. App., p. 697). A party seeking certification of a Rule 23(b)(3) class must demonstrate *inter alia* that the questions of law or fact common to class members predominate over any questions affecting only individual members. Gene & Gene, 541 F.3d at 325 (quoting Fed. R. Civ. Pro. 23(b)(3)). Considering whether "questions of law or fact common to class members predominate" begins with the elements of the underlying cause of action. Erica P. John Fund, Inc. v. Halliburton Co., 131 S. Ct. 2179, 2184, 180 L. Ed. 2d 24 (2011).

The predominance inquiry requires a court to consider "how a trial on the merits would be conducted if a class were certified." Gene & Gene, 541 F.3d at 325 (quoting Bell Atl. Corp. v. AT&T Corp., 339 F.3d 294, 302 (5th Cir. 2003)). This in turn means that the court must identify the substantive issues that will control the outcome, assessing which issues will predominate, and then determine whether the issues are common to the class--a process that ultimately prevents [*59] the class from degenerating into a series of individual trials. Id. The court must go beyond the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination

of the certification issues. Castano, 84 F.3d at 744 (citing Manual for Complex Litigation § 30.11 (3d ed. 1995)). The predominance requirement tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. Id. (quoting Amchem Prods., 521 U.S. at 623-24). The predominance of individual issues necessary to decide an affirmative defense may preclude class certification. Gene & Gene, 541 F.3d at 327 (quoting In re Monumental Life Ins. Co., 365 F.3d 408, 420 (5th Cir. 2004)).

Generally, the strength of the plaintiff's claim on the merits should not affect the certification decision. See Castano, 84 F.3d at 744. Nonetheless, the determination of class action questions is often intimately involved with the merits of the underlying claims. Id. at 744 n. 17 (quoting Cooper & Lybrand v. Livesay, 437 U.S. 463, 469 n.12, 98 S. Ct. 2454, 57 L. Ed. 2d 351 (1978)). Frequently the "rigorous analysis" required for Rule 23 certification will entail some overlap with [*60] the merits of the plaintiff's underlying claim. Wal-Mart Stores, Inc. v. Dukes, 131 S. Ct. 2541, 2551-52, 180 L. Ed. 2d 374 (2011). "The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." Id. (quoting Gen. Tel. Co. v. Falcon, 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L. Ed. 2d 740 (1982)). This is particularly true with the more complex determinations required for certification under Rule 23(b)(3). Castano, 84 F.3d at 744 n.17. "[I]n some cases there will be overlap between the demands of 23(a) and (b) and the question of whether plaintiff can succeed on the merits." Huff v. N.D. Cass Co., 485 F.2d 710, 714 (5th Cir. 1973) (en banc).

In this case all aspects of the Rule 23 certification inquiry are contested except the numerosity requirement [31] and the adequacy of Plaintiffs' counsel. (Rec. Doc. 994-1, at 40 n.42). All of the Rule 23(a) requirements are important and must be satisfied but the (b)(3) requirements usually present a far more challenging obstacle for certification than the Rule 23(a) requirements. Therefore, for the various causes of action, the Court can appropriately begin its Rule 23 analysis by assuming arguendo that the Rule 23(a) [*61] requirements are satisfied and turning its attention to the more "exacting demands" of Rule 23(b)(3), in particular the predominance requirement. Gene, 541 F.3d at 325. If the predominance requirement is satisfied then the Court will necessarily address Rule 23(b)(3)'s superiority requirement, and if necessary, Rule 23(a)'s requirements. Id. at 326.

[31]   The proposed class numbers about 500 members.

**1. Trafficking Victims Protection Act**

The first set of claims that Plaintiffs seek to certify for class-wide treatment are their forced labor and trafficking claims brought under the auspices of the Trafficking Victims Protection Reauthorization Act of 2003. These claims derive from alleged violations of two criminal statutes, 18 U.S.C. § 1589 (forced labor) and 18 U.S.C. § 1590 (trafficking with respect to peonage, slavery, involuntary servitude, or forced labor). 18 U.S.C. § 1595 allows Plaintiffs to seek civil recovery for violations of the forced labor and trafficking criminal statutes, §§ 1589 and 1590. [32] Plaintiffs' forced labor and trafficking claims are brought against defendants Signal, Pol, and Dewan.

[32]   "An individual who is a victim of a violation of section 1589, 1590, or 1591 of [*62] this chapter may bring a civil action against the perpetrator in an appropriate district court of the United States and may recover damages and reasonable attorney's fees." 18 U.S.C.A. § 1595(a) (West 2000 & Supp. 2004). The civil remedies provision was enacted as part of the Trafficking Victims Protection Reauthorization Act of 2003, Pub. L. No. 108-193, 117 Stat. 2875 (2003). In 2008 Congress broadened the scope of the civil remedy statute but that amendment, which came subsequent to the events giving rise to this lawsuit, is not at issue in this case.

Defendants contend that Plaintiffs' § 1589 claims cannot be tried on a representative basis and are therefore not amenable to certification because the claims are fundamentally about individual consent. According to Defendants, the legislative history of § 1589, and the Supreme Court's decision in United States v. Kozminski, which actually predates the enactment of § 1589, demonstrate that Plaintiffs' forced labor claims cannot be certified as a matter of law under the facts of this case. In other words, the very nature of a forced labor claim precludes Plaintiffs from meeting their burden of demonstrating that the predominance requirement [*63] of Rule 23(b)(3) is satisfied.

Plaintiffs argue that the Trafficking Victims Protection Act ("TVPA") does not require a showing of individualized consent because the TVPA focuses on the actions of the defendant, not the plaintiff. Therefore, liability under the TVPA can be proven regardless of the number of plaintiffs bringing a claim. Plaintiffs point out that the TVPA introduced the concept of "serious harm" into the forced labor realm and that "serious harm" is assessed objectively on a reasonable person standard. Therefore, according to Plaintiffs, no one plaintiff's perspective, subjective position, or consent is legally relevant. The only question that need be answered is whether a reasonable person in Plaintiffs' shoes would feel com-

pelled to provide his labor against his will--a question that can be answered on a class-wide basis.

The question of whether to certify a class for a TVPA claim is a question of first impression in the Fifth Circuit. To determine whether issues of fact common to the class predominate over individual issues the Court turns its attention to the elements of the forced labor cause of action and the substantive issues that will control the outcome of the  [*64] claims.

### A. Forced Labor, 18 U.S.C. § 1589

Section 1589 of Title 18, pertaining to **Forced Labor**, provides:

> Whoever knowingly provides or obtains the labor or services of a person--
>
> (1) by threats of serious harm to, or physical restraint against, that person or another person;
>
> (2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or
>
> (3) by means of the abuse or threatened abuse of law or the legal process,
>
> shall be [subject to criminal penalties].

18 U.S.C.A. § 1589 (West 2000 & Supp. 2001). [33] The coercive means described in subsections (1)-(3) supra are taken nearly verbatim from the definition of "coercion" found at 22 U.S.C. § 7102(2), which is part of the civil provisions of the Trafficking Victims Protection Act.

33  Congress amended § 1589 in 2008 to make it even broader. That amendment was signed into law on December 23, 2008, and is not applicable to Plaintiffs' claims.

Section 1589 became law on October 28, 2000, when President Clinton signed into law the Victims of Trafficking and Violence Protection Act of 2000. The [*65] purposes of the Act were "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims." 22 U.S.C.A. § 7101 (West 2004).

It is widely recognized that Congress crafted § 1589 pertaining to forced labor to fill a significant gap in the scheme of involuntary servitude criminal laws that the Supreme Court had identified in United States v. Kozminski, 487 U.S. 931, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (1988). In Kozminski, the government prosecuted the defendants for criminal violations of 18 U.S.C. § 1584, which criminalized involuntary servitude. The victims were two mentally retarded men who had been found laboring on the defendants' farm in poor health, in squalid conditions, and in relative isolation from society. During the criminal prosecutions the government offered some evidence of physical abuse but also relied on various other methods of coercion--denial of pay, subjection to substandard living conditions, isolation--to establish that the victims believed that they had no alternative but to work on the farm. Kozminski, 487 U.S. at 936. The government had argued that the  [*66] two men were "psychological hostages" whom the defendants had "brainwashed into serving them." Id. The district court's jury charge specifically allowed the jury to consider various types of non-physical, psychological coercion when determining whether the two men had been held to involuntary servitude. Id. at 939. The jury voted to convict. The appellate court en banc reversed the convictions.

The Supreme Court granted the government's writ to consider the scope of conduct pertinent to the meaning of "involuntary servitude" for purposes of a criminal prosecution under § 1584. In light of the state of the law when Congress first enacted § 1584 in 1948, the Court concluded that "involuntary servitude" was limited to cases involving the compulsion of services by the use or threatened use of physical or legal coercion-- psychological coercion could not suffice. Kozminski, 487 U.S. at 948. The government had urged the Court to adopt a broad construction of "involuntary servitude" so as to prohibit the compulsion of services by any means that, from the victim's point of view, either leaves the victim with no tolerable alternative but to serve the defendant or deprives the victim of the power  [*67] of choice. Id. at 949. But the Court refused to give such an amorphous interpretation to a criminal statute. Such an interpretation would give no notice to ordinary people who are required to conform their conduct to the law and the question of whether any specific acts would constitute a crime would depend solely on the specific victim's state of mind. Id. at 949-50. Further, the rule of lenity, which serves to promote fair notice to those subject to the criminal laws, requires that any uncertainty concerning the ambit of criminal statutes leads to a narrower interpretation, not a broader one. Id. at 951-52.

In summing up, the Supreme Court stated that *absent change by Congress*, for purposes of a criminal prosecution under § 1584, the term "involuntary servitude" necessarily means a condition of servitude in which the victim is forced to work for the defendant by

the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process. Kozminski, 487 U.S. at 952. The Court clarified, however, that its holding did not imply that evidence of other means of coercion, or of the victim's special vulnerabilities would be irrelevant. [*68] To the contrary, the vulnerabilities of the victim would be relevant in determining inter alia whether the physical or legal coercion or threats thereof "could plausibly have compelled the victim to serve," as well as the "causal effect" of any physical or legal coercion. Id. The Supreme Court affirmed, thereby vacating the convictions and remanding for a new trial.

Congress enacted § 1589 in the wake of Kozminski to provide federal prosecutors with the tools to combat severe forms of worker exploitation that do not rise to the level of involuntary servitude as defined in Kozminski. H.R. Rep. 106-939. Section 1589 is intended to address the increasingly subtle methods of traffickers who often use means other than overt violence. Id. With § 1589, prosecutors would no longer be required to demonstrate physical harm or threats of force against victims because the "serious harm" standard employed by the statute encompasses a broad array of harms, both physical and non-physical. Id.

The Kozminski Court did not directly confront the question of whether a forced labor charge requires proof that the victim's rendering of labor was involuntary or non-consensual, which of course is the point of [*69] law that the parties dispute in this case. But it is beyond dispute that the Court's discussion of the law throughout the opinion confirms that the concept of involuntary servitude or forced labor turns on whether the victim rendered labor because of the verboten physical force or legal coercion. In other words, the issue is whether the victim was coerced by physical force or legal coercion into providing labor *involuntarily*. Nothing about Kozminski even remotely suggests that a finding of involuntary servitude or forced labor could be premised solely on the defendant's conduct and the fact that the victim did in fact work for the defendant, while ignoring the issue of causation. Kozminski clearly suggests that a determination of involuntary servitude or forced labor requires a causal connection between what the defendant did, what the victim did, *and why the victim did it.* See Kozminski, 487 U.S. at 952 ("[T]he vulnerabilities of the victim are relevant in determining whether the physical or legal coercion or threats thereof could plausibly have compelled the victim to serve."). In other words, the forced labor analysis cannot be confined solely to the defendant's conduct but necessarily [*70] must take into account the particular victim's vulnerabilities. [34]

34 Justice Brennan's concurring opinion in particular contains numerous points of discussion that confirm that the victim's perspective is crucial to a forced labor determination. See, e.g., Kozminski, 487 U.S. at 956-57 (Brennan, J., concurring) ("Without considering these techniques (and their particular effect on a mentally disabled person), one would hardly have a complete picture of whether the coercion inflicted on the victims was sufficient to make their service involuntary.").

The question then is whether the TVPA so changed the forced labor inquiry so as to focus solely on the defendant's conduct to the exclusion of the victim's perspective. The TVPA included the new § 1589 statute on forced labor, that Plaintiffs rely upon herein, to counter Kozminski but the problem with Kozminski was not that the Supreme Court considered the individual victim's vulnerabilities to be relevant to the issue of compulsion but rather that the coercive means punishable for a forced labor violation were too narrow under Kozminski, particularly with respect to psychological coercion. Section 1589 clearly recognizes that there are numerous [*71] types of harm beyond physical abuse or legal coercion that can be used to force an individual to work involuntarily. So because of the TVPA the more subtle forms of coercion that escaped criminal punishment in Kozminski are now clearly unlawful.

But the Court does not read either the TVPA or § 1589 in particular as shifting the focus of the crime of forced labor solely to the defendant's conduct without concern for whether the defendant's conduct was sufficient to make *the specific alleged victim* render labor involuntarily. The TVPA did not render the issue of consent irrelevant to a forced labor determination. Congress could have expressly rendered victim consent irrelevant to the determination, as is the case with the United Nations Protocol applicable to human trafficking, but Congress declined to do so. See Jennifer M. Chacon, Misery & Myopia: Understanding the Failures of U.S. Efforts to Stop Human Trafficking, 74 Fordham L. Rev. 2977, 2982 (2006). [35] And the House Report on the TVPA contains a discussion that talks about "the individual circumstances of the victims that are relevant in determining whether a particular type or certain degree of harm or coercion is sufficient to [*72] maintain or obtain a victim's labor or services, including the age and background of the victims." H.R. Rep. 106-939. Other courts continue to recognize implicitly that even in the aftermath of the TVPA the question of forced labor turns on whether the defendant's conduct or tactics reasonably coerced or forced the victim to provide labor. See, e.g., United States v. Bradley, 390 F.3d 145 (1st Cir. 2004), rev'd on other grounds, Bradley v. United States, 545

U.S. 1101, 125 S. Ct. 2543, 162 L. Ed. 2d 271 (2005); United States v. Peterson, 627 F. Supp. 2d 1359 (M.D. Ga. 2008). And one cannot determine whether the defendant's actions coerced or forced the victim to provide labor without looking to the specific victim involved.

35   In fact, this author has opined that the TVPA, contrary to earlier law, actually gives "central importance" to the question of victim consent. Chacon, supra, at 2999.

Moreover, the need to consider the specific alleged victim becomes even more crucial when the subtler forms of psychological coercion are involved, which the new § 1589 allows and which Plaintiffs rely upon in this case. Most human beings would likely choose to provide labor in lieu of receiving severe beatings or being tortured so with [*73] egregious forms of physical abuse the specific victim's vulnerabilities may become less important. But with more subtle types of coercion, particularly psychological coercion, the vulnerabilities and characteristics of the specific victim become extremely important because one individual could be impervious to some types of coercion that cause another to acquiesce in providing forced labor. This is exactly what § 1589 now recognizes. But because § 1589 is a criminal statute that potentially reaches a broad range of coercive conduct that standing alone might not be unlawful, two things are clear. First, the defendant's conduct must be the driving force behind the victim's "choice" to render the labor. [36] And second, the victim's response to the defendant's actions must pass the reasonable person test. The reasonable person test injects an objective standard into the forced labor determination which is important given the criminal nature of the statute. After all, as Justice Brennan noted in Kozminski, criminal sanctions cannot depend on a completely subjective standard that criminalizes otherwise innocent behavior simply because a particularly sensitive victim reacts to it. 487 U.S. at 960-61 [*74] (Brennan, J., concurring). Therefore, even though the "serious harm" that § 1589 encompasses is extremely broad it must at least pass a threshold objective standard such that it would cause a reasonable person in the victim's shoes to render forced labor--the criminal law of which § 1589 is a part requires no less. Thus, it is not enough that the defendant's conduct was subjectively coercive so as to cause the victim to render involuntary labor. The defendant's conduct must also be objectively coercive enough to do so. [37] But contrary to Plaintiffs' assertion, the injection of the objective reasonable person standard into the forced labor equation does not serve to eliminate the subjective aspects of the crime--the jury must still determine whether the victim was coerced subjectively to provide labor based on the defendant's threats. This is the very essence of the crime of forced

labor and Plaintiffs' interpretation of their burden of proof on the forced labor claims is contrary to the statute.

36   Justice Brennan sagaciously explained in Kozminski how at some level the laborer always has a "choice" no matter what the threat because he can choose to work or take a beating. But with less [*75] egregious forms of coercion it is particularly difficult to determine when a person's actions are "involuntary." Kozminski, 487 U.S. 931, 959, 108 S. Ct. 2751, 101 L. Ed. 2d 788 (Brennan, J., concurring).

37   The reasonable person standard for serious harm was codified in the 2008 amendments to the TVPA when Congress added a definition for "serious harm" to § 1589: "The term 'serious harm' means any harm, whether physical or nonphysical including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform and to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C.A. § 1589(c)(2) (West Supp. 2011). The court in Bradley had used a very similar definition of "serious harm" in its pre-2008 charges to the jury. 390 F.3d at 150.

Of course, Plaintiffs are not prosecutors, they are civil litigants seeking to recover money damages under § 1595 for a violation of a criminal statute, § 1589. But § 1595 is a damages statute, not a statutory penalty provision that imposes a monetary sanction once the plaintiff establishes that the defendant has engaged in [*76] certain conduct. The plaintiff must prove the damages that he sustains as a result of the defendant's violation of § 1589, and proving that compulsion at the hands of the defendant caused the plaintiff to render his services involuntarily is simply part of the causation analysis for the civil claim. It would be inimical to the concept of damage recovery in civil litigation to simply ignore the question of whether the individual plaintiff was in fact injured by the defendant's conduct. And with a forced labor claim, the injury question is inextricably intertwined with the question of whether it was in fact the defendant's conduct that coerced labor from the plaintiff.

That said, Plaintiffs do not suggest that they are completely irrelevant to whether a violation of § 1589 has occurred, only that individual characteristics that might make one individual less susceptible to coercion than his co-worker are irrelevant. Plaintiffs' contention is that certain broader characteristics shared by the class as a whole, e.g., immigration status, payment of exorbitant fees to recruiters, poor living conditions at Signal, would have compelled any reasonable person to stay at Signal

and provide labor [*77] and therefore the focus should be on Defendants' conduct. Clearly, the members of the class do share some common characteristics. And broadly speaking, it may very well be a logical conclusion that a welder of Indian origin, who incurred significant debt and now finds himself in the United States on a temporary visa, might choose to stay in an unpleasant employment situation. But while all of these considerations surely factor into the decision to stay with the employment, it does not mean that these characteristics that apply class-wide can substitute for the subjective aspects of why any given Plaintiff chose to stay at Signal. The question in a forced labor case is not whether any reasonable person who finds himself in the victim's situation would have felt trapped by his circumstances and therefore stayed on the job with Signal. The question is whether Defendants' coercive conduct was such that it could overcome the will of the victim so as to make him render his labor *involuntary*. The Court is persuaded that this question cannot be answered via generalized class-wide proof but rather must be answered individually based upon individualized proof.

The Court does not agree, however, [*78] with Signal's contention that a § 1589 claim can never be suitable for class certification. Certainly, based on the type of coercion used, there may be cases where consent becomes irrelevant. In other words, some "choices" might be so illegitimate that any decision to work is "involuntary." See Kozminski, 487 U.S. at 959 (Brennan, J., concurring). But this case does not present one of those situations. To the contrary, this case involves paid workers who in fact could leave their jobs at any time, albeit under penalty of returning to their home countries but that restriction was dictated by U.S. immigration law. The workers were for the most part paid well, free to come and go as they pleased, and some even took vacations and bought cars. The pressure to work for Signal arguably came at least in part from a set of circumstances that each plaintiff individually brought upon himself when he elected to pay what is now characterized as "exorbitant" fees to participate in the green card program. Part of the "serious harm" that Plaintiffs claim that they faced was financial and reputational harm which are uniquely individual in nature. And the "threats" that Plaintiffs allege were made to [*79] compel them to work were often made to individuals, not to the class as a whole.

Based on the foregoing this Court is persuaded that individual issues with respect to coercion and consent will predominate Plaintiffs' § 1589 forced labor claims. This is true whether the question is viewed as one of coercion as an element of Plaintiffs' claims, see Channer v. Hall, 112 F.3d 214 (5th Cir. 1997), or as consent as an element of Defendants' defense. Plaintiffs cannot avoid

the burden of proof that each individual plaintiff faces, i.e., that it was conduct on the part of either Signal, Pol, or Dewan that was coercive so as to overcome his will and render his labor involuntary, by relying on the characteristics that apply broadly to the class as a whole. Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3) even though common issues are present in their forced labor claims. The motion to certify is therefore DENIED as to the § 1589 forced labor claims.

### B. Trafficking, *18 U.S.C. § 1590*

Section 1590 of Title 18, pertaining to **Trafficking** With Respect to Peonage, Slavery, Involuntary, Servitude, or Forced Labor, provides:

> Whoever knowingly recruits, harbors, transports, provides, [*80] or obtains by any means, any person for labor or services *in violation of this chapter* shall be [subject to criminal penalties].

18 U.S.C.A. § 1590 (West 2000 & Supp. 2001) (emphasis added). [38] The specific violations of Chapter 77 that Plaintiffs allege underlie their § 1590 trafficking claims, in addition to the violations of § 1589 regarding forced labor, are § 1583 (Enticement into slavery), § 1584 (Sale into involuntary servitude), § 1592(a) (Unlawful conduct with respect to documents in furtherance of trafficking, peonage, slavery, involuntary servitude, or forced labor), and § 1594(a) (Attempted violations of §§ 1583, 1584, 1589, & 1590).

38   Congress amended § 1590 in 2008. That amendment is not applicable to Plaintiffs' claims.

For the reasons explained in the § 1589 forced labor section above, the Court is persuaded that a human trafficking claim premised on a violation of the forced labor statute cannot be tried on a class-wide basis. Although a trafficking claim will focus to a great extent on the conduct of the defendant, it remains that a trafficking claim under § 1590 must be premised on a violation of one of the involuntary servitude statutes, even if indirectly so as is [*81] the case with § 1592(a), pertaining to the claim that Dewan confiscated passports while Plaintiffs were still in India. Under the facts of this case, individual issues will play a significant part in any claim premised on a violation of the statutes prohibiting forced labor, slavery, and involuntary servitude. Plaintiffs cannot satisfy the predominance requirement of Rule 23(b)(3) even though common issues are present in their trafficking claims. Therefore, Plaintiffs' trafficking claims under § 1590 are not amenable to class certification and the motion is DENIED as to these claims.

2012 U.S. Dist. LEXIS 114247, *

## 2. Racketeer Influenced and Corrupt Organizations Act (RICO)

The second set of claims that Plaintiffs seek to certify for class-wide treatment pursuant to Rule 23(b)(3) are their claims under the Racketeer Influenced and Corrupt Organizations Act or RICO, 18 U.S.C. §§ 1962(c) and 1962(d). Plaintiffs' RICO claims are brought against all defendants.

The RICO statutory scheme is aimed at combating organized crime--RICO is located in Title 18 of the criminal code--and the Act imposes criminal and civil liability upon those who engage in certain "prohibited activities" which are listed in 18 U.S.C. § 1962 (a) through (c). [*82] [39] Section 1962(c), which is Plaintiffs first RICO claim, prohibits "any person employed by or associated with any enterprise" from participating in or conducting the affairs of that enterprise through a "pattern of racketeering activity." [40] St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 445 (5th Cir. 2000); 18 U.S.C. § 1962(c). Section 1962(d), which is Plaintiffs' second RICO claim, prohibits a conspiracy to violate the provisions of § 1962(c). Regardless of the subsection, RICO claims under § 1962 have three common elements: 1) a person who engages in, 2) a pattern of racketeering activity, 3) connected to the acquisition, establishment, conduct, or control of an enterprise. Abraham v. Singh, 480 F.3d 351, 355 (5th Cir. 2007) (quoting Word of Faith v. Sawyer, 90 F.3d 118, 122 (5th Cir. 1996)). Private individuals who are injured by criminal RICO activity can recover damages in a civil action. [41] 18 U.S.C. § 1964 (c).

39    The prohibited activities are:

(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a [*83] principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce . . . .

(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

18 U.S.C.A. § 1962 (a) - (c) (West 2000).
40    "Racketeering activity" means, in [*84] relevant part, any act which is indictable under any of the following provisions of Title 18 of the United States Code: section 1341 (mail fraud), section 1343 (wire fraud), section 1546 (fraud and misuse of visas, permits, and other documents), and sections 1581-1592 (peonage, slavery, and trafficking in persons). 18 U.S.C.A. § 1961(1)(B) (West 2000 & Supp. 2011). The foregoing predicate acts are only those relevant to this lawsuit. The RICO statute contains a lengthy and exhaustive list of criminal acts that can serve as predicate acts. A "pattern of racketeering activity" requires at least two acts of racketeering activity. Id. § 1961(5).
41    RICO's civil enforcement provision provides in relevant part:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee . . . .

18 U.S.C.A. § 1964 (c) (West 2000).

Plaintiffs allege three association-in-fact RICO enterprises in support of their RICO claims. "RICO Enterprise I" is defined as "[a]ll Defendants and the United [*85] States Consular officers in India." (SAC ¶ 290). Plaintiffs allege that the common purpose of this enterprise is recruiting, transporting, providing, processing, and obtaining foreign workers to work on shipyards in the United States, including Signal's operations in Texas and Mississippi. (Id. ¶ 293).

"RICO Enterprise II" is defined as the "Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal." (SAC ¶ 291). Plaintiffs allege that the common purpose of this enterprise is selling United States green cards, visas, and work opportunities to Indian workers to convince such workers to pay fees and travel to the United States to work for companies, including Signal. (Id. ¶ 299).

"RICO Enterprise III" is defined as the "Recruiter Defendants, Defendant Signal, Legal Facilitator Defendants, Swetman Security, and M & M Bank." [42] (SAC ¶ 292). Plaintiffs allege that the common purpose of this enterprise is providing and maintaining a consistent and acquiescent labor force at Signal's operations. (Id. ¶ 304).

[42]   Swetman Security and M & M Bank are not parties to this litigation. Plaintiffs contend that Swetman Security assisted Signal in effectuating forced labor and trafficking [*86] at Signal by participating in the forced detention and attempted deportation of several plaintiffs and perhaps by conducting other security activities at Signal's Pascagoula facility. (RICO Case Stmt. ¶ 3B).

Plaintiffs contend that M & M Bank, at the direction of Signal, opened accounts for Plaintiffs and agreed to have their wages directly deposited into these accounts. Plaintiffs contend that when some workers departed Signal the bank denied them access to their bank accounts at Signal's behest. (Id. ¶ 3J).

Plaintiffs rely upon the following predicate acts of racketeering activity for their RICO violations under 18 U.S.C. §§ 1962(c)-(d): a) enticement into slavery in violation of 18 U.S.C. § 1583; b) involuntary servitude in violation of 18 U.S.C. § 1584; c) forced labor in violation of 18 U.S.C. § 1589; d) trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590; e) unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a); f) mail fraud in violation of 18 U.S.C. § 1341; g) wire fraud in violation

of 18 U.S.C. § 1343; and h) immigration document fraud in violation of [*87] 18 U.S.C. § 1546.

Plaintiffs allege that as a result of Defendants' RICO violations they have sustained similar injuries such as payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and additional legal fees. (SAC ¶¶ 327, 331). Plaintiffs seek treble damages, attorneys' fees, and costs. (Id. ¶ 332).

Plaintiffs argue that their RICO claims are amenable to certification because the answer to the core question of whether Signal and each of the other defendants conducted or participated in RICO enterprises through a pattern of racketeering activity will be the same for all putative class members. Plaintiffs contend that the trafficking and forced labor-based RICO claims are certifiable for the same reasons that the TVPA claims are certifiable. Regarding the mail/wire/visa fraud claims, Plaintiffs contend that Signal and Burnett filed attestations with the Department of Labor and United States Citizenship and Immigration Services of a 10-month labor need in order to obtain H-2B visas for the plaintiff class all the while knowing that Signal's labor need was really two to three years and perhaps [*88] permanent; that Dewan, Pol, Burnett and Signal fraudulently promised United States green cards, visa extensions, and jobs; that all Defendants designed and carried out the fraudulent recruitment scheme by use of the phones, e-mail, and the mails.

Plaintiffs stress that they are not seeking to certify fraud claims that require proof of individualized reliance. In that vein, the first theory that Plaintiffs rely upon in support of certifying their fraud claims is that in issuing the H-2B visas the U.S. government relied on the false attestations of a 10 month labor need at Signal. Plaintiffs argue that they suffered injury as a direct result of this fraud directed at the U.S. government because but for the government having issued the H-2B visas, Plaintiffs would have never made the final installment payment to defendant Dewan, Pol, and Burnett. Plaintiffs argue that because there is a direct relationship between their injury and Defendants' mail and wire fraud upon the U.S. government, they need not show individualized, first party reliance in order to support their RICO fraud claims. This theory of third-party reliance is referred to throughout the parties' briefing as the Bridge [43] [*89] claim.

[43]   Bridge v. Phoenix Bond & Indem. Co., 553 U.S. 639, 128 S. Ct. 2131, 170 L. Ed. 2d 1012 (2008).

Plaintiffs' second theory of RICO fraud is a "market approach" [*90] theory. Plaintiffs contend that a jury

2012 U.S. Dist. LEXIS 114247, *

could validly infer from the identical contracts that they signed and the exorbitant fees that they paid that the plaintiff class relied on Defendants' fraudulent representations regarding green cards. Without the promise of a green card no plaintiff would have paid the exorbitant fees that they paid to participate in the program and work at Signal. Plaintiffs contend that the evidence adduced thus far demonstrates that the prices that Defendants charged were commensurate with what would be charged for green cards, not temporary work visas. Plaintiffs advise that they will introduce expert testimony showing that in the Indian market for foreign visas no applicant would have paid the money that Plaintiffs paid without the expectation of a green card. Thus, Plaintiffs argue that they can prove reliance for their fraud claims on a class-wide basis without the need for individualized proof. According to Plaintiffs, there is no need to ask each of them individually if he relied on the contents of the contract that he signed.

Defendants argue that Plaintiffs' RICO claims cannot be certified for class treatment because RICO claims simply defy certification [*91] in any form and RICO's legal requirements preclude certification of the trafficking and fraud-based claims. Defendants argue that RICO claims premised on the trafficking and involuntary servitude predicate acts cannot be certified for the same reasons that the TVPA claims are not subject to certification, i.e., that trafficking and other coercion claims are implicitly based upon reliance on threats--something that can only be proven on an individual basis. Defendants also argue that RICO causation cannot be proven on a class-wide basis because a RICO plaintiff must establish that his injury is caused by conduct that is wrongful under RICO--again, something that can only be proven on an individual basis. Signal argues that Plaintiffs' fraud-based RICO claims are founded on allegations of first-party individual reliance and under the law in this circuit such claims cannot be certified under Rule 23(b)(3) because individual issues will predominate.

### A. Section 1962(c)--Substantive RICO Violation

#### Trafficking Predicate Acts

Plaintiffs' RICO claims premised on the predicate acts of enticement into slavery in violation of 18 U.S.C. § 1583, involuntary servitude in violation of 18 U.S.C. § 1584, [*92] forced labor in violation of 18 U.S.C. § 1589, trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590, and unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a) cannot be certified for the same reasons that the claims cannot be certified when sued upon directly under the TVPA. Plaintiffs will be required to

prove that the defendant committed the predicate acts upon which they rely for the pattern of racketeering activity. As previously explained in the section addressing certification of the TVPA claims, proof of these predicate acts, which are all premised on coercion, cannot be made without resort to individualized proof in light of the facts of this case. Common issues will not predominate and certification under Rule 23(b)(3) is therefore not appropriate.

#### Fraud-Based Predicate Acts

Plaintiffs also rely upon the following fraud-based predicate acts in support of their § 1962(c) RICO claims: mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and immigration document fraud in violation of 18 U.S.C. § 1546. As explained above, [*93] Plaintiffs urge two arguments in support of their contention that common issues will predominate under Rule 23(b)(3) with these fraud-based claims: 1) that a fraud-on-the-government Bridge claim requires no individualized proof of reliance, and 2) that first-party reliance can be proven via common evidence under Plaintiffs' market approach theory.

#### 1) Bridge claim

#### a. Motion to Strike-1012 and Motion to File Third Amended Complaint

In response to Plaintiffs' Bridge claim of third party reliance, Signal has filed a Motion to Strike-1012 arguing that Plaintiffs did not adequately plead a third party reliance claim for the predicate acts of visa document fraud under 18 U.S.C. § 1546(a). According to Signal, Plaintiffs only pled first-party reliance and those claims are not subject to certification. Even so, Signal argues that the § 1546 Bridge claim cannot be certified because RICO proximate cause will not be satisfied.

The Motion to Strike-1012 is DENIED and the Motion to File Third Amended Complaint is DENIED AS MOOT. The Court is persuaded that Plaintiffs adequately pled their RICO claims and that there is no need to amend their complaint. Signal and the other defendants will suffer no prejudice [*94] at this juncture because the Court has determined that the RICO claims premised on predicate acts under 18 U.S.C. § 1546 are not amenable to certification anyway. As the case moves into the merits phase, notice as to the scope of Plaintiffs' § 1546 claims will not be an issue because Defendants are now all well aware of Plaintiffs' various fraud theories, and Defendants will be free to conduct whatever discovery they believe to be necessary to defend the RICO claims premised on violation of § 1546.

The Court is not moved by Signal's contention that evidence elicited at their representatives' depositions should be stricken. Signal's representatives were testifying as to facts about which they had first-hand knowledge and the questions that Plaintiffs' counsel asked were fair game.

**b. Analysis**

Causation is a crucial element of every civil RICO claim. In Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 268, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992), the Supreme Court held that factual or "but for" causation alone is insufficient to prove causation for a civil RICO claim. Proximate cause is also required. Id. Proximate cause requires a direct relation between the injury asserted and the injurious conduct alleged. [*95] Id. When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged RICO violation led directly to the plaintiff's injuries. Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 461, 126 S. Ct. 1991, 164 L. Ed. 2d 720 (2006). With RICO claims, the compensable injury at issue is the harm caused by the predicate acts sufficiently related to constitute a pattern, for the essence of the violation is the commission of those acts in connection with the conduct of an enterprise. Sedima v. IMREX Co., 473 U.S. 479, 497, 105 S. Ct. 3275, 87 L. Ed. 2d 346 (1985). Any recoverable damages occurring by reason of a violation of § 1962(c) will flow from the predicate acts. Id.

When the predicate acts are fraud-based, proof of reliance on the fraud is often a necessary prerequisite to establishing the causation required by § 1964(c). Anza, 547 U.S. at 478 (Thomas, J., concurring in part and dissenting in part). Prior to the Supreme Court's decision in Bridge, the law in this circuit required a RICO plaintiff to prove individual, first-party reliance on alleged fraud as part of the element of causation. See Sandwich Chef of Tex., Inc. v. Reliance Nat'l Indem. Ins. Co., 319 F.3d 205 (5th Cir. 2003). In Sandwich Chef the Fifth [*96] Circuit explained that RICO fraud actions require a showing of detrimental reliance *by the plaintiff* on the alleged fraud in order to satisfy proximate cause. Id. at 219 (quoting Summit Props., Inc. v. Hoechst Celanese Corp., 214 F.3d 556, 560 (5th Cir. 2000)). Fraud actions that require proof of individual reliance cannot be certified for class treatment under Rule 23(b)(3) because individual rather than common issues will predominate. Id. at 211, 219; Castano, 84 F.3d at 745. Essentially, Sandwich Chef all but foreclosed the possibility of Rule 23(b)(3) certification of fraud-based RICO actions in this circuit. [44]

44   Sandwich Chef expressly held open the possibility that proof of fraud upon a third party

could constitute proof of reliance by the plaintiff under circumstances not present in that case. 319 F.3d at 223 n.13.

In 2008 the Supreme Court decided Bridge, which held that first-party reliance is not an element of a civil RICO claim premised on mail fraud. 553 U.S. at 641. The plaintiffs in Bridge were participants in a local tax sale. They claimed that the defendants' acts of mail fraud against the county gave the defendants an unfair advantage at tax sale auctions. The district [*97] court dismissed the plaintiffs' RICO claims because the plaintiffs were not the direct recipients of the allegedly fraudulent statements and therefore could not have relied upon them.

The Seventh Circuit reversed and the Supreme Court granted certiorari to address whether first-party reliance is an element of a civil RICO claim predicated on mail fraud. Bridge, 553 U.S. at 646. The Supreme Court held that first-party reliance is not an element of a civil RICO claim predicated on mail fraud. Id. at 649. The Court reasoned that neither the mail fraud statute nor the RICO statute imposed a requirement of first-party reliance. Id. A person can be injured by reason of a pattern of mail fraud even if he has not relied on any misrepresentations. Id. at 649.

The Court also rejected the contention that proof of first-party reliance is necessary to establish proximate causation. Bridge, 553 U.S. at 654-55. But a RICO plaintiff will have to establish that *someone* relied upon the defendant's misrepresentation because without such reliance even "but for" causation will probably be lacking. [45] Id. at 658-59.

45   The Fifth Circuit made a very similar observation in Sandwich Chef, noting that for a misrepresentation [*98] to cause injury there must be reliance somewhere. 319 F.3d at 218-19, After all, knowledge of the truth defeats a claim of fraud because it eliminates the deceit as the "but for" cause of the damages. Id. (citing Summit, 214 F.3d at 560 n.19).

Thus, while Bridge overruled cases like Sandwich Chef to the extent that they conflicted with the decision by requiring first-party reliance as part of a RICO fraud claim, see St. Germain v. Howard, 556 F.3d 261, 263 (5th Cir. 2009), Bridge did not eliminate the need for reliance *by someone* when proof of the element of proximate cause necessitates it. Bridge likewise does not foreclose that in some situations proof of first-party reliance might very well be necessary to establish causation. And where proof of first-party reliance breaks down into individual determinations of reliance then Sandwich Chef's admonitions about why certification under Rule

23(b)(3) is not likely still survive. Further, causation can be more challenging to prove when the plaintiff relies upon fraud perpetrated on a third party. See, e.g., Hemi Group, LLC v. City of New York, 130 S. Ct. 983, 175 L. Ed. 2d 943 (2010); Anza, 547 U.S. at 457.

Turning now to the Bridge claim herein, the contention [*99] is that defendants Signal and Burnett lied on forms submitted to the U.S. government in order to obtain approval to bring temporary H-2B workers into the United States to work for Signal. The "lies" at issue are the assertions that Signal's labor needs were temporary and limited to a 10 month period. According to Plaintiffs, the government clearly relied on these misrepresentations because otherwise Signal would not have received approval to hire H-2B foreign workers. Plaintiffs contend that this third-party reliance by the government on Signal's and Burnett's fraudulent statements does not implicate individual proof the way that first-party reliance does and therefore does not create an impediment to certification under Rule 23(b)(3). The Bridge claim implicates fraud under 18 U.S.C. § 1546 [46] most strongly but §1341 and § 1343 are also implicated because the mails and wires were surely used to transmit the H-2B documents to the government.

46   Section 1546, entitled Fraud and misuse of visas, permits, and other documents, provides in relevant part:

Whoever knowingly forges, counterfeits, alters, or falsely makes any immigrant or nonimmigrant visa, permit, border crossing card, alien [*100] registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, or utters, uses, attempts to use, possesses, obtains, accepts, or receives any such visa, permit, border crossing card, alien registration receipt card, or other document prescribed by statute or regulation for entry into or as evidence of authorized stay or employment in the United States, knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by means of any false claim or statement, or to have been otherwise procured by fraud or unlawfully obtained; or

. . . .

Whoever knowingly makes under oath, or as permitted under penalty of perjury under section 1746 of title 28, United States Code, knowingly subscribes as true, any false statement with respect to a material fact in any application, affidavit, or other document required by the immigration laws or regulations prescribed thereunder, or knowingly presents any such application, affidavit, or other document which contains any such false statement or which fails to contain any reasonable basis in law or fact--

Shall be fined under this [*101] title or imprisoned not more than 25 years . . . .

18 U.S.C.A. § 1546(a) (West 2000 & Supp. 2011).

Plaintiffs are of course correct in their contention that proving that the government relied on misrepresentations in approving H-2B status for Signal, and ultimately in issuing the hundreds of H-2B visas when the individual plaintiffs applied for them, does not trigger the individual questions that can often derail certification of fraud-based RICO actions. It does not necessarily follow, however, that Plaintiffs can nevertheless prove causation for their RICO injuries without resort to individual proof of reliance. In fact, the Court is persuaded that they cannot.

In order to understand why individual proof of reliance is necessary to the element of causation in this case notwithstanding Plaintiffs' fraud on the government theory, one must consider the nature of the RICO violations alleged in this case and the specific injuries that Plaintiffs' attribute to those RICO violations. Plaintiffs' claim in a nutshell is that the defendants engaged in a scheme to defraud them by making false promises regarding green cards. (RICO Case Stmt.¶ 5D). Fraud on the government aside, it has always been [*102] and remains Plaintiffs' contention that without the fraudulent promise of a green card they would not have paid the significant recruitment fees, would not have burdened themselves with massive amounts of debt, and would not have come to the United States to work for Signal. (Id. ¶ 9). Plaintiffs claim to have endured great financial, personal, and familial sacrifices in reliance on Defendants' misrepresentations. The most significant of the specific injuries

2012 U.S. Dist. LEXIS 114247, *

that Plaintiffs attribute to Defendants' fraudulent scheme are the exorbitant fees that they paid to Dewan, Pol, Rao, and Burnett, and the interest on the loans that Plaintiffs incurred to finance their way into the program. (Id. ¶¶ 4, 17). But these injuries were not the consequence of the alleged fraud that Signal and Burnett directed at the U.S. government when applying for H-2B status. In fact, for many of the plaintiffs the green card scheme began before Signal even entered the picture and applied for H-2B status. As to every plaintiff in this case, his RICO injuries arose directly out of the allegedly false and fraudulent green card promises that Dewan, Pol, Rao, and Burnett made to him. And the only way that any individual [*103] plaintiff could sustain an injury from that fraud was to rely upon it in ignorance of the truth.

Plaintiffs do not attempt to argue that the entirety of their injuries are attributable to Signal's and Burnett's alleged fraud on the government. Instead, Plaintiffs point out that the third installment payment that they paid to the recruiters is attributable to the government having approved Signal's H-2B status, the government having done so in reliance on misrepresentations as to Signal's labor needs. Moreover, Plaintiffs have made the allegation that once they arrived in the United States Signal continued to use the false promise of a green card in order to placate them, and therefore they continued to sustain injury from the fraudulent green card scheme after arriving at Signal via the H-2B program.

The fact that Signal received approval to bring H-2B workers into this country is surely a but for cause of some portion of each plaintiff's alleged injuries--for those plaintiffs who were recruited specifically for Signal after it had obtained approval to bring H-2B workers into the United States, the fraud on the government is probably *one* but for cause of every aspect of those plaintiffs' [*104] injuries; for those plaintiffs who were recruited and began incurring payments and debt *before* Signal entered the picture, the fraud on the government is perhaps one but for cause of a latter portion of their injuries. But for every plaintiff in this case, the totality of the injuries alleged, or at the very least the most significant of the injuries alleged, were not proximately caused by fraudulent representations made to the government--they were proximately caused by Defendants' false representations to the plaintiff of receiving a green card. It was the fraudulent conduct directed specifically at the plaintiffs that injured them.

In a fraudulent scheme like the one alleged in this case that spans several years and the globe, and involves numerous players to effect its purpose, the instances of fraud that occur might very well be legion. But the fact that Plaintiffs can identify one narrow aspect of fraud and prove that someone relied upon it, does not strip the question of RICO causation in this case of its individual

nature. It is important at this juncture to recognize exactly what Bridge teaches about reliance in a RICO fraud case--reliance is *not* an element of the case. Reliance [*105] is important only insofar as it is necessary to prove causation. And while causation fails at the outset if no one relies on a fraudulent misrepresentation, it does not follow that causation between a RICO violation and the injury alleged is satisfied simply because the plaintiff can identify one aspect of fraudulent conduct that occurred in furtherance of the scheme to defraud and show that someone relied on it. RICO injuries must arise out of the unlawful conduct that constitutes the predicate acts. The injuries asserted in this case are not proximately caused by any predicate act premised on fraud on the government. That's not to say that the alleged fraud on the government is not relevant to some aspect of Plaintiffs' RICO claims, including the element of causation. But the Court is persuaded that in light of the specific scheme to defraud that Plaintiffs allege in this case, they will still have to prove first-party reliance on the alleged fraud that was directed at them--the fraud that most proximately caused their injuries.

Furthermore, in Bridge, the entirety of the fraudulent conduct alleged was directed at third parties whose reliance on it *directly* injured the plaintiff. In  [*106] this case, the majority of the injurious fraudulent conduct was directed specifically and directly to Plaintiffs. The fraud on the government that Plaintiffs allude to herein is not the fraud that directly injured Plaintiffs.

To be sure, there will be significant overlap in the evidence if each Plaintiff is required to present his RICO claim to a jury. And surely there will be numerous common issues amongst the cases. But in light of the issue of individual reliance, those common issues will not predominate even if they happen to outnumber the individual issues. The question of individual reliance will be paramount to resolving whether Plaintiffs' injuries were caused by a RICO violation. Therefore, Plaintiffs' reliance on Bridge in support of certification under Rule 23(b)(3) is misplaced.

## 2) Market Approach Theory

### a. Motion to Strike-1082

Signal has filed a second Motion to Strike-1082 arguing in essence that Plaintiffs' contention that they can prove reliance via written contracts is new. Plaintiffs' market approach theory is simply one way that they hope to show causation with respect to their RICO claims. As explained above, reliance is not an element of the claims, and therefore  [*107] neither is the method that Plaintiffs intend to rely upon to show it. The motion is DENIED.

**b. Analysis**

Regarding Plaintiffs' "market approach" theory of reliance, Defendants argue that Plaintiffs cannot obtain certification in this manner because they are essentially arguing for a presumption of reliance based on circumstantial evidence. Defendants contend that certification on this theory would likely run afoul of Defendants' Seventh Amendment right to a jury trial.

In contrast to certification under Bridge, Plaintiffs' market approach theory is grounded on first-party reliance-Plaintiffs' own reliance on Defendants' fraudulent promises regarding green cards. However, Plaintiffs contend that first-party reliance can be proven via circumstantial, class-wide evidence that eliminates the need for individualized proof. Plaintiffs point to the decision in Klay v. Humana, Inc., 382 F.3d 1241 (11th Cir. 2004), as an example of how common evidence can be used to establish first-party reliance.

Certainly evidence such as the contracts that Plaintiffs signed, the slide show presentations that were made at recruitment seminars, and even the quantum of the fees that Plaintiffs paid will be relevant [*108] to establishing individual reliance on the green card promise. But the Court is not persuaded that this case presents a situation like Klay where first-party reliance can be established based solely on this type of evidence. Plaintiffs' contention in this case is that they were defrauded by a false promise of a green card into joining Dewan's recruitment program, traveling to the United States to work for Signal under conditions so deplorable that they were violative of the criminal laws of this country, and then duped once again into staying on at Signal based on Signal's own false representations regarding green cards and permanent employment. Plaintiffs allege injuries arising out of each leg of the fraudulent scheme. But while the circumstantial evidence that Plaintiffs point to for proving first-party reliance might be sufficient to permit a jury to infer that a plaintiff signed up for the program and paid the first installment in reliance on the promise of a green card, it is not necessarily sufficient to carry the entire claim to its conclusion at Signal.

Each plaintiff who came to the United States had to apply for an H-2B temporary visa in order to enter the country. Some plaintiffs [*109] like Dhananjaya had previously worked in the United States under the temporary H-2B guest-worker program and therefore must have understood the temporary nature of the visa. Plaintiffs understood that they could not divulge to consular staff that they were expecting to get green cards or to stay in the United States permanently. Arguably, Plaintiffs had to be willing to misrepresent the truth during those interviews and some presumably did just that. Plaintiffs arrived at Signal in waves and the first group to

arrive began protesting immediately about the lack of green cards yet others continued to go to Signal voluntarily on H-2B visas, presumably based on representations made by Signal personal to other class members. Although Plaintiffs maintain that Dewan lied to them about the ramifications of going to Signal on temporary visas, Dewan testified that some of the class members were so adamant about coming to the United States that they were willing to do so even though it might mean not getting a green card. Once arrived at Signal some of the plaintiff class was in Texas and some was in Mississippi, and perhaps subject to differing representations by Signal personnel.

All of these [*110] facts, and many others, must be weighed in light of the fact that the plaintiff class as a whole did not labor under any specific vulnerabilities when they decided to join the green card program. That's not to say that they were not the victims of fraud but Plaintiffs are not a class of children or mentally challenged persons. Plaintiffs were adult men, some of whom had worked overseas before and some of whom were well-educated and savvy. All of the Plaintiffs knew that green cards were difficult to get and could only be obtained from the United States government. Plaintiffs were clearly eager to come to the United States--some individuals tried to obtain employment with Signal even without going through the recruiting scheme. A jury could find, for any given individual plaintiff, that given the nature of green cards, the significant money that Defendants were demanding, and a plaintiff's own complicity in doing whatever was necessary to enter this country, that the injuries alleged were not proximately caused by Defendants' conduct. On the other hand, a jury could find, for any given individual plaintiff, that Defendants' conduct did cause the plaintiff's injuries. The Court is persuaded [*111] that Defendants have the right to test each plaintiff's claim of reliance to the jury.

None of the foregoing necessarily means that any given plaintiff did not rely on Defendants' allegedly fraudulent representations when choosing to join the program, travel to the United States, and work for Signal. And the Court is not disputing Plaintiffs' contention that many members of the class faced a Hobson's choice of either coming to the United States on a temporary H-2B visa or losing all of their money. But it is clear that in order to get from point A, which is joining the recruitment program, to point C, which is staying on as part of Signal's compliant workforce, far more fraud must have been involved than the class-wide evidence that Plaintiffs point to in this case. In fact, Plaintiffs claim exactly that. Plaintiffs contend that they were lied to about the temporary nature of an H-2B visa and lied to about whether green card processing would continue once they arrived at Signal. But these alleged misrepresentations, which

would have been crucial to understanding why Plaintiffs came to Signal, were made individually. And in contrast to the Klay case, which seemingly involved no direct [*112] communication of misrepresentations by the defendants to the plaintiffs, the plaintiffs in this case had direct contact with the recruiters and the Signal personnel who allegedly lied to them about green cards and permanent residency. Those lies form a crucial part of each plaintiff's reliance on the fraud at issue in this case.

For the foregoing reasons the Court is persuaded that Plaintiffs cannot prove their § 1962(c) substantive RICO claims without resort to individualized proof in light of the facts of this case. Common issues will not predominate and certification under Rule 23(b)(3) is therefore not appropriate. [47] The motion to certify is therefore DENIED as to Plaintiffs' RICO claims under 18 U.S.C. § 1962(c).

> [47]  The Court also notes that some of the injuries/damages that Plaintiffs allege in conjunction with the RICO violations are highly individualized in nature and not subject to formulaic calculation: Assumption of significant interest bearing debt, interest on loans, lost work and professional opportunities, and lost and unpaid wages.

### B. Section 1962(d)--RICO Conspiracy

RICO criminalizes conspiracy to violate any of its substantive provisions. United States v. Delgado, 401 F.3d 290, 296 (2005) [*113] (citing 18 U.S.C. § 1962(d)). In the criminal setting, the government must establish that two or more people agreed to commit a substantive RICO offense, and that the defendant knew of and agreed to the overall objective of the RICO offense. Id. (quoting United States v. Posada-Rios, 158 F.3d 832, 855 (5th Cir. 1998)). The conspirator need not have committed or agreed to commit two predicate acts. Id. (citing Salinas v. United States, 522 U.S. 52, 61-66, 118 S.Ct. 469, 139 L. Ed. 2d 352 (1997)).

The core of a RICO civil conspiracy is an agreement to commit predicate acts. Abraham, 480 F.3d 351, 357 (5th Cir. 2007). A plaintiff can use § 1962(d) to sue a defendant or co-conspirator who might not have violated one of the substantive provisions of § 1962. Beck v. Prupis, 529 U.S. 494, 506-07, 120 S. Ct. 1608, 146 L. Ed. 2d 561 (2000). But while § 1962(d) criminalizes an illegal agreement, § 1964(c) imposes civil liability and therefore asks whether an admittedly illegal agreement gives rise to damages. Beck, 529 U.S. at 507 (Stevens, J., dissenting). In Beck, the Supreme Court held that a civil RICO conspiracy plaintiff cannot establish injury for purposes of § 1962(d) by relying on an overt act that is not unlawful under the RICO statute. Beck, 529 U.S. at 505-06. [*114] The injury recoverable for a RICO

conspiracy violation must result from either an act of racketeering or conduct otherwise unlawful under the statute. Id. at 507. An agreement alone will not give rise to civil liability under §§ 1962(d) and 1964(c). Id. at 508 n.1 (Stevens, J., dissenting).

The implication of the foregoing discussion is clear. Proving the mere existence of a RICO conspiracy might be sufficient to trigger criminal sanctions but it is not sufficient to recover damages in a civil suit. Plaintiffs will have to prove that their injuries were caused by the predicate acts that they have alleged. But as the Court explained in the section discussing RICO liability under § 1962(c), the predicate acts are not amenable to certification under Rule 23(b)(3) because common issues will not predominate. The motion to certify is therefore DENIED as to Plaintiffs' RICO claims under 18 U.S.C. § 1962(d).

### 3. Civil Rights Claims (42 U.S.C. § 1981)

The third set of claims that Plaintiffs seek to certify for class-wide treatment are their disparate treatment claims under 42 U.S.C. § 1981 for discriminatory employment practices. Plaintiffs' § 1981 claims are brought against defendant Signal. In [*115] support of their § 1981 claims, Plaintiffs allege that Signal discriminated against them with respect to the mandatory room and board arrangements at the Signal labor camps, which the non-Indian and/or U.S. citizen employees were not subject to. (SAC ¶ 336, 337). Plaintiffs also allege that Signal discriminated against them with respect to job assignments and other conditions of employment. (Id. at ¶ 378). Plaintiffs allege that Signal maintained an objectively hostile and abusive work environment based on their race, national origin, and/or alienage. (Id. at ¶¶ 339-342). Plaintiffs seek damages, including compensatory and punitive damages, attorney's fees, and costs. [48] (Id. at ¶ 345).

> [48]  Again, this claim does not include all members of the plaintiff class because it only involves those plaintiffs who actually worked at Signal. See note 7, supra.

Section 1981, Equal Rights Under the Law, provides:

> (a) Statement of equal rights
>
>   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons [*116] and property as is

enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of State law.

42 U.S.C.A. § 1981 (West 2003).

Section 1981 provides a federal remedy for workplace discrimination in private employment on the basis of race or ethnicity. See Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975); St. Francis College v. Al-Khazraji, 481 U.S. 604, 107 S. Ct. 2022, 95 L. Ed. 2d 582 (1987). To establish a prima facie case under § 1981, a plaintiff must show: 1) that he is a racial minority, 2) that the defendant intended to discriminate against him on the basis of race, and 3) that the discrimination concerns one or more of the activities enumerated in the statute. Wesley v. Gen. Drivers, Warehousemen & Helpers Local 745, 660 F.3d 211, 2011 WL 4579133, at *2 (5th Cir. Oct. 5, 2011) [*117] (citing Felton v. Polles, 315 F.3d 470, 483 (5th Cir. 2002), abrogated on other grounds, Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). Proof of intentional discrimination is essential for relief under § 1981. Id. (citing Gen. Bldg. Contractors Ass'n v. Penn., 458 U.S. 375, 389, 102 S. Ct. 3141, 73 L. Ed. 2d 835 (1982)).

Plaintiffs argue that their § 1981 claims are amenable to certification because they are grounded on Signal's uniform corporate policies toward the putative class. Plaintiffs contend that they will prove their § 1981 claims with generalized proof applicable to the class as a whole--Signal's executives' testimony, Signal's emails, employee writings, etc. According to Plaintiffs, common issues not only predominate the § 1981 claims, they constitute the only issues.

Plaintiffs point out that Signal's basis for resisting certification of their § 1981 claims is that individualized proof will be necessary to prove subjective harm and mental distress injury. But Plaintiffs contend that this will not be an issue because they will not seek emotional distress injury as part of their claim for compensatory damages. Further, the compensatory damages that they do seek are "refund-type" recovery [*118] of the recruitment fees and man camp fees, which are subject to a formulaic calculation. Therefore, according to Plaintiffs, issues pertaining to individual damage awards do not foreclose certification.

In Allison v. Citgo Petoleum Corp., the Fifth Circuit addressed the issue of whether claims of disparate treatment race discrimination were subject to class certification under either Rule 23(b)(2) or (b)(3). 151 F.3d 402 (5th Cir. 1998). The Fifth Circuit explained that compensatory damages for intangible injuries are not presumed merely because the plaintiff proves that a statutory violation has occurred. Id. at 416-17. Specific individualized proof is necessary and compensatory damages may be awarded only if the plaintiff submits proof of actual injury. Id. at 417 (citing Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 938-40(5th Cir. 1996); Brady v. Fort Bend County, 145 F.3d 691, 717-20 (5th Cir. 1998)). The very nature of compensatory damages for intangible injuries necessarily implicates the subjective differences of each plaintiff's circumstances so that they constitute an individual, not a class-wide remedy. Allison, 151 F.3d at 417. Allison explains why a plaintiff class [*119] seeking compensatory damages for a discrimination claim faces great difficulty in obtaining certification under Rule 23(b)(3) because individual issues will typically predominate.

While Plaintiffs are likely correct in their assertion that intentional discrimination by Signal can be proven via class-wide, non-individualized evidence, Plaintiffs' attempt to circumvent the predominance problem surrounding damages is unconvincing for several reasons. Aside from punitive damages, all of the relief that Plaintiffs seek for the § 1981 claims are compensatory in nature. In other words, there are no back pay issues or front pay issues or other remedies that would normally pertain to an ongoing employment relationship. [49] But compensatory damages arising out of workplace discrimination are not presumed to be owed simply because the plaintiff establishes that the employer maintained a discriminatory work environment. In order to obtain compensatory damages the plaintiff must prove actual injury to himself and that injury must be attributable to (caused by) the defendant's disparate treatment. Thus, while Plaintiffs have attempted to define their compensatory damage claims in formulaic "refund" [*120] terms, it is clear that the significant recruitment fees that they are trying to recoup as compensatory damages--fees that were paid to third parties before the plaintiffs even arrived at Signal--are not an element of damages attributable to dis-

TAB 3

Westlaw.

Not Reported in F.Supp.2d, 2007 WL 2580969 (E.D.Tex.)
**(Cite as: 2007 WL 2580969 (E.D.Tex.))**

H

Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas,
Marshall Division.
EPICREALM, LICENSING, LLC
v.
AUTOFLEX LEASING, INC., et al.
Epicrealm, Licensing, LLC
v.
Franklin Covey Co., et al.

Nos. 2:05-CV-163-DF-CMC,
2:05-CV-356-DF-CMC.
Aug. 27, 2007.

Larry Dean Carlson, Brian James Gaffney, Kevin James Meek, Baker Botts, Dallas, TX, Andrew Wesley Spangler, Elizabeth L. Derieux, Sidney Calvin Capshaw, III, Brown McCarroll, Thomas John Ward, Jr., Ward & Smith Law Firm, Longview, TX, Deborah J. Race, Otis W. Carroll, Jr., Ireland Carroll & Kelley, Tyler, TX, Franklin Jones, Jr., Jones & Jones, Marshall, TX, Jeffrey Wayne Moles, Quinn Emanuel Urquhart Oliver & Hedges, LLP, New York, NY, for Epicrealm, Licensing, LLC.

Charles Ainsworth, Parker Bunt & Ainsworth, Tyler, TX, for Friendfinder Network, Inc., Grande Communication Networks, Inc., Clark Consulting, Inc., Herbalife International of America, Inc., and Autoflex Leasing, Inc.

Danny Lloyd Williams, Matthew Richard Rodgers, Williams Morgan & Amerson PC, Houston, TX, Eric M. Albritton, Attorney at Law, Jason A. Saunders, Albritton Law Firm, Longview, TX, Ira P. Rothken, Rothken Law Firm, San Rafael, CA, Margaux A. Aviguetero, Otto O. Lee, Intellectual Property Law Group, LLP, San Jose, CA, Tyler Alexander Baker, Fenwick & West, Mountain Valley, CA, Michael J. Sacksteder, Fenwick & West, San Fran-

cisco, CA, for Friendfinder Network, Inc.

J. Stephen Ravel, Jonathan M. Buck, Kelly Hart & Hallman, Joseph Roger Williams, Jr., Andrews Kurth LLP, Austin, TX, for Grande Communication Networks, Inc.

David J. Beck, Beck Redden & Secrest, Houston, TX, Aaron Levangie, William D. Belanger, Pepper Hamilton LLP, Boston, MA, for Franklin Covey Co.

Kenneth Robert Adamo, Jones Day, Dallas, TX, A. Gregory Gibbs, Ognjan V. Shentov, Richard H. An, Jones Day, New York, NY, Carl R. Roth, Michael Charles Smith, The Roth Law Firm, P.C., Marshall, TX, William J. Brown, Jr., Jones Day, Irvine, CA, for Herbalife International of America, Inc.

Robert S. Beiser, Stanley B. Block, Vedder Price Kaufman & Kammholz, Ludwig E. Kolman, Pope Cahill & Devine Ltd., Chicago, IL, for Clark Consulting, Inc., and Herbalife International of America, Inc.

Lance Lee, Young Pickett & Lee, Texarkana, TX, Michael W. Tieff, Steven J. Rocci, Woodcock Washburn LLP, Philadelphia, PA, Paul Alexander Bezney, Tracy Lynn Stoker, Adkerson, Hauder & Bezney, Dallas, TX, for Autoflex Leasing, Inc.

***ORDER***
DAVID FOLSOM, United States District Judge.
   **\*1** Before the Court is Plaintiff's Motion for Reconsideration and Request for Oral Argument Regarding Magistrate Judge Craven's Order Denying Plaintiff's Motion to Compel. 2:05-cv-163, Dkt. No. 348; 2:05-cv-356, Dkt. No. 333. Also before the Court are the responses of Defendants Grande Communication Networks, Inc. ("Grande"), Herbalife International of America, Inc. ("Herbalife"), and Franklin Covey Co. ("Franklin Covey"). 2:05-cv-163, Dkt. Nos. 352, 353, 354. Defendants Grande and Herbalife filed identical responses in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2580969 (E.D.Tex.)

**(Cite as: 2007 WL 2580969 (E.D.Tex.))**

Page 2

Civil Action No. 2:05-cv-356. Dkt. Nos. 337 & 338. The Court held a hearing on August 20, 2007.

Having considered the arguments of counsel and all relevant papers and pleadings, the Court finds that the order of the magistrate judge should be **REMANDED** for further consideration in light of this order.

## I. BACKGROUND

Plaintiff filed the above-captioned suits on May 2, 2005, and August 5, 2005, alleging infringement of United States Patent Nos. 5,894,554 and 6,415,335 (the "patents-in-suit"). The patents-in-suit allegedly encompass certain systems and methods to dynamically generate web pages, whereby a web server interacts with a page server and other data sources to generate dynamic web pages that are subsequently transmitted over the Internet. On November 2, 2005, the Honorable T. John Ward consolidated the above-captioned cases for pretrial purposes because the cases involve the same plaintiff and same asserted patents. 2:05-cv-163, Dkt. No. 58; 2:05-cv-356, Dkt. No. 63. Judge Ward subsequently transferred the above-captioned cases to the undersigned. 2:05-cv-163, Dkt. No. 60; 2:05-cv-356, Dkt. No. 71. This Court referred the above-captioned cases to United State Magistrate Judge Caroline M. Craven ("Magistrate Judge Craven") for pretrial purposes on November 16, 2005. 2:05-cv-163, Dkt. No. 64; 2:05-cv-356, Dkt. No. 75.

On November 29, 2006, Plaintiff filed a motion to compel production. 2:05-cv-163, Dkt. No. 283; 2:05-cv-356, Dkt. No. 285. After briefing on this motion, Magistrate Judge Craven held a hearing on January 23, 2007. Following that hearing, Magistrate Judge Craven continued the trial setting to October 2007. *See* 2:05-cv-163, Dkt. Nos. 332 & 345; 2:05-cv-356, Dkt. Nos. 322 & 332. Magistrate Judge Craven entered an order on Plaintiff's motion to compel on April 16, 2007. 2:05-cv-163, Dkt. No. 340; 2:05-cv-356, Dkt. No. 333. This order is the subject of Plaintiff's present motion for reconsideration. FN1

FN1. Magistrate Judge Craven entered another order on the same day addressing the scope of Plaintiff's PICs. *See* 2:05-cv-163, Dkt. No. 341. That order is not presently under reconsideration because the defendant to which that order related has settled. *See* 2:05-cv-163, Dkt. No. 349 & 355.

On May 11, 2007, Defendants moved to extend the trial setting to March 2008.2:05-cv-163, Dkt. No. 351; 2:05-cv-356, Dkt. No. 336. Magistrate Judge Craven granted Defendants' motion on May 31, 2007. 2:05-cv-163, Dkt. No. 361; 2:05-cv-356, Dkt. No. 344.

On August 16, 2007, Plaintiff filed an unopposed motion to transfer the above-captioned cases from the Marshall Division to the Texarkana Division. 2:05-cv-163, Dkt. No. 376; 2:05-cv-356, Dkt. No. 352. Magistrate Judge Craven granted Plaintiff's motion on August 20, 2007, and ordered a new trial setting in May 2008, as requested by the parties. 2:05-cv-163, Dkt. Nos. 379 & 380; 2:05-cv-356, Dkt. Nos. 354 & 355.

## II. LEGAL PRINCIPLES

**\*2** Defendants appeal the decision of Magistrate Judge Craven pursuant to Federal Rule of Civil Procedure 72(a), which provides that the Court shall consider objections and shall modify or set aside any portion of a magistrate judge's order on a nondispositive matter found to be "clearly erroneous or contrary to law." *See also* 28 U.S.C. § 636(b)(1)(A). A finding is "clearly erroneous" only when the Court is "left with the definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust,* 508 U.S. 602, 622, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993).

## III. THE PARTIES' POSITIONS

Judge Craven's April 16, 2007 order found, among other things, that Plaintiff's infringement contentions are insufficient to compel Defendants to produce documents related to a Microsoft product called "Microsoft IIS." 2:05-cv-163, Dkt.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2580969 (E.D.Tex.)

**(Cite as: 2007 WL 2580969 (E.D.Tex.))**

No. 340; 2:05-cv-356, Dkt. No. 333. Plaintiff moves for reconsideration of that order, arguing that the scope of discovery should not be strictly limited to products and services specifically accused by its infringement contentions. Dkt. No. 348 at 1-2. Alternatively, Plaintiff submits that "the Court should allow [Plaintiff] to file another patent infringement lawsuit against Defendants naming the systems excluded by the April 16 Order ...." *Id.* at 9.

Defendants have filed three separate responses. 2:05-cv-163, Dkt. Nos. 352, 353, 354. Grande Communications argues that Judge Craven properly found that grandecom.net has not been accused of infringement. Dkt. No. 352 at 4. Herbalife emphasizes that Plaintiff failed to mention even one potentially infringing configuration offered by Microsoft. Dkt. No. 353 at 5. Herbalife also argues that allowing Plaintiff to file another patent infringement suit naming the systems excluded by Magistrate Judge Craven's April 16, 2007 order would be an impermissible collateral attack on that order. *Id.* at 6. Franklin Covey argues that Plaintiff has never accused www.planplusonline.com of infringement. Dkt. No. 354 at 3. Franklin Covey also emphasizes Plaintiff's nine month delay in raising issues related to document production. *Id.* at 5. As to Plaintiff's alternative relief, Franklin Covey argues the doctrine of "claim splitting" prohibits another lawsuit. *Id.* at 7 (discussing *Orion IP, LLC v. Home Depot USA, Inc.,* 2:05-cv-306 (E.D.Tex. Oct. 7, 2005)).

### IV. DISCUSSION

Local Patent Rule ("P.R.") 3-1 provides that a party claiming patent infringement must serve upon each opposing party a "Disclosure of Asserted Claims and Infringement Contentions" (sometimes referred to as "Patent Infringement Contentions" or "PICs"). P.R. 3-1 (Appx. M to Local Rules, as amended Oct. 27, 2006). FN2 As to each asserted claim, these PICs must identify "each accused apparatus, product, device, process, method, act, or other instrumentality ('Accused Instrumentality') of each opposing party of which the party is aware."

*Id.* at 3-1(b). The present motion for reconsideration centers on whether the scope of discovery should be strictly limited to the products and services specifically identified in the patent holder's PICs. At the hearing on the present motion, the parties addressed an order entered in *Caritas Technologies, Inc. v. Comcast Corp.,* in which Magistrate Judge Craven found that "[plaintiff] only ha[d] the right to discover information regarding the alleged infringing service, not the right to discover information on whether it should assert a claim of infringement regarding other services." Civil Action No. 2:05-cv-339, Dkt. No. 63 at 8 (E.D.Tex. Feb. 10, 2006).

> FN2. The parties refer to "Preliminary Infringement Contentions" in their briefing. The Eastern District of Texas has revised its Local Patent Rules to remove the word "preliminary." *See* General Order 06-15 at 27-28 (Oct. 27, 2006). Plaintiff served its infringement contentions before this amendment became effective. *See* Scheduling Order, Dkt. No. 80.

**\*3** Contrary to *Caritas,* the Court finds no bright line rule that discovery can only be obtained if related to an accused product identified in a party's PICs. For example, the Dallas Division of the Northern District of Texas has adopted local rules for patent cases directing that "the scope of discovery is not limited to the preliminary infringement contentions or preliminary invalidity contentions but is governed by the Federal Rules of Civil Procedure." § 2-5, Miscellaneous Order No. 62 (Apr. 2, 2007). The Court infers that this Dallas Division local rule intends that the scope of discovery is determined on a case-by-case basis and as contemplated by the "relevant to the claim or defense of any party" language in Federal Rule of Civil Procedure 26(b)(1). Further, Judge Ward of the Eastern District of Texas has found that relevant discovery in a patent infringement suit "includes discovery relating to the technical operation of the accused products, as well as the identity of and technical op-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 2580969 (E.D.Tex.)
**(Cite as: 2007 WL 2580969 (E.D.Tex.))**

eration of any products reasonably similar to any accused product." *See, e.g., Microunity Sys. Eng'g, Inc. v. Advanced Micro Devices, Inc.,* 2-06-cv-486, Dkt. No. 38 at ¶ 3 (E.D.Tex. May 23, 2007).

The Court concludes that the scope of discovery may include products and services (in this case, websites and systems) "reasonably similar" to those accused in the PICs. *Id.* This finding best comports with the "notice pleading and broad discovery regime created by the Federal Rules" and the "right to develop new information in discovery." *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.,* 467 F.3d 1355, 1366 (Fed.Cir.2006).

Nonetheless, Magistrate Judge Craven also considered whether Plaintiff should have earlier sought leave to amend its PICs or should have included the websites and systems about which Plaintiff seeks discovery in its original PICs. Dkt. No. 340 at 5-10. "Amendment or supplementation any Infringement Contentions ... other than [in response to a claim construction ruling], may be made only by order of the Court, which shall be entered only upon a showing of good cause." P.R. 3-6(b); *see also O2 Micro,* 467 F.3d at 1360. Magistrate Judge Craven thus properly considered that Plaintiff "had an obligation to investigate and provide to Defendants ... an appropriate infringement theory." Dkt. No. 340 at 6. Delay and diligence remain factors to consider in deciding whether "good cause" justifies the amendment of infringement contentions after the deadline contained in a scheduling order.

The Court notes that the trial setting in this matter has recently been moved to May 2008. *See* 2:05-cv-163, Dkt. Nos. 379 & 380; 2:05-cv-356, Dkt. Nos. 354 & 355. The Court expects the parties will soon submit revised scheduling orders to Magistrate Judge Craven, and the Court anticipates that the deadlines for fact discovery and expert discovery (currently set for November 20, 2007, and January 9, 2008, respectively) will be extended. *See* 2:05-cv-163, Dkt. No. 363 at 3; 2:05-cv-356, Dkt. No. 346 at 3. The Court therefore finds adequate

time for Magistrate Judge Craven to review the order at issue in light of the Court's finding that discovery should not be strictly limited to products specifically accused in the PICs.

### V. CONCLUSION

**\*4** For all of the foregoing reasons, Magistrate Judge Craven's order on Plaintiff's motion to compel is hereby **REMANDED** for further consideration in light of the Court's finding that the scope of discovery may include accused websites and systems "reasonably similar" to those accused in the PICs.

E.D.Tex.,2007.
Epicrealm, Licensing, LLC v. Autoflex Leasing, Inc.
Not Reported in F.Supp.2d, 2007 WL 2580969 (E.D.Tex.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB 4



Not Reported in F.Supp.2d, 2010 WL 2721271 (S.D.Cal.)
**(Cite as: 2010 WL 2721271 (S.D.Cal.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. California.
Brooke GARDNER, individually, and on behalf of
a class of others similarly situated, Plaintiff,
v.
GC SERVICES, LP, Defendant.

No. 10-CV-997-IEG (CAB).
July 6, 2010.

West KeySummary**Removal of Cases 334 ⚷74**

334 Removal of Cases
    334V Amount or Value in Controversy
        334k74 k. Amount or Value Claimed or Involved. Most Cited Cases

Employees bringing a putative class action suit against their employer alleging various claims for unpaid wages under California law failed to establish that removal of the action was improper, as their employer demonstrated that it was more likely than not that the amount in controversy exceeded five million dollars, as required by Class Action Fairness Act. The employee's claim for failure to pay overtime premium for hours worked in excess of eight in a given workday to 303 full-time employees sought a potential recovery of over $3,000,000. Additionally, the employee claimed that the employer failed to pay termination wages for 1,385 account representatives. The potential recovery for those workers was approximately $4,800,000. 28 U.S.C.A. § 1332(d); West's Ann.Cal.Labor Code §§ 510, 203.

Jason M. Lindner, Stueve Siegel Hanson LLP, San Diego, CA, for Plaintiff.

Mariana Aguilar, Seyfarth Shaw LLP, Los Angeles, CA, for Defendant.

ORDER:

(1) DENYING PLAINTIFF'S MOTION TO REMAND [Doc. No. 4]; and
(2) DENYING DEFENDANT'S MOTION TO DISMISS, TRANSFER, OR STAY [Doc. No. 2].

IRMA E. GONZALEZ, Chief Judge.

**\*1** This is a putative class action alleging various claims for unpaid wages under California state law. Currently before the Court are Defendant's Motion to Dismiss for Lack of Jurisdiction, to Transfer to the Eastern District of Missouri, or to Stay Plaintiff's Claims, [Doc. No. 2], and Plaintiff's Motion to Remand to State Court, [Doc. No. 4]. Having considered the parties' arguments, and for the reasons set forth below, the Court **DENIES** both motions.

**BACKGROUND**
**I. Multiple actions**

The present action is brought by Plaintiff Brooke Gardner ("Gardner"), individually and on behalf of others similarly situated, against Defendant GC Services LP (hereinafter, the *"Gardner* action"). Two earlier-filed actions are also relevant to the disposition of the motions currently pending before the Court. The first one is an action brought by Darryl Easley, individually and on behalf of others similarly situated, against GC Services LP and GC Services Corp. (hereinafter, the *"Easley* action"). The second one is an action brought by Lora Meyers, Sherry Clere, Patricia Glass, Nota Jean Barnes, Debra Davis, Cecilia Koster, Johnna Parker, Steven Christy, and Peggy Spurlock, on behalf of themselves and others similarly situated, against GC Services LP (hereinafter, the *"Meyers* action"). Each of these is discussed in turn below.

*A. The Easley action*

On October 20, 2009, Darryl Easley, a Missouri resident and former employee at one of GC Services' Missouri call centers, filed a complaint in the United States District Court for the Eastern District of Missouri alleging that he and other similarly situated employees of GC Services and GC Services Corp. were required to work "off the clock"

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2010 WL 2721271 (S.D.Cal.)
**(Cite as: 2010 WL 2721271 (S.D.Cal.))**

without compensation and were not paid time-and-a-half for overtime hours worked. The *Easley* complaint alleged causes of actions under the Federal Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. §§ 201-262, as well as under Missouri's wage and hour laws. (Def.Motion, Ex. C, ¶¶ 31-52.)

*B. The Meyers action*

On November 13, 2009, the *Meyers* Plaintiffs filed an action in the United States District Court for the Southern District of West Virginia similarly alleging that they were required to perform "off the clock" work without compensation and were not paid appropriate overtime wages. The *Meyers* complaint alleged only a cause of action pursuant to the FLSA. (*Id.,* Ex. D, ¶¶ 44-53.) While the case at first appeared to include only employees in West Virginia, it was later amended-in cooperation with the *Easley* attorneys-to seek a nationwide collective action involving the exact class of employees making the same claims as in the *Easley* lawsuit. (*See id.,* Ex. E.) The *Meyers* lawsuit also included opt-in Plaintiffs from California. (*See id.,* Ex. E, ¶ 18; *id.,* Ex. F.)

Just like in the present case, defendant GC Services in the *Meyers* lawsuit moved to dismiss or, in the alternative, to transfer or stay the action in the Southern District of West Virginia in favor of the action then-pending in the Eastern District of Missouri. On March 18, 2010, the district court granted defendant's motion, finding that the first-to-file rule should apply, and transferred the action to the Eastern District of Missouri. (*Id.,* Ex. B.)

*C. The Beasely action*

**\*2** Thereafter, plaintiffs in the *Easley* and *Meyers* actions moved to have them consolidated in the Eastern District of Missouri, and on April 26, 2010, the combined plaintiffs filed an Amended Consolidated Complaint (hereinafter, the *"Beasely"* action"). (*Id.,* Ex. A.) The *Beasely* complaint alleged a single claim for violation of the FLSA, (*id.,* Ex. A, ¶¶ 21-29), and specifically excluded GC Services' California employees from the putative plaintiff class, (*id.,* Ex. A, ¶ 19). Plaintiffs also filed the opt-

in consent forms for all those who previously opted into the *Meyers* case, except for the two California employees. (*See id.,* Ex. H.)

*D. The Gardner action*

Finally, on March 24, 2010, Gardner-represented by the same attorneys as the plaintiffs in the *Beasely* lawsuit-filed the present action in the Superior Court for the County of San Diego, alleging five cause of action: (1) failure to pay straight-time wages in violation of California state law; (2) failure to pay overtime wages in violation of California state law; (3) failure to pay all compensation due and owing at termination in violation of California state law; (4) violation of the California Business and Professions Code § 17200 et seq.; and (5) quantum meruit. (*Id.,* Ex. I.) On May 10, 2010, GC Services removed the action to this Court. [Doc. No. 1].

**II. Procedural history**

After the *Gardner* action was removed to this Court, Defendant moved to dismiss the action for lack of jurisdiction or, in the alternative, to transfer it to the Eastern District of Missouri or stay it pending the resolution of the *Beasely* lawsuit. [Doc. No. 2]. Plaintiff filed an opposition, and Defendant replied. [Doc. Nos. 6, 9]. At the same time, Plaintiff also filed a motion to remand this action to state court. [Doc. No. 4]. Defendant filed an opposition, and Plaintiff replied. [Doc. Nos. 7, 8]. The Court heard oral argument on both motions on July 6, 2010.

**DISCUSSION**
**I. Plaintiff's motion to remand**

Plaintiff's motion to remand alleges Defendant failed to meet its burden of showing that the jurisdictional amount is met in this case. When a case is removed from state court, the removing defendant bears the burden of establishing federal jurisdiction, including any applicable amount in controversy. *Abrego Abrego v. Dow Chem. Co.,* 443 F.3d 676, 683 (9th Cir.2006) (per curiam). "Where the complaint does not specify the amount of damages sought, the removing defendant must prove by a

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 3

Not Reported in F.Supp.2d, 2010 WL 2721271 (S.D.Cal.)
**(Cite as: 2010 WL 2721271 (S.D.Cal.))**

preponderance of the evidence that the amount in controversy requirement has been met." *Id.* (citing *Gaus v. Miles, Inc.,* 980 F.2d 564, 566-67 (9th Cir.1992)). Thus, the defendant must provide evidence that it is "more likely than not" that the amount in controversy satisfies the jurisdictional requirement. *Sanchez v. Monumental Life Ins. Co.,* 102 F.2d 398, 404 (9th Cir.1996). This burden is unchanged where, as in this case, the removal is based on the Class Action Fairness Act of 2005 ("CAFA"). *See Abrego,* 443 F.3d at 685-86.

**\*3** As the Ninth Circuit has explained, CAFA "vests the district court with 'original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which' the parties satisfy, among other requirements, minimal diversity." *Id.* at 680 (quoting 28 U.S.C. § 1332(d)). In the present case, Plaintiff argues the remand is appropriate because Defendant has failed to meet its burden of establishing by preponderance of the evidence that the amount in controversy exceeds $5,000,000.

Contrary to Plaintiff's contentions, however, there is no obligation on Defendant to submit any declarations or "summary-judgment-type evidence" in support of its assertion that the jurisdictional amount is met in the present case. Rather, the Ninth Circuit has explained that:

> "The district court may consider whether it is 'facially apparent' from the complaint that the jurisdictional amount is in controversy. If not, the court may consider facts in the removal petition, and *may* 'require parties to submit summary-judgment-type evidence relevant to the amount in controversy at the time of removal.' "

*Abrego,* 443 F.3d at 690 (quoting *Singer v. State Farm Mut. Auto. Ins. Co.,* 116 F.3d 373, 377 (9th Cir.1997)) (emphasis added). Accordingly, Defendant can meet its burden as long as the jurisdictional amount is either "facially apparent" from the complaint or is shown to be "more likely than not"

by the facts alleged in the removal petition. *See id.; see also Valdez v. Allstate Ins. Co.,* 372 F.3d 1115, 1117 (9th Cir.2004) (noting that the Ninth Circuit has "endorsed the Fifth Circuit's practice of considering facts presented in the removal petition as well as any summary-judgement-type evidence relevant to the amount in controversy at the time of removal" (citation and internal quotation marks omitted)); *Bosinger v. Phillips Plastics Corp.,* 57 F.Supp.2d 986, 989 (S.D.Cal.1999) (noting that where the complaint does not specify an amount of damages, "the underlying facts supporting removal must be stated in the removal notice itself").

In this case, Defendant's Notice of Removal adequately alleges the underlying facts to show it is "more likely than not" that the amount "in controversy" exceeds $5,000,000. *See Korn v. Polo Ralph Lauren Corp.,* 536 F.Supp.2d 1199, 1205 (E.D.Cal.2008) ("The ultimate inquiry is what amount is put 'in controversy' by the plaintiff's complaint, not what a defendant will actually owe." (citations omitted)). First, Defendant points to Plaintiff's claim for violation of California Labor Code § 510, which requires the payment of overtime premium for hours worked in excess of eight in a given workday. (Notice of Removal, at 3.) Defendant notes that it currently employs 303 full-time employees who meet the proposed class definition. (*Id.* at 3; *see also* Jackson Decl., ¶ 4.) According to Defendant, if those employees, earning on average $14.50 per hour, worked 30 minutes of overtime per day over four years, the unpaid overtime owed on the overtime claim would exceed $3,000,000.[FN1] (Notice of Removal, at 3.) Second, Defendant points to Plaintiff's claim for failure to timely pay termination wages under California Labor Code § 203, for which the penalty is 30 days of wages. (*Id.*) Defendant notes that it has employed approximately 1,385 account representatives and employees in equivalent positions since April 2006. who had their employment with GC Services terminated. (*Id.; see also* Jackson Decl., ¶ 5.) According to Defendant, the potential recovery by those employees would be approximately

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2721271 (S.D.Cal.)
**(Cite as: 2010 WL 2721271 (S.D.Cal.))**

$4,800,000.FN2 (Notice of Removal, at 3.) Together, the recovery on just these two claims would be approximately $7,800,000. Accordingly, Defendant provided sufficient underlying facts to demonstrate that the combined amount "in controversy" exceeds $5,000,000. *See Rippee v. Boston Market Corp.,* 408 F.Supp.2d 982, 986 (S.D.Cal.2005) (concluding that "an estimate of the amount of unpaid overtime in *controversy* can be calculated using information from Defendant's own records"). FN3

> **FN1.** 0.5 hours * 1.5 * $14.50 (hourly rate) * 235 per year * 4 years * 303 full-time employees = $3,097,417.50.

> **FN2.** $14.50 (hourly rate) * 8 hours per day * 30 days * 1,385 separated employees = $4,819,800.

> **FN3.** Contrary to Plaintiff's arguments, Defendant's allegations in the Notice of Removal are more than "magical incantations," *see Abrego,* 443 F.3d at 689, "mere averment[s]," *see Gaus,* 980 F.2d at 567, or "conclusory allegations," *see Singer,* 116 F.3d at 377, that the Ninth Circuit held are insufficient to meet the defendant's burden of showing that the amount in controversy "more likely than not" exceeds the jurisdictional requirement. Moreover, precise certainty is not required for Defendant to meet its burden. *See Korn,* 536 F.Supp.2d at 1204-05 ("[A] removing defendant is *not* obligated to 'research, state, and prove the plaintiff's claims for damages.' " (quoting *McCraw v. Lyons,* 863 F.Supp. 430, 434 (W.D.Ky.1994)).

**\*4** For the foregoing reasons, because the underlying facts alleged in the Notice of Removal demonstrate that it is "more likely that not" the amount in controversy exceeds $5,000,000 as required by CAFA, *see* 28 U.S.C. § 1332(d)(2), the Court **DENIES** Plaintiff's motion to remand.

**II. Defendant's motion to dismiss, transfer, or stay**

Defendant argues that in light of the duplicative nature of the claims and of the putative classes in the *Gardner* and *Beasely* actions, dismissal of the later-filed *Gardner* lawsuit is warranted under the first-to-file rule. The "first to file" rule is a "generally recognized doctrine of federal comity" that allows a district court to decline jurisdiction over an action "when a complaint involving the same parties and issues has already been filed in another district." *Pacesetter Sys., Inc. v. Medtronic, Inc.,* 678 F.2d 93, 94-95 (9th Cir.1982) (citations omitted). Pursuant to the rule, "when two identical actions are filed in courts of concurrent jurisdiction, the court which first acquired jurisdiction should try the lawsuit and no purpose would be served by proceeding with a second action." *Id.* However, this rule is "not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration." *Id.*

In applying the "first to file" rule, the court looks to three threshold factors: (1) the chronology of the two actions; (2) the similarity of the parties; and (3) the similarity of the issues. *See Alltrade, Inc. v. Uniweld Products, Inc.,* 946 F.2d 622, 625 (9th Cir.1991). If the case meets the requirements of the "first to file" rule, the court has the discretion to transfer, stay, or dismiss the action. *See id.* at 628-29. However, even where the rule would otherwise apply, the court also has the discretion to "dispense" with its application "for reasons of equity." *Id.* at 628.

*A. Chronology of the two actions*

In this case, the first factor is clearly satisfied because the *Gardner* action was filed after both the *Easley* and *Meyers* complaints were filed, and after they were consolidated in the Eastern District of Missouri in the form of the *Beasely* action.

*B. Similarity of the parties*

Defendant, however, failed to establish there is a similarity of the parties such that would warrant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2721271 (S.D.Cal.)
**(Cite as: 2010 WL 2721271 (S.D.Cal.))**

the application of the "first to file" rule. For the rule to apply, the actions need not be identical. *Byerson v. Equifax Info. Servs., LLC,* 467 F.Supp.2d 627, 635-36 (E.D.Va.2006); *Inherent.com v. Martindale-Hubbell,* 420 F.Supp.2d 1093, 1097 (N.D.Cal.2006). Thus, the rule only requires the parties be "substantially similar." *Inherent.com,* 420 F.Supp.2d at 1097; *accord Byerson,* 467 F.Supp.2d at 635-36 (requiring a "substantial overlap" with respect to the parties). Moreover, in the context of a class action, "the classes, and not the class representatives, are compared." *Adoma v. Univ. of Phoenix, Inc.,* 711 F.Supp.2d 1142, 2010 WL 1797263, at *5 (E.D.Cal.2010) (citing *Ross v. U.S. Nat'l Ass'n,* 542 F.Supp.2d 1014, 1020 (N.D.Cal.2008)).

**\*5** In the present case, as Plaintiff correctly notes, the *only* identical party between the two actions is Defendant GC Services. As for the putative classes, there is no overlap at all, much less "substantial overlap." *See Byerson,* 467 F.Supp.2d at 635-36. Plaintiff's complaint here seeks to represent a putative class of employees who worked in Defendant's two call centers *in California.* (Def.Motion, Ex. I, ¶ 17.) The *Beasely* action in the Eastern District of Missouri, on the other hand, specifically *excludes* all California employees from the putative class. (*Id.,* Ex. A, ¶ 7.)

Defendant's arguments to the contrary are not persuasive. Although Defendant argues the actions were brought by the same attorneys against the same defendant, it fails to cite any case law as to why this would be relevant in this context. Similarly, the fact that the actions *before amendment* might have involved a "substantial overlap" between the parties is not dispositive. *See, e.g., Ross,* 542 F.Supp. at 1020 (denying defendant's motion to dismiss despite the fact that both actions were "brought against the same defendant by the same counsel, and both *initially alleged* putative classes of U.S. Bank employees in California, Oregon, and Washington" (emphasis added)). Rather, the focus is on the composition of the two classes at

this point. *See, e.g., Walker v. Progressive Cas. Ins. Co.,* No. C03-656R, 2003 WL 21056704, at *2 (W.D.Wash. May 9, 2003) ("Whatever plaintiffs' stated intentions, the fact remains that they are currently parties in the *Camp* action, and it is this fact, not plaintiffs' future plans, that the court finds controlling."). Accordingly, in this case, the second factor of the "first to file" rule is not met because there is no longer any substantial similarity of parties between the two actions. *See Inherent.com,* 420 F.Supp.2d at 1097.

*C. Similarity of the issues*

Defendant also failed to establish there is a similarity of the issues between these two actions. As with the parties, the issues in the two actions need not be identical, as long as they are "substantially similar." *Adoma,* 2010 WL 1797263, at *5; *Inherent.com,* 420 F.Supp. at 1097.

Defendant argues the issues in the *Gardner* and *Beasely* actions are substantially similar because "[b]oth lawsuits allege that GC Service's call center employees performed various tasks offthe-clock, such as logging into computer applications before and after their scheduled shift and working during meal breaks." (Def. Motion, at 7 (internal citations omitted).) However, this is a false similarity. As Plaintiff correctly notes, while the *Beasely* complaint alleges only a violation of the FLSA, (*see* Def. Motion, Ex. A, ¶¶ 21-29), the complaint in this case only alleges five causes of action under California state law, (*see id.,* Ex. I, ¶¶ 27-52). This distinction results in significant differences between the claims asserted and remedies requested in the two actions.

**\*6** First, while the *Beasely* action only seeks relief for Defendant's failure to pay overtime wages, (*see* Def. Motion, Ex. A, ¶¶ 11-12), the present action also seeks relief for Defendant's failure to pay straight-time wages (Count I), Defendant's failure to pay compensation due and owing at termination (Count III), and Defendant's violation of California Business and Professions Code § 17200 et seq. (Count IV), (*see id.,* Ex. I, ¶¶ 27-30,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2721271 (S.D.Cal.)
**(Cite as: 2010 WL 2721271 (S.D.Cal.))**

37-52).

Second, the certification process is different for the two actions. Under Rule 23 of Federal Rules of Civil Procedure, once the Court conditionally certifies a class, all the prospective class members are a part of the class unless they affirmatively *opt-out* of the action. *See* FED. R. CIV. P. 23(c)(2), (c)(3). On the other hand, collective actions brought under the FLSA require that individual members *opt in* by filing a written consent. *See* 29 U.S.C. § 216(b) ("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.").

Finally, the remedies available in two actions are different. By way of example only, while the FLSA mandates overtime to be calculated on a weekly basis at one and one-half of the regular pay rate, California law mandates overtime to be paid for more than eight hours worked in any workday or for any time worked on the seventh day in a workweek, and provides for double rate whenever an employee works more than twelve hours in one workday or more than eight hours on the seventh day. *Compare* 29 U.S.C. § 207(a)(1) with CAL. LABOR CODE § 510(a).

The cases cited by Defendant do not mandate a different conclusion. Thus, in *Jumapao v. Washington Mutual Bank, F.A.,* No. 06-CV-2285 W(RBB), 2007 WL 4258636 (S.D.Cal. Nov.30, 2007), the court granted the motion to transfer where both actions alleged claims under the FLSA *and* California state law, and where the first action involved 249 individuals from California. Similarly, in *Walker,* 2003 WL 21056704, the court granted a motion to dismiss based on prior action where the two named plaintiffs in the second action were also parties to the first action, there were 39 other class members from the first action that qualified as members of the plaintiffs' proposed class in the second action, and the FLSA and the Washington Minimum Wage Act contained "materially identical definitions of the administrative capacity exemption." Finally, in

*Adoma,* 2010 WL 1797263, the court found the "first to file" rule to apply where the proposed classes in both actions sought to represent at least some of the same individuals and both actions raised FLSA claims, although the second action also alleged an additional unpaid overtime theory.

Accordingly, in this case, because the claims alleged in the two actions are not "substantially similar," the third factor also weighs against the application of the "first to file" rule.

**D. Exception**
**\*7** Even if the factors somehow favored the application of the "first to file" rule, the Court could still exercise its discretion to "disregard it in the interests of equity." *Adoma,* 2010 WL 1797263, at \*6 . The Ninth Circuit has explained that the application of the "first to file" should not be "mechanical." *See Alltrade,* 946 F.2d at 627-28. According to the court, "district court judges can, in the exercise of their discretion, dispense with the first-filed principle for reasons of equity." *Id.* at 628. Thus, in *Adoma,* although the district court found all three factors to be satisfied, the court exercised its discretion not to apply the rule where the second action involved additional claims and different relief under California law. 2010 WL 1797263, at ----6-7. According to the court:

Further, plaintiff brings additional theories of recovery. Moreover, the fact that plaintiff also seeks relief under California state law, which requires entirely different calculations for overtime compensation, demonstrates that judicial resources will not be significantly conserved. California courts will, if plaintiff is successful, notice a class action concerning overtime pay, and these class members will be required to participate in two separate claims for overtime compensation.

*Id.* at \*7. The same is true here. Even if all of the "first to file" factors weighed in favor of its application (which they do not), in light of the distinct California state claims raised and relief requested in the *Gardner* action, the application of the "first to

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 2721271 (S.D.Cal.)
**(Cite as: 2010 WL 2721271 (S.D.Cal.))**

file" rule would not result in any significant conservation of judicial resources.

For the foregoing reasons, the Court **DENIES** Defendant's motion to dismiss or, in the alternative, transfer or stay the present action based on the "first to file" rule.

### CONCLUSION

Accordingly, the Court **DENIES** Plaintiff's motion to remand and **DENIES** Defendant's motion to dismiss, transfer, or stay.

**IT IS SO ORDERED.**

S.D.Cal.,2010.
Gardner v. GC Services, LP
Not Reported in F.Supp.2d, 2010 WL 2721271 (S.D.Cal.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

# TAB 5

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)
**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

H

Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas,
Texarkana Division.
ICHL, LLC d/b/a Intellectual Capital Holdings
Limited, Plaintiff
v.
NEC CORPORATION OF AMERICA, et al., Defendants
ICHL, LLC d/b/a Intellectual Capital Holdings
Limited, Plaintiff
v.
BFG Technologies, Inc., et al., Defendants
ICHL, LLC d/b/a Intellectual Capital Holdings
Limited, Plaintiff
v.
LG Electronics, Inc., et al., Defendants.

Nos. 5:08CV65, 5:08CV175, 5:08CV177.
June 19, 2009.

### MEMORANDUM ORDER

DAVID FOLSOM, District Judge.

**\*1** The above-entitled and numbered civil action was heretofore referred to United States Magistrate Judge Caroline M. Craven pursuant to 28 U.S.C. § 636. The Report of the Magistrate Judge which contains her proposed findings of fact and recommendations for the disposition of such action has been presented for consideration. No objections to the Report and Recommendation were filed. The Court is of the opinion that the findings and conclusions of the Magistrate Judge are correct. Therefore, the Court hereby adopts the Report of the United States Magistrate Judge as the findings and conclusions of this Court. Accordingly, it is

**ORDERED** that Defendant BFG Technologies, Inc., EVGA Corporation, and PNY Technologies, Inc.'s Joint Motion to Transfer Venue (Dkt. No. 31); and ICHL I and III Defendants' Joint Motion to Transfer Venue (Dkt.Nos.57, 50) are

DENIED.

### REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE

CAROLINE M. CRAVEN, United States Magistrate Judge.

The above-referenced case was referred to the undersigned United States Magistrate Judge for pre-trial purposes in accordance with 28 U.S.C. § 636. Before the Court are the following: (1) Defendant BFG Technologies, Inc., EVGA Corporation, and PNY Technologies, Inc.'s Joint Motion to Transfer Venue (Docket Entry # 31); and (2) ICHL I and III Defendants' Joint Motion to Transfer Venue (Docket Entry # s 57, 50). The Court, having reviewed the relevant briefing and hearing arguments of counsel May 19, 2009, recommends Defendants' motions to transfer venue be **DENIED.**[FN1]

> FN1. There is a split of authority as to whether a motion to transfer venue is one that a magistrate judge may hear and determine, or only recommend an appropriate disposition under the statute governing the authority of a United States Magistrate Judge. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72; *Beavers v. Express Jet Holdings, Inc.,* 421 F.Supp.2d 994, 995 (E.D.Tex.2005) (J. Hines) (*compare, e.g., White v. Abco Eng'g Corp.,* 199 F.3d 140, 142 (10th Cir.1999); *Paoa v. Marati,* 2007 U.S. Dist. LEXIS 94856, 2007 WL 4563938 (D.Haw. Dec. 28, 2007); *Lu v. Lu,* 2007 U.S. Dist. LEXIS 67545 (E.D.N.Y. Sept. 12, 2007); *Vanmeveren v. Int. Bus. Machines Corp.,* 2055 U.S. Dist. LEXIS 38527, 2005 WL 3543179 (D.Kan. Dec. 27, 2005); *Meier v. Premier Wine & Spirits, Inc.,* 371 F.Supp.2d 239, 244 (E.D.N.Y.2005); *McEvily v. Sunbeam-Oster Co., Inc.,* 878 F.Supp. 337, 340 (D.R.I.1994); *O'Brien v. Goldstar Technology, Inc.,* 812 F.Supp. 383 (W.D.N.Y.1993); *Holmes v. TV-3, Inc.,*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)
**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

141 F.R.D. 697 (W.D.La.1991) (each holding that magistrate judge has authority to order a change of venue, subject to the clearly erroneous standard of review by the District Court), with *Beavers,* 142 F.Supp.2d at 995-96; *Campbell v. United States Dist. Ct.,* 501 F.2d 196 (9th Cir.1974); *Outlast Technologies, Inc. v. Frisby Technologies, Inc.,* 298 F.Supp.2d 1112 (D.Colo.2004) (each holding that ordering a change of venue is dispositive). In absence of governing circuit precedent, the undersigned elects to submit a report and recommendation subject to *de novo* review rather than a final order on the motion. *See Beavers* 421 F.Supp .2d at 995-96. This approach allows the parties to argue and the presiding District Judge to determine whether to review the undersigned's opinion under a *de novo* or clearly erroneous standard of review. *Id.* at 996.

## I.
## BACKGROUND

Plaintiff ICHL, LLC ("ICHL" or "Plaintiff") has filed three separate patent infringement lawsuits against three groups of defendants ("Defendants"), alleging infringement of United States Patent 4,884,631 (the "'631 patent"). The defendants in the second suit filed by Plaintiff, BFG Technologies, Inc., EVGA Corporation, and PNY Technologies, Inc. ( *"ICHL II* Defendants") moved this Court under 28 U.S.C. § 1404(a) to transfer venue to the United States District Court for the Central District of California. Subsequently, the defendants in the first suit, Sony Electronic, Inc., Sony Computer Entertainment America, Inc., and Lenovo, (United States) Inc. ( *"ICHL I* Defendants"), and the defendants in the third suit, Mitsubishi Digital Electronics America, Inc., Samsung Electronics America, Inc., and Toshiba America Consumer Products, LLC ( *"ICHL III* Defendants") filed a joint motion to transfer pursuant to 28 U.S.C. § 1404(a), also seeking a transfer of this case to the United States District Court for the Central District of California.

## II.
## DEFENDANTS' MOTIONS TO TRANSFER

In their motions to transfer this case to the Central District of California, Defendants assert the overwhelming majority of non-party witnesses, party witnesses, documents, and physical evidence is located in or near the Central District of California. According to Defendants, none of the parties, witnesses, or documents are located in the Eastern District of Texas.

**\*2** In response, Plaintiff asserts it has a direct connection with the Eastern District of Texas, and it would be greatly inconvenienced by having to litigate in a forum more than one thousand miles away from its home. Plaintiff focuses on the fact that the underlying dispute in this case has a nationwide, if not global, scope as opposed to a regional dispute focused in or near the Central District of California. Thus, Plaintiff contends Defendants are unable to satisfy their burden of showing good cause that a transfer is justified.

## III.
## APPLICABLE LAW

**A. 28 U.S.C. § 1404(a)**

Twenty-eight U.S.C. § 1404(a) provides, "for the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." The defendant must first demonstrate that the plaintiff could have brought the action in the transferee court initially. *In re Volkswagen AG,* 371 F.3d 201, 203 (5th Cir.2004) ( *In re Volkswagen AG* ). The defendant moving to transfer venue must show "good cause" for transfer. *In re Volkswagen of America, Inc.,* 545 F.3d 304, 315 (5th Cir.2008) (en banc) (*In re Volkswagen* ). "When viewed in the context of § 1404(a), to show good cause means that a moving party, in order to support its claim for a transfer, must satisfy the statutory requirement and *clearly demonstrate* that a transfer is '[f]or the convenience of parties and witnesses, in the interest of justice .' " *Id.*

In determining whether to grant a motion to

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)

**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

transfer under section 1404(a), a district court must balance the private convenience interests of the litigants and the public interests in the fair and efficient administration of justice. *See Koehring Co. v. Hyde Const. Co.,* 324 F.2d 295, 297 (5th Cir.1963) (*citing Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947));[FN2] *see also In re Volkswagen,* 545 F.3d at 315. The private interest factors include "(1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for willing witnesses; and (4) all other practical problems that make a trial of a case easy, expeditious, and inexpensive." *In re Volkswagen,* 545 F.3d at 315, *citing In re Volkswagen AG,* 371 F.3d 201, 203 (5th Cir.2004). The last catch-all private interest factor has been applied in this Court to include the plaintiff's choice of forum, the possibility of delay and prejudice if transfer is granted, and the place of the alleged wrong. *Monster Cable Prods., Inc. v. Trippe Mfg. Co.,* 2008 WL 2492060, *1, *4 (E.D.Tex.2008); *LG Elecs., Inc. v. Hitachi, Ltd.,* 2007 WL 4411035, *2 (E.D.Tex.2007).

> FN2. The Court points out that *Gilbert* involved a common law *forum non conveniens* issue which is to be distinguished from a transfer under § 1404. District courts are given greater discretion to transfer in § 1404 cases than they are to dismiss in *forum non conveniens* cases. *Norwood v. Kirkpatrick,* 349 U.S. 29, 32, 75 S.Ct. 544, 99 L.Ed. 789 (1955). *Gilbert* merely articulated the public and private interest factors to be considered.

The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *In re Volkswagen,* 545 F.3d at 315, *citing In re Volkswagen AG,* 371 F.3d at 203. While the *Gilbert* factors are appropriate for most cases, they are not necessarily exhaustive or exclusive. *In re Volkswagen,* 545 F.3d at 315. No single factor is of dispositive weight. *Id., citing Action Indus., Inc. v. U.S. Fid. & Guar. Corp.,* 388 F.3d 337, 340 (5th Cir.2004). The court should engage in a case-by-case consideration of convenience and fairness. *See Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 29, 108 S.Ct. 2239, 101 L.Ed.2d 22 (1988).

**\*3** The Fifth Circuit in *In re Volkswagen* recently noted that the § 1404(a) standard for transfer of venue was intended to be less exacting than the common law forum non conveniens doctrine adopted by the Supreme Court in *Gilbert,* which resulted in dismissal as opposed to a mere transfer of venue. *In re Volkswagen,* 545 F.3d at 313-14. Therefore, a movant is no longer required to show that the § 1404(a) factors "substantially outweigh the plaintiff's choice of venue." *Id.* at 314-15. Rather, "[w]hen the movant demonstrates that the transferee venue is clearly more convenient ... it has shown good cause and the district court should therefore grant the transfer," even though the plaintiff has chosen the present venue. *Id.* at 315.

**B. Case Law**

Given the large number of recent decisions regarding motions to transfer venue in patent cases filed in this district, the Court finds a review of the relevant case law would be beneficial. Several courts in the Eastern District of Texas have applied the Fifth Circuit's recent precedent from *In re Volkswagen,* 545 F.3d 304 (5th Cir.2008) (en banc), in patent cases to resolve motions seeking to transfer venue under 28 U.S.C. § 1404(a). These cases reveal that the central question is whether or not the underlying dispute is focused on some localized region away from the Eastern District of Texas.

In December of 2008, the court denied the defendants' motion to transfer venue in *J2 Global Comm., Inc. v. Protus IP Solutions,* 2008 WL 5378010 (E.D.Tex. Dec.23, 2008) ("*J2 Global I* "). The defendants in this patent case had not offered

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)

**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

Page 4

any specific examples of documents or other evidence which were located in the proposed transferee forum, the Central District of California, so the first private interest factor weighed against transfer. *Id.* at *3. Defendants had not demonstrated any need for compulsory process in California to secure witnesses so the second factor also weighed against transfer. *Id.* With regard to the third and fourth private interest factors, the defendants pointed out that the plaintiff's principal place of business was in California; defendant Easylink's principal place of business was in Georgia, and defendant Captaris' principal place of business was in Washington. *Id.*

The defendants also specified that one potential non-party witness, one of the inventors of the patents in suit, resided in the Central District of California. *Id.* The plaintiff countered that the other inventor resided in Washington, D.C. *Id.* The court noted the Eastern District of Texas is "roughly equidistant between California and Washington D.C., [and] this District would seem to be a more convenient location than California." *Id.* The court identified the geographic spread of witnesses between east and west coasts to explain why California was not a clearly more convenient forum than Texas for resolving that dispute. *Id.* at *5-*6. Regarding the public interest factors, the court held they were either neutral or weighed against transfer. *Id.* at *6-*7.

**\*4** Approximately one week after the *J2 Global* decision, the Federal Circuit Court of Appeals issued its decision in *In re TS Tech USA Corp.,* 551 F.3d 1315 (Fed.Cir.2008) ( *"TS Tech"* ). The plaintiff was a Delaware corporation with its principal place of business in Michigan. Two of the three defendants were incorporated under the laws of Ohio and had principal places of business in Ohio. The third defendant was a Canadian corporation with its principal place of business in Canada. *Id.* at 1318, n. 1. The Federal Circuit held that the district court "clearly abused its discretion in refusing to transfer the case despite no connection between the case and the Eastern District of Texas

except [the plaintiff's] decision to file [the] suit in that venue." *Id* . at 1318.

The Federal Circuit pointed out that none of the parties had any connection with the Eastern District and that, instead, "the vast majority of identified witnesses, evidence, and events leading to this case involve Ohio or its neighboring state of Michigan." *Id* . at 1321. The Federal Circuit also noted that the district court had concluded that the public interest factor of having localized interests decided at home weighed against transfer-that the citizens of the Eastern District of Texas had a "substantial interest" in having the case tried locally because several of the vehicles were sold in the Eastern District. *Id.* The Federal Circuit disagreed, stating the "vehicles containing TS Tech's allegedly infringing headrest assemblies were sold throughout the United States, and thus the citizens of the Eastern District of Texas have no more or less of a meaningful connection to this case than any other venue." *Id.* So, the Federal Circuit granted the defendants' petition for writ of mandamus and directed the district court to transfer the case to the Southern District of Ohio. *Id.* at 1323.

After the Federal Circuit delivered its *TS Tech* opinion, the defendants in *J2 Global* asked the court to reconsider its opinion. On rehearing, the court denied the defendants' motions for reconsideration. The court further explained that transfer to California would not be more convenient given that the likely witnesses came from eighteen different states and provinces and five foreign countries. *J2 Global Comm. v. Protus IP Solutions,* Cause Nos. 6:08-cv-00211;   6:08-cv-262;   6:08-cv-263 (E.D.Tex. Feb. 20, 2009) ( *"J2 Global I"* ) at 7-8 (distinguishing case from other "cases where all of the parties and witnesses are localized in one general geographic area").

In January of 2009, two courts in the Eastern District transferred cases but emphasized that the plaintiffs did not have any connection with the Eastern District. Instead, the relevant events and evidence were located in and around the transferee

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)
**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

forum. In *Odom v. Microsoft Corp.,* 596 F.Supp.2d 995 (E.D.Tex. Jan.30, 2009), the court observed that the case was significantly localized in the Northwest. The plaintiff resided in Oregon, and the defendant resided in Washington. *Id.* at 998. Thus, both parties were residents of the Northwest. Additionally, Microsoft's equitable defenses arose out of conduct and contracts in the Northwest. *Id.* at 1001, 1003. No Texas resident was a party to this litigation, nor was any Texas state law cause of action asserted. *Id.* at 1003. All identified witnesses, with the possible exception of one, were located in the Northwest. *Id.* at 1002. The case was not one where witnesses were expected to be traveling from all over the country or world. *Id.* Rather, "the vast majority of identified key witnesses in the case [were] much closer to Oregon than Texas." *Id.*

**\*5** In *PartsRiver, Inc. v. Shopzilla, Inc.,* Cause No. 2:07-cv-00440, Docket Entry # 90 (E.D.Tex. Jan. 30, 2009), Chief Judge David Folsom expressly based his transfer Order on the "regional nature" of the case, pointing out that both the plaintiff and six of the seven defendants were located in California, and that most witnesses and documents would come from California and Washington. *Id.* at 4. Later, in *Novartis Vaccines and Diagnostics, Inc. v. Hoffman-La Roche, Inc., et al.,* 597 F.Supp.2d 706 (E.D.Tex. February 3, 2009), the Court denied the defendants' transfer motion, relying on the plaintiff's showing "that the relevant proof in this case is *spread throughout the nation*– as [the accused product] was developed in North Carolina, was approved by the FDA in Washington D.C., is presently manufactured in Colorado and Michigan (and Switzerland), and is sold throughout the United States." *Id.* at 4 (emphasis added). Moreover, the plaintiff was located in California, and the defendants were located in Colorado, North Carolina, and New Jersey. *Id.*

In *MHL TEK, LLC v. Nissan Motor Co., et al,* Cause No. 2-07-cv-00289 (E.D.Tex. Feb. 23, 2009), Judge T. John Ward was asked to reconsider his decision of September 10, 2008, denying the de-

fendants' motion to transfer the case to Michigan. The court concluded the "defendants ha[d] not shown that the proposed transferee forum is clearly more convenient" and therefore denied the motion to reconsider. *Id.* at 17. The plaintiff was a Texas corporation with offices in Michigan; the defendants were various foreign automobile companies and subsidiaries with their principal offices located in Virginia, Michigan, Alabama, Tennessee, Georgia, New Jersey, South Carolina, Indiana, California, Germany, Japan, and South Korea. *Id.* at 2-3.

Specifically, with regard to the defendants, the court noted that four defendants resided in Germany; three in California; two in Japan; two in South Korea; two in New Jersey; one each in Michigan, Tennessee, Alabama, Georgia, South Carolina, Indiana, and Virginia. *Id.* at 7. The court found that "this district would, in the least, be just as convenient or inconvenient to most of the defendants as the desired transferee District." *Id.* With regard to the non-party witnesses, the court noted that the relevant witnesses were spread around the country or the world. *Id.* at 10. "This is not a case where all of the witnesses are concentrated in one part of the country, close to the forum where transfer is sought to." *Id.* Accordingly, the court found that the convenience of the witnesses and cost of attendance factor was neutral. *Id.* at 11.

On March 23, 2009, the court denied the defendants' motion to transfer in *Konami Digital Entertainment Co, Ltd. et al v. Harmonix Music Systems, Inc., et al,* Cause No. 6-08-cv-00286 (E.D.Tex. March 23, 2009). The court noted that "the geographic location of physical evidence must be taken into account" but that in the *Konami* case:

**\*6** these materials are spread throughout the country and the nation, and therefore [the transferee forum] is not a clearly more convenient forum to access sources of proof for all parties. With respect to sources of proof that are purely electronic information ... it does not follow that transfer to [the transferee forum] where Defendant ... would have relevant source code would be more

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)
**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

convenient for anyone.

*Id.* at 8-9. The sources of proof originated from Massachusetts, New York, California, and Japan, where the parties had their principal places of business. *Id.* at 9. Therefore, the court found the relative ease of access to sources of proof factor neutral. *Id.* Regarding witnesses, the parties identified witnesses in Massachusetts, New York, California, New Jersey, and Japan. *Id.* at 10. Because the witnesses were located throughout the country and in Japan, the court found this factor neutral as well. *Id.* at 11.

The courts which have transferred cases have emphasized that the plaintiffs did not have any connection with the Eastern District and that, instead, the relevant evidence and witnesses were located in and around the transferee forum. The courts which have denied transfer motions have focused on the lack of a common regional geographic area in and around the proposed transferee forum where relevant documents and witnesses are located. In sum, when a dispute is national or global in its reach, courts in this district are not usually finding that any one particular forum is "clearly more convenient" than another. With these general principles in mind, the Court now considers whether Defendants have shown good cause in this case to justify a transfer to the Central District of California.

## IV.
## DISCUSSION
### A. Whether the Central District of California is a proper venue for this case

"The first issue that a district court must address in ruling on a motion to transfer under § 1404(a) is whether the judicial district to which transfer is sought qualifies under the applicable venue statutes as a judicial district where the civil action 'might have been brought.' " *In re Horseshoe Entm't,* 337 F.3d 429, 433 (5th Cir.2003). There is no question this suit originally could have been filed in the United States District Court for the Central District of California.

The Court now considers the private and public interest factors restated in *In re Volkswagen,* starting with the private interest factors which are as follows: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process to secure the attendance of witnesses; (3) the cost of attendance for and convenience of willing witnesses; and (4) all other practical problems that make a trial easy, expeditious, and inexpensive.

### B. Private Interest Factors

### 1. Relative ease of access to sources of proof

Defendants argue that transfer is appropriate because the Central District of California would provide easier access to Defendants' sources of proof. According to Defendants, defendants SEL, SCEA, Mitsubishi, EVGA, PNY, Eastcom, Mr. Rippel (the inventor), the California Institute of Technology (the assignor), Mr. Tachner (the prosecuting attorney), and non-parties Mr. Speck, Mr. Ansell, Dr. Laughton, and Mr. Edwards reside or have offices in or near the Central District of California. However, like the defendants in *J2 Global,* "other than generally referring to documents, [Defendants] have not identified any specific evidence, physical or otherwise" that is more conveniently accessible to the Central District of California. *See J2 Global II,* slip op. at 5. Plaintiff points out that the relevant documents and physical evidence are spread throughout the country. According to Plaintiff, the actual manufacture of the infringing products takes place either overseas or in New Jersey or Illinois. Plaintiff asserts financial information is maintained in the parties' offices in California (EVGA), New Jersey (PNY), Illinois (BFG), and the Eastern District of Texas (ICHL).

**\*7** Plaintiff states it is storing physical evidence of the infringing products at its offices in the Eastern District of Texas. Specifically, Robert Klinger, one of two principals of ICHL and the managing director of the company, performs his day-to-day responsibilities out of two office locations each of which is within the Eastern District.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)
**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

The primary location is his principal business office which is located at 2591 Dallas Parkway, Suite 300, Frisco, TX 75034. The other location is a home office located at 3999 Touraine Dr., Frisco, Texas 75034. Klinger Decl., ¶ 3. According to Plaintiff, other relevant documents are available online or through the United States Patent and Trademark Office.

In *Novartis,* Chief Judge David Folsom considered this factor under facts similar to this case. There, the sources of proof, like here, were many and were spread across the nation. The Court noted that while transfer to North Carolina would make access to some proof easier, access to all evidence would not necessarily be easier. 597 F.Supp.2d at 711. The Court further noted that some evidence located on the West Coast related to the development of the patented invention would be "far more difficult to reach if [the] case were transferred to the East Coast." *Id.* Therefore, the Court distinguished the *Novartis* case from both *In re Volkswagen* and *In re TS Tech* wherein the physical evidence was confined to a limited region.

Similarly, this is not a case like *In re Volkswagen* or *TS Tech* where the evidence is substantially located in or near the transferee forum. *See In re Volkswagen,* 545 F.3d at 316 (all documents relating to accident and all physical evidence in transferee forum, including crash site and other sensitive physical evidence identified by movant); *TS Tech,* 551 F.3d at 1320-21 ("all of the key witnesses" and "all of the physical evidence" in transferee forum, including bulky physical evidence identified by movant). Rather, the relevant proof is spread throughout the nation.

Importantly, Mr. Klinger stated that he has in his possession in his "Eastern District offices certain documents that are central to ICHL's claims, including documents reflecting ICHL's acquisition of the patent and analysis concerning how the accused products infringe the patents." Klinger Decl., ¶ 7. Also, when Plaintiff "bought the patent from the California Institute of Technology ("Caltech"),

it acquired Caltech's entire file containing any and all of Caltech's documents related to the patent, including correspondence with the prosecuting attorney and correspondence with Mike Kotschenreuther, a prospective licensee." *Id.* at ¶ 8. This entire file was delivered directly to Mr. Klinger's home office in the Eastern District of Texas. *Id.* Mr. Klinger also keeps physical samples of the allegedly infringing products in the Eastern District offices and in a "public storage" facility that Plaintiff rents in the Eastern District. *Id.* at ¶ 9.[FN3]

> FN3. This is not a case like *In re Genentech, Inc. and Biogen Idec, Inc.,* 2009-M901 (Fed.Cir. May 22, 2009), wherein the foreign plaintiff brought the suit in the Eastern District of Texas, "a venue which indisputably [had] no connection to any of the witnesses or evidence relevant to the cause of action." *Id.* at 1.

**\*8** Even if the Court were to ignore the fact that some relevant evidence is currently located in the Eastern District of Texas, the Court would still find the Central District of California is not a venue in which evidence is necessarily more easily accessible overall. Accordingly, this factor does not weigh in favor of transfer.

**2. Availability of compulsory process to secure the attendance of witnesses**

The second private interest factor to be considered is the availability of compulsory process to secure the attendance of witnesses. Federal Rule of Civil Procedure 45(b)(2) governs the places where a subpoena issued by a court of the United States may be served. The non-party witnesses located outside this district "are outside the Eastern District's subpoena power for deposition under FED. R. CIV. P. 45(c)(3)(A)(ii)," and any "trial subpoenas for these witnesses to travel more than 100 miles would be subject to motions to quash under FED. R. CIV. P. 45(c)(3)." *In re Volkswagen,* 545 F.3d at 316. The Fifth Circuit in *Volkswagen* noted, in considering this factor, that the venue transfer analysis is concerned with convenience, and the fact a court

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)
**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

can deny any motions to quash does not address concerns regarding the convenience of parties and witnesses. *Id.* Because there was a proper venue available that enjoyed absolute subpoena power for both depositions and trial, the Fifth Circuit in *Volkswagen* held the factor weighed in favor of transfer.

Here, Defendants assert the inventor of the '631 patent (Mr. Rippel), the assignor to Plaintiff and nearly 20-year owner of the '631 patent (Caltech), the prosecuting attorney (Mr. Tachner), and three individuals identified by Plaintiff as having knowledge of facts relating to the '631 patent, its ownership, and/or licensing (Mr. Speck, Mr. Edwards, and Mr. Ansell) are all in the Central District of California and thus outside the Eastern District of Texas' subpoena power for depositions. Defendants further assert the non-party California Institute of Technology witnesses are particularly important because they likely possess significant information relevant to the '631 patent, including laches. Finally, Defendants assert Dr. Laughton, a non-party witness identified by Plaintiff as having knowledge of facts related to the '631 patent, its ownership, and/or licensing, is also subject to compulsory process in the Central District of California even though he resides in the Northern District of California. *See Morris v. Safeco Ins. Co.,* 2008 WL 5273719, at *5 (N.D.Cal. Dec.19, 2008) ("Plaintiff erroneously assumes that the Eastern District[ ] [of California's] subpoena power could reach only those non-party witnesses who reside within 100 miles. The Eastern District[ ] [of California's] subpoena power extends throughout the state of California pursuant to Rule 45 of the Federal Rules of Civil Procedure, which provides that a subpoena may be served anywhere within the state of the issuing court if a state statute allows state-wide service of a subpoena issued by a state court of general jurisdiction. *See* Fed.R.Civ.P. 45(b)(2)(C). Section 1989 of the California Code of Civil Procedure authorizes such state-wide service.").

**\*9** Plaintiff argues Defendants "artificially restrict the scope of third-party witnesses largely to

the inventor (Wally Rippel), the prosecuting attorney (Leonard Tachner), and representatives of the inventor's employer (Caltech)," and that not surprisingly, these witnesses are geographically near each other. Plaintiff's response in Cause No. 5:08cv65, Docket Entry # 57 at pg. 9. Plaintiff states that in most patent cases, the inventor and his or her employer will typically engage a local patent attorney to prosecute the application. "If an exclusive focus were placed on this particular cluster of witnesses," according to Plaintiff, "it is hard to imagine many patent cases being tried somewhere other than the place of invention." *Id.*

The Court agrees with Plaintiff that the analysis should be broader than the seven non-party witnesses identified by Defendants. As Judge Davis explained in *Network-1 Sec. Solutions, Inc. v. D-Link Corp.:*

> The extension of the argument that venue should be based on the location of the inventors or prosecuting attorney would require that any suit involving the '930 patent be filed in New York. This is illogical since the patent venue statute does not limit venue to the districts where the inventors or prosecuting attorneys reside and is contrary to Congressional intent. Rather the statute anticipates that there are many appropriate venues in a patent case.
>
> * * *
>
> Witnesses in patent cases are typically more dispersed. There are the inventors who created the patented invention and the attorneys who prosecuted the patent application, who may or may not have ties to the plaintiff. The inventors and designers of the defendant's accused products are also important. Of immense importance, and usually unknown at the beginning of the case, are witnesses with personal knowledge of relevant prior art. Such witnesses are usually not affiliated with either party and have the possible power of proving the plaintiff's patent invalid.... Typically, witnesses in patent cases are scattered throughout

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)

**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

the country, if not the world.

433 F.Supp.2d 795, 802-03 (E.D.Tex.2006). *See also MHL,* slip op. at 9-10 (noting that the court cannot limit its consideration to just the inventor and prosecuting attorney and emphasizing importance of party witnesses and expert witnesses in convenience of parties and witnesses factor).

The record reflects not only the seven non-party witnesses identified by Defendants, but also "prior art" non-party witnesses who are spread out around the country, encompassing places such as France, Washington, D.C., and Minnesota. Garry Dec. ¶ 10. Neither the Central District of California nor the Eastern District of Texas will have subpoena power over these non-party witnesses. With respect to the "invention" witnesses, Plaintiff points out that Mr. Rippel has agreed to appear for trial and deposition in Texas without need for a subpoena. Rippel Decl. ¶ 3. Most importantly, for purposes of this factor, Plaintiff asserts that while the Caltech "licensing" witnesses are located in California, at least four different "licensing" witnesses are located in Texas. *See* Defendants' Motion to Transfer Venue in Cause No. 5:08cv65, Docket Entry # 56 at pg. 7 (identifying Winthrop A. Eastman (Houston) and Daniel Thompson (Dallas)); *see also* Garrey Decl., Ex. 4, pg. 4 (identifying IDTM (Austin)); Klinger Decl., ¶ 8 (identifying Mike Kotschenreuther (Austin)).

**\*10** At least one court in this district has held that the court has trial subpoena power over witnesses residing in the State of Texas. The court in *Mohamed v. Mazda Motor Corp.,* 90 F.Supp.2d 757, 771 (E.D.Tex.2000) stated Federal Rule of Civil Procedure 45 underwent a complete revision in 1991 to enable "the court to compel a witness found within the state in which the court sits to attend trial." *Id.* at 778. If the witness' residence or employment is more than 100 miles from the place of trial but nevertheless within the sate in which the trial sits, the Court can "command" the witness to appear at trial pursuant to subdivision (c)(3)(A)(ii).

Although the Eastern District of Texas may have the power to subpoena for trial the four identified "licensing" non-party witnesses residing in the State of Texas, the Court does not have absolute subpoena power over these witnesses for purposes of discovery. Nor does the fact, that this Court may have trial subpoena power over the four Texas non-party witnesses, address the concerns regarding the convenience of all the non-party witnesses as required by *In re Volkswagen.*

Although neither this Court nor the transferee court would enjoy absolute subpoena power in this case, a Central District of California court would have absolute subpoena power over some identified non-party witnesses. In *In re Genentech, Inc. and Biogen Idec, Inc.,* 2009-M901 (Fed.Cir. May 22, 2009), there were a substantial number of witnesses within the subpoena power of the transferee court and no witnesses who could be compelled to appear in the Eastern District of Texas. *Id.* at 10. The Federal Circuit held that the "fact that the transferee venue is a venue with usable subpoena power here weighs in factor of transfer, and not only slightly." In this case, the Court finds this factor weighs in favor of transfer.

**3. Cost of attendance for and convenience of willing witnesses**

The third private interest factor is the cost of attendance for and convenience of willing witnesses. "The court is to consider whether substantial inconvenience will be visited upon key fact witnesses should the court deny transfer." *Shoemake v. Union Pacific Railroad Co.,* 233 F.Supp.2d 828, 832 (E.D.Tex.2002). "Additionally, the convenience of non-party witnesses is accorded greater weight than that of party witnesses." *Id.*

Defendants state they have strong ties to the Central District of California, asserting as follows: (1) Sony Electronics, Inc. has its principal place of business in San Diego, California, approximately 80 miles from the Central District of California (Southern Division) courthouse (Lauwaert Decl., ¶ 2) (Singer Decl., Ex. I); (2) Sony Computer Enter-

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)

**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

tainment America Inc., has its principal place of business in Foster City, California, 408 miles from the Federal Courthouse in Santa Ana (Buchanan Decl., ¶ 2) (Singer Decl., Ex. I); (3) EVGA's principal place of business is in the Central District of California; (4) PNY maintains an office in the Central District of California; (5) Eastcom has its principal place of business in the Central District of California; and (6) Mitsubishi Digital Electronics America, Inc. has its principal place of business in the Central District of California in Irvine, California, less than 13 miles from the Santa Ana courthouse. Rogers Decl., ¶¶ 2, 7. According to Defendants, these party witnesses which may be called to testify on technical, marketing, sales, and financial topics will have an easier time attending trial in California.

**\*11** Plaintiff responds by asserting California is not clearly more convenient for all the defendants or for Plaintiff's witnesses. Specifically, *ICHL I* defendant NEC Corporation of America is based in Dallas, Texas. Garrey Decl., Ex. 5. *ICHL I* defendant Lenovo, (United States) Inc. has four operational hubs located in Beijing, China; Raleigh, North Carolina; the Republic of Singapore, and Paris, France. Singleton Decl., ¶ 2. *ICHL III* defendant Samsung Electronics America, Inc. has its principal place of business in Ridgefield Park, New Jersey. Panosian Decl., ¶ 2. *ICHL III* defendant Toshiba America Consumer Products, LLC has its principal place of business in Wayne, New Jersey. Olivero Decl., ¶ 2.

In *In re Volkswagen I,* the Fifth Circuit set a 100-mile threshold as follows: "When the distance between an existing venue for trial of a matter and a proposed venue under § 1404(a) is more than 100 miles, the factor of inconvenience to witnesses increases in direct relationship to the additional distance to be traveled." *In re Volkswagen I,* 371 F.3d at 204-05. The Fifth Circuit further stated it is an "obvious conclusion" that it is more convenient for witnesses to testify at home. *Id.* at 205. Additional "distance means additional travel time; additional

travel time increases the probability for meal and lodging expenses; and additional travel time with overnight stays increases the time which fact witnesses must be away from their regular employment." *Id.* The Eastern District of Texas is located more than 100 miles from the California witnesses identified by Defendants.

Given the national character of this lawsuit and the fact that one defendant and Plaintiff have connections with Texas, the Court finds transfer in this case would "merely reallocate inconvenience rather than lessen it." *Novartis,* 597 F.Supp.2d at 713. This is simply not a case where an out-of-state plaintiff has chosen to file suit in an arbitrary forum to which it is unconnected. Plaintiff is a Texas limited liability company. Its "official" mailing address is currently in Arlington, Texas (in the Northern District), but that is mainly a mailbox for financial documents. (Klinger Decl., ¶ 2). Plaintiff also maintains offices, personnel, documents, and storage facilities in the Eastern District of Texas. Robert Klinger, one of two principals of ICHL, maintains two office locations (including a home office and another office which is his primary business office) in Frisco, Texas, which is in Denton County in the Eastern District.

Even if the Court were inclined to disregard Plaintiff's connections to Frisco, which is located in the Eastern District of Texas, limiting its focus only to ICHL's Arlington location, the Court would still find a trial in this Court would be substantially more convenient to Plaintiff than a trial in the Central District of California, which is over 1200 miles away from Arlington. Klinger Decl., ¶ 10. More importantly, even if Plaintiff had no connection to the Eastern District of Texas, Defendants have still not failed to demonstrate that there is a localized focus of people, events, and evidence in the Central District of California as to make that venue clearly more convenient for all involved. To the contrary, this case has a national reach, such that no one particular forum can be said to be clearly more convenient than any other.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)
**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

**\*12** As noted above, Defendants themselves are located across the United States. Specifically, Defendants are located in (1) Texas, (2) California, (3) Illinois, and (4) New Jersey. Defendants admit that "key party witnesses" are located not only in California, but also in Illinois and New Jersey. What is more, Plaintiff points out that while the inventor, prosecuting attorney, and the Caltech "licensing" witnesses are in California, four other "licensing" witnesses have been identified in Texas and the prior art witnesses are spread throughout the world. Therefore, while transfer to the Central District of California may be more convenient for some party and non-party witnesses, this convenience may be offset by additional burdens placed on other party and non-party witnesses. For these reasons, the Court finds that the cost of attendance for and convenience of willing witnesses does not favor transfer to California.

**4. All other practical problems that make trial easy, expeditious and inexpensive**

In this last catch-all private interest factor, the Court has oftentimes considered the possibility of delay and prejudice if transfer is granted. Delay and prejudice associated with transfer is only relevant "in rare and special circumstances" and only if "such circumstances are established by clear and convincing evidence." *In re Horseshoe,* 337 F.3d 429, 434 (5th Cir.2003). No rare or special circumstances are presented here. The Court finds this final catch-all private interest does not weigh in favor of or against transfer.

**C. Public Interest Factors**

The "interest of justice" is also an important component of the transfer analysis. 28 U.S.C. § 1404(a). The public interest factors are: "(1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized interests decided at home; (3) the familiarity of the forum with the law that will govern the case; and (4) the avoidance of unnecessary problems of conflict of laws [or in] the application of foreign law." *Id.* The only contested public interest factors are the administrative difficulties flowing from court congestion and the local interest in having localized interests decided at home. The Court finds the other two factors to be neutral.

Defendants rely on recent Federal Judicial Caseload Statistics which indicate that cases in the Central District of California reach disposition more quickly than cases pending in the Eastern District of Texas. According to Defendants, the Central District of California's less congested docket favors transfer. Relying on more relevant "time to trial" statistics rather than "time to disposition" statistics, Plaintiff argue the time to trial is actually 3.3 months quicker in the Eastern District of Texas. Therefore, Plaintiff asserts this factor is neutral, at least.

"To the extent that court congestion is relevant, the speed with which a case can come to trial and be resolved may be a factor." *Genentech,* 2009-M901 at 13. Although the Federal Circuit did not disturb the district court's suggestion that it could dispose of the case more quickly than if the case were transferred to the Northern District of California, the court noted that the factor appeared to be the "most speculative," and "case-disposition statistics may not always tell the whole story." *Id.* at 14. In this case, the Court finds this factor is neutral, neither weighing in favor or of against transfer.

**\*13** With regard to the local interest in having localized interests decided at home, Defendants and Plaintiff both point out that no single venue possesses a uniquely meaningful connection to a patent dispute. In a suit where an allegedly infringing product is sold nationwide, the Federal Circuit has held that no one venue has "more or less of a meaningful connection to [the] case than any other venue." *In re TS Tech,* 551 F.3d 1315, 2008 WL 5397522, \*4 ("Here, the vehicles containing TS Tech's infringing headrest assemblies were sold throughout the United States, and thus the citizens of the Eastern District of Texas have no more or less of a meaningful connection to his case

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)

**(Cite as: 2009 WL 1748573 (E.D.Tex.))**

than any other venue."). Thus, this factor is also neutral.

## V.

## CONCLUSION

Defendants must show that the Central District of California is clearly more convenient for the parties and witnesses and that transfer is in the interest of justice. Carefully considering all of the relevant factors, the Court concludes that Defendants have not shown good cause to justify transfer in this case. Accordingly, the Court is of the opinion that Defendants' motions should be denied. Based on the foregoing analysis, it is hereby

**RECOMMENDED** that Defendant BFG Technologies, Inc., EVGA Corporation, and PNY Technologies, Inc.'s Joint Motion to Transfer Venue (Docket Entry # 31); and ICHL I and III Defendants' Joint Motion to Transfer Venue (Docket Entry # s 57, 50) be **DENIED.**

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge. 28 U.S.C.A. 636(b)(1)(C). Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn,* 474 U.S. 140, 148, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Rodriguez v. Bowen,* 857 F.2d 275, 276-77 (5th Cir.1988).

**SIGNED this 2nd day of June, 2009.**

E.D.Tex.,2009.
ICHL, LLC v. NEC Corp. of America
Not Reported in F.Supp.2d, 2009 WL 1748573 (E.D.Tex.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB 6

Westlaw.

Slip Copy, 2013 WL 3245957 (S.D.Tex.)
**(Cite as: 2013 WL 3245957 (S.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
S.D. Texas,
Houston Division.
Kelsey JONES, et al., Plaintiffs,
v.
XEROX COMMERCIAL SOLUTIONS, LLC, Defendant.

Civil Action No. H–13–0650.
June 26, 2013.

Lakshmi Ramakrishnan, Alfonso Kennard, Jr., Kennard Law, P.C., Houston, TX, for Plaintiffs.

Dennis Paul Duffy, Michael James Lombardino, Baker Hostetler LLP, Houston, TX, Tracey L. Ellerson, Baker Hostetler LLP, Orlando, FL, for Defendant.

### MEMORANDUM AND ORDER

NANCY F. ATLAS, District Judge.

**\*1** This wage and overtime case is before the Court on Defendant Xerox Commercial Solutions, LLC's ("Defendant") Motion to Transfer Venue (the "Motion") [Doc. # 12]. The Motion is ripe for consideration.[FN1] The Court has carefully reviewed the parties' arguments, the record, and applicable law, and **denies** Defendant's Motion to Transfer Venue at this time.

> FN1. Plaintiffs filed a Response [Doc. # 15] to which Defendant filed a Reply [Doc. # 18]. Plaintiffs then filed a Sur–Reply [Doc. # 20].

## I. BACKGROUND

### A. The Texas Lawsuit

On March 8, 2013, Plaintiffs Kelsey Jones, Denise Ewin, George W. Ivey, IV, and Seth Feinhandler filed this collective action lawsuit in the Houston Division of the Southern District of Texas seeking unpaid regular wages, unpaid overtime wages, lost wages, liquidated damages, attorneys' fees, and costs for Defendant's alleged failure to pay them and similarly situated employees minimum wage and overtime wages.[FN2] *See* Original Complaint [Doc. # 1], at 1, 10. Plaintiffs were employed by Defendant Xerox Commercial Solutions, LLC as "Customer Care Specialists" in Houston, Texas. *Id.* at 2. Plaintiffs contend that Defendant used a payment scheme called "ABC" under which employees were paid a flat rate per call plus premium pay, "which was calculated based on whether the Customer Care Specialists met certain targets for average call handling time and positive customer survey responses." *Id.* at 3. In January 2012, Plaintiffs assert that Defendant began using a payment system called "RBC" under which Customer Care Specialists were paid $9.00 per hour plus premium pay up to $14.00 per hour. *Id.* at 4. According to Plaintiffs, they were only compensated for time they were logged into Defendant's timekeeping system; they were logged out of the system by supervisors; and they were not compensated for time when the system experienced technical difficulties. *Id.* at 3–4. Plaintiffs allege that Defendant violated the FLSA by (1) failing to pay them minimum wage, (2) failing to pay time-and-a-half for hours worked beyond forty hours per week, and (3) discharging Plaintiffs in retaliation for complaining about these FLSA violations. *Id.* at 5. Plaintiffs also allege claims for breach of contract, quantum meruit, and promissory estoppel. *Id.* at 7–9.

> FN2. Daniel Narcisse and Alejandro Otero have since opted into this case. Narcisse Consent to Join [Doc. # 16]; Otero Consent to Join [Doc. # 21].

### B. The Washington Lawsuit

On October 12, 2012, a collective action lawsuit was filed in the Seattle Division of the United States District Court for the Western District of Washington alleging that Xerox Business Services

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3245957 (S.D.Tex.)
**(Cite as: 2013 WL 3245957 (S.D.Tex.))**

LLC; Livebridge, Inc.; Affiliated Computer Services, Inc.; and Affiliated Computer Services, LLC (collectively, the "Washington Defendants") violated the FLSA by failing to pay its "customer service employees" minimum wage and overtime pay through use of a payment system referred to as the "ABC" system. *See* Collective Action Complaint (the "Washington Complaint") [Exh. B to Doc. # 20], at 1–4.

Plaintiffs Kelsey Jones, Denise Ewin, and George W. Ivey, IV, and Opt-in Plaintiff Daniel Narcisse filed consents entitling them to join that lawsuit in January and February 2013.[FN3] In May 2013, these Plaintiffs filed declarations with the Washington court expressing their desire to withdraw their consent. Declarations [Exh. A to Doc. # 20]; Sur–Reply, at 3.

> FN3. *See* Ewin Consent to Join [Exh. A to Doc. # 18], at 2–5; Jones Consent to Join [Exh. B to Doc. # 18], at 2–5; Ivey Consent to Join [Exh. C to Doc. # 18], at 2–5; Narcisse Consent to Join [Exh. D to Doc. # 18], at 2–3. Plaintiff Seth Feinhandler did not consent to join the Washington lawsuit.

## II. *LEGAL STANDARD*

**\*2** Defendant argues that this case should be transferred pursuant to the "first-tofile" rule to the Western District of Washington. "The first-to-file rule is a discretionary doctrine." *Cadle Co. v. Whataburger of Alice,* 174 F.3d 599, 603 (5th Cir.1999). The Fifth Circuit has consistently held that, "when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Id.* (citing *Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950 (5th Cir.1997) ; *West Gulf Maritime Ass'n v. ILA Deep Sea Local 24,* 751 F.2d 721, 728 (5th Cir.1985)). "The first-to-file rule is 'grounded in principles of comity and sound judicial administration,' which requires 'courts of coordinate jurisdiction and equal rank [ ] to exercise care to avoid interference with each other's affairs.' " *Benavides v. Home Depot USA, Inc.,*

No. H–06–0029, 2006 WL 1406722, at \* 1 (S.D.Tex. May 19, 2006) (quoting *Cadle,* 174 F.3d at 603). "The three primary concerns of the rule are: (1) to 'avoid the waste of duplication;' (2) to 'avoid rulings which may trench upon the authority of sister courts;' and (3) to 'avoid piecemeal resolution of issues that call for a uniform result.' " *Id.* (citing *Save Power,* 121 F.3d at 950–51).

The court in which the action is second filed must focus its inquiry on whether there is "substantial overlap" between the two cases. *Cadle,* 174 F.3d at 605; *Save Power,* 121 F.3d at 950–51; *Benavides,* 2006 WL 1406722, at \* 1. The party wishing to transfer the case has the burden to prove that transfer is warranted. *See Sanofi–Aventis Deutschland GmbH v. Novo Nordisk, Inc.,* 614 F.Supp.2d 772, 777 n. 5 (E.D.Tex.2009); *VCode Holdings, Inc. v. Cognex Corp.,* No. 2:07–cv–138, 2007 WL 2238054, at \*2 (E.D.Tex. Aug.3, 2007) (citations omitted); *Buckalew v. Celanese, LTD.,* No. G–05–315, 2005 WL 2266619, at \*1 (S.D.Tex. Sept.16, 2005). "If the cases do not completely overlap, then the court considering transfer should consider whether the cases should be consolidated, the extent of the overlap, the likelihood of conflict, and the comparative advantage and interest of each forum in resolving the dispute." *Benavides,* 2006 WL 1406722, at \* 1 (citing *Save Power,* 121 F.3d at 950–51). " 'Once the likelihood of a substantial overlap between the two suits ha[s] been demonstrated, it [is][ ] no longer up to the [second filed court] to resolve the question of whether both should be allowed to proceed.' " *Cadle,* 174 F.3d at 605 (quoting *Mann Mfg., Inc. v. Hortex, Inc.,* 439 F.2d 403, 407 (5th Cir.1971)).

## III. *ANALYSIS*

Defendant contends that this case should be transferred under the first-to-file rule because the FLSA minimum wage and overtime pay issues are "substantially the same," Motion, at 5, and four Plaintiffs in this case consented to join the Washington lawsuit.[FN4] The Court is unpersuaded.

> FN4. In the alternative, Defendant argues

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 3245957 (S.D.Tex.)
**(Cite as: 2013 WL 3245957 (S.D.Tex.))**

that, if the Court is unwilling to transfer the entire case, the FLSA minimum wage and overtime pay claims should be severed and transferred. *See* Motion, at 16–17.

**\*3** First, Defendant has not provided sufficient evidence to support its contention that the claims substantially overlap. Defendant has offered no evidence that the so-called "ABC" payment program in the Washington lawsuit is the same payment program as the "ABC" program referenced in this case. Although the payment programs may share a nickname, there is no evidence that they function in the same manner or are part of a single payment practice by a single entity. Indeed, it appears from the respective plaintiffs' allegations in the two suits that the systems do not function the same. The "ABC" system in Texas is alleged to have involved the payment of a flat rate per call plus premium pay if targets for average call handling time and positive customer survey responses were met. Original Complaint, at 3. In the Washington lawsuit, the "ABC" payment system allegedly compensated employees at an hourly rate plus incentive pay based on time spent on calls with customers. Washington Complaint, at 4. Defendant also offered no evidence that the "RBC" payment program was used by any of the Washington Defendants or is at issue in the Washington case.

Additionally, there are a several unique allegations within the FLSA wage claims asserted by Plaintiffs' at bar. Although claims in both suits involve allegations that the plaintiffs were not paid for pre-shift, post-shift, and shift work outside the "ABC" system, Plaintiffs here allege additional practices that resulted in unpaid work. Plaintiffs contend that they "were frequently logged out of the time-keeping system by supervisors and others resulting in unpaid working time," and "[w]orking time of Plaintiffs was not recorded when the time-keeping system experienced technical failures or failed to load." Original Complaint, at 4. Two Plaintiffs in the case at bar, Seth Feinhandler and George W. Ivery, IV, also assert that they were in

"performance coach" positions "where they were required to be away from their work stations to assist other Customer Care Specialists with customer calls" and that they were not paid for the time spent coaching other Customer Care Specialists. Original Complaint, at 4. There are no similar allegations in the Washington complaint. Thus, Defendant has not established that the FLSA minimum wage and overtime pay claims substantially overlap with those in the Washington lawsuit. Defendant simply has failed to show that problems will arise if the two courts should issue inconsistent rulings. *See Buckalew,* 2005 WL 2266619, at \*3.

Plaintiffs here also raise several causes of action independent from their FLSA claims. In *Buckalew v. Celanese, LTD,* the court explained that claims of retaliation, intentional infliction of emotional distress, and harassment differentiated the second filed case from the first. *Id.* at \*3. Here, Plaintiffs allege claims for retaliation under the FLSA and common law claims for breach of contract, quantum meruit, and promissory estoppel. Original Complaint, at 7–9. No comparable claims are presented in the Washington lawsuit. Consolidating the two lawsuits therefore would not avoid duplication, piecemeal resolution, or trenching upon the authority of sister courts as to these issues. Indeed, the facts and legal issues raised by Plaintiffs' FLSA minimum wage and overtime pay claims are distinct from Plaintiffs' FLSA retaliation claims.

**\*4** Further, significantly, Defendant does not establish that substantial overlap exists between either the plaintiffs or the defendants in the two lawsuits. "The first-to-file rule does not require identical parties, but the fact that the parties are different cuts against an argument for substantial overlap." *Buckalew,* 2005 WL 2266619, at \*3 (explaining that there was not substantial overlap, *inter alia,* because although the defendants in the two lawsuits were the same, the plaintiffs were not). Defendant has offered no evidence that it is affiliated with any of the Washington Defendants.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 4

Slip Copy, 2013 WL 3245957 (S.D.Tex.)
**(Cite as: 2013 WL 3245957 (S.D.Tex.))**

Defendant is a foreign limited liability company registered in Las Vegas, Nevada. Assumed Name Certificate [Exh. A to Doc. # 15], at 2; Business Organization Inquiry for Xerox Commercial Solutions, LLC ("Organizational Inquiry") [Exh. A to Doc. # 15], at 3. Xerox Business Services, LLC [FN5] is a Delaware limited liability company; Livebridge, Inc. is an Oregon corporation; Affiliated Computer Services, Inc. is a Delaware corporation; and Affiliated Computer Services, LLC is a Delaware limited liability company. Washington Complaint, at 2–3.

> FN5. The Washington complaint reveals that Xerox Business Services, LLC is affiliated with or acquired the other Washington Defendants. Washington Complaint, at 3–4.

In addition, Plaintiffs are no longer a part of the Washington lawsuit. Plaintiffs each have withdrawn his or her consent to join that suit. Declarations [Exh. A to Doc. # 20]; Sur–Reply, at 3. Accordingly, on the record before this Court, there is no evidence that the parties in the Washington lawsuit overlap with the parties in this case at all.

Finally, the Houston Division of the United States District Court for the Southern District of Texas has a greater interest in resolving this dispute. Plaintiffs now seek a much narrower collective action involving only the Customer Care Specialists currently or formerly employed in Houston, Texas. *See* Oral Argument Recording of May 20, 2013 Hearing. The witnesses and records related to Plaintiffs' claims are in Houston, Texas. The case also involves local citizens who chose Houston as the forum for their dispute. It is a well-established ruled that "the plaintiff's choice of forum is generally entitled to great deference." *Buckalew, 2005 WL 2266619, at *3* (citing *Speed v. Omega Protein, Inc.,* 246 F.Supp.2d 668, 672 (S.D.Tex.2003)). Accordingly, the Court denies Defendant's Motion to Transfer Venue.

**IV. *CONCLUSION***

On this record, Defendant has failed to establish that there is a substantial overlap between the two suits that likely will result in conflicting rulings. It is therefore

**ORDERED** that Defendant's Motion to Transfer Venue [Doc. # 12] is **DENIED without prejudice.**

S.D.Tex.,2013.
Jones v. Xerox Commercial Solutions, LLC
Slip Copy, 2013 WL 3245957 (S.D.Tex.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB 7

Westlaw.

Page 1

Not Reported in F.Supp.2d, 2011 WL 2600600 (E.D.Tex.)
**(Cite as: 2011 WL 2600600 (E.D.Tex.))**

Only the Westlaw citation is currently available.

United States District Court,
E.D. Texas,
Beaumont Division.
Getzell Johnson MURRELL, Sr.
v.
Carl CASTERLINE, et al.

Civil Action No. 1:10cv794.
June 29, 2011.

Getzell Johnson Murrell, Sr., Tucson, AZ, pro se.

*MEMORANDUM OPINION REGARDING TRANSFER*
EARL S. HINES, United States Magistrate Judge.
**\*1** Plaintiff Getzell Johnson Murrell, Sr., an inmate confined at the United States Penitentiary in Tucson, Arizona, proceeding *pro se,* brings this lawsuit against Carl Casterline (former warden of the United States Penitentiary in Pollock, Louisiana), Robert Tapia (current warden of the United States Penitentiary in Pollock, Louisiana), and correctional officers Cindy Pile, Steve Aycock, Harris Hatchett, Lee Phillips, Frederick Jefferson, M. Cannon, and Lane Gremillion, all employed at the United States Penitentiary in Pollock, Louisiana.

The above-styled action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636 and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to the United States Magistrate Judge for findings of fact, conclusions of law, and recommendations for the disposition of the case.

*Factual Background*
Plaintiff filed this action in the United States District Court for the Western District of Louisiana on February 7, 2003, alleging various constitutional violations concerning the conditions of his confinement. In his only remaining claim, plaintiff alleges

the above-referenced defendants were deliberately indifferent to his serious medical needs by deliberately exposing him to environmental tobacco smoke ("ETS") through failing to enforce the prison smoking policies and denied him proper medical care while he was incarcerated at the federal prison in Pollock, Louisiana.

All of the defendants named in this action are, or were, employed at the United States Penitentiary in Pollock, Louisiana. Additionally, the incidents complained of in this case occurred in Pollock, Louisiana. Further, plaintiff filed his claims in the United States District Court for the Western District of Louisiana. This action, however, was transferred from the United States District Court in the Western District of Louisiana to this court on motion by the defendants to transfer venue based on the "first-to-file" rule.

*Analysis*
*First–to–File Rule*
The first-to-file rule "requires federal district courts—courts of coordinate jurisdiction and equal rank—to exercise care to avoid interference with each other's affairs." *West Gulf Maritime Ass'n v. H.A. Deep Sea Local 24,* 751 F.2d 721, 728 (5th Cir.1985). The Fifth Circuit recognizes the first-to-file rule based on "principles of comity and sound judicial administration." *Save Power Ltd. v. Syntek Fin. Corp.,* 121 F.3d 947, 950 (5th Cir.1997) .

"Under the first-to-file rule, when related cases are pending before two federal courts, the court in which the case was last filed may refuse to hear it if the issues raised by the cases substantially overlap." *Cadle Co. v. Whataburger of Alice, Inc.,* 174 F.3d 599, 603 (5th Cir.1999) (citing *Save Power,* 121 F.3d at 950; *West Gulf Maritime Ass'n,* 751 F.2d at 728). Completely identical parties are not required; however, the first-to-file rule does not apply when there is merely some relation between the first and subsequently filed actions—the crucial inquiry is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 2

Not Reported in F.Supp.2d, 2011 WL 2600600 (E.D.Tex.)
**(Cite as: 2011 WL 2600600 (E.D.Tex.))**

one of substantial overlap. *See Save Power,* 121 F.3d at 951.

**\*2** In the first-filed action, *Murrell v. Chandler,* Civil Action No. 01:01cv 184, filed in this court, plaintiff alleges he was exposed to unreasonably high levels of ETS while confined at the Federal Correctional Complex in Beaumont, Texas. Plaintiff claims the defendants were deliberately indifferent to his plight during the period from December, 1999 through March 3, 2001. Plaintiff alleges "he was assigned to a non-smoking unit but smokers were housed at the same unit; he was exposed to excessive levels of ETS 12 to 24 hours a day in his housing unit and at the factory where he worked; the smoke was often so thick in his housing unit that he had to hold a wet towel over his face to breathe; he advised the defendants that the no smoking policy was not being enforced and that he was having serious health problems that included migraine headaches and respiratory problems." *Murrell v. Chandler,* No. 07–40340 (5th Cir. Apr. 30, 2008). Specifically, plaintiff must prove objectively that he was exposed to unreasonably high levels of ETS at the facility in Beaumont, Texas, and that the defendants, all employed at the facility in Beaumont, were subjectively deliberately indifferent.

In *Murrell v. Casterline,* the second case, filed in the Western District of Louisiana, plaintiff also complains of exposure to ETS. In this case, however, plaintiff complains of exposure at the United States Penitentiary in Pollock, Louisiana during the period from the time of his arrival sometime in 2001 through 2005, and he was denied medical care for a serious medical need through exposure to ETS. *See Murrell v. Casterline,* 1:03cv257 (W.D.La.), docket entry no. 127—Report and Recommendation. Thus, plaintiff must prove that the defendants, all employed at the prison facility in Pollock, Louisiana, were subjectively deliberately indifferent regarding incidents which occurred at the penitentiary in Pollock, Louisiana.

"[T]he 'first-to-file rule' not only determines

which court may decide the merits of substantially similar cases, but also establishes which court may decide whether the second suit filed must be dismissed, stayed or transferred and consolidated." *Sutter Corp. v. P & P Indus., Inc.,* 125 F.3d 914, 920 (5th Cir.1997). "In the absence of compelling circumstances the court initially seized of a controversy should be the one to decide whether it will try the case." *Mann Manufacturing, Inc. v. Hortex, Inc.,* 439 F.2d 403, 406 (5th Cir.1971). While noting in the transfer order that in both lawsuits plaintiff seeks "damages against Bureau of Prisons employees secondary to Plaintiff's alleged exposure to environmental tobacco smoke while he was incarcerated in BOP facilities," the Louisiana district court made no finding that the issues in the subsequently-filed action "substantially overlap" the issues in the first-filed suit. And, in fact, that determination is to be made by the Eastern District of Texas based on it's prior jurisdiction. *Id.* at 408.

**\*3** Here, the claims in the two cases are separate and distinct, involving the alleged subjective deliberate indifference of entirely different defendants located at two different prison facilities. Additionally, the claims are distant in both time and proximity, concerning plaintiff's incarceration at a facility in Beaumont, Texas from December, 1999 through March 3, 2001 and his incarceration at a facility in Pollock, Louisiana from sometime in 2001 through 2005.

In the two cases brought by plaintiff there is merely some relation between the two actions. Both cases were brought by the same plaintiff and both involve plaintiff's alleged exposure to excessive tobacco smoke. The cases, however, do not substantially overlap and separate proceedings will not result in conflicting rulings or a ruling by the second court that interferes with the power of the first. Thus, plaintiff's second case may proceed simultaneously and parallel to the first case.

*Venue*
When, as in this case, jurisdiction is not founded solely on diversity of citizenship, 28 U.S.C. §

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2600600 (E.D.Tex.)
**(Cite as: 2011 WL 2600600 (E.D.Tex.))**

1391 provides that venue is proper only in the judicial district where the defendants reside or in which the claim arose. Here, plaintiff complains of incidents which occurred in Pollock, Louisiana. Further, the defendants are employed at the federal prison located in Pollock, Louisiana. When public officials are parties to an action in their official capacities, they reside for venue purposes in the county where they perform their official duties, which in this case is Grant Parish, Louisiana. *Holloway v. Gunnell,* 685 F.2d 150 (5th Cir.1982); *Lowrey v. Estelle,* 433 F.2d 265 (5th Cir.1976).

Pursuant to 28 U.S.C. § 98, Grant Parish is located in the Western District of Louisiana. As Grant Parish is located in the Western District of Louisiana, venue in the Eastern District of Texas is not proper for plaintiff's claims.

"For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). After due consideration, plaintiff's claims against prison officials in Pollock, Louisiana should, in the interest of justice, be transferred to the Western District of Louisiana. An appropriate order so providing will be entered by the undersigned.

**SIGNED** this *28* day of *June,* 2011.

E.D.Tex.,2011.
Murrell v. Casterline
Not Reported in F.Supp.2d, 2011 WL 2600600 (E.D.Tex.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

TAB 8

Not Reported in F.Supp.2d, 2013 WL 1949948 (E.D.Tex.)
**(Cite as: 2013 WL 1949948 (E.D.Tex.))**

**H**

Only the Westlaw citation is currently available.NOT FOR PRINTED PUBLICATION

United States District Court,
E.D. Texas,
Sherman Division.
Krishna REDDY, Plaintiff,
v.
SUPERIOR GLOBAL SOLUTIONS, INC., et al.,
Defendants.

No. 4:11cv845.
May 9, 2013.

Krishna Reddy, pro se.

William Wallace Camp, The Law Office William W. Camp, Dallas, TX, Danise McMahon, John Douglas Fraser, Ferguson Law Group PC, Plano, TX, for Defendants.

*ORDER DENYING MOVING PLAINTIFF'S MOTION FOR RECONSIDERATION OF ORDER GRANTING EXTENSION OF TIME TO FILE DEFENDANTS' BELATED ANSWERS AND ORDER ADOPTING REPORT AND RECOMMENDATION OF THE UNITED STATES MAGISTRATE JUDGE*

RON CLARK, District Judge.

**\*1** Came on for consideration the report of the United States Magistrate Judge in this action, this matter having been heretofore referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636. On February 22, 2013, the report of the Magistrate Judge was entered containing proposed findings of fact and recommendations that plaintiff's Motion for an Order for Entry of Default by the Court Clerk and for Default Judgment as to the Defendants Superior Global Solutions, Inc., Gary Smith, Kathy Coos, and Karen Boudreaux [Doc. # 79] be denied [Doc. # 88]. On February 22, 2013, the Magistrate Judge also granted defendants'

Motion for Enlargement of Time in which to File Answer, and deemed the answers filed on January 7, 2013 as timely [Doc. # 89]. On March 11, 2013, plaintiff filed Objections to the Report and Recommendation of the Magistrate Judge and Motion for Reconsideration of Order Granting Extension of Time to File Defendants' Belated Answers [Doc. # 90]. On March 25, 2013, defendants filed a response [Doc. # 92]. On April 4, 2013, plaintiff filed a reply [Doc. # 93]. On April 15, 2013, defendants filed a sur-reply [Doc. # 98].

On December 22, 2011, plaintiff filed a complaint against defendants. Defendants timely responded to the suit by filing motions to dismiss plaintiff's claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. The Magistrate Judge issued reports and recommendations on the motions. Objections were filed, and an order adopting was entered on December 17, 2012, in which the motions were granted in part and denied in part. The answer date, as calculated pursuant to the rules, was January 3, 2013. Defendants did not file an answer or any other appropriate motion on January 3, 2013. On January 7, 2013, plaintiff then filed a motion for entry of default and motion for default [Doc. # 77, # 79]. After the motion for default was filed, defendants filed answers on January 7, 2013 [Doc. # 78, # 80]. Defendants also filed a joint motion for enlargement of time in which to file their answers [Doc. # 81]. The Clerk has taken no action on the request for entry of a default. On February 22, 2013, the Magistrate Judge granted efendants' motion for extension ofof time to file answer and deemed answers filed on January 7, 2013 as timely [Doc. # 89].

Plaintiff's motion to reconsider asserts that the Magistrate Judge lacked authority to grant the request to deem the late answers timely filed. Plaintiff asserts that the Magistrate Judge cannot sign an order that would moot the district judge's review of a Magistrate Judge's recommendations.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1949948 (E.D.Tex.)

**(Cite as: 2013 WL 1949948 (E.D.Tex.))**

Federal law affords a Magistrate Judge broad discretion in the resolution of non-dispositive pre-trial matters. *See* FED.R.CIV.P. 72(a); 28 U.S.C. § 636(b)(1)(A). The standard for a motion for reconsideration is "clearly erroneous." *Parks v. Collins,* 761 F.2d 1101, 1104 (5th Cir.1985). The court may modify or set aside a Magistrate Judge's order only if it is clearly erroneous or contrary to law. *Castillo v. Frank,* 70 F.3d 382, 385 (5th Cir.1995). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

**\*2** Plaintiff fails to assert how the Magistrate Judge's decision is clearly erroneous or contrary to law. The motion for extension is a non-dispositive motion that only required an order as opposed to a report and recommendation. Rule 6(b)(1)(B) of the Federal Rules of Civil Procedure provides that when a party moves the court to accept a filing after the relevant deadline, the court may "for good cause, extend the time ... if the party failed to act because of excusable neglect." FED.R.CIV.P. 6(b). Although plaintiff asserts that defendants must demonstrate a meritorious defense, this requirement is not required under Rule 6(b). The Magistrate Judge acted well within his discretion based upon the facts of this case to grant an extension of the answer deadline. After considering the motion to reconsider and all responses, the court finds that the plaintiff failed to demonstrate how the Magistrate Judge's decision was clearly erroneous or contrary to law, and the motion to reconsider is denied.

Plaintiff also filed an objection to the report and recommendation that recommended denial of the motion for default. Plaintiff's last objection is that the motion is not moot as found by the Magistrate Judge. The court has determined that the Magistrate Judge correctly granted the extension to file a late answer, which the court agrees would moot any request for a default judgment. However, the

Magistrate Judge made this recommendation only as an alternative ground for denial of the motion for default. The Magistrate Judge fully considered the merits of the motion and recommended denial of the motion on the merits. After making that finding on the merits, the Magistrate Judge then determined that the motion should also be denied as moot. The court overrules the objection and finds no error by the Magistrate Judge.

Plaintiff then objects that the Magistrate Judge failed to consider whether there was a meritorious defense, that the "mis-calendering" the deadline is not considered excusable neglect, and that she would suffer prejudice if the default was not granted.

None of the objections have any merit. Plaintiff repeatedly argues in her pleadings that defendants' various motions should be struck and not recognized because defendants are in default. These arguments are frivolous and are rejected. Plaintiff's belief that a default has been entered is mistaken. Again, the record is clear, the fact that defendants missed a deadline to answer by a few days is not the same thing as a default judgment being entered against defendants. All that happened in this case was that defendants missed their deadline to file an answer by a few days. Plaintiff seems to want to take a missed deadline and declare herself the winner in this lawsuit, simply because a deadline was missed by a few days. The court will consider all motions currently pending that have been filed by defendants, because those motions are properly before the court. No default has ever been entered in this case, and the court is not addressing a motion to set aside a default judgment.

**\*3** Even if a defendant is technically in default, a plaintiff is not entitled to a default judgment as a matter of right. *Lewis v. Lynn,* 236 F.3d 766, 767 (5th Cir.2001) (per curiam). "In fact, '[d] efault judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Id.* (quoting *Sun Bank of Ocala v. Pelican Homestead and Savs. Ass'n,* 874 F.2d 274,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2013 WL 1949948 (E.D.Tex.)

**(Cite as: 2013 WL 1949948 (E.D.Tex.))**

276 (5th Cir.1989)). The Fifth Circuit favors resolving cases on their merits and generally disfavors default judgments. *Rogers v. Hartford Life & Accident Ins. Co.,* 167 F.3d 933, 936 (5th Cir.1999). Default judgment "should not be granted on the claim, without more, that the defendant had failed to meet a procedural time requirement." *Mason & Hanger–Silas Mason Co., Inc. v. Metal Trades Council,* 726 F.2d 166, 168 (5th Cir.1984) (per curiam). The decision to enter a judgment by default is discretionary. *Stelax Indus., Ltd. v. Donahue,* No. 3:03–CV–923–M, 2004 WL 733844, at *11 (N.D.Tex. Mar.25, 2004).

The court agrees with the Magistrate Judge that a default judgment should not be entered in this case. Plaintiff has failed to demonstrate any prejudice in this case. Plaintiff has failed to assert how a delay of two business days caused her any harm. Plaintiff tries to argue that there is some prejudice from the defendants filing a motion for summary judgment. However, the court does not see how a delay of a few days in filing an answer causes any prejudice to plaintiff. The summary judgment is a proper motion filed by defendants and will be considered at the appropriate time. The court sees no prejudice to the fact that plaintiff must establish that there is a fact issue in responding to a motion for summary judgment. The drastic remedy of a default judgment against defendants is not appropriate based upon the facts of this case.

The bottom line is that defendants have properly filed an answer. No default has ever been entered against any of the defendants and no default should be entered against any of the defendants. Defendants were well within their rights to seek discovery and file motions which are now pending before the court. The court agrees with the Magistrate Judge's handling of these matters and finds no error.

Having received the report of the United States Magistrate Judge, and considering the objections thereto filed by plaintiff [Doc. # 90], this court is of the opinion that the findings and conclusions of the Magistrate Judge are correct and adopts the Magistrate Judge's report as the findings and conclusions of the court.

It is, therefore, **ORDERED** that plaintiff's Motion for an Order for Entry of Default by the Court Clerk and for Default Judgment as to the Defendants Superior Global Solutions, Inc., Gary Smith, Kathy Coos, and Karen Boudreaux is **DENIED.**

It is further **ORDERED** that Slaintiff's Motion for Reconsideration of Order Granting Extension of Time to File Defendants' Belated Answers is **DENIED.**

**\*4** So **ORDERED.**

E.D.Tex.,2013.
Reddy v. Superior Global Solutions, Inc.
Not Reported in F.Supp.2d, 2013 WL 1949948 (E.D.Tex.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2014, I electronically filed the foregoing **APPENDIX A TO PLAINTIFFS' RESPONSE IN OPPOSITION TO APPEAL OF MAGISTRATE JUDGE'S ORDER OR ALTERNATIVELY OBJECTION TO MAGISTRATE'S REPORT AND RECOMMENDATION TO DENY MOTIONS OF BURNETT TO TRANSFER VENUE** with the Clerk of the Court using the CM/ECF system which will automatically send notification of such filing to all CM/ECF participants.

I FURTHER CERTIFY that that U.S. Mail sent to the address of record for Global Resources, Inc. has been returned undeliverable, therefore I am unable to serve a copy of this pleading on Global Resources, Inc.  The last known address of Global Resources, Inc is:

> Global Resources, Inc.
> c/o Michael Pol
> 13 Herring Road
> Beaumont, MS 39423-2055

By:     s/ William H. Boice

KILPATRICK TOWNSEND &
   STOCKTON, LLP

William H. Boice
Georgia Bar No. 065725

1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404)-815-6555
bboice@kilpatricktownsend.com

Attorney for Plaintiffs