**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

REJI SAMUEL, et al.                               §
                                                  §
v.                                                §          **1:13-CV-323**
                                                  §
SIGNAL INTERNATIONAL L.L.C., et al.    §


**MEMORANDUM AND ORDER ON SIGNAL'S MOTION TO COMPEL (DOC. NO. 122)**
**AND PLAINTIFFS' MOTION FOR INTERIM PROTECTIVE ORDER**
**UNDER RULE 30(d)(3) (DOC. NO. 140)**

This case is assigned to the Honorable Marcia Crone, United States District Judge, and is referred to the undersigned United States Magistrate Judge for pretrial proceedings pursuant to a referral order entered on May 22, 2013.  (Doc. No. 5.)  Pending before the undersigned is the "Signal Defendants' Motion to Compel" (Doc. No. 122) filed by Signal International, L.L.C., Signal International, Inc., Signal International Texas, G.P., and Signal International Texas, L.P. (collectively, "Signal"), and the Plaintiffs' "Motion for Interim Protective Order Under FED. R. CIV. P. 30(d)(3)."  (Doc. No. 140.)

Both motions center on the resolution of one issue—to what extent does the *in terrorem* effect preclude discovery into the Plaintiffs' "immigration status, immigration history, employment history, and personal information."  (Doc. No. 140, p. 1.)

Signal seeks to compel production of the "plaintiffs' T or U visas, their applications for such visas and other similar evidence, including evidence as to the lives of the plaintiffs after Signal employment."  (Doc. No. 122, p. 1–2.)  T and U visas are available to victims of human trafficking or other "qualifying criminal activity" and allow those who qualify to stay in the United States for up to four years, and may even lead to permanent residence.  The Plaintiffs resist production on two grounds.  First, they claim that requiring production of immigration

related documents might reveal their immigration status, which "would harass, embarrass, and oppress the Samuel Plaintiffs . . . and otherwise chill legitimate claims against such illegal activity." (Doc. No. 125, p. 1.)  This is also known as the *in terrorem* effect.  (Id. at p. 7–9.)  Second, in its objections to discovery propounded by the Plaintiffs, Signal claimed that documents relating to events occurring after the Plaintiffs stopped working for Signal were irrelevant.  Therefore, the Plaintiffs contend that Signal cannot now seek to compel the production of documents from this period.  (Id. at p. 6–7.)  In turn, the Plaintiffs request that a protective order be entered preventing discovery into "immigration status, immigration history, employment history, and personal information of the Samuel Plaintiffs or their families after the Samuel Plaintiffs' employment with the Signal Defendants was terminated."  (Id. at p. 10); (see also Doc. No. 140, p. 1.)

After considering the parties' briefing and applicable authorities, the undersigned grants in part and denies in part Signal's motion.  Specifically, as to Signal's request for the Plaintiffs' T and U visas, given the nature and stage of this case, and the fact that the documents are both relevant and discoverable, the undersigned finds that Signal's need for the information regarding the Plaintiffs' visas outweighs any potential *in terrorem* effect.  Therefore, the undersigned grants Signal's motion as to the visas.  As for documents related to the Plaintiffs' lives "after Signal employment," Signal failed to identify with any specificity what it is seeking and why it needs this information, and therefore, failed to meet its burden.  In addition, because Signal has resisted discovery of information from this period on the grounds that it is irrelevant, Signal cannot now claim that this information is discoverable.  Accordingly, Signal's motion as it relates to information about "the lives of the plaintiffs after Signal employment" is denied.

As to the Plaintiffs' requests to enter a protective order (Doc. Nos. 125 and 140), the undersigned finds that the Plaintiffs have failed to show good cause why discovery on certain topics should be completely precluded.  The information that the Plaintiffs seek to protect is relevant and discoverable.  However, should Signal seek discovery that is clearly irrelevant and solely aimed at harassment, particularly extensive discovery regarding the Plaintiffs' relatives and other third parties, the undersigned will at that time consider whether judicially imposed limits are necessary.

## I. Background

### 1. Factual Background

The Plaintiffs are seventeen Indian men who allege that they are victims of human trafficking.  (Doc. No. 1, pp. 2, 6–9.)  The Plaintiffs assert that Signal, along with several other defendants, lured them into this country with the false promise that if they adequately performed work for Signal, that this could be a pathway to "legal and permanent work-based immigration to the United States . . . ."  (Id. at 2.)  Based on these allegedly false promises and misleading statements, the Plaintiffs paid significant sums of money to obtain work papers and visas to come to the United States.  (Id.)  Once here, the Plaintiffs claim to have found themselves in deplorable living and working conditions, as well as subject to threats of "arrest, loss of immigration status and deportation, and . . . a campaign of psychological abuse, coercion, and fraud designed to render Plaintiffs afraid, intimidated, and unable to leave Signal's employ."  (Id. at p. 4.)

### 2. Procedural Background

This case has its origins in a putative class action filed in the Eastern District of Louisiana.  (See Doc. No. 1, David v. Signal Int'l, L.L.C., 2:08-cv-01220 (E.D. La. March 7, 2008)).  Class certification was denied, which caused the individual putative class members to

file suit in the districts where their injuries allegedly occurred.  (See Doc. No. 1117, David, 2:08-cv-01220 (E.D. La. Jan 4, 2012)).  Cases were filed in the Eastern District of Texas, the Eastern District of Louisiana, and the Southern District of Mississippi.  The Mississippi cases were consolidated and transferred to the Eastern District of Louisiana under the "first-to-file" rule. (See Doc. No. 44, Achari v. Signal Int'l, L.L.C., No. 1:13-cv-222 (S.D. Miss. Oct. 18, 2013)).  In addition, the Equal Employment Opportunity Commission filed suit in the Southern District of Mississippi alleging multiple Title VII violations that was also transferred to the Eastern District of Louisiana.  (See Doc. No. 52, EEOC v. Signal Int'l, L.L.C., No. 1:11-cv-179 (S.D. Miss. Feb. 29, 2012)).

All of the cases in the Eastern District of Louisiana are pending in the same court, and that court has severely limited discovery related to immigration status.  (Doc. No. 125, p. 5.); see also David v. Signal Int'l, L.L.C., 257 F.R.D. 114, 126 (E.D. La. 2009) ("[A]ny inquiry into plaintiffs' current immigration status, current residence and/or post-termination employment history will most assuredly strike paralyzing fear in the plaintiffs sufficient to chill any inclination they may have had to prosecute their pending claims.").  The Plaintiffs argue that "[t]o require disclosure in this case would not only conflict with other protective orders in the Related Cases, it would also allow the Signal Defendants to circumvent those orders and obtain discovery other courts have excluded."  (Doc. No. 125, p. 4–5.)  The undersigned is confident, however, that to the extent any order entered in this case conflicts with an order entered in a related case pending in the Eastern District of Louisiana, any impact can be ameliorated by proper limits on the dissemination and use of the information produced.

4

### III. Legal Standard

"Generally, the scope of discovery is broad and permits the discovery of 'any nonprivileged matter that is relevant to any party's claim or defense.'"  Crosby v. La. Health Serv. & Indem. Co., 647 F.3d 258, 261 (5th Cir. 2011) (quoting FED. R. CIV. P. 26(b)(1)).  "A discovery request is relevant when the request seeks admissible evidence or 'is reasonably calculated to lead to the discovery of admissible evidence.'"  Id. (quoting Wiwa v. Royal Dutch Petroleum Co., 392 F.3d 812, 820 (5th Cir. 2004)).  Moreover, "a district court has broad discretion in all discovery matters, and such discretion will not be disturbed ordinarily unless there are unusual circumstances showing a clear abuse."  Beattie v. Madison Cnty. Sch. Dist., 254 F.3d 595, 606 (5th Cir. 2001) (citations omitted).

"On notice to other parties and all affected persons, a party may move for an order compelling . . . discovery."  FED. R. CIV. P. 37(a)(1).  "The moving party bears the burden of showing that the materials and information sought are relevant to the action or will lead to the discovery of admissible evidence."  Marin v. Gilberg, Civ. A. No. V-07-62, 2009 WL 426061, at *2 (S.D. Tex. Feb. 19, 2009).  If the moving party meets its burden, "the burden then shifts to the party resisting discovery to show why the discovery is irrelevant, overly broad, or unduly burdensome or oppressive, and thus should not be permitted."  Id.

In addition, "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," a party may move for a protective order under Federal Rule of Civil Procedure 26(c).  The party seeking a protective order bears the burden to show that good cause exists.  See In re Terra Int'l, Inc., 134 F.3d 302, 306 (5th Cir. 1998).  The Fifth Circuit has noted that this requires showing "'a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements.'"  Id. (quoting United States v. Garret, 571 F.2d 1323,

1326 n. 3 (5th Cir. 1978)); <u>compare</u> <u>Topo v. Dhir</u>, 210 F.R.D. 76, 77–78 (S.D.N.Y. 2002) (rejecting the idea that "protective orders must be supported by concrete factual showings" and noting that some courts only require "good cause") (citations omitted).

**IV. Analysis**

### 1.  Signal's "Motion to Compel" (Doc. No. 122)

Signal seeks to compel the production of the "plaintiffs' T or U visas, their applications for such visas and other similar evidence, including evidence as to the lives of the plaintiffs after Signal employment."  (Doc. No. 122, p. 1–2.)  At a minimum, it appears that Signal is requesting that the undersigned compel production of documents related to Requests for Production Nos. 7 and 8.[1]  (Doc. No. 122, Ex. A) (<u>See</u> <u>also</u> Doc. No. 125) (identifying four specific Requests for Production at issue in Signal's motion, including Requests Nos. 7 and 8).  These requests relate specifically to the Plaintiffs' T visas.[2]  It is unclear what Signal means by "evidence as to the lives of the plaintiffs after Signal employment," because Signal failed to identify any particular Request to Production to which it is seeking a response.  Thus, the information that Signal seeks can be grouped into two categories: visa related documents and post-Signal employment documents.  Each set will be addressed separately.

---

1. The requests are as follows:

<u>Request for Production No. 7</u>: Complete copies of Plaintiff['s] T Visa application.  This request includes copies of any supplemental application and any other correspondence provided by Plaintiff, or representative, to the US government in any way to his T-Visa application.

<u>Request for Production No. 8</u>:  Complete copies of the results of Plaintiff['s] T Visa application.  Plainitff['s] response should include any document ever received from the US Government relating in any way to Plaintiff's T visa application, including, but not limited to, any final determination, as well as a copy of the visa issued, if any.

2. Signal's motion seeks to compel production of both T and U visas, but Signal did not specifically request the U visa in its Requests for Production.  (Doc. No. 122.)  The Plaintiffs, however, do not raise this as a reason not to produce the U visas.  Given the similarity of the T and U visas, the undersigned will consider compelling production of both visas.

6

a. <u>Visa related documents</u>

i. *Background on T and U visas*

T and U visas were created with the passage of the Victims of Trafficking and Violence Prevention Act ("VTVPA").  <u>See</u> Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, §§ 107, 1513, 114 Stat. 1464, 1477–79, 1534–37.  The T visa is available to unauthorized immigrants who have been victims of human trafficking, whereas a U visa is available to victims of "qualifying criminal activity."  <u>See</u> 8 C.F.R. §§ 214.11 (T visa); 214.14 (U visa).  The Code of Federal Regulations contains a laundry list of "qualifying criminal activity," which includes such crimes as trafficking, involuntary servitude, and slave trade.  <u>Id.</u> § 214.14(a)(9).

The T and U visas share some important characteristics that are relevant to this case. First, they are available not only to the victim, but also certain family members of the victim.  <u>Id.</u> §§ 214.11(o) (T visa); 214.14(f) (U visa).  Second, both require cooperation with law enforcement.  To obtain a T visa, the victim must comply with any reasonable requests from a law enforcement agency for assistance in the investigation or prosecution of human trafficking. <u>Id.</u> § 214.11(h).  Similarly, to obtain a U visa, a victim must have been "helpful, is being helpful, or is likely to be helpful to a certifying agency in the investigation or prosecution of the qualifying criminal activity upon which his or her petition is based . . . ."  <u>Id.</u> § 214.14(b)(3). Third, each visa is valid for four years, and after a period of three years, the victim may seek permanent residence.  <u>Id.</u> §§ 245.23(a) (T visa); 241.14(g) (U visa).  Lastly, each visa authorizes the victim to lawfully obtain employment.  <u>Id.</u> §§ 214.11(l) (T visa); 214.14(i)(7) (U visa).

ii. *Signal has met its burden*

As the movant, it is Signal's burden to demonstrate that the Plaintiffs' T and U visas are

7

discoverable.  Signal argues that because there are substantial benefits derived from obtaining one of these visas, there may be an incentive for the Plaintiffs to fabricate their claims or exaggerate the extent of the harm that they suffered as a result of Signal's conduct.  Therefore, according to Signal, these documents are discoverable because they may be probative of the Plaintiffs' motives.[3]

The information that Signal seeks falls within the broad scope of discovery.  FED. R. CIV. P. 26(b) ("Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . ." and "relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.").[4] Information in the visas and visa applications may shed light on Signal's claim that the Plaintiffs "manufactured their allegations against Signal," or could at least lead to the discovery of admissible evidence.  (Doc. No. 122, p. 4.)  For example, in the T visa application, under penalty of perjury, a victim must check a box stating that they are a victim of severe trafficking.  The applicant is also requested to explain certain answers, such as whether they will suffer extreme hardship if removed from the United States, and whether they have reported these acts to law enforcement, as well as submit a "personal narrative statement describing the trafficking."[5]  See I-914, Application for T Nonimmigrant Status, http://www.uscis.gov/i-914.  Moreover, a law

---

3.  Signal devotes much of its motion to arguments related to the confrontation clause and its constitutional rights to discovery.  These arguments are misplaced.  The confrontation clause, by its terms, only applies in the criminal setting.  U.S. CONST. amend. VI ("In all *criminal prosecutions*, the accused shall enjoy the right . . . to be confronted with the witnesses against him.") (emphasis added).  In a civil case, the Federal Rules of Civil Procedure dictate Signal's rights to information.  So long as this court does not clearly abuse its discretion in applying these rules and completely deprive Signal of access to discovery (which in an extreme case may potentially be a due process violation), Signal's constitutional rights will have been protected.

4.  See also Local Civil Rule CV-26(d) (noting that information is discoverable if "it is information that is likely to have an influence on or affect the outcome of a claim or defense" or "that deserves to be considered in the preparation, evaluation or trial of a claim or defense").

5.  The Plaintiffs claim that redacted affidavits attached to their visa applications have been produced. (Doc. No. 125, p. 3 n. 1.)

enforcement officer may also fill out a form containing similar information.   See I-914, Supplement B, Declaration of Law Enforcement Officer for Victim of Trafficking in Persons, http://www.uscis.gov/i-914 (noting that a person may qualify for a T visa without this form, but "submission of the Supplement B is strongly advised").   In this form, a law enforcement officer is to describe the victimization, as well as mark a box on whether the applicant has been a victim of trafficking.   Signal is entitled to know what boxes, if any, were checked by the Plaintiffs or law enforcement, and any proffered descriptions, which would necessarily relate to the events giving rise to this lawsuit.

In addition, Signal filed a cross-claim against the other defendants, arguing that if there is any wrongdoing, the other defendants are to blame.   (Doc. No. 79, p. 56) ("Plaintiffs' suit alleges that Signal was part of a concerted wrongdoing directed at foreign workers.   However, Signal was a victim of the cross claim defendants' actions rather than a willing participant.").   The information contained in the visa application, particularly where an applicant is requested to do more than just check a box, but rather, describe their experiences, may be informative.   If, for example, Plaintiffs' applications made no mention of Signal, but only of the other defendants, this could be highly relevant to this case.   While the undersigned is not determining at this juncture whether such evidence will be admissible at trial, it is not beyond belief that it might, at the very least, lead to the discovery of admissible evidence.   Therefore, Signal has met its burden of demonstrating this information is discoverable.

### iii.   *The burden shifts to the Plaintiffs*

The Plaintiffs argue that they should not be compelled to produce immigration related documents on two grounds.   First, in its responses to the Plaintiffs discovery requests, Signal narrowed the scope of discovery by claiming that documents from the time that Plaintiffs

stopped working for Signal are irrelevant, and as such, Signal cannot now claim that information from this period is discoverable.  Second, producing these documents would have an *in terrorem* effect on the Plaintiffs, as well as other victims of trafficking, and therefore, social policies trump Signal's need for the visas.

### 1.   The immigration documents are relevant

As to the Plaintiffs' first argument, the undersigned finds that the Plaintiffs' T and U visas cannot be classified as merely documents relating to the Plaintiffs' post-Signal activities. First, it is unclear when, or even if, any of Plaintiffs sought these visas.  It is plausible that if any Plaintiffs applied for these visas, they did so while still employed at Signal.  Moreover, these documents will likely contain factual statements and assertions about the Plaintiffs' experiences related to their trafficking and their experiences while employed by Signal.  Accordingly, even if the Plaintiffs applied for these visas after they left Signal, the information contained in the applications is not simply information related to Plaintiffs' post-Signal activities.  Therefore, Plaintiffs' objection on relevancy grounds is not sufficient to deny Signal access to these documents.

### 2.   The *in terrorem* effect does not outweigh Signal's need for the documents

The Plaintiffs next argue that, even if the visas are relevant, they should not be required to produce them because, if forced to do so, it would dissuade them from prosecuting this case. This is known as the *in terrorem* effect, and has been invoked to preclude or limit discovery into sensitive topics, particularly immigration status.

The *in terrorem* effect is predicated on two concepts.  First, that certain remedial statutes, in order to achieve their goals, rely on enforcement by private citizens.  See Rivera v. NIBCO, Inc., 364 F.3d 1057, 1065–66 (9th Cir. 2004) ("Congress intended to empower individuals to act

as private attorneys general in enforcing provisions of Title VII."); Kathleen Kim, <u>The</u> <u>Trafficked Worker as Private Attorney General: A Model for Enforcing the Civil Rights of</u> <u>Undocumented Workers</u>, 1 U. CHI. LEGAL F. 247, 251 (2010) (noting that the VTVPA was amended in 2003 to add a private cause of action "thereby codifying a new class of private attorneys general and representing an effort to extend civil rights protections to trafficked persons").  Second, if forced to disclose their immigration status in a lawsuit, victims may be reluctant to file suit because, if it is revealed that they are not in the country legally, they may face deportation or harassment.  <u>Rivera</u>, 364 F.3d at 1064.  One court even reasoned that documented workers might be deterred from enforcing their rights for "fear that their immigration status would be changed, or that their status would reveal the immigration problems of their family or friends . . . ." <u>Id.</u> at 1065.  Thus, the *in terrorem* effect reflects a policy choice that the enforcement of certain statutes outweighs a party's need for full and unfettered discovery into matters that may be of minimal or no relevance.  <u>Rivera</u>, 364 F.3d at 1064–66 (discussing the policy reasons behind the *in terrorem* doctrine and holding: "Given Title VII's dependence on private enforcement, we find that the national effort to eradicate discrimination in the workplace would be hampered by the discovery practices [the defendant] seeks to validate here."); <u>Topo v. Dhir</u>, 210 F.R.D. 76, 78 (S.D.N.Y. 2002) ("[A]llowing parties to inquire about the immigration status of other parties, . . . present[s] a danger of intimidation [that] would inhibit plaintiffs in pursuing their rights.") (citation omitted).

There is no bright-line rule for when the *in terrorem* effect should limit discovery. Rather, courts balance the unique facts and posture of each case against the relevant social policies of the statutes at issue.  <u>See</u>, <u>e.g.</u>, Thomas A. Doyle, "Competing Concerns in Employment Litigation: How Courts are Managing Discovery of an Employee's Immigration

Status," 28 A.B.A. J. Lab. & Emp. L. 405, 406–14 (Spring 2013) (identifying eight factors courts often consider in deciding whether to allow discovery of an employee's immigration status). The two most relevant factors that courts tend to consider are: what statute the plaintiff is suing under and the procedural posture of the case.

As for the statute that a plaintiff is suing under, this informs whether immigration status is in any way relevant to the underlying case. Where irrelevant or merely collateral to a party's claim or defense, courts often preclude immigration related discovery. See Topo, 210 F.R.D. at 77–78. For example, the Fifth Circuit granted a writ of mandamus and reversed a trial court's order requiring the plaintiffs to answer questions related to their immigration status, because the "protections of the Fair Labor Standards Act are applicable to citizens and aliens alike and whether the alien is documented or undocumented is irrelevant." In re Reyes, 814 F.2d 168, 170–71 (5th Cir. 1987); see also EEOC v. Evans Fruit Co., Inc., CV-10-3033-LRS, 2012 WL 442025 (E.D. Wash. Feb. 10, 2012) (noting that immigration status has no bearing on determining liability under Title VII). Conversely, when immigration status is arguably relevant, courts have allowed for discovery. See Cazorla v. Koch Foods of Miss., L.L.C., No. 3:10-cv-135, 2014 WL 281979, at *2 (S.D. Miss. Jan. 24, 2014).

The heart of the issue in this case is human trafficking. One could argue that, like claims under Title VII or the FLSA, immigration status is irrelevant to claim for trafficking. See In re Reyes, 814 F.2d at 170–71. A person can bring a trafficking claim regardless of whether they are a citizen, legal immigrant, or undocumented worker. See, e.g., 18 U.S.C. § 1590. However, something sets a trafficking claim apart from one brought pursuant to Title VII or the FLSA— the T and U visa. These visas create a safe harbor, allowing victims of trafficking and certain other crimes to stay in the United States legally while prosecuting their case. No such equivalent

visa, amnesty, or safe harbor exists for a plaintiff bringing an FLSA or Title VII claim.

The availability of these visas impact the *in terrorem* analysis in two important respects. First, they create an incentive for an undocumented worker to fabricate or exaggerate a claim of human trafficking.  See Cazorla, 2014 WL 281979, at *1 (noting that certain immigration benefits were available to plaintiffs due to their allegations).  The undersigned is not insinuating that this is the case here.  However, it appears that this is at least conceivable, and Signal should have the opportunity to explore this possibility.  Second, they create a safe harbor for illegal immigrants who were victims of trafficking.  One of the underpinnings of the *in terrorem* effect is that undocumented workers will be less likely to seek redress for fear that their immigration status will be revealed and they will then face deportation.  Because an undocumented worker who was the victim of severe trafficking can receive a T or U visa, any chilling effect is greatly minimized.  In fact, it is difficult to imagine an undocumented worker who would bring a civil suit alleging to be a victim of trafficking, but fail to seek such a visa.  Or, stated another way, it is difficult to comprehend an instance in which a person would not report that they were a victim of human trafficking for fear their T visa would be potentially discoverable in a lawsuit years later—a lawsuit they themselves initiated.  The only workers whose rights might be chilled would be those who were trafficked but failed to qualify for either visa.  Empirical evidence, however, suggests that this is a relatively small group, and the Plaintiffs have not suggested that could be the case here.[6]

---

6. From 2002 through 2012, 5,820 T-1 visa applications, which are visas issued directly to the victim, were filed.  See U.S. Citizenship and Immigration Services Form I-914 – Application for T Nonimmigrant Status, Form I-918 – Petition for Nonimmigrant Status Receipts, Approvals, and Denials, Fiscal Year 2013, Through Third Quarter, http://www.uscis.gov/tools/reports-studies/immigration-forms-data/data-set-form-i-914-application-t-nonimmigrant-status (last visited October 15, 2014).  Of those applied for, 1,671 were denied, equating to 29%.  As for T-2,3,4 or 5 visas, which are available to family members of a victim, 606 applications, or 20%, were denied.  From 2009 through 2012, 18% of U-1 visa (victim visas) were denied, and 16% of U-2,3,4,5 (family member visas) were denied.

The procedural posture of a case also impacts the *in terrorem* analysis.  For example, in Rivera, the Ninth Circuit affirmed the trial court's issuance of a protective order precluding discovery related to immigration status, because such discovery was irrelevant at that time to the issue before the court, which was liability (as opposed to damages) under Title VII.  Rivera, 364 F.3d at 1074–75.  The trial court, however, had yet to decide whether the proceedings were going to be bifurcated, leaving the door open to the possibility that the analysis may change in the future.  See Rivera, 364 F.3d at 1062, 1070.  As one court subsequently noted, "Rivera did not foreclose the possibility that immigration status, although clearly irrelevant to the Title VII liability determination, might not become relevant later in the remedies portion of the litigation." Rodriguez v. ACL Farms, Inc., No. cv-10-3010, 2010 WL 4683743, *4 (E.D. Wash. Nov. 12, 2010).  Likewise, in David, one of the parallel cases pending in the Eastern District of Louisiana, when the court first entered the protective order (that the Plaintiffs argue the undersigned should adopt), the issue being resolved was class certification.  David, 257 F.R.D. at 125.  Immigration status of the plaintiffs had no bearing on the issues of numerosity, commonality, typicality, and adequacy of representation.  Id.

Courts, however, have recognized that as a case progresses and moves towards trial, the pendulum begins to swing in favor of allowing discovery, and depending on the facts of the case, a defendant's need may outweigh any social policies that would otherwise prevent disclosure. See Cazorla, 2014 WL 281979 at *1.  For example, in Cazorla, Koch Foods of Mississippi was accused of committing atrocities against Hispanic workers.  Id.  The court, early in the case, entered a protective order prohibiting discovery of immigration related documents.  Id.  Koch Foods later sought reconsideration of the protective order and specifically to compel the production of the plaintiffs' U visas.  Id.  The court granted Koch's motion as to the visas, noting

14

that they were relevant because "immigration benefits may be made available to [the plaintiffs] because of the allegations they have made." Id. The court held:

> The issue is the relevance of the information sought by Koch Foods to the claims and defenses in this action. Koch Foods has raised a legitimate defense regarding U visas, T visas, or other immigration benefits, and it is entitled to pursue discovery, including visa applications, that supports the defense. The relevance of this information clearly outweighs its *in terrorem* effect, as any individuals who have applied for immigration benefits have, necessarily, already disclosed their immigration status to federal authorities.

Id. at *2. Likewise, other courts, after balancing all the factors, have found that a defendant's need for information outweighed any potential *in terrorem* effect. See Camayo v. John Peroulis & Sons Sheep, Inc., Nos. 10-cv-772, 11-cv-1132, 2012 WL 5931716, at *1–2 (D. Colo. Nov. 27, 2012) (granting a motion to compel production of the plaintiffs' T or U visas in a human trafficking case); EEOC v. Global Horizons, Inc., No. cv-11-3045, 2013 WL 3940674, at *4–7 (E.D. Wash July 31, 2013) (lifting the prohibition on discovery related to the plaintiffs' immigration status because the information was relevant, and the plaintiffs failed to show good cause warranting a continued limitation).

After weighing all the relevant factors and policies, the undersigned finds that the Plaintiffs have failed to meet their burden of showing that "good cause" exists to enter a protective order precluding production of the Plaintiffs' visa related documents. The Plaintiffs have not demonstrated that there would in fact be a chilling effect if, at this stage, they were required to disclose their visas. See In re Terra Int'l, Inc., 134 F.3d 302, 306 (5th Cir. 1998) (noting that a party must make "a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements"). What the undersigned finds most compelling is that, in this context, any chilling effect is largely offset by the availability of the T or U visa. A victim of trafficking does not need to choose between risking deportation by filing suit to rectify

a wrong, or allowing atrocities to go unpunished in order to avoid bringing attention to their immigration status.  Instead, purported victims of human trafficking are allowed to blow the whistle on their employers while at the same time being protected from deportation by obtaining a T visa.  While there may be a small subset of people who are legitimate victims of trafficking but denied a T visa, when balanced against the relevancy of this information and Signal's need for it, the undersigned finds protecting this small and undefined class is an insufficient reason to deny Signal the information it seeks.

Accordingly, the undersigned grants Signals' motion as to the Plaintiffs' T and U visas.

iv. *Limits on further discovery and on the use and dissemination of the Plaintiffs' documents*

The Plaintiffs seek to block Signal from obtaining personal information about them, as well as their relatives.  (Doc. No. 125, p. 10.)  As discussed above, some discovery into the Plaintiffs' immigration status is permissible.  Nevertheless, discovery aimed at sensitive information of people who are not parties to this case may very well have an *in terrorem* effect on the Plaintiffs and deter them from prosecuting this suit.  Signal, however, has not made such a request.[7]  Therefore, at this time, there is no need to enter a broad protective order.  Should Signal seek such discovery, the undersigned will at that time weigh the potential *in terrorem* effect against Signal's need for the information, and the balance of the various factors may very well change.

In addition, it is worth noting that discovery related to the immigration status of friends and relatives would appear to be irrelevant.  For example, a condition precedent of a family member receiving a visa is that the victim be awarded a visa.  8 C.F.R. § 214.11(o) ("an alien who has applied for and been granted T-1 nonimmigrant status may apply for admission of an

_____

7. See supra Note 1.

16

immediate family member . . . .").   Therefore, production of the named Plaintiffs' visa information should be sufficient for Signal to test its theories regarding the Plaintiffs' motives. Should Signal seek discovery related to the Plaintiffs' family members, it will need to demonstrate a particular need.   However, because it is theoretically possible that such a need may exist, the undersigned will address that issue if and when it presents itself.

The Plaintiffs shall designate any documents produced pursuant to this order as "Confidential" and those documents are to be treated as "Protected Documents," as defined in the protective order governing this case.  (Doc. Nos. 55 and 94.)  Moreover, the undersigned is mindful that to some extent this order conflicts with ones that have been entered in the cases pending in the Eastern District of Louisiana.   Therefore, to prevent Signal from circumventing the protective orders in other cases, Signal may *only* use information regarding the Plaintiffs visas in *this case*; use outside this case, in any manner, including depositions, motions, etc., particularly in the EEOC case, which shares common plaintiffs, would be a violation of this order and would subject the violating party to sanctions.

b.  Post-Signal documents

In addition to the immigration materials discussed above, Signal also seeks to compel production of "other similar evidence, including evidence as to the lives of the plaintiffs after Signal employment."  (Doc. No. 122, p. 1–2.)  Signal, however, fails to cite which particular Requests for Production it is seeking to have the Plaintiffs respond to, and fails to cite with any specificity what documents it is seeking.  See, e.g., Hart v. Nationwide Mut. Fire Ins. Co., 270 F.R.D. 166, 169 (D. Del. 2010) ("Plaintiff makes only generalized arguments about Defendant's responses, and the Court will not undertake a review of each of the 65 document requests without more specific guidance from Plaintiff on what responses it is challenging and why.").

17

The only actual guidance that Signal offers is a reference of "*see* Exhibit 1, pp. 4-9," which covers Requests for Production Nos. 1 through 10, and that it is seeking "written material concerning the lives of the plaintiffs after Signal employment."  (Doc. No. 122, p. 11.)  It is not the role of the undersigned to parse out Signal's Requests for Production or guess at which requests Signal seeks responses.  Plaintiffs contend that at issue, other than the specific requests for visas, are Requests for Production Nos. 2 (current driver's license) and 47 (first paycheck from an employer located in the U.S. other than Signal).  (Doc. 125, p. 1.)

Signal has failed to carry its burden of demonstrating that these materials are relevant, or will lead to the discovery of admissible evidence.  Signal's motion is almost exclusively focused on compelling production of the Plaintiffs' T and U visas, and only vaguely argues that this other information is needed because it will "deepen the jury's appreciation of the motives of the plaintiffs."  (Doc. No. 122, p. 2.)  For instance, Signal does not address why it needs copies of the Plaintiffs' current driver's license, why it needs a copy of Plaintiffs' first paycheck after they left Signal, or how this information may lead to the discovery of admissible evidence.  Signal's failure to demonstrate with precision what it is seeking, or why this information is relevant, is reason enough to deny Signal's motion.  See Hart, 270 F.R.D. at 169 ("While the Court recognizes the potential relevance [of the information sought] . . . Plaintiff has not directed the Court's attention to any particular document request or to make any particularized argument with respect to a document request.").

However, there is an additional reason to deny Signal's request—Signal has objected to several requests for production propounded by the Plaintiffs on the grounds that:

> documents requested for the time frame January 1, 2004 through July 31, 2005 and February 1, 2009 through December 31, 2009 are not relevant or likely to lead to the discovery of relevant information.  Signal objects to the date range in this request because only events during the recruitment of the H2B workers and

their time of employment at Signal are probative of the claims in this action.

(Doc. No. 125, Ex. 1, pp. 2, 4–5, 7.) (emphasis added).  Signal cannot refuse to produce documents on grounds that any documents from outside a certain period are irrelevant to the dispute, and then seek to compel production of documents from this same timeframe.  As the Plaintiffs correctly note, "the Signal Defendants cannot have it both ways."  (Doc. No. 125, p. 7.) Because Signal has objected to any discovery after the Plaintiffs left Signal, and from the information before the court there is no indication that Signal withdrew these objections or that the parties have subsequently agreed to expand the relevant period for discovery, the undersigned denies Signal's motion as to "the lives of the Plaintiffs after Signal employment."

**2. Plaintiffs' "Motion for Interim Protective Order Under Fed. R. Civ. P. 30(d)(3)" (Doc. No. 140)**

Plaintiffs allege that Signal is seeking information during depositions that is calculated to have an *in terrorem* effect, and they have requested that the undersigned enter a protective order "limit[ing] depositions of the Samuel Plaintiffs and any other witnesses with relevant information so as to exclude any questions having an *in terrorem* effect on the Samuel Plaintiffs . . . including discovery of immigration status, immigration history, employment history, and personal information of the Samuel Plaintiffs."  (Doc. No. 140.)  As discussed above, it is the Plaintiffs' burden to show that good exists warranting a protective order.  See In re Terra Int'l, Inc., 134 F.3d 302, 306 (5th Cir. 1998).  For reasons detailed below, the undersigned finds that the Plaintiffs have failed to meet their burden, and therefore, declines to enter broad protective order at this time.

Plaintiffs argue that there are "three categories of behavior" that evidence Signal's discovery abuses and demonstrate the need for a protective order.  (Doc. No. 140, p. 4.)  First, that Signal is attempting to harass the Plaintiffs by seeking information related to their family

members.  As evidence, the Plaintiffs offer portions of a deposition transcript containing an exchange between one of the Plaintiffs and Signal.  (Id., Ex. A.)  There are two excerpts that warrant attention.  In one excerpt, Signal asked whether this Plaintiff's brother had a green card. In another, Signal indicated a desire to depose this Plaintiff's brother and requested his contact information.  It appears from the broken record before the court that Signal is trying to piece together an argument that because this Plaintiff was in contact with a relative prior to his employment with Signal, who had knowledge of the immigration process, that this Plaintiff knows more about the immigration process than he is letting on.  It is plausible that the Plaintiff's brother may corroborate this, and therefore, Signal should be allowed to depose the Plaintiff's brother because this information is highly relevant to some of the claims and defenses in this case.

Therefore, the undersigned does not find that *all* inquiries of relatives and family members should be off limits.  However, if Signal were to depose a non-party family member, this deposition should be narrowly tailored to the issues in this case.  For reasons discussed above, the current immigration or employment status of a Plaintiffs' relatives or friends does not appear relevant to the issues in this case, nor does it appear reasonably calculated to lead to the discovery of admissible evidence.  Intrusive and probing discovery into the lives of the Plaintiffs' family may very well have an *in terrorem* effect on the Plaintiffs.  See Rivera, 364 F.3d at 1065–66 (discussing the fear that undocumented workers face in bringing suit, and noting that even some documented workers may be deterred because "their status would reveal the immigration problems of their family and friends . . . ").  Whether to allow such questioning would call for a fact-specific analysis, and without knowing who Signal is seeking to depose, what is being asked, and why, the undersigned cannot determine whether the questioning is

permissible.  The undersigned is not going to attempt to delineate the contours of what issues Signal may or may not inquire about without being presented a specific factual dispute.[8]

Second, the Plaintiffs argue that Signal has inappropriately used information gleaned from a deposition in this case in another matter.  (Doc. No. 140, p. 5–6.)  In other words, Signal is using the lack of a protective order in this case to circumvent protective orders in other cases.  (Doc. No. 125, p. 5–6.)  Because the undersigned does not find that a protective order like the one entered in David is warranted, to prohibit a party from circumventing a protective order in another case, the undersigned orders that information learned in this case, that would be subject to a protective order in another case, cannot be used in that case.  In other words, there is a "Chinese wall" between all of the various matters as it relates to the Plaintiffs' T and U visas.[9]  From the date of this order forward, violation of this separation between cases, as it relates to immigration related discovery, will be considered an abuse of the discovery process and subject the violating party to sanctions.  At the time of the deposition, however, there was no protective order in place *in this case* protecting this information.   While better judgment may have counseled against using information from this case in another case (particularly one in which a protective order precluding such discovery was in place), technically Signal did not violate any of this court's orders.

Third, the Plaintiffs complain that deposition transcripts, which were marked "highly confidential" from this case, were filed, not under seal, in another case pending in the Eastern District of Texas.  (Doc. No. 140, p. 7.)  There is no order in this case that would compel, or even

---

8.  Should another dispute about an appropriate line of questioning arise during a deposition, the parties are reminded that this District maintains a discovery hotline that allows the parties to get an immediate resolution of their issues and carry on with the deposition.  See Local Civil Rule CV-26(e).

9.  This does not impact the "Consent Order Regarding Use of Discovery from Related Cases."  (Doc. No. 96.)  Rather, this mandate only applies to sensitive information produced pursuant to Signal's motion to compel.

allow, for this to be filed under seal.  Local Civil Rule CV-5(a)(7) states: "Unless authorized by statute or rule, a document in a civil case shall <u>not</u> be filed under seal" unless counsel has moved to seal the document, or the "court has already granted authorization to seal the document." (emphasis added).  The only protective order in this case relates to the dissemination of "confidential proprietary and business information and/or trade secrets" (Doc. No. 55); this does not cover personal information regarding immigration status.

Moreover, the undersigned does not find that the use of the excerpt goes so far as to the point of being harassing.  It merely indicates that one of the Plaintiffs received a T visa.  Signal is simply trying to draw the parallel that it is likely that the Plaintiffs in that case have also received a T visa.  However, since this order clarifies that information learned in one case about a Plaintiffs' immigration status may not be used in another, moving forward, this is should not to be an issue.

Ultimately, the Plaintiffs have failed to meet their burden for why a broad protective order should be entered.  Plaintiffs' arguments about the *in terrorem* effect are wholly general, and fail to detail precisely how these Plaintiffs will be deterred from prosecuting this suit. Moreover, for reasons stated above, the undersigned finds that *in terrorem* effect does not operate in this case to close off all immigration related lines of questioning.  The areas that Signal is inquiring about are relevant, or at the very least, may lead to the discovery of admissible evidence.  Should the Plaintiffs' believe that Signal is crossing the line, the undersigned will address those concerns on a case-by-case basis.

## **V. Conclusion**

It is therefore ORDERED that Signal's "Motion to Compel" (Doc. No. 122) is **GRANTED IN PART AND DENIED IN PART**.  Within seven (7) days, the Plaintiffs shall

produce documents responsive to Signal's Requests for Production Nos. 7 and 8, including information related to U visas.  Signal's motion as it relates to "other similar evidence, including evidence as to the lives of the plaintiffs after Signal employment" is **DENIED**.  Furthermore, the Plaintiffs' requests for the entry of a protective order (Doc. Nos. 125 and 140) are **DENIED**.

Lastly, Signal is precluded from using information related to the Plaintiffs' immigration status gathered through the discovery process in this case, in any other matter pending in either the Eastern District of Texas or Eastern District of Louisiana.

SIGNED this 15th day of October, 2014.

Zack Hawthorn
United States Magistrate Judge