**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| REJI SAMUEL, ATHA MOHAMMAD ABDUL, KESAVARAO BUNDANKAYALA, RAJU DIVAKARAN, BIJU PERUMPILLY GEORGE, KRISHNA GONTHINA, NAYAPPULLI JAYACHANDRAN, GALLA VENKATA RAMA KRISHNA, SAMUEL JOSE KUMRUMTHODATHIL, LOHITHAKSHAN MADAMPET, JOHNY MANDY MATHAI, BELTHAZAR PETER, MOHANAN BALAKRISHNA PILLAI, SANTHOSH KUMAR RAJENDRAN PILLAI, ABY KARICKATHARA RAJU, SUMESH PORAMBATHUPARAMBIL SUBRAMANIAN, and CHANDRAN SHAJU THANISSERY, | ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) CIVIL ACTION NO.: |
| v. | ) 1:13-cv-00323-MAC-ZJH ) |
| SIGNAL INTERNATIONAL L.L.C., SIGNAL INTERNATIONAL, INC., SIGNAL INTERNATIONAL TEXAS, G.P., SIGNAL INTERNATIONAL TEXAS, L.P., MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS), | ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**SAMUEL PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY AND STRIKE THE**
**EXPERT REPORT OF DR. LOUISE SHELLEY**

KILPATRICK TOWNSEND &
   STOCKTON, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404)-815-6555
bboice@kilpatricktownsend.com
bcorgan@kilpatricktownsend.com
spangborn@kilpatricktownsend.com
sramsey@kilpatricktownsend.com
hheindel@kilpatricktownsend.com

William H. Boice
Georgia Bar No. 065725
Brian G. Corgan (*Pro Hac Vice*)
Georgia Bar No. 187700
Susan W. Pangborn (*Pro Hac Vice*)
Georgia Bar No. 735027; CA Bar No. 282533
Shane G. Ramsey (*Pro Hac Vice*)
Georgia Bar No. 940547
Heather L. Heindel (*Pro Hac Vice*)
Georgia Bar No. 285204
*Remaining Counsel Listed on Signature Page*

Attorneys for Plaintiffs

# I.     INTRODUCTION

Plaintiffs Reji Samuel, et al. ("Plaintiffs") respectfully move this court to strike the expert report of and exclude any testimony from Louise Shelley ("Dr. Shelley"), proffered as an expert by Signal International, LLC, Signal International, Inc., Signal International Texas, G.P., and Signal International Texas, L.P. (collectively, "Signal").  Plaintiffs seek to exclude Dr. Shelley as an expert because her Report and deposition testimony show that her testimony does not meet the Federal Rule of Evidence 702, is irrelevant, unhelpful to the jury, is biased and consists of impermissible legal conclusions.   This excerpt from her deposition testimony shines the light on Dr. Shelley's bias:

> Q.    And how much are you being compensated per hour by Signal in this case?
> A.    I am being paid 400 an hour for my work, and 200 for travel time.
> Q.    Is that your standard rate for expert work?
> A.    No, it is much, much less.
> Q.    What is your standard rate?
> A.    I receive as much as 900 an hour.
> Q.    Why in this case have you decided to give a discount to Signal?
> A.    Because I feel very strongly about this case, that there has been an injustice done to Signal.  I feel concerned about the validity of this case, and I also am very concerned about the viability of Signal and its employment to its workers.
> Q.    What makes you concerned about the viability of Signal?
> A.    Because of all the expenditures on this lawsuits and also the damage that has been done to its reputation, it makes it difficult for them to get business.

(Shelley Dep. 9:17 – 10:15, Sept. 23, 2014), attached hereto as Exhibit B.

At the crux of Dr. Shelley's testimony is her contention that the Plaintiffs' human trafficking-related claims are not valid.  As an advocate for Signal, however, Dr. Shelley makes radical leaps in reasoning regarding the Plaintiffs' human trafficking claims, and she propounds opinions she is unqualified to make.  As part of her human trafficking analysis, Dr. Shelley also relies on expertise she does not have, expressing opinions about welding, food, housing

conditions at Signal, housing availability in Mississippi in late 2006 and 2007, labor conditions in the United Arab Emirates, Plaintiffs' credibility, and the law regarding human trafficking.  In an effort to be a catch-all expert and to provide advocacy for her client, Signal, Dr. Shelley has undermined her qualifications to provide objective testimony in the area where she arguably has expertise: organized crime and human trafficking.  Dr. Shelley's Report:  (a) is centered on an erroneous legal conclusion (she uses the wrong (legal) definition of "trafficking"), (b) reflects no reliable methods or principles in reaching conclusions; (c) and is otherwise unhelpful in addressing irrelevant matters and in simply restating Signal's arguments, making credibility determinations, as to matters of relevance.  Plaintiffs therefore request that this Court exercise its gatekeeper role and preclude Dr. Shelley from testifying at trial.

## II.    DR. SHELLEY'S REPORT

Dr. Shelley's Report ("Shelley Rep."), served in this matter on July 29, 2014, is attached hereto as Exhibit A.   Dr. Shelley is currently a university Professor and Director of the Terrorism, Transnational Crime & Corruption Center at the School of Public Policy at George Mason University.   She recites that her "particular focus has been the business of human trafficking, and the role of organized crime in this activity, from a global perspective." (Shelley Rep. at 1, ¶1.)

Dr. Shelley defines the trafficking she will be addressing in her Report according to the United Nations protocol to prevent, suppress and punish Trafficking in Persons. (Shelley Rep. at 6, ¶8.)  This definition includes only forms of trafficking more severe than those at issue in this case, and that error on an opinion of law taints her report and becomes the basis for Dr. Shelley's erroneous conclusion in her ultimate factual opinion – that there was no trafficking involved in this case.

In her review of relevant facts, Dr. Shelley acknowledges that the Indian workers may have been lied to by Dewan, Pol and Burnett, and charged exorbitant fees, but at several points states (incorrectly) as a matter of fact that Signal was unaware of these deceptions and fees. (See, e.g. Shelley Rep. at 8, ¶12.)  Dr. Shelley includes analysis of a possible claim of debt bondage, even though no such claim has been asserted in this case.  (Shelley Rep. at 10, ¶15.) Dr. Shelley reviews certain Texas and Department of Justice publications which report on confirmed trafficking situations, and remarkably concludes by the absence of this case from those Reports that there could not have been trafficking here.  (Shelley Rep. at 12-13, ¶20.)

Dr. Shelley devotes the last half of her Report to a response to the Plaintiff's Expert Report served by Florence Burke. (Shelley Rep. at 13-29, ¶22-54.)  But Dr. Shelley does not offer data, tests or any other expert-like analysis with respect to the features of human trafficking Ms. Burke identified.  Instead, as to each point, Dr. Shelley simply recites the factual arguments that Signal makes or might make in addressing those features.  And Dr. Shelley offers opinions along the way on numerous issues as to which she has no expertise.  For example, she concluded that the food at the man camps was adequate because she visited the restaurant in New Orleans now run by the caterer who had supplied food for the man camp.  (Shelley Rep. at 19, ¶28.)  She also noted as important that Signal bought cricket equipment "at significant expense" so that the Indian workers could play cricket on family day. (Shelley Rep. at 23, ¶34.)  She also concluded that many of the employees gained weight, based on her supposed review of photographs of employees between the time they arrived and photographs taken on family day.  (Id.)

Dr. Shelley found it important that Signal did not charge the workers any employment fees, and that when Signal in her view learned of the situation with the recruiter, they broke off their relationship with Michael Pol.  (Shelley Rep. at 28, ¶51.)  Dr. Shelley was unable to explain

during her deposition why this discovery did not lead to the termination of Dewan and Burnett, who shared in the excessive fees, other than to suggest that Signal maintained the relationship so as to try to persuade Dewan and Burnett to return some of the fees, a request that was unsuccessful.  (Shelley Dep. 47:4, 63:5-6; 71:4-5, 72:17-18.)  Dr. Shelley acknowledges that the recruiters were "unscrupulous."  (Shelley Rep. at 29, ¶54.)  Dr. Shelley absolves Signal from responsibility for that in part because Signal "faced a serious information deficit at the time it was approached by Pol and Burnett as to the problems of recruitment of overseas workers." (Shelley Rep. at 30, ¶55.)  Dr. Shelley's final conclusion is as follows:

> In conclusion, Signal did not have access to information that would allow it to be aware of the problem of recruiters making false promises to its potential workers in India.  Neither, did it have reason to suspect that the local lawyer and recruiter would be engaged in duplicitous practices.  Signal was not engaged in human trafficking at any stage of the process with the H2B workers, either at recruitment, on their arrival in the United States or in their employ.

(Shelley Rep. at 31, ¶57.)

## III.   ARGUMENT

### A.   The Requirements of Rule 702

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. *DAC Surgical Partners, P.A. v. United Healthcare Services, Inc.*, 2014 WL 4684834, at *1 (S.D. Tex. July 31, 2014). It applies to "scientific" testimony, as well as to "technical or specialized expert testimony." *Id.* at *1 (citing *Kuhmo Tire Co. v. Carmichael,* 526 U.S. 137 (1999)); *Seatrax, Inc. v. Sonbeck Intern., Inc.*, 200 F.3d 358, 372 (5th Cir. 2000). Before expert testimony can be admitted, the proponent of the testimony must establish all elements of admissibility under Rule 702 by a preponderance of the evidence. 4 JACK B. WEINSTEIN & MARGARET A.

BERGER, WEINSTEIN'S FEDERAL EVIDENCE § 702.05[1][a] (Joseph M. McLaughlin, ed., Matthew

Bender 2d ed. 1997); *Moore v. Ashland Chemical Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

### B.       This Court Acts as a Gatekeeper Under Federal Rule of Evidence 702.

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience,
> training, or education may testify in the form of an opinion or otherwise
> if: (a) the expert's scientific, technical, or other specialized knowledge
> will help the trier of fact to understand the evidence or to determine a
> fact in issue; (b) the testimony is based on sufficient facts or data; (c) the
> testimony is the produce of reliable principles and methods; and (d) the
> expert has reliably applied the principles and methods to the facts of the
> case.

Rule 702 requires a judge to perform a gatekeeping role to ensure that expert testimony is

relevant and reliable.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589 (1993);  *Watkins v. Telsmith, Inc.*, 121

F.3d 984, 988-89 (5th Cir. 1997).   "Whether the expert would opine on economic valuation,

advertising psychology, or engineering, application of the *Daubert* factors is germane to

evaluating whether the expert is a hired gun or a person whose opinion in the courtroom will

withstand the same scrutiny that it would among his professional peers."  *Watkins*, 121 F.3d at

991.  In order to determine reliability, the gate-keeper should consider the following factors:

> (1) Whether a "theory or technique … can be (and has been) tested"; (2)
> Whether it "has been subjected to peer review and publication"; (3)
> Whether, in respect to a particular technique, there is a high "known or
> potential rate of error" and whether there are "standards controlling the
> technique's operation"; and (4) Whether the theory of technique enjoys
> "general acceptance" within a "relevant scientific community."

*Black v. Food Lion, Inc.*, 171 F.3d 308, 311 (5th Cir. 1999).   In short, the Court has a

responsibility "to make certain that an expert, whether basing testimony upon professional

studies or personal experience, employs in the courtroom the same level of intellectual rigor that

5

characterizes the practice of an expert in the relevant field." *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 372 (5th Cir. 2000) (quoting *Kumho*, 119 S.Ct. at 1176).

## C.   Dr. Shelley's Report Contains Numerous (and Erroneous) Legal Conclusions that Must Be Excluded.

Dr. Shelley's expert report and her testimony are replete with legal conclusions.  These conclusions fall far outside the scope permissible expert testimony and therefore must be excluded.  Witnesses can provide opinion testimony as to "ultimate issues," Fed. R. Evid. 704, but legal conclusions as expert evidence are inadmissible. *See*, *Owen v. Kerr–McGee Corp.*, 698 F.2d 236, 240 (5th Cir.1983).  "It is the job of the Court – not the expert – to instruct the jury on the applicable law."  *Lackey v. SDT Waste & Debris Servs.*, LLC, CIV.A. 11-1087, 2014 WL 3866465 (E.D. La. Aug. 6, 2014) (citing *Askanase v. Fatjo*, 130 F.3d 657, 673 (5th Cir.1997)). Further, an expert cannot "supplant[s] [the] jury's independent exercise of common sense," *C.P. Interests, Inc. v. California Pools, Inc.*, 238 F.3d 690, 698 (5th Cir. 2001), and tell the jury "nothing more than" what its verdict should be. *Owen v. Kerr-McGee Corp.*, 698 F.2d at 240.  A court may exclude an expert witness if that expert was offered to provide inadmissible legal conclusions. *Alldread v. City of Grenada*, 988 F.2d 1425, 1436-37 (5th Cir. 1993); *Lackey*, 2014 WL 3866465, *8.

Dr. Shelley's report contains numerous legal conclusions, and her testimony as presented in her Report would supplant the roles of both the judge and the jury.  Therefore, her testimony on the following must be excluded:

1.   Dr. Shelley's Misapplied Legal Definition of Human Trafficking that is More Restrictive than Plaintiffs' Forced Labor Claims Should Be Excluded.

Dr. Shelley reaches the legal conclusion in her report that "the Signal situation differs from the US definition of human trafficking, as defined by the Trafficking Victims Protection Act, the prevailing federal law."  (Shelley Rep. at 12, ¶19.)  Further, peppered throughout her

report, Dr. Shelley references the TVPA's definition of a "severe form of trafficking," 22 U.S.C. § 7102(9),[1] in support of her position that Plaintiffs are not victims of human trafficking.  Dr. Shelley cannot invade the province of the jury and give opinions on ultimate legal conclusions. The danger of allowing experts to invade the jury's providence is manifest in this case because Dr. Shelly does not seek to apply – or even mention in her report – the trafficking law applicable to this case.  Notably, a "severe form of trafficking" is not part of Chapter 77, Title 18 of the U.S.  Code, for which TVPA reauthorizations have created a private right of action.  See 19 U.S.C. § 1595.  Plaintiffs bring their TVPA claims pursuant to 18 U.S.C. § 1595 for violations of the forced labor and trafficking in persons provisions of 18 U.S.C. §§ 1589 and 1590.

       2.       <u>Dr. Shelley's Opinion Addressing a Nonexistent Debt Bondage Claim Should be Excluded</u>.

Dr. Shelley also spends a considerable portion of her report contesting a debt bondage claim that the Plaintiffs do not assert.  (Shelley Rep. 9-10, ¶13-15).  Plaintiffs cannot bring a debt bondage claim because their debt was not to Signal, their employer, but Dr. Shelley is incorrect that Plaintiffs actually bring a debt bondage claim.  Rather, Plaintiffs' debt became an element of their forced labor claim because, as the *David* Court has noted, "'serious harm' includes financial harm 'that is sufficiently serious ... to compel a reasonable person .. to perform or to continue performing labor services in order to avoid incurring that harm.' Courts have found that threats of being in debt and being unable to repay those debts constitutes 'serious harm' . . .." *David v. Signal Int'l*, LLC, CIV.A. 08-1220, 2014 WL 4063875, -- F.Supp.2d -- (E.D. La. Aug. 12,

---

[1] A "severe form of trafficking" in the labor context is defined as "the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services, through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery."  22 U.S.C.  § 7102(9)(B).

2014)(citing *Nunag–Tanedo*, 790 F.Supp.2d 1134 (C.D.Cal.2011); *Panwar v. Access Therapies, Inc.*, 2013 WL 5486783 (S.D.Ind. Sept.30, 2013)).

      3.    <u>Dr. Shelley's Opinion Addressing Exemption of Signal Housing Facilities from Standards in the Occupational Safety and Health Act Should Be Excluded</u>.

In her report, Dr. Shelley states that "Signal was exempt from OSHA standards for the housing of its H2B workers…"  (Shelley Rep. at 28, ¶32.).  Even if Dr. Shelley were to provide an inkling of support for this statement – which she does not in her report or her deposition testimony (Shelley Dep. 13:21 – 16:11.) – coverage under the OSHA is a legal conclusion Dr. Shelley is not qualified to make.  This may be contrasted with using OSHA regulations "as guides for the determination of standards of care."  *Lee v. Cent. Gulf Towing, L.L.C.*, CIV.A. 04-1497, 2005 WL 6773727 (E.D. La. Aug. 1, 2005).  The latter would be within the permissible scope of an expert's testimony, but Dr. Shelley's opinion goes well beyond the permissible scope.

      4.    <u>Dr. Shelly's Opinions Regarding The U.S. Department of Justice Special Counsel Immigration Related Unfair Labor Practices March 2008 Letter Should be Excluded</u>.

In her Report, Dr. Shelley echoes the contention Signal has made in numerous public statements that, because in 2008 the U.S. Department of Justice Special Counsel for Immigration Related Unfair Labor Practices (DOJ-OSC) did not find "sufficient evidence of reasonable cause" to show that Signal discriminated or retaliated based on citizenship, Signal has been "cleared" of discrimination and retaliation.  (Shelley Report ¶¶ 16 and 34).  Again, Dr. Shelly's attempt to offer a legal conclusion misses the mark.  Since H2-B visa holders are not "protected individuals" under 8 U.S.C. § 1324b(a)(1), (3), and the DOJ-OSC only investigates employers with fewer than 15 employees, see 9 U.S.C. § 1324b(a)(2)(B), DOJ-OSC would not have investigated any citizenship or national origin discrimination claims brought by Plaintiffs.  And

of course, the EEOC, after reviewing evidence developed from the David case, did file suit against Signal for discrimination and retaliation against the Plaintiffs and others.  E.D. La. No. 12-557.  Explaining why Dr. Shelley chose to ignore the EEOC case entirely in her Report, Dr. Shelley stated only that it was "because I am much more familiar with the Department of Justice." (Shelley Dep. 122:8 – 130:17).

     5.     <u>Dr. Shelley's Opinions Addressing Law Regarding Agency Should be Excluded</u>.

Throughout her report, Dr. Shelley suggests that, because Signal purportedly did not make deceptive statements directly to recruits in India, "Signal was not part of any deceptive promises."  (*e.g.*, Shelley Rep. at 17, ¶ 27).  The part Signal played in extending deceptive promises or charging fees to the Plaintiffs will hinge largely on questions of agency.  Dr. Shelley should not be permitted to interpret agency law for the Court.

     **D.**     **Dr. Shelley's Methodology is Not Scientifically Valid.**

For many of her opinions, Dr. Shelley asks this Court to make "scientifically unsupported leaps of faith in the causal chain."  *See e.g., Rider v. Sandoz Pharm. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2012).  "This is not an exercise in scientific logic but in the fallacy of *post-hoc propter-hoc* reasoning, which is as unacceptable in science as in law."  *Black v. Food Lion, Inc.,* 171 F.3d 308, 313 (5th Cir. 1999).  The Court should exclude these portions of Dr. Shelley's testimony in this case for precisely this reason.  She is simply offering "conclusory statements devoid of factual or analytical support."  *Cook v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1111 (11th Cir. 2005) (internal quotations and citations omitted); *General Star Indemnity Co. v. Sherry Brooke Revocable Trust*, 243 F.Supp.2d 605, 626 (W.D. Tex. 2001) ("Conclusory opinions by designated experts lack the requisite evidentiary reliability mandated by Rule 702 because they fail to set forth a discernible methodology.").  Two of the most egregious examples are discussed below.

First Dr. Shelley contends that "Independent government investigation by the Texas government and researchers of the Department of Justice determined the Signal case did not involve trafficking …" and "the Texas State Task Force Report reveals that law enforcement authorities were working on trafficking in the region of Orange, Texas and both the Texas Task Force and the Bureau of Justice Statistics determined that the Signal case was not trafficking, as it is not included either in the Texas State trafficking report or in the BJS Report."  (Shelly Rep. ¶20.)  Incredibly, the Justice Department report Dr. Shelley references does not reference any specific case, but rather presents nation-wide statistics regarding confirmed and reported human trafficking incidents.[2]  Similarly the Texas report does not describe cases, with the exception of certain media reports about eight criminal human trafficking cases and a separate short description of a criminal prostitution raid in Beaumont based on one of the eight media reports.[3] Dr. Shelley's attempt to pull non-existent conclusions from these reports lacks any semblance of intellectual rigor.  *Seatrax*, 200 F.3d 358 at 372.

---

[2] The Justice Department report is available at
http://www.bjs.gov/content/pub/pdf/cshti0810.pdf.  ("USDOJ Report")  Dr. Shelley makes much of Table 5 in the DOJ report, which only lists nine Asian victims of labor trafficking.  (Shelley Rep. at ¶ 22).  However, Dr. Shelley does not reveal that Table 5 actually lists "cases confirmed to be human trafficking by high data quality task forces." At the time of the report, only 18 of 42 task forces in the United States were "high data quality task forces."  USDOJ Report at 5.  To qualify as a "confirmed" human trafficking case under DOJ's guidelines, there either must have been an arrest and confirmation by law enforcement or a "continued presence" or T or U visa endorsement – both of which can only be issued by law enforcement.  USDOJ Report 2. Therefore, an alleged human trafficking incident observed by a task force but not confirmed by law enforcement would not be included in DOJ's statistics.  Further confusing the issue, Dr. Shelley in her report refers to a Texas task force where, in fact, the Texas Attorney General report Dr. Shelley references indicates there were five separate task forces in operation in Texas. TX AG Report at 6.  There is no indication that any of the Texas task forces were among the small minority presenting data to DOJ considered for its report.
[3] The Texas Attorney General's report is available at
https://www.texasattorneygeneral.gov/AG_Publications/pdfs/human_trafficking_2008.pdf.  The media reports are summarized in Appendix B.  The description of the Beaumont prostitution raid is on page 20, as well as in the media reports.

Second, to counter the factual evidence related to the quality of the food and testimony of the Plaintiffs, Dr. Shelley opines that the food at the Signal man camp was "adequate in quantity and was nutritional."  (Shelley Rep. at 19, ¶28.)  Dr. Shelley came to this conclusion by eating at a commercial restaurant run by the caterers in New Orleans more than six years after the last Indian H-2B worker ate at the man camp.  (Shelley Rep. at 19, ¶28.)  In addition, she reviewed photos of unidentified Indian H-2B workers on an unspecified "family day" and contended that the workers gained weight.  (Shelley Rep. at 23, ¶36.)  Dr. Shelley's methodology, looking at photos and eating in a restaurant, are not valid methodologies for determining the quality of food served in a man camp six years earlier and two hundred miles away.

### E.      Dr. Shelley's Expert Testimony Does Not Assist the Trier of Fact.

Dr. Shelley's testimony should be excluded because it does not assist the trier of fact. Expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person.  "The expert testimony must be relevant, not simply in the sense that all testimony must be relevant, Fed. R. Evid. 402, but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue."  *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003).

 "Proffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments."  *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1373 (S.D. Fla. 2005).  While Dr. Shelley is an established professor focused on human trafficking, her opinions largely parrot Signal's theory of the case, and that is not the role of an expert witness.

In *Rezulin Products Liability Litigation*, 209 F. Supp. 2d 531 (S.D.N.Y. 2004), the defendant moved to exclude the plaintiff's expert who proposed to testify to a narrative reciting selected regulatory events concerning the drug at issue.  The defendant argued that the proposed

11

testimony was "nothing more than a repetition of the factual allegations in the plaintiff's complaint combined with comments amounting to [the expert's] spin on the facts."  *Id*. at 551. The court rejected this proffered expert testimony, finding that "such material, to the extent it is admissible, is properly presented through percipient witnesses and documentary evidence."  *Id*. The court stated that the expert would do "no more than counsel for plaintiff will do in argument, i.e., propound a particular interpretation of [defendant's] conduct."  *Id*.

Here Dr. Shelley recites Signal's positions, opines that:

- Dr. Shelley repeatedly insists that Signal bore no responsibility for and had no knowledge of the recruitment practices of Sachin Dewan, Michael Pol, and Malvern Burnett.  In fact, Dr. Shelley suggests that Signal was justified in relying on the recruiter defendants because there was no publicly available information about recruitment practices and human trafficking in India.[4]  That Signal provided a blanket Power of Attorney to Sachin Dewan, with whom Signal had no prior business relationship, apparently knowing nothing nor attempting to learn about corrupt India recruitment practices, speaks volumes about Signal's own recklessness.[5]

- Signal did not discriminate against the Indian workers (Shelley Rep. ¶34.)

- Signal's worker safety practices were "exemplary."  (*e.g.* Shelley Rep. at ¶¶ 13, 17, 28 (p. 21), 42, 43, 44).

- Some of the Indian H-2B workers committed fraud during the skills tests in India (Shelley Rep. at 11, ¶ 17 - 34).

- Signal's requirement that Plaintiffs open bank accounts and a single Signal-designated bank "represents an effort by Signal to protect [the H-2B workers'] funds."

- With no expertise on the subject or reference to more than a single magazine article about FEMA trailers, Dr. Shelley parrots Signal's position that there was no decent rental housing available for the Indian H-2B workers other than the labor camps.  At

---

[4]In her extensive deposition testimony on the subject of Signal's knowledge of the recruitment process, Dr. Shelley vacillates between different contradictory facts.  Ultimately, it became very clear that Dr. Shelley in fact understood little about when and how Signal learned about what she described as the recruiters' "duplicitous practices," nor about Signal's rand esponse to these practices.  (Shelley Dep. at 25-99.)

[5]In her deposition testimony, Dr. Shelley acknowledges that "I think [Signal] could have worked better with the recruiters.  I think as you suggested maybe there could have been a more informed procedure to work with these workers in India."  (Shelley Dep. at 96:22 – 97:6).

the same time, she insist that the Plaintiffs were not required to live at Signal's man camp.  During her deposition testimony, however, she clarified that Signal did not give the Indian H-2B workers the option, if they could find rental housing off site, of not paying the $1,050 monthly boarding charge.

- Dr. Shelley contends that the trailers at the man camps were "high end" and were better than the Plaintiffs would have experienced in the Persian Gulf or Saudi Arabia. (Shelley Rep. at ¶ __.)  Dr. Shelley bases this conclusion on a visit to some of the trailers (*id*.) <u>after</u> they no longer had beds or occupants (Shelley Dep., pp. 210-11), and a video of the man camps "just before the facilities were closed" when they had no occupants (Shelley Dep., p. 211).  In her deposition, Dr. Shelley acknowledged that she had not been shown a video taken of the Mississippi man camp while it was fully occupied.  (*Id.*, pp. 212-13.)

- Though Dr. Shelley is not a financial expert, she claims the $1,050 monthly boarding charges the H-2B workers paid to Signal "was not as source of profit for the company."  (Shelley Rep. at ¶ 33). This point is contradicted by Plaintiffs' financial expert.  Dr. Shelley also suggests that "housing prices for non-citizens were necessarily higher."  (Shelley Rep. at ¶ 33).

These are two examples of Dr. Shelley simply providing conclusory support for Signal's theory of the case.  Dr. Shelley admits she has no knowledge of safety proceeds and no knowledge of the workers skills.  Dr. Shelley's Report is riddled with additional examples. These regurgitations of Signal's theory will not help the trier of fact.

### F.    Dr. Shelley Is Not Permitted to Assess Witness's Credibility.

Dr. Shelley improperly opines as to the Plaintiff's credibility, a question at the core of what a trier of fact must resolve.  Absent disputes about the truth, there would be little need for a jury.  Juries similarly would become largely superfluous if experts were to supplant the jurors' role in determining the credibility of witnesses.

It is for this reason that courts do not permit experts to ascertain witness' and parties' credibility.  *See, e.g.*, *Schmidt v. MTD Products, Inc.*, CIV.A. 04-3412, 2006 WL 5127539, *3 (E.D. La. July 5, 2006); *see also*, *Goodwin v. MTD Prods., Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ("[A]n expert cannot testify as to credibility issues. Rather, credibility questions are within the province of the trier of fact, in this case a jury."); *Hasham v. California State Bd. Of*

13

*Equalization*, 200 F.3d 1035, 1047 (7th Cir. 2000) (same); *United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999) ("It is the exclusive province of the jury to determine the believability of a witness .... An expert is not permitted to offer an opinion as to the believability or truthfulness of a witness's story"); *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir.1999) ("Regardless of the intent or motivation of the expert in commenting on the eyewitness testimony, we agree ... that the testimony regarding the credibility of eyewitness testimony was improper."); *Frase v. Henry*, 444 F.2d 1228, 1231 (10th Cir. 1971) (expert cannot state legal conclusions by passing upon weight or credibility of the evidence, or usurping the province of the jury by telling it what result should be reached); *Mar Oil Co. v. Korpan*, 973 F. Supp. 2d 775, 786 (N.D. Ohio, 2013) ("An expert cannot testify about a witness' credibility. The jury, not the expert, evaluates credibility."); *Richman v. Sheahan*, 415 F.Supp.2d 929, 941–42 (N.D. Ill. 2006) ("A fundamental premise of our system of trial in both civil and criminal cases is that determining the weight and credibility of witness testimony is for the jury, who are presumed to be fitted for the task by their natural intelligence and their practical knowledge of the affairs of life"); *4 Weinstein's Federal Evidence* § 702.06 ("The credibility of witnesses is normally an issue left exclusively to the finder of fact, and is an improper subject for expert testimony."). ("I have said that in interviewing many of the top management of Signal I have seen a great concern for the Indian workers." (Shelley Dep., p. 65). Dr. Shelley's regard for her clients at Signal is also evidenced by her use of their first names in recounting her chats with them: "I talked to Darrell, yes." (*Id.*, p. 29, referring to Mr. Snyder); "I have had discussions with Tracey and Ron" (*Id.*, p. 134, referring to Ms. Binion and Mr. Schnoor.)

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Plaintiffs' Motion to Exclude Dr. Louise Shelley as an expert. Dr. Shelley's transparent bias and the lack

of intellectual rigor in her analysis and opinions render her testimony and Report inadmissible under Fed. R. Evid. 702 and *Daubert*, and she should be excluded entirely.

DATED:  October 17, 2014.

Respectfully Submitted,

KILPATRICK TOWNSEND &
STOCKTON, LLP
bboice@kilpatricktownsend.com
bcorgan@kilpatricktownsend.com
spangborn@kilpatricktownsend.com
sramsey@kilpatricktownsend.com
hheindel@kilpatricktownsend.com
tludlam@kilpatricktownsend.com
kreed@kilpatricktownsend.com
abelagodu@kilpatricktownsend.com
rwilliamson@kilpatricktownsend.com
liza.akins@kilpatricktownsend.com

By:   */s/ Shane G. Ramsey*
William H. Boice
Georgia Bar No. 065725
Brian G. Corgan (*Pro Hac Vice*)
Georgia Bar No. 187700
Susan W. Pangborn (*Pro Hac Vice*)
Georgia Bar No. 735027; CA Bar No. 282533
Shane G. Ramsey (*Pro Hac Vice*)
Georgia Bar No. 940547
Heather L. Heindel (*Pro Hac Vice*)
Georgia Bar No. 285204
Akarsh P. Belagodu (*Pro Hac Vice*)
Georgia Bar No. 496714
Reginald A. Williamson (*Pro Hac Vice*)
Georgia Bar No. 462110
Elizabeth C. Akins (*Pro Hac Vice*)
Georgia Bar No. 796422
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404)-815-6555

Taylor H. Ludlam (*Pro Hac Vice*)
North Carolina Bar No. 42377
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609

Kristopher L. Reed (*Pro Hac Vice*)
Colorado Bar No. 36991
1400 Wewatta Street, Suite 600
Denver, CO  80202

*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF CONFERENCE</u>

This is to certify that on October 16, 2014, counsel for the *Samuel* Plaintiffs (Mr. Ramsey) met by telephone with counsel for the Signal Defendants (Ms. Hangartner, Mr. Roux, and Mr. Weinberger) for the purposes of complying with the meet and confer requirement in Local Rule CV-7(h).  Counsel for plaintiffs in the *Joseph* (Mr. Fleming and Ms. Landers) and *David* (Mr. Howard) cases also attended, as did counsel for the Dewan Defendants (Mr. Shapiro).  Counsel for the Burnett Defendants (Mr. Cerniglia) was notified of the conference, but was unable to attend.  Counsel for the *Joseph* Plaintiffs explained that Plaintiffs intended to file a motion to exclude Dr. Shelley as an expert witness pursuant to Fed. R. Evid. 702 and *Daubert*.  Counsel for the Signal Defendants indicated that Signal intends to oppose the motion as to Dr. Shelley, although counsel for Signal did agree to withdraw a separate proposed expert report that Signal has served on Plaintiffs (Dr. Sebastian Irudaya Rajan).

*/s/ Shane Ramsey*
Shane G. Ramsey (*Pro Hac Vice*)
Georgia Bar No. 940547
Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 17, 2014 a true and correct copy of

**SAMUEL PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY AND STRIKE THE**

**EXPERT REPORT OF DR. LOUISE SHELLEY** was filed electronically with the Clerk of

Court using the CM/ECF system, which will automatically send e-mail notification of such

filings to all attorneys of record.

I FURTHER CERTIFY that U.S. Mail sent to the address of record for Global Resources,

Inc. has been returned undeliverable, therefore I am unable to serve a copy of these pleadings on

Global Resources, Inc.  The last known address of Global Resources, Inc. is:

> Global Resources, Inc.
> c/o Michael Pol
> 13 Herring Road
> Beaumont, MS 39423-2055

| | |
|---|---|
| KILPATRICK TOWNSEND & | By:    _/s/ Shane G. Ramsey_____ |
| STOCKTON, LLP | Shane G. Ramsey (*Pro Hac Vice*) |
| 1100 Peachtree Street, Suite 2800 | Georgia Bar No. 940547 |
| Atlanta, GA 30309-4528 | |
| Telephone:  (404) 815-6500 | |
| Facsimile:  (404)-815-6555 | |
| sramsey@kilpatricktownsend.com | Attorney for Plaintiffs |

2