# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# BEAUMONT DIVISION

| | |
|---|---|
| REJI SAMUEL, ATHA MOHAMMAD ABDUL, KESAVARAO BUNDANKAYALA, RAJU DIVAKARAN, BIJU PERUMPILLY GEORGE, KRISHNA GONTHINA, NAYAPPULLI JAYACHANDRAN, GALLA VENKATA RAMA KRISHNA, SAMUEL JOSE KUMRUMTHODATHIL, JOHNY MANDY MATHAI, BELTHAZAR PETER, MOHANAN BALAKRISHNA PILLAI, SANTHOSH KUMAR RAJENDRAN PILLAI, ABY KARICKATHARA RAJU, SUMESH PORAMBATHUPARAMBIL SUBRAMANIAN, and CHANDRAN SHAJU THANISSERY, <br><br>Plaintiffs,<br><br>v.<br><br>SIGNAL INTERNATIONAL L.L.C., SIGNAL INTERNATIONAL, INC., SIGNAL INTERNATIONAL TEXAS, G.P., SIGNAL INTERNATIONAL TEXAS, L.P., MALVERN C. BURNETT, GULF COAST IMMIGRATION LAW CENTER, L.L.C., LAW OFFICES OF MALVERN C. BURNETT, A.P.C., GLOBAL RESOURCES, INC., MICHAEL POL, SACHIN DEWAN, and DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS),<br><br>Defendants. | CIVIL ACTION NO: 1:13-cv-00323-MAC-ZJH |

## SAMUEL PLAINTIFFS' RESPONSE IN OPPOSITION TO SIGNAL DEFENDANTS' MOTION IN LIMINE TO EXCLUDE/LIMIT TESTIMONY OF AMY MOWL

KILPATRICK TOWNSEND &
  STOCKTON, LLP
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone: (404) 815-6500
Facsimile: (404)-815-6555
bboice@kilpatricktownsend.com
bcorgan@kilpatricktownsend.com
spangborn@kilpatricktownsend.com
sramsey@kilpatricktownsend.com
hheindel@kilpatricktownsend.com

William H. Boice
Georgia Bar No. 065725
Brian G. Corgan (*Admitted Pro Hac Vice*)
Georgia Bar No. 187700
Susan W. Pangborn (*Admitted Pro Hac Vice*)
Georgia Bar No. 735027; CA Bar No. 282533
Shane G. Ramsey (*Admitted Pro Hac Vice)*
Georgia Bar No. 940547
Heather L. Heindel (*Admitted Pro Hac Vice*)
Georgia Bar No. 285204
*Remaining Counsel Listed on Signature Page*

Attorneys for Plaintiffs

Plaintiffs Reji Samuel, et al. ("Plaintiffs") respectfully submit this their response in opposition to the Signal Defendants' Motion in Limine to Exclude/Limit Testimony of Amy Mowl [ECF No. 159] (the "Motion"). Signal's arguments regarding Ms. Mowl's testimony are based on fundamental mischaracterizations of the nature and basis of Ms. Mowl's opinions, as well as fundamental misunderstandings as to the law regarding admissibility of expert testimony, and should be rejected.

Ms. Mowl's proposed testimony provides a culturally specific socio-economic context to assist the jury in understanding the nature of the debts incurred by Plaintiffs in India to pay the hefty recruitment fees charged by Defendants. Ms. Mowl's proposed testimony usurps no function of the jury, nor does she otherwise improperly exceed her role. Ms. Mowl's testimony is based on reliable sources, and is based on sufficient facts and data. And finally, disputes regarding the bases and sources of Ms. Mowl's opinion go to the weight rather than the admissibility of her testimony and should be left for the consideration of the jury.

## FACTUAL BACKGROUND

On June 9, 2014, Plaintiffs served their expert reports on Defendants, including the expert report of economist Ms. Mowl (the "Report"), attached hereto as Exhibit A. Ms. Mowl is a research economist with ten years' experience conducting research on household economic behavior and decision-making in India. (Report ¶ 1.) She is currently employed with the Institute for Financial Management and Research Finance Foundation, based in Chennai, India. (*Id.*) Her research on household finance in India includes design and implementation of a "long-term, comprehensive quantitative survey of 10,000 rural and urban households [in South India] which examines the topics of household finance, education, health, migration and gender." (*Id.* ¶ 3.) It also includes extensive research on "financial, institutional, and social barriers to accessing

formal finance" and use of non-bank moneylenders and unregulated loans by Indian households. (*Id.* ¶ 4.) As part of her research, she has conducted studies in which Indian moneylenders and borrowers have been interviewed about lending, borrowing, and loan collection practices. Mowl Dep. 57:23-61:23, Oct. 8, 2014, a copy of the transcript of which is attached hereto as <u>Exhibit B</u>.

Ms. Mowl's proposed expert testimony focuses on moneylending, household debt, debt collection, and contracting practices in India. (*See* Report.) Her Report provides information on limited access to regulated banking and bank loans in India. Drawing on numerous academic studies and reports from sources such as the World Bank and Indian government, Ms. Mowl describes the structure and common characteristics of loans extended by unregulated, informal moneylenders in India. (*Id.* ¶¶ 16-29.) These were the kinds of loans upon which many Plaintiffs relied, at least in part, to raise funds to pay Defendants' recruitment fees. Ms. Mowl also draws on her expertise and various academic sources to describe the social context of individual debt-holding in India. (*Id.* ¶¶ 30-33.)

Ms. Mowl's report also examines common debt-collection practices of both formal banks and informal moneylenders in India, citing numerous sources, including academic publications and over a dozen separate articles from newspapers including the *Wall Street Journal*, *New York Times*, and the *Hindu* (a longstanding, reputable English language paper). (*Id.* ¶¶ 34-41; *see also* Mowl Dep. 79:14-80:5.) The sources cited by Ms. Mowl report numerous instances of moneylender harassment of borrowers and their families that were published in 2006-2008, encompassing the time period in which most Plaintiffs were recruited by Defendants, incurred loans to pay Defendants' recruitment fees, and were trying to repay their debts while working for Signal in the United States. (Report ¶¶ 36-41; Compl. [ECF No. 1] ¶¶ 3-5.) Among the accounts

2

cited by Ms. Mowl were reports of attempted or actual suicides of debtholders and their family members, including, but not limited to, agricultural workers. (Report ¶¶ 36-41.)

In addition to the academic sources and news reports, Ms. Mowl reviewed Plaintiffs' sworn declarations and the Complaint in this case. (*See id.*, Ex. 2.) From review of this evidence, as well as drawing on academic sources and her own experiences surveying Indian households about their debts and researching moneylending practices in India, Ms. Mowl offered opinions as to:

> the India context and background on the types of financing that the plaintiffs had used before coming to the United States and to provide . . . background material on that, as well as to examine the specific details of every client's case and to examine the finances used to pay for the migration and to provide my opinion on what the decision-making would likely have been in taking up both the migration and the loan decisions and what I thought the likely outcome of all those decisions would be.

(Mowl Dep. 11:9-20.) In addition to the Plaintiffs' Complaint and declarations, Ms. Mowl cites and relies on numerous sources in her Report, the majority of which are studies by academics, non-governmental organizations, or government agencies. (*See generally* Report.)

## ARGUMENT

Rule 702 of the Federal Rules of Evidence provides for the admission of expert testimony if (1) the expert's specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue, (2) the testimony is based on sufficient facts or data, (3) the testimony is the product of reliable principles and methods, and (4) the expert has reliably applied the principles and methods to the facts of the case. Because the structure, practices, and social context of banking, moneylending, and access to credit in India are substantially different from those in the United States, Ms. Mowl's testimony would assist an American jury in understanding the likely impact and significance of Plaintiffs' borrowing large sums of money to finance the hefty recruitment fees charged by Defendants. Ms. Mowl's testimony is based on her

3

own significant research in the field, other academic studies, as well as Plaintiffs' sworn statements. Signal's misrepresentations and out-of-context quotations of Ms. Mowl's testimony notwithstanding, Ms. Mowl's report and testimony demonstrate reasoned, reliable application of her knowledge and research regarding Indian debt and moneylending to the evidence in this case. Signal's criticisms with respect to the sources relied upon by Ms. Mowl in forming her opinions go to the weight, not the admissibility, of her testimony. Arguments of this nature are properly directed to a jury and are not an appropriate basis for exclusion.

> A. **Ms. Mowl Does Not Opine on Witness Credibility, and Questions Relating to the Underlying Factual Assumptions of Ms. Mowl's Opinion Should Be Left to the Finder of Fact.**

Ms. Mowl does not opine—and is not offering to opine—as to the accuracy or credibility of the Plaintiffs in their depositions and declarations. Neither has Ms. Mowl usurped the province of the jury as the trier of fact. Rather, Ms. Mowl merely relies upon the Plaintiffs' declarations in forming her opinions, a practice that is common among experts and accepted in the Fifth Circuit. Further, any dispute concerning the bases and sources of her opinion should be left for the consideration of the jury.

"An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703. In this case, some of the many sources on which Ms. Mowl based her opinion were the Plaintiffs' sworn declarations. Ms. Mowl stated that because the purpose of her expert report was to "form an opinion about the type of debt they'd taken on and their behavior and decision-making, it was important . . . to really see what their own words were . . . ." (Mowl Dep. 22:16-20.) Experts commonly and reasonably rely on deposition testimony, declarations, and affidavits in forming their opinions, and such sources are generally considered "sufficiently reliable bases" within the Fifth Circuit and elsewhere.

4

*Metrejean v. REC Marine Logistics, L.L.C.*, No. 05-5049, 2009 WL 3062622, at *3 (E.D. La. Sept. 21, 2009); *see also Dana Corp. v. Am. Standard, Inc.*, 866 F. Supp. 1481, 1501 (N.D. Ind. 1994) (stating that the expert "based his opinions on his understanding of what various depositions reported, and he may do that under Rule 703"). So long as the expert does not simply parrot statements without analysis or application of her expertise, reliance on declarations in forming an opinion is both commonplace and permitted. *See*, *e.g.*, *Chesapeake La., L.P. v. Innovative Wellsite Sys., Inc.*, No. 12-2963, 2014 WL 4388256, at *1-2 (W.D. La. Sept. 5, 2014) (permitting the use of deposition testimony in an expert opinion because the expert applied his expertise to the facts gleaned from the deposition testimony to reach his opinion, rather than merely parroting the testimony).

In this case, Ms. Mowl did much more than simply regurgitate the Plaintiffs' testimony. She instead applied her own extensive expertise and experience in the field to the facts in the Plaintiffs' statements in order to assist the jury in understanding debt instruments and collection practices in India, their social and cultural importance, and their specific impact on the Plaintiffs' decision-making. (Mowl Dep. 11:13-20 (stating that she was asked to provide background regarding debt instruments in India and to "examine the specific details of every client's case and to examine the finances used to pay for the migration and to provide [an] opinion on what the decision-making would likely have been in taking up both the migration and the loan decisions").) Ms. Mowl assessed the particular facts presented in the Plaintiffs' statements, including the varieties of debt instruments used to finance the recruitment process and the Plaintiffs' expectations regarding a permanent job in the United States, to opine that the "plaintiffs in question undertook a reasonable, rational investment." (Mowl Dep. 53:2-3.) Ms. Mowl also applied her expertise to opine as to the Plaintiffs' limited bargaining authority in the

5

context of Indian contracting practices, as well as the familial, social, and cultural pressures that Plaintiffs could expect as a result of their debt and the failure of their employment expectations. (Report ¶¶ 48-58.)

In her deposition, Ms. Mowl stated that she "ha[d] to assume that there was some truth behind" the sworn declarations upon which she relied simply for the purposes of rendering her opinion. (Mowl Dep. 47:4-5.) What Signal appears to misunderstand, however, is that Ms. Mowl will *not* be testifying to the jury that the declarants on whose statements she relied were telling the truth. In fact, Ms. Mowl approached each statement the same way she would approach any research document—by checking the consistency of the statements and whether they matched known trends, and her own expertise, regarding Indian finance products. (Mowl Dep. 47:5-16.) ("So, if . . . the person would say early on that he borrowed five lakh from three different moneylenders, I would start adding up the amounts, see if the interest rates added up, checking the banks, are those real Indian banks, are those products I'm familiar with.")

By relying on the Plaintiffs' statements—in addition to multiple other academic sources, articles, and her own vast experience—Ms. Mowl was neither making credibility determinations nor usurping the role of the jury. The statements are simply part of the bases and sources of her opinion. "[A]s a general rule, questions relating to the bases and sources of an expert's opinion affect the *weight* to be assigned that opinion rather than its *admissibility* and should be left for the jury's consideration." *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty.*, 80 F.3d 1074, 1077 (5th Cir. 1996)). If the Defendants wish to dispute the accuracy or veracity of the Plaintiffs' statements—or any of the sources on which Ms. Mowl relies—they can do so sufficiently through cross examination. As the Supreme Court stated in *Daubert v. Merrell Dow*

6

*Pharmaceuticals, Inc.*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof" is how one appropriately attacks admissible evidence. 509 U.S. 579, 596 (1993).

The cases cited by Defendants support this proposition. In *V & S Ice Machine Co. v. Eastex Poultry Co.*, the Fifth Circuit highlighted the well-known principle that "the credit and weight to be assigned to expert testimony are matters entrusted to the sound discretion of the trier of fact." 437 F.2d 422, 426 (5th Cir. 1971). Similarly, in *Pipitone v. Biomatrix, Inc.*, the Fifth Circuit held that the fact-finder was "entitled" to hear the expert's testimony and "decide whether it should accept or reject that testimony after considering all factors that weigh on credibility, including whether the predicate facts on which [the expert] relied are accurate." 288 F. 3d 239, 250 (5th Cir. 2002).

Simply put, Ms. Mowl's opinions do not usurp the province of the jury. She does not opine as to the Plaintiffs' credibility and does not merely regurgitate or parrot the Plaintiffs' statements. And finally, should the Defendants choose to dispute the veracity of the sources on which Ms. Mowl relies, the proper method is through cross-examination rather than exclusion. Accordingly, the Motion should be denied.

> B. **Ms. Mowl's Statements Related to Suicide Are Based On Reliable Sources and Questions Relating to the Sources of Ms. Mowl's Opinion Should Be Left to the Finder of Fact.**
>
> 1. <u>Signal Mischaracterizes and De-Contextualizes Mentions of Debtor Suicides in Ms. Mowl's Report and Testimony.</u>

Signal's argument for exclusion of "testimony regarding suicides in India stemming from debt," (Mot., 2.), is extremely vague and mischaracterizes the substance of Ms. Mowl's Report. Signal inaccurately contends that Ms. Mowl "discusses a 'wave of mass suicides' occurring with agricultural workers in the mid-2000s.'" (*Id.* at 5.) This is a significant exaggeration, as Ms.

7

Mowl mentions the topic of mass suicides of agricultural workers only to note that reports of such suicides, along with suicides among other rural indebted persons, were widely reported in the Indian media during the time period in which Plaintiffs were incurring debts to pay Defendants' recruitment fees. (Report ¶ 36.) Ms. Mowl's point in mentioning media reports of agricultural worker suicides is that such reports "heightened political and public awareness of debt practices and over indebtedness in rural areas." (*Id.*)

Contrary to Signal's arguments, Ms. Mowl does not present "Indian farmer suicide data" in her Report and testimony. In actuality, Ms. Mowl focuses on widespread media reports in the relevant 2006-2008 time period detailing harassment of indebted persons—not just agricultural workers—some of which was reported to have driven the indebted persons to attempt suicide. (*See id.* ¶¶ 36-41.) The point of Ms. Mowl's proffered testimony is not to discuss "Indian farmer suicide data" but to discuss examples of harsh collection practices used by moneylenders in India and media reports thereof, in order to place in cultural context Plaintiffs' articulated fears that they and their family members would be subject to severe harassment if they could not repay the debts they incurred in India. Indeed, in her Report and deposition testimony, Ms. Mowl discussed several instances in which reported lender harassment of borrowers was severe, but did not result in suicide. (*See generally id.* ¶¶ 40-41; Mowl Dep. 74:10-76:11.) The cited media reports are significant in part because such widespread reports themselves—even if one were to dispute their accuracy, which Defendants do not—could reasonably shape the beliefs of the Indian public, including Plaintiffs, as to the dangers of failing to repay their debts. (Report ¶¶ 35-41, ¶¶ 56-58.)

In light of what Ms. Mowl's Report actually says, Signal's primary complaint seems to be that Ms. Mowl mentions documented cases of suicide in discussing reported outcomes of

8

harassing debt collection tactics. While Signal predictably reacts with sensitivity to the mention of a suicide in this context – given that Plaintiffs were aware of an Indian worker at Signal's Mississippi man camp having attempted suicide rather than be deported and face debts he had incurred in India to pay his recruitment fees (*see* Compl. ¶ 168.) – Signal is not entitled to have all mentions of suicides stricken from expert discussion of debt collection practices.

> 2. Signal's Conclusory Attack on the Reliability of Sources Cited by Mowl is Without Substance and Is Not A Proper Ground for Exclusion.

Signal further complains that Ms. Mowl fails to cite sufficiently reliable or authoritative sources in support of her opinions regarding suicide data. In particular, Signal contends that the media reports regarding moneylender harassment and debt collection practices cited by Ms. Mowl are anecdotal, unverified and therefore unreliable.

In her Report, Ms. Mowl discusses over a dozen separate major media news reports published during the 2006-2008 time period relevant to this case, in which multiple incidences of harassment of borrowers by money lenders were discussed. The news sources cited by Ms. Mowl are major, reputable newspapers published in the United States and India. As Ms. Mowl explains, attempting suicide and "abetment to suicide" are official crimes in the Indian criminal code, which leads to these events being documented and reported regularly in the media. (*See* Report ¶¶ 35-36.) Moreover, as explained above, even if such reports were not true (and Signal does not challenge their accuracy), Ms. Mowl points to such reports as indicative of media attention and increased public awareness focused on the harsh consequences of debtor failure to repay loans, which likely would have shaped Plaintiffs' perceptions of what might happen to them and their families if they failed to timely repay their debts.

Federal courts have repeatedly reiterated that the reliability analysis under *Daubert* must remain flexible: "not every *Daubert* factor will be applicable in every situation; and a court has

9

discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). The reliability analysis "can adapt to the particular circumstances underlying the testimony at issue." *Engenium Solutions, Inc. v. Symphonic Techs., Inc.*, 924 F. Supp. 2d 757, 769 (S.D. Tex. 2013). In cases in which the subject of the expert testimony "is not subject to experimental conditions and testable methodologies, 'other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations.'" *Ariwodo v. U.S. Customs & Immigration Enforcement*, No. 04-04572, 2007 WL 580845, at *4 (S.D. Tex. Feb. 20, 2007) (quoting *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006)).

Here, the *Daubert* factors regarding testing, peer-reviewing, and rates of error are inapplicable to the topics on which Ms. Mowl opines, and the "authoritative source" that Signal demands is simply unavailable. Selectively quoting Ms. Mowl's deposition, Signal inaccurately suggests that there exists "rigorous data on the number of suicides classed by money lenders" or suicide data classified by skilled welders and pipe-fitters, all of which Ms. Mowl deliberately avoided in preparation of her Report. Signal points to no actual data at this level of specificity because it simply does not exist. When such data is unavailable, courts look to other indicia of reliability and frequently permit testimony where, "as here, the expert derives his testimony mainly from first-hand observations and professional experience." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 246 (5th Cir. 2002) (finding the expert's methodology reliable even though he failed to conduct an epidemiological study under the circumstances, and instead relied on experience and observation).

The reports Ms. Mowl cited were all from major reputable newspapers and were all coupled with Ms. Mowl's own considerable experience researching the practices and experiences

of moneylenders and debtors. Ms. Mowl is not required to have data sets or expertise at the granular level of moneylender-driven suicides among pipe fitters and welders in order to reliably opine on the general context of money lending and debt collection practices prevalent among the kinds of loans and moneylenders utilized by Plaintiffs. Expert testimony based on relevant and reputable underlying sources and supplemented by an expert's experience is sufficiently reliable to be admitted. *See, e.g.*, *Montgomery v. Parker Towing Co.*, No. 07-3218, 2008 WL 559569, at *2 (E.D. La. Feb. 26, 2008) (finding the expert's report reliable because it was "not only based upon the manual, but upon his experience as a safety professional").

Moreover, Signal's criticisms of the underlying bases and sources of Ms. Mowl's Report are properly directed to the weight, rather than the admissibility, of her testimony, and do not constitute a proper basis for limitation or exclusion. *See id.* (finding that the argument as to the sufficiency of the underlying sources "goes to the weight to be given [the expert's] testimony and not to its admissibility"); *Delta Towing, L.L.C. v. Justrabo*, No. 08-3651, 2009 WL 3763868, at *4 (E.D. La. Nov. 9, 2009) (finding that the argument that the expert's opinions are "unsupported by 'citation to testimony, documents or applicable standards'" goes to the "weight to be given [the expert's] testimony and not its admissibility," and noting that "challenges to [the expert's] knowledge and experience are better suited for cross-examination").

    **C.**    **Ms. Mowl Relied Upon Sufficient Facts and Data in Forming Her Opinions and Questions Relating to the Sources of Ms. Mowl's Opinion Should Be Left to the Finder of Fact.**

Ms. Mowl's opinions are based upon sufficient facts and data and should not be excluded. Rule 702 requires that an expert opinion be based on "sufficient facts or data" and is intended to safeguard against opinions based on "insufficient, erroneous information." *Arnold v. Canal Barge Co.*, No. 13-4966, 2014 WL 2465313, at *2 (E.D. La. June 2, 2014) (internal

11

quotation marks omitted). Experts are permitted, however, to rely on "one version of a disputed fact, and 'reliable expert testimony often involves estimation and reasonable inferences from a sometimes incomplete record.'" *Id.* (quoting *Moore v. Int'l Paint, L.L.C.*, 547 F. App'x 513, 516 (5th Cir. 2013)). As one court stated, contrary to Signal's arguments, "Rule 702 requires only *sufficient* data and facts, not *perfect* data and facts." *Id.* at *4. When an expert's underlying premises are not "completely unsubstantiated factual assertions," any disputes regarding those premises are best left to the jury. *Id.*

In forming her opinions, Ms. Mowl relied on much more than unsubstantiated factual assertions. In fact, Ms. Mowl cited a multitude of different sources in her Report and relied upon several academic papers and studies, on topics including, but not limited to: informal finance in low-income countries; consumer credit in India; financial intermediation in developing countries; moneylenders in Kerala; temporary migration; transaction costs in access to formal credit; and Indian economic development more broadly. (*See* Report.) Ms. Mowl also cited and relied upon several news reports and informal articles concerning financial systems in India, moneylenders, Indian banks, and more. (*See id.*) In addition to these sources, Ms. Mowl relied upon 15 sworn declarations by the Plaintiffs, the Plaintiffs' Complaint and her own significant experience in the fields of economics, informal finance, and debt instruments and collection. (*See id.*)

Signal blatantly ignores the majority of the sources cited by Ms. Mowl, and argues that Ms. Mowl has not relied on sufficient facts or data because she based her opinions "entirely on Plaintiffs' statements" and failed to request or rely upon data such as bank records or pay statements. (Mot., 6.) These arguments fail for two reasons: (1) neither bank records nor pay data were relevant to or would have impacted Ms. Mowl's opinions; and (2) the failure to

consider every available source of information is more appropriately addressed through cross-examination than through exclusion.

First, Ms. Mowl testified that formal banking records and documents are notoriously poorly kept in India and likely unavailable in any event. (Mowl Dep. 34:18-41:15.) Ms. Mowl testified that access to these records and documents was unnecessary in the forming of her opinion regarding the treatment of loan instruments and the social impact of debt in India given the weight of other evidence, including empirical evidence on borrowing, lending, savings, insurance, credit, patterns of house-hold decision-making, and behavioral economics. (*Id.* at 33:4-12.) Records concerning pay data related to the Plaintiffs' work in the United States were similarly unimportant to Ms. Mowl's analysis, as the bulk of her opinions focused on the reasonableness of the Plaintiffs' decision-making in choosing certain types of loans or debt instruments, and the sacrifices that they would have made in so doing based on social and cultural factors in India. (*See* Report ¶¶ 42-58.) Moreover, as Ms. Mowl explained, many of the Plaintiffs financed their migration by selling irreplaceable assets like family land or gold jewelry of female family members (which has huge cultural importance) rather than taking out loans. (*See* Mowl Dep. 142:23-143:12.) Accordingly, pay data showing whether the Plaintiffs could have paid back loans would have been irrelevant in the face of the non-monetizable sacrifices made by the Plaintiffs. (*Id.*[1])

Second, courts in the Fifth Circuit have repeatedly held that arguments related to the failure to consider certain sources of information go to the weight rather than the admissibility of

---

[1] Signal's argument in this section blatantly mischaracterizes Ms. Mowl's deposition testimony, claiming that she admitted that her failure to consider pay data was "a problem actually in [her] report." (Mot., 7.) In fact, Ms. Mowl made this statement in politely trying to respond to Signal's mischaracterizations of her report: "[M]aybe the report hadn't been clear that the nature of the debts that were taken here can't just be cleared in six months . . . it may have been my own fault. So, maybe it wasn't clear." (Mowl Dep. 144:25 – 145:5.) Read in proper context, it is clear that Ms. Mowl was commenting on Signal's misunderstanding of her Report, not fatal error on her part: "I think there is a mischaracterization here." (*Id.* at 144:21-22.)

13

the testimony. *See, e.g.*, *Mathis v. Exxon Corp.*, 302 F.3d 448, 460-61 (5th Cir. 2002) (finding no abuse of discretion in admitting the expert's testimony because the failure to consider certain sources or to conduct certain studies was unconnected to the purpose of the expert's testimony and because the proper method of attacking the expert testimony is through cross-examination before the jury); *Arnold*, 2014 WL 2465313, at *3 (stating that even "substantial" criticisms regarding the data and assumptions "go to the weight of [the expert's] testimony and not to its admissibility"); *Paes v. Rowan Cos.*, No. 12-1069, 2013 WL 757646, at *3-4 (E.D. La. Feb. 27, 2013) (finding that the failure to consider all available sources of information "go[es] to the weight to be assigned his opinion rather than its admissibility" and is "more appropriately addressed on cross-examination"). In one case, for example, the court admitted the expert testimony and found that arguments as to the use of assumptions instead of historical data, the failure to take account of relevant data, and the failure to make projections based on historical data "fall directly into the category of impeachment cross-examination." *Right of Way Maintenance Co. v. Gyro-Trac, Inc.*, No. H-05-4081, 2007 WL 1428634, at *2 (S.D. Tex. May 11, 2007). Signal will have ample opportunity to question Ms. Mowl's assumptions through cross-examination at trial.

## **CONCLUSION**

Signal's Motion mischaracterizes Ms. Mowl's opinions and the sources on which they were based at every turn. Contrary to Signal's arguments, Ms. Mowl does not opine on witness credibility, bases her opinions on reliable sources, and relied upon sufficient facts and data in forming those opinions. Accordingly, Signal's motion to exclude or limit the report and testimony of Ms. Mowl should be denied.

DATED:  November 3, 2014

KILPATRICK TOWNSEND &
STOCKTON, LLP
bboice@kilpatricktownsend.com
bcorgan@kilpatricktownsend.com
spangborn@kilpatricktownsend.com
sramsey@kilpatricktownsend.com
hheindel@kilpatricktownsend.com
tludlam@kilpatricktownsend.com
kreed@kilpatricktownsend.com
abelagodu@kilpatricktownsend.com
rwilliamson@kilpatricktownsend.com
liza.akins@kilpatricktownsend.com

Respectfully Submitted,

By:  /s/ Heather L. Heindel
William H. Boice
Georgia Bar No. 065725
Brian G. Corgan (*Pro Hac Vice*)
Georgia Bar No. 187700
Susan W. Pangborn (*Pro Hac Vice*)
Georgia Bar No. 735027; CA Bar No. 282533
Shane G. Ramsey (*Pro Hac Vice*)
Georgia Bar No. 940547
Heather L. Heindel (*Pro Hac Vice*)
Georgia Bar No. 285204
Akarsh P. Belagodu (*Pro Hac Vice)*
Georgia Bar No. 496714
Reginald A. Williamson (*Pro Hac Vice*)
Georgia Bar No. 462110
Elizabeth Crabtree Akins (*Pro Hac Vice*)
Georgia Bar No. 796422
1100 Peachtree Street, Suite 2800
Atlanta, GA 30309-4528
Telephone:  (404) 815-6500
Facsimile:  (404)-815-6555

Taylor H. Ludlam (*Pro Hac Vice*)
North Carolina Bar No. 42377
4208 Six Forks Road, Suite 1400
Raleigh, NC 27609

Kristopher L. Reed (*Pro Hac Vice*)
Colorado Bar No. 36991
1400 Wewatta Street, Suite 600
Denver, CO  80202

*Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 3, 2014, a true and correct copy of **SAMUEL PLAINTIFFS' RESPONSE IN OPPOSITION TO SIGNAL DEFENDANTS' MOTION IN LIMINE TO EXCLUDE/LIMIT TESTIMONY OF AMY MOWL** was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filings to all attorneys of record.

I FURTHER CERTIFY that U.S. Mail sent to the address of record for Global Resources, Inc. has been returned undeliverable, therefore I am unable to serve a copy of these pleadings on Global Resources, Inc.  The last known address of Global Resources, Inc. is:

> Global Resources, Inc.
> c/o Michael Pol
> 13 Herring Road
> Beaumont, MS 39423-2055

This 3rd day of November, 2014.

|  |  |
|---|---|
|  | By:  s/ Heather Heindel |
| KILPATRICK TOWNSEND & <br>   STOCKTON, LLP <br> 1100 Peachtree Street, Suite 2800 <br> Atlanta, GA 30309-4528 <br> Telephone:  (404) 815-6500 <br> Facsimile:  (404)-815-6555 | Heather L. Heindel (*Pro Hac Vice*) <br> Georgia Bar No. 285204 <br><br> Attorney for Plaintiffs |