**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | | |
|---|---|---|
| **REJI SAMUEL, et al.** | § | |
| | § | |
| **v.** | § | **1:13-CV-323** |
| | § | |
| **SIGNAL INTERNATIONAL L.L.C.,** | § | |
| **et al.** | § | |

<u>**REPORT AND RECOMMENDATION ON SIGNAL'S**</u>
<u>**MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. NO. 165)**</u>

This case is assigned to the Honorable Marcia A. Crone, United States District Judge, and is referred to the undersigned United States Magistrate Judge for all pretrial matters pursuant to a Referral Order.   (Doc. No. 5.)   Pending before the undersigned is a "Motion for Partial Summary Judgment" (Doc. No. 165) filed by Defendants Signal International, L.L.C., Signal International, Inc., Signal International Texas, G.P., and Signal International Texas, L.P. (collectively, "Signal"). Signal seeks summary judgment on three of the Plaintiffs' claims, arguing that some claims are defective as a matter of law, and that there is no genuine dispute of material fact as to others. After considering the parties' briefing (Doc. Nos. 165, 187, 200, 209) and the applicable authorities, the undersigned recommends that Signal's "Motion for Partial Summary Judgment" (Doc. No. 165) be denied.

<u>**I. Background**</u>[1]

In the aftermath of Hurricane Katrina, approximately 590 men, including the seventeen Plaintiffs in this case, were allegedly trafficked into the United States to provide labor for Signal's operations.   (Doc. No. 1, pp. 2–9.)   The Plaintiffs claim that the Defendants made false promises

---

1.  Local Rule CV-56(a) requires that a motion for summary judgment include a "Statement of Undisputed Facts."   Signal's "Statement of Undisputed Facts" contains both hotly contested facts, as well as legal conclusions. Therefore, this section contains only a brief recitation of the background of this case and should not be construed as a statement of facts.

of "permanent work-based immigration to the United States," and that to take advantage of this promising opportunity, the Plaintiffs allegedly "incurred significant debts to pay mandatory recruitment, immigration processing, and travel fees . . . ."   (Id. at p. 2.)   After arriving at Signal's facility in Orange, Texas, the Plaintiffs were allegedly subjected to serious abuses, threatened with deportation if they left, and forced to live in substandard conditions.   In addition, the Plaintiffs assert that they could not leave their jobs with Signal due to the large debts they incurred in their homeland.   Signal denies any wrongdoing and denies that the Plaintiffs were subjected to forced labor, trafficking, or involuntary servitude.

A putative class action was filed in the Eastern District of Louisiana on behalf of all the workers who had allegedly been trafficked to the United States to work at Signal's facilities in Texas, Louisiana, and Mississippi.   (See Doc. 1, David v. Signal Int'l, L.L.C., 2:08-cv-1220 (March 7, 2008)).   The court in David denied class certification, which caused the individual class members to file suit where their alleged injuries occurred.   See David v. Signal Int'l, L.L.C., No 08-1220, 2012 WL 10759668, at *37 (E.D. La. Jan. 4, 2012).   The Plaintiffs in this case worked at Signal's facility in Orange, Texas, which is within this judicial district.

The Plaintiffs are suing Signal, as well as Malvern C. Burnett, Gulf Coast Immigration Law Center, L.L.C., Law Offices of Malvern C. Burnett, A.P.C, Michael Pol, Global Resources, Inc., Sachin Dewan, and Dewan Consultants Pvt. Ltd. (a/k/a Medtech Consultants).   The Plaintiffs allege that some or all of the Defendants violated the following federal statutes: (1) the Trafficking Victims Protection Reauthorization Act of 2003; (2) the Racketeer Influenced and Corrupt Organizations Act; (3) the Civil Rights Act of 1866; and (4) the Ku Klux Klan Act of 1871.   (Doc. No. 1, pp. 32–50.)   In addition, the Plaintiffs assert causes of action for state law fraud, negligent misrepresentation, and breach of contract against all of the Defendants.   (Id.)

2

## II. Legal Standard

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"   Rogers v. Bromac Title Servs., L.L.C., 755 F.3d 347, 350 (5th Cir. 2014) (quoting FED. R. CIV. P. 56(a)).   "A genuine dispute as to a material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"   Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).   "The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."   Gellhaus v. Wal-Mart Stores, Inc., 769 F. Supp. 2d 1071, 1074 (E.D. Tex. 2011) (Crone, J.)   This burden is not met by "merely mak[ing] a conclusory statement that the other party has no evidence to prove its case."   Inn Foods, Inc. v. Mida, No. 6:06-cv-169, 2008 WL 2078965, at *2 (E.D. Tex. May 15, 2008) (Schneider, J.) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 328 (1986)).

"If the moving party fails to meet this initial burden, the motion must be denied regardless of the nonmovant's response."   Id. at *2 (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).   "If the movant does, however, meet this burden, the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."   Little, 37 F.3d at 1069.   The nonmovant's "burden is not satisfied with some 'metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence."   Id. at 1075 (internal citations omitted).   "Factual controversies are construed in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing

3

that an actual controversy exists." Espinoza v. Cargill Meat Solutions Corp., 622 F.3d 432, 437–38 (5th Cir. 2010).

### III. Analysis

The Plaintiffs' complaint contains seven claims for relief. (See Doc. No. 1, pp. 32–50.) Signal moved for summary judgment on three claims: violations of the Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and violations of the Ku Klux Klan Act of 1871 (42 U.S.C. §1985(3)). (See Doc. No. 165.) The undersigned will address Signal's motion on a claim by claim basis.

A. First Claim: Violations of the Trafficking Victims Protection Reauthorization Act of 2003

Congress passed the Victims of Trafficking and Violence Protection Act of 2000 to "combat trafficking in persons." See Pub. L. No. 106-386, 114 Stat. 1464, 1446 (codified at 22 U.S.C. § 7101 et seq.). This act was amended in 2003 to, inter alia, create a civil remedy for certain violations of Chapter 77 of Title 18 of the United States Code. See Trafficking Victims Protection Reauthorization Act of 2003 ("TVPRA"), Pub. L. No. 108-193, 117 Stat. 2875, 2878 (creating a civil remedy for violations of 18 U.S.C. §§ 1589, 1590, and 1591). In their first cause of action, the Plaintiffs seek damages under the civil remedies provision of the TVPRA (18 U.S.C. § 1595) for "forced labor" (18 U.S.C. § 1589) and "trafficking with respect to . . . forced labor" (18 U.S.C. § 1590).[2]

---

2. The Plaintiffs' complaint also alleged violations of 18 U.S.C. §§ 1583, 1584, and 1592(a). (Doc. No. 1, pp. 32–34.) The Plaintiffs' response, however, is clear that they are abandoning their reliance on these statutes. (See Doc. No. 187, p. 2) ("Plaintiffs have therefore determined to simplify the case by dismissing voluntarily their claim under the TVPA to the extent it relies upon sections 1583, 1584, 1592(a) and 1592(b)."). In addition, they have moved for dismissal of their claims to the extent they are based on these statutes. (Doc. No. 212.)

4

Signal claims that it is entitled to summary judgment on the Plaintiffs' trafficking claim (18 U.S.C. § 1590) because (1) the TVPRA did not apply extraterritorially at the time of the alleged trafficking and (2) "'that there is an absence of evidence to support' the case of the Plaintiffs with regard to the scienter required by § 1590 . . . ." (Doc. No. 165, p. 20) (quoting <u>Celotex Corp.</u>, 477 U.S. at 325).   As for the Plaintiffs' claims premised on violations of §§ 1592 and 1594, Signal argues that summary judgment is warranted because imposing civil liability for violations of these two statutes would require an impermissible retroactive application of the TVPRA.

      a.   *Applying the TVPRA to the facts of this case constitutes a domestic—not extraterritorial—application of the statute*

Signal argues that the TVPRA did not apply extraterritorially at the time of the alleged trafficking, and because the Plaintiffs' trafficking claim stems from conduct that is "significantly extraterritorial," their claim fails as a matter of law.   (Doc. No. 165, pp. 12–15.)   The Plaintiffs do not dispute that the TVPRA had no extraterritorial reach prior to 2008.   <u>See</u> William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No. 110-457, 122 Stat. 5044, 5071–72 (amending the TVPRA to confer extraterritorial jurisdiction).   Rather, the Plaintiffs insist that they are merely seeking a domestic application of statute, and therefore, whether the TVPRA can be applied extraterritorially is irrelevant.   (Doc. No. 187, pp. 13–17.) The undersigned agrees with the Plaintiffs, and finds that applying the TVPRA to the facts at hand—which involves trafficking workers into the United States—requires only a domestic application of the statute.[3]

To determine whether a statute is being applied extraterritorially or domestically, courts are to examine the facts of the case in light of the "'focus' of Congressional concern" in enacting

---

[3]. Because this case involves a domestic application of the TVPRA, the undersigned expresses no opinion on whether the TVPRA had any extraterritorial reach prior to 2008.   <u>Compare</u> <u>Adhikari v. Dauod & Partners</u>, 994 F. Supp. 2d 831, 835–36 (S.D. Tex. 2014) (withdrawing a previous opinion and holding that the TVPRA did not apply extraterritorially prior to 2008).

the statute.  Morrison v. Nat'l Austl. Bank Ltd., 561 U.S. 247, 266–70 (2010) ("For it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States.").  For example, in *Morrison*, the Supreme Court considered whether §10(b) of the Securities Exchange Act of 1934 was being applied domestically or extraterritorially.  Id.  The alleged misrepresentations that formed the basis of the claim were made in the United States and were about an American company, but the securities that were affected were only traded on a foreign stock exchange.  Id. at 251–53.  The Supreme Court found that the focus of §10(b) was "transactions in securities listed on domestic exchanges, and domestic transactions in other securities," as opposed to where the misrepresentations occurred.  Id. at 267.  Therefore, because the securities were only traded on a foreign exchange, as opposed to a domestic exchange, imposing liability would require an extraterritorial application of the statute.

After reviewing the plain language of the TVPRA, as well as the legislative history, the undersigned finds that what is critical under the TVPRA is "where the forced labor *occurred* and *to where* to victims were trafficked, and not *from where* the victims were trafficked . . . ."  Tanedo v. E. Baton Rouge Parish Sch. Bd., No. SA CV 10-01172, 2012 WL 5378742, at * 6 (C.D. Cal. Aug. 27, 2012) (emphasis added) (reaching this conclusion based on a comparison to the facts of *Morrison*).  For example, the Congressional findings supporting the passage of the Victims of Trafficking and Violence Protection Act of 2000—which are codified at 22 U.S.C. § 7101(b)—recognize that trafficking victims are "trafficked within or across international borders," and that "traffickers often transport victims from their home communities to unfamiliar destinations, including foreign countries."  22 U.S.C. § 7101(b)(1), (5); see also Tanedo, 2012 WL 5378742, at *6 (citing H.R. Conf. Rep. No. 106-939, at 1 (2000)).  Here, it is undisputed that the Plaintiffs were eventually brought to the United States.  Accordingly, imposing liability under

§ 1590 requires only a domestic application of the statute.   (See Doc. No. 2077, <u>David v. Signal</u> <u>Int'l, L.L.C.</u>, 2:08-cv-1220 (E.D. La. Jan. 6, 2015) (finding that the plaintiffs' claims under the TVPRA are not extraterritorial)).

Signal argues that the undersigned should follow *Adhikari v. Dauod & Partners*, 994 F. Supp. 2d 831 (S.D. Tex. 2014), which dismissed a trafficking claim on the grounds that the TVPRA did not apply extraterritorially prior to 2008.   (See Doc. No. 165, pp. 13–17); <u>see</u> <u>Adhikari</u>, 994 F. Supp. 2d at 835–37.   Signal, however, overlooks a critical distinction—the workers in *Adhikari* were not trafficked to the United States—they were trafficked from Nepal to Iraq.[4]   <u>Adhikari</u>, 994 F. Supp. 2d at 835–37; <u>see also</u> <u>John Roe I v. Bridgestone Corp.</u>, 492 F. Supp. 2d 998, 990, 999–1002 (S.D. Ind. 2007) (holding that the TVPRA did not apply where the alleged involuntary servitude occurred solely in Liberia).   Thus, *Adhikari* is not on point.

Accordingly, the undersigned agrees with the Plaintiffs and finds the that transporting or recruiting of workers *into the United States* is a domestic—not extraterritorial—application of the TVPRA.   The fact that the Plaintiffs are foreign or some of the acts may have occurred abroad does not change the domestic character of the Plaintiffs' claims.

   b.   *The Plaintiffs have put forth enough evidence to create a genuine dispute of material fact as to whether Signal is liable for trafficking*

Signal next argues that summary judgment is warranted because "the Plaintiffs have no evidence to prove [] that Signal always subjectively intended to convert the recruited individuals into involuntary, slave-like, forced laborers once they arrived in the United States."   (Doc. No. 165, p. 20.)   Signal's argument has three parts.   First, § 1590 requires finding that Signal

---

   4.   Some of the workers were told that their ultimate destination would be an American military installation in Iraq, and the plaintiffs alternatively argued that Military Extraterritorial Jurisdiction Act ("MEJA") made it a domestic application of the TVPRA.   <u>Adhikari</u>, 994 F. Supp. at 833.   The court found this unpersuasive.   <u>Id.</u> at 837 (noting that "the Court [had] already expressed [an] unwillingness to rest its jurisdiction on the 'murky area of the law' that is the MEJA").

"knowingly" trafficked the Plaintiffs "for the purpose" of forced labor, which Signal argues requires "proof of the specific intent associated with premeditated crime." (Id. at p. 21.) Second, there is no evidence to show that Signal had such intent. Third, to the extent that the Plaintiffs' claim stems from "financial coercion" based on the large debts they incurred, this type of harm was not recognized under the TVPRA until 2008. Therefore, according to Signal, to find liability based on financial coercion alone would require a retroactive application of the statute.

i.   Mental state required under §1590

It is unclear whether the parties truly dispute what is required to prove liability under § 1590. Signal argues that "what is required is proof that the recruits [were] being recruited for an unlawful form of labor, labor acquired through threats, for example, of serious harm." (Id.) The Plaintiffs have not argued that a lesser showing is needed or that Signal is *per se* liable for trafficking merely by recruiting workers. However, to the extent that there is a dispute, the undersigned will address Signal's argument.

Section 1590 states: "whoever knowingly recruits, harbors, transports, provides, or obtains by any means, any person for labor or services in violation of this chapter shall be fined under this title or imprisoned not more than 20 years, or both." 18 U.S.C. §1590; see also 18 U.S.C. § 1594 (creating a civil remedy for violations of § 1590). By its terms, § 1590 requires recruiting or transporting a person with the knowledge that it is for, amongst other things, forced labor. "Knowingly" means having the factual knowledge. See United States v. Ho, 311 F.3d 589, 605 (5th Cir. 2002) ("[T]he term 'knowingly' does not have any reference to a state of mind or to knowledge of the law. The knowledge requisite to a knowing violation of a statute is factual knowledge as distinguished from knowledge of the law . . . .") (alterations in original) (quoting Bryan v. United States, 524 U.S. 184, 192 (1998)). Therefore, the Plaintiffs need to demonstrate

that Signal had knowledge that workers were recruited or transported to be used as forced labor (or at least create a genuine dispute of material fact to survive summary judgment).   In other words, "[o]btaining the services of another person is not itself illegal; it is illegal only when accompanied by one of the three given circumstances [in §1589], and the jury must find that the defendant knew that the circumstance existed."   See United States v. Calimlim, 538 F.3d 706, 711 (7th Cir. 2008).

As noted above, it appears that the parties agree on this proposition.[5]   (Doc. No. 165, p. 21); (Doc. No. 187, pp. 22–23.)   To the extent that Signal believes that some higher mental state is required, Signal has cited no authority for such a proposition.

      ii.   <u>The Plaintiffs have put forth sufficient evidence of forced labor and trafficking to create a genuine dispute of material fact</u>

Signal claims that "the freedom the plaintiffs exercised during their time at Signal is irreconcilable with the inference that these individuals were trafficked," thus, it is entitled to summary judgment.   (Doc. No. 165, p. 25.)   To support its argument, Signal presents the Plaintiffs' depositions, in which they testified about their ability to freely come and go from Signal's facility.   (Id. at pp. 9–12.)   An example from Aby Raju's deposition is illustrative:

> Q: Every time you wanted to walk out of the housing facility, so long as you signed your name on the sign-out sheet, you can do that.   Right?
>
> A: If you are asking like that, that they would ask you, "Where are you going? What do you have in your hand," they examined that; when you are going out and coming

---

5.  Perhaps the undersigned's confusion stems from Signal's extensive discussion of *Morrissette v. United States*, 342 U.S. 246 (1952).   In *Morrissette*, the defendant was convicted for "knowingly" stealing and converting government property.   Id. at 248.   The defendant admitted to taking the property, but argued that he believed that it had been abandoned, and as such, did not "knowingly" convert the property.   Id.   The trial court, however, refused to allow this defense, which effectively read a mental state out of the statute.   Id. (noting that the trial court stated: "He took it because he thought it was abandoned and he knew he was on government property. . . That is no defense . . . I will not permit you to show this man thought it was abandoned.").   The Supreme Court held that this was an error, and that the statute required the defendant to know—as a matter of fact—that he was taking government property.   Id. at 270–74.   Therefore, if the jury believed that he thought the property had been abandoned, he did not "knowingly" convert government property.   To the extent that *Morrissette* instructs that the undersigned cannot simply read out of the TVPRA the "knowingly" element (which the Plaintiffs have not urged), it is applicable.   Otherwise, the undersigned strains to understand Signal's point.

in, they check you in person; and then they would also look at your badge number and try and see your ID for when you are going out and coming back in, too.

Q: But my question is every time you wanted to go out, you can go out?

A: Yes.   I could go out, but provided I meet all these conditions, then I could go out.

(Id., Ex. 14, 70:12–24.)   The other Plaintiffs testified similarly.   (See id. at pp. 9–12.)   Signal argues that because the Plaintiffs were not kept under lock-and-key and physically had the ability to leave its facility, there can be no claim of forced labor.   In turn, because there is no claim of forced labor, there can be no claim for trafficking.   See 18 U.S.C. § 1590 (prohibiting the trafficking of a person for forced labor).

Signal's argument, however, is inconsistent with the TVPRA.   At the relevant time, 18 U.S.C. § 1589 prohibited knowingly providing or obtaining the labor or services of a person:

(1) by threats of serious harm to, or physical restraint against, that person or another person;

(2) by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint; or

(3) by means of the abuse or threatened abuse of law or the legal process.

See Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106-386, 114 Stat. 1478, 1486–87 (codified at 18 U.S.C. § 1589).   By including the term "serious harm," the statute expressly sought to not just prohibit forced labor through physical restraint, but also other oppressive forms of "nonviolent coercion" as well.   See 22 U.S.C. § 7101(b)(1), (13). Therefore, Signal's argument that summary judgment should be granted merely because the Plaintiffs could leave its facility does not comport with the definition of forced labor under the TVPRA.   The Plaintiffs can survive summary judgment by presenting evidence that creates a fact

issue as to whether they were forced to continue working for Signal through "physical restraint," threats of "serious harm," *or* "abuse of law or the legal process."   See 18 U.S.C. § 1589.

After reviewing the Plaintiffs' evidence, the undersigned finds that there is a fact issue as to whether the Plaintiffs were subjected to forced labor.   For example, Mr. Raju testified that Signal made numerous threats that if he left Signal, he would be turned into immigration authorities. (Doc. No. 187, Ex. 8, 210:11–18.)   "[M]any courts have determined that threats of deportation constitute a condition of servitude induced through abuse of the legal process."   Kiwanuka v. Bakilana, 844 F. Supp. 2d 107, 115 (D.D.C. 2012) (collecting cases); but see Zavala v. Wal-Mart Stores, Inc., 691 F.3d 527, 540–41 (3d Cir. 2012) (holding that "[a]bsent some special circumstances, threats of deportation are insufficient to constitute involuntary servitude," and that because the plaintiffs did not claim that they were compelled to go to work each day, nor forced to stay once their work was finished, and had considerable freedom to move to other cities and find different jobs, there was no claim of involuntary servitude); (See also Doc. No. 2077, David v. Signal Int'l, L.L.C., 2:08-cv-1220 (Jan. 6, 2015) (finding that Signal was not entitled to summary judgment in part because "Plaintiffs have introduced evidence from which a jury could infer Signal knowingly threatened immigration consequences in order to maintain its forced labor")). The other Plaintiffs tell similar stories about threats of deportation, and some even state that their passports were confiscated.   (Doc. No. 187, pp. 5–18.)   Furthermore, Biju George testified about times when he was not allowed to leave Signal's facility.   (Id., Ex. 10, 88:7–89:15; 123:4–19.) Therefore, there is a fact issue as to whether the Plaintiffs were able to freely leave Signal's facility.   Accordingly, given the Plaintiffs' testimony and the broad definition of forced labor under the TVPRA, there is a genuine dispute of material fact as to the Plaintiffs' forced labor and trafficking claims.

iii.   Financial coercion was actionable under the TVPRA before the 2008
amendments

Signal next argues that to the extent that the Plaintiffs' trafficking claim is premised on the

fact that the large debts that they undertook to pay the recruitment fees forced them to continue

working for Signal, this was not actionable under the TVPRA until 2008.   (Doc. No. 165, pp. 27–

31.)   "Serious harm" was not defined in the original statute.   The 2008 amendments added a

definition:

> The term "serious harm" means any harm, whether physical or nonphysical,
> including psychological, financial, or reputational harm, that is sufficiently serious,
> under all the surrounding circumstances, to compel a reasonable person of the same
> background and in the same circumstances to perform or to continue performing
> labor or services in order to avoid incurring that harm.

See William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No.

110-457, 122 Stat. 5044, 5069.   Signal argues that because financial harm was added to the

TVPRA in 2008, and "Congress does not legislate unnecessarily," financial harm could not have

been not part of the statute prior to 2008.   (Doc. No. 165, pp. 28–29.)   Therefore, Signal asserts

that imposing liability based on financial coercion would be an impermissible retroactive

application of the 2008 amendments.   The Plaintiffs argue that the statute was broad enough, at

the time of the alleged trafficking, to encompass their claim of financial coercion.   (Doc. No. 187,

pp. 17–22.)

The undersigned is not persuaded by Signal's argument.   First, while financial coercion

may be a part of the Plaintiffs' claim, it is not their only basis for imposing liability under the

TVPRA.   As discussed above, there appears to be other alleged actions taken by Signal that meet

the definition of forced labor under the TVPRA.   Second, the plain language of the statute

demonstrates that it encompasses more than just threats of physical harm.   Forced labor was

defined at the relevant time as "threats of serious harm . . . or physical restraint."   As the court in

12

*Tanedo* noted: "That § 1589 distinguishes between serious harm and physical restraint indicates that, prior to 2008, Congress intended that serious harm not be limited to physical harm, and instead include at least some non-physical harm, *e.g.*, financial harm." <u>Tanedo</u>, 2012 WL 5378742 at *4.   The legislative history supports this reading.   "[T]he House Conference Report from 2000 [] stated that the [Victims of Trafficking and Violence Protection Act of 2000] 'refers to a broad array of harms, including both physical and nonphysical,' and would apply 'where the traffickers use more subtle means designed to cause their victims to believe that serious harm will result to themselves or others if the leave' such as threats of families' 'bankruptcy in their home country.'" <u>Id.</u> (quoting H.R. Conf. Rep. No. 106-939, at 101 (2000)).   In addition, while not directly addressing a claim of financial coercion, the Fifth Circuit found that, prior to 2008, "serious harm [under §1589(a)] can include psychological coercion."   <u>United States v. Nnaji</u>, 447 F. App'x 558, 559 (5th Cir. 2011) (per curiam).

Lastly, Signal cites no case applying such a narrow interpretation of "serious harm" under the TVPRA.   As the Plaintiffs correctly note, the one case upon which Signal relies does not apply the TVPRA, but rather is examining slavery as defined by international norms.   <u>See</u> <u>Velez v. Sanchez</u>, 693 F.3d 308, 319–23 (2d Cir. 2012).[6]

Because the goal of the TVPRA was to reach modern day slavery, which may take on many forms, and "serious harm" should be interpreted broadly, the undersigned finds that the Plaintiffs' claim of financial coercion was cognizable before 2008.   (<u>See</u> <u>also</u> Doc. No. 2077,

---

6.   Interestingly, the district court in *Velez* dismissed a claim for forced labor under the TVPRA.   <u>See</u> <u>Velez v. Sanchez</u>, 754 F. Supp. 2d 488, 498–99 (E.D.N.Y. 2010).   The court converted the plaintiff's claim from one brought under the Alien Tort Statute to one brought pursuant to § 1589, but found that the evidence did not support such a claim.   Specifically, the court found that the plaintiff's fear of being yelled at was not actionable and that "by her own admission, [she] never feared physical harm . . . ."   <u>Id.</u> at 498.   Therefore, neither opinion in *Velez* adopts Signal's narrow interpretation.

David v. Signal Int'l, L.L.C., 2:08-cv-1220 (Jan. 6, 2015) (holding that "serious harm under pre-amendment Section 1589 includes financial harm")).

c. *Retroactive application of 18 U.S.C. §§ 1592 and 1594 is no longer at issue*

Signal also argues that "Section 1595 did not authorize a private right of action for violations of §§ 1592 or 1594 prior to [2008]."  (Doc. No. 165, p. 18.)   While Signal is correct that the civil remedies provision of the TVPRA did not expressly encompass these statutes until 2008, the Plaintiffs have abandoned their reliance on these sections (as well as §§ 1583 and 1584). (See Doc. No. 187, p. 13 n. 11); (Doc. No. 212) (moving to voluntarily dismiss certain claims). Therefore, there is no need to consider whether these sections apply retroactively.

B. Second Claim: Racketeer Influenced and Corrupt Organizations Act 18 U.S.C. § 1962(c) and 18 U.S.C. §1962(d)

The Plaintiffs' second claim for relief consists of violations of 18 U.S.C. §§ 1962(c) and 1962(d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").   (Doc. No. 1, pp. 34–43.)   Signal claims that it is entitled to summary judgment on the Plaintiffs' RICO claims because: (1) the Plaintiffs failed to establish a distinct RICO enterprise; (2) RICO does not apply extraterritorially; and (3) there no proof of a conspiracy.   (Doc. No. 165, pp. 31–39.)

a. *The Plaintiffs have alleged a distinct RICO person and RICO enterprise*

Signal argues that the Plaintiffs' RICO claim is "structurally defective" because the Plaintiffs "allege both that Signal is a RICO 'person' and that Signal was a 'member' of all RICO Enterprises alleged in the Second Claim for Relief . . . ."   (Id. at p. 31.)   Signal's argument misconstrues the Plaintiffs' complaint, as well as misapplies the law on the person/enterprise distinction under RICO.

"RICO claims under § 1962 require: '(1) a *person* who engages in (2) a *pattern of racketeering activity*, (3) connected to the acquisition, establishment, conduct, or control of an

*enterprise.*"  Bradley v. Phillips Petroleum Co., 527 F. Supp. 2d 625, 645 (S.D. Tex. 2007) (quoting In re Burzynski, 989 F.2d 733, 741–42 (5th Cir. 1993)) (emphasis in original).  "To establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161 (2001).  RICO defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. §1961(3).  Signal does not dispute that it can be a RICO person.  See St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 447 (5th Cir. 2000) ("[A] corporation obviously qualifies as a 'person' under RICO and may be subject to RICO liability.") (quoting Haroco, Inc. v. Am. Nat'l Bank & Trust Co., 747 F.2d 384, 401 (7th Cir. 1984)).

"An enterprise under RICO can include the usual legal entities such as partnerships and corporations, but it also can include 'any union or group of individuals associated in fact although not a legal entity . . . .'"  Bradley, 527 F. Supp. 2d at 651 (quoting Manax v. McNamara, 842 F.2d 808, 811 (5th Cir. 1988)).  The Supreme Court has indicated that "enterprise" should be interpreted broadly.  See Boyle v. United States, 556 U.S. 938, 943–45 (2009) (noting that the "very concept of an association in fact is expansive").  Here, the Plaintiffs argue that there are two association in fact type enterprises, both of which Signal is a member.  (Doc. No. 1, pp. 35–38.) To establish such an enterprise, the Plaintiffs must show evidence of "an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." Boyle, 556 U.S. at 944.

In addition, for claims under § 1962(c), courts also require that the RICO person and RICO enterprise be distinct.  St. Paul Mercury Ins., 224 F.3d at 447   ("[S]ubsection (c) requires that the RICO person be distinct from the RICO enterprise.").  This is where Signal argues that the

Plaintiffs' claim is defective.   Signal insists that because "the Complaint alleges both that Signal is a RICO 'person' and that Signal was a 'member' of all RICO enterprises," the Plaintiffs have failed to allege an enterprise that is separate and distinct from Signal itself.   (Doc. No. 165, p. 31.)

Signal's argument is misplaced.   First, Signal is simply incorrect when it asserts that the Plaintiffs are alleging that "Signal enterprised with itself."   (Doc. No. 200, p. 5.)   The Plaintiffs have alleged that Signal is a *member* of an enterprise; they have not alleged that the entire enterprise consists only of Signal and its officers, directors, or employees.   Compare Atkinson v. Anadarko Bank & Trust Co., 808 F.2d 438, 440 (5th Cir. 1987) (holding that "Anadarko Bank, Anadarko Bankshares, and [] three employees" were not an association in fact enterprise separate and distinct from Andarko Bank because there was no evidence that these entities "were associated in any manner apart from the activities of the bank").

Second, Signal misconstrues the relevant case law.   The cases cited by Signal do not stand for the proposition that the Plaintiffs' RICO claim is defective as a matter of law merely because a corporation is named as a person and a part of a RICO enterprise.   Rather, these cases hold that the distinctiveness element was not satisfied based on the facts.   For example, in *Bradley*, the plaintiffs alleged that the enterprise consisted of a group of companies.   Bradley, 527 F. Supp. 2d at 651.   The court found that there was nothing in the plaintiffs' complaint "to suggest that the enterprise existed for any reason other than to commit the alleged predicate acts."   Id.   Moreover, the court found that "even if [the plaintiffs] had adequately pled an enterprise, they have failed to plead that any Defendants were 'employed by or associated with [the] enterprise' as required under § 1962(c)."   Id. at 651–52.   Signal has not pointed to anything in the record that demonstrates, as a matter of fact, that the alleged enterprises are not distinct from the various members.   Accordingly, Signal has not met its burden for summary judgment.

16

Moreover, *Bradley* did not hold that a corporation could not—as a matter of law—be named as part of an enterprise.   What Signal appears to be alluding to is a line of cases holding that when a corporation is named as a RICO person, and *that same corporation is named as the enterprise*, the distinctiveness requirement may not be satisfied.   See Atkinson, 808 F.2d at 440; see also Heden v. Hill, 937 F. Supp. 1230, 1242 (S.D. Tex. 1996) ("When the alleged Section 1962(c) violator is a legal entity, such as a corporation, this required separation is not established by merely showing that the corporation, through its employees, officers, and/or directors, committed a pattern of predicate acts in the conduct of its own business.").   As the Second Circuit noted, alleging a corporation as a member of an enterprise "does not foreclose the possibility of a corporate entity being held liable as a defendant under Section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself."   See Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A., 30 F. 3d 339, 344 (2d Cir. 1994).   In other words, groups of corporations can form an association in fact type enterprise, but a party cannot avoid the distinctiveness requirement by "alleging a RICO enterprise that consists merely of a corporation defendant associated with its own employees or agents carrying on the regular affairs of the defendants."   Isystems v. Spark Networks, Ltd., No. 10-10905, 2012 WL 3101672, at *5 (5th Cir. March 21, 2012) (per curiam) (quoting Khurana v. Innovative Health Care Sys., 130 F.3d 143, 155 (5th Cir. 1997)); see also Atlas Pile Driving Co. v. DiCon Fin. Co., 886 F.2d 986, 995 (8th Cir. 1989) (upholding allegations of an enterprise that consisted of multiple corporations). Because the Plaintiffs have alleged a larger enterprise than just Signal, the Plaintiffs' claim is not structurally defective as a matter of law.[7]   (See also Doc. No. 2115, David v. Signal Int'l, L.L.C.,

---

[7]. Some commentators have argued that based on principles of statutory interpretation, a corporation cannot be part of an association in fact RICO enterprise.  See, e.g., Randy D. Gordon, "Of Gangs and Gaggles: Can a Corporation be part of an Association-in-Fact RICO Enterprise? Linguistic, Historical, and Rhetorical Perspectives, 16 U. PA. J. BUS. L. 973, 998–1008 (2014).   According to Mr. Gordon, circuit courts have erred by allowing plaintiffs

2:08-cv-1220 (E.D. La. Jan. 9, 2014) (finding that nearly identical RICO enterprises, which included Signal as a member, did not violate the distinctiveness requirement)).

Accordingly, because Signal does not cite to anything in the record demonstrating that the alleged members did not form an enterprise, and because merely pleading that Signal is a member of an enterprise is not fatal to the Plaintiffs' RICO claims, Signal is not entitled to summary judgment.  Of course, at trial, the Plaintiffs will need to prove all of the elements of a RICO enterprise.  See, e.g., Boyle, 556 U.S. at 944 (noting that an association in fact enterprise is "proved by evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit").

      b.  *Extraterritorial application of RICO*

Signal next argues that RICO does not apply extraterritorially.   (Doc. No. 165, pp. 32–34.) Specifically, Signal argues that "the civil RICO claim should be dismissed *pro tanto*,[8] based on the theory's often unlawful, extraterritorial nature with regard to (1) mail and wire fraud; (2) trafficking; and (3) unlawful document related practices under § 1592." (Id. at p. 37.)   The Plaintiffs have abandoned their claim under § 1592.

---

"to allege association-in-fact enterprises that include (and in many cases consist only of) corporations or other legal entities."  Id. at 1028; see also Caroline N. Mitchell et al., "Returning RICO to Racketeers: Corporations Cannot Constitute an Associated-in-Fact Enterprise Under 18 U.S.C. § 1961(4), 13 FORDHAM J. COPR. & FIN. L. 1 (2008) (calling for a return to the "plain meaning" of RICO and arguing that based on questions asked at oral argument during *Mohawk Indus., Inc. v. Williams*, 547 U.S. 516 (2006), many of the justices showed a concern about interpreting RICO so broadly).   While these commentators raise interesting points, until the Supreme Court revisits *Boyle*, which instructed courts to interpret "enterprise" broadly, or the Fifth Circuit dictates otherwise, the undersigned is obligated to follow precedent.  See, e.g, United States v. Thevis, 665 F.2d 616, 625 (5th Cir. Unit B 1982) (affirming a RICO conviction when the enterprise consisted of both individuals and corporations).   Moreover, Signal has not raised the issues that these commentators were discussing.  Rather, Signal's argument is based on the faulty premise that the Plaintiffs alleged that Signal has been named as *the* enterprise, as opposed to just a member of a larger enterprise.

    8. *Pro tanto* is defined as: "To that extent; for so much; as far as it goes."   Black's Law Dictionary, p. 1259 (8th ed. 2004).   The undersigned understands this to mean that to the extent that the Plaintiffs have plead a civil RICO cause of action based on the predicate acts of mail and wire fraud, trafficking, and unlawful document production, the Plaintiffs' claim fails.   The Plaintiffs, however, also pled the predicate act of forced labor, and Signal did not move for summary judgment on that claim.

Signal argues as follows: RICO does not apply to conduct outside the United States, most of the alleged actionable conduct occurred abroad, therefore, the Plaintiffs' RICO claim fails.   (Id. at p. 32.)   Signal's analysis is overly simplistic.   While Signal is correct that numerous courts have held that RICO does not apply extraterritorially, that does not end the inquiry.   See, e.g., Mitsui O.S.K. Lines, Ltd. v. Seamaster Logistics, Inc., 871 F. Supp. 933, 937–38 (N.D. Cal. 2012) ("[C]ourts have uniformly held that RICO is silent as to its extraterritorial application and that, under *Morrison*, it therefore has none.").   The real issue is whether applying RICO to *these set of facts* requires an extraterritorial application.   In other words, if this were a case involving only foreign conduct, RICO would not apply.   But that is not the case here.   The facts of this case are partly foreign and partly domestic.

The Ninth Circuit, in *United States v. Xu*, 706 F.3d 965, 974–78 (9th Cir. 2013), which involved a scheme that had both foreign and domestic ties, undertook a comprehensive analysis of what conduct RICO reaches in light of *Morrison*.   The defendants in *Xu* were charged under RICO for a "scheme to steal funds from the Bank of China."   Id. at 972.   They argued, however, that the entire conspiracy took place overseas, thus they could not be charged.   Id. at 974–75. The conspiracy consisted of two parts: first, "a criminal enterprise that involved . . . embezzlement against the Bank of China that occurred in China and Hong Kong," and second, "immigration fraud to escape to the to the United States with [the] ill-gotten gains."   Id. at 975.

The court in *Xu* started with the presumption that RICO does not apply extraterritorially. Id. at 974–75.   The court then examined whether "under the circumstances . . . RICO can be lawfully applied to any, or all, of Defendants' conduct—foreign or domestic."   Id. at 975.   The court noted, "*Morrison* frames the extraterritorial inquiry in terms of the focus of congressional concern in enacting the statute," and while "RICO's focus is far from clear-cut," two general

19

approaches have evolved.   Id.   "One camp asserts that RICO's focus is on the enterprise," while "the other camp asserts that RICO's focus is on the pattern of racketeering activity."   Id.   In addition, after the Ninth Circuit issued *Xu*, the Second Circuit articulated yet another test, finding that RICO applies extraterritorially to the extent that the underlying predicate offense applies extraterritorially.   European Cmty. v. RJR Nabisco, Inc., 764 F.3d 129, 136 (2d Cir. 2014) ("RICO applies extraterritorially if, and only if, liability could attach to extraterritorial conduct under the relevant RICO predicate act.").   The Fifth Circuit has yet to address which test to apply and courts are split.   See CGC Holding Co., L.L.C. v. Broad & Cassel, No. 13-1255, 2014 WL 6872148, at *15–17 (10th Cir. Dec. 8, 2014) (noting that "[c]ourts have gone in two directions in identifying the 'focus' of RICO").   However, the undersigned need not guess at which test applies, since under any approach, Signal's conduct is domestic in nature.

If the focus is on the pattern of racketeering, it is evident that there are sufficient ties to the United States to apply RICO to the instant case.   As discussed above, the conspiracy in *Xu* had two distinct parts.   Xu, 706 F.3d at 978.   The first part, which consisted of stealing money from the Bank of China, had no domestic ties.   Id.   The second part, however, which consisted of entering the United States using fraudulent visas and passports in violation of United States immigration laws, "bound the Defendants' enterprise to the territorial United States."   Id. Therefore, the court found that because the goal of the enterprise involved a violation of United States immigration law, "the dual parts of Defendants' enterprise were necessarily conjoined in pursuit of that goal—i.e., to steal large amounts of money from the Bank of China and get away with it in the United States."   Id. at 978–79.   The court held that the defendants could be liable under RICO.

Here, while the actual recruitment of the Plaintiffs may have occurred abroad, it is undisputed that the goal was to bring them to the United States.   This nexus to the United States ties "the Defendants' enterprise to the territorial United States" and allows for RICO to attach. For example, had the Defendants recruited the Plaintiffs for work in Mexico, then it would be a stronger case the there was no domestic tie to trigger RICO under the pattern of racketeering test. However, because the workers were recruited for work in the United States, and actually brought here, this conduct is actionable under RICO.

Likewise, under the enterprise test, the undersigned finds that this is a domestic enterprise. Courts applying this test consider "where the enterprise's decisions are made, as opposed to carried out, and thus centers on the 'brains' of an enterprise, not the 'brawn.'"   Xu, 706 F.3d at 976 (citing European Cmty. v. RJR Nabisco, Inc., No. 02-cv-5771, 2011 WL 843957, at *5–6 (E.D.N.Y. March 8, 2011) rev'd 764 F.3d 129).[9]   Courts have analogized this inquiry to the "nerve center" test enunciated in *Hertz Corp. v. Friend*, 559 U.S. 77 (2010).   European Cmty., 2011 WL 843957, at *6.   The enterprises alleged in this case consist mainly of domestic entities. Compare In re Le-Nature's, Inc., No. 0-1445, 2011 WL 2112533, at *3 (W.D. Pa. May 26, 2011) ("[T]he very title of the statute, 'Racketeer Influenced and Corrupt Organizations,' suggests an emphasis on the organization, or enterprise itself.   Consistent with this principle, it has been found that RICO is inapplicable to a solely foreign enterprise.") (citations omitted); Sorota v. Sosa, 842 F. Supp. 2d 1345, 1350 (S.D. Fla. 2012) (noting that the enterprise, which consisted of only Peruvian individuals and companies, was a foreign enterprise).   Here, the majority of the Defendants are domestic entities, and only Defendants Sachin Dewan and Dewan Consultants are

---

9.   The Second Circuit rejected this test in favor of defining RICO's extraterritorial conduct in terms of the underlying predicate acts.   European Cmty., 764 F.3d at 139 ("We think it far more reasonable to make the extraterritorial application of RICO coextensive with the extraterritorial application of the relevant predicate statutes.").   The enterprise test, however, has been applied outside of the Second Circuit, and therefore, it is still a viable approach.

foreign.   Moreover, Signal cites no portion of the factual record in making this argument and therefore, has not demonstrated that this is a foreign enterprise.   The Plaintiffs, however, attached evidence that tends to show that the enterprises were driven primarily by Signal.   (Doc. No. 187, pp. 31–32) (citing evidence showing how "each of the Indian-based defendants received directives from the U.S-based members").   Therefore, at the very least, there is a fact issue as to whether this would be a domestic enterprise under this approach.

In addition, under the Second Circuit's recently minted test, the undersigned finds that RICO liability can attach to Signal's conduct.   The Second Circuit considers whether the predicate act has an extraterritorial reach.   European Cmty., 764 F.3d at 139.   If it does, then RICO liability can attach.   Id.   The court also held that "[i]f domestic conduct satisfies every essential element to prove a violation of a United States statute that does not apply extraterritorially, that statute is violated even if some further conduct contributing to the violation occurred outside the United States."   Id. at 142.   Here, the Plaintiffs rely on three predicate acts: trafficking, mail fraud, and wire fraud.   As discussed above, the Plaintiffs' trafficking claim is domestic, therefore, RICO liability can attach.   As for mail and wire fraud, while these statutes do not apply extraterritorially, the Plaintiffs have made sufficient allegations that Signal, along with the other Defendants, used the United States mail and wire systems to further their scheme.   See id.   (noting that because "[t]he complaint alleges that defendants hatched schemes to defraud in the United States, and that they used the U.S. mails and wires in furtherance of these schemes and with the intent to do so," the domestic conduct satisfied every element essential element, and therefore, RICO liability could attach).   Furthermore, Signal has pointed to nothing in the record showing that the alleged mail and wire fraud occurred only abroad.   (See also Doc. No. 2115, David v. Signal Int'l, L.L.C., 2:08-cv-1220 (E.D. La. Jan. 9, 2014)).

Therefore, under any of the above approaches, Signal is not entitled to summary judgment on the Plaintiffs' RICO claims.

      c.   *Involuntary servitude/slavery*

Signal also seeks "partial summary judgment on the claims alleging violations of 18 U.S.C. §§ 1583, 1584, and implicitly, the Thirteenth Amendment."  (Doc. No. 165, p. 34.)   The Plaintiffs, however, have abandoned their reliance on these statutes, and have moved to dismiss their RICO claims based on these predicate acts.   Accordingly, the undersigned need not address Signal's arguments as to these claims.

      d.   *Conspiracy*

Signal argues that the Plaintiffs' claim under §1962(d) should be dismissed because "Plaintiffs lack the evidence required to establish the *scienter* § 1962(d) requires under countless federal authorities."  (Doc. No. 165, p. 38.)   According to Signal, "missing is proof that cognitively, Signal subjectively entertained the required *mens rea* to defraud, i.e., knew at the time that statements concerning green cards, in that context, were fraudulent statements . . . ."  (Doc. No. 200, p. 8.)

"In order to demonstrate a RICO conspiracy under §1962(d), [the Plaintiffs] must demonstrate '(1) that two or more people agreed to commit a substantive RICO offense and (2) that [the defendant] knew of and agreed to the overall object of the RICO offense.'"  <u>Chaney v. Dreyfus Serv. Corp.</u>, 595 F.3d 219, 239 (5th Cir. 2010) (quoting <u>United States v. Sharpe</u>, 193 F.3d 825, 869 (5th Cir. 1999)).   "A conspirator must at least know of the conspiracy and 'adopt the goal of furthering or facilitating the criminal endeavor.'"  <u>Id.</u> (quoting <u>Salinas v. United States</u>, 522 U.S. 52, 65 (1997)).

Signal is not entitled to summary judgment on the Plaintiffs' § 1962(d) claim for two reasons.   First, Signal has not carried its burden.   Signal merely offers the conclusion that the Plaintiffs have no evidence that Signal had the requisite intent to defraud and does not cite to any portion of the record in making this argument.   "It is not enough for the moving party to merely make a conclusory statement that the other party has no evidence to prove his case."   See Celotex Corp., 477 U.S. at 328 (White, J. concurring); see also Ash v. Corley, 992 F.2d 540, 543 (5th Cir. 1993) ("Before the non-moving party is required to produce evidence in opposition to [a motion for summary judgment], the moving party must first satisfy its obligation of demonstrating that there are no factual issues warranting trial.") (citation omitted).   While Signal does not have to "negate the elements of the nonmovant's case," Signal must offer more than the mere assertion that the Plaintiffs cannot prove their case.   See Little, 37 F.3d at 1075; see also Seastrunk v. Darwell Integrated Tech., No. 3:05-cv-0531, 2008 WL 190316, at *2–3 (N.D. Tex. Jan. 22, 2008) ("The moving party, while not needing to produce evidence, must at least identify portions of the record that demonstrate an absence of evidence.").

Second, despite Signal not meeting its burden, the Plaintiffs put forth enough evidence to demonstrate the existence of a genuine dispute of material fact.   The Plaintiffs offer, amongst other evidence, the deposition of Sachin Dewan, who testified that Signal knew he had made false promises of permanent residency.   (Doc. No. 187, Ex. 36.)   This evidence creates a triable issue as to whether Signal knew of the false promises, yet participated in the conspiracy by continuing to use Dewan to recruit the Plaintiffs and facilitate the illicit scheme.   See Provident Life & Acc. Ins. Co. v. Goel, 274 F.3d 984, 991 (5th Cir. 2001) ("Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are the jury functions, not those

of a judge . . . .The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.") (citations omitted).

In sum, in light of the Plaintiffs' evidence, there is a fact issue as to what Signal knew, when Signal knew it, and Signal's level of participation in the overall scheme.   Accordingly, summary judgment on the Plaintiffs' conspiracy claim is not warranted.

C.   Claim Four: Violations of the Ku Klux Klan Act of 1871 (42 U.S.C. § 1985(3))

In the Plaintiffs' fourth claim for relief, they seek damages under 42 U.S.C. §1985(3) claiming that "Defendants conspired, agreed, planned and coordinated for the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes (inter alia, 18 U.S.C. §§1589, 1590) to be free from forced labor, involuntary servitude, and trafficking in persons." (Doc. No. 1, p. 45.)   The Plaintiffs' complaint lists three separate and distinct acts that allegedly violate § 1985(3): involuntary servitude, forced labor, and trafficking.   (Id.)   Unlike their claims under the TVPRA and RICO, the Plaintiffs did not abandon their claim of involuntary servitude as to their §1985(3) cause of action.   Signal moves for summary judgment on two grounds.   First, Signal claims that the evidence negates the Plaintiffs' claim.   (Doc. No. 165, p. 39) ("[T]here is no genuine issue of material fact concerning the truth that the plaintiffs knew that they were free to leave Signal whenever they wanted, even if leaving was in some sense painful . . . .").   Second, that §§ 1589 and 1590 are not actionable under §1985(3).

a.   *Definition of involuntary servitude under §1985(3)*

Section 1985(3) states:

If two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws . . . the party so injured or deprived may have an action for the recovery of damages.

25

42 U.S.C. § 1985(3).   The Supreme Court has recognized only two rights protected by this statute: the right to interstate travel and the right to be free from involuntary servitude.   See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 278 (1993).

At issue here is how broadly to interpret "involuntary servitude" under §1985(3).   Signal argues that the definition, as stated in *United States v. Kozminski*, 487 U.S. 931 (1988), is controlling.   (Doc. No. 165, pp. 34–39.)   In *Kozminski*, two men were convicted under 18 U.S.C. § 241, which "prohibits conspiracy to interfere with an individual's Thirteenth Amendment right to be from 'involuntary servitude,'" and 18 U.S.C. § 1584, which "makes it a crime [to] knowingly and willfully hold another person 'to involuntary servitude.'"   Kozminski, 487 U.S. at 934.   The issue in *Kozminzki* was "the meaning of 'involuntary servitude'" under these two statutes.   Id. at 939.   The Court held that "involuntary servitude" was to be narrowly construed and limited to "the use or threat of physical restraint or physical injury, or by the use or threat of coercion through law or the legal process."   Id. at 952.   The Court considered statutes implementing the Thirteenth Amendment, and found that Congress had not undertaken to broadly define involuntary servitude, and "that nothing in the history of the Slave Trade statute [the precursor to §1584] suggests that it was intended to extend to conditions of servitude beyond those applied to slaves, *i.e.,* physical or legal coercion."   Id. at 946–47.

Congress, however, expressly repudiated *Kozminski*'s narrow definition of involuntary servitude with the passage of the Victims of Trafficking and Violence Protection Act of 2000. Kiwanuka, 844 F. Supp. 2d at 115–16 ("*Kozminski* is not controlling, as Congress has specifically addressed the *Kozminski* decision and rejected it as too narrow.").   This Act broadened the definition of involuntary servitude to "include cases in which persons are held in a condition of servitude through nonviolent coercion."   See Victims of Trafficking and Violence Protection Act

26

of 2000, Pub. L. No. 106-386, 114 Stat. 1446, 1467 (codified at 22 U.S.C. § 7101).   Specifically, involuntary servitude is defined as "any scheme, plan, or pattern intended to cause a person to believe that, if the person did not enter into or continue in such a condition, that person or another person would suffer *serious harm* or physical restraint."   22 U.S.C. § 7102(6) (emphasis added).

Here, the expanded definition of "involuntary servitude" defeats Signal's motion.[10] Signal simply argues that because the Plaintiffs were physically free to leave, there can be no claim for involuntary servitude.   (Doc. No. 165, p. 35) ("[T]he statement of Undisputed Facts above demonstrates that the Plaintiffs recognized that they could have left Signal physically if they had chosen to.   Under *Kozminski*, the claims of slavery and involuntary servitude are therefore insupportable.").   However, as discussed above, after 2000, involuntary servitude now encompasses nonviolent coercion and threats of serious harm.   A review of the evidence demonstrates that the Plaintiffs have put forth enough evidence to create a fact issue as to whether they have satisfied the current definition of involuntary servitude.   For instance, each of the Plaintiffs testified that Signal threatened them with deportation.   (See Doc. No. 187, pp. 5–11.) In addition, most of the Plaintiffs claim that they had their passports taken and were threatened with physical force.   (See id.)   One Plaintiff goes so far as to claim the camp was gated and he felt he was kept under lock and key.   (Id., Ex. 10, 88:7-10) ("Q: Was there ever a time when you wanted to leave the camp that you were stopped from doing so? A: Yes, there was an incident like that.").   While the threats of deportation and confiscation of passports may not have been actionable under *Kozminkzi*, it is these types of "nonviolent coercion" that Congress sought to reach with the passage of the Victims of Trafficking and Violence Protection Act of 2000. Therefore, the mere fact that the Plaintiffs were physically free to leave Signal's facility does not

---

10.   The civil remedy provision of the TVPRA did not extend to 18 U.S.C. § 1584—the crime of involuntary servitude—until 2008.   However, because § 1985(3) provides the remedy, not 18 U.S.C. § 1595, finding Signal liable for damages for conspiracy to commit involuntary servitude would not be a retroactive application of § 1595.

entitle Signal to judgment as a matter of law, and the Plaintiffs have come forward with enough evidence to create a fact issue as to whether they were victims of involuntary servitude.

b.   *§§1589 and 1590 are actionable under §1985(3)*

At the outset, is unclear whether Signal is actually seeking dismissal of the Plaintiffs' claims under §1985(3) to the extent that they are relying on violations of §§ 1589 and 1590. (Compare Doc. No. 165, p. 34) (seeking a *pro tanto* dismissal of certain portions of the Plaintiffs' RICO claim).   The Plaintiffs' claim for relief under §1985(3) is predicated on involuntary servitude, in addition to forced labor and trafficking.   As discussed above, Signal is not entitled to summary judgment on the involuntary servitude prong of the Plaintiffs' claim.   However, Signal states in passing that dismissal is warranted because "§1985(3) in no way 'derives . . . from §§ 1589 and 1590.'"   (Id. at p. 39) (quoting David v. Signal Int'l, L.L.C., No. 08-1220, 2012 WL 10759668, at *36 (E.D. La. Jan. 4, 2012)).   The undersigned, however, finds that private conspiracies to violate §§ 1589 or 1590, that are motivated by racial animus, are actionable under § 1985(3).   Therefore, Signal is not entitled to summary judgment.

Section 1985(3) is not a source of rights, rather "the rights, privileges and immunities that § 1985(3) vindicates must be found elsewhere . . . ."   United Broth. of Carpenters & Joiners of Am. v. Scott, 462 U.S. 825, 833 (1983).   One of the rights protected by this section is the right to be free from involuntary servitude.   Therefore, if §§1589 and 1590 are statutes that enforce the Thirteenth Amendment (as the Plaintiffs argue), then a conspiracy to violate these statutes should be actionable under § 1985(3).   See, e.g., Wells v. Rhodes, 928 F. Supp. 2d 920, 930–31 (S.D. Ohio 2013) (holding that "§ 1982 provides an adequate basis for a private conspiracy claim under § 1985(3) . . . [because] § 1982 protects citizens against private infringements in their property

28

rights . . . [and] shares a close relationship with the Thirteenth Amendment, which the Supreme Court has recognized as a source of rights for § 1985(3).").

Courts have found that § 1589 is "an exercise of Congressional power under Section Two of the Thirteenth Amendment."[11]   John Roe I v. Bridgestone Corp., 492 F. Supp. 988, 1003 (S.D. Ind. 2007); United States v. Toviave, 761 F.3d 623, 629 (6th Cir. 2014) (noting that § 1589 was passed to implement the Thirteenth Amendment); United States v. Garcia, No. 02-cr-1105-01, 2003 WL 22938040, at *2–3 (W.D.N.Y. Dec. 2, 2003) (rejecting a claim that §1589 was unconstitutional because Congress lacked power under the commerce clause, and holding that §1589 was a "proper exercise of Congress's power under the Thirteenth Amendment"); see also 22 U.S.C. § 7101(b)(22) ("The right to be free from slavery and involuntary servitude is among those inalienable rights.   Acknowledging this fact, the United States outlawed slavery and involuntary servitude in 1865, recognizing them as evil institutions that must be abolished.   Current practices of sexual slavery and trafficking of women and children are similarly abhorrent to the principles upon which the United States was founded.").   Moreover, Congress is afforded wide latitude to both define modern forms of slavery and involuntary servitude, as well as to enact legislation to combat these insidious institutions.   In discussing Congress's power under § 2 of the Thirteenth Amendment, the Fifth Circuit recognized that:

> [T]he Supreme Court held [in *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409 (1968)] that the scope of Congress's power was not limited to measures intended to end structures of slavery in a literal or a formal sense.   Instead, the Supreme Court held that Congress has the authority to enact legislation necessary to abolish "badges" and "incidents" of slavery, as well as the power to rationally determine what those "badges" and "incidents" are.

United States v. Cannon, 750 F.3d 492, 499 (5th Cir. 2014) (holding that the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act of 2009 was a valid exercise of Congressional power

---

11.   But see H.R. Rep. No. 106-487, pt. 2, at 27 (2000) (noting that the "Constitutional Authority" for the act is "Article I, section 8, clause 4 of the Constitution").

under the Thirteenth Amendment).   Therefore, because § 1985(3) protects the right to be free from involuntary servitude, and §§ 1589 and 1590 define and outlaw modern day manifestations of involuntary servitude and slavery, it follows that conspiracies to violate these statutes are actionable under § 1985(3).

The only other case that has addressed this specific issue is *David*, which is not binding. The court in *David* found that "the [Victims of Trafficking and Violence Protection Act of 2000], which sought to criminalize involuntary servitude based [on] other forms of coercion, did not change the scope of the Thirteenth Amendment."   <u>David</u>, 2012 WL 10759668, at *36.   The undersigned, however, respectfully disagrees with the *David* court's reasoning in finding that a private conspiracy to violate §§ 1589 or 1590 is not actionable under § 1985(3).   First, the court in *David* found that extending the reach of § 1985(3) would lead to "every criminal statute that involves a victim [] potentially giv[ing] rise to a 'right'" under § 1985(3).   <u>Id.</u> at *36 n. 50. Section 1985(3), however, has been on the books for nearly one hundred and fifty years and only two rights have been recognized: interstate travel and involuntary servitude.   <u>See, e.g.</u>, <u>Great Am. Fed. Savs. & Loan Ass'n v. Novotny</u>, 442 U.S. 366, 378 (1979) (holding that the right to be free from workplace discrimination under Title VII was not actionable under § 1985(3)).   Moreover, finding statutes that combat modern day involuntary servitude actionable under § 1985(3) does not expand the rights protected by §1985, but merely clarifies the definition of involuntary servitude.

Second, the *David* court noted that interpreting § 1985(3) too broadly would "render it 'a general federal tort law'" which would be "contrary to the admonition that the Supreme Court has long held since *Griffin v. Breckenridge*, 403 U.S. 88, 91 (1971) . . . ."   <u>Id.</u> at *36 n. 50.   *Griffin*, however, held that a necessary element under § 1985(3) is that "there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators'

actions."   See Griffin, 403 U.S. at 102.   This requirement limits the reach of private conspiracies under § 1985(3) and prevents it from becoming a federal tort law.   Accordingly, the undersigned does not share the *David* court's concerns.

Therefore, the undersigned finds that Signal is not entitled to summary judgment on the Plaintiffs' §1985(3) claim, regardless of whether it is predicated on involuntary servitude, forced labor, or trafficking.

## IV. Recommendation

For the reasons stated above, the undersigned recommends that Signal's "Motion for Partial Summary Judgment" (Doc. No. 165) be **DENIED**.

## V. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c) (Supp. IV 2011), each party to this action has the right to file objections to this report and recommendation.   Objections to this report must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within fourteen (14) days after being served with a copy of this report; and (4) be no more than eight pages in length.   See 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b)(2); Local Rule CV-72(c).   A party who objects to this report is entitled to a de novo determination by the United States District Judge of those proposed findings and recommendations to which a specific objection is timely made.   See 28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this report, within fourteen days of being served with a copy of this report, bars that party from: (1) entitlement to de novo review by the United States District Judge of the findings of fact and conclusions of law, see Rodriguez v. Bowen, 857 F.2d 275, 276–77 (5th Cir. 1988), and (2) appellate review, except on grounds of plain error, of any such findings of fact

and conclusions of law accepted by the United States District Judge.  See Douglass v. United
Servs. Auto. Ass'n, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

SIGNED this 23rd day of January, 2015.

_____
Zack Hawthorn
United States Magistrate Judge

32