**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION**

| | | |
|---|---|---|
| **REJI SAMUEL**, *et al.* | § | |
| | § | |
| **v.** | § | **1:13-CV-323** |
| | § | |
| **SIGNAL INTERNATIONAL L.L.C.**, *et al.* | § | |

**MEMORANDUM AND ORDER ON THE PARTIES'
MOTIONS TO EXCLUDE EXPERT TESTIMONY**

This case is assigned to the Honorable Marcia Crone, United States District Judge, and is referred to the undersigned United States Magistrate Judge for pretrial proceedings pursuant to a referral order entered on May 22, 2013.  (Doc. No. 5.)  Pending before the undersigned are ten motions to exclude and/or limit expert testimony.  The Plaintiffs moved to exclude the following experts: Virginia Miles, Donald H. Strobel, Dr. Kevin Fox Gotham, Enrique Gonzalez, Ronald J. McAlear, and Dr. Louise Shelley.  (Doc. Nos. 151, 152, 153, 155, 156, 157.)  Defendants Signal International, L.L.C., Signal International, Inc., Signal International Texas, G.P., Signal International Texas, L.P. (collectively, "Signal") moved to exclude the Plaintiffs' experts Amy Mowl and Florence Burke.  (Doc. Nos. 159, 161.)  Defendants Malvern C. Burnett, the Law Offices of Malvern Burnett, A.P.C., and the Gulf Coast Immigration Law Center, L.L.C. (collectively, "Burnett") moved to exclude Signal's expert, Enrique Gonzalez.  (Doc. No. 158.)  Defendants Sachin Dewan and Dewan Consultants Pvt. Ltd. (collectively, "Dewan") moved to exclude Signal's expert, Dr. Louise Shelley.  (Doc. No. 162.)  Because the motions all relate to the same operative facts, apply the same law, and at times relate to one another, the undersigned will address all the pending motions in one order.

# I.  BACKGROUND

In the aftermath of Hurricane Katrina, approximately 590 men, including the seventeen Plaintiffs in this case, were allegedly trafficked into the United States to provide labor for Signal's operations.  (Doc. No. 1, pp. 2–9.)  The Plaintiffs claim that the Defendants made false promises of "permanent work-based immigration to the United States," and that to take advantage of this promising opportunity, the Plaintiffs allegedly "incurred significant debts to pay mandatory recruitment, immigration processing, and travel fees . . . ."  (Id. at p. 2.)  After arriving at Signal's facility in Orange, Texas, the Plaintiffs were allegedly subjected to serious abuses, threatened with deportation if they left, and forced to live in substandard conditions.  In addition, the Plaintiffs assert that they could not leave their jobs with Signal due to the large debts they incurred in their homeland.

A putative class action was filed in the Eastern District of Louisiana on behalf of all the workers who had allegedly been trafficked to the United States to work at Signal's facilities in Texas, Louisiana, and Mississippi.  (See Doc. 1, David v. Signal Int'l, L.L.C., 2:08-cv-1220 (March 7, 2008)).  The court in David denied class certification, which caused the individual class members to file suit where their alleged injuries occurred.  See David v. Signal Int'l, L.L.C., No 08-1220, 2012 WL 10759668, at *37 (E.D. La. Jan. 4, 2012).  The Plaintiffs in this case worked at Signal's facility in Orange, Texas, which is within this judicial district.

The Plaintiffs allege that some or all of the Defendants violated the following federal statutes: (1) the Trafficking Victims Protection Reauthorization Act of 2003; (2) the Racketeer Influenced and Corrupt Organizations Act; (3) the Civil Rights Act of 1866; and (4) the Ku Klux Klan Act of 1871.  (Doc. No. 1, pp. 32–50.)  In addition, the Plaintiffs assert causes of action for

state law fraud, negligent misrepresentation, and breach of contract against all of the Defendants.

(Id.)

## II. LEGAL STANDARD

The admission or exclusion of expert testimony is a matter within the discretion of the district court. Kuhmo Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999); Huss v. Gayden, 571 F.3d 442, 452 (5th Cir. 2009). Federal Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

FED. R. EVID. 702; accord Kuhmo Tire Co., 526 U.S. at 152; Daubert v. Merrel Dow Pharms., Inc., 509 U.S. 579, 588 (1993). The proponent of the proffered expert testimony "has the burden of establishing, by a preponderance of the evidence, that the pertinent admissibility requirements are met." United States v. Fullwood, 342 F.3d 409, 412 (5th Cir. 2003) (citing FED. R. EVID. 104(a)).

The district court is to consider several criteria in determining whether an expert's opinion is admissible. First, whether the proffered expert is qualified to testify because of his knowledge, skill, experience, training, or education. United States v. Cooks, 589 F.3d 173, 179 (5th Cir. 2009) (citing FED. R. EVID. 702); Wilson v. Woods, 163 F.3d 935, 937 (5th Cir. 1999). "[T]o qualify as an expert, 'the witness must have such knowledge or experience in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.'" United States v. Hicks, 389 F.3d 514, 524 (5th Cir. 2004) (quoting United States v. Bourgeois, 950 F.2d 980, 987 (5th Cir. 1992)) (internal quotations omitted).

Next, whether the proffered expert's testimony is reliable.  See Kuhmo Tire Co., 526 U.S. at 152.   The court possesses considerable flexibility in assessing the reliability of expert testimony.  Id. at 141; Stolt Achievement, Ltd. v. Dredge B. E. Lindholm, 447 F.3d 360, 366 (5th Cir. 2006).   While the *Daubert* factors are the most common benchmark, the court should consider all relevant factors, and is not required to analyze the *Daubert* factors in every case. Stolt Achievement, Ltd, 447 F.3d at 366 (citing Kuhmo Tire Co., 526 U.S. at 149).   The overarching goal "is to make certain that an expert . . . employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kuhmo Tire Co., 526 U.S. at 152.

"The [c]ourt's role is that of a gatekeeper only, limited to determining admissibility, not credibility of the evidence."  Knox v. Ferrer, No. 5:07-CV-6, 2008 WL 4411326, at *2 (S.D. Miss. Sept. 22, 2008) (citing Pipitone v. Biomatrix, Inc., 288 F.3d 239, 244 (5th Cir. 2002)). This role requires a court to make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  Daubert, 509 U.S. at 592–93.  The court should approach this task "with proper deference to the jury's role as the arbiter of disputes between conflicting opinions."  United States v. 14.38 Acres of Land, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting Viterbo v. Dow Chem Co., 826 F.2d 420, 422 (5th Cir. 1987)) (internal quotations omitted).

The court's assessment of admissibility is not intended to replace the adversarial system, which should highlight weak evidence.  Primrose Operating Co. v. Nat'l Am. Ins. Co., 382 F.3d 546, 562 (5th Cir. 2004).  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking

shaky but admissible evidence." Daubert, 509 U.S. at 596.  "The *Daubert* analysis should not

supplant trial on the merits." Mathis v. Exxon Corp., 302 F.3d 448, 461 (5th Cir. 2002) (citing

Pipitone, 288 F.3d at 250).

Finally, the court must determine that the proffered expert testimony is relevant.  See

FED. R. EVID. 702 (stating that expert testimony is admissible only if it "will assist the trier of

fact to understand the evidence or to determine a fact in issue").  Evidence is relevant if it "has

any tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence."  FED. R. EVID.

401.

## III. ANALYSIS

A. Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Ronald J.
   McAlear" (Doc. No. 156)

Signal retained Ronald J. McAlear ("McAlear") "for the purposes of providing

information and guidance on Shipyard normal and customary practices . . . ."  (Doc. No. 156, Ex.

C, p. 1.)  McAlear is an engineer, holds a masters degree from the Massachusetts Institute of

Technology, and has spent his career working in all facets of the shipbuilding industry, including

at the management level.  (Id. at pp. 1–2.)  Though difficult to discern precisely what McAlear's

opinions are, it appears that he concludes that Signal "applies the normal and customary industry

practices" in several areas, including: safety, quality, the environment, the use of I.D. badges,

and the issuance of personal protective equipment.  (Id. at pp. 28–29.)

The Plaintiffs seek to exclude McAlear as an expert on the grounds that: (1) he is not

qualified to testify as an expert on safety; (2) his opinions are irrelevant; (3) his opinions are not

based on sufficient or reliable facts or data; and (4) his methodology is flawed.  (Doc. No. 156,

pp. 12–15.)  In addition, should the undersigned not completely exclude McAlear, the Plaintiffs

seek to limit his opinions to those contained in the report that was served on July 29, 2014—the "Texas Report"—arguing that a later served report was untimely.  (Id. at p. 11.)

      a.   *Timeliness of the David Report*

As an initial matter, the Plaintiffs seek to limit McAlear's opinions to those contained in the Texas Report.  (Id. at p. 11.)  The Plaintiffs argue that McAlear drafted a more robust report for use in a parallel case—the "*David* Report"—after "recognizing that the Texas Report was woefully inadequate."  (Id. at p. 4.)  While the Texas Report was timely, the *David* Report was served in this case on August 27, 2014, weeks after the deadline for disclosing experts passed.  (See Doc. No. 121) (setting July 29, 2014 as the deadline for defendants to serve expert reports).

"Rule 26(a) requires the expert's initial report to include 'a *complete* statement of all opinions the witness will express and the basis and reasons for them.'"  Culter v. Louisville Ladder, Inc., No. 4:10-4684, 2012 WL 2994271, at *5 (S.D. Tex. July 20, 2012) (quoting FED. R. CIV. P. 26(a)(2)(B)(i)) (emphasis in original).  In addition, the Federal Rules of Civil Procedure impose a duty to supplement expert reports.  See FED. R. CIV. P. 26(a)(2)(E); 26(e).  Courts, however, have struck so-called "supplemental" reports when they were offered not because of newly learned information or to correct an error in the initial report, as is contemplated by the Rules, but rather were merely an attempt to bolster the original report.  Culter, 2012 WL 2994271 at *5; see also Gallagher v. S. Source Packaging, L.L.C., 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008) ("Courts distinguish 'true supplementation' (*e.g.* correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by 'supplementing' an expert report with a 'new and improved' expert report.").  Such a decision lies within the discretion of the court.  See Reliance Ins. Co. v. La.

Land & Exploration Co., 110 F.3d 253, 257–58 (5th Cir. 1997) (finding that the district court did not abuse its discretion in refusing to allow a late filed supplemental report).

Here, the *David* Report cannot fairly be classified as merely a supplement to the Texas Report.  Signal points to no newly learned information or errors that McAlear sought to correct.  Rather, Signal asserts that the *David* Report provides "greater explanation and support for Mr. McAlear's conclusions"—this is the antithesis of a supplemental report.  (Doc. No. 173, p. 9.)  The Plaintiffs, however, fail to identify how they have been prejudiced.  See Geiserman v. MacDonald, 893 F.2d 787, 791 (5th Cir. 1990) (affirming the district court's enforcement of a scheduling order that resulted in a party not being able to present expert testimony, and noting that one of the factors was the "potential prejudice in allowing" the late testimony).  The *David* Report was served well in advance of McAlear's deposition, and the Plaintiffs do not assert that their preparation was hindered.  Furthermore, the Plaintiffs have not claimed that the late report required them to retain a new expert, or that it was merely offered as an attempt to avoid summary judgment.  See Reliance Ins. Co., 110 F.3d at 257 (noting that if a late supplemental report were allowed, the defendants could potentially be required to seek a rebuttal witness and a delay would have been inevitable); Culter, 2012 WL 2994271 at *5.

The undersigned does not condone the serving of a late expert report—particularly without seeking leave to do so.  However, given the logistical complexities of having multiple cases proceeding at the same time in two districts, and the fact that the Plaintiffs were unable to show any prejudice, the *David* Report will be considered as the operative expert report for this case.

b.   *Scope of McAlear's opinions*

Before discussing the Plaintiffs' specific arguments, it necessary to clarify the scope McAlear's opinions.  The Plaintiffs characterize McAlear as "an expert on safety practices," and most of their arguments are aimed at excluding McAlear as a safety expert.  (Doc. No. 156, pp. 12–13.)  Signal concedes that he is not an expert on safety, and asserts that he is merely opining about whether "a company operates customarily in the industry relative to safety."  (Doc. No. 173, pp. 5–6.)   Signal also identifies other general areas, aside from safety practices, that McAlear discusses.  (Id. at p. 2–3.)

McAlear, however, at times opines that Signal's facilities were in fact safe.  For example, he states, "Signal has operated one of the safest shipyards in the Industry" and that Signal's "safety record is evident when you compare the historical safety performance ratings from 2003 to 2013."  (Doc. No. 156, Ex. C, p. 25.)  McAlear goes so far as to call Signal's safety record "exemplary."  (Id.)  Such opinions go beyond merely discussing what is customary in the industry.

The undersigned finds that McAlear's opinions on safety are inadmissible for two reasons.  First, McAlear admits that he is "not an expert in safety."  (Doc. No. 156, Ex. B, 131:12.)  Therefore, he is not qualified to render such opinions.  Second, he has not examined sufficient information nor applied a reliable or meaningful principle to reach these particular conclusions.  Rendering an opinion that Signal's safety record is "exemplary" would require considering and balancing Signal's safety record against that of other companies or against identifiable industry standards.  McAlear undertook no such analysis.  Conversely, to opine generally that Signal's practices are consistent with industry customs only requires being familiar with the industry and being familiar with Signal's practices.

8

Accordingly, McAlear's opinions are limited to those relating to customary practices within the marine fabrication industry, and he may not opine as to whether Signal's facilities were in fact safe.

### c.   *McAlear is qualified to testify about industry customs*

The Plaintiffs argue that McAlear's report should be excluded because he admitted that he is not an expert on safety, and therefore, not qualified to testify as an expert.  (Doc. No. 156, p. 12.)  However, as discussed above, the Plaintiffs' characterization of McAlear's opinions is too narrow.  He is not just opining on whether Signal is a safe company or about its safety record.  Rather, he discusses general industry customs and Signal's practices measured against those customs.  Given McAlear's "[o]ver 40 years of experience in all aspects of the Marine Industry," including experience in managing and running shipyards, his practical work experience qualifies him as an expert about general practices in the industry.  (Doc. No. 156, Ex. C, App. A); see also Martin v. Wal-Mart Stores, Inc., No. 2:10-cv-268, 2011 WL 6399690, at  *1 (S.D. Miss. Dec. 20, 2011) (finding that an expert's twenty-four years of work experience qualified him to testify as an expert); Satcher v. Honda Motor Co., 52 F.3d 1311, 1317–18 (5th Cir. 1995) (holding that the district court did not err in finding an expert qualified to testify based on his experience).

### d.   *McAlear's opinions are relevant*

The Plaintiffs claim that McAlear's report should be struck because "[g]eneral standards and practices in the industry and Signal's shipyard safety practices are not relevant to" any of their claims.  (Doc. No. 156, p. 12.)  In response, Signal asserts that due to the Plaintiffs' factual allegations about the use of I.D. badges and unsafe working conditions, McAlear's opinions about general industry practices are relevant.  (Doc. No. 173, pp. 2–5.)  Signal is correct—the

Plaintiffs' complaint makes numerous references to the conditions of employment imposed by Signal.  For example, the Plaintiffs' complaint discusses the testing and re-testing by Signal, the fact that Signal charged the Plaintiffs for job-related tool kits, the use of I.D. badges, and general working conditions.  (See Doc. No. 1, pp. 26–28.)

Expert testimony is admissible if it will "help the trier of fact to understand the evidence . . . ."  See  FED. R. CIV. 702.  To the extent that the Plaintiffs criticize certain conditions of their employment and complain that they were working in substandard conditions, expert testimony claiming that these are customary practices is relevant.  Moreover, a potential juror is unlikely to be familiar with customary shipyard practices, and as such, expert testimony will assist the jury on this topic.  The Plaintiffs, however, claim that the issue is not whether Signal operates its facility in a way that is consistent with industry customs, but rather, whether the Plaintiffs were treated differently than other similarly situated non-Indian workers employed by Signal.  (Doc. No. 198, p. 2) ("[T]he practices of the industry at large, with respect to all employees, are irrelevant to the issue of Signal's treatment of the Plaintiffs relative to other Signal employees.").  While the disparate treatment of the Plaintiffs may be the ultimate issue as to the Plaintiffs' § 1981 claim, to the extent that the Plaintiffs raise certain issues about Signal's practices, it would be helpful to a jury (albeit marginally) to learn about general practices in the industry.  Accordingly, while McAlear's testimony may not be a perfect fit to the ultimate issue in this case, it is relevant enough to be admissible. See U.S. v. Tucker, 345 F.3d 320, 327 (5th Cir. 2003) (noting that the relevance inquiry centers on "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute") (quoting Daubert, 509 U.S. at 591).

e.   *McAlear's opinions are based sufficient facts and data*

Next, the Plaintiffs contend that McAlear's report should be struck because he based his opinions on documents found on Signal's website.  (Doc. No. 156, p. 13.)  Stated another way, McAlear did not consider a sufficient amount of information from a reliable source.  This type of challenge goes to the weight of his testimony, not its admissibility.  See 14.38 Acres of Land, 80 F.3d at 1077 ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").  Moreover, a review of Appendix B to the *David* Report illustrates that McAlear reviewed materials beyond just those available on Signal's website.  (Doc. No. 156, Ex. C, App. B.)  In fact, in their argument about all the differences between the Texas Report and the *David* Report, the Plaintiffs highlight all the information that McAlear considered.   (Doc. No. 156, pp. 4–6) (noting that McAlear considered ISO certifications, deposition excerpts, and even conducted an "informal survey" on tools and protective gear).  Accordingly, the undersigned finds that McAlear has reviewed enough information to opine on whether Signal's practices meet industry norms.   To the extent that the Plaintiffs wish to challenge the bases for McAlear's opinions, they can do so on cross-examination.

f.   *McAlear's opinions are the product of reliable principles and/or methods*

The Plaintiffs state that McAlear has met none of the *Daubert* factors.  (Doc. No. 159, pp. 14–15.)  The relevant inquiry, however, is not whether any or all of the *Daubert* factors are met, but rather, whether there is any reasonable criteria on which the expert based his opinion.  See Stolt Achievement, Ltd., 447 F.3d at 366; see also Huck v. City of Beaumont, 147 F. Supp. 2d 565, 568 (E.D. Tex. 2001) (Cobb, J.) ("[T]he *Daubert* inquiry is always fact-specific, and . . . the *Daubert* factors may not all apply.").   Here, McAlear balanced his expertise about industry

customs against sufficient information about Signal's practices to reach the conclusion that Signal's practices as to quality, the environment, the use of I.D. badges, and the issuance of personal protective equipment are "normal and customary" within the industry.  (Doc. No. 156, Ex. D, p. 28.)  This type of analysis is sufficient to support McAlear's opinions.

> g.  *Conclusion*

For the reasons stated above, the undersigned **GRANTS IN PART** the Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Ronald J. McAlear" (Doc. No. 156).  McAlear may testify about general industry practices and opine on whether Signal's practices are consistent with these customs.  McAlear, however, may not opine that Signal is a safe company or has an "exemplary safety record."

> B.  <u>Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Virginia Miles" (Doc. No. 151)</u>

Virginia Miles ("Miles") is Signal's expert on OSHA.  She offers one opinion—that "prior to the 2009 Field Operations Manual there is no documentation wherein OSHA definitively claimed to have jurisdiction over non-agricultural temporary labor camps . . . ." (Doc. No. 151, Ex. A, p. 2.)  Miles then supports this conclusion with five findings.  (<u>Id.</u>)

The Plaintiffs move to strike Miles's report, arguing that: (1) it is not relevant; (2) not helpful; and (3) is merely a legal conclusion.  (<u>See</u> Doc. No. 151.)

> a.  *Miles's opinion on whether certain OSHA regulations applied is relevant*

Plaintiffs argue, "the jurisdiction and coverage of OSHA prior to 2009 is not relevant to the legal claims at issue in this case."  (<u>Id.</u> at p. 3.)  As a preliminary matter, this is not an OSHA enforcement action, and therefore, OSHA standards play no substantive role in this case.  It is disingenuous, however, for the Plaintiffs to make a relevance argument in light of the fact that they designated an expert to offer opinions on the numerous ways in which Signal violated

OSHA regulations.  (Doc. No. 175, Ex. A) (detailing the various ways in which Signal's "man camp" did not comply with OSHA).  Moreover, the Plaintiffs' expert specifically states, "OSHA's Temporary Labor Camp standards apply to Signal's housing camp at Orange, Texas." (Id., Ex. A, p. 6.)  He then uses these regulations as a guide for detailing the numerous ways in which Signal failed to comply with OSHA.  (Id.); (see also Doc. No. 199) (the Plaintiffs characterized their expert as opining "that in his view the relevant OSHA regulations, 29 C.F.R. § 1910.142, did apply to non-agricultural temporary labor camps, in 2006 and 2007," and that he "present[ed] an extensive analysis showing how far out of OSHA compliance the Texas 'man camp' was . . . .").  If the Plaintiffs are going to elicit testimony from an expert that Signal failed to comply with certain OSHA regulations, then Miles's opinion, which merely offers a conflicting view on whether these regulations applied, is relevant.

b.  *Miles's opinion on whether certain OSHA regulations applied is helpful*

Next, the Plaintiffs claim that Miles's testimony will not be helpful because there is "nothing beyond the ken of the average juror." (Doc. No. 151, p. 3.)  The undersigned disagrees. A contested point between the parties (and their experts) is whether certain OSHA standards applied during the time in question, and whether these standards are the appropriate baseline upon which to measure Signal's conduct.  A layperson will be assisted by hearing expert testimony on whether and to what extent these regulations applied—if at all—during the relevant time.

c.  *Miles does not offer legal a conclusion*

Lastly, the Plaintiffs seek to strike Miles's report because it consists of impermissible legal conclusions.  (Id. at p. 4.)  Miles, however, stops short of reaching a legal conclusion that the "man camps" were not subject to OSHA's regulations on temporary labor camps.  Rather,

her opinion is that there is nothing clearly showing that these regulations applied.  (See Doc. No. 151, Ex. A, p. 2) (claiming that there is "no documentation wherein OSHA definitively claimed to have jurisdiction . . .").  It appears that Signal is going to use Miles to demonstrate that the standards applied by the Plaintiffs' expert may not have applied, and thus, discredit his opinions. Miles's opinion is akin to merely rebutting a key assumption made by the Plaintiffs' expert. Incidentally, the Plaintiffs' expert comes much closer to offering a legal opinion, by stating: "OSHA's Temporary Labor Camp standards apply to Signal's housing camp at Orange, Texas." (Doc. No. 175, Ex. A, p. 6.)

     d.  *Conclusion*

For the reasons stated above, the Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Virginia Miles" (Doc. No. 151) is **DENIED**.

    C.  <u>The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Donald H. Strobel" (Doc. No. 152)</u>

Signal designated Donald H. Strobel as an expert on the Fair Labor Standards Act.  (Doc. No. 179, p. 1.)  However, there are no FLSA claims pending in this case.  (See Doc. No. 216) (denying Plaintiffs' request for leave to add FLSA claims).  "Expert testimony which does not relate to any issue in the case is not relevant, and ergo, not helpful."  <u>Roman v. Western Mfg.</u>, 691 F.3d 686, 694 (5th Cir. 2012).  Because Stroble's report is not helpful, it is inadmissible. Fed. R. Evid. 702.

Accordingly, the undersigned **GRANTS** Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Donald H. Strobel."  (Doc. No. 152.)  Signal, however, can seek reconsideration of this order should FLSA claims ever be added to this case.

D. <u>The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Kevin Fox Gotham" (Doc. No. 153)</u>

Signal designated Kevin Fox Gotham, Ph.D. ("Dr. Gotham"), a professor of sociology at Tulane University, to "evaluate the availability of housing in the Gulf Coast region in . . . Orange County[,] Texas in the aftermath of hurricanes Katrina and Rita." (Doc. No. 180, p. 2.) He offers six opinions, labeled A through F, touching on the lack of available housing in the aftermath of hurricanes Katrina and Rita, the impacts that this had on businesses to recruit workers, and why Signal built the "man camps." (Doc. No. 153, Ex. A.)

The Plaintiffs claim that Dr. Gotham's report should be struck because it is (1) irrelevant and (2) based on insufficient facts and data. The Plaintiffs also argue that Dr. Gotham's report should be limited to the four opinions that were contained in the report that was served in this case, as opposed to the six opinions served in *David* (a parallel case pending in the Eastern District of Louisiana).

a. *Dr. Gotham's last two opinions should not be struck for failing to serve them*[1]

The report attached to the Plaintiffs' motion contains six opinions and appears to be from *David.* (Doc. No. 153, Ex. A.) Though not attached to any of the parities' briefing, the Plaintiffs claim that the report that was actually served in this case contained only four opinions. (Doc. No. 153, p. 4 n. 3.) The Plaintiffs argue that the two additional opinions that Dr. Gotham offered in *David* should be excluded because they were never formally served in this case. (Doc. No. 205, p. 3 n. 3.)

---

1. The decision whether to allow a late filed expert report—which is essentially why the Plaintiffs seek to limit Dr. Gotham's opinions—involves determining whether to amend the scheduling order. This inquiry involves a four-factor test. See Geiserman, 893 F.2d at 790–91. In contrast, determining whether Dr. Gotham's opinions are admissible, is a different inquiry. Therefore, the undersigned finds it necessary to first consider whether these opinions are properly part of this case, before determining whether they are admissible. As will be discussed below, opinions E and F are struck from this case.

The undersigned disagrees for two reasons.  First, the Plaintiffs did not specifically move in their motion to have Dr. Gotham's report limited to four opinions.  They merely asserted in a footnote that Dr. Gotham's report only contains four opinions, yet attached the report from *David*, which contains six opinions.  (See Doc. No. 153, p. 4 n. 3) (noting the difference between the report served in this case and that served in *David*, but not requesting to have the additional two opinions struck).  It is not until the Plaintiffs' reply is it clear that they seek such relief. (Doc. No. 205, p. 3 n. 3) (discussing the two additional opinions in *David*, and arguing that "[b]ecause these opinions were not provided in the Report—which will not be amended—such opinions should be excluded") (internal citations omitted).  The undersigned will not consider arguments raised for the first time in a reply.  See Tran Enters., L.L.C. v. DHL Express (USA) Inc., 627 F.3d 1004, 1010 (5th Cir. 2010).

Second, even assuming the issue was properly raised, the Plaintiffs have not stated how they were prejudiced by the additional two opinions.  Reliance Ins. Co., 110 F.3d at 257–58 (applying the four factor test articulated in *Geiserman*).  The Plaintiffs had the opportunity to depose Dr. Gotham regarding all six opinions, it appears that they had his full report in advance of his deposition, and there is nothing in the record demonstrating that the Plaintiffs' deposition preparation as to all six opinions was hindered.  Moreover, while Dr. Gotham testified that he does not plan to amend his report, his deposition testimony is clear that he plans to offer six opinions in this case.  (Doc. No. 154, Ex. B, 156:6–159:4.)  Therefore, there is no unfair surprise.

Again, the undersigned does not condone Signal's tactics of untimely bolstering an expert report, but the Plaintiffs have failed to properly raise this issue and show any prejudice. Therefore, to the extent that the Plaintiffs seek to exclude Dr. Gotham's last two opinions because they were untimely (or never formally served)—their request is denied.

b.  *Dr. Gotham's opinions are relevant*[2]

The Plaintiffs argue that Dr. Gotham's report, "which conclude[s] that Hurricanes Rita and Katrina destroyed housing and other buildings on the Gulf Coast," is "so generalized as to be common sense" and therefore, fails to meet the helpfulness standard of Federal Rule of Evidence 702(a).  (Doc. No. 153, p. 3.)  In addition, the Plaintiffs claim that "the destruction caused by Hurricane Katrina and Rita in 2005 is entirely irrelevant to the specific issue of what particular housing was available to the Plaintiffs . . . ."  (Doc. No. 153, p. 9.)  Signal responds by arguing that Dr. Gotham's report is helpful because it "will assist the Court and the jury in determining the nexus between Signal's logic, intentions, and actions."  (Doc. No 180, p. 5.)

To meet the first prong of Rule 702, "the expert's scientific, technical, or other specialized knowledge [must] help the trier of fact understand the evidence or to determine a fact in issue."  FED. R. CIV. P. 702(a).  The Plaintiffs claim that there is no need for expert testimony on the fact that hurricanes Rita and Katrina destroyed housing on the Gulf Coast.  Dr. Gotham's opinions, however, go beyond this one basic idea.  For example, he also opines on the "problems that businesses faced in attracting skilled labor in the context of widespread housing damage in the months and years after Hurricane Katrina and Hurricane Rita."  (Doc. No. 180, p. 5); (see also Doc. No. 153, Ex. A, pp. 23–27) (discussing the correlation between the lack of available housing and the difficulty in attracting workers).  Moreover, the extent of the housing shortage may be beyond the knowledge of a layperson.  While some jurors may still remember what life was like after the hurricanes, it is plausible that a juror may have only recently moved to the area and lacks such familiarity.  In addition, these hurricanes occurred nearly ten years ago—it is

---

2.  The Plaintiffs moved to exclude Dr. Gotham's report in its entirety, but did not move in the alternative to strike opinion B, which addresses the impacts that Hurricane Katrina had on Mississippi.  Moreover, interspersed with Dr. Gotham's other opinions is a discussion of the Mississippi area, which was the location of another Signal facility.  The undersigned questions whether a discussion of the Mississippi region is relevant to this case.

possible that memories have faded.  Accordingly, information regarding the housing market and the impact that it had on attracting workers to the area is helpful, and as such, meets Rule 702(a).

Furthermore, contested factual issues include why Signal allegedly forced the Plaintiffs to live in the "man camps" and why Signal needed to use an immigrant labor force.  The state of the housing market is arguably relevant to these issues.  Therefore, by offering a big picture perspective on what the housing market was like during the relevant period, Dr. Gotham's testimony is helpful.  In short, if the Plaintiffs are going to claim that there was no need for Signal to build the "man camps," then testimony on the state of the housing market is relevant.

      c.   *Sufficient facts and data*

Dr. Gotham's opinions can be broken into two general categories: (1) general opinions about the impacts of the hurricanes (opinions A through D) and (2) opinions about Signal's actions (opinions E and F).  As to Dr. Gotham's general testimony, he relies on sufficient facts and data to reach general conclusions about the state of the housing market and the difficulty in attracting workers to disaster areas.  While the utility of such testimony is questionable, as discussed above, it meets the admissibility requirements of the Federal Rules of Evidence.  In addition, while the Plaintiffs fault him for not considering the data on a granular enough level (*i.e.*, examining specific vacancy rates), he considered sufficient data to conclude that the housing markets were negatively impacted by the hurricanes.

Dr. Gotham's more specific opinions, however, should be excluded.  As for opinion E, Dr. Gotham has not reviewed enough specific information about housing availability in close proximity to Signal's facility in Orange, Texas to reach the conclusion that "Signal built on-site facilities to address an acute housing shortage for workers."  (Doc. No. 153, Ex. A, p. 34); (see also id. at p. 37) ("[I]t is my opinion that the dearth of housing availability in Orange County,

Texas . . . created a major obstacles for businesses in these areas to attract and keep the labor necessary for business and community recovery efforts."). To reach such a specific opinion he would need to look at the housing market in an area in close proximity to Signal's facility in Orange, Texas. Dr. Gotham has undertaken no such analysis. He did not consider specific data in a narrowly defined region, and even classifies his report as considering "the state of the housing market in general during the years after the disaster." (Id., Ex. B, 68:12–14.) Dr. Gotham's opinions that housing was impacted by the hurricanes, without something specific to the area in question or without facts showing what housing was actually available near Signal's facility, will not support this opinion. Moreover, the specific data upon which Dr. Gotham relies focuses on the Mississippi region, not on Texas. (Id. at pp. 37–38.)

As for Opinion F, this opinion is improper because it is not helpful and usurps the role of the jury. Dr. Gotham is attempting to pass judgment on the propriety of Signal's actions as they relate to the "man camp." For example, he states that "Signal did not force or coerce the workers to stay in the on-site facility" (Id. at p. 42); that "no plaintiff was ever required to live in the on-site housing facilities . . . ." (Id. at p. 41); and that the housing facility benefited the Plaintiffs. (Id. at p. 41–42.) The jury, informed about the state of housing market generally and other testimony, can determine whether Signal actually had no other choice but to build the "man camps" or that the Plaintiffs benefited from them.

  d. *Conclusion*

For the reasons stated above, the Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Kevin Fox Gotham" (Doc. No. 153) is **GRANTED IN PART**. Dr. Gotham may opine about the state of housing in Orange, Texas in general and the correlation between available housing and attracting skilled workers. However, opinions E and F are struck, and he

may not opine as to whether there was "an acute" housing shortage in Orange, Texas, why Signal built the "man camp," whether the Plaintiffs were required or coerced into living at the "man camp," or whether the "man camp" actually benefited the Plaintiffs.

E. Signal's "Motion in Limine to Exclude/Limit Testimony of Florence Burke" (Doc. No. 161)

Florence Burke ("Burke") is the Plaintiffs' expert on human trafficking. She is offered to (1) "provide the trier of fact with background on the H2-B guest worker visa program and on human trafficking in general" and (2) "to demonstrate to the fact-finder that the facts and circumstances of this case as alleged by the Plaintiffs fit within the typical pattern of human trafficking." (Doc. No. 184, p. 1.) Signal argues that Burke's report should be struck for three reasons: (1) her report contains legal conclusions; (2) her opinions are unreliable; and (3) she is not qualified to render an opinion regarding the Plaintiffs' mental state. (Doc. No. 161.)

a. *Permissible scope of expert testimony on human trafficking*

Courts have reached varied conclusions on whether expert testimony on human trafficking is admissible. Compare Elat v. Ngoubene, 993 F. Supp. 2d 497, 514 (D. Md. 2014) (allowing some testimony about human trafficking) with (Doc. No. 2038, David v. Signal Int'l, L.L.C., No. 2:08-cv-1220 (E.D. La. Dec. 30, 2014) (striking all expert testimony on human trafficking)). The issue is that in this context, it is difficult to delineate between an opinion that is merely a legal conclusion (*i.e.*, that 18 U.S.C. § 1590 was violated) and testimony that educates the jury and may be helpful. While Federal Rule of Evidence 704 "abolish[ed] the per se rule against testimony regarding ultimate issues of fact . . . [it] does not open the door to all opinions." See Owen v. Kerr-McGee Corp., 698 F.2d 236, 241–42 (5th Cir. 1983). "The Advisory Committee notes make it clear that questions which would merely allow the witness to tell the jury what result to reach are not permitted. Nor is the rule intended to allow a witness to

give *legal* conclusions." Id.  "The line between a permissible opinion on an ultimate issue and an impermissible legal conclusion is not always easy to discern."  United States v. McIver, 470 F.3d 550, 562 (4th Cir. 2006).

In delineating the proper of scope of expert testimony on human trafficking, the undersigned must guard against two things.  First, an expert must not be allowed to instruct the jury on what the legal elements of human trafficking are (*i.e.*, what is needed to prove a violation of 18 U.S.C. § 1590)—that is the court's job.  Second, an expert must be prevented from telling the jury what conclusion to reach as to whether the Plaintiffs were victims of human trafficking—that is for the jury to decide.  Therefore, the issue is how to delineate between a general discussion of human trafficking, which may help the jury better understand the complexities of human trafficking and is therefore admissible, and reaching a conclusion as to whether these Plaintiffs were victims of human trafficking, which would usurp the role of the jury.  This difficulty is further compounded by the fact that the term "human trafficking" has both a legal and a colloquial meaning, further blurring the line between permissible and impermissible testimony.

The undersigned finds the appropriate balance to be as follows: Burke may testify about "human trafficking in general," which includes discussing the general features of human trafficking schemes, but she may not offer an opinion on whether these Plaintiffs were victims of human trafficking.  This will allow Burke to educate and inform the jury on the subtleties of human trafficking, which meets the helpfulness requirement of Rule 702, without directly offering a legal conclusion.  FED. R. CIV. P. 702(a) (requiring that an expert's specialized knowledge "help the trier of fact to understand the evidence").  Moreover, allowing Burke to apply the facts of this case to her general standards would be tantamount to her telling the jury

what conclusion to reach.  See also Elat, 993 F. Supp. 2d at 514 (striking portions of Burke's testimony, but allowing her to testify generally about "the patterns of coercion and threats that are typically present in situations involving the exploitation of foreign workers" and other general topics relating to human trafficking).

Two examples of the scope of permissible and impermissible testimony may be helpful. First, the portion of Burke's report where she offers background on human trafficking and discusses "common features of trafficking situations" is permissible because it is purely informative.  (Doc. No. 161, Ex. A, p. 11.)  However, Burke cannot take the next logical step and conclude that there was trafficking in this case or opine on how the Plaintiffs were affected.  For example, she states:  "Having considered Plaintiffs' accounts of their trafficking experiences, it is my opinion that many of the trafficking factors identified above were present in Defendants' conduct towards them and operated to create a psychologically coercive environment in which a reasonable worker in the Plaintiffs' situation would have felt compelled to continue working for Signal."  (Id. at p. 12.)  This is nothing more that her evaluating the facts and reaching a conclusion that there was trafficking—such an analysis is within the province of the jury.

Second, Burke discusses in general terms how victims of human trafficking are often made a set promises about what their working conditions will be like, but in reality, the conditions tend to be significantly worse.  (Id. at p. 19.)  This is within the scope of permissible testimony.  Burke, however, crosses the line by stating: "the Plaintiffs in this case believe they were deceived and betrayed in terms of their employment conditions, living conditions, net wages, opportunity to work, overtime hours, and immigration status."  (Id. at pp. 19–20.)  The jury, after hearing the facts, can evaluate whether the Plaintiffs were deceived.

The above examples are not the only places where Burke's opinions go too far. However, because her report is so intertwined with permissible and impermissible opinions, the undersigned will not attempt to state on a paragraph-by-paragraph (or sentence-by-sentence basis) what is excluded from Burke's report.  The limitation that she may only opine about the characteristics of human trafficking in general, and not whether there was trafficking in this case, should suffice.

      b.   *Signal's other arguments*

Signal also raises several other arguments as to why Burke's testimony should be excluded or limited.  First, Signal argues that Burke misrepresented two of her qualifications, and therefore should be struck.  (Id. at pp. 2–3.)  The undersigned disagrees.  A review of her experience and training shows Burke has extensive experience working with victims of human trafficking and is qualified to testify as an expert on human trafficking.  (See Doc. No. 161, Ex. A, pp. 1–5.)  Whether the school where she obtained her Ph.D. in clinical psychology is accredited by the American Psychological Association, or whether her license to be a family counselor in California is still valid, does not impact whether she is qualified as an expert on trafficking.  To the extent that Signal believes that these alleged misstatements affect the weight the jury should ascribe to her testimony, it can raise such issues on cross-examination.

Next, Signal argues that Burke's report is unreliable because her interview process is flawed and that opinions based on Plaintiffs' statements are inadmissible.  (Doc. No. 161, pp. 6–9.)  Because Burke is precluded from reaching an opinion on the issue of whether the Plaintiffs were victims of human trafficking, or evaluating the facts of this case as they relate to human trafficking, Signal's argument is now moot.  (Id. at p. 9.)  Likewise, Signal's argument that

Burke is not competent to "reach a final diagnosis" is no longer at issue, since she will not be testifying as to how these Plaintiffs were impacted.

        c.  *Conclusion*

Signal's "Motion in Limine to Exclude/Limit Testimony of Florence Burke" (Doc. No. 161) is **GRANTED IN PART.**  Burke's opinions shall be limited to those related to general characteristics of human trafficking schemes, and Burke is precluded from testifying whether these Plaintiffs were victims of human trafficking or in what ways the facts of this case are similar to other known cases of human trafficking.

    F.  <u>Plaintiffs' "Amended Motion to Exclude Testimony and Strike the Expert Report of Dr. Louise Shelley" (Doc. No. 168) and Dewan's "Motion and Incorporated Memorandum to Exclude Expert Witness Testimony" (Doc. No. 162)</u>

Signal designated Louise Shelley, Ph.D. ("Dr. Shelley") to testify as an expert on "human trafficking and related organized crime." (Doc. No. 182, p. 1.)  Dr. Shelley received her Ph.D. in Sociology from the University of Pennsylvania, and is currently a professor at the School of Public Policy at George Mason University.  Her forty-five page report leads to one ultimate conclusion: "Signal was not engaged in human trafficking at any stage of the process with the H2B workers, either at recruitment, on their arrival in the United States or in their employ." (Doc. No. 168, Ex. B, p. 44.)  The Plaintiffs seek to exclude Dr. Shelley's report, arguing that: (1) her report contains numerous legal conclusions; (2) her methodology is not valid; (3) her testimony is not helpful; and (4) she impermissibly assesses the witnesses' credibility.  Dewan also seeks to exclude Dr. Shelley's testimony, arguing that she "makes blanket, unfounded assertions that the Dewan Defendants engaged in fraudulent conduct . . . ." (Doc. No. 162, p. 4.)

a. *Dr. Shelley's report contains impermissible legal conclusions*

The Plaintiffs argue that Dr. Shelley's report should be struck because it is "replete with legal conclusions" and "[t]hese conclusions fall far outside the scope of permissible expert testimony . . . ." (Doc. No. 168, p. 6.)  The Plaintiffs first argue that Dr. Shelley offers numerous legal conclusions about human trafficking.  For the same reasons that the Plaintiffs' human trafficking expert report was limited, Dr. Shelley's report must also be limited.  Therefore, Dr. Shelley's opinions are subject to the same limitation discussed above: Dr. Shelley may only discuss the general characteristics of human trafficking, but may not opine as to whether these Plaintiffs were in fact victims of human trafficking.

In addition, the Plaintiffs move to exclude three other alleged legal conclusions reached by Dr. Shelley.  At the outset, because Dr. Shelley's testimony is limited to only a discussion about human trafficking generally, this part of the Plaintiffs' motion is now moot.  However, for clarity, the undersigned will address the Plaintiffs' arguments.  First, the Plaintiffs claim that Dr. Shelley offers an opinion on a "non-existent" debt bondage claim.  A part of her report does address debt bondage.  (Doc. No. 168, Ex. B, pp. 11–12) ("[T]here was no debt bondage in this case under either the American or UN definition.").  Debt bondage has a specific legal definition, and differs from the Plaintiffs' claim that the financial debts they incurred forced them to continue working for Signal.  See 22 U.S.C. §7102(5) (defining debt bondage as "the status or condition of a debtor arising from a pledge by the debtor of his or her personal services or those of a person under his control as a security for debt").  The Plaintiffs have not made a claim of debt bondage.  Accordingly, because Dr. Shelley's opinion regarding debt bondage does not relate to any cause of action or issue in this case, it is inadmissible.  See Roman, 691 F.3d at 694.

Next, Dr. Shelley claims that "Signal was exempt from OSHA standards for the housing of its H2-B workers . . . ." (Doc. No. 168, p. 8.)  Dr. Shelley is not qualified to offer an opinion on the applicability of OSHA, therefore, this opinion is struck.  Lastly, the Plaintiffs argue that Dr. Shelley offers opinions on the law of agency.  According to the Plaintiffs, the numerous references that she makes regarding Signal's role in the allegedly false promises is tantamount to an opinion on agency.  The undersigned disagrees—Dr. Shelley does not offer any opinions on agency law.  However, as will be discussed below, such comments on the evidence are not helpful, and therefore, are struck from her report.

> b. *Helpful*

The Plaintiffs argue that Dr. Shelley's opinions do not assist the trier of fact because they "merely parrot Signal's theory of the case . . . ." (Id. at p. 11.)  This is a fair characterization of much of Dr. Shelley's report.  Large portions of her report read more like an opening statement than an expert report.  For example, she "opines" that: "Signal did not obtain workers for its facilities in Texas and Mississippi through the use of force, fraud, or coercion" (Doc. No.  168, Ex. B, p. 9); "Burnett might have engaged in deceptive promises, but as the chronology presented by the plaintiffs in the third amended complaint [demonstrates], Signal was not a part of any deceptive promises" (Id. at p. 18); "Signal did not promise the workers green cards, nor did they learn that this promise had been made by the recruiters until after the workers arrived at Signal['s] facilities"  (Id. at p. 19); "The Indian H2B workers did not have their passports or visas confiscated" (Id. at p. 38); and "[i]n reviewing the thousands of Signal emails, I saw nothing in them reflecting any effort to economize on the workers or to shortchange them." (Id. at p. 41.)  These are just a few examples of many.

Because Dr. Shelley's opinions are limited to those related to the general characteristics of trafficking, such commentary on what the evidence establishes will not be allowed.

    c.   *Reliability and methodology*

The Plaintiffs next argue, "[f]or many of her opinions, Dr. Shelley asks this Court to make 'scientifically unsupported leaps of faith in the causal chain'" (Doc. No. 168, p. 9) (quoting Rider v. Sandoz Pharm. Corp., 295 F.3d 1194, 1202 (11th Cir. 2012)).   The Plaintiffs identify two particular instances.   First, they claim that Dr. Shelley supports her opinion that there was no trafficking in this case by erroneously drawing a conclusion from a report done by the Texas Task Force on Human Trafficking.   (Doc. No. 168, p. 10.)   Again, because Dr. Shelley will only be allowed to opine about the general characteristics of human trafficking, and not whether there was trafficking in this case, she will be precluded from drawing this conclusion.

The Plaintiffs next argue that Dr. Shelley opines that the food at the "man camp" was "adequate in quantity and was nutritional," and she reached this opinion by "eating at a commercial restaurant run by the caterers in New Orleans more than six years after the last Indian H-2B worker ate at the 'man camp.'"   (Doc. No. 168, p. 11.)   This is not the type of rigorous analysis that is required of an expert.   Moreover, the quality of food at a restaurant in New Orleans, years later, is in no way indicative of the quality of food at the "man camps."   Therefore, such an "opinion" is improper.   These are just two examples; Dr. Shelley offers numerous "opinions" that are reached through a less than rigorous analysis.[3]   Because her testimony is limited to discussing the general features of human trafficking schemes, these

---

      3.  Dr. Shelley also opined, "[e]xamining Slides 1, 2, and 3 of Signal's safety performance reveals that is has an extremely low rate of accidents."  (Doc. No. 168, Ex. B, p. 35.)   As discussed above, reaching such a conclusion requires balancing Signal's safety record against identifiable standards.  See infra III.A.b.  Dr. Shelley has not done this.  Likewise, she opines that:  "I saw a photo of Khuttan's welding test as compared to those of others and he was clearly an individual with inadequate or an absence of welding experience previously."  (Doc. No. 168, Ex. B, pp. 22–23.)  Dr. Shelley is no way qualified to discuss the contents of a welding test, nor does she discuss how she reached the opinion that this Plaintiff had inadequate skills.

portions of her report are no longer in the case.  However, because her report is replete with these types of remarks, the undersigned reiterates that any testimony given by Dr. Shelley at trial must meet the requirements of Rule 702.

d.  *Dr. Shelley improperly assesses the witnesses' credibility*

The Plaintiffs also seek to strike portions of Dr. Shelley's report where she assesses the credibility of the witnesses.  (Doc. No. 168, pp. 13–14.)  Signal responds that Dr. Shelley is not passing on the witnesses' credibility, but rather, merely elucidating the bases for her opinions. The undersigned is not persuaded.  (Doc. No. 182, p. 16.)  Dr. Shelley spends several pages of her report evaluating the Plaintiffs' testimony.  For example, she states that "Kurian David's T-visa application is full of incorrect statements" (Doc. No. 168, Ex. B, p. 21); "Hemant Khuttan's declaration raises many questions as to its veracity and the validity of his complaints" (Id. at 22); and she notes an alleged contradiction in Sony Vadusevan-Sulekha's statement by stating that "the problem with his statement is that Signal never had any pictures of housing or residential facilities on its website.  This is a fantasy not reality."  (Id. at p. 23.)  The jury, without the assistance of Dr. Shelley, can evaluate whether the Plaintiffs are being truthful.  Accordingly, such opinions are improper.

e.  *Dr. Shelley's testimony as it relates to Dewan is improper*

Dr. Shelley asserts in numerous places throughout her report that Dewan engaged in either deceptive or fraudulent practices.  (See, e.g., id. at pp. 9, 18–19, 22, 26.)  Such testimony is improper because it is unhelpful.  Whether Dewan committed fraud or engaged in deceptive practices is something the jury can readily evaluate on their own after hearing the evidence—there is no need for expert testimony on this point.  Dr. Shelley cannot simply regurgitate

Signal's theory of the case through expert testimony.   Accordingly, Dr. Shelley shall be precluded from opining about Dewan's conduct.

      f.   *Conclusion*

Much of Dr. Shelley's report consists of impermissible legal conclusions, advocacy, assessment of the witnesses' credibility, and unreliable and unfounded opinions.   However, Dr. Shelley does devote a few paragraphs of her report to discussing the elements of human trafficking generally, and even opines that the Plaintiffs' expert does not identify all elements that are "central to labor trafficking."  (Doc. No. 168, Ex. B, p. 35.)  This portion of Shelley's report is acceptable; the remainder of Dr. Shelley's report is not.

Therefore, for the reasons stated above, the Plaintiffs' "Amended Motion to Exclude Testimony and Strike the Expert Report of Dr. Louise Shelley" (Doc. No. 168) is **GRANTED IN PART**.   Dr. Shelley's testimony is limited to a discussion of the general elements and characteristics of human trafficking.   She, however, may not opine on whether these Plaintiffs were victims of human trafficking, the credibility of the Plaintiffs, or offer her assessment of the facts of this case.   Dewan's "Motion and Incorporated Memorandum to Exclude Expert Witness Testimony" (Doc. No. 162) is **GRANTED**, and Dr. Shelley's opinions as they relate to Dewan are struck.

    G.  <u>The Plaintiffs' "Motion to Limit the Testimony of Enrique Gonzalez, III" (Doc. No. 155) and Burnett's "Motion and Memorandum in Support to Exclude Legal Opinion Testimony of Signal's Immigration Law Expert" (Doc. No. 158)</u>

Signal's expert, Enrique Gonzalez ("Gonzalez"), an immigration lawyer, "prepared a report addressing various ethical and U.S. immigration law issues as they pertain to the conduct of the various parties involved in this case."  (Doc. No. 155, Ex. A, p. 1.)  The Plaintiffs moved to strike Gonzalez's opinion II and six other "stray remarks."  (Doc. No. 155, pp. 4–7.)  Signal responded by arguing that Gonzalez was not "retained to provide an opinion on plaintiffs'

conduct in this case and concedes that he will not testify at trial to any individual plaintiffs' conduct, nor that of any plaintiffs collectively." (Doc. No. 178, p. 1.)  However, Signal claims that Gonzalez's opinion II is "essential for the development of [his] subsequent opinions regarding Burnett." (Id. at pp. 1–2.)

In addition, Burnett moved to exclude a large portion of Gonzalez's report, arguing that it contains impermissible legal conclusions. (Doc. No. 158.)  Signal responded and claimed that Gonzalez's report was not "proffered to circumvent the fact finding role of the jury," but that "the facts and the pertinent regulations are so intertwined that they must be presented in conjunction," and therefore, his opinions are admissible in their entirety. (Doc. No. 176, p. 1.)

      a. *Due to the severance and transfer of Signal's cross-claims, Gonzalez's opinions II-V are no longer relevant*

Gonzalez offers five opinions. (Doc. No. 155, Ex. A.)  Because Signal's cross-claims against Burnett and others were recently severed and transferred to the Eastern District of Louisiana, opinions III through V are no longer relevant, and therefore, are inadmissible. (Doc. No. 211.)  These opinions focus on duties owed by an immigration attorney to its client, and the standard of care that an immigration attorney should maintain.  In other words, they are aimed at supporting Signal's claims against Burnett for malpractice and breach of fiduciary duty—claims that are no longer at issue in this case.

In addition, the undersigned finds Gonzalez's opinion II is not helpful, and therefore, inadmissible.  He opines that: "Foreign nationals seeking an H-2B visa are considered to have committed immigration fraud if they deliberately conceal their intent to remain permanently in the United States from a U.S. consular or immigration officer." (Doc. No. 155, Ex. A, p. 24.)  There is no cause of action in this case that centers on whether the Plaintiffs committed immigration fraud.  While Signal may argue that the Plaintiffs in fact concealed their true intent,

there is no need for expert testimony opining as to whether this amounts to immigration fraud. Signal's primary argument that opinion II should not be struck is that it is "essential for the development of Gonzalez's subsequent opinions regarding Burnett." (Doc. No. 178, pp. 1–2.) However, these subsequent opinions have been struck, therefore, this argument is without merit.

Accordingly, the undersigned strikes opinions II-V.

b. *Other "stray remarks" are inadmissible*

The Plaintiffs also move to exclude six other "stray remarks" that they claim are aimed at them and are impermissible. Two examples are illustrative. First, Gonzalez states: "The intent by the foreign nationals and other companies was for the workers to remain in the U.S. permanently." (Doc. No. 155, Ex. A, p. 14.) Second, by "counseling foreign nationals to lie to immigration officers about their intent to remain in the U.S., Mr. Burnett, as well as the foreign nationals, knowingly committed immigration fraud." (Id. at p. 15.)

It appears that Gonzalez is inferring that the Plaintiffs committed these acts, even though Gonzalez unequivocally testified that he is not offering any opinions on the Plaintiffs' conduct. (Doc. No. 155, Ex. B, 191:6–13.) There is simply no other way to interpret his assertion that "the foreign nationals" (*i.e.*, the Plaintiffs) "knowingly committed immigration fraud" by allegedly lying about their intent. Therefore, to prevent any unnecessary confusion that Gonzalez is opining about the Plaintiffs' conduct, these remarks are struck. Moreover, these remarks are offered in Gonzalez's report to illustrate how Burnett allegedly breached his duties. Because opinions about Burnett's duties as an immigration lawyer are no longer relevant to this case, there is no need for such stray remarks. Accordingly, the Plaintiffs' motion is granted.

c.   *Gonzalez's opinion I*

All that remains is Gonzalez's opinion I, in which he states: "it is not immigration fraud to indicate to the U.S. government that the need for H2-B workers is on a temporary basis, and then to seek an extension after extreme natural disasters like Hurricanes Rita and Katrina." (Doc. No. 155, Ex. A, p. 24.)   The Plaintiffs do not take issue with this opinion.   Moreover, Burnett does not specifically argue that this opinion should be struck, but rather claims generally that "this Court should limit any testimony by Plaintiffs' and Signal's experts to the general process for obtaining non-immigrant visas and permanent work resident visas" and not allow experts to offer "any legal opinion as to what the law is or whether or not any applicable laws or regulations were breached by anyone."   (Doc. No. 158, p. 11–12.)

Opinion I straddles the line between being a legal conclusion and helpful testimony on the immigration process generally.   On the one hand, Gonzalez should be prevented from testifying outright that Signal did not commit immigration fraud.   This would be a legal conclusion.   However, looking at this opinion within in the context of Gonzalez's report, Gonzalez does not do this.   This opinion is contained in the background section of his report, and is part of his discussion of the immigration process generally.   Moreover, he never actually concludes that Signal did not commit immigration fraud (even though that is what can be inferred).   Therefore, opinion I is proper.   While Gonzalez's opinion comes close to offering a legal conclusion, it is not inadmissible.   At trial, however, the parties will need to be vigilant to ensure that the phrasing of any questions do not elicit a pure legal conclusion.   See, e.g., Owen, 698 F.2d at 240 (discussing that the way a question is phrased may elicit an improper legal conclusion) (citing FED. R. EVID. 704 advisory committee's notes).

d.   *Conclusion*

Because Signal's cross-claims have been transferred, the undersigned strikes opinions III-V of Gonzalez's report as irrelevant.  The Plaintiffs' "Motion to Limit the Testimony of Enrique Gonzalez, III" (Doc. No. 155) is **GRANTED** and the undersigned strikes Gonzalez's opinion II. Moreover, the six "stray remarks" identified by the Plaintiffs are also struck, and Gonzalez is precluded from offering testimony that appears to opine about the Plaintiffs' conduct.  Burnett's "Motion and Memorandum in Support to Exclude Legal Opinion Testimony of Signal's Immigration Law Expert" (Doc. No. 158) is **GRANTED IN PART** and Gonzalez may not offer "any testimony as to his opinions of the law, . . . [or] opinions[,] . . . legal conclusions[,] or interpretation of what the evidence establishes."  Gonzalez may, however, discuss the H2-B visa program generally and the general process for obtaining such visas.

H.   Signal's "Motion in Limine to Exclude/Limit Testimony of Amy Mowl" (Doc. No. 159)

Signal moves to exclude or limit the testimony of the Plaintiffs' expert, Amy Mowl. (Doc. No. 159.)  Mowl is an economist, and is currently on the faculty of the Institute for Financial Management and Research Business School in Chennai, India.   The Plaintiffs designated Mowl to provide "a culturally specific socio-economic context to assist the jury in understanding the nature of the debts incurred by Plaintiffs in India to pay hefty recruitment fees charged by Defendants."  (Doc. No. 185, p. 1.)  Signal seeks to exclude or limit Mowl's testimony on three grounds: (1) she makes impermissible credibility determinations; (2) her testimony regarding suicide must be limited; and (3) "Mowl uses insufficient information and unreliable principles or methods in forming her opinions." (Doc. No. 159.)

a.  *Credibility Determination*

Signal argues that Mowl passes on the credibility of the Plaintiffs' statements, and that her "opinions impermissibly regurgitate[] the Plaintiffs' testimony stamped with the *imprimatur* of her expertise."   (Doc. No. 159, p. 5.)   The undersigned disagrees with Signal's characterization of Mowl's approach.   Mowl testified that she received sworn statements made by the Plaintiffs, and because they were sworn, assumed they were true.   (Id., Ex. B, 46:19–47:16.)   In addition, when questioned about whether she examined the truthfulness of the Plaintiffs' statements, she said she did not because they were consistent with what she knows about Indian finance products.   (Id.)   This is not the same as opining that the statements are in fact true.

Signal attempts to argue that Mowl's opinions are similar to ones that were struck in *Elat v. Ngoubene*.  (Doc. No. 159, p. 5.)  In *Elat*, the expert weighed two competing sets of facts, and concluded that the plaintiff's version of the facts was more credible than the defendants'.  *Elat*, 993 F. Supp. 2d at 513–14 (noting that the expert's "evaluation of the truthfulness of Plaintiff's version of the underlying events as compared to Defendants' is little different from the way that juries themselves determine credibility from conflicting testimony.").  The expert then used the plaintiff's version of the facts as the basis for her opinion.  Id.  Mowl did not undertake such an analysis.  She merely took the plaintiffs' statements at face value and felt she could because they were consistent with what she expected based on her experience.  This is the same as forming an opinion based on documents produced in discovery.

b.  *Testimony regarding suicide*[4]

To illustrate the effect that debts can have on people in India, Mowl discusses a recent wave of suicides by Indian farm workers.  (Doc. No. 159, Ex. A, pp. 17–20.)  Signal seeks to

---

4.  Signal did not argue that such testimony may be unfairly prejudicial.  See FED. R. EVID. 403.

exclude this part of Mowl's report on two grounds.  First, Signal argues that her sources are faulty.  Mowl's sources were Indian newspapers.  Signal has pointed to no reason why the reliability or truthfulness of these sources should be doubted.  Moreover, this type of challenge goes to the weight that the fact finder should ascribe to the opinions, not their admissibility.  <u>See</u> <u>14.38 Acres of Land</u>, 80 F.3d at 1077 ("As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.").

Second, Signal claims that Mowl has not offered any form of "peer-reviewed or other authoritative source" showing that suicide rates amongst the farming community are relevant or similar to those amongst the non-farming community.  (Doc. No. 159, p. 6); <u>see</u> <u>also</u> <u>Daubert</u>, 509 U.S. at 592–93 (noting that one of the indicia of reliability is whether the expert's theory or technique has been subject to peer review).  While courts have struck expert testimony when there is too large of an analytic gap, the undersigned does not find that such a gap exists here. <u>See also</u> <u>Pipitone</u>, 288 F.3d at 244 (discussing that "the factors identified in *Daubert* may or may not pertinent in assessing reliability").  Mowl does not need to show a direct correlation between farm worker and non-farm worker suicide rates to draw an analogy.  Furthermore, Signal has pointed to no studies that Mowl has ignored, and the undersigned finds it unlikely that such studies have ever been conducted.

       c.   *Sufficiency of information and reliability of principles*

Signal next argues that Mowl has not reviewed sufficient information.  Signal faults her for "not consider[ing] the pay data produced by Signal as part of its ESI productions," "failing to request any banking records," and not reviewing the deposition of Sachin Dewan.  (Doc. No. 159, pp. 6–7.)  The undersigned's role, however, is to ensure that expert testimony is "based on

*sufficient* facts or data"—not to ensure that an expert left no stone unturned.  FED. R. EVID. 702.

Here, after reviewing her report, the undersigned finds that Mowl has met this threshold.  Mowl

lists over forty sources that she considered in drafting her report.   Also, a review of her

deposition shows that she had cogent reasons for choosing not to review certain sources.

Furthermore, an argument that an expert "did not review sufficient fats and data goes to the

weight of [its] opinion, to be brought out in cross-examination and resolved by the jury, not to

admissibility."  Suzion Wind Energy Corp. v. Shippers Stevedoring Co., 662 F. Supp. 2d 623,

667 (S.D. Tex. 2009).

> d.  *Conclusion*

Accordingly, Signal's "Motion in Limine to Exclude/Limit Testimony of Amy Mowl"

(Doc. No. 159) is **DENIED**.

## IV. Conclusion

The undersigned finds as follows:

- The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Ronald J. McAlear" (Doc. No. 156) is **GRANTED IN PART**.  McAlear may testify about general industry practices and opine as to whether Signal's practices are consistent with these customs.  However, McAlear may not opine that Signal is a safe company or has an "exemplary safety record";

- The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Virginia Miles" (Doc. No. 151) is **DENIED**;

- The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Donald H. Strobel"  (Doc. No. 152) is **GRANTED** subject to reconsideration should the court at a later time allow the Plaintiffs to file FLSA claims in this case;

- The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Kevin Fox Gotham" (Doc. No. 153) is **GRANTED IN PART**.  Dr. Gotham may opine about the state of housing in Orange, Texas in general and the correlation between available housing and attracting skilled workers (opinions A through D).  However, opinions E and F are struck, and he may not opine as to whether there was "an acute" housing shortage in Orange, Texas, why Signal built the "man camp," whether the Plaintiffs were required or coerced into living at the "man camp," or whether the "man camp" actually benefited the Plaintiffs;

- Signal's "Motion in Limine to Exclude/Limit Testimony of Florence Burke" (Doc. No. 161) is **GRANTED IN PART**.  Burke's opinions shall be limited to those related to general characteristics of human trafficking schemes, and Burke is precluded from testifying as to whether these Plaintiffs were victims of human trafficking or in what ways the facts of this case are similar to other known cases of human trafficking;

- The Plaintiffs' "Amended Motion to Exclude Testimony and Strike the Expert Report of Dr. Louise Shelley" (Doc. No. 168) is **GRANTED IN PART**.  Dr. Shelley's testimony is limited to a discussion of the general elements and characteristics of human trafficking, and she may not opine on whether these Plaintiffs were victims of human trafficking, the credibility of the Plaintiffs, or offer her assessment of the facts of this case;

- Defendants Sachin Dewan and Dewan Consultants Pvt. Ltd.'s "Motion and Incorporated Memorandum to Exclude Expert Witness Testimony" (Doc. No. 162) is **GRANTED** and the undersigned strikes Dr. Shelley's opinions about Dewan;

- The Plaintiffs' "Motion to Exclude Testimony and Strike the Expert Report of Dr. Louise Shelley" (Doc. No. 157), which is nearly identical to their amended motion, is **DENIED AS MOOT**;

- The Plaintiffs' "Motion to Limit the Testimony of Enrique Gonzalez, III" (Doc. No. 155) is **GRANTED**.  The undersigned strikes Opinion II and the six other identified "stray remarks" identified by the Plaintiffs;

- Burnett's "Motion and Memorandum in Support to Exclude Legal Opinion Testimony of Signal's Immigration Law Expert" (Doc. No. 158) is **GRANTED IN PART** and the undersigned strikes opinions III-V.  Moreover, Gonzalez may not offer any testimony as to his opinions of the law, or opinions, legal conclusions, or interpretation of what the evidence establishes.  Gonzalez may, however, discuss the H2-B visa program generally and the general process for obtaining such visas;

- Signal's "Motion in Limine to Exclude/Limit Testimony of Amy Mowl" (Doc. No. 159) is **DENIED**.

## V. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c) (Supp. IV 2011), each party to this action has the right to file objections to this order.  Objections to this order must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within fourteen (14) days after being served with a copy of this report; and (4) be no more than five pages in length.[5]  See 28 U.S.C. § 636(b)(1)(A); FED. R. CIV. P. 72(a); Local Rule CV-72(b).  If timely objections are made, the district court judge will "modify or set aside any part of the order that is clearly erroneous or is contrary to law.  See 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a).

SIGNED this 6th day of February, 2015.

_____
Zack Hawthorn
United States Magistrate Judge

---

[5].  The local rules limit objections to a non-dispositive order to five pages.  See Local Rule CV-72(b). Should any party need additional pages, they must file a motion for leave to exceed page limits.

38